**Page 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
---------------------X
SHENEA JAMES, as Administrator of the
Estate of DEDRICK JAMES, Deceased, and
SHENEA JAMES, Individually,
           Plaintiff,
  - against -
           Case No:
           23-CV-0657
THE UNITED STATES OF AMERICA, CITY OF
ROCHESTER, RPD INVESTIGATOR RICHARD
ARROWOOD, "JOHN DOE RPD OFFICERS 1-10"
(names and number of whom are unknown at
present), MONROE COUNTY SHERIFF TODD
BAXTER, MSCO SERGEANT CHRISTIAN
DEVINNEY, RICHARD ROD, "SHERIFF'S
DEPUTIES 1-10" (names and number of whom
are unknown at present) NYSP
INVESTIGATOR JEFFREY ULATOWSKI and other
unidentified members of the ROCHESTER
POLICE DEPARTMENT, MONROE COUNTY
SHERIFF'S OFFICE, and NEW YORK STATE
POLICE,
           Defendants.
---------------------X

      October 4, 2024
      11:00 A.M.

    DEPOSITION OF RICHARD ARROWOOD, one of
the Defendants herein, taken by the attorney
for the Plaintiff, pursuant to Notice, held
via web conference at the above date and
time before Sharon Cassidy, a Stenotype Reporter
and Notary Public within and for the State of
New York.
      * * * *

                1

**Page 2**

A P P E A R A N C E S:

ROTH & ROTH, LLP
    Attorneys for the Plaintiff
    192 Lexington Avenue, Suite 802
    New York, New York 10016

BY:   ELLIOT SHIELDS, ESQ.


UNITED STATES ATTORNEY'S OFFICE
WESTERN DISTRICT OF NEW YORK
    Attorneys for the Defendant
    The United States of America
    138 Delaware Avenue
    Buffalo, New York 14202

BY:   MICHAEL S. CERRONE, ESQ.


LAW DEPARTMENT OF CITY HALL OF ROCHESTER
    Attorneys for the Defendant
    City of Rochester
    30 Church Street, Room 412A
    Rochester, New York 14614
BY:   JOHN M. CAMPOLIETO, ESQ.

                2

**Page 3**

      FEDERAL STIPULATIONS
    IT IS HEREBY STIPULATED AND AGREED, by
and between the parties hereto, through their
respective Counsel, that the certification,
sealing and filing of the within examination
will be and the same are hereby waived;

    IT IS FURTHER STIPULATED AND AGREED that
all objections, except as to the form of the
question, will be reserved to the time of the
trial;

    IT IS FURTHER STIPULATED AND AGREED that
the within examination may be signed before any
Notary Public with the same force and effect as
if signed and sworn to before the Court.

                3

**Page 4**

    THE REPORTER:  It is hereby
stipulated and agreed by and between
counsel for all parties present that this
deposition is being conducted remotely by
video conference, and that the court
reporter, witness and all counsel are in
separate remote locations and
participating via Zoom or any web
conference meeting platform under the
control of Bee Reporting Agency, Inc.
    It is further stipulated that this
videoconference will not be recorded in
any manner and that any recording without
the express written consent of all
parties shall be considered unauthorized,
in violation of law and shall not be used
for any purpose in this litigation or
otherwise.
    Before I swear in the witness, I
will ask each counsel to stipulate on the
record that I, the court reporter, may
swear in the witness even though I am not
physically in the presence of the witness
and that there is no objection to that at

                4

```
 1
 2         this time, nor will there be an objection
 3      at a future date.
 4              MR. SHIELDS:  No objection.
 5              MR. CAMPOLIETO:  No objection.
 6              MR. CERRONE:  No objection.
 7              THE REPORTER: Mr. Arrowood, can you
 8      please produce government-issued ID?
 9              MR. ARROWOOD:  (Complying.)
10              (Whereupon, the Witness presented
11      government issued ID as identification.)
12              THE REPORTER:  Thank you.
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    5
```

```
 1                       Richard Arrowood
 2         Q.  My understanding before was that they
 3      didn't have a title for Detective; is that
 4      right?
 5         A.  Say that again.
 6         Q.  I just didn't know that there was a
 7      role with the RPD, Detective, you know, just a
 8      label of your job title.  I had this
 9      conversation with other officers I deposed
10      before and they said, oh, no, we don't have the
11      title of Detective at the RPD, so that is why I
12      was confused.
13         A.  Yes, they just changed the title.
14         Q.  From Investigator to Detective?
15         A.  Correct.
16         Q.  So my first question for you is, have
17      you ever given testimony at a civil deposition
18      like this before?
19         A.  Not that I recall.
20         Q.  But you have testified in court in
21      criminal cases?
22         A.  Correct.
23         Q.  I am going to go over some ground
24      rules before we get started.  The most important
25      thing is that you and I don't speak at the same
                                                    7
```

```
 1
 2      R I C H A R D    A R R O W O O D,
 3          The witness herein, having first been
 4      duly sworn or affirmed by Sharon Cassidy, a
 5      Notary Public within and for the State of New
 6      York, was examined and testified as follows:
 7      DIRECT EXAMINATION BY ELLIOT SHIELDS, ESQ.:
 8         Q.  Please state your name for the record.
 9         A.  Richard Arrowood.
10         Q.  Please state your current business
11      address for the record.
12         A.  185 Exchange Boulevard, Rochester, New
13      York.
14         Q.  Good morning, Investigator.
15         A.  Good morning.
16         Q.  Is it Investigator, is that the
17      correct title?
18         A.  As of a few days ago.  It is Detective
19      now.
20         Q.  Detective, does that mean you are no
21      longer with the RPD?
22         A.  Yes, I am still with the RPD.
23         Q.  So did they change the titles for
24      their roles with the RPD then?
25         A.  They changed the name of it.
                                                    6
```

```
 1                       Richard Arrowood
 2      time, and that's for the court reporter to get
 3      everything down in the little book that will be
 4      used at the trial in this case.
 5         A.  Okay.
 6         Q.  If there is anything that I ask you
 7      that you don't understand, please tell me and I
 8      will gladly rephrase my question for you.
 9         A.  Okay.
10         Q.  Can you give me an estimate about how
11      many times you have testified in court before?
12         A.  Hundreds.
13         Q.  Same general rules as when you
14      testified in court.
15         A.  Okay.
16         Q.  Can you tell me everything that you
17      did to prepare for today's deposition?
18         A.  I met with John and reviewed a few
19      reports.
20         Q.  When did you meet with John?  Don't
21      tell me anything you talked about, obviously
22      that is privileged.  When was that meeting?
23         A.  Yesterday.
24         Q.  About how long was it?
25         A.  Half-hour maybe.
                                                    8
```

```
                    Richard Arrowood
   Q.  In preparation for your deposition,
did you speak with anyone else about the case?
   A.  No.
   Q.  Did you ever speak with any other task
force members about this lawsuit?
   A.  I am sure it has come up in
conversation in the past.
   Q.  Have you spoken with any other task
force members about their deposition testimony?
   A.  No.
   Q.  You said that you reviewed a few
reports.  Can you tell me what reports you
reviewed?
   A.  Like the letter -- I don't know the
specific names of it.  It was just general
information about them.
   Q.  Reports from this case?
   A.  Yes.
   Q.  Any reports that you filled out?
   A.  No.
   Q.  I just want to switch to some
background questions.  Can you tell me what your
highest level of education is?
   A.  A few college courses.
                                              9
```

```
                    Richard Arrowood
   Q.  When was that?
   A.  The last time I took a college course,
that I remember, is '08, '09 maybe.
   Q.  Was that while you were working with
the RPD?
   A.  Yes.
   Q.  When did you graduate high school?
   A.  '88.
   Q.  What did you do after you graduated
high school?
   A.  Welder in the navy.
   Q.  How long were you in the navy for?
   A.  Almost six years.
   Q.  And then what did you do after you
completed your time with the navy?
   A.  Police officer in West Virginia.
   Q.  What department was that?
   A.  Capitol Charleston, West Virginia.
   Q.  What year did you start there and what
year did you end there?
   A.  '94 to '96.
   Q.  When you began your career in West
Virginia, did you have to go to the police
academy?
                                             10
```

```
                    Richard Arrowood
   A.  Yes.
   Q.  How long was the police academy there?
   A.  Roughly six months.
   Q.  They taught you general laws of
arrest, police practices, stuff like that?
   A.  Yes.
   Q.  How about like how to conduct search
warrants, best practices for apprehending
suspects?
   A.  Yes.
   Q.  When you were with that department,
did you have any disciplinary issues?
   A.  No, not that I remember.
   Q.  When you were with that department,
did you ever discharge your firearm in the
course of your police duties?
   A.  No.
   Q.  What happened after 1996, where did
you go from there?
   A.  City of Rochester, the police
department.
   Q.  What brought you to the City of
Rochester?
   A.  I married a girl from here.
                                             11
```

```
                    Richard Arrowood
   Q.  So you transferred to the Rochester
Police Department?
   A.  I was hired by the Rochester Police
Department.
   Q.  When you got hired by the Rochester
Police Department, did you have to go to the
academy?
   A.  Yes.
   Q.  How long was that?
   A.  Roughly six months.
   Q.  Was that in 1996 or something else?
   A.  '96.
   Q.  Again, they taught you general best
practices for police officers and how to comply
with the laws in the State of New York?
   A.  Yes.
   Q.  Did that include apprehension of
suspects?
   A.  Yes.
   Q.  Did you have classes on, for example,
executing search warrants?
   A.  Yes.
   Q.  Search warrants, arrest warrants also?
   A.  Yes.
                                             12
```

3 (Pages 9 to 12)

```
                    Richard Arrowood
 1
 2       Q.  After the academy, the next step is
 3   field training; is that right?
 4       A.  Yes.
 5       Q.  How long is field training?
 6       A.  Three phases of four weeks each and
 7   then five phases of two weeks.  So three, three
 8   and a half months, maybe four.
 9       Q.  Do you remember who your FTOs were?
10       A.  Yes.
11       Q.  Can you tell me who they were?
12       A.  Dave Williams, he was first and final.
13   I can picture the other face and then I can't
14   spit out the name.  I could picture the other
15   two officers.  One guy is retired now.  I'm
16   sorry, maybe I will remember later.
17       Q.  Field training, it is general
18   on-the-ground training, learning how to put into
19   practice the things that you learned in the
20   academy, is that generally right?
21       A.  Yes.
22       Q.  For example, did you have to make
23   arrests during your field training?
24       A.  Yes.
25       Q.  Did you have to apply for any arrests
                                                  13
```

```
                    Richard Arrowood
 1
 2       Q.  At some point were you promoted to
 3   Sergeant?
 4       A.  No.  I was offered Sergeant, but I was
 5   already Investigator.
 6       Q.  There are different tracks; is that
 7   right?
 8       A.  I guess that is one way to put it,
 9   yes.
10       Q.  Like an Investigator in the hierarchy
11   is above a Sergeant?
12       A.  Correct.
13       Q.  When were you promoted to
14   Investigator?
15       A.  I believe like September of '20.
16       Q.  So you were with the Marshals at that
17   time?
18       A.  Yes.
19       Q.  When you were promoted to
20   Investigator, did you have to receive any
21   additional training?
22       A.  Yes.
23       Q.  Can you describe that training for me?
24       A.  Field training with another
25   Investigator.
                                                  15
```

```
                    Richard Arrowood
 1
 2   or search warrants during your field training?
 3       A.  I'm sure for warrants, arrest
 4   warrants.  I am pretty sure not for search
 5   warrants.
 6       Q.  And then did you execute those search
 7   warrants during your field training?
 8       A.  I don't remember any specific
 9   instances.
10       Q.  Can you kind of take you me through
11   your career with the RPD after you finished your
12   field training through today?
13       A.  In a nutshell, I did about
14   twenty years on patrol.  I got selected to go to
15   Marshals after -- whatever the math is, '96 to
16   2018, and spent about almost three years, just
17   shy of three years with the Marshals, got made
18   Investigator, spent about a year as Investigator
19   and then they asked me to come back to the
20   Marshals and here I am.
21       Q.  Can you take me through -- when did
22   you first join the Marshals?
23       A.  I believe it was February of '18.
24       Q.  What was your rank at that time?
25       A.  Officer.
                                                  14
```

```
                    Richard Arrowood
 1
 2       Q.  Let me ask you this:  When you joined
 3   the Marshals in 2018, on a day-to-day basis,
 4   would you be working exclusively with the
 5   Marshals or would you also still be doing like
 6   regular RPD duties?
 7       A.  No, I wasn't doing regular RPD duties
 8   anymore.  I was with the Marshals.  I didn't
 9   answer to RPD.
10       Q.  So basically exclusively you would
11   work with the Marshals once you were deputized?
12       A.  Yes.
13       Q.  So how did it work when you did your
14   field training as an Investigator, was that like
15   through the Marshals or did you go back to the
16   RPD for that?
17       A.  Rephrase that.
18       Q.  At the time that you were promoted to
19   an Investigator, were you still working
20   exclusively with the U.S. Marshals?
21       A.  For a year as Investigator with RPD.
22       Q.  I'm sorry, I was confused about that.
23   In 2018, you go to the Marshals, you're an
24   officer and then -- I'm sorry, I forget what
25   year you were promoted to Investigator?
                                                  16
```

**Page 17**

Richard Arrowood

A. I believe September of '20.
Q. In September of '20, you go back to the RPD for about a year?
A. Yes.
Q. Can you just give me a general overview of what your job duties are as an Investigator with the RPD?
A. Investigating crimes, get fielded to patrol investigations. It is usually felonies. It could range from a simple larceny to grand larceny all the way to a shooting.
Q. So your job is to basically dig and get more details about crimes and apprehending suspects?
A. Yes.
Q. Aside from the field training, did you receive any other training about good and accepted police practices for your role as an Investigator?
A. I don't remember any specific other training.
Q. I guess my question is, is there any kind of academy training when you get promoted to Investigator or is it just the field

**Page 18**

Richard Arrowood

training?
A. Field training.
Q. After that field training, is there further ongoing training in your role as an Investigator?
A. Not officially.
Q. When you joined the task force, was there specific training that the task force provided when you first joined the task force?
A. We eventually do get training.
Q. Is there like an academy when you first join?
A. When I first joined, there wasn't.
Q. How did you learn how to perform your job duties as a task force member?
A. Probably a lot of like field training.
Q. Basically on-the-ground training with other members of the task force?
A. In the beginning, yes.
Q. Were you, for example, assigned to someone that would be the equivalent of a field training officer?
A. The deputies always oversaw us. We weren't supposed to be out in -- we weren't

**Page 19**

Richard Arrowood

supposed to be doing operations without a U.S. Marshal being with us.
Q. You said the deputies oversaw you and you weren't supposed to do anything without a U.S. Marshal being with you. I have a couple of follow ups to that. When you say the deputies oversaw you, do you mean the Sheriff's Deputies?
A. U.S. Marshals.
Q. On the team, there is only a few U.S. Marshals, right?
A. Yes.
Q. Would it be fair to say there is more members from the team from the RPD and the Sheriff's Office and the State Police then there are Marshals?
A. Yes.
Q. When you joined the U.S. Marshals, did you receive any rules, regulations, that would be, for example, the equivalent of the Rochester Police Department's general orders?
A. Yes.
Q. What were those called?
A. Just Marshals' -- I don't know the specific name of it. Just U.S. Marshals'

**Page 20**

Richard Arrowood

policies and procedures.
Q. Did they give you a booklet or anything?
A. I don't remember specifically.
Q. Would that have been like their standard operating procedures?
A. Yes.
Q. Is that something that you carry around with you during your job duties to refer to?
A. No.
Q. My understanding is that the police academy for the RPD will be given tests, you know, about your knowledge of the general orders. Was there ever any kind of equivalent to that for the Marshals with their standard operating procedures?
A. I don't remember having a test on them.
Q. Let's back up a little bit. One thing in your role as both an Investigator and with the Marshals would include intelligence gathering; is that fair to say?
MR. CAMPOLIETO: Note my objection.

**Page 21**

Richard Arrowood

2  A. Yes.
3  Q. Would you agree that thorough
4  intelligence gathering is critical for officer
5  safety in operational success?
6  A. Yes.
7  Q. What types of intelligence gathering
8  should be done before executing a high-risk
9  warrant?
10 A. In general?
11 Q. Let's say a high-risk arrest warrant,
12 you know, in general, what do best practices
13 require in terms of intelligence gathering
14 before that warrant is executed?
15     MR. CAMPOLIETO: Objection. You can
16     answer.
17 A. The nature of the crime, the history
18 of the subject, weapons involved, weapons
19 possibly in play, how many, you know, weapons,
20 how many subjects, you know, the background of
21 the location. You know, is it a drug house, is
22 it a regular house.
23 Q. When you are gathering that
24 intelligence, how should the accuracy of that
25 intelligence be verified before the warrant is

**Page 22**

Richard Arrowood

2  executed?
3     MR. CAMPOLIETO: Objection.
4  A. (No response.)
5  Q. When your attorney objects, it is a
6  note for the record, in the written record. If
7  he is going to direct you not to answer, he will
8  make it very explicit and say, don't answer that
9  question. Do you want me to repeat the
10 question?
11 A. Yes.
12 Q. When you are planning an operation and
13 gathering intelligence, what are the best
14 practices for ensuring the accuracy or verifying
15 the accuracy of the intelligence before the
16 warrant is executed to ensure officer safety and
17 operational success?
18 A. The importance of the accuracy, it is
19 very important.
20 Q. I'm sorry, that was a long question.
21 Let me try to make it clearer. What are the
22 best practices for going about verifying the
23 accuracy of the intelligence that has been
24 gathered?
25     MR. CAMPOLIETO: Objection. But you

**Page 23**

Richard Arrowood

2  can answer.
3  A. Can you make it a more simple
4  question? The importance of the accuracy of the
5  intelligence, you know...
6  Q. Sure. When you gather intelligence,
7  you need to make sure it is accurate, correct?
8  A. Correct.
9  Q. How do you do that?
10 A. How do you determine if the
11 information is accurate?
12 Q. Yes. How do you verify the accuracy
13 of the intelligence?
14 A. I have confidence in police reports
15 and prior police reports, you know, reports done
16 by fellow officers and things and I guess you
17 judge by where the information comes from.
18 Q. So one thing is the credibility of the
19 source of the information?
20 A. Yes.
21 Q. I guess what I am getting at is,
22 before you execute a warrant, you know, for
23 officer's safety issues specifically, you want
24 to make sure that there is only one person in a
25 house instead of ten, right?

**Page 24**

Richard Arrowood

2     MR. CAMPOLIETO: Objection.
3  A. Yes, if that could be done.
4  Q. How about operational planning, can
5  you describe the components of comprehensive
6  operational planning for a warrant execution?
7     MR. CAMPOLIETO: Objection.
8  A. We brief it, you gather all of the
9  information, you make sure your guys understand,
10 you know, hopefully have a good understanding of
11 the location and maybe some contingency plans,
12 you know, good coverage, proper amount of guys
13 to, you know, do the task.
14 Q. So one thing you mentioned is an
15 operational plan. How important is it to have a
16 written preoperational plan?
17 A. A written preoperational plan?
18 Q. Yes.
19 A. I don't know if that is important.
20 Q. So the U.S. Marshals' standard
21 operating procedures generally require a written
22 preoperational plan, that is why I am asking
23 that question.
24     MR. CAMPOLIETO: Object to the form
25     of the question.

**Page 25**

Richard Arrowood

Q. Let me ask another question. How often in your time with the Marshals before there is an execution of an arrest warrant is a written preoperational plan completed?
A. Each situation is different. I don't have, you know, specific, when we have something written down and when we don't.
Q. When was the last time that you remember having a written preoperational plan?
A. Like a detailed plan?
Q. Yes.
A. I don't remember.
Q. Anything in writing that is disseminated or briefed to the team?
A. I don't remember.
Q. In your time with the RPD, were you ever on the SWAT team?
A. Yes.
Q. With the SWAT team, there is a preoperational plan, correct?
A. Yes.
Q. That's written out and you guys will sit down and have a brief meeting prior to the operation?

**Page 26**

Richard Arrowood

A. Yes.
Q. Is the similar process followed with the U.S. Marshals?
A. The U.S. Marshals is not a SWAT team.
Q. My question is, is there a similar process where there is a written preoperational plan that you sit down with the U.S. Marshals' team and brief before execution of a warrant?
A. I am sure it happens. I don't remember the last time that happened. We do get involved in more serious cases. I just don't remember specific...
Q. It is fair to say that the process is different, correct?
A. Correct.
Q. It sounds like the process is less formal; is that fair?
MR. CAMPOLIETO: Objection.
A. Yes, I would say it is less formal.
Q. So you don't follow like a standard procedure where there is a written operational plan that is briefed every time a warrant is executed, correct?
A. Correct.

**Page 27**

Richard Arrowood

Q. As opposed to the SWAT team at the RPD where that does happen, correct?
A. Yes.
Q. What contingency measures should be included in an operational plan before an arrest warrant is executed?
MR. CAMPOLIETO: Objection. You can answer.
A. So what contingency plan should be --
Q. What contingency measures, what types of risks should you be thinking about and planning for when you are preparing an operational plan to execute a warrant?
A. Maybe just have a plan if he leaves before you are able to knock on the door or get in a car or walks down the street.
Q. Those are the types of things that should be considered and planned for before you go to execute a warrant, right?
A. Right.
Q. And those are the types of things that should be discussed at a briefing with the team prior to the execution of a warrant, right?
A. Yes.

**Page 28**

Richard Arrowood

Q. How about risk assessment, can you explain the process for conducting a risk assessment before a warrant execution?
A. Repeat that, please.
Q. Sure. What are the types of -- what factors should be considered when evaluating potential dangers prior to executing a warrant?
A. If there is injury, you know, maybe the route to the closest hospital to where you are doing the operation.
Q. I think you mentioned earlier that it is important to know, for example, how many people might be inside the residence. Is that another thing?
A. Yes.
Q. And whether they are potentially armed?
A. Yes.
Q. Anything else like that that could go to officer safety?
A. I am sure I could sit here and ponder answers, I am sure there are other answers to give.
Q. These are the all types of things that

```
                    Richard Arrowood
 1
 2   should go into any comprehensive plan before a
 3   warrant is executed, correct?
 4       A.   Correct.
 5       Q.   That's what best practices would
 6   require?
 7           MR. CAMPOLIETO:  Objection.
 8       A.   Yes.
 9       Q.   Different tactical considerations,
10   like what are the best practices for deciding
11   between entering a residence versus waiting for
12   a suspect to leave to apprehend him?
13       A.   What are some of the best -- repeat
14   that.
15       Q.   Sure.  What are the best practices for
16   deciding between entering a residence to
17   apprehend a suspect versus setting up like
18   surveillance and waiting for that person to
19   leave the residence and apprehend them outside
20   or something else?
21       A.   For example, if he was a shooter, I
22   would probably want to wait for him to leave the
23   house.
24       Q.   When you say if he was a shooter, do
25   you mean if you are going to apprehend somebody
                                                  29
```

```
                    Richard Arrowood
 1
 2   who is a suspected, like, shooter in a crime
 3   that you are going to arrest him for, is that
 4   what you mean?
 5       A.   Yes.
 6       Q.   What other types of things should you
 7   weigh in terms of risks for the different
 8   apprehension methods?
 9       A.   Say that again.
10       Q.   Sure.  How should law enforcement
11   weigh the risks of different apprehension
12   methods?  It sounds like what you are saying --
13       A.   This is more or less what I have
14   answered with the question before that.
15       Q.   I guess my question is really, you
16   said if he was a shooter, that means you might
17   wait for him to leave the residence.  So to me,
18   I guess what that means is, you're saying
19   entering the home would be more dangerous than
20   waiting for him to leave the home?
21       A.   Yes, he would be more comfortable in
22   the house.  I would think there would be more of
23   a risk of us getting shot if we go in the house
24   to confront someone who just shot somebody.  So
25   I would probably wait to have him in an area
                                                  30
```

```
                    Richard Arrowood
 1
 2   where he is not so comfortable like in his own
 3   house where he knows every inch of his house.
 4       Q.   So, in general, it would be safer to
 5   apprehend somebody outside of their house than
 6   inside their house; is that fair?
 7       A.   Every situation is different.  I just
 8   gave an example.  Every situation is different.
 9   Maybe if he is a fast guy on his feet, maybe if
10   he is a fast runner, you know, you want to wait
11   for him to get on foot and he is six-two and one
12   hundred and eighty pounds and he can run, you
13   know, a mile really, really fast and jump
14   fences, you want to take him outside or do you
15   want to get him in the house.
16       Q.   Those are all things that would go
17   into the intelligence gathering and operational
18   planning process, correct?
19       A.   Correct.
20       Q.   Can you describe the ideal command
21   structure for a warrant execution operation?
22           MR. CAMPOLIETO:  Objection.
23       A.   A command structure of a warrant
24   execution operation?
25       Q.   Just an ideal command structure, maybe
                                                  31
```

```
                    Richard Arrowood
 1
 2   not exactly what happens with the Marshals, but,
 3   you know, what should the hierarchy of the team
 4   that is executing the warrant be in?
 5           MR. CAMPOLIETO:  Objection.
 6       A.   I guess the Case Agent would be the
 7   one with last say on the case, I guess, if that
 8   is the hierarchy.
 9       Q.   So there should be someone that is
10   basically in charge?
11           MR. CAMPOLIETO:  Objection.
12       A.   Yes.  I mean, I think the Case Agent
13   has a lot of weigh on the case because it is his
14   case.
15       Q.   On the U.S. Marshals, is there a
16   general hierarchy within the team?
17       A.   A general hierarchy of the team, I
18   would guess that the U.S. Marshals, the Deputy
19   U.S. Marshal on a day-to-day basis, you know,
20   it's a U.S. Marshals' team, so I would venture
21   to say they are the ones that are more or less
22   in charge.
23       Q.   So with the RPD SWAT team, there is
24   like the SWAT team commander, right?
25       A.   Yes.
                                                  32
```

**Page 33**

Richard Arrowood

Q. Was that Aaron Springer when you were on the team or somebody else?
A. Yes.
Q. So Springer would have been the commanding officer, everything would have to be cleared by him at that time for the SWAT team?
A. I think it was Baxter and then Eric Paul.
Q. So whoever it was, they had the final say on any SWAT team operation when you were a SWAT commander, right?
A. On a SWAT team, they would have the say.
Q. Is there any equivalent person on the U.S. Marshals' task force?
MR. CAMPOLIETO: Objection.
A. The Marshal.
Q. You mean like the person that is actually not out in the field with you?
A. I mean, you are asking me about the hierarchy of the U.S. Marshals. The U.S. Marshals of the City of Rochester is the guy.
Q. And then in the SWAT team, there would be like an assistant commander and then there

**Page 34**

Richard Arrowood

would be team leaders. Is there any similar hierarchy in the Marshals' task force?
MR. CAMPOLIETO: Objection.
A. Not that I am aware of.
Q. For example, on the task force, do you have any specific designated role?
A. I am the -- I would say my role is developed in being the surveillance guy.
Q. Is that an informal role, like you don't have a title written down on a piece of paper as the surveillance guy?
A. Yes.
Q. Is that kind of how the team operates like informally like that?
A. With me, I guess.
Q. I guess what I am saying is, people kind of just develop into specified roles that they occupy informally instead of having like a commanding officer designate them officially into some specific role; is that fair to say?
MR. CAMPOLIETO: Objection.
A. With me, I would say it's fair to say.
Q. Like there is not like an entry team and a perimeter team for the U.S. Marshals?

**Page 35**

Richard Arrowood

A. No, not on paper.
Q. But in practice, is that how it works?
A. Skill levels, people's skill levels, you know, different people's skill levels I would say comes into play.
Q. Is there like a designated tactical leader?
A. On paper, there is not a designated leader.
Q. But that is not on paper anywhere, that is kind of informally how it has been decided?
A. I would agree with that.
Q. For example, there is no requirement that DeVinney like signoff on operational plans before a warrant is executed?
MR. CAMPOLIETO: Objection. You can answer, if you know.
A. I don't know.
Q. So as far as you know, there's not?
A. What was the question?
Q. As far as you know, there's no requirement that DeVinney signoff on operational plans before a warrant is executed?

**Page 36**

Richard Arrowood

A. He doesn't officially have to signoff on an operational plan.
Q. You said that you have gotten some training since you've joined the U.S. Marshals. Can you describe what types of training task force members received for warrant executions?
A. Usually attend annual training out of state. There's a lot of shooting, a lot of room entry techniques. Periodically throughout the year DeVinney will conduct training with us, the same, vehicle operations, entry operations, shooting.
Q. How often does the DeVinney training occur?
A. Bi-monthly, sometimes monthly.
Q. Do you do like scenario based exercises for warrant executions?
MR. CAMPOLIETO: Objection.
A. Yes, we do scenario based as well.
Q. Can you kind of describe that for me?
A. You get a scenario, you get, you know, roughly seeing like a man with a gun and shots fired and, you know, you've got to react to it.
Q. Do you have like a facility where you

**Page 37**

1  Richard Arrowood
2  will practice warrant execution?
3  A. There is no set facilities. It is
4  whatever is available for them to find.
5  Q. Like the training facilities or
6  whatever the normal training facilities in the
7  area?
8  A. Yes.
9  Q. Can you tell me how many times you
10 have discharged your firearm in your law
11 enforcement career?
12 A. Separate incidents, maybe five.
13 Q. I think I know about two of them. So
14 you shot at a dog in 2017, right, were you
15 including that?
16 A. Yes.
17 Q. And then there was the incident in
18 Buffalo on June 19, 2020?
19 A. Yes, Buffalo area.
20 Q. Can you tell me about the other three
21 incidents?
22 A. Deer.
23 Q. All deer?
24 A. Yes.
25 Q. Like a deer that gets hit by a car and

**Page 38**

1  Richard Arrowood
2  needs to be put out of its misery basically?
3  A. I think all three of them were hit by
4  a car.
5  Q. So the only non-deer incidents was the
6  dog and the Smith incident?
7  A. Yes, that I recall.
8  Q. Can you walk us through the planning
9  process for the Dana Smith operation in Buffalo?
10 A. Walk through the planning operation?
11 Q. Yes. So my understanding is that
12 Mr. Smith was tracked to a house in the Buffalo
13 area and the task force executed a warrant
14 operation there; is that right?
15 A. Yes.
16 Q. Can you tell me about the
17 investigation and planning process prior to the
18 execution of the warrant in that case?
19 A. Briefed by the MSCO guys on the case,
20 you know, the serious violence of the case. It
21 was a pretty brutal murder. We learned that he
22 was in Niagara Falls, we met up there and
23 briefed and sat it. I believe we went back and
24 I believe we briefed it again and sat it and
25 then, you know...

**Page 39**

1  Richard Arrowood
2  Q. When you -- I am unfamiliar with some
3  of the terms. So when you say you sat it, does
4  that mean like surveillance or something else?
5  A. Conduct a surveillance.
6  Q. What kind of surveillance was
7  conducted?
8  A. Eyes, you know, visible surveillance
9  of a person.
10 Q. To make sure that he was at the
11 location?
12 A. Yes.
13 Q. Do you know if there was a written
14 operational plan that was created for that
15 warrant execution?
16 A. I don't remember making up one, so I
17 am assuming, no, there wasn't one.
18 Q. You said it was briefed a couple of
19 times with the team?
20 A. Yes.
21 Q. Earlier you said if there was a
22 dangerous shooter, that might be an instance
23 where you would wait for the suspect to leave
24 the residence. Is that something that was
25 considered in the Dana Smith incident?

**Page 40**

1  Richard Arrowood
2  A. So simplify that question again.
3  Q. Yes. When we were discussing various
4  options earlier, one thing I believe you
5  testified to was that if the person was a
6  shooter, that might be an instance where you
7  would wait for them to leave the residence to
8  apprehend them instead of going into the house.
9  So my question is, is that something
10 you considered with the Dana Smith incident,
11 waiting for him to leave the house to make the
12 apprehension versus making entry?
13 A. So he did leave and went back and then
14 the order was given to surround the house. That
15 wasn't my order.
16 Q. Who gave that order?
17 A. The Marshal.
18 Q. So the Marshal for the -- what is it,
19 the New Jersey Atlantic Task Force, is that your
20 task force?
21 A. Yes.
22 Q. So like the actual Marshal for that
23 area's task force said to go and surround the
24 perimeter?
25 A. Yes.

10 (Pages 37 to 40)

```
                    Richard Arrowood
 1
 2      Q.  Is it normal that that Marshal is
 3  involved in the warrant apprehensions?
 4      A.  He sometimes periodically is involved.
 5      Q.  When he is involved, then he would be
 6  like the commanding officer?
 7      A.  He is the Marshal.
 8      Q.  Do you know why he was involved there;
 9  was it because it was a more dangerous
10  apprehension?
11          MR. CAMPOLIETO:  Objection.
12      A.  I don't know why.
13      Q.  Do you know if there were any other
14  types of risk assessments conducted before that
15  warrant was executed since it was a dangerous
16  suspect that you were apprehending?
17      A.  I am sure we had risk assessments, but
18  I don't remember specifically.
19      Q.  Do you remember any specifics of any
20  of the briefings, what types of things you
21  talked about before the warrant was executed?
22      A.  Three or four years, I don't remember
23  specifics.
24      Q.  Do you remember if there were any
25  alternative methods of apprehending him that
                                              41
```

```
                    Richard Arrowood
 1
 2  were considered, such as waiting for him to
 3  leave the house?
 4          MR. CAMPOLIETO:  Objection.  The
 5      previous answer, he stated he left the
 6      house.
 7      A.  He did leave the house.
 8      Q.  You said he left the house and he went
 9  back in.  I guess my question is -- the
10  apprehension was made when he was inside the
11  house.  So was there ever a consideration of
12  trying to apprehend him, like waiting for him to
13  leave the house again to apprehend him?
14      A.  I remember there was concern that he
15  was spooked, which means he was, you know, alert
16  and we believed he was alerted to the police
17  presence there.  I remember there being fear
18  that he would run and get out and get away from
19  us.  I believe that is why the order was given
20  to surround the house.
21      Q.  Earlier you said that your role had
22  sort of developed into like a surveillance type
23  of role, but in this case you made entry into
24  the house.  Why was your role different in this
25  situation?
                                              42
```

```
                    Richard Arrowood
 1
 2      A.  When the order was given to surround
 3  the house, I was one of the first guys there, I
 4  was probably the first guy there, and then this
 5  guy came and walked outside and looked down the
 6  street and I saw him and he runs back in the
 7  house and I am right after him in pursuit.
 8      Q.  Can you take me through the incident
 9  from there, the order is given, you show up at
10  the house, you see him and then you chase him
11  into the house?
12      A.  I think I just said that.
13      Q.  Can you just take me through what
14  happened from there?
15      A.  Me and Chuck chased him in the house,
16  he is hiding behind the door, digging in his
17  crotch for something and then he runs to the
18  back of the house and then there was a struggle
19  there.  Then he runs to the front, the back of
20  the house and there is a struggle there.  Then,
21  you know, I am put in a position where I had to
22  discharge my firearm and he was taken into
23  custody.
24      Q.  Can you explain a little bit more
25  about -- you said you were put in a situation
                                              43
```

```
                    Richard Arrowood
 1
 2  where you had to discharge your firearm.  Can
 3  you explain that, like what happened?
 4      A.  So he pulled a knife out.  I could
 5  have broken away from him, I was on my feet,
 6  Chuck wasn't, he was wrestling with the guy.  He
 7  was like in a sitting position.  He couldn't get
 8  away from Smith and I had to make the decision
 9  to protect my partner.
10      Q.  So they were in a physical altercation
11  and Smith had a knife and so that would present
12  a deadly force and so you shot him?
13          MR. CAMPOLIETO:  Objection.  You can
14      answer.
15      A.  Yes.
16      Q.  Were you conducting the surveillance
17  prior to the execution of the warrant or
18  somebody else?
19      A.  Yes, I was conducting the
20  surveillance.  I don't know if anybody else was
21  conducting surveillance, but I was conducting
22  surveillance.
23      Q.  So that's why you were there first?
24          MR. CAMPOLIETO:  Objection.
25      A.  Yes.
                                              44
```

**Page 45**

Richard Arrowood

Q. After the incident, was there like a formal debriefing conducted?
A. There were a formal debriefing afterwards.
Q. Did that result in like an after-action report being written?
A. I don't know.
Q. Is it typical for the U.S. Marshals Task Force to write after-action reports?
   MR. CAMPOLIETO: Objection. You can answer.
A. So is it typical that the U.S. Marshals write an action report? I am not a supervisor with the Marshals, so I don't know.
Q. I guess my understanding is from your testimony and other member's testimony is that there is not really a supervisor on the team, right, so you would all kind of be in the position to write an after-action report, right?
A. I wasn't tasked with writing an after-action report and I don't know who was or if that was tasked out.
Q. In your time with the U.S. Marshals Task Force, have you ever been tasked with

**Page 46**

Richard Arrowood

writing an after-action report?
A. Not that I remember, no.
Q. After the Smith incident, were there any discussions held about how the operation could have been conducted differently or more safely?
   MR. CAMPOLIETO: Objection.
A. I don't remember having a conversation like that afterwards, no.
Q. Were there any changes made to the task force's policies or practices after that incident?
A. Not that I am aware of.
Q. How did that incident inform your approach to future operations, if at all?
A. I don't think it had a direct impact on my operations.
Q. I mean, I just assumed that being involved in a shooting is always a difficult thing, no matter what, right? I mean, that is why I asked if it changed your approach in any way to try and be avoid being put in that position again.
   MR. CAMPOLIETO: Objection.

**Page 47**

Richard Arrowood

A. It is one of the bad parts of the job. It didn't change anything.
Q. After that incident, you were given several awards, correct?
A. Several? I might have gotten one or two.
Q. One was the Distinguished Service Award; is that right?
A. I don't remember.
Q. Let's talk about the Dedrick James' operation. Do you remember what intelligence was gathered about Dedrick James about the warrant execution?
A. I just remember having a brief understanding of the incident that made him wanted.
Q. When you said that made him wanted, do you mean, like, what led to the issuance of the warrant for his arrest?
A. Yes, what he did.
Q. Do you know if there was like a full background check that was conducted?
A. I don't know.
Q. My understanding is that you were

**Page 48**

Richard Arrowood

involved in the surveillance prior to the execution of the warrant; is that right?
A. Yes.
Q. Can you take me through what your role was in the warrant execution, in the surveillance that you did? Just tell me what happened basically.
A. I remember assisting with the surveillance and then the decision was made to, you know, approach the house and I assisted by going into the backyard and take a perimeter point to keep contain of the house.
Q. Let's back up a little bit. Was there a briefing beforehand?
A. Before the case or before approaching the house?
Q. Let me back up a little bit, those are bad questions. When you first became aware of the warrant, was that like at a briefing with the team or something else?
A. I don't remember. I am not saying there wasn't, I just don't remember the briefing.
Q. How does that typically work when

```
                    Richard Arrowood
 1
 2   someone brings a warrant to the rest of the
 3   team, how is the rest of the team made aware of
 4   it?
 5       A.  My common practice is -- well, common
 6   practice is we meet up somewhere and discuss the
 7   case.
 8       Q.  Is there any kind of written rule
 9   about how information about a warrant is
10   disseminated to the rest of the team?
11       A.  A specific rule about how it is
12   disseminated?
13       Q.  Yes, like a rule that, hey, you need
14   to type up a one-page memo with certain
15   information contained in it and give a copy of
16   that memo to all of the team members.  Is there
17   any kind of rule like that?
18       A.  No.
19       Q.  So the way it would normally be done
20   is getting together in person to discuss the
21   warrant?
22       A.  I'm sorry, could you repeat that?
23       Q.  The question was, the way that the
24   information about the warrant would be
25   communicated to the rest of the team members
```

49

```
                    Richard Arrowood
 1
 2   would be gathering in person to discuss the
 3   warrant; is that right?
 4       A.  There is a common practice of
 5   disseminating information.  The common practice
 6   would be to meet up and discuss the case.
 7       Q.  That is like when the case first comes
 8   into the assigned officer?
 9       A.  I believe that would be, yes, that
10   would be a good idea.
11       Q.  So you're one of the RPD guys.  So RPD
12   has a warrant that they want to pass onto the
13   task force, they contact you, you give the
14   warrant and then you tell the rest of the team
15   members about it?
16       A.  Yes.
17       Q.  So that would be like before --
18   normally that would occur before the first day
19   -- normally that would occur before the day that
20   the warrant is executed, you would get it, you
21   would do some intelligence, gathering
22   surveillance and then later execute the warrant,
23   is that the general process or something else?
24           MR. CAMPOLIETO:  Objection.  You can
25       answer.
```

50

```
                    Richard Arrowood
 1
 2       A.  Yes, you get the case, you know, you
 3   let the guys know and you come up with a plan
 4   and you tell the rest of the guys about it.
 5       Q.  The person that comes up with the plan
 6   would be like the assigned team member?
 7       A.  Whoever the case agent would be would
 8   be the guy who would probably to decide on how
 9   to pursue the case.
10       Q.  So the case agent would decide how to
11   pursue the case.  Does that have to be signed
12   off by any particular member of the team or like
13   a vote of all of the team members or anything
14   like that?
15       A.  I am not aware of signing off on
16   anything.
17       Q.  Do you know if there was a written
18   operational plan created for the Dedrick James'
19   incident?
20       A.  I don't know.  Not that I am aware of.
21       Q.  Do you know how the decision was made
22   to enter the James' residence?
23       A.  Do I know how the decision was made to
24   enter the residence?
25       Q.  Yes.  I guess it was a bad question.
```

51

```
                    Richard Arrowood
 1
 2   Versus some other method of apprehension, like
 3   waiting for him to leave the house?
 4       A.  Well, we conducted surveillance for, I
 5   mean, for a time.
 6       Q.  On the day of the incident, how were
 7   you asked to conduct surveillance?
 8       A.  How?  Watching it.
 9       Q.  I mean, did another team member
10   contact you and ask you to go to the residence
11   to do surveillance?
12       A.  Yes.
13       Q.  Who was that?
14       A.  Jeff.
15       Q.  He was the Case Agent?
16       A.  Yes.
17       Q.  He testified basically that he was
18   doing surveillance and then he had to go to do a
19   random drug test, so he asked you to come and do
20   the surveillance; is that right?
21       A.  That is possibly how it went down.
22       Q.  Do you remember how long you were
23   conducting surveillance for?
24       A.  For a time in the morning, I believe.
25       Q.  Do you remember what you were looking
```

52

13 (Pages 49 to 52)

## Page 53

```
                Richard Arrowood
 1
 2   for when you were conducting the surveillance?
 3      A.  I remember there was a car involved.
 4      Q.  Did you ever see Dedrick James enter
 5   or leave the house?
 6      A.  I don't remember seeing him entering
 7   or leaving.  I don't think so.
 8      Q.  Do you remember seeing his car?
 9      A.  Yes, I believe his car was there.
10      Q.  So the car was there the whole time?
11      A.  I don't know about the whole time.  I
12   believe I remember seeing it.
13      Q.  When you went to the scene, Jeff was
14   there and basically you released him, is that
15   what happened or something else?
16      A.  Well, if he left to go to do a drug
17   test, then, yes, I believe that is a good
18   assumption that I relieved him.
19      Q.  Did he eventually come back?
20      A.  Yes.
21      Q.  Did he relieve you when he came back
22   or what happened when he came back?
23      A.  I don't remember.
24      Q.  Do you remember on the day of the
25   incident if there was another pre-execution
```

## Page 54

```
                Richard Arrowood
 1
 2   briefing with other team members?
 3      A.  I don't remember a pre-execution
 4   briefing.
 5      Q.  How does it work before you execute a
 6   warrant like this, do you guys get together in a
 7   staging area and then approach the house
 8   together or something else?
 9          MR. CAMPOLIETO:  Objection.
10      A.  Every case is different.
11      Q.  Do you remember what happened here?
12      A.  I just remember we were conducting
13   surveillance and I remember we were approaching
14   the house.  I don't remember all of the details.
15      Q.  Do you remember any factors that were
16   considered in assessing the risks of this
17   particular operation?
18      A.  I remember it was a little low level,
19   this guy injured a little kid with a toothbrush
20   by pulling the toothbrush too fast out of his
21   mouth, you know, that was the violence of this
22   case.  It didn't involve a gun, it was not a
23   shooting, you know, it was a pretty low level
24   case, almost something that you would leave to
25   patrol officers, you know.
```

## Page 55

```
                Richard Arrowood
 1
 2      Q.  Do you know why it wasn't left to the
 3   patrol officers?
 4      A.  It was a State Police case, it wasn't
 5   City of Rochester case.
 6      Q.  So would State Police not have had
 7   jurisdiction or something to come and arrest
 8   him?
 9      A.  Would the State Police not have
10   jurisdiction?  Yes, State Police had
11   jurisdiction.
12      Q.  Do you know why the State Police
13   didn't just show up and arrest him?
14      A.  That is what Jeff is, Jeff is State
15   Police.
16      Q.  I guess instead of like referring it
17   to the task force, is there any reason why one
18   of his colleagues from the State Police couldn't
19   just have knocked on the door?
20      A.  He is the State Police guy.  I mean,
21   he is working mostly in the City of Rochester, I
22   mean, send it to him.  That's what I would do.
23      Q.  My understanding is that your team
24   generally gets involved when it's more dangerous
25   warrant situations.  Is that not the case?
```

## Page 56

```
                Richard Arrowood
 1
 2      A.  That is usually the case.  But
 3   different agencies bring on different cases.
 4   You know, it was an assault, so it met the
 5   criteria.  It was a felony assault, it meets the
 6   criteria.  You know, if it doesn't meet the
 7   criteria, if it is like a larceny, like
 8   shoplifting over $1,000 and there was no
 9   violence, I mean, that doesn't meet our
10   criteria.  But since it was an assault second,
11   it met our criteria.
12      Q.  That makes sense.  Do you know if it
13   was ever discussed like trying to apprehend him
14   in a different manner, like waiting for him to
15   get in his car and conducting a controlled
16   traffic stop?
17      A.  I know we were conducting
18   surveillance.  I mean, I don't -- I know it
19   would have been ideal to see him come out and
20   take him.
21      Q.  You don't remember being given
22   instructions when you were doing surveillance to
23   pull him over, if he left the house and got the
24   in car?
25      A.  I don't remember, no.  They wouldn't
```

```
                    Richard Arrowood
 1
 2    be telling me to do that.
 3        Q.   What would you have done if he had
 4    gotten in his car and started to drive away when
 5    you were doing the surveillance?
 6        A.   Alert the rest of the team.
 7        Q.   When a warrant like this is executed,
 8    do team members come with like less lethal
 9    equipment as an option to use, I don't know,
10    like a TASER?
11        A.   So I believe some of the members have
12    TASERS.
13        Q.   Are there any other less lethal
14    options that you guys normally carry during a
15    warrant execution like this?
16        A.   Some of the guys might have batons.
17    Beyond that, I am not aware.
18        Q.   How about like bean bag guns?
19        A.   No, not that I am aware of.
20        Q.   Do you know if there was any
21    designated tactical leader for this operation,
22    other than Ulatowski being the Case Agent?
23        A.   He is the guy that I remember being in
24    charge of the case.
25        Q.   Slightly different question from
                                                    57
```

```
                    Richard Arrowood
 1
 2    before.  Is there like a specific command
 3    structure during the execution of a warrant,
 4    like is it just follow the Case Agent's lead or
 5    something else?
 6        A.   I just remember this being such a low
 7    level case and I remember Jeff being the lead on
 8    this.
 9        Q.   When you say a low level case, that
10    would be like after conducting all of the
11    background information and everything, there was
12    nothing that indicated that it would be a
13    dangerous apprehension --
14            MR. CAMPOLIETO:  Objection.
15        Q.   -- or is that just based on the nature
16    of the crime that he was being arrested for?
17        A.   Again, I didn't do the research and I
18    am answering my questions because of what I know
19    and it's a toothbrush with a little kid, you
20    know, it's a pretty minor case, so I believe
21    that is why the decision was made.
22        Q.   You said during the incident you were
23    part of the perimeter team; is that right?
24        A.   Yes.
25        Q.   Can you take me through the incident,
                                                    58
```

```
                    Richard Arrowood
 1
 2    again, from the approach, you went to the
 3    perimeter and kind of explain what you remember?
 4        A.   I remember walking to the house, going
 5    into the backyard and taking a point at the back
 6    of the house more toward the driveway side or
 7    toward -- if I am looking at the house, I was
 8    more -- I am in the backyard, being at the back
 9    of the house, looking at the house, I was more
10    to the left, that's what I remember.
11        Q.   When you guys are conducting an
12    operation, how do you communicate, by the radio
13    or something else?
14        A.   Radio.
15        Q.   Does the task force have like a
16    special radio or a certain channel that you use?
17        A.   We usually use a tactical channel.
18        Q.   Do you know if that channel is
19    recorded?
20        A.   I don't know.
21        Q.   So you're in the back and then what
22    happens, eventually you -- what happens next,
23    after they approach the front?
24        A.   I was in the back and at the time I
25    remember hearing someone radio that he is
                                                    59
```

```
                    Richard Arrowood
 1
 2    running and it made me more alert.  Nobody came
 3    out a window or anything.  So, you know, I
 4    eventually know that the perimeter was all set
 5    to break down.
 6        Q.   Did you hear the gunshot?
 7        A.   I don't remember hearing the gunshot.
 8        Q.   Could you hear anything else from
 9    within the house?
10        A.   I don't remember, no.  Nothing that I
11    remember.
12        Q.   Did you ever enter the house at all?
13        A.   I could have.  But I specifically
14    don't remember going inside the house.
15        Q.   Did you ever speak with the
16    grandmother?
17        A.   I don't remember talking to her.
18        Q.   Did you ever take any statements from
19    or speak with any other witnesses?
20        A.   I don't remember doing that, no.
21        Q.   After the incident, was there like a
22    debrief meeting?
23        A.   Immediately after, I don't remember
24    having a debrief meeting.  There could have
25    been, but I don't remember.
                                                    60
```

Richard Arrowood

Q. At some point did you guys get together and talk about what happened?
A. I am sure we did. I just don't remember.
Q. As a result of this incident, were there any changes to the protocols of the task force that were made?
A. I don't remember. I don't think there were any changes made.
Q. Are there any changes that you would recommend to improve officer's safety for future warrants based on what happened in this situation?
A. I don't know anything that we could do to make it safer.
Q. At the time of this incident, the task members were not required to wear body cameras, right?
A. Yes, we weren't. I don't think anybody had body cameras back then.
Q. Today, do task force members wear body cameras?
A. I believe the Sheriff's Office wear them and I believe the U.S. Deputies wear them.

61

Richard Arrowood

Q. RPD doesn't wear them?
A. Correct.
Q. Do you know why that is?
A. It's policy that RPD is not issued a camera while in plainclothes details.
Q. I guess I didn't realize that Marshals' assignment was a plainclothes detail, but that is what you are telling me. So my question is, U.S. Marshals' assignment from the RPD is a plainclothes detail?
A. Yes.
Q. Just a few other questions. Have you ever been named as a defendant in any other lawsuits arising from your career as a law enforcement officer?
A. Yes.
Q. How many?
A. The protesting, you know, the protestors, the riots in Rochester.
Q. Do you know if you were just named as a defendant in one of those lawsuits or more than one?
A. I believe I am only named in one of the riot lawsuits.

62

Richard Arrowood

Q. Were you a member of the Mobile Field Force during that time?
A. Yes.
Q. What was your role on the Mobile Field Force at that time?
A. Just another team member.
Q. So you weren't like a supervisor or anything like that?
A. No.
Q. When you were named as a defendant in that lawsuit, did you read a copy of the Complaint that was filed?
A. I believe I looked it over.
Q. Do you recall the allegations?
A. I believe the person alleging wrongdoing was the lady in the wheelchair.
Q. Stephanie Woodward?
A. I believe so.
Q. I just want to show you a copy of the Complaint and ask you one question. Give me one second, I am going to try and share the screen.
MR. CAMPOLIETO: This is the Complaint of the Woodward case?
MR. SHIELDS: Correct.

63

Richard Arrowood

MR. SHIELDS: So this is the Second Amended Complaint that was filed.
Q. Can you see that on your screen?
A. Yes.
Q. My question is, if you can tell, I don't know if you can, if you are depicted in the Complaint, in this picture, if you can tell, if one of these people, one of the police officers is you?
A. It might. I mean, I don't know a hundred percent for sure. But that might be me directly right in the middle.
Q. When you say directly in the middle, do you mean the officer that appears to be closest to Ms. Woodward?
A. Yes. I can't see the face, so I don't know.
Q. Let me ask you this: At the time of the protest, did you have a beard?
A. I don't know.
Q. I mean, I grow a beard and I shave it off periodically. Is that something you do or do you always have a beard or is that something new for you?

64

```
                Richard Arrowood
 1
 2      A.  Lately I have been keeping it.
 3      Q.  But you don't recall in September of
 4  2020 if you had a beard or not?
 5      A.  I mean, during this time, I am not
 6  sure.
 7      Q.  I am going to take that down.  I just
 8  have a couple more questions about that case.
 9          Do you know at the time if the
10  Rochester Police Department had any wheelchair
11  accessible transportation vehicles?
12      A.  I don't know.
13      Q.  Do you recall how Ms. Woodward was
14  transported, if at all, with her wheelchair
15  after her arrest?
16      A.  I didn't do the transport.  I don't
17  know.
18      Q.  Do you recall on that day whether the
19  Sheriff's Deputies were transporting arrestees
20  in County owned transportation vehicles?
21      A.  Say that question again.
22      Q.  So basically Ms. Woodward's allegation
23  in that Complaint is that neither the RPD nor
24  the County of Monroe had wheelchair accessible
25  transportation vehicles and on that day, the
                                               65
```

```
                Richard Arrowood
 1
 2  City had contracted with the County to use
 3  Sheriff's Deputies' vans to transport the
 4  arrestees.  Do you recall that at all, whether
 5  the County Sheriffs had been tasked with
 6  transporting arrestees on that day?
 7      A.  I don't know.
 8      Q.  Do you recall if there were any
 9  discussions among the officers who arrested Ms.
10  Woodward about how she might be transported
11  after her arrest?
12      A.  I don't know.  I wasn't part of the
13  transportation.
14      Q.  Do you recall being part of the
15  arrest?
16      A.  I remember approaching her and dealing
17  with her.
18      Q.  Can you tell me what you remember
19  about approaching her and dealing with her?
20      A.  I remember her being in a wheelchair.
21      Q.  Do you remember anything that you said
22  to her or she said to you?
23      A.  No, I don't remember the specific
24  conversation.
25      Q.  Do you remember any officers saying to
                                               66
```

```
                Richard Arrowood
 1
 2  her, what's wrong with you?
 3      A.  No.
 4      Q.  Do you remember her explaining that
 5  part of her disability is that she has to use
 6  the bathroom frequently?
 7      A.  I just know that she was in a
 8  wheelchair.
 9      Q.  Do you remember any discussion among
10  the officers about potentially transporting her
11  by lifting her out of her wheelchair and placing
12  her in a police vehicle?
13      A.  No, I don't.
14      Q.  In your time with the RPD, have you
15  ever transported a wheelchair user after an
16  arrest?
17          MR. CAMPOLIETO:  Objection.  You can
18      answer.
19      A.  I am sure I have.  I just don't
20  remember.
21          MR. CERRONE:  I want to jump in
22      here.  Discovery is generally pretty
23      broad and open ended in civil cases, but
24      I think we are getting far afield.  I
25      think a certain amount of questions
                                               67
```

```
                Richard Arrowood
 1
 2      concerning the Woodward case would not be
 3      inappropriate.  But getting into the
 4      case, specific questions about that
 5      particular case, that has absolutely
 6      nothing to do with this case, and I would
 7      just respectfully ask plaintiff's counsel
 8      to move on.
 9          MR. SHIELDS:  I am going to move on.
10      My understanding is that for the U.S.
11      Marshals, basically they have to have a
12      clean disciplinary record, so I wanted to
13      get to the point of saying, okay, what
14      happened here and was there any kind of
15      investigation or discipline that was
16      looked into after the incident because I
17      feel like that could potentially impact
18      his membership with the Marshals'
19      service, that is how it is relevant.
20          MR. CAMPOLIETO:  Well, there is no
21      discipline, we know that.  There is no
22      discipline.  If you want to finish up,
23      please go ahead.
24          MR. SHIELDS:  I am almost done.
25      Q.  At the time of the Woodward incident,
                                               68
```

```
                    Richard Arrowood                                    Richard Arrowood
 2   were you aware of any RPD policies or procedures    2   from the United States.  Thank you,
 3   for transporting arrestees with mobility issues     3   Detective.
 4   like Ms. Woodward?                                  4       MR. SHIELDS:  Do you have any
 5       A.  Was I aware of any policies?                5   questions, John?
 6       Q.  Yes.  Do you know if the RPD has any        6       MR. CAMPOLIETO:  No questions.
 7   policies about what you are supposed to do when     7       THE REPORTER:  Counsel, will you be
 8   you arrest a wheelchair user?                       8   ordering a copy of the transcript?
 9       A.  I am sure there is a policy somewhere,      9       MR. CERRONE:  I am taking a copy,
10   but I don't know.  I didn't transport her, I      10   e-mail only.
11   wasn't involved in transporting her.              11       MR. CAMPOLIETO:  I will take a copy,
12       Q.  So what happened after you placed her     12   e-mail and hard copy.
13   under arrest?                                     13       THE REPORTER:  Thank you.
14       MR. CAMPOLIETO:  Objection.  You can          14       (Whereupon, the examination of this
15   answer.                                           15   witness was concluded at 12:40 P.M.)
16       A.  I just remember dealing with her for a    16
17   short time and I believe another officer, you     17
18   know, took over and then I didn't have any more   18
19   contact with her.                                 19
20       Q.  So after the initial contact, you         20
21   weren't involved in any of the decisions about    21
22   getting her to the public safety building?        22
23       A.  I was not involved in any of the          23
24   transporting.  I was not involved in any          24
25   decisionmaking on how to get her there.           25
                                              69                                                71

                    Richard Arrowood                    1
 2       Q.  Are you aware of any changes in RPD's      2             A C K N O W L E D G E M E N T
 3   policies after the Woodward incident or as a      3
 4   result of her lawsuit with respect to                 STATE OF NEW YORK   )
 5   transporting individuals with mobility issues?     4       ss:
 6       MR. CAMPOLIETO:  Objection.  There                COUNTY OF          )
 7   are discussions and there are changes, I          5
 8   don't think that this is the appropriate          6       I, RICHARD ARROWOOD, hereby certify that
 9   witness.  But he can answer it, if he             7   I have read the transcript of my testimony taken
10   can.                                              8   under oath in my deposition of October 4, 2024;
11       A.  I don't know of any changes coming        9   that the transcript is a true, complete and
12   about or because of that.  I don't know.         10   correct record of what was asked, answered and
13       Q.  Is there anything else about the         11   said during this deposition, and that the
14   Dedrick James' incident with respect to changes  12   answers on the record as given by me are true
15   or best practices in warrant operations that we  13   and correct.
16   haven't covered that you would like to add?      14
17       A.  I don't know of any changes because of   15                 _____
18   that incident.                                            RICHARD ARROWOOD
19       Q.  Anything else that is pertinent to the   16
20   incident or your role that we haven't discussed? 17   Subscribed and sworn to before me
21       A.  Not that I am aware of.                  18   this     day of          , 2024.
22       MR. SHIELDS:  Detective, thank you           19
23   for your time.  Those are all of my              20   _____
24   questions for today.                                    Notary Public
25       MR. CERRONE:  I have no questions            21
                                                      22
                                              70      23
                                                      24
                                                      25
                                                                                                   72
```

```
 1
 2                    I N D E X
 3
        EXAMINATION OF       BY           PAGE
 4      Richard Arrowood   Mr. Shields    6-71
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                            73
```

```
 1
 2                 C E R T I F I C A T E
 3        I, SHARON CASSIDY, a Notary Public of the
 4   State of New York do hereby:
 5        That the testimony in the within
 6   proceeding was held before me at the aforesaid
 7   time and place.
 8        That said witness was duly sworn before
 9   the commencement of the testimony, and that he
10   testimony was taken stenographically by me, then
11   transcribed under my supervision, and that the
12   within transcript is a true record of the
13   testimony of said witness.
14        I further certify that I am not related
15   to any of the parties to this action by blood or
16   marriage, that I am not interested directly or
17   indirectly in the matter in controversy, nor am
18   I in the employ of any of the counsel.
19        IN WITNESS WHEREOF, I have hereunto set
20   my hand this 31st day of October, 2024.
21
22
23        _____
              SHARON CASSIDY
24
25
                                            74
```