UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SHENEA JAMES as administrator of the estate
Of DEDRICK JAMES, deceased, and SHENEA
JAMES, individually,

                 Plaintiff,

                                        6:23-CV-6057

v.

THE UNITED STATES OF AMERICA, CITY
OF ROCHESTER, RPD INVESTIGATOR
RICHARD ARROWOOD, et al.,

                 Defendants.

---

**MEMORANDUM OF LAW OF DEFENDANT UNITED STATES OF AMERICA IN
SUPPORT OF ITS SUMMARY JUDGMENT MOTION**

MICHAEL DIGIACOMO
United States Attorney
MICHAEL S. CERRONE
Assistant U.S. Attorney
U.S. Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716-843-5851
michael.cerrone@usdoj.gov

## INTRODUCTION

This Memorandum of Law is submitted on behalf of Defendant United States of America (the "Government") in support of its motion seeking an Order, pursuant to Fed. R. Civ. P. 56, granting summary judgment and dismissing Plaintiff's Amended Complaint in its entirety.

## SUMMARY OF RELEVANT FACTS[1]

On August 25, 2021, Plaintiff's decedent Dedrick James ("James") was charged with felony assault on his two-year old son arising out of an incident that occurred on December 27, 2020 in which James "completely extracted two of his [son's] teeth " "by quickly and forcefully pulling a toothbrush out of [his son's] mouth."  SUF ¶¶ 45-46.  As a result of this assault, James's son suffered respiratory failure, was intubated, was in critical condition, and was treated in the intensive care unit for fourteen days.  SUF ¶¶ 8-37.

After James refused to voluntarily surrender to the New York State Police ("NYSP"), a warrant was issued for his arrest by the Town Justice of Marion, New York.  SUF ¶¶ 38-47.  James's arrest warrant was then referred by the NYSP to the United States Marshals Service ("USMS") New York/New Jersey Regional Fugitive Task Force ("USMS Task Force").  SUF ¶ 48.

Congress authorized the USMS to investigate fugitive matters.  See 28 U.S.C. § 566(e)(1)(B) ("The United States Marshals Service is authorized to . . . investigate such fugitive matters, both within and outside the United States, as directed by the Attorney General.") (emphasis added)).  The statute empowers the USMS to pursue fugitive matters in general, without regard to the state or federal nature of the underlying charges.  The USMS

---

[1] The Court is respectfully referred to the accompanying Statement of Undisputed Facts ("SUF") for a more fulsome recitation of the facts relevant to this motion.

has also been authorized to deputize "federal, state, or local law enforcement officers whenever the law enforcement needs of the U.S. Marshals Service so require" to perform the functions of a Deputy United States Marshal. 28 C.F.R. § 0.112(b).  At the time of the subject incident of September 15, 2021, Rochester Police Department Officer William Baker ("Baker"), Monroe County Deputy Sheriff Christian Devinney ("Devinney"), and NYSP Investigator Jeffrey Ulatowski ("Ulatowski") were deputized as Special Deputy U.S. Marshals as part of the USMS Task Force.  Dkt. # 1, Exh. B.

James resided at his grandmother Betty Ervin's ("Ervin") house at 6 Vinewood Place in Rochester, New York.  SUF ¶¶ 6-7.  At approximately 10:35 a.m. on September 15, 2021, the members of the USMS Task Force approached the residence in order to take James into custody pursuant to his arrest warrant.  SUF ¶¶ 92-100.  Ulatowski knocked on the door.  SUF ¶ 101.  James's grandmother, Ervin, opened the front door.  SUF ¶ 102.  Ulatowski introduced himself and asked if James was home.  SUF ¶ 103.  Ervin said James was home and she would get him.  Ulatowski waited at the threshold of the house.  SUF ¶ 104.  James then exited a room at the rear of the house.  James asked, "Why are you guys looking for me?"  SUF ¶¶ 107-108.  Ulatowski responded, "[m]y name is Jeff, I'm with the state police, and [] we have a warrant for your arrest and we need to take you into custody."  SUF ¶ 109.  James "seemed to become very compliant and walking towards me, at which point, I said, you're doing good Dedrick, keep walking towards me."  SUF ¶ 111.  Then, "as soon as [Ulatowski] grabbed my handcuffs, that's when he kind of spun around and ran to the bathroom."  SUF ¶ 112. Ulatowski, Baker and USMS Deputy Marshal Carlton Smith ("Smith") followed in pursuit of James.  SUF ¶¶ 114-115.  As James was running into the bathroom, Ulatowski then "jumped on his back in order to gain control of him, and then the fluid motion of that led us

to fall into the bathtub." SUF ¶ 117. Ulatowski and James ended up "face down into the bathtub." SUF ¶ 118. James was actively resisting the officers' efforts to restrain him. SUF ¶¶ 119-120.

As Ulatowski was struggling to restrain James, Ulatowski saw "to the right of his ear and directly in my face was the barrel of a gun. That's the first time I saw that gun." SUF ¶ 121. Seeing that James was pointing a gun at Ulatowski's head, Baker then yelled "gun, gun, gun!" SUF ¶ 122. Baker tried to disarm James by grabbing the gun which had a laser sight attached and was casting a red dot on the bathroom wall. SUF ¶ 123. Ulatowski was pushing the gun "[o]ut of the way of my face." SUF ¶ 126. Baker lost his grip on the gun and James was able to get it underneath his body. SUF ¶ 124. Baker then yelled: "I'm going to shoot him! I'm going to shoot him!" SUF ¶ 127. Then suddenly, James's gun discharged. SUF ¶ 128. James then emitted a gurgling sound and went limp. SUF ¶ 129. James shot himself in the chest and he was pronounced dead shortly thereafter. SUF ¶ 132.

## PROCEDURAL HISTORY

Shenea James ("Plaintiff"), Administrator of the Estate of James, commenced this suit in New York State Supreme Court, Monroe County against, among other defendants, Baker, Devinney, and Ulatowski (the "State Action"). Dkt. # 1, ¶ 1, Exh. 1. On January 18, 2023, U.S. Attorney Trini E. Ross certified that (i) Baker, Devinney, and Ulatowski were deputized as Special Deputy U.S. Marshals at the time of the alleged incident; (ii) they were acting within the scope of their deputization with the United States with respect to the claims alleged in the summons and complaint; and (iii) they were deemed to be employees of the United States under the Federal Tort Claims Act ("FTCA"). Dkt. # 1, Exh. B. On January 20, 2023, the State Action was removed to federal court by Baker, Devinney, and Ulatowski.

Dkt. # 1.  On January 27, 2023, Baker, Devinney, and Ulatowski moved to substitute the "Government as defendant in place of Baker, Devinney, and Ulatowski concerning Plaintiff's state law tort claims, pursuant to 28 U.S.C. § 2679(b)(1), and to dismiss the state law tort claims against them for lack of subject matter jurisdiction, pursuant to Fed. R.Civ. P. 12(b)(1). Dkt. # 3.

On February 7, 2023, rather than oppose the motion to dismiss, Plaintiff filed an amended complaint.  Dkt. # 6.  The Amended Complaint added the Government and USMS Deputy Marshal Smith as defendants.  Dkt. # 6, p. 1.  Whereas the Complaint was based solely on claims "under the laws of the state of New York," Dkt. # 1, Exh. 1, ¶ 1, the Amended Complaint asserted claims "pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) and the Federal Tort Claims Act," as well as "under the laws of the state of New York."  Dkt. # 6, ¶ 1.  Specifically, Plaintiff's first and second causes of action were asserted under <u>Bivens</u> for excessive force and failure to intervene against Smith, Baker, and Ulatowski.  Dkt. # 6, pp. 14-15.  The third through fifth causes of action were asserted under the FTCA against the Government for assault and battery, negligent planning, and negligence.  Dkt. # 6, pp. 16-18.  The sixth and seventh causes of action were asserted under 42 U.S.C. § 1983 for excessive force and failure to intervene against Baker and Ulatowski.  Dkt. # 6, pp. 20-21.  The eighth and fourteenth causes of action were asserted against Monroe County Sheriff Todd Baxter.  Dkt. # 6, pp. 22, 28.  The ninth through thirteenth causes of action were asserted against all Defendants under New York state law for, respectively, negligent planning, wrongful death, negligence, assault and battery, and failure to intervene.  Dkt. # 6, pp. 23-28.

On February 9, 2023, the Government, Smith, Baker, Devinney, and Ulatowski moved (i) to substitute the Government as defendant in place of Smith, Baker, Devinney, and Ulatowski concerning Plaintiff's state law tort claims, pursuant to 28 U.S.C. § 2679(b)(1); (ii) to dismiss the state law tort claims against Smith, Baker, Devinney, and Ulatowski for lack of subject matter jurisdiction; (iii) to dismiss the claims asserted against Baker, Devinney, and Ulatowski under 42 U.S.C. § 1983; (iv) to dismiss the Bivens claims asserted against Smith, Baker, Devinney, and Ulatowski; and (v) to dismiss the negligent planning and failure to intervene claims. Dkt # 7-1. In responding to the motion to dismiss, Plaintiff conceded the dismissal of the Bivens claims and the substitution of the Government for Smith, but challenged whether the U.S. Attorney's certification of Baker, Devinney, and Ulatowski was proper, and challenged the other aspects of the Government's motion. Dkt. # 21, p. 6.

On May 11, 2023, District Judge David G. Larimer (now retired) granted the Government's motion to dismiss in its entirety. Dkt. # 21. The Court upheld the certification of Baker, Devinney, and Ulatowski and ordered the substitution of the Government for them (as well as for Smith). Dkt. # 21, pp. 7-15. The Court ordered that all claims against Smith, Baker, Devinney, and Ulatowski be dismissed. Dkt. # 21, pp. 15-16. The Court also dismissed the negligent planning and failure to intervene claims against the Government. Dkt. # 21, pp. 16-19. Thus, the claims that remain against the Government are Plaintiff's third and twelfth causes of action for assault and battery, fifth and eleventh causes of action for negligence, and tenth cause of action for wrongful death. The only other remaining defendant is RPD Officer Richard Arrowood who, from time to time, has been deputized as a Special Deputy U.S. Marshal on the USMS Task Force but his deputization was not in effect at the time of the September 15, 2021 incident.

## SUMMARY OF ARGUMENT

Plaintiff's negligence claims are meritless for two reasons. First, Plaintiff's negligence claims should be dismissed under the law of the case doctrine. Plaintiff alleged in his interrogatory answers that the Government was negligent by: (i) failing to develop a formal operational plan for execution of the arrest warrant; (ii) failing to conduct an adequate risk assessment prior to the incident; (iii) failing to devise a plan for warrant execution that included safer, non-lethal alternatives for apprehending James; and (iv) failing to evaluate alternative arrest strategies such as apprehending James outside of his residence. Exhibit 21, pp. 3-4. Thus, Plaintiff's interrogatory answers establish that Plaintiff's "negligence" claims are in actuality "negligent planning" claims. Since the Court has already dismissed Plaintiff's negligent planning claims, Plaintiff's negligence claims, which are based entirely on a negligent planning theory, should be dismissed under the law of the case doctrine.

Second, Plaintiff's negligence claims should be dismissed under the FTCA's discretionary function exception. The FTCA's discretionary function exception bars "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The Supreme Court has established a two-part test for determining whether a claim is barred by the discretionary function exception: (i) whether the act "involv[es] an element of judgment or choice," United States v. Gaubert, 499 U.S. 315, 322 (1991); and (ii) "whether that judgment is of the kind that the discretionary function exception was designed to shield." Gaubert, 499 U.S. at 322-23. Here, there are no mandatory statutory, regulatory, or policy directives that govern the manner in which a USMS task force locates individuals, plans for,

or executes arrest warrants.  The relevant policy directives, in fact, give USMS officers wide discretion.  For example, the relevant USMS policy directive states that "[w]hen the investigation develops information that the fugitive is located in a specific private premises, entry into the premises *may be* accomplished in any of the following ways …."  Exhibit C (emphasis added).  With respect to the second element of the discretionary function test, the federal courts have held – in dozens of similar cases which will be summarized below – that law enforcement tactics used in apprehending fugitives are exactly the type of action that the discretionary function exception was designed to shield.

Plaintiff's battery claim should also be dismissed.  While many battery claims involve he said-he said scenarios that implicate issues of fact requiring a trial, the Second Circuit and the district courts in this Circuit have often granted summary judgment in law enforcement use of force cases.  In fact, the Second Circuit has held that it is reasonable as a matter of law for a police officer to tackle a suspect who is resisting arrest and attempting to flee.  Here, the USMS task force officers came to James's residence to arrest him pursuant to a valid arrest warrant after James refused to voluntarily surrender.  The USMS task force officers knocked on the front door of James's residence.  After entering the residence, the USMS task force officers identified themselves and informed James that they had a warrant for his arrest.  After initially appearing to cooperate, James ran away from the officers toward the back of his residence.  As James was fleeing, Ulatowski then jumped on James's back and their momentum caused them to fall into the bathtub.  The USMS task force officers then used their hands and bodies in an attempt to control James.  The USMS task force officers did not use any weapon during this encounter.  After James pointed a loaded gun at Ulatowski's head, the officers struggled to gain control of the gun, but James managed to pull the gun

under his body wherein he shot and killed himself.  In sum, the USMS task force officers simply did nothing wrong.  James's death was caused, unfortunately, by his actions and his actions alone – violently assaulting his son, failing to voluntarily surrender to the NYSP, fleeing from the USMS task officers when they entered his residence, resisting arrest after he attempted to flee from the officers, pointing a loaded gun at the officers, and, finally, shooting himself.

## ARGUMENT

### Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The Court should grant summary judgment if, after considering the evidence in the light most favorable to the non-moving party, the Court finds that no rational jury could find in favor of that party."  Boyd v. City of Buffalo, No. 22-CV-00519, 2025 WL 92362, at *5 (W.D.N.Y. Jan. 14, 2025) (citation omitted) (Vacca, J.).  "The moving party bears the burden of showing the absence of a genuine dispute as to any material fact."  Boyd, 2025 WL 92362, at *5 (quoting Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014)) (internal quotation marks omitted). "Once the moving party has met its burden, the opposing party 'must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation.'" Boyd, 2025 WL 92362, at *5 (quoting Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 44 (2d Cir. 2015).  "Specifically, the non-moving party 'must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.'"

Boyd, 2025 WL 92362, at *5 (quoting Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011)).

**POINT I**

**SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING PLAINTIFF'S NEGLIGENCE CLAIMS**

Plaintiff brings this action pursuant to the Federal Tort Claims Act ("FTCA"). Under the FTCA, courts are bound to apply the substantive tort law of the state where the alleged tort occurred. Richards v. United States, 369 U.S. 1, 10-15, 82 S.Ct. 585, 7 L.Ed. 2d 492 (1962). It is undisputed here that all relevant events occurred in New York. Accordingly, New York substantive tort law applies. Rambarrat v. United States, 227 Fed. Appx. 82, 83 (2d Cir. 2007) (summary order). Under New York law, the elements of a negligence claim are: (1) defendant owed plaintiff a duty of care; (2) defendant breached the duty of care; and (3) defendant's breach of the duty of care caused plaintiff's injury. Kwitek v. U.S., No. 07-CV-826, 2010 WL 3992192 at * 9 (W.D.N.Y. Oct. 12, 2010).

**A. Plaintiff's Negligence Claims Must Be Dismissed Under the Law of the Case**

"Under the law of the case doctrine, a decision on an issue of law made at one stage of the case becomes binding precedent to be followed in subsequent stages of the same litigation." Panczykowski v. Laborers Int'l Union of N. Am., No. 97-CV-0036A, 2000 WL 387602, at *11 (W.D.N.Y. Mar. 31, 2000), aff'd sub nom. Panczykowski v. Laborers' Int'l Union of N. Am., 2 F. App'x 157 (2d Cir. 2001) (citing Prescatore v. Pan American World Airways, Inc., 97 F.3d 1, 7–8 (2d Cir.1996) and Liona Corporation v. PCH Associates, 949 F.2d 585, 592 (2d Cir.1991)). "The purpose of law of the case rules is 'to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.'" Panczykowski, 2000 WL 387602, at *11 (quoting Liona Corp., 949 F.2d at 592).

While the law of the case doctrine is discretionary, it "counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Jackson v. New York State, 523 Fed.Appx. 67, 69 (2d Cir.2013) (summary order).

Here, Plaintiff's fifth and eleventh causes of action for negligence remain in this case. In her interrogatory answers, Plaintiff alleges that the Government was negligent by: (i) failing to develop a formal operational plan for execution of the arrest warrant; (ii) failing to conduct an adequate risk assessment prior to the incident; (iii) failing to devise a plan for warrant execution that included safer, non-lethal alternatives for apprehending James; and (iv) failing to evaluate alternative arrest strategies such as apprehending James outside of his residence. Exhibit 21, pp. 3-4. Essentially, Plaintiff's negligence theories all fall under the rubric of negligent planning. Indeed, in her Amended Complaint, Plaintiff's fifth and eleventh causes of action (Dkt. # 6, ¶¶ 141, 191) cite to the same case, "*Ferreira v. City of Binghamton*, 2022 NY Slip Op 01953 [Mar. 23, 2022]," that Plaintiff cites in support of her fourth and ninth causes of action that are explicitly labeled as "negligent planning" claims and which Judge Larimer already dismissed. Dkt. # 6, ¶¶ 126, 174; Dkt. # 21, pp. 16-18. Since Plaintiff's "negligence" claims are alleged and described by Plaintiff as negligent planning claims, those claims should be dismissed under the law of the case.[2]

---

[2] It should be noted that Judge Larimer, in dismissing the claims brought by Plaintiff against Monroe County on a negligent training theory, held that:

> [P]laintiff's assertion that Baxter is not entitled to immunity presupposes that there was a "safer plan" that should have been used to effectuate James's arrest, and that Baxter should have trained his deputies about such a hypothetical plan, or at least trained them how to devise a safer plan themselves. The facts alleged do not plausibly support that assertion.

## B. Plaintiff's Negligence Claims Should be Dismissed Under the FTCA's Discretionary Function Exception

Moreover, even if the law of the case doctrine did not require dismissal of Plaintiff's negligence claims, the discretionary function exception to the FTCA would require dismissal. Absent a waiver, sovereign immunity shields the federal government, its agencies, and employees from suit. FDIC v. Meyer, 510 U.S. 471, 475 (1994) (citing Loeffler v. Frank, 486 U.S. 549, 554 (1988)); see also United States v. Mitchell, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").

With its passage of the FTCA in 1946, Congress "waived sovereign immunity from suit for certain specified torts of federal employees." Dalehite v. United States, 346 U.S. 15, 17 (1953). "This waiver, however, operates subject to numerous conditions, each of which must be satisfied for a court to exercise jurisdiction." Adeleke v. United States, 355 F.3d 144, 153 (2d Cir. 2004). Exempted from the FTCA's waiver of sovereign immunity are the classes of claims contained in section 2680, including the discretionary function exception which bars "[a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception is "a form of retained sovereign immunity. As a result, the

---

> In fact, the allegations indicate that the method of execution was fairly straightforward: the officers knew that the subject of the warrant, James, was inside the house, they went to the door, James's grandmother opened the door, James saw the officers and ran farther into the house, they followed, caught up with James, and a struggle ensued, in which James was shot. I see no basis to contend that the unfortunate outcome of these events could fairly be attributed to Baxter's inadequate training of his deputies.

Dkt. # 29; James v. City of Rochester, No. 23-CV-6057DGL, 2023 WL 4413972, at *4 (W.D.N.Y. July 10, 2023).

[FTCA's] waiver of federal sovereign immunity does not encompass actions based upon the performance of, or failure to perform, discretionary functions." In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169, 190 (2d Cir. 2008). "Because the FTCA is structured as a grant of subject matter jurisdiction to the federal courts, a finding that the discretionary function exception applies is tantamount to holding that the court lacks jurisdiction." Caban v. United States, 671 F.2d 1230, 1235 n.5 (2d Cir. 1982) (citation omitted).

The Supreme Court has enunciated a two-part test for determining whether a claim is barred by the discretionary function exception. First, courts must determine whether the act "involv[es] an element of judgment or choice." Gaubert, 499 U.S. at 322. Pursuant to this first part, courts look to whether "a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow[.]" Gaubert, 499 U.S. at 322 (quoting Berkovitz v. United States, 486 U.S. 531, 536 (1988)). Second, if the conduct does involve judgment or choice, courts then look to "whether that judgment is of the kind that the discretionary function exception was designed to shield." Gaubert, 499 U.S. at 322-23 (quoting Berkovitz, 486 U.S. at 536). "The basis for the discretionary function exception was Congress' desire to 'prevent judicial second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Berkovitz, 486 at 536-537 (quoting United States v. Varig Airlines, 467 U.S. 797, 814 (1984)). Thus, the exception protects "governmental actions and decisions based on considerations of public policy." Gaubert, 499 U.S. at 323 (citation and internal quotation marks). It is immaterial whether various policy considerations actually were considered, because "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to

12

policy analysis." <u>Gaubert</u>, 499 U.S. at 325.  Furthermore, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." <u>Gaubert</u>, 499 U.S. at 323.  <u>Gaubert</u>  also made clear that the discretionary function exception is not confined to conduct at the planning  or policy level but applies to day-to-day decisions made on an operational level as to which of a range of permissible choices is the wisest.  <u>Gaubert</u>, 499 U.S. at 326; <u>see also</u> <u>Vaizburd v. United States</u>, 90 F. Supp. 2d 210, 214 (E.D.N.Y. 2000).  Also, the discretionary function exception applies even if the government's conduct was negligent or an abuse of discretion.  <u>Gaubert</u>, 499 U.S. at 323; <u>Dalehite</u>, 346 U.S. at 33 (1953) (the discretionary function exception "applies to policy judgments, even to those constituting abuse of discretion."); <u>Calahan v. United States</u>, 329 F. Supp. 2d 404, 407 (S.D.N.Y. 2004). It is the plaintiff who bears the burden of demonstrating that the discretionary function exception does not apply to his or her claim.  <u>Molchatsky v. United States</u><i>,</i> 778 F. Supp. 2d 421, 431 (S.D.N.Y. 2011), <u>aff'd</u> 713 F.3d 159 (2d Cir. 2013).

The federal courts have regularly held that the discretionary function exception applies to the execution of arrest warrants by federal law enforcement agents.  For example, in <u>Est. of Salazar v. United States</u>, the Court held that the discretionary function exception applied to the manner in which Deputy U.S. Marshals attempted to apprehend a fugitive. No. LACV1110279JAKSPX, 2014 WL 12588477, at *15–25 (C.D. Cal. May 20, 2014).  The fugitive in <u>Salazar</u> pled guilty to possession of child pornography but failed to appear for sentencing.  <u>Id.</u> at * 2.  The USMS investigation revealed that the fugitive "did not have any violent criminal history and that no weapons were registered in his name."  <u>Id.</u>  While the

USMS deputies were conducting surveillance on the fugitive's residence, they observed the fugitive exiting his residence and entering his vehicle. <u>Id.</u> The officers approached the fugitive's vehicle and ordered the fugitive to exit the vehicle, but then the officers noticed that the fugitive was holding a firearm. <u>Id.</u> at * 3. As the fugitive moved the gun in the direction of the officers, one of the officers shot and killed the fugitive. <u>Id.</u> Plaintiff alleged that the USMS was negligent in the following ways:

> (1) the manner in which they conducted surveillance of Salazar prior to the attempt to arrest him; (2) their decision to seek to arrest Salazar that day rather than to follow the original plan to do so at a later date when a greater number of law enforcement personnel would be present; (3) the manner in which they approached Salazar's vehicle, including their alleged failure properly to identify themselves as law enforcement personnel and their conduct that preceded and resulted in the use of deadly force; and (4) their decision to proceed to use force in an attempt to remove Salazar from the vehicle rather than keeping his vehicle blocked, monitoring him and calling for additional law enforcement personnel to come to the location to cause Salazar to surrender.

<u>Id.</u> at * 4. With regard to the first prong of the <u>Gaubert</u> test, the Court held that the applicable USMS policy directives concerning officers identifying themselves in the course of an arrest, the manner in which surveillance should be conducted, and how to make an arrest did not contain any mandatory directives. <u>Id.</u> at * 18-19. Concerning the second prong of the <u>Gaubert</u> test, the court held that:

> The USMS Policy Directives grant considerable discretion to Marshals regarding where and when to seek to arrest a fugitive pursuant to a warrant. … Because these Directives grant the Deputy Marshals discretion regarding how to conduct surveillance and to make an arrest, it is presumed that the Marshals' decision to arrest Salazar in his vehicle, rather than leave and return at a later time with additional USMS or local law enforcement personnel, are ones grounded in policy. … The evidence showed that the decision by the Marshals to change their initial plan—to conduct surveillance to confirm Salazar's location—to one in which they would seek to arrest him that day if he appeared outside the Fox Ridge Residence, was grounded in policy. Their new decision involved a balancing of the needs to conserve USMS resources and assure community and officer safety. The USMS Directives state that social considerations should underlie decisions made pursuant to their provisions.

> They emphasize that a Marshall has a duty to "carry out [an] arrest effectively" in a "location which offers as few avenues of escape as possible," while also doing so "with maximum safety" and "avoid[ing] the use of unnecessary force or wanton severity." … Marshals are given discretion in applying these principles, including "whether circumstances dictate informing the local authorities." … Thus, the Marshals' decision to arrest Salazar outside of the Fox Ridge Residence involved discretionary choices grounded in policy. …

Id. at * 20.

In Hart v. United States, the Court held that the discretionary function exception applied where an officer of the Bureau of Indian Affairs detained a fugitive near his home, consented to his request to go into his house before he was transported to a jail, and the fugitive then committed suicide inside his home. 630 F.3d 1085, 1090 (8th Cir. 2011). The plaintiff argued that the officer failed to properly supervise, secure, and detain the arrestee. The Court held that the first prong of the Gaubert test was satisfied because the relevant policy guidance granted officers significant discretion concerning how much control to exercise during and after an arrest. Id. at 1090. Regarding the second prong of the Gaubert test, the Court concluded that it was satisfied because "[the officer was] required to consider his training, the need to restrain [the arrestee], concern for [the arrestee's] safety, the public's safety, his available resources, and the information at hand in determining the proper course of action." Id. at 1091 (citations and internal quotation marks omitted). The Court thus concluded that these factors showed that "the decision regarding how to best effectuate an arrest warrant is fundamentally rooted in policy considerations, and that judicial second-guessing of this decision thus is not appropriate." Id. (citations and internal quotation marks omitted).

In Kuhlman v. United States, the Court held that the discretionary function exception applied to the actions of a Deputy U.S. Marshal who was a member of a USMS fugitive task

force who hit a fugitive with his car to prevent him from fleeing. 822 F. Supp. 2d 1255, 1262 (M.D. Fla. 2011).  In finding the second prong of the <u>Gaubert</u> test satisfied, the Court reasoned that the Deputy "would need to consider, among other factors: (1) the risk Kuhlman posed to the public, including the fact that Kuhlman had a history of violence and fleeing; (2) the risk the pursuit posed to Kuhlman and others; and (3) the urgency of apprehending Kuhlman, including the fact that Kuhlman was located close to a nearby school that was about to let out."  <u>Id.</u> at 1262.

Similarly, in <u>Williams v. United States</u>, the Court held that the discretionary function exception applied to an apprehension of a fugitive by an FBI agent where the agent used his vehicle to first block the fugitive's path of escape and then to strike the fugitive to prevent him from fleeing.  The Court found that the second prong of the <u>Gaubert</u> test was satisfied because the FBI agent had to "consider his training, the need to restrain Williams, the concern for Williams's safety, the public's safety, his available resources, and the information at hand in determining the proper course of action."  <u>Id.</u> at 258.  The Court concluded that "[a]ll of these factors indicate that the decision regarding how to best effectuate an arrest warrant is 'fundamentally rooted in policy considerations, and that judicial second-guessing of this decision thus is not appropriate.'"  <u>Id.</u> at 258 (citations omitted).[3]

---

[3] <u>See also</u> <u>Hunter v. United States</u>, No. CV 17-00616, 2019 WL 6790653, at *3–4 (M.D. La. Dec. 12, 2019) (discretionary function exception applied where USMS task force decided to execute arrest warrant without local law enforcement assistance); <u>Donaldson v. United States</u>, No. 15-CV-908 JLS (KSC), 2018 WL 1089986, at *10–12 (S.D. Cal. Feb. 26, 2018) (discretionary function exception applied to pre-shooting conduct of USMS); <u>Greico v. United States</u>, Civ. Action No. 14-00933, 2015 WL 1489356 (D. Or. Apr. 1, 2015) (finding that discretionary function exception barred negligence claim because USMS' decision on where to initiate the arrest of fugitive with active arrest warrant "involved an element of judgment" because there were "no set policy directives mandating the precise manner in which an arrest should be made"); <u>Shuler v. United States</u>, 531 F.3d 930 (D.C. Cir. 2008) (discretionary function exception covered the FBI's decision when to arrest a suspected criminal and its alleged failure to protect an informant who disclosed a criminal's whereabouts).

As stated above, Plaintiff alleges that the Government was negligent by: (i) failing to develop a formal operational plan for execution of the arrest warrant; (ii) failing to conduct an adequate risk assessment prior to the incident; (iii) failing to devise a plan for warrant execution that included safer, non-lethal alternatives for apprehending James; and (iv) failing to evaluate alternative arrest strategies such as apprehending James outside of his residence. Exhibit 21, pp. 3-4.   Concerning Plaintiff's second, third, and fourth theories – failure to perform a risk assessment, failure to devise a safe plan for execution of the arrest warrant, and failure to evaluate alternative strategies for warrant execution – they are not supported by any mandatory directive under the USMS's Policy Directives or Standard Operating Procedures ("SOP").[4]   Neither the Policy Directives nor the SOP mandates what an operational plan must contain, nor does it mandate that the USMS Task Force perform tasks such as a formal risk assessment.   In fact, the USMS's Policy Directives concerning arrests – which were cited in the Salazar case – do not provide any mandatory directives.   For example,

- "an arrest *should be* effected by sufficient law enforcement personnel to insure the safety of all participants."
- "[t]he deputy in charge of planning the arrest *will consider* whether circumstances dictate informing the local authorities in advance. When it can be anticipated that additional assistance will be required to carry out the arrest effectively and with maximum safety, the deputy-in-charge *should* solicit local police assistance."
- "[i]n approaching the person to be arrested, the arresting deputy *should* be forceful to the extent necessary to control the situation. The deputy *should* physically restrain the person when announcing their intention to effect the arrest."
- a deputy "*should* meet resistance with a sufficient degree of force to subdue any opposition and prevent escape."

---

[4] Plaintiff's first negligence theory -- failing to develop an operational plan for execution of the arrest warrant – fails as a matter of substantive tort law because the USMS did, in fact, develop a written operational plan prior to the execution of the arrest warrant.  As stated in the accompanying Declaration of Shane Marshall, the USMS Task Force completed a document entitled "Enforcement Action Briefing," which is an operational plan.  Thus, the Government cannot be held liable on a theory of failing to develop an operational plan when it is undisputed that the USMS Task Force did develop such a plan.

- "[a]ny degree of force used to effect any arrest *may also be* used to prevent any escape and retain custody of the prisoner."
- "[a]n arresting deputy *should* never underestimate a prisoner and *should* remain constantly alert regardless of the status or condition of the arrestee."
- "[t]he warrant *may be* executed at any place within the jurisdiction of the United States."
- "[w]hen the investigation develops information that the fugitive is located in a specific private premises, entry into the premises *may be* accomplished in any of the following ways …."

Marshall Declaration, Exhibit C (emphasis added.)  Thus, all of the relevant policy directives relating to arrests use permissive rather than mandatory language.  Accordingly, the first step of the <u>Gaubert</u> test – that the act "involv[es] an element of judgment or choice" – has been satisfied.   <u>Gaubert</u>, 499 U.S. at 322.

 With respect to the second part of the <u>Gaubert</u> test -- "whether that judgment is of the kind that the discretionary function exception was designed to shield" – the testimony of the officers clearly shows that the decision of the USMS Task Force as to which warrant execution method to use involved a "day-to-day decision[] made on an operational level as to which of a range of permissible choices is the wisest." <u>Gaubert</u>, 499 U.S. at 322-323, 326. Indeed, here, the officers testified that they considered other apprehension methods but uniformly agreed that the "knock and talk" method was the best option, especially since there were no concerns about weapons or a violent history that would make that approach unreasonable.  SUF ¶¶ 70-91.  In sum, the decision regarding which method to use – door knock, call-out, traffic stop, or some other – calls for the weighing "of a range of permissible choices" to determining which "is the wisest," and, thus, the USMS Task Force's decision was "of the kind that the discretionary function exception was designed to shield."  <u>Gaubert</u>, 499 U.S. at 322-323, 326.

## POINT II

## SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING PLAINTIFF'S BATTERY AND ASSAULT CLAIMS

Under New York law, "an assault is an intentional placing of another person in fear of imminent harmful or offensive contact." Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001) (citations and internal quotation marks omitted). "While actual contact is not required, there must be some manifestation that creates reasonable apprehension of harmful physical contact." Cunningham v. United States, 472 F. Supp. 2d 366, 380 (E.D.N.Y. 2007) (citations and internal quotation marks omitted). "A battery is an intentional wrongful physical contact with another person without consent." Girden, 262 F.3d at 203 (citations and internal quotation marks omitted). A plaintiff asserting a battery claim must "prove that there was bodily contact, that the contact was offensive, and that the defendant intended to make the contact without the plaintiff's consent." Johnson v. Suffolk County Police Dep't, 245 A.D.2d 340, 341, 665 N.Y.S.2d 440, 440 (2d Dep't 1997).[5]

The existence of probable cause to make an arrest does not bar causes of action in assault or battery based on excessive force. Bennett v. N.Y.C. Housing Auth., 245 A.D. 2d 254, 665 N.Y.S. 2d 91 (2d Dept. 1997). Where there has been a lawful arrest, intentional

---

[5] Under the FTCA, the Government is generally not responsible for the intentional torts committed by its employees. 28 U.S.C. § 2680(h). Section 2680(h) of the FTCA provides that the FTCA does not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights …." 28 U.S.C. § 2680(h). "We have referred to § 2680(h) as the 'intentional tort exception." Levin v. United States, 568 U.S. 503, 507 (2013). However, the FTCA contains an exception to the intentional tort exception for "acts or omissions of investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h). Thus, for investigative or law enforcement officers, the United States may be held liable under the FTCA for intentional torts such as "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." 28 U.S.C. § 2680(h). The FTCA defines an "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). Accordingly, the Government may theoretically be held liable for assault or battery of James by the USMS Task Force.

contact with the arrested person does not constitute assault and battery provided such force is reasonable. Cunningham v. United States, 472 F.Supp. 2d 366, 381 (E.D.N.Y. 2007). "However, under New York state law, unlike under federal law, if an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest." Zhao v. United States, 273 F. Supp. 3d 372, 399 (W.D.N.Y. 2017) (citations, parentheticals, and internal quotation marks omitted).

In sum, in a law enforcement context, a court must first determine if an arrest was lawful. Zhao, 273 F.Supp.3d at 399. If the arrest was unlawful, then any assault or battery would be "offensive," regardless of the amount of force used, and the defendant would be liable. Id. If the arrest was lawful, then the court must assess whether the force used was reasonable. Id. Here, the USMS Task Force's attempted arrest of James was lawful as it was pursuant to a warrant signed by a state judge. Exhibit 11. Thus, the Court must then analyze whether the force used by the officers was reasonable.

"The test for whether a plaintiff can maintain a cause of action for assault and battery against a law enforcement officer is the exact same test as the one used to analyze a Fourth Amendment excessive force claim." Zhao, 273 F. Supp. 3d at 398–99 (citations, parentheticals, and internal quotation marks omitted); Li v. Aponte, No. 05 CIV. 6237 (NRB), 2008 WL 4308127, at *6 (S.D.N.Y. Sept. 16, 2008). "Determining whether the force used in effectuating an arrest was reasonable is a fact-specific, individualized inquiry that 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest

by flight.'" <u>Zhao</u>, 273 F.Supp.3d at 399 (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)). "[T]he actions of the officers must be judged against the purported justification for the use of force under the circumstances and a defendant may be liable if the force used exceeded the force needed for the factual circumstances." <u>Piper v. City of Elmira</u>, 12 F.Supp.3d 577, 588 (W.D.N.Y. 2014) (internal quotation omitted).

In evaluating excessive force claims, the courts "are careful to evaluate the record " ' from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" <u>Tracy v. Freshwater</u>, 623 F.3d 90, 96 (2d Cir. 2010) (quoting <u>Jones v. Parmley</u>, 465 F.3d 46, 61 (2d Cir. 2006) and <u>Graham</u>, 490 U.S. at 396). "Moreover, we are required to "make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' " <u>Tracy</u>, 623 F.3d at 96 (quoting <u>Jones</u>, 465 F.3d at 61 and <u>Graham</u>, 490 U.S. at 396). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." <u>Graham</u>, 490 U.S. at 397 (internal quotations and citation omitted).

"Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." <u>Amnesty Am. v. Town of W. Hartford</u>, 361 F.3d 113, 123 (2d Cir. 2004). Since excessive force cases are highly fact dependent and often based on a he said-he said factual dispute about the force used and the necessity of using force, summary judgment is often denied in such cases. <u>Ismael v. Charles</u>, No. 1:18-CV-3597-GHW, 2020 WL 4003291, at *7 (S.D.N.Y. July 15, 2020) (" 'granting summary judgment against plaintiffs on excessive force claims is rarely appropriate.'")

(quoting Anderson v. City of New York, No. 1:16-cv-02583 (ALC), 2019 WL 1426723, at *8

(S.D.N.Y. Mar. 28, 2019).  For these reasons, "[c]ourts are hesitant 'to dismiss complaints

alleging excessive force even at the summary judgment stage if conflicts exist in the record

regarding the degree and justification of force.'"  Anderson v. City of New York, No. 1:16-

CV-02583 (ALC), 2019 WL 1426723, at *8 (S.D.N.Y. Mar. 28, 2019) (quoting Atkins v.

County of Orange, 372 F. Supp. 2d 377 (S.D.N.Y. 2005)).

Nevertheless, the Second Circuit and the district courts in this Circuit have dismissed

many battery and excessive force claims pretrial.  Tracy, 623 F.3d at 97 (2d Cir. 2010)

(affirming grant of summary judgment on two aspects of plaintiff's excessive force claim).[6]

For example, in Tracy, the police officer (named Freshwater) stopped plaintiff's car

purportedly because it was covered in snow thus impacting the driver's ability to see.  Id. at

93.  After pulling over plaintiff, a male, he stated that he did not have his license and

registration.  Id.  The officer then checked the license plate and determined that the car

---

[6] See also Husbands v. City of New York, 335 F. App'x 124, 129 (2d Cir. 2009) (summary order) (affirming summary judgment dismissing excessive force claim, holding that officer's punch to arrestee's torso was not excessive force because it "was necessary to subdue [the arrestee] and apply handcuffs"); Gutierrez v. New York, No. 18-CV-3621 (MKB), 2021 WL 681238, at *14 (E.D.N.Y. Feb. 22, 2021) (granting summary judgment dismissing excessive force claim, holding that the officers' tackling of an armed robbery suspect was reasonable); Rolkiewicz v. City of New York, 442 F. Supp. 3d 627, 646 (S.D.N.Y. 2020) (granting summary judgment dismissing excessive force claim, holding that officers' use of force by striking plaintiff with metal flashlight was objectively reasonable when plaintiff was resisting arrest by "stiffening his arms, throwing his arms back, and generally making it difficult to handcuff him"); Young v. Cabrera, No. 18-CV-3028, 2020 WL 7042759, at *5 (E.D.N.Y. Nov. 30, 2020) (granting summary judgment dismissing excessive force claim, holding that officers' use of force by throwing plaintiff to the ground in an effort to arrest him was reasonable as a matter of law where plaintiff was a suspect in a knifepoint robbery); Chaney v. City of Albany, No. 16-CV-1185, 2019 WL 3857995, at *10 (N.D.N.Y. Aug. 16, 2019) (granting summary judgment dismissing excessive force claim, holding that officers' conduct in tackling plaintiff, who was suspected of drug crimes, to the ground and handcuffing him was reasonable as a matter of law); Kalfus v. N.Y. & Presbyterian Hosp., 706 F. Supp. 2d 458, 472–73 (S.D.N.Y. 2010) (granting summary judgment dismissing excessive force claim, holding that the video of plaintiff's arrest for trespass demonstrated that plaintiff was "clearly resisting" as he refused to stand up and "clearly pushed back with his weight" when the officers placed him face down on a concrete slab to handcuff him and, therefore, the officers used "only objectively reasonable force under the circumstances"), aff'd, 476 F. App'x 877 (2d Cir. 2012); Ojo v. United States, No. 16 CV 4112 (MKB)(LB), 2019 WL 3852391, at *10 (E.D.N.Y. Aug. 15, 2019), report and recommendation adopted, No. 16CV4112MKBLB, 2019 WL 4602823 (E.D.N.Y. Sept. 23, 2019) (dismissing battery claim based on alleged "tight handcuffing" because plaintiff failed to allege an injury from the handcuffing).

belonged to a woman.  Id.  The officer further questioned plaintiff who then twice falsely identified himself.  Id. The officer ordered plaintiff to exit the vehicle.  Id.  During the officer's attempt to pat down and handcuff plaintiff, plaintiff, according to his account, slipped and fell on ice and snow and the officer then struck him twice with a metal flashlight.  Id.  The officer claimed that, after plaintiff exited the vehicle, plaintiff refused his order to place his hands on his head, plaintiff ran towards him and tried to punch him.  Id.  Only then did the officer strike the plaintiff with the flashlight, according to the officer.  Id.  Plaintiff then ran away from the officer who, according to plaintiff, grabbed plaintiff and struck him twice more with the flashlight.  Id.  Plaintiff apparently broke free from the officer and attempted to flee again but the officer jumped on him and eventually handcuffed him against plaintiff's resistance.  Id.  Plaintiff claims that the officer pepper sprayed him after he was handcuffed while the office asserted that he only pepper sprayed plaintiff because he was resisting arrest.

Id.  On appeal from a grant of summary judgment, the Second Circuit affirmed the grant of summary judgment on three of the four aspects of plaintiff's excessive force claim.  Id. at 97-98.  With respect to the second aspect of his claim – that the officer (Freshwater) jumped on plaintiff (Tracy) as he attempted to flee, the Second Circuit also affirmed summary judgment.

Id.  The Court reasoned:

> By Tracy's own account, he had managed to struggle free and was attempting to escape when he slipped and fell. Given that he was clearly resisting arrest at that point, it was not unreasonable for Freshwater to respond by diving on top of Tracy and pinning him down so that he could not get back up and continue to flee. Turning again to the *Graham* analysis, we note, first, that the crime in question was now arguably more serious because Tracy was unquestionably resisting arrest which, in turn, only further bolstered Freshwater's presumption that Tracy was a fugitive seeking to evade potentially serious charges. Second, the risk to officer safety and the public persisted. Third, as noted, Tracy was, by his own admission, actively resisting arrest at this point. In finding Freshwater's decision to tackle Tracy to be reasonable, we note again

that Freshwater was proceeding on his own without the assistance of other officers. While the injury sustained by Tracy was more serious here, we note that, as a result of the encounter, Freshwater was also injured, giving further credence to our conclusion that his use of force was both necessary and reasonable under the circumstances. Tracy provides no factual issue or legal argument that would discredit any of the above, and, accordingly, we have no difficulty concluding, as the district court did, that Freshwater's use of force was reasonable.

Id. at 97-98.[7]

Here, it is undisputed that, after initially appearing to cooperate when the officers entered the house, James turned and ran into a nearby bathroom. Thus, like Tracy, it is undisputed that James fled from the officers in order to evade arrest. Therefore, "it was not unreasonable for" Ulatowski "to respond by diving on top of" James "and pinning him down so that he could not get back up and continue to flee." Id. at 97-98. It is also undisputed that, while James was resisting arrest in the bathroom, he drew a handgun, and pointed it at Ulatowski's head before shooting himself. The only force used by the officers in response was their hands and bodies. They did not use any weapon against James. Thus, whereas the plaintiff in Tracy allegedly tried to punch the officer and was otherwise resisting arrest and attempting to flee, James pulled a gun and pointed it at Ulatowski while he was resisting arrest thus easily justifying their limited use of force to try and restrain him. Accordingly, the Graham factors here are even more compelling than those in Tracy. With respect to the first Graham factor -- the severity of the crime -- plaintiff in Tracy was stopped in his vehicle with no officer suspicion of serious wrongdoing, whereas a criminal complaint had been filed against James for a felony assault against a child and the officers were at his home to arrest him pursuant to a valid warrant. With respect to the second Graham factor -- threat to officer

---

[7] The Court did, however, reverse the grant of summary judgment with respect to the use of pepper spray as the parties disagreed regarding whether the officer used the pepper spray after plaintiff was handcuffed. Id. at 98.

safety -- the plaintiff in Tracy allegedly tried to punch the officer and was otherwise resisting arrest whereas James pulled a gun and pointed it at Ulatowski's head while he was resisting arrest. In sum, the force used here was reasonable given that James charged with a serious felony assault on a child, James "attempt[ed] to evade arrest by flight" when he ran from the officers, James "actively resist[ed] arrest" when Ulatowski and Smith tried to restrain and arrest him, and James "pose[d] an immediate threat to the safety of the officers" when he pulled a gun and pointed it at Ulatowski. Zhao, 273 F.Supp.3d at 399.

Plaintiff argues in her interrogatory answers that the Government is liable for assault and battery because: (i) "[u]pon entering the residence, agents, including Smith, Ulatowski, and Baker, rushed towards Mr. James, and physically seized and tackled Mr. James, despite the absence of immediate threats," and (ii) "[d]eposition testimony from Ulatowski and Baker describes how Mr. James was not given a reasonable opportunity to surrender and was instead forcibly restrained in a manner that led directly to his fatal injuries." Exhibit 21, pp. 4-5. However, Plaintiff's first argument – that the officers used excessive force by seizing and tackling James despite no immediate threat – was explicitly rejected by the Second Circuit in Tracy wherein the Court held that tackling a suspect who is trying to flee is "not unreasonable." Id. at 97. Plaintiff's second argument – that James was not given an opportunity to surrender -- is frivolous. It is undisputed that the officers entered the home, informed James they had a warrant for his arrest, James initially appeared to cooperate and was moving towards the officers as Ulatowski reached for his handcuffs, and then James fled. James had every opportunity to surrender but he instead chose to flee from the officers.

25

Accordingly, summary judgment should be granted dismissing Plaintiff's battery claim.[8]

## **CONCLUSION**

For the foregoing reasons, the Government's motion for summary judgment should be granted and Plaintiff's Amended Complaint should be dismissed in its entirety with prejudice.

DATED:  Buffalo, New York, May 22, 2025

MICHAEL DIGIACOMO
United States Attorney

BY:    s/MICHAEL S. CERRONE
Assistant U.S. Attorney
U.S. Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716-843-5851
michael.cerrone@usdoj.gov

---

[8] Section 5-4.1 of the New York Estates Powers and Trusts Law ("EPTL") authorizes the personal representative of a decedent survived by distributees to maintain an action for wrongful death provided that the defendant would have been liable to the decedent by reason of such wrongful conduct if death had not ensued. LaMarca v. United States, 31 F. Supp. 2d 110, 124 (E.D.N.Y. 1998). This means "that no action may be maintained by the representative unless the decedent, at the time of his death, could have maintained an action for the underlying tort." Id. (quoting Dundon v. United States, 559 F. Supp. 469, 475-76 (E.D.N.Y. 1983)).  Thus, if the Court holds that there is no viable claim for battery or negligence, Plaintiff's wrongful death claim must be dismissed.