

**Office of the New York State Attorney General Letitia James**

# Office of Special Investigation

August 26, 2022

# Report on the Investigation into the Death of Dedrick James

ag.ny.gov/osi    (800) 771-7755

## DEDRICK JAMES

### SUMMARY

New York Executive Law Section 70-b ("Section 70-b") authorizes the Office of the Attorney General ("OAG"), through the Office of Special Investigation ("OSI"), to investigate and, if warranted, to prosecute offenses arising from any incident in which the death of a person is caused by a police officer. When OSI does not seek charges, Section 70-b requires issuance of a public report. This is the public report of OSI's investigation of the death of 24-year-old Dedrick James.

On September 15, 2021, at 10:30 a.m., at 6 Vinewood Place in the City of Rochester (Monroe County), a contingent of the United States Marshals Service Fugitive Task Force (for the purposes of this report, this contingent will be referred to as "USMS Task Force" or "Task Force") attempted to arrest Mr. James on an arrest warrant issued by a Marion Town Court Justice in Wayne County, New York. The Task Force included officers from the New York State Police ("NYSP"), Monroe County Sheriff's Office ("MCSO"), Rochester Police Department ("RPD"), Monroe County District Attorney's Office ("MCDA"), and the United States Marshals Service ("USMS").

Based on the investigation, OSI concludes that the evidence does not prove beyond a reasonable doubt that the actions of NYSP Inv. Ulatowski and RPD PO Baker were unjustified under Article 35 of the New York Penal Law.[1]

### BACKGROUND

#### The Alleged Crime[2]

According to NYSP Investigator Scott Carr, who spoke to members of OSI after the incident, on December 27, 2020, he was assigned to investigate injuries to a two-year-old child, allegedly inflicted by his father, Dedrick James, that day while his mother was at work. When the child's mother came home and found him injured, she took him to Newark-Wayne Community Hospital, where medical staff determined that he required a higher level of care and transferred him to Strong Memorial Hospital in Rochester, by helicopter, where he was admitted to the intensive care unit, intubated, and placed on a ventilator due to respiratory failure.

For the next two days, NYSP tried to reach Mr. James, without success, by going to his home in Wayne County, calling his cell phone, having the child's mother call his cell phone several times, calling and interviewing Mr. James's mother, and going to his other known home at 6 Vinewood Place in Rochester. On December 29, 2020, Mr. James's mother brought Mr. James to the NYSP barracks in Rochester for an interview, in which Mr. James said the child had accidentally injured himself.

---

[1] The actions of USMS Dep. Marshal Smith are not within the legal authority of OAG to prosecute, because Dep. Marshal Smith was not a "police officer" or a "peace officer" as defined in Section 70-b, the sole source of OAG's prosecutorial authority in cases of this kind.

[2] The description of the alleged crime is provided to explain how and why the matter was referred to the USMS Task Force.

Inv. Carr and other NYSP investigators conducted an investigation including the execution of search warrants, review of medical records, interviews with doctors, and interviews of other witnesses.

On April 20, 2021, Inv. Carr interviewed Mr. James a second time at the NYSP barracks in Rochester, and Mr. James again said the child had accidentally injured himself. However, the investigation had developed evidence that the injuries could not have been self-inflicted, and Inv. Carr told Mr. James he was free to go that day but would likely be arrested after the District Attorney's Office reviewed the case. Inv. Carr said if Mr. James remained cooperative, he could coordinate a surrender.

On July 26, 2021, the District Attorney's Office authorized Inv. Carr to arrest Mr. James for Assault in the Second Degree, Penal Law Section ("PL") 120.05(9).

Over the next few weeks, Inv. Carr made multiple unsuccessful attempts to contact Mr. James to arrange his voluntarily surrender. On August 11, 2021, he called Mr. James and left a voicemail but received no response. On August 23, 2021, he called again but no one answered. On August 24, 2021, he traveled from Wayne County to 6 Vinewood Place in Rochester with his partner and knocked on the door; although there were two cars in the driveway and it appeared someone was inside, nobody answered.

On August 25, 2021, Inv. Carr filed a Felony Complaint charging Mr. James with Assault in the Second Degree and obtained an arrest warrant from Marion Town Justice Samuel J. Bonafede. The next day, Inv. Carr contacted NYSP Inv. Ulatowski, a member of the Rochester-based USMS Task Force, and requested they find and arrest Mr. James. Inv. Carr said he referred the warrant to the Task Force because they were better equipped to find unresponsive warrant subjects, allowing him to continue to investigate other cases, and, in this case, they were physically closer to Mr. James's residence in Rochester. Inv. Carr told Inv. Ulatowski about Mr. James's alleged crime and Mr. James's last known address and sent him a copy of the arrest warrant and Mr. James's criminal history.

## The USMS Task Force

According to USMS Office of Professional Responsibility Chief Aaron Ward, who spoke to members of OSI, USMS Fugitive Apprehension Task Forces, composed of officers from federal, state, and local agencies, investigate and arrest persons with active state and federal warrants. Task Forces receive arrest warrant referrals from participating agencies, who sign Memorandums of Understanding (MOUs) with the USMS. The MOUs limit the types of cases a Task Force will accept to serious felonies, including "violent crimes against persons." Assault in the Second Degree is a qualifying crime.

According to Inv. Ulatowski, who spoke to members of OSI, after Inv. Carr forwarded the warrant referral, Inv. Ulatowski briefed other Task Force members and, over the next few weeks, they conducted surveillance of Mr. James's house. On the morning of September 15, 2021, at 9:00 a.m.,[3] Inv. Ulatowski drove by 6 Vinewood Place and saw a 2013 white Dodge Dart, registered to Mr. James, parked in the driveway. He asked RPD Inv. Richard Arrowood, another Task Force member, to watch the house and car, while he attended to other work matters. When Inv. Ulatowski returned at 10:00 a.m., the car was still in the driveway.

---

[3] All times are approximate.

Believing Mr. James would likely be inside, Inv. Ulatowski radioed the Task Force Headquarters that he had a lead on a warrant suspect, and other members should assemble to arrest him.

According to MCSO Sgt. Christian DeVinney, the tactical leader of the Rochester-based USMS Task Force, who spoke to members of OSI, at least eight to ten officers are needed to execute an arrest warrant, because that is the minimum number to handle a variety of assigned roles, including officers to knock on the front door, cover the perimeter and ensure the suspect does not escape, clear the home for security reasons and conduct searches, stay with anyone present other than the subject until the home is secure, act as designated medics, drivers, and radio operators, and if necessary perform breach/entry. Due to the serious nature of the crimes alleged in referrals, the Task Force never conducts one or two officer home visits. Once a warrant has been referred to the Task Force no further attempts are made to gain voluntary surrender.

Consistent with these protocols, on September 15, 2021, fourteen members of the Task Force arrived at 6 Vinewood Place to arrest Mr. James.



*6 Vinewood Place on September 15, 2021. Dedrick James's 2013 White Dodge Dart is in the driveway on the right.*

### INTERVIEWS

Based on OSI's interviews, as summarized below, and other evidence, at approximately 10:35 a.m., Task Force officers arrived at 6 Vinewood Place in multiple vehicles and approached the home. Inv. Ulatowski, RPD PO Baker, and USMS Dep. Marshal Smith took the lead and were the only officers physically struggling with Mr. James when his gun went off.

There is no BWC footage of what took place in the bathroom because the USMS Task Force in this case had not implemented The United States Department of Justice's Policy permitting

Task Force officers to wear BWCs. As a result, the only available evidence of what occurred during the struggle that ended in Mr. James's death is the accounts of the officers on the scene.

OSI interviewed Inv. Ulatowski, PO Baker, Dep. Marshal Smith, all other officers who could see into the bathroom at the time of the shooting. OSI also interviewed Mr. James's grandmother, Betty Ervin, who was home at the time. In addition to their interviews, Ms. Ervin and the officers, except Dep. Marshal Smith, provided written statements, which they swore to, pursuant to Penal Law section 210.45. Dep. Marshal Smith provided an incident report. The following is a summary of their accounts.

### NYSP Investigator Jeffrey Ulatowski's Account

Inv. Ulatowski said he was the point person for Mr. James's arrest. He approached the front door with PO Baker and Dep. Marshal Smith and rang the doorbell. According to Inv. Ulatowski, after a few minutes, a woman, who he later learned was Mr. James's grandmother, answered the door. Inv. Ulatowski asked if Mr. James was home and told her they had a warrant for his arrest. The woman acknowledged that Mr. James was home and said she would go get him. She tried to shut the front door, but Inv. Ulatowski blocked it with his foot. The woman stepped back from the door, and Inv. Ulatowski followed her inside.



*View from the front door of 6 Vinewood Place, looking into the home.*

Once inside, Inv. Ulatowski said that he saw Mr. James exit a bedroom door at the end of the hallway. Mr. James asked, "Why are you guys looking for me?" and appeared agitated. Inv.

Ulatowski responded, "You got a warrant," and told Mr. James to show him his hands. Mr. James initially walked towards Inv. Ulatowski with his hands in front. Since Mr. James appeared compliant, Inv. Ulatowski thought the arrest would go smoothly, so he said to Mr. James, "You're doing good, walk towards me." As Mr. James drew closer, Inv. Ulatowski reached behind his own back to remove his handcuffs. Mr. James abruptly stopped, backed up, and then turned and ran into the bathroom. Inv. Ulatowski ran after him, into the bathroom.



*The hallway - the bedroom Mr. James came from is straight ahead and the bathroom he ran into is on the right.*



*The bathroom.*

Inv. Ulatowski said he caught Mr. James in the bathroom and wrapped him in a bear-hug from behind, but their momentum caused both to fall into the bathtub. Mr. James was face down, and Inv. Ulatowski was on top, looking at the back of Mr. James's head. As Mr. James struggled to break free, Inv. Ulatowski said he heard PO Baker yell, "Gun!" three times. Inv. Ulatowski, still on top of Mr. James, looked to the right of Mr. James's head, and saw the barrel of a handgun pointed directly at his face. Inv. Ulatowski reached for the gun to disarm Mr. James but said he is uncertain if he ever got a hand on it. At one point during the struggle, Inv. Ulatowski said he saw a red laser dot on the wall. After a few moments, he said he heard PO Baker say, "I'm going to shoot him! I'm going to shoot him!" In response, Inv. Ulatowski said

that he loosened his grip around Mr. James's body and arms, in order to move away, and almost immediately heard a gunshot. At first, he was not sure who, if anyone, was shot. Then he heard Mr. James make gurgling sounds and realized Mr. James was shot but did not know by whom.

As Inv. Ulatowski moved, Mr. James's body turned slightly allowing Inv. Ulatowski to see the gun, now lying in the bathtub. He grabbed it and called out to other Task Force members that he had the gun; he also called for a medic.

Inv. Ulatowski exited the bathroom and walked outside. Another officer checked him for injuries, since his vest and gloves were covered in blood; he had none. Inv. Ulatowski said he placed the gun and his gloves in a plastic evidence bag and placed that bag and his vest in PO Baker's truck. He stayed with the evidence until RPD Evidence Technician Mueller collected it.

### RPD Officer William Baker's Account

PO Baker said he approached the front door with Inv. Ulatowski and Dep. Marshal Smith. A woman who he later learned was Mr. James's grandmother eventually answered the door, and Inv. Ulatowski spoke to her. PO Baker saw a camera mounted on the porch pointed at the area where they were standing (see Evidence Collection, below). He said he heard the woman say that Mr. James was inside, and then followed Inv. Ulatowski into the home.

Inside, PO Baker said that he saw Mr. James walk out of a bedroom at the end of a hallway. Mr. James asked, "What's going on?" or "Why are you guys here?" Mr. James initially walked towards the officers, and then he suddenly stopped, backed up, and reached into his left pocket as he ran into the bathroom. Inv. Ulatowski chased Mr. James into the bathroom, with PO Baker immediately behind him.

Inside the bathroom, PO Baker said that he saw Inv. Ulatowski try to physically restrain Mr. James from behind, but both fell into the bathtub. PO Baker saw a gun in Mr. James's left hand; Mr. James's left arm was wrapped underneath and around his body, so the gun pointed over his right shoulder back towards Inv. Ulatowski. PO Baker yelled, "Gun! Gun! Gun!" and grabbed the front of the gun (where a laser sight was attached) with both hands and pulled the gun towards himself. As he struggled to take the gun from Mr. James, PO Baker saw a red laser appear from the gun. Due to their positions bent over the bathtub, PO Baker did not have a firm grip on the gun, allowing Mr. James to pull it back and underneath his own body. Fearing that Mr. James would gain full control of the pistol and shoot himself or Inv. Ulatowski, PO Baker let go of the gun, drew his own pistol, and said "Jeff, I'm going to shoot him." In response, he said he saw Inv. Ulatowski disengage slightly. He then heard a gunshot, and saw Mr. James go limp.

PO Baker helped pull Mr. James out of the bathtub and lay him on the bathroom floor so the other officers could provide first aid. He then left the house and went outside.

### USMS Deputy Marshal Carlton Smith's Account

Dep. Marshal Smith said he approached the front door with Inv. Ulatowski and PO Baker. Inv. Ulatowski knocked on the front door, and a woman answered. As Inv. Ulatowski spoke to her, Dep. Marshal Smith saw Mr. James inside the home through the open front door. Inv. Ulatowski, PO Baker, and Dep. Marshal Smith entered the home.

Once inside, Dep. Marshal Smith said he heard Inv. Ulatowski tell Mr. James, "You have a warrant, show us your hands." Mr. James had just come from a back bedroom and was initially walking toward the officers; he then, according to Dep. Marshal Smith, stopped, backpedaled, and ran into the bathroom. All three officers ran after him: Inv. Ulatowski first, PO Baker second, and Dep. Marshal Smith third.

Inside the bathroom, Dep. Marshal Smith said that Inv. Ulatowski grabbed at Mr. James from behind, but since they were still moving forward, they both fell face down in the bathtub. Dep. Marshal Smith tried to restrain Mr. James's head so PO Baker and Inv. Ulatowski could gain enough control to place him in handcuffs. Mr. James's hands were underneath his body near his chest, and he was actively struggling against the officers' attempts to get his hands behind his back. Dep. Marshal Smith then heard one of the officers say, "He's got a gun!" A few moments later, as the struggle continued, he heard a gunshot and saw Mr. James go limp.

After the gunshot, other officers removed Mr. James from the bathtub and Task Force medics began to provide lifesaving measures.

### MCSO Sergeant Shawn Edwards's Account

Sgt. Edwards was the Task Force K-9 officer and was standing on the front steps of Mr. James's house when he said that he saw Inv. Ulatowski knock on the front door and speak to a woman inside. He saw Mr. James come down a hallway and walk partway towards the officers. Mr. James then stopped and ran towards the back of the house. Sgt. Edwards followed Inv. Ulatowski, PO Baker, and Dep. Marshal Smith inside the home, and down the hallway towards the bathroom. Sgt. Edwards heard someone yell, "Gun! Gun! Gun!" When he looked into the bathroom from the hallway, he saw officers on top of Mr. James in the bathtub. As additional Task Force officers entered the bathroom, Sgt. Edwards heard a gunshot from his position in the hallway just outside the bathroom door. Sgt. Edwards then left the house to get his K-9 out of the way and called for medical assistance.

### MCSO Deputy David Wood's Account

Dep. Wood said that he was outside the home and across the street when he saw Inv. Ulatowski knock on the front door and speak to a woman inside. Through the open front door, he saw Mr. James in the hallway. When officers rushed into the residence, Deputy Wood sprinted across the street and into the house. He continued down the hallway until he could see into the bathroom. Deputy Wood said that he saw multiple officers piled up in the bathtub, but he could not see Mr. James. He then heard PO Baker yell, "He's got a gun!" so he tried to enter the bathroom to help. At that point he heard PO Baker yell, "I'm going to shoot him!" followed shortly by the sound of a gunshot. Dep. Wood heard Inv. Ulatowski say, "He's shot," and he asked if Mr. James still had the gun. Inv. Ulatowski replied, "I have the gun."

Dep. Wood helped move Mr. James from the bathtub to the floor, where he and MCSO Sgt. Christian DeVinney began first aid. They found a gunshot wound to Mr. James's upper chest and applied a chest-seal bandage. Dep. Wood continued to assist with first aid until he was relieved by MCSO Dep. William Connell, the Task Force's assigned medic.

### MCSO Deputy Charles Carroll's Account

Dep. Carroll was outside the home, standing by one of the Task Force vehicles, when he saw Inv. Ulatowski, PO Baker, and Dep. Marshal Smith knock on the front door and speak to a woman inside. Moments later, he said that he saw that same group of officers rush into the home, so he followed. He heard someone yell, "He's running!" so he yelled the same to other officers who remained outside. Once in the house, Dep. Carroll saw an older woman to his left in the living room. He heard someone yell, "He's got a gun!" and ran down the hallway towards the bathroom. He was able to peer around Sgt. Edwards and Dep. Wood and saw PO Baker, Inv. Ulatowski, and Dep. Marshal Smith struggling with someone in the bathtub. Moments later he heard a gunshot, then heard officers asking, "Who's hit? Who's hit?" Dep. Carroll saw Inv. Ulatowski stand up from the bathtub and walk out of the bathroom. He then watched Dep. Wood pull Mr. James out of the bathtub and begin first aid with the help of MCSO Sgt. DeVinney. After performing a security check of the residence, Dep. Wood left the home. Outside he saw Inv. Ulatowski, who said to him, "I think he just shot himself."

### MCSO Sergeant Christian DeVinney's Account

Sgt. Christian DeVinney was outside the home, standing near the front right corner of the house when he saw Task Force members approach the front door and speak to someone inside. Moments later he saw those same officers run into the house and heard someone yell, "Runner!" He initially ran to the side of the home to prevent an escape out the back but saw other officers covering the rear yard. He continued to hear a commotion inside the house, so he ran to the front door and into the residence. At first, he saw a woman in the living room, then he continued down the hallway where he saw officers around the bathroom door. He looked into the bathroom and saw a group of officers piled in the bathtub, and then heard a gunshot. Sgt. DeVinney asked who was shot and watched as officers checked themselves for injuries; he heard one officer say, "He shot himself." Sgt. DeVinney watched Inv. Ulatowski walk out of the bathroom with a small caliber pistol in his hand, and head towards the front door.

Once the other officers were out of the way, Sgt. DeVinney and Dep. Wood lifted Mr. James out of the bathtub, placed him on the bathroom floor, and checked him for injuries. Sgt. DeVinney found a gunshot wound in his upper left chest, and he and Dep. Wood covered it with a chest-seal bandage. Task Force medic Dep. Connell joined Sgt. DeVinney, and they provided chest compressions and air via a bag valve mask until Emergency Medical personnel arrived. Sgt. DeVinney did not see Mr. James display any signs of life during the time he provided medical care.

### Betty Ervin's Statement

Betty Ervin was interviewed first by RPD investigators and provided a sworn written statement. Later, she met with OSI Investigators and again described what took place. The accounts were the same. Ms. Ervin said she was asleep in her living room when she woke up to the sound of someone banging on the front door. She heard a voice yell, "Open the door or we will break it in!" She got up from her chair, opened the front door, and saw several police officers standing on the front porch. The officers called out for Mr. James and asked if he was home. Ms. Ervin said she would get him. When Ms. Ervin called for Mr. James, he came out of his room. Officers rushed past her and went for Mr. James. She heard a fight going on in the bathroom and then heard, "He's got a gun! He's got a gun!" Next, she heard a gunshot, and then heard someone

say, "He shot himself!" After the gunshot, officers escorted Ms. Ervin out of the house. She waited with a neighbor while other officers arrived, and the house was taped off for investigation.

Ms. Ervin said she could not see what happened in the bathroom at the time the gun went off.

## EVIDENCE COLLECTION

Following the incident, members of RPD's Major Crimes Unit executed a search warrant at 6 Vinewood Place, and RPD Evidence Technicians processed the scene. OSI Investigators responded to the scene and were present during the search.

From PO Baker's truck, Evidence Technician Mueller recovered a pistol and pair of tan gloves inside a plastic evidence bag. Inv. Ulatowski directed him to those items, which he stayed with after taking them from the house. The gun was a Smith & Wesson .380 Bodyguard pistol with a laser sight. A portion of the laser sight and the battery were missing. The pistol had a capacity of 7 rounds: 6 in the magazine plus 1 in the chamber. It was still loaded with 6 rounds of ammunition from 2 different brands: 4 rounds from Ammo Incorporated and 2 rounds from WIN.



*The Smith & Wesson .380 Bodyguard Pistol and NYSP Inv. Ulatowski's tan gloves, collected from RPD Officer Baker's Truck.*

From the bathtub in the bathroom, Evidence Technicians recovered a single .380 caliber fired cartridge case; the brand was Ammo Incorporated. They also recovered a small battery and a piece of plastic, which they later determined to be the battery for and the missing portion of the cover of the laser sight—all of which were covered in blood. They photographed the bathtub and the items found in it; OSI has reviewed the photo, but due to its graphic nature, omits it from this report.



*The partially reassembled Smith & Wesson .380 Pistol. The battery is replaced in the laser sight, and the broken plastic cover from the laser sight is on the bottom. The magazine and ammunition have been removed.*

Under a mattress in the bedroom Mr. James walked out of when Inv. Ulatowski entered the house, Evidence Technicians and OSI Investigators found a Smith & Wesson .380 Bodyguard magazine, loaded with 6 rounds of Ammo Incorporated ammunition. In a safe in the same bedroom, they also found packaging for an additional Smith & Wesson .380 Bodyguard magazine, and a box of same brand and caliber ammunition found in the pistol: .380 Ammo Incorporated.



*Under the mattress Mr. James's bedroom. A Smith & Wesson .380 Bodyguard magazine.*

*Contents of a safe in Mr. James's bedroom. Packaging for a Smith & Wesson .380 Bodyguard magazine is on the upper left, and a box of Ammo Incorporated .380 ammunition is on the lower left.*

In the same bedroom, Evidence Technicians and OSI Investigators saw a monitor with a live feed from cameras outside the house, including one aimed at the front porch. Although the cameras provided a live stream, they did not record locally, nor were they connected to the internet to record at another location.



*The monitor in Mr. James's bedroom with live feed from four cameras outside 6 Vinewood Place, including the front door. RPD Evidence Technicians and OSI Investigators found that the video system did not record.*

Evidence technicians processed the Smith & Wesson pistol, the magazines, and the ammunition for fingerprints and DNA. Although they were able to "lift fingerprints" from both magazines, they were not suitable for comparison. They also swabbed the handgun and magazine for DNA and sent the swabs to the Monroe County Crime Lab for analysis. DNA from a bloodstain on the pistol matched Mr. James. DNA from the magazine was a mixture of at least three individuals, but there was an insufficient amount of DNA for further comparison. No additional DNA analysis of the exterior of the pistol was reasonable since Inv. Ulatowski's gloves, covered with Mr. James's blood, could not be ruled out as potentially transferring DNA onto the firearm.

The pistol, magazines, and ammunition were submitted to the Monroe County Crime Laboratory for ballistics analysis (see Ballistics Evidence, below).

Evidence technicians also photographed and documented the firearms and ammunition of all the officers listed above. No officer carried a .380 caliber firearm, and all ammunition was accounted for—meaning no Task Force officer fired their own weapon.

## MEDICAL EVIDENCE

According to American Medical Response records, emergency medical personnel received a call for assistance at 10:42 a.m. They arrived at 10:46 a.m. When they entered the bathroom at 10:48 a.m., Mr. James was on the floor, eyes half open, fixed and dilated, and had a gunshot wound to his left upper chest, which was covered with a chest seal. They placed a cardiac monitor on Mr. James but found no heartbeat or pulse—they pronounced Mr. James deceased at 10:49 a.m.

Dr. Christine Yoo of the Monroe County Medical Examiner's Office conducted Mr. James's autopsy. OSI Investigators attended the autopsy and obtained Dr. Yoo's preliminary report, which listed the cause of death as "contact gunshot wound to the torso." Dr. Yoo's report noted a single gunshot wound to the left side of the upper chest, from the front to the back and downward, with injuries along the wound path to the heart and left lung. Dr. Yoo also noted "evidence of close-range discharge of a firearm (faint soot searing)." According to Dr. Yoo, Mr. James died quickly from a gunshot wound to the heart.

Dr. Yoo recovered a single bullet ("deformed jacketed projectile") from Mr. James's lower back and submitted it to the Monroe County Crime Laboratory for ballistics analysis (see Ballistics Evidence, below).

## BALLISTICS EVIDENCE

Eric Freemesser, a Forensics Firearms Examiner with the Monroe County Crime Laboratory, conducted ballistics analysis of the following items:

1. Smith & Wesson .380 Bodyguard pistol - taken from the bathtub by Inv. Ulatowski and recovered by Evidence Technician Mueller
2. Fired .380 Ammo Incorporated cartridge casing - recovered from the bathtub
3. Fired bullet - recovered from Mr. James's body
4. Additional Smith & Wesson .380 Bodyguard magazine and additional .380 Ammo Incorporated ammunition - recovered from the bedroom

Freemesser's report stated, "there was agreement in all discernible class characteristics and sufficient agreement in corresponding individual characteristics" to conclude the bullet and the cartridge case "were discharged by [the] pistol." The report also said the additional Smith & Wesson .380 Bodyguard magazine fit and functioned with the pistol.

In a subsequent phone call, Freemesser confirmed in plain English that the Smith & Wesson .380 Bodyguard pistol fired the bullet found in Mr. James's body and ejected the cartridge case found in the bathtub.

## LEGAL ANALYSIS

There is no evidence that any officer used deadly physical force against Mr. James.

Yet it is clear that Inv. Ulatowski, PO Baker, and Dep. Marshal Smith used physical force against Mr. James when they attempted to arrest him, and their use of physical force was a

link in the chain of events that led to Mr. James's death. Under Article 35 of the New York State Penal Law, they were justified in using physical force.[4]

Penal Law Section 35.30(1) provides:

> "A police officer or a peace officer, in the course of effecting or attempting to effect an arrest ... of a person whom he or she reasonably believes to have committed an offense, may use physical force when and to the extent he or she reasonably believes such to be necessary to effect the arrest ... or in self-defense or to defend a third person from what he or she reasonably believes to be the use or imminent use of physical force..."

In this case, Inv. Ulatowski had a copy of a judicially signed arrest warrant for Dedrick James, providing him with a reasonable belief that Mr. James had committed an offense. Moreover, as stated by Inv. Ulatowski, PO Baker, and Dep. Marshal Smith, no officer made physical contact with Mr. James until he ran from them, in response to being told he was under arrest. At that point Inv. Ulatowski tackled Mr. James from behind to detain him. PO Baker saw that Mr. James had a pistol in his hand, pointed at Inv. Ulatowski, and yelled "Gun, Gun, Gun!" All three officers tried to control and disarm Mr. James using only their hands, but they were unsuccessful. PO Baker then said he was going to shoot Mr. James, but before he acted Mr. James shot himself and the episode was over.

Accordingly, based on the evidence, the Attorney General finds that Inv. Ulatowski, PO Baker and Dep. Marshal Smith were justified, under Penal Law Section 35.30(1), in their use of physical force against Mr. James when they attempted to arrest him.

## RECOMMENDATION

OAG has consistently recommended that all police departments equip officers with body-worn cameras ("BWCs").[5] Absent such evidence, the only evidence is eye-witness accounts. Had officers executing the arrest warrant for Mr. James been equipped with BWCs, there may have been a clearer understanding of this incident. OAG recognizes that the US Department of Justice has implemented policy changes to equip federal agents with BWCs[6], and permit state and local law enforcement officers serving on Task Forces to wear BWCs.[7] OAG commends these efforts and recognizes that implementation of these polices is not immediate. Nevertheless,

---

[4] As noted above, OAG does not have jurisdiction over USMS Dep. Marshal Smith, since he is a federal agent and therefore not a "police officer" or "peace officer" as defined in Executive Law Section 70-b. Nevertheless, his actions were so intertwined with those of NYSP Inv. Ulatowski and RPD PO Baker that a joint analysis is warranted.

[5] See summary in First Report Pursuant to Executive Law Section 70-b (ny.gov) (p. 16, "Recommendations"), published on October 1, 2021, after this incident occurred.

[6] Justice Department Announces First Federal Agents to Use Body-Worn Cameras, available at https://www.justice.gov/opa/pr/justice-department-announces-first-federal-agents-use-body-worn-cameras (September 1, 2021).

[7] Department of Justice Announces the Use of Body-Worn Cameras on Federal Task Forces, available at https://www.justice.gov/opa/pr/department-justice-announces-use-body-worn-cameras-federal-task-forces (October 29, 2020).

these policy changes were made before the date of this incident and were not implemented. Therefore, we use this case as an opportunity to recommend that full implementation of BWCs by federal agents and Task Force Officers occur without any unnecessary delay.

Dated: August 26, 2022