UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SHENEA JAMES as administrator of the estate Of DEDRICK JAMES, deceased, and SHENEA JAMES, individually,

                                            Plaintiff,

-against-

THE UNITED STATES OF AMERICA, CITY OF ROCHESTER, RPD INVESTIGATOR RICHARD ARROWOOD, et al.

                                            Defendants.

23-cv-6057

**PLAINTIFF'S COUNTERSTATEMENT OF UNDISPUTED FACTS PURSUANT TO RULE 56.1**

**PLAINTIFF'S LOCAL RULE 56.1 COUNTERSTATEMENT OF UNDISPUTED FACTS**

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, Plaintiff, SHANEA JAMES, submits the below response to Defendants' Statement of Undisputed Facts, and the further additional paragraphs of material facts as to which it is contended there exists a genuine issue to be tried.

1. Admit

2. Deny. The Task Force began active surveillance of 6 Vinewood Place on September 14, 2021, continuing into September 15, 2021. Investigator Scott Carr ("Carr") of the New York State Police began investigating Dedrick James in April of 2021. See EXHIBIT A, NYS Investigator Scott Carr Investigation notes from April 2021 (Bates 00001007–08). Carr interviewed Mr. James on multiple occasions. *See id*. Carr also went to the subject residence at 6 Vinewood Place on multiple occasions. *See id.* (Bates 000010007-09). On August 26, 2021, Carr got in touch with the Marshal's Task Force to request their assistance in apprehending Mr. James. *See id*. at (Bates 00001010). He conveyed the

information he knew about Mr. James to Trooper Jeff Ulatowski, who led the Task Force. The gist of the information Ulatowski received from Investigator Carr as "background" was simply that Mr. James was wanted for assault, that Carr had been unable to reach him by phone, the best known addresses for Mr. James, and that he was known to drive a white Dodge. EXHIBIT B, Trooper Jeff Ulatowski Dep, 21:19-22:17 (Oct. 2, 2024). Carr did not tell Ulatowski that Mr. James was the father of KC, whom he was accused of assaulting, or anything about the circumstances. *See id*. at 23:24-24:22. Officer Arrowood testified that he did not know anything about Mr. James or any intelligence gathered prior to the operation. See EXHIBIT C, RPD Investigator Richard Arrowood Dep. at 47:11–24 (Oct. 4, 2024).

3. Admit.
4. Deny. No forensic evidence has been cited or presented by Defendants to conclusively establish who possessed the firearm or pulled the trigger. Further, none of the officers involved, including Ulatowski and Smith, observed who had the gun in hand when it discharged. Investigator Ulatowski testified that he did not know how the shot went off, and while he claimed that Mr. James was the "only other person in the bathtub that could have" pulled the trigger, he admitted he had "no idea" whether he was touching the gun or Mr. James's hand when it discharged. See Ex. B, Ulatowski Dep. 57:5–9. Deputy U.S. Marshal Carlton Smith likewise testified that he never saw a gun before the shot was fired, stating unequivocally: "I don't know who shot the gun… I wasn't in the bathtub." See Ex. I, Smith Dep. 85:17–86:5. Accordingly, there is no admissible or conclusive evidence establishing that Mr. James possessed or fired the weapon that caused his death. The officers' self-serving accounts are uncorroborated and must be subjected to

heightened scrutiny. See O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003); Cruz v. City of Anaheim, 765 F.3d 1076, 1079 (9th Cir. 2014).

5. Admit.

6. Deny. Arrowood had previously been deputized and worked on the USMS Task Force, but his deputization had expired by September 15, 2021, and he was acting solely in his capacity as an RPD officer on the date of the incident. See City's Exhibit D at 5 ("The only other remaining defendant is RPD Officer Richard Arrowood who, from time to time, has been deputized as a Special Deputy U.S. Marshal on the USMS Task Force but his deputization was not in effect at the time of the September 15, 2021 incident.").

7. Deny. Arrowood had previously been deputized and worked on the USMS Task Force, but his deputization had expired by September 15, 2021, and he was acting solely in his capacity as an RPD officer on the date of the incident. See City's Exhibit D at 5 ("The only other remaining defendant is RPD Officer Richard Arrowood who, from time to time, has been deputized as a Special Deputy U.S. Marshal on the USMS Task Force but his deputization was not in effect at the time of the September 15, 2021 incident.").

8. Admit, but clarify that on September 15, 2021, Arrowood was not deputized as a U.S. Marshall and was acting solely in his capacity as an RPD officer. See City's Exhibit D at 5 ("The only other remaining defendant is RPD Officer Richard Arrowood who, from time to time, has been deputized as a Special Deputy U.S. Marshal on the USMS Task Force but his deputization was not in effect at the time of the September 15, 2021 incident.").

9. Admit.

10. Admit.

11. Admit.

12. Deny. On September 15, 2021, Arrowood was an RPD employee, was not deputized as a U.S. Marshall, and was solely employed and supervised by the Rochester Police Department and the City. *See id*.

13. Admit.

14. Deny. As a member of the Marshal's Task Force, Arrowood's role included training, planning and preparation for the warrant execution, as well as decision-making relating to surveillance, the method of apprehension, and any contingencies. *See id.* at 21:11-22; 22:12-23:17, 27:13-25, 28:12-19, 31:4-19; EXHIBIT D, USMS Standard Operating Procedures, Enforcement Actions; EXHIBIT E., Deputy Christian Devinney Dep., 35:13-36:6. Arrowood also conducted surveillance, including critical day-of surveillance of the location while Lead Task Force member Ulatowski was occupied for several hours. Arrowood thus played a crucial role in determining how to apprehend Mr. James. See Ex. B, Ulatowski Dep. 44:6–25, 45:13-18, 66:9-19, 68:6-11. See also Ex. C, Arrowood Dep, 52:4-5, 53:6-9, 56:17-20.

**ADDITIONAL PARAGRAPHS OF MATERIAL FACTS AS TO WHICH IT IS CONTENDED THERE EXISTS A GENUINE ISSUE TO BE TRIED**

**A. Dedrick James Is Investigated Over A Nine-Month Period Relating To An Incident Involving His Son**

1. Law enforcement began investigating a December 27, 2020 incident involving Mr. James and his 2-year-old son where his son's teeth were dislodged during brushing. They interviewed Mr. James about it multiple times. The first interview took place two days after the incident, on December 29, 2020. Mr. James submitted to this interview

voluntarily and was forthright about what occurred. There was no indication at that time that Mr. James would be charged with a crime, or that the incident was even being considered as criminal. See Ex. A (Bates 00001005–06).

2. On April 20, 2021, police went to the home of Mr. James to speak to him. He voluntarily spoke with them outside of his residence. They requested that he come to the station, and he did, sitting down for a *Mirandized* formal interview, where he was again cooperative and forthright. See Ex. A (Bates 00001007–08).

3. Investigator Scott Carr contacted the District Attorney's office on April 20, 2021, and was advised that Mr. James would not be charged in connection to the incident involving KC. See Ex. A (Bates 00001008).

4. On July 26, 2021, a decision was made to charge Mr. James with Assault in relation to the KC incident. See Ex. A (Bates 00001009).

5. The first attempt to contact Mr. James regarding his pending charges was made on August 11, 2021, by Investigator Carr. He did not get an answer. It is unclear what number he used to contact Mr. James, or why he believed the number was Mr. James's. See Ex. A (Bates 00000997-98, 00001009).

6. This is significant, because law enforcement had multiple numbers for Mr. James. They had a T-Mobile number and a number that was given to them by Lenore Cromartie, which she stated Mr. James was not answering. Ex A. Both numbers were obtained in December of 2020, about eight months before they attempted to contact him about his criminal charge.

7. Investigator Carr made one more attempt to call Mr. James on August 23, 2021. See Ex. A (Bates 00001009).

8. On August 24, 2021, Investigator Carr went to Mr. James's residence at 6 Vinewood Place, Rochester, NY and knocked on the door. It is unknown whether Mr. James was home. No one answered the door. See Ex. A (Bates 00001009).

9. On August 25, 2021, an arrest warrant was obtained for Mr. James. See EXHIBIT F, Arrest Warrant (Bates 00000043).

10. The very next day, August 26, 2021, Investigator Carr got in touch with the Marshal's Task Force to request their assistance in apprehending Mr. James. See Ex. A (Bates 00001010). Thereafter, the lead task force member, Trooper Ulatowski, made no attempt to contact Mr. James before the warrant was executed. See Ex. B, Ulatowski Dep. 25:6–26:11 (Oct. 2, 2024) (testifying that he made no effort to call or contact James, stating "I didn't see the need to do that").

**B. Mandatory Rules Governing US Marshal's Task Force Enforcement Actions**

11. USMS Task Forces are only authorized for cases meeting specific criteria. The criteria are not discretionary. Among the criteria are that the subject ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. D at Bates 00000939-940, 00000942.

12. The task force is intended for use only in apprehending violent offenders, which shapes the level of preparation and safety measures that are expected. See Ex. E, DeVinney Dep. 19:3–15 (Sept. 17, 2024).

13. An ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ created in preparation for a USMS enforcement action. This form is known as ▮▮▮▮▮ See EXHIBIT F, USMS Intro to Operational Planning (Bates 00000968); Ex. E (Bates 00000944).

14. With regard to the execution of a warrant, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. See Ex. F (Bates 00000969-970).

15. Many tactical considerations are mandated to be considered by the Task Force, ████████████████████████████████████████████████████ ██████ Id. (Bates 00000970-971).

16. The SOP mandates that ████████████████████████████████████████████████████ Ex. D (Bates 00000942).

17. It goes on to mandate that ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.” Id. (Bates 00000943).

18. It goes on to mandate that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.” Id.

19. It goes on to mandate that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████." Id.

## C. RPD Investigator Richard Arrowood's Training and Preparation

20. RPD Investigator Arrowood has significant knowledge about U.S. Marshal enforcement actions from his roughly three years that he was deputized as a U.S. Marshall prior to this incident (during which he was not deputized). Ex. C, Arrowood Dep. at 14:14-17.

21. Investigator Arrowood testified during his deposition about the best practices regarding planning and preparation that go into enforcement actions as part of the U.S. Marshal's Task Force. See id. at 21:11-23:20. He cited the critical importance of validating the accuracy of intelligence during the planning stages of the operation, a process that requires review of prior reports and knowledge of fellow officers. He specifically cited the subject's background and the potential for weapons. *See id.* at 22:12-23:17.

22. It is critical for task force members to know, in advance of an arrest operation, the nature of the charge, the subject's criminal history, whether weapons were used or may be present, and the layout and risks of the arrest location. *See id*. at 21:11–22, 28:12–19, 31:4–19; See Ex. E, DeVinney Dep. at 35:13–36:6.

23. Despite his key role in the Marshal's Task Force operation, Officer Arrowood knew virtually nothing about Mr. James or any intelligence gathered prior to the operation. See Ex. C, Arrowood Dep. 47:11–24.

24. Task Force Leader Ulatowski testified that he held a verbal briefing about two weeks before the operation to go over minimal information with some task force members. See Ex. B, Ulatowski Dep. 26:17–27:14.

25. Officer Arrowood did not recall the verbal pre-operational briefing held by Ulatowski approximately two weeks before the warrant execution. See Ex. C, Arrowood Dep. at 48:18–24, see also 53:24-54:4.

26. That briefing did not include any discussion of what method would be used to apprehend the suspect. See Ex. B at 26:17–27:14.

27. Typically, a U.S. Marshal's Task Force should meet before operations to determine the safest method of apprehension. See EXHIBIT G, RPD Officer William Baker Dep. 90:20–91:12 (May 8, 2024).

28. In this case, Ulatowski made the decision on how to conduct the operation unilaterally. See Ex. B, Ulatowski Dep. 31:3–33:8.

29. Officer Baker likewise treated the operation as routine and confirmed that no formal discussion occurred about the method of apprehension based on any special risk posed by Mr. James. See Ex. F, Baker Dep. 90:10–91:7.

30. Arrowood testified that he did not recall using a written pre-operational plan in this operation. See Ex. C, Arrowood Dep. at 25:9-16.

31. Arrowood testified that the Task Force does not follow a standard procedure, and that they do not complete a written operational plan that is briefed with the Task Force members every time a warrant is executed. *See id*. at 24:14–26:25.

32. He showed no awareness of the Enforcement Action Briefing that was prepared in this case, and did not understand it to be a written pre-operational plan. *See id*. at 25:9–26:25; See also EXHIBIT H, U.S.M.S. Enforcement Action Briefing.

33. No witness testified to seeing, receiving, or hearing a pre-op checklist, and the lead officer—Investigator Ulatowski—explicitly denied formulating or communicating a written operational plan. See Ex. B, Ulatowski Dep. 35:22–36:5.

34. Section IV(A)(1)(j) of the U.S.M.S SOP on enforcement actions states that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. See Ex. D at Bates No. 00000943.

35. Despite serving in a leadership role, Arrowood acknowledged unfamiliarity with the USMS SOP regarding enforcement operations, including its mandatory planning and risk assessment requirements. See Ex. C, Arrowood Dep. 19:18–20:20.

36. Arrowood testified that proper pre-operational planning should include contingency measures for risks such as the suspect fleeing out the back door, getting in a car, or walking down the street, and that such measures should be discussed at a team briefing prior to warrant execution; he further agreed that risk assessments should account for factors like the number of people inside the residence and whether they are potentially armed, all to promote officer safety. See id. at 23:18–24:13; 27:11-25; 28:2-25

37. Arrowood also testified that, when unsure if a suspect may be armed—such as in the case of a recent shooter—the best and least dangerous practice is generally to wait for them to leave their residence and apprehend them outside the house, where they are less comfortable and familiar with the environment, reducing the risk of officers being shot; he emphasized that law enforcement should weigh the risks of different apprehension methods, noting that every situation is different but that entering a home carries heightened dangers. See id. at 29:15-23; 30:15-31:3.

38. Other Task Force members, including Sergeant DeVinney and Deputy Marshal Smith, testified that pursuing a suspect into a residence carries heightened risks and that safer alternatives—such as waiting for the suspect to exit the home—should generally be considered, particularly when public safety or officer safety is at stake. See Ex. E, DeVinney Dep. at 37:16–38:17; Ex. I, Smith Dep. at 41:5–21 (May 7, 2024).

**D. Richard Arrowood's Role in Planning and Execution**

39. The U.S. Marshal's Task Force began surveillance of 6 Vinewood Place on September 14, 2021. Ex. B, Ulatowski Dep. at 28:25–29:16; Ex. J, USMS Report of Investigation at Bates No. 00000099.

40. On September 15, 2021, Ulatowski arrived at 6 Vinewood Place around 9:00 AM and observed the white Dodge vehicle believed to be driven by Mr. James in the driveway, prompting him to radio the Task Force to prepare for the warrant execution. See Ex. B, Ulatowski Dep. at 44:6-25; 66:9-19. However, Ulatowski then had to leave the scene for a random drug test, during which time no other Task Force members were stationed around the residence for the operation. Id. at 67:21-25. Before departing, Ulatowski contacted Arrowood to take over surveillance duties and maintain visual observation of the vehicle until he could return. Id. at 44:6-25; 66:9-19.

41. Arrowood remained in his surveillance position until Ulatowski returned and took over. Id. at 68:6-10.

42. Arrowood never saw Mr. James during his surveillance of 6 Vinewood Place. Exhibit C, Arrowood Dep. at 53:6-7.

43. A white Dodge was parked in the driveway. Id. at 53:8-9.

44. Upon returning from his drug test on the morning of September 15, 2021, Investigator Ulatowski authorized the Task Force to proceed with the arrest operation. He acknowledged that he did not conduct an in-person meeting with the full team that morning prior to execution, which he described as atypical for such operations. See Ex. B, Ulatowski Dep. 45:19–46:15.

45. Ulatowski reasoned that the team was already familiar with the case based on a verbal briefing held two weeks prior, which not all officers had attended. *See id.*

46. No specific roles or assignments were given to task force members prior to executing the arrest. Id. at 43:4–19.

47. Arrowood understood that a common practice in these situations was for the team to meet up prior to the start of the operation to discuss it. See Ex. C, Arrowood Dep. at 49:2-22; 50:4-6. He confirms that this did not occur in this case. Id. at 53:24-54:4.

48. Arrowood believed it would have been "ideal" to arrest James after he left his residence, rather than after going inside. *See id*. at 56:12-20.

49. At the time of approach, the team did not know who was inside the residence. See Ex. B, Ulatowski Dep. at 32:19–24.

50. Arrowood approached in plain clothes, not in marked uniform. Id. at 62:7–12.

51. Arrowood positioned himself in the backyard at a perimeter point toward the driveway side of the house to maintain containment during the operation. See Ex. C, Arrowood Dep. at 58:4–13.

52. Prior to approaching the home, the Task Force did not conduct any visual surveillance to identify individuals inside the residence or confirm the layout. Id. at 48:12–19.

53. Arrowood does not recall the Task Force conducting any formal debriefing, or informal discussion, regarding the incident after Mr. James was shot and killed. *See id.* at 61:2-5.

54. No changes were made to the protocols of the task force following James' death. Id. at 61:6-10.

**E. Death of Dedrick James Following Entrance To His Home By Task Force Members**

55. Officer Baker and Investigator Ulatowski went onto the front porch of 6 Vinewood Place. Baker was carrying a large shield. Deputy Smith arrived shortly after and joined them on the porch. See Ex. B, Ulatowski Dep. at 48:1–10; Ex. G, Baker Dep. at 114:20–115:4; Ex. I, Smith Dep. at 75:5–20 ("I was one of the last people that showed up on the scene and I remember getting out of my car and just B-lining to the door with the two guys that were up there. It wasn't necessarily my role, that's what I did.")

56. Ulatowski knocked on the door and Dedrick's grandmother answered. She stated that Mr. James was home and agreed to get him. Ulatowski did not plan or state how long he would wait. See Ex. B, Ulatowski Dep. at 35:6–21

57. While James's grandmother went to get him, Ulatowski forcibly entered the home without consent. See Ex. B, Ulatowski Dep. at 49:21–50:

58. James appeared at the front door, saw the officers, and backed away with his hands in the air. See Ex. I, Smith Dep. at 77:23–78:25.

59. Ulatowski reached for his handcuffs and James turned and ran. See Ex. B, Ulatowski Dep. at 51:3–15.

60. Officer Baker claimed that he believed James might be running to retrieve a gun. See Ex. G, Baker Dep. at 122:16–18.

61. As James ran, he allegedly placed one hand in his pocket. *See id*. at 137:16–138:473.
62. The officers followed James into a bathroom. Ulatowski jumped onto James's back, and both fell into the bathtub. See Ex. B, Ulatowski Dep. at 52:12–2175.
63. All three officers converged on James in the tub. Smith used a "pain compliance" technique—applying pressure to James's jaw and temple. See Ex. I, Smith Dep. at 83:4–85:19.76.
64. Around this time, the officers became aware of a handgun. See Ex. B, Ulatowski Dep. at 53:13–54:3.77.
65. Ulatowski tried to push James's arm—holding the gun—downward. *See id*. at 56:2–1178.
66. Ulatowski grabbed for James's hand but was unsure if he touched the firearm. *See id*. at 56:19–57:20.79.
67. Officer Baker had both of his hands on the gun. See Ex. G, Baker Dep. at 143:10–15.80.
68. Baker testified he was stretching across the bathtub, pulling the gun. *See id*. at 143:16–20.
69. Baker then stepped back and announced, "I'm going to shoot him." *See id*. at 151:12–17.
70. Smith testified that there was no time to consider non-lethal alternatives due to how quickly events unfolded. See Ex. I, Smith Dep. at 87:3–10.83.
71. A single shot was discharged from the handgun during the struggle. See Ex. G, Baker Dep. at 151:21–22.
72. 84.Neither Smith nor Ulatowski could say who fired the gun. See Ex. I, Smith Dep. at 86:2–9; Ex. B, Ulatowski Dep. at 57:4–5.8
73. Baker testified that Ulatowski's hands were near James when the shot fired. See Ex. G, Baker Dep. 153:14–19

74. .After the shot, James was hit and began gurgling blood. See Ex. B, Ulatowski Dep. at 58:9–59:2.87.

75. As James lay dying, officers handcuffed him. See Ex. G, Baker Dep. at 146:10–13

Dated:      New York, New York      Respectfully Submitted,
                 July 28, 2025                    ROTH & ROTH LLP

                                                By: _____~/s/~_____
                                                Elliot Dolby Shields, Esq.
                                                *Counsel for Plaintiff*
                                                192 Lexington Ave, Suite 802
                                                New York, New York 10016
                                                Ph: (212) 425-1020

          To:     All parties (via ECF)