UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHENEA JAMES as administrator of the estate Of DEDRICK JAMES, deceased, and SHENEA JAMES, individually, <br><br>           Plaintiff, <br><br>     -against- <br><br> THE UNITED STATES OF AMERICA, CITY OF ROCHESTER, RPD INVESTIGATOR RICHARD ARROWOOD, et al. <br><br>         Defendants. | **23-cv-6057 (MAV)(MJP)** |

**MEMORANDUM OF LAW IN OPPOSITION TO THE UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**

Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016

## **TABLE OF CONTENTS**

TABLE OF CONTENTS.............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ......................................................................................... 3

RELEVANT LAW ..................................................................................................... 7

ARGUMENT .............................................................................................................. 8

    I.    THE NEGLIGENCE CLAIMS MUST PROCEED TO TRIAL........................ 8

        A.   The Law of the Case Doctrine is inapplicable. ........................................ 8

        B.   The Discretionary Function Exception is Inapplicable................................ 10

            1.   Prong One – No "Discretionary" Choice Where Mandatory SOPs Prescribe the Course of Action ................................................................................................ 10

            2.   Prong Two – The Choices at Issue Are Operational, Not Policy-Rooted ............... 12

            3.   No Discretion to Violate Constitutional and Statutory Directives........................... 13

            4.   The Government has Not Met Its Burden of Proof to Demonstrate the Discretionary Function Exemption Applies ...................................................................................... 15

        C.   The Task Force Members Were Negligent in the Planning and Execution of the Warrant. ........................................................................................................ 15

    II.   MATERIAL FACT ISSUES PRECLUDE SUMMARY JUDGEMENT ON THE ASSAULT AND BATTERY CLAIMS .................................................................. 16

        A.   There Are Factual Disputes and Credibility Issues Regarding the Fatal Shot.............. 18

        B.   Force Used By Defendants Was Not Objectively Reasonable ...................................... 19

    III.   THE WRONGFUL DEATH CLAIM MUST PROCEED TO TRIAL ........................ 21

    IV.   CONCLUSION......................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) ................................ 2, 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ........................................................ 19

*Andrulonis v. United States*, 952 F.2d 652, 655 (2d Cir. 1991)................................................... 12

Arizona Maint. Co. v. United States, 864 F.2d 1497, 1504 (9th Cir. 1989)................................. 10

Ashford v. United States, 511 F.3d 501, 504–05 (5th Cir. 2007) ................................................. 11

*Barnes v. Felix*, 605 U.S. ---, 145 S. Ct. 1353, 1357–60 (2025) ......................................... *passim*

*Berkovitz v. United States*, 486 U.S. 531, 536 (1988) ....................................................... 2, 10, 12

*Caban v. United States*, 671 F.2d 1230, 1233 (2d Cir. 1982)...................................................... 12

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ..................................................................... 8

*Coulthurst v. United States*, 214 F.3d 106, 110–11 (2d Cir. 2000) ................................... 2, 12, 13

Dancy v. McGinley, 843 F.3d 93, 116 (2d Cir. 2016)................................................................... 17

*Dzionara-Norsen v. County of Monroe*, No. 6:21-cv-06715-MAV-MJP, 2025 WL 1826383, at *4
    (W.D.N.Y. July 2, 2025).......................................................................................................... 17, 20

*East End Eruv Ass'n, Inc. v. Town of Southampton*, No. 13-CV-4810, 2014 WL 4826226, at *9
    (E.D.N.Y. Sept. 24, 2014).............................................................................................................. 9

*Ferreira v. City of Binghamton*, 38 N.Y.3d 298 (2022) ................................................................. 8

*Gavenda v. Orleans Cnty.*, No. 97-CV-0074E, 1997 WL 436740, at *3 (W.D.N.Y. July 28,
    1997) ........................................................................................................................................ 9

*Graham v. Connor*, 490 U.S. 386, 397 (1989) ....................................................... 14, 17, 19, 20

*Greico v. United States*, No. 1:14-CV-00933, 2015 WL 1489356, at *2–4 (D. Or. Apr. 1, 2015)
    .............................................................................................................................................. 11

*Greico v. United States*, No. 1:14-CV-00933, 2015 WL 1489356, at *3–4 (D. Or. Apr. 1, 2015)
    .............................................................................................................................................. 11

*Griggs v. Washington Metropolitan Area Transit Authority*, 232 F.3d 917 (D.C. Cir. 2000) 13, 15

*Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ................................... 8

*Holland v. City of Poughkeepsie*, 90 A.D.3d 841, 844 (2d Dep't 2011) ..................................... 19

*Huntress v. United States*, No. 18-CV-2974 (JPO), 2019 WL 1434572, at *5 (S.D.N.Y. Mar. 29,
    2019) ("[T]he discretionary function exception does not shield official conduct that is ...
    unconstitutional."), *aff'd*, 810 F. App'x 74 (2d Cir. 2020) ..................................................... 13

*Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955) ..................................................... 12

*Ismael v. Charles*, No. 1:18-CV-3597-GHW, 2020 WL 4003291 (S.D.N.Y. July 15, 2020).. 2, 17

*James v. United States*, No. 6:23-cv-06057-DGL, 2023 WL 3485695, at *8–9 (W.D.N.Y. May
    11, 2023) .................................................................................................................................... 9

Jones v. Treubig, 963 F.3d 214, 228–29 (2d Cir. 2020) .............................................................. 18

Kerman v. City of New York, 261 F.3d 229, 240–42 (2d Cir. 2001).......................................... 21

*Kumaran v. Kadlec*, No. 22-CV-4435, 2024 WL 3448107, at *3 (S.D.N.Y. July 9, 2024)........... 9

*Leticia v. United States*, 2023 WL 7110953, at *15–16 (E.D.N.Y. Oct. 27, 2023)..................... 14

*M.Q. v. United States*, --- F. Supp. 3d ----, 2025 WL 965810, at *6–7 (S.D.N.Y. 2025)............. 13

*Molchatsky v. United States*, 778 F. Supp. 2d 421, 431 (S.D.N.Y. 2011), aff'd, 713 F.3d 159 (2d Cir. 2013) ................................................................................................................ 15

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 115 (2d Cir. 2017) ................... 8

*O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) ............................. 2, 19, 21

*O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) ....................................... 8

*SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) .................................. 8

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004) ..... 8

*Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999) .................................................................. 17

*Tracy v. Freshwater,* 623 F.3d 90, 96 (2d Cir. 2010) ................................................................ 20

*United States v. Gaubert,* 499 U.S. 315, 322 (1991) ..................................................... 10, 12, 13

*United States v. Varig Airlines,* 467 U.S. 797, 814 (1984) ......................................................... 10

*Xi v. Haugen*, 68 F.4th 832, 850–52 (3d Cir. 2023) ................................................................... 13

**Statutes**

28 U.S.C. § 1346(b)(1) ............................................................................................................. 16

28 U.S.C. § 2680(a) .................................................................................................................... 2

Fed. R. Civ. P. 56(a) ................................................................................................................... 8

N.Y. Est. Powers & Trusts Law § 5-4.1 ...................................................................................... 21

**Other Authorities**

18B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4478.5 (3d ed. 2024) ..................................................................................................................... 9

Elliot D. Shields, *Special Duty & Scope of Negligence Against Municipalities*, N.Y.C.L.A. L. Blog (Apr. 19, 2022), https://nyclalaw.wordpress.com/2022/04/19/special-duty-scope-of-negligence-against-municipalities/ ........................................................................... 9

## PRELIMINARY STATEMENT

The Defendant, United States of America (the "Government")'s motion for summary judgment should be denied in its entirety. The Government provides no factual or legal basis to dismiss any of Shenea James's claims. Ms. James has presented substantial admissible evidence of egregious misconduct—which resulted in the death of her 24-year-old son, Dedrick James ("Mr. James")—and which must be accepted as true on this motion. Because there are triable issues of fact and credibility that cannot be determined on this motion as a matter of law, the Government's motion should be denied.

Mr. James was killed on the morning of September 15, 2021, when members of the United States Marshals Service Fugitive Task Force ("USMSFTF") attempted to arrest him at his grandmother's home at 6 Vinewood Place. After Mr. James ran into the bathroom, officers followed and engaged in a physical struggle. He was shot once in the chest while face-down in the bathtub and died at the scene despite attempts at resuscitation.

Prior to the warrant execution, the Task Force members did not create a written pre-operational plan or communicate the plan to the task force members before it was executed. In fact, several Task Force members were not present at the informal pre-operational briefing where any "plan" was discussed. These failures violated mandatory USMS Standard Operating Procedures—see EXHIBIT E, USMS Standard Operating Procedures, "Enforcement Actions"—and preclude the Government's affirmative defense of the Discretionary Function Exception.

The task force's training and procedures further demonstrates their negligence. Task Force members received no specialized training in fugitive apprehension planning, and they had no checklist or other system for ensuring that mandatory SOP procedures were complied with.

Because the Task Force violated mandatory, written requirements of the SOP on Enforcement Actions, the Government's argument that Plaintiff's negligence claims are barred by 28 U.S.C. § 2680(a) fails. See *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (DFE inapplicable where a federal statute, regulation or policy specifically prescribes a course of action). Moreover, the negligence in this case resulted from ad hoc choices and violations of mandatory SOP provisions, not any conscious balancing of policy factors like resource allocation or public safety. See *Coulthurst v. United States*, 214 F.3d 106, 110–11 (2d Cir. 2000) (negligence resulting from "laziness, carelessness, or inattentiveness," as opposed to a policy-driven decision, is not protected by the DFE).

Ms. James' claims for assault, battery, and wrongful death cannot be dismissed because material questions of fact and officer credibility remain. Where the only witness able to contradict an officer's account is deceased, courts must critically assess the officer's version and consider circumstantial evidence that could support a finding of excessive force. See *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003). Here, divergent deposition testimony and substantial circumstantial evidence raise serious disputes as to the reasonableness of the officers' conduct—both in planning and executing the warrant and in the fatal force used against Mr. James—which must be resolved by the factfinder. See *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004); *Ismael v. Charles*, No. 1:18-CV-3597-GHW, 2020 WL 4003291 (S.D.N.Y. July 15, 2020).

Significant factual disputes remain in this case, as the Task Force members testified to markedly divergent accounts and assessments of the operation where Mr. James was shot and killed. The Task Force failed to comply with mandatory SOP protocols for planning and execution

of an arrest warrant. These failures caused Mr. James' death. For these reasons, summary judgment is inappropriate, and Defendants' motion should be denied in full.

<u>**STATEMENT OF FACTS**</u>

On September 15, 2021, Dedrick James was killed during a warrant execution by the USMS Fugitive Task Force[1]  at the home where he lived with his elderly grandmother in Rochester, NY. The Task Force stormed into his home, chased him into a bathroom, tackled him into a tub—and during the ensuing struggle, the gun discharged Mr. James was struck in the chest, killing him. The only eyewitnesses to the shooting are Task Force members, who were not wearing body worn cameras.

Mr. James had no criminal convictions. On the date of the incident, the Task Force was executing a warrant arising from charges against Mr. James for allegedly assaulting his two-year-old son, "KC", who resided with his mother, Zayvia Cromartie, in Marion, NY. On December 27, 2020, Dedrick was taking care of KC in Cromartie's home while she was at work. When he was brushing KC's teeth, KC bit down hard on the brush, and when Mr. James attempted to remove the brush, two of KC's teeth were allegedly dislodged. ¶1[2] Later that day, Cromartie and her mother confronted Mr. James, threw him out of the house, and took KC to the hospital. ¶3. They sought an Order of Protection against Dedrick when he attempted to see his son. ¶4.

Despite the accidental nature of the incident involving KC, law enforcement investigated, interviewing involved parties shortly after the incident. Mr. James submitted to a voluntary interview on December 29, 2020, after which no criminal charges were pursued. ¶5 Mr. James

---

[1] The Task Force was comprised of officers from several different law enforcement agencies, including the Rochester Police Department, Monroe County Sheriff's Office, and New York State Police. All personnel were deputized as Marshalls during their involvement in the joint operation, except for RPD Officer Richard Arrowood.

[2] All "¶" citations refer to the numbered paragraphs in Plaintiff's Rule 56.1 Counterstatement, underneath the heading, "**ADDITIONAL PARAGRAPHS OF MATERIAL FACTS AS TO WHICH IT IS CONTENDED THERE EXISTS A GENUINE ISSUE TO BE TRIED**", which begins on page 26, unless otherwise noted.

voluntarily submitted to a second interview on April 20, 2021. ¶6 New York State Police Investigator Scott Carr conferred with the District Attorney's office following the second interview and was told not to file charges. ¶7. The DA's office changed their mind on July 26, 2021, notifying Investigator Carr that Mr. James was being charged with assaulting KC. ¶8

In August of 2021—almost eight months after the incident involving KC—Investigator Carr began trying to locate Mr. James. He attempted to call Dedrick on August 11 and 23, 2021; but no one answered the phone on either occasion. ¶9-11.[3] On August 24, 2021, Investigator Carr went to Mr. James' residence and knocked on the door. No one answered. ¶12. The next day, August 25, Carr obtained an arrest warrant, and on August 26, Carr requested the assistance of USMSFTF to apprehend Mr. James. ¶¶ 13-14.

The USMS Task Force is a multi-agency unit led by the U.S. Marshals Service, and by policy may only pursue felony cases involving violent offenses. See SOP § III.C.2.c (listing qualifying offenses); § III.C.2.e (mandating review to ensure compliance with criteria). ¶¶17, 26. Its operations are governed by detailed Standard Operating Procedures that include both discretionary guidance and mandatory requirements, particularly concerning tactical planning and investigative preparation. See SOP § IV.A. ("SOPs"). ¶16. These include a requirement that a written pre-operational plan must be formulated and communicated to all team members before executing an arrest warrant. SOP § IV.A.1.f. ¶22. Where time does not permit a written plan, the team must instead use a verbal plan structured by the Situational Operational Planning Checklist. SOP § IV.A.1.g. ¶23. Time permitting, a complete background investigation of the subject must be conducted in advance. SOP § IV.A.1.a. ¶19. All officers must be visibly identified as law

---

[3] It is unknown what number or numbers Investigator Carr used to try to reach Mr. James. Law enforcement had multiple numbers for him, and none had been tried since December of 2020. When Investigator Carr spoke to Mr. James in April of 2021, he reached him by going to his residence in person.

enforcement—e.g., by raid jackets, vests, or badges—and may not operate in plain clothes. SOP § IV.A.1.b–c. ¶21. The SOPs also prescribe various tactical protocols and contingency planning measures that must be considered and implemented, including planning for officer safety, subject resistance, medical emergencies, and potential barricade situations. SOP § IV.A.1.e–k. ¶¶20-24.

Trooper Jeff Ulatowski assembled the U.S. Marshals Task Force to arrest Dedrick James—but none of the mandatory procedures governing task force operations were followed. Although Sergeant Christian DeVinney of the Monroe County Sheriff's Office serves as the Task Force's primary training officer, he did not attend the pre-operational briefing. ¶¶36, 40. That briefing occurred two weeks prior to the arrest attempt and was not attended by all members. ¶¶36–40. No written pre-operational plan was prepared or distributed, in violation of mandatory USMS policy. See Ex. E, USMS SOP § IV(A)(1)(f) (Bates 00000938) ("A written pre-operational plan will be formulated and communicated."); SOF ¶¶41–44. The only formal document—the Enforcement Action Briefing—was reviewed solely by Ulatowski. ¶¶34, 42–43.

Task force members received minimal instruction and knew little about the target or the plan. ¶¶30, 32, 35, 37, 47–48. Ulatowski knew only that Mr. James was wanted for an assault involving a child, and that Mr. James was possibly associated with 6 Vinewood Place and a white Dodge vehicle. ¶¶32–33. There was no discussion of Mr. James's background, the potential for weapons, the layout of the residence, or any contingency or alternate arrest strategies. ¶¶38–39. Ulatowski unilaterally decided that the team would surround the house while he attempted a knock-and-talk approach. ¶¶38–39.

Ulatowski made no effort to contact Mr. James before executing the warrant. He did not call, visit, or attempt any outreach, stating that it would have been "pretty unusual" and that he had no reason to do so. See ¶¶9–14, 50 (Plaintiff's Counterstatement); ¶¶91–92 (Plaintiff's opposition

to Defendant's Rule 56.1 Statement). Instead, he conducted several drive-bys of 6 Vinewood Place, and on the morning of the operation saw a white Dodge Dart in the driveway. ¶¶49–50. After briefly initiating surveillance, he left for several hours to take a drug test. ¶52. When he returned and saw the car was still parked, he radioed officers to converge on the house. ¶53. There was no meeting beforehand, and officers arrived without a coordinated plan, dressed in plain clothes. ¶¶53, 56.

The home sat at the end of Vinewood Place, a one-way dead-end street. ¶49. Officers had the option to wait and conduct a vehicle stop if Mr. James exited, but they chose not to. ¶¶50–51. Instead, Ulatowski led the approach without knowing who was inside or what awaited them. ¶¶55, 57. Officer Baker and Ulatowski approached the front door together, and were joined by Deputy Smith, who was one of the last to arrive on scene, and he exited his car and ran to join them at the door—despite that not being his assigned role. ¶ 56.

When Trooper Ulatowski knocked on the door of 6 Vinewood Place on September 15, 2021, Mr. James' grandmother, Betty Ervin, answered the door. ¶58. Ulatowski asked if Dedrick was home and Ervin said that he was and that she would get him. ¶58. Ulatowski did not allow her to close the door, and forcibly entered the threshold of the home. ¶61. Ulatowski claimed it was a safety concern once Mr. James' grandmother answered the door and said that she would retrieve him. ¶59. Ulatowski had no plan for how long he would give Dedrick to comply. ¶58. Ulatowski hoped Dedrick would come outside and cooperate. ¶¶62-63.

Mr. James exited a bedroom from the back of the house and put his hands in the air. ¶ 64. Ulatowski allegedly informed Mr. James that they had a warrant for his arrest and asked him to cooperate. Mr. James began walking towards then officers until Ulatowski escalated the situation by reaching towards his duty belt (allegedly to get his handcuffs, but his gun was also located on

his duty belt), at which point Mr. James turned and ran towards a bathroom. ¶¶64-66. Mr. James allegedly put a hand in his pocket as he ran. ¶¶67-68.

Task force officers acknowledged that entry into a residence is inherently dangerous and that safer alternatives are generally preferred. ¶ 69 Deputy Smith testified that marshals are "never taught" to enter a building before exhausting other options. ¶ 69. Baker testified that officers should avoid rushing into homes and instead should plan methodical entries. ¶70. Nevertheless, Ulatowski and Baker forcibly entered the home and immediately chased Mr. James into the bathroom, and Smith quickly followed them. ¶¶ 61, 72. The officers knew the decision to run inside was dangerous and risky according to their training and experience. ¶¶ 31, 69-71. The three officers pursued Mr. James into a bathroom and Ulatowski tackled Mr. James, falling on top of him in the bathtub, both men face down. ¶¶73-74. Smith grabbed Dedrick by his head and neck and applied various pressure point techniques for pain compliance. ¶75.

While all three officers had their hands on Mr. James, they allegedly saw him holding a handgun. ¶76. Ulatowski and Baker both grabbed at the hand holding the gun. ¶¶78-79. Ulatowski pushed Mr. James down to create space and pushed down the arm holding the gun. ¶77. Baker pulled on the gun itself, stretching Mr. James' body. ¶80. As the struggle continued, Baker stepped back and announced that he was going to shoot Dedrick. ¶81. As he did so, the gun went off. ¶83. It is unknown who pulled the trigger. ¶84-85. One bullet went inside of Mr. James' chest and killed him. ¶86. As blood gurgled into his mouth, officers pulled his arms behind his back and placed handcuffs on his wrists. ¶87. He was twenty-four years old when he died from the gunshot wound.

## **RELEVANT LAW**

Summary judgment is appropriate under Rule 56 only where the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to

judgment as a matter of law. See Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is genuine "if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).

The burden rests on the party seeking summary judgment to establish the absence of any triable issue, and in evaluating the evidence, the court must resolve all ambiguities and draw all permissible inferences in favor of the nonmoving party. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004); *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 115 (2d Cir. 2017). Courts may not weigh evidence or assess witness credibility, as those determinations fall exclusively within the factfinder's province. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

These principles carry particular force in cases involving the use of deadly force. Where, as here, the person shot is unable to testify and the only account comes from the officer involved, courts must be especially cautious. The Second Circuit has made clear that courts must critically evaluate the officer's version and consider whether circumstantial evidence could allow a factfinder to reject it and find the use of force unreasonable. *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003).

## ARGUMENT

### I.    THE NEGLIGENCE CLAIMS MUST PROCEED TO TRIAL

#### A.  The Law of the Case Doctrine is inapplicable.

Judge Larimer's May 11, 2023 decision on the Rule 12 motion dismissed only the "negligent planning" claim that plaintiff had pleaded under *Ferreira v. City of Binghamton*, 38 N.Y.3d 298 (2022). As *Ferreira* makes clear, negligent planning liability is premised on a

municipality's assumption of responsibility for the design and control of a warrant operation. It is a "special duty" theory that runs exclusively against the governmental entity itself—not against individual officers who merely executed the plan. Because the City of Rochester is not a defendant in this FTCA case, and because the planning duty recognized in *Ferreira* is municipal in nature, Judge Larimer properly dismissed that claim. Conversely, he sustained the separate common-law negligence claims against the individual federal officers, which are governed by ordinary standards of care and are not subject to the *Ferreira* special-duty framework. *James v. United States*, No. 6:23-cv-06057-DGL, 2023 WL 3485695, at *8–9 (W.D.N.Y. May 11, 2023); see also Elliot D. Shields, *Special Duty & Scope of Negligence Against Municipalities*, N.Y.C.L.A. L. Blog (Apr. 19, 2022), https://nyclalaw.wordpress.com/2022/04/19/special-duty-scope-of-negligence-against-municipalities/.

The Government now invokes the law of the case doctrine, but that doctrine does not apply where the earlier ruling addressed a different legal theory directed at a different party. See *East End Eruv Ass'n, Inc. v. Town of Southampton*, No. 13-CV-4810, 2014 WL 4826226, at *9 (E.D.N.Y. Sept. 24, 2014) (law of the case does not apply where issues or parties differ); *Gavenda v. Orleans Cnty.*, No. 97-CV-0074E, 1997 WL 436740, at *3 (W.D.N.Y. July 28, 1997) (doctrine applies only within a single case or between the same parties); see also 18B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4478.5 (3d ed. 2024) (explaining that law of the case is inapplicable to different parties or different issues and remains discretionary). Even if the issues overlapped, Judge Larimer's decision was interlocutory, and it is well settled that district courts may revisit interlocutory rulings "for any reason they deem sufficient." *Kumaran v. Kadlec*, No. 22-CV-4435, 2024 WL 3448107, at *3 (S.D.N.Y. July 9, 2024). Moreover, discovery completed since May 2023 has revealed multiple violations of mandatory federal policies—new

evidence that independently precludes application of the doctrine. See id.; *Wright & Miller*, supra, § 4478.5.

Accordingly, the prior dismissal of the municipal negligent-planning claim neither resolves nor limits the ordinary-negligence claims now asserted against the individual officers, and the Government's reliance on the law-of-the-case doctrine fails.

### B. The Discretionary Function Exception is Inapplicable.

Even when the conduct at issue involves an element of judgment, the discretionary function exception ("DFE") does not apply unless that judgment is "of the kind that the discretionary function exception was designed to shield." *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988). The purpose of the DFE is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 536–37 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)). But government conduct does not fall within the DFE merely because it involves "an element of choice." *Arizona Maint. Co. v. United States*, 864 F.2d 1497, 1504 (9th Cir. 1989). The exception applies only where the discretion exercised is policy-based—rooted in considerations of public policy. *Berkovitz*, 486 U.S. at 537. Here, the officers' conduct violated mandatory federal procedures—not policy choices—and thus falls outside the scope of the DFE.

#### 1. *Prong One – No "Discretionary" Choice Where Mandatory SOPs Prescribe the Course of Action*

The first step of the *Berkovitz-Gaubert* inquiry asks whether the challenged conduct "involve[d] an element of judgment or choice." *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *United States v. Gaubert*, 499 U.S. 315, 322 (1991). If "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," then "the employee has no rightful option but to adhere to the directive," and the discretionary function

10

exception does not apply. *Berkovitz*, 486 U.S. at 536. Here, the U.S. Marshals Fugitive Task Force operated under binding Standard Operating Procedures that mandated a pre-operational plan (either written or verbal using a checklist), a comprehensive briefing, a background investigation where time permitted, visible police identification, and contingency planning. See SOF ¶¶ 19–24, 41–44, 56. By failing to create or communicate any plan (¶¶ 22–24), to ensure all members were briefed (¶¶ 42–43), to complete a background investigation of Mr. James (¶ 19), and to ensure all officers wore clearly visible law enforcement markings (¶ 56), the Task Force violated mandatory directives—not discretionary guidance.

The Government's suggestion that the "Enforcement Action Briefing" satisfied USMS SOP requirements is unavailing. SOP § IV.A.1.f requires that a written pre-operational plan be created and communicated to all Task Force members. Yet the record confirms that only Trooper Ulatowski reviewed the Enforcement Action Briefing, and several members—including key participants—did not even know it existed. See SOF ¶¶ 34, 42–43. The document was neither circulated nor discussed among the full team. A plan that is not conveyed to the officers expected to execute it cannot satisfy the SOP's mandate. As a matter of both policy and logic, a briefing unread and unshared is no plan at all. See also *Greico v. United States*, No. 1:14-CV-00933, 2015 WL 1489356, at *3–4 (D. Or. Apr. 1, 2015) (rejecting DFE where USMS violated own planning and use-of-force directives).

Courts consistently hold that when federal officers violate such specific, binding policies, the discretionary function exception does not apply. See *Ashford v. United States*, 511 F.3d 501, 504–05 (5th Cir. 2007) (prison officials' failure to follow mandatory housing protocols defeated DFE); *Greico v. United States*, No. 1:14-CV-00933, 2015 WL 1489356, at *2–4 (D. Or. Apr. 1, 2015) (failure to follow USMS use-of-force policy precluded DFE defense).

### 2.  *Prong Two – The Choices at Issue Are Operational, Not Policy-Rooted*

Even where a government employee exercises judgment, the discretionary function exception ("DFE") applies only if that judgment is "of the kind that the discretionary function exception was designed to shield," namely, judgments "grounded in social, economic, or political policy." *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 537 (1988); *United States v. Gaubert*, 499 U.S. 315, 323 (1991). The DFE "protects only governmental actions and decisions based on considerations of public policy," not operational negligence or noncompliance with binding rules. *Gaubert*, 499 U.S. at 323.

The Supreme Court and Second Circuit have repeatedly held that when government employees fail to execute established plans or disregard mandatory safety procedures, their conduct is not protected by the DFE. See *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955) (liability for negligent lighthouse maintenance); *Andrulonis v. United States*, 952 F.2d 652, 655 (2d Cir. 1991) (failure to warn of laboratory hazards not protected by DFE because it did not involve policy judgment); *Coulthurst v. United States*, 214 F.3d 106, 110–11 (2d Cir. 2000) (negligent inspection due to laziness or inattention is not shielded); *Caban v. United States*, 671 F.2d 1230, 1233 (2d Cir. 1982) (INS detention decisions not involving policy trade-offs fall outside DFE).

Here, the challenged conduct involved no balancing of public-policy concerns. The lead officer, Trooper Ulatowski, confirmed that there was no written or verbal pre-operational plan and that the required USMS checklist was not used. ¶41 (citing Ex. C, Ulatowski Dep. 35:22–36:6). He simply "radioed everyone to the house" (¶ 53) and forcibly entered the residence when the grandmother opened the door—without convening a meeting, confirming who was inside, or briefing the team (¶¶ 53, 61). Officers wore plain clothes (¶ 56), conducted no background investigation (¶ 19), prepared no plan (¶¶ 22–24), and violated every core element of the pre-

operation protocols (¶¶ 19–24, 41–44, 56). These are not policy-based decisions; they are textbook examples of "laziness, carelessness, or inattentiveness," which *Coulthurst* explicitly excludes from DFE protection. 214 F.3d at 110; see also *Gaubert*, 499 U.S. at 325 n.7 (discretionary acts must still be policy-grounded to qualify for immunity).

Indeed, the D.C. Circuit has emphasized that the execution of an arrest—even if discretionary in the ordinary sense—is not the type of policy-based discretion protected by the DFE. In *Griggs v. Washington Metropolitan Area Transit Authority*, 232 F.3d 917 (D.C. Cir. 2000), the court rejected immunity where an officer used excessive force during an arrest, holding that "the arrest function involved discretion in the ordinary sense but not discretion in the policymaking sense, which is the interest protected by municipal immunity." Id. at 921–22. The same reasoning applies here.

### 3. No Discretion to Violate Constitutional and Statutory Directives

Even assuming arguendo the officers retained some discretion, they had no discretion to violate the Fourth Amendment—or to ignore binding USMS protocols enacted specifically to prevent chaotic, high-risk entries like the one that led to Mr. James's death. The Discretionary Function Exception (DFE) does not apply where the alleged conduct violates the Constitution. *Huntress v. United States*, No. 18-CV-2974 (JPO), 2019 WL 1434572, at *5 (S.D.N.Y. Mar. 29, 2019) ("[T]he discretionary function exception does not shield official conduct that is ... unconstitutional."), *aff'd*, 810 F. App'x 74 (2d Cir. 2020) (summary order); *Xi v. Haugen*, 68 F.4th 832, 850–52 (3d Cir. 2023) (DFE inapplicable where officers "exceeded the government's constitutional authority"); *M.Q. v. United States*, --- F. Supp. 3d ----, 2025 WL 965810, at *6–7 (S.D.N.Y. 2025) (same).

This case presents precisely such a violation. The fatal force used against Mr. James must be evaluated under the Fourth Amendment's "objective reasonableness" standard, assessed "in

light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). As the Supreme Court reiterated in *Barnes v. Felix*, the Fourth Amendment's reasonableness standard requires a holistic assessment of the "totality of the circumstances," not a myopic focus on split-second decisions. 605 U.S. ---, 145 S. Ct. 1353, 1357–60 (2025). Those circumstances include whether officers created the very danger that necessitated the use of force—a point especially relevant where, as here, the record shows wholesale deviation from established protocols.

The USMS task force violated multiple mandatory Standard Operating Procedures: it failed to complete a written or checklist-guided verbal operational plan (SOF ¶¶ 22–24, 41–44), failed to conduct a background investigation (SOF ¶ 19), failed to ensure all team members were briefed (SOF ¶¶ 42–43), and executed the operation in plain clothes without visible police insignia (SOF ¶ 56). These lapses created a volatile and uncoordinated encounter that forced officers into a cramped bathroom where they fatally shot Mr. James—despite alternative, less intrusive means of arrest being readily available (SOF ¶¶ 49–51, 55–57).

The fatal force, viewed in context, was not an isolated act of judgment but the foreseeable consequence of violating rules designed to prevent escalation. These are not protected policy decisions. Rather, they are operational failures that led to an objectively unreasonable seizure— exactly the type of constitutional violation that strips the Government of DFE immunity. See *Leticia v. United States*, 2023 WL 7110953, at *15–16 (E.D.N.Y. Oct. 27, 2023) (DFE inapplicable where failure to follow procedure caused unconstitutional separation of mother and child).

Moreover, as *Griggs* confirms, an officer's execution of a warrant or use of force during an arrest is not protected by the DFE when the conduct exceeds constitutional bounds or ignores operational constraints. The court there flatly rejected immunity for a use of force "manifestly

excessive" and "beyond the outer perimeter" of the officer's authority. *Griggs*, 232 F.3d at 921–22. The same conclusion applies here, where the record shows reckless entry tactics and disregard of basic SOP safeguards.

Because the facts, when considered in totality, make out a violation of the Fourth Amendment, the DFE categorically does not apply.

### 4. *The Government has Not Met Its Burden of Proof to Demonstrate the Discretionary Function Exemption Applies*

It is the Government's burden to demonstrate that each challenged act falls within the discretionary function exception by satisfying both *Berkovitz* prongs. See *Molchatsky v. United States*, 778 F. Supp. 2d 421, 431 (S.D.N.Y. 2011), aff'd, 713 F.3d 159 (2d Cir. 2013) ("[I]f a plaintiff fairly alleges negligence outside the scope of the discretionary function exception … the Government must establish that an activity is not mandated by statute and involves some element of judgment or choice and that the decision in question was susceptible to policy analysis." (cleaned up)). Because the officers here violated mandatory SOPs, and because their operational misjudgments were not rooted in any discernible policy analysis, the discretionary function exception does not apply. The United States therefore remains liable for the task force's negligence.

### C. The Task Force Members Were Negligent in the Planning and Execution of the Warrant.

The record supports a finding that Task Force members acted negligently in both planning and executing the warrant. They failed to comply with multiple mandatory Standard Operating Procedures (SOPs) that governed fugitive apprehension operations. Trooper Ulatowski, who led the operation, made no effort to contact Mr. James prior to seeking enforcement assistance and conducted no background investigation to assess potential risks. See SOF ¶¶9–14, 19, 50.

No written or verbal pre-operational plan was created, in violation of SOP § IV(A)(1)(f), which mandates that "a written pre-operational plan will be formulated and communicated." See SOF ¶¶22–24, 41. Ulatowski confirmed that no such plan was prepared or distributed, and that the required checklist for verbal briefings was not used. Id. The only document prepared—an Enforcement Action Briefing—was reviewed solely by Ulatowski and never shared with the team. See SOF ¶¶34, 42–43.

The briefing that did occur took place nearly two weeks before the arrest and was not attended by key officers. See SOF ¶¶36, 40. Officer Arrowood and Sergeant DeVinney, the Task Force's training officer, both testified that they did not attend the pre-operational meeting. Id. No roles were assigned, no surveillance was conducted, and no contingency strategies were discussed. See SOF ¶¶37–39, 47–48.

Officers wore plain clothes in violation of SOP identification requirements and entered the home without a coordinated plan, escalating the situation unnecessarily. See SOF ¶¶56, 61. These failures—of planning, briefing, and execution—were operational in nature, not policy-driven, and reflect precisely the kind of negligence that precludes summary judgment under the FTCA.

## II.     MATERIAL FACT ISSUES PRECLUDE SUMMARY JUDGEMENT ON THE ASSAULT AND BATTERY CLAIMS

Under the FTCA, the United States is liable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Where the relevant state law is New York, assault and battery claims based on excessive force are evaluated under the same objective reasonableness standard as federal constitutional excessive force claims. See *Dzionara-Norsen v. County of Monroe*, No. 6:21-cv-06715-MAV-MJP, 2025 WL 1826383, at *4 (W.D.N.Y. July 2,

2025) (Vacca, J.) ("New York state law claims for assault and battery are subject to the same standard of review as excessive force claims.").

Whether force is excessive under either framework turns on whether the conduct was objectively reasonable under the totality of the circumstances. See *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Barnes v. Felix*, 605 U.S. ---, 145 S. Ct. 1353, 1357–60 (2025) (holding that excessive force claims "must be judged in light of the full sequence of events, not based solely on the final moments"). That standard requires courts to evaluate not only the force used, but the lead-up to it—including whether officers created the danger through reckless tactics, inadequate planning, or failure to follow required protocols.

In cases like this one, summary judgment is rarely appropriate. Courts consistently deny summary judgment where there are factual disputes regarding the degree of force used, the threat posed by the plaintiff, or whether officers acted reasonably under the circumstances. See *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004); *Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness."). This is unsurprising, as "[g]ranting summary judgment against plaintiffs on excessive force claims is rarely appropriate," given that "whether a use of force was justified is a fact intensive inquiry that often must be left for a jury to decide." *Ismael v. Charles*, No. 1:18-cv-3597-GHW, 2020 WL 4003291, at 6 (S.D.N.Y. July 15, 2020) (internal quotation marks and citation omitted).

Moreover, the existence of probable cause to arrest does not immunize officers from liability for assault, battery and excessive force. "[T]he seizure and reasonableness inquiries are distinct and should not be conflated." *Dancy v. McGinley*, 843 F.3d 93, 116 (2d Cir. 2016). Even where an arrest is lawful, any force used must still be reasonable under the Fourth Amendment—

17

an independent constitutional inquiry. See also *Jones v. Treubig*, 963 F.3d 214, 228–29 (2d Cir. 2020) (holding that a valid arrest does not entitle officers to use significant force absent continued resistance or threat). The relevant question is not whether force was permitted, but whether the degree and manner of force were objectively reasonable given the circumstances. *Barnes v. Felix*, 145 S. Ct. 1353, 1357–60 (2025). This totality-of-the-circumstances assessment precludes summary judgment where, as here, the facts show disputed and unresolved questions about the necessity and proportionality of force.

### A.  There Are Factual Disputes and Credibility Issues Regarding the Fatal Shot

The circumstances surrounding Dedrick James's death are disputed, rendering summary judgment on Plaintiff's assault and battery claims improper. The Government contends that Mr. James shot himself, yet no witness has definitively testified to that effect. On the contrary, task force members affirm that they cannot say who pulled the trigger. See Ex. G, 86:2–9; Ex. C, 57:4–5. During the struggle, at least one—and possibly as many as three—officers made physical contact with the weapon. See Ex. B, 143:10–15, 153:14–19; Ex. G, 83:4–85:19. Regardless of who ultimately discharged the firearm, the physical force applied to Mr. James by the officers directly contributed to the trigger being pulled. Trooper Ulatowski jumped on Mr. James's back, wrapped him in a bear hug, spun him around, and forced him down into the bathtub. See Ex. C, 52:12–21; Ex. B, 142:3–5. Deputy Marshal Smith applied pressure to Mr. James's head, neck, and jaw. See Ex. G, 83:4–85:19. Officer Baker was fully extended, pulling on the firearm while it was allegedly in Mr. James's hand. See Ex. B, 143:10–20.

The exact circumstances of the shooting remain riddled with factual inconsistencies. Such disputes cannot be resolved on summary judgment. It is well-settled that in excessive force cases, where the parties present competing narratives, summary judgment is inappropriate. A reasonable factfinder could credit any number of the conflicting accounts presented at trial. At this stage, the

18

Court cannot weigh credibility or resolve factual inconsistencies—those are questions reserved for the factfinder. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (in deadly force cases, courts must scrutinize the officer's account and consider whether circumstantial evidence permits a factfinder to discredit it).

This caution is especially warranted here, where no body-worn camera footage exists to corroborate or contradict the officers' claims. As the NYS Attorney General's report confirms, the Task Force had not yet implemented DOJ's BWC policy at the time of the shooting, leaving the factfinder entirely dependent on the participants' recollections—despite significant inconsistencies. In such circumstances, where the government controls the narrative and the deceased cannot testify, summary judgment must be denied. See *O'Bert*, 331 F.3d at 37 ("the court may not simply accept what may be a self-serving account by the police officer").

## B. Force Used By Defendants Was Not Objectively Reasonable

An officer's use of force is privileged only if it was objectively reasonable under the circumstances. When force is excessive or unnecessary, the privilege is lost, and the officer—and, by extension, the United States under the FTCA—may be liable for assault and battery. See *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Holland v. City of Poughkeepsie*, 90 A.D.3d 841, 844 (2d Dep't 2011) ("Generally, the question of whether the use of force was reasonable under the circumstances is a question best left for a jury to decide.").

As this Court recently held, "New York state law claims for assault and battery are subject to the same standard of review as excessive force claims," and whether an officer used excessive force must be resolved through the constitutional framework of objective reasonableness. See *Dzionara-Norsen v. County of Monroe*, No. 6:21-cv-06715-MAV-MJP, 2025 WL 1826383, at *4

(W.D.N.Y. July 2, 2025). The objective reasonableness framework, as recently reaffirmed by the Supreme Court in *Barnes v. Felix*, requires a holistic assessment of the "totality of the circumstances"—not just the final seconds of a rapidly unfolding encounter. See *Barnes v. Felix*, 605 U.S. ---, 145 S. Ct. 1353, 1357–60 (2025).

Here, the facts surrounding Dedrick James's apprehension are disputed and, viewed in the light most favorable to Plaintiff, could support a finding that both the physical and deadly force used were objectively unreasonable. The record shows that officers rushed into the home, escalated the encounter with Mr. James, chased him into a bathroom, tackled him face-first into a tub, and allegedly engaged in a struggle over a firearm that was ultimately discharged, causing Mr. James' death. See Ex. C, 52:12–21, 53:13–54:3; Ex. B, 143:10–20.

Under the well-settled framework established in *Graham v. Connor*, 490 U.S. 386, 396 (1989), and applied by the Second Circuit in *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010), courts assess the reasonableness of force by considering: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to officer or public safety; and (3) whether the suspect was actively resisting or fleeing. In *Tracy*, the plaintiff had fled from a traffic stop at night in poor weather conditions. After slipping and falling, he was struck multiple times in the head with a metal flashlight and then pepper-sprayed at close range while handcuffed. The Second Circuit vacated summary judgment on the excessive force claim, holding that a reasonable jury could find that the use of pepper spray after the plaintiff was restrained constituted unconstitutional force. See id. at 98–99.

This case presents, at minimum, similar if not stronger grounds for a jury determination. Dedrick James was not fleeing in public but inside his home, and officers had engaged his grandmother to help secure his cooperation. Ex. C, 35:6–21. When he ran further into the

residence, officers had non-confrontational alternatives available, including containing the scene or calling out to him. *Id*. at 33:23–34:3. Instead, they executed a dynamic, warrant-based entry without a written plan, knocked over the elderly grandmother (Ex. G, 75:5–9), and cornered Mr. James in a cramped bathroom, where several officers physically engaged him, triggering a fatal struggle over a firearm. Ex. C, 52:12–21, 53:13–54:3; Ex. B, 143:10–20.

Whether force was objectively reasonable must be assessed under the "totality of the circumstances"—a fact-intensive inquiry that rarely lends itself to summary judgment. See *Barnes v. Felix*, 145 S. Ct. 1353, 1357–60 (2025); *Kerman v. City of New York*, 261 F.3d 229, 240–42 (2d Cir. 2001). In *Kerman*, the Second Circuit reversed summary judgment where a chaotic arrest, disputed facts, and lack of corroborating evidence made reasonableness a question for the jury. The same is true here. The officers' disregard for mandatory planning protocols, failure to control the scene, and decision to initiate a dynamic entry into a private home—without knowing who was inside—culminated in a fatal use of force that demands careful factual scrutiny. And because Mr. James is deceased, "the court may not simply accept what may be a self-serving account by the police officer." *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003). The absence of body-worn camera footage, along with conflicting officer testimony and ambiguous physical evidence, only heightens the need for trial. These are classic credibility and factual disputes that must be resolved by the factfinder at trial—not the Court on summary judgment.

## III.    THE WRONGFUL DEATH CLAIM MUST PROCEED TO TRIAL

Under New York law, wrongful death liability attaches to any tortious act or omission that causes death (providing pecuniary injuries to the decedent's distributees) (N.Y. Est. Powers & Trusts Law § 5-4.1). Because evidence supports a finding of negligence here, and because there is evidence that defendants assaulted and battered Dedrick James, resulting in his death, the wrongful

death claim must be decided by the trier of fact. Defendants' Motion does not dispute this, arguing in a footnote only that "if the Court holds that there is no viable claim for battery or negligence, Plaintiff's wrongful death claim must be dismissed." ECF 52-5 at p. 26, fn. 8. Because both claims must proceed to trial, so too must Plaintiff's wrongful death claim.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the Government's motion for summary judgment in its entirety. The record, viewed in the light most favorable to Plaintiff, presents genuine issues of material fact and does not establish that the United States is entitled to judgment as a matter of law on any claim. Plaintiff therefore should be permitted to present her case at trial, relying on the rich factual detail developed in discovery to hold the Government accountable for the tragic and preventable death of her son, Dedrick James.

Dated: July 18, 2025                    Roth & Roth, LLP
       New York, New York

                                        _____~//s//~_____
                                        Elliot Dolby Shields