UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SHENEA JAMES as administrator of the estate Of
DEDRICK JAMES, deceased, and SHENEA JAMES,
individually,

                                        Plaintiff,

                   -against-

THE UNITED STATES OF AMERICA, CITY OF
ROCHESTER, RPD INVESTIGATOR RICHARD
ARROWOOD, et al.

                                        Defendants.

**23-cv-6057**

**PLAINTIFF'S
COUNTERSTATEMENT
OF UNDISPUTED
FACTS PURSUANT TO
RULE 56.1**

**PLAINTIFF'S LOCAL RULE 56.1 COUNTERSTATEMENT OF UNDISPUTED FACTS**

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, Plaintiff, SHANEA JAMES,

submits the below response to Defendants' Statement of Undisputed Facts, and the further

additional paragraphs of material facts as to which it is contended there exists a genuine issue to

be tried.

1-10: Admit.

11. Deny that it's been established that Dedrick James "allegedly injured" his son KC. There

is no proof that KC was "injured" as a matter of law, or that any injury that did occur was caused

by Dedrick James. EXHIBIT A, Plaintiff's Dep. 40:12-20 (May 1, 2024).

12. Objection. Plaintiff's deposition testimony describing statements allegedly made by her

son is inadmissible hearsay under Federal Rule of Evidence 801(c) and may not be used to prove

the truth of the matter asserted. Plaintiff testified only that "he told me" certain things—she lacks

personal knowledge and was not a percipient witness. Ex. A, Plaintiff's Dep. 42:2–5 (May 1,

2024).

13. Objection. The Government relies on inadmissible hearsay—Plaintiff is not an eyewitness and merely repeats what her son allegedly told her. Plaintiff testified: "I wasn't there. I'm just telling you what he told me." Ex. A, Plaintiff's Dep. 41:10–11 (May 1, 2024).

14. **Objection:** Plaintiff's statement about the incident was based solely on what her deceased son allegedly told her, and is hearsay without exception. Plaintiff testified, "He told me KC was brushing his teeth and he tried to snatch the toothbrush from him because he bit down and the teeth came out." Ex. A, Plaintiff's Dep. 41:7–9 (May 1, 2024).

15. **Objection:** Plaintiff was not present for the events and testified that her description of James's actions was based solely on what he told her, which is inadmissible hearsay. Plaintiff testified, "He said KC was fine. He was a little — he was in a little pain from the teeth coming out, but he was fine and he laid him down for a nap." Ex. A, Plaintiff's Dep. 40:17–20 (May 1, 2024).

16. Objection. Plaintiff lacks personal knowledge of the decision to take KC to the hospital; this evidence would be inadmissible at trial as it is multiple layers of hearsay. Plaintiff testified that Dedrick was the first to suggest taking KC to the hospital. Ex. A, Plaintiff's Dep. 41:3-4 (May 1, 2024)

17. Deny. At no point in Investigator Scott Carr's notes about Dedrick's interview does he state that Dedrick characterized KC as "injured." The report states that according to Dedrick, KC's "tooth came out" while brushing his teeth. See Defendant's Exhibit 2 (Bates 00001005–06).

18. Objection. The assertion that James's NYSP interview "mirrored" what he told his mother constitutes double hearsay—one hearsay account offered to bolster another—without foundation. See Ex. A, Plaintiff's Dep. 40:12–41:21 (May 1, 2024); Defendant's Exhibit 2 (Bates

00001005–06). Deny that this comparison proves the content, comprehensiveness, or consistency of James's account.

19. Admit.

20. **Objection.** Cromartie's statement to NYSP is inadmissible hearsay under Rule 801(c). To the extent the Government relies on her statement for the truth of what James allegedly told her, it is double hearsay and inadmissible absent an applicable exception. See Defendant's Exhibit 3 (Bates 00001007–08).

21–24. **Objection.** These paragraphs rely on out-of-court statements by Cromartie that are inadmissible hearsay and are not subject to cross-examination. To the extent the Government intends to offer her recounting of events—especially her confrontation with James and his alleged "version of events"—to prove the truth of those matters, such statements are objectionable. See Defendant's Exhibit 4 (Bates 00000997–98). Deny that this summary is admissible or that it proves the version of events offered by James or Cromartie.

25–26. **Objection.** To the extent these paragraphs include statements by Cromartie regarding KC's condition or James's reaction, they are hearsay and lack a proper foundation. Defendant's Exhibit 4 (Bates 00000998). Deny that these assertions may be considered for their truth without Cromartie's live testimony and cross-examination.

27. Admit, but clarify that it was Cromartie's mother who drove KC and Cromartie to the hospital. See Defendant's Exhibit 4 (Bates 00000998).

28-35: Admit.

36–37. **Objection.** These paragraphs rely on a pediatrician's letter offered for its conclusions regarding causation and intent. Unless the REACH doctor testifies at trial, the letter is hearsay and its conclusions lack foundation under FRE 702. Moreover, the REACH opinions contain

speculative statements ("could have occurred," "examples might include") that go beyond medical diagnosis and constitute improper lay interpretation of causation. See Defendant's Exhibit 8 (Bates 00001049).

38: Admit.

39:-44: Admit but note that Investigator Carr never actually spoke to Dedrick James and there is no evidence that Dedrick was aware that he had a warrant.

45-47: Admit.

48: Deny that Investigator Carr had "exhausted" efforts to obtain James's voluntary surrender. There is no evidence that he had a good phone number for Dedrick James, or what his basis was for calling the number he called to try to reach Mr. James. He only called the number he had on two dates before seeking help from the Marshals. He only went to the address of Dedrick's grandmother one time, without knowing if Dedrick was there. He never determined how many people reside at the address. He did not attribute any vehicles in the driveway to Dedrick during his attempts to contact him or prior to requesting help from the Marshals. See Defendant's Exhibit 9 (Bates 00001009–10).

Instead, after spending less than two weeks attempting to contact Dedrick James, who had no criminal history, to obtain a voluntary surrender, Investigator Carr then spent closer to three weeks working with Defendants to seize Mr. James using the "element of surprise" vis-a-vis an arrest warrant. Defendant's Exhibit 9; EXHIBIT B, Officer William Baker's Dep., 122:8–24 (May 8, 2024).

49: Admit.

50: Partially disputed. Admit that this appears to be Trooper Ulatowski's understanding based on his deposition. However, this understanding was apparently mistaken and not based on

personal knowledge. There is no evidence that Dedrick James was ever made aware that a warrant had issued, nor that he refused to surrender. Ulatowski testified only that he believed James was "unresponsive" after a prior conversation, based on what he was told by Carr. See EXHIBIT C, Trooper Jeff Ulatowski Dep. 25:6–20 (Oct. 2, 2024). There is no direct testimony or documentary evidence showing that James was offered or declined the opportunity to surrender voluntarily.

51-52: Admit.

53: Deny that Dedrick James assaulted KC. The record reflects that KC's teeth were dislodged during a toothbrushing incident, and that Dedrick voluntarily submitted to multiple NYSP interviews and consistently stated that KC's injury was accidental. See Defendant's Exhibit 2 (Bates 00001005–06); see also Ex. A, 40:12–20. There is no evidence that he acted with intent or recklessness to harm KC, nor any judicial finding of culpability prior to his death.

Admit that he has no significant criminal history, with the clarification that Dedrick James had **no criminal convictions whatsoever**. A full review of his criminal history confirms zero convictions of any kind. See EXHIBIT D, USMS Report of Investigation (Bates 00000101).

54-59: Admit.

60: Deny.  First, the requirement of a written pre-operational plan is not discretionary under the Standard Operating Procedure governing USMS operations. That SOP requires that "a written pre-operational plan will be formulated and communicated." EXHIBIT E, USMS Standard Operation Procedure § IV(A)(1)(f) (Bates 00000938). But that did not happen in this case. Depositions of all officers on the task force demonstrate a lack of consistency regarding whether a) there is always a written pre-operational plan in USMS task force arrests, b) what

form the writing takes, if any, and c) whether all members of the task force understood the Enforcement Action Briefing to be a written pre-operational plan.

According to Acting Marshal Arrowood, he doesn't specifically remember having a pre-operational plan in the past. The procedure he is used to with the task force is "less formal." He showed no awareness of the Enforcement Action Briefing and did not understand it to be a written pre-operational plan. See EXHIBIT F, Officer Richard Arrowood Dep. 25:13–26:17 (Oct. 4, 2024). Marshal Smith likewise denied knowledge of any written pre-operational plan. See EXHIBIT G, Carlton Smith Dep. 73:3–12 (May 7, 2024). Officer Baker also showed no awareness of the Enforcement Action Briefing's existence. Ex. B, Baker Dep. 132:16–133:4.

Investigator Ulatowski was the lead officer for this warrant execution. His is the only name listed on the Enforcement Action Briefing. Yet according to Ulatowski, there was no written pre-operational plan in this case; he referred only to "administrative Marshals paperwork" and denied having prepared an operational plan. See Ex. C., Ulatowski Dep. 35:22–36:5. This calls into question the accuracy of Shane Marshall's declaration submitted with Defendant's motion, insofar as it characterizes the Enforcement Action Briefing as a "written pre-operational plan" in satisfaction of the SOP, despite the absence of any shared understanding among task force members to that effect.

61: Admit.

62: Deny. "Completed" suggests that all relevant portions of the USMS Enforcement Action Briefing (Form 45) were filled out in accordance with policy. In fact, the form is sparsely populated and omits critical operational details. See EXHIBIT H, Enforcement Action Briefing (Bates 00001011). There are no "notes" or briefing details included. There is no reference connecting the subject location—6 Vinewood Place—to Dedrick James. Only one "Team

Member" (Investigator Ulatowski) is listed. There is a designated section for vehicle information, but it is left blank, even though Ulatowski testified that the presence of a white Dodge Dart was the sole reason he believed James was at the residence. See Ex. C, Ulatowski Dep. 27:6–13.

The Government also cites Ulatowski's deposition at pages 36–37 and 40 to support its assertion that the Enforcement Action Briefing was completed. However, Ulatowski never testified that the form was fully or properly completed, nor that it served as a substitute for a full operational plan. To the contrary, he admitted that no written operational plan was prepared, and that the document was merely "administrative Marshals paperwork." Ex. C, Ulatowski Dep. 35:22–36:5. Page 40 of his deposition contains no discussion of the form or its content at all.

63: Deny. The Enforcement Action Briefing contains very little information and helps to demonstrate that USMS failed to perform a "complete background investigation" of Mr. James as required by its training protocols. See Ex. H, Enforcement Action Briefing; EXHIBIT I, USMS Lesson Plan, Introduction to Operational Planning, EPO #1 Sec. IV(a)(ii) (requiring a complete background investigation prior to execution of a warrant).

Deposition testimony from task force members confirms a striking lack of familiarity with Dedrick James's background. Lead officer Ulatowski testified that his understanding was limited to the fact that Dedrick James was wanted for assault on a child, that Carr had not been able to reach him by phone, that his last known address was Vinewood Place, and that he drove a white Dodge Dart. He admitted that he had no information indicating James was dangerous, and that this was treated as a "routine" arrest. See Ex. C, Ulatowski Dep. 22:12–23:20, 42:1–10.

Ulatowski also did not know that Dedrick was the father of the alleged victim. See Ex. C, Ulatowski Dep. 24:6–10. Officer Arrowood testified that he had no meaningful background

information about James and was unaware of any specific intelligence that had been gathered. See Ex. F, Arrowood Dep. 47:6–21. Officer Baker likewise treated the operation as routine and confirmed that no formal discussion occurred about the method of apprehension based on any special risk posed by Dedrick. See Ex. B, Baker Dep. 90:10–91:7.

All officers treated the arrest as "low level," and no one testified to having reviewed a completed background packet, risk matrix, or other individualized intelligence prior to the operation.

64: Deny.

The USMS Standard Operating Procedures (SOP) governing enforcement actions set forth specific pre-operational requirements that were not satisfied in this case. See Ex. E, USMS SOP (Bates 00000938–41). Section IV(A)(1)(a)–(j) outlines the following requirements:

(a) When time permits, a **complete background investigation** of the fugitive shall be conducted prior to apprehension.

(f) A **written pre-operational plan** will be formulated and communicated to the arrest team.

(g) If there is insufficient time to complete a written plan, a **verbal pre-operational plan using the Situational Operational Planning Checklist** must be formulated and communicated to all team members.

(h) If **manpower is insufficient**, the team must **evaluate the risk** and weigh the benefits and consequences of proceeding with an arrest versus alternatives such as surveillance, containment, or coordination with outside agencies.

The record demonstrates that no complete background investigation was conducted (see ¶63, supra), no written pre-operational plan was created (see ¶60–62), and no verbal plan using the

required checklist is reflected in any briefing or officer testimony. No witness testified to seeing, receiving, or hearing a pre-op checklist, and the lead officer—Investigator Ulatowski—explicitly denied formulating or communicating a written operational plan. See Ex. C, Ulatowski Dep. 35:22–36:5.

Moreover, none of the task force members testified that they conducted or reviewed a manpower evaluation or discussed alternative arrest strategies such as surveillance or containment. The failure to comply with these mandatory SOP provisions renders the planning and execution of the warrant deficient under USMS's own policies.

In addition, the USMS Lesson Plan titled *Introduction to Operational Planning* states in Section IV(A) that "the following procedures for execution of search warrants and arrests will be followed by USMS Enforcement operations team members." Ex. I, *USMS Lesson Plan – Introduction to Operational Planning*, Sec. IV(A) (Bates 00000968–69). It proceeds to identify mandatory tactical considerations, including various warrant execution strategies—such as surround and call-out, containment, and surveillance—as well as contingency planning for unexpected developments. See id.

65. It is false for Defendants to claim that there are no mandatory directives governing arrest operations. The USMS Standard Operating Procedures (SOP) for Enforcement Operations contain numerous non-discretionary requirements, plainly indicated by the use of mandatory terms such as "will," "shall," and "must." These directives appear throughout the SOP and apply specifically to task force operations. See Ex. E, USMS SOP (Bates 00000935–41).

66. Deny. For example, in the section titled "Distribution of Federal, State, and Local Cases," the SOP mandates that: "The district caseload will be distributed by the SDUSM(s)," and that "each DUSM will be assigned a caseload" (Sec. III(C)(1)(a)); "distribution of state and local

cases will be coordinated by the SI/SDUSM or their designee and the Special Deputy United States Marshals" (Sec. III(C)(2)(a)); and "USMS personnel involved in Enforcement Operations targeting state and local cases will work felony cases that meet the following criteria" (Sec. III(C)(2)(c)). Moreover, "prior to assigning state and local warrants, the SI/SDUSM or their designee is responsible for reviewing each case to verify that it meets the above criteria and thereby remains in line with the Presidential Threat Protection Act mandate" (Sec. III(C)(2)(e)). Additionally, Special Deputy U.S. Marshals "shall use the following procedures" when initiating a case (Sec. III(C)(3)). These are not optional tasks; they are explicit mandates governing how enforcement work is assigned and reviewed. See Ex. E, USMS SOP.

67: Deny. Most critically, Section IV(A)(1) of the SOP governs "Executing Search Warrants and Arrest Warrants" and states unequivocally that "the following procedures for execution of search warrants and arrests will be followed by USMS Enforcement Operations team members." See Ex. E, USMS SOP (Bates 00000938). Among these requirements are:

- "Time permitting and prior to initiating any enforcement operations in the field, a complete background investigation will be conducted..." (Sec. IV(A)(1)(a));

- "A written pre-operational plan will be formulated and communicated" (Sec. IV(A)(1)(f));

- "When there is insufficient time to draft a written pre-operational plan, a verbal plan will be formulated using the Situational Operational Planning Checklist... [and] communicated to all team members" (Sec. IV(A)(1)(g));

- "USMS personnel must evaluate the circumstances and weigh the benefits and consequences of attempting an arrest against other alternatives" when resources are insufficient (Sec. IV(A)(1)(j)).

The SOP goes on to mandate additional responsibilities, including coordination with other agencies (Sec. IV(A)(1)(l)), procedures for hostage or barricade situations (Sec. IV(A)(1)(o)), and standardized restraint of arrestees (Sec. IV(A)(1)(r)–(s)). Each of these provisions reflects binding obligations—not suggestions—and collectively rebut any assertion by Defendants that there are no mandatory policies applicable to the warrant-based arrest of a fugitive.

68. Deny. The entire task force was not present at the alleged pre-operational meeting or briefing. It is unknown which officers attended aside from William Baker. The record does not support the Government's implication that the full team participated. Officer William Baker testified that he responded directly to the location on the day of the operation and gave no indication that there was a formal briefing that included all task force members. See Ex. B, Baker Dep. 90:10–91:7.

Sergeant Christian DeVinney explicitly testified that he was not present at any pre-operational briefing. He joined the team later "on the street" after they had already deployed to the target location. See EXHIBIT J, Deputy Christian DeVinney Dep. 40:23-41:12 (Sept. 17, 2024).

Acting Marshal Richard Arrowood did not confirm attendance at any specific meeting and testified that he had no clear recollection of formal pre-operational plans or briefings being regularly conducted. See Ex. F, Arrowood Dep. 25:13–26:17.

Deputy Marshal Carlton Smith likewise never stated that he was present at a full task force meeting prior to the execution of the warrant. In sum, the available testimony from task force members indicates that no comprehensive pre-operational meeting occurred, and the record does not support the assertion that the team was briefed collectively in advance.

69. Admit that the Enforcement Action Briefing was prepared, but note that it omits key information that USMS personnel testified was central to the decision to conduct the operation on September 15, 2021. Specifically, the form contains a designated field for "Known Vehicles," yet it lists that field as "N/A" despite Investigator Ulatowski testifying that the presence of a white Dodge Dart registered to Dedrick James was the sole reason he believed James was present at the target location. See Ex. H, Enforcement Action Briefing (Bates 00001011); see also Ex. C, Ulatowski Dep. 27:6–13.

70. Admit but clarify: Admit that Investigator Ulatowski testified he determined static surveillance was "not a viable option" due to the layout of Vinewood Place being a short dead-end street. He claimed that placing officers there would expose them to detection by neighbors or the subject. See Ex. C, Ulatowski Dep. 28:9–20.

71. Admit but clarify: While Ulatowski discounted static surveillance, he testified that his plan was instead to drive up and down the street periodically to check for Dedrick's car. He referred to these efforts as "drive-bys," not formal surveillance. See Ex. C, Ulatowski Dep. 27:7–22, 28:21–25. He did not conduct or document any sustained observation of the house, nor did he establish how many times he conducted such drive-bys.

72. Admit but clarify: Despite labeling surveillance unfeasible, Ulatowski himself drove onto the street, turned around, and observed Dedrick's vehicle in the driveway the morning of the operation. See Ex. C, Ulatowski Dep. 29:1–15. He testified that this occurred the morning of the operation, and that he had seen the vehicle once before, the previous evening. Id.

73. Ulatowski successfully located Dedrick at the residence based on visual confirmation of the car and without incident, undermining his claim that surveillance was unworkable. He did not

report being detected, nor did he cite any adverse consequences to this method. See Ex. C,

Ulatowski Dep. 29:1–15, 30:1–7.

74. Deny. There is no competent evidence that Dedrick James's vehicle was in the driveway

at 6 Vinewood on the morning of September 15, 2021. Investigator Ulatowski testified that he

observed a white Dodge Dart parked at the residence, but he acknowledged that this belief—that

the car belonged to Dedrick—was based solely on secondhand information from Investigator

Carr. Ulatowski never confirmed ownership through DMV records or direct observation of

Dedrick operating the vehicle. See Ex. C, Ulatowski Dep. 27:6–13.

He also testified that he saw the vehicle the day before and the morning of the operation but

did not identify any license plate or offer corroborating information to definitively link the car to

Dedrick James. Id. at 29:1–13. Importantly, the Enforcement Action Briefing—which includes a

designated section for known vehicles—lists that field as "N/A." See Ex. H, Enforcement Action

Briefing (Bates 00001011). This omission further confirms that the Government had no concrete

basis for asserting that the vehicle was connected to Mr. James.

75-78: Admit.

79. Deny that the method Ulatowski used—surround and knock—was "the best" for

executing the warrant. Ulatowski did not meaningfully compare multiple arrest options or assess

relative risks. When asked directly whether he considered other methods of apprehending Mr.

James, such as a traffic stop, call-out, or waiting at the door, Ulatowski repeatedly stated that he

did not consider those alternatives as viable or did not consider them at all. See Ex. C, Ulatowski

Dep. 33:12–34:7 (Oct. 2, 2024).

Moreover, Defendants' own Statement of Undisputed Facts confirms this lack of

consideration. They admit in ¶81 that "Ulatowski testified that he did not consider another

warrant execution plan other than a knock on the front door," and that he simply "figured it would go the same way" based on prior routine experience. See Ex. C, Ulatowski Dep. 32:10–33:1.

Thus, the assertion that the chosen method was "the best" is unsupported by any comparative analysis or specific risk-based rationale. Ulatowski's own testimony shows that the approach was selected by default, not by deliberate evaluation.

80-81: Admit.

82: Admit but clarify. Admit that Investigator Ulatowski stated he did not consider a controlled traffic stop as a viable option. However, his rationale is contradicted by the circumstances of the operation. Ulatowski testified that the vehicle he believed belonged to Dedrick James was parked on a short dead-end street—Vinewood Place—and that he drove down that street, turned around, and observed the car without being detected. See Ex. C, Ulatowski Dep. 28:9–29:15.

Ulatowski also stated that the only way to exit the dead-end street was via the intersection at the bottom, and that officers were stationed at or near that intersection. See Ex. C, Ulatowski Dep. 33:5–21. Based on that layout, officers would have been ideally positioned to initiate a controlled vehicle stop once Dedrick exited the driveway, using standard interdiction tactics. Ulatowski acknowledged that while he "considered" a vehicle stop, he "didn't consider it as an option"—not because it was impossible, but because he chose not to pursue it. Id.

Task force members had the manpower, proximity, and positional advantage to execute a traffic stop safely. Thus, Ulatowski's decision to disregard that option was not compelled by tactical constraints but by personal judgment. A controlled vehicle stop would have been both feasible and prudent under the circumstances.

14

83-84: Admit. Ulatowski did not consider any other options for arresting Dedrick James other than going inside of the residence.

85: Admit. Officer Baker states that it is most effective to knock on the door and try to "gain their cooperation." See Ex. B, Baker Dep. 102:6–10.

86: Admit but clarify. Admit that this was Deputy Marshal Carlton Smith's testimony. Smith testified that entry into a residence is not inherently more dangerous than other arrest methods, and that task force officers exercise discretion when determining how and where to execute a warrant. He stated, "It's up to the case agent to determine when and where we will arrest somebody. If he decide we want to knock on a door, that's what we will do. And then if we want to stop and pin, then we would do that." See Ex. G, Smith Dep. 95:2–10.

While it may be true that policy does not mandate a specific method of apprehension, the applicable USMS SOP does impose several required planning steps prior to executing an arrest warrant. These include conducting a full background investigation "time permitting" (Sec. IV(A)(1)(a)), preparing and communicating a written pre-operational plan (Sec. IV(A)(1)(f)), and, where time does not permit, using a verbal plan formulated via the Situational Operational Planning Checklist (Sec. IV(A)(1)(g)). See Ex. E, USMS SOP (Bates 00000941–43). There is no evidence that any of these directives were satisfied in this case.

87: Admit but clarify. Admit that this was Deputy Marshal Carlton Smith's testimony. However, the evidence shows that the task force used a "one size fits all" approach, applying a default knock-and-enter method that was not specifically tailored to the circumstances of Dedrick James's case. Smith acknowledged that different situations warrant different arrest strategies, such as controlled vehicle stops or apprehensions outside the home. See Ex. G, Smith Dep. 41:24–43:25.

Despite this, the task force made no effort to allow James to exit the building voluntarily, even though surveillance was feasible and in fact had been performed. Task force members had observed a white Dodge Dart at the residence and were stationed near the exit of the dead-end street, giving them the ability to conduct a controlled traffic stop if James left. See Ex. C, Ulatowski Dep. 28:9–29:15; see also Ex. B, Baker Dep. 124:3–126:14.

These tactics were never pursued. Ulatowski testified that he did not seriously consider other methods, and other task force members confirmed that there was no pre-op discussion of alternative strategies. See Ex. B, Baker Dep. 90:10–91:7; Ex. C, Ulatowski Dep. 33:12–34:7.

88: Admit but clarify. Admit that this was Ulatowski's testimony. However, no "knock and talk" occurred in this case. A "knock and talk" implies an approach intended to initiate voluntary dialogue, often without the immediate intent to arrest. Here, officers did not approach the home with the intent to talk but to take Dedrick James into custody based on a warrant. Ulatowski testified that after Ervin opened the door and confirmed James was inside, he did not wait for James to appear but remained at the door because of a perceived safety concern. He explicitly stated: "So to back out of the house and assume that he's going to come to the door, it's a safety concern for everyone at that scene." See Ex. C, Ulatowski Dep. 35:13–21.

This was not an attempt to initiate dialogue or encourage voluntary surrender. Rather, it was a coordinated, warrant-based entry without the opportunity for James to exit voluntarily before force was applied.

89: Deny.

Defendants assert that "Baker testified that the USMS Task Force discussed the potential risks of entering the residence," citing Baker Dep. 113. While Baker did say that risk was discussed generally, the context of his testimony shows that this was not a meaningful risk

assessment. Baker confirmed that there was no indication James would be armed or dangerous, and stated that the warrant was considered "pretty low-level." See Ex. B, Baker Dep. 114:4–10. He stated that the team "still had a shield" and treated it "as if any violence could occur," but admitted they didn't believe it was likely. Id.

Furthermore, Baker could not recall whether any surveillance was conducted that day to assess risk, nor did he identify any specific intelligence that informed the operation beyond a routine assumption that "something could happen." See Ex. B, Baker Dep. 112:1–24. The record supports that no formal or detailed threat analysis was completed before entry.

Accordingly, while risk was superficially acknowledged, the testimony cited by Defendants does not support the claim that a meaningful or case-specific discussion of potential risks took place prior to entry.

90: Deny. Had task force members been prepared for any type of violence, they would have chosen a safer method for apprehending Dedrick James. Each officer testified that for a suspect who was believed to have a gun, the operational steps are different. Ex. F, Arrowood Dep., 28:17-19; Ex. B, Baker Dep., 102:24-104:9; Ex. J, Devinney Dep., 37:16-38:17.

91: Admit.

92: Deny. There is no competent evidence that the car observed in the driveway belonged to Dedrick James. Investigator Ulatowski testified that his belief was based on information provided by Investigator Carr, but he did not verify the vehicle's registration or witness James operating or entering the car. Ulatowski stated: "I had not seen it before then," and confirmed, "I had not seen Dedrick actually driving the vehicle or getting in and out of it." See Ex. C, Ulatowski Dep. 29:14–25.

Moreover, there was no direct visual confirmation that James was inside the home prior to the team entering. No officer reported seeing James in a window, at the door, or anywhere in the house until after his grandmother opened the door and stated he was home. Even then, the officers relied solely on her representation—there was no firsthand observation of Dedrick James prior to entry. See Ex. C, Ulatowski Dep. 49:1–13.

93: Deny. Defendants assert that the USMS Task Force conducted a "case brief with the officers" prior to approaching the residence. However, the deposition testimony of multiple officers contradicts this claim. Investigator Ulatowski expressly stated, "So the answer to your question, was there a staged area briefing before we went and knocked on that door that morning, the best of my recollection is no." See Ex. C, Ulatowski Dep. 46:12–15.

Deputy Marshal Carlton Smith also confirmed that any briefing was brief and informal, conducted "over the radio and prior to setting up the perimeter." He described the plan as "kind of whose case it was or whoever was on the scene first," and testified that there were no written assignments and no formal plan about who would do what. See Ex. G, Smith Dep. 72:17–25, 73:14–21.

Although Officer Baker recalled some form of briefing, he was vague about its timing and substance. He admitted that he didn't remember any specific details and couldn't recall who else attended. See Ex. B, Baker Dep. 112:1–25.

Thus, while limited communication may have occurred, the record does not support that a formal "case brief" involving the full team took place prior to the approach.

94-105: Admit.

106: Deny. Investigator Ulatowski did not "wait" at the door. The evidence shows that he immediately entered the residence upon seeing Dedrick James. Ulatowski testified that after

James's grandmother answered the door and confirmed Dedrick was home, he "made sure the door was open" and remained at the threshold for safety reasons. See Ex. C, Ulatowski Dep. 49:21–23.

Once he observed Dedrick come out of a back room, he did not pause or attempt further verbal engagement. He moved into the house without delay. He stated: "I was in the threshold of the door. I put eyes on and observed Dedrick James come out of the back of the house," and from that point, the team advanced rapidly. See Ex. C, Ulatowski Dep. 50:4–10.

There is no indication that Ulatowski waited at the door for any meaningful period before initiating the entry or pursuit. His own account shows immediate action once Dedrick was seen.

107: Admit.

108: Deny. The testimony is that Dedrick James asked "why are you guys here?" There is no evidence that he asked whether they were looking for him. Ex. B, Baker Dep., p. 137. Moreover, since Mr. James is dead, this is inadmissible hearsay.

109. Admit this is what Ulatowski testified.

110. Objection. The alleged statement by Mr. James is inadmissible hearsay.

111. Admit this is what Ulatowski testified.

112. Admit this was Ulatowski's testimony.

113. Admit this was Ulatowski's testimony.

114. Admit this was Ulatowski's testimony.

115: Admit.

116: Admit but clarify. Admit that this was Officer Baker's testimony. However, the rationale he provided for using the "element of surprise"—that waiting could allow Dedrick James to plan to "ambush or shoot" the officers—is wholly unsupported by the evidence. Baker

testified that although such a possibility exists in general, in this case, the team had no indication that James had a gun, had ever used a gun, or had any history of violence. He confirmed that there was "no indication" James might have weapons, had been involved in prior shootings, or was affiliated with any gang. See Ex. B, Baker Dep. 120:5–121:16.

At the time James allegedly ran, officers had no new information to suggest he was armed or preparing to ambush them. Their stated justification—fear of an ambush or sudden violence—was based on generic concern, not any intelligence specific to this case. Baker admitted that the team considered this a "lower-level" warrant. Id. at 102:4–10.

Accordingly, the use of the "element of surprise" was not grounded in specific facts about Dedrick James, but rather a generalized assumption that runs counter to the task force's own assessments of the risk he posed.

117. Deny. While Investigator Ulatowski testified that he "jumped on [James's] back in order to gain control of him, and then the fluid motion of that led us to fall into the bathtub," he also confirmed that he approached James from behind and physically tackled him into the bathroom without hesitation. See Ex. C, Ulatowski Dep. 52:18–21.

However, testimony is inconsistent as to Ulatowski's exact position and orientation at the time of the takedown. Officer Baker testified that he could not clearly recall Ulatowski's position, but described the scene as a chaotic and rapid entry with multiple officers piling into a confined bathroom space. See Ex B, Baker Dep., 140:25-142:25. Deputy Smith likewise could not confirm Ulatowski's configuration when the entry occurred. See Ex. G, Smith Dep. 83:19–84:3.

This inconsistency undermines the assertion that the physical engagement happened exactly as Ulatowski described, and supports that no officer had a clear, continuous line of sight on the moments immediately preceding the fall into the bathtub.

118. Admit. Dedrick James was not facing his assailants when he was shot and killed.

119. Deny. Deposition testimony does not establish what Dedrick James's intentions were during the physical confrontation. While Ulatowski testified that James was "violently struggling" and "not willing to be handcuffed," this does not resolve the underlying question of James's mental state or motivation. See Ex. C, Ulatowski Dep. 54:23–25.

There is no testimony from any officer affirming that James made verbal threats or gestures of aggression prior to the moment he was tackled in the bathroom. On the contrary, officers acknowledged that James had no documented history of violence or firearm use, and no officer reported knowing he had a gun until after the struggle had begun.

Given the chaotic nature of the bathroom entry and the speed of the encounter, it is equally plausible—if not more likely—that James's movements were motivated by fear, confusion, or an attempt to conceal the weapon to avoid harm. Officer Baker testified that James "reached into his left pocket and ran," but did not interpret that act as overt aggression until seeing the gun later in the bathroom.

Accordingly, any claim that James was "actively resisting" must be treated with caution. The officers' own accounts reflect uncertainty, and none can speak definitively to what James intended in the moments before or during the struggle.

120: Admit.

121-122: Admit. No member of law enforcement saw Dedrick James with a gun prior to moments before he was shot.

21

123: Admit. Baker grabbed for the gun moments before James was shot and killed.

124: Deny. There is no evidence that Dedrick James was attempting to get the gun underneath his body. The only accounts of the incident come from officers, none of whom could conclusively state that James was actively trying to retrieve or aim the gun during the struggle. In fact, Investigator Ulatowski testified that he is uncertain if he ever made contact with the gun at all and did not know who pulled the trigger. He stated that the firearm came into view suddenly and that he saw it pointed at his face, but did not testify that James was manipulating it in an aggressive or offensive manner. See Ulatowski Dep. summary, Defendant's Exhibit 9 (Bates 00001083).

Officer Baker similarly testified that he attempted to grab the gun, but due to the awkward position over the bathtub, he lost grip and saw the weapon go under James's body. He acknowledged that this could have occurred during the physical struggle and not as an intentional act by James. See Ex. B, Baker Dep. 150–151.

No officer testified that they saw James reach for or attempt to use the firearm during the struggle in a deliberate manner. The gun's presence and movement appear to be the result of chaotic physical conditions rather than any purposeful act by James.

125: Admit.

126-129: Admit that this is what the officers testified to.

130. Deny. The only evidence for this assertion is Investigator Ulatowski's own self-serving testimony, offered after the death of Mr. James, who cannot dispute or clarify the facts. No forensic evidence has been cited or presented by Defendants to conclusively establish who pulled the trigger, and Ulatowski himself conceded in his deposition that "I can't say definitively whose finger was on the trigger." See Ex. C, Ulatowski Dep. 57:2–4.

Where, as here, the key material facts rely solely on the statements of the officer involved in a fatal use-of-force incident, courts must apply heightened scrutiny to those assertions. As the Second Circuit has held, "[g]iven the difficult problem posed by a suit for the use of deadly force, in which the witness most likely to contradict the police officer's story—the person shot dead—is unable to testify[,]... the court may not simply accept what may be a self-serving account by the police officer." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003); see also *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) ("We cannot simply accept what may be a self-serving account by the police officer.").

Accordingly, because this claim hinges entirely on one interested party's uncorroborated testimony, and the decedent is unable to refute it, it cannot be deemed undisputed for summary judgment purposes.

131: Deny. There is no conclusive evidence that Dedrick James was the only person who could have pulled the trigger. Investigator Ulatowski admitted he had "no idea" how the shot went off, did not see who pulled the trigger, and acknowledged that he and James were entangled, with other officers in close physical proximity at the time. See Ex. C, Ulatowski Dep. 57:4–10. Ulatowski testified that Officer Baker was "above me to my right shoulder, and Carl Smith was somewhere over to my left," and conceded he did not know whether he was touching the gun or James's hand when the gun discharged. Id.

Officer Baker testified that he physically grabbed the gun and was pulling on it when the shot was fired. See Ex. B, Baker Dep. 143:6–17. Baker described stretching over the bathtub and holding the barrel of the gun with both hands. Id.

Deputy Smith likewise testified that he was applying force to James's head and shoulders while officers were struggling for control. See Ex. G, Smith Dep. 84:8–15. He acknowledged that it was unclear who had control of the weapon, and he did not see the moment of discharge.

Given that three officers were physically engaged with Mr. James in a small space, with at least two reaching for or holding the gun, and that no witness testified to seeing who pulled the trigger, Defendants' assertion that only Dedrick James could have fired the weapon is unsupported and improperly speculative.

132. Deny. There is no evidence that Dedrick James shot himself. The Monroe County Medical Examiner, Dr. Christine Y. Yoo, certified the *cause of death* as a "contact gunshot wound of the torso" and explicitly classified the *manner of death* as **Homicide**. See EXHIBIT K, Medical Examiner's Report (Bates 00001073).

The autopsy report does not contain any conclusion about who fired the fatal shot. It simply documents that the entrance wound was located on the medial left side of the upper chest and that it bore "evidence of close-range discharge of a firearm (faint soot searing)"—a finding equally consistent with the discharge occurring during a physical struggle. Id.

Further, none of the officers testified to actually observing James fire the weapon. Ulatowski, the lead officer, admitted that he could not say who pulled the trigger. See Ex. C, Ulatowski Dep. 57:4–10. At least three officers had physical contact with James and the firearm in a confined space at the time of discharge.

Therefore, Defendants' assertion that James shot himself is unsupported by the medical evidence or any reliable testimony, and is contradicted by the homicide classification issued by the Medical Examiner.

133. Deny. The New York State Attorney General's Office did not conclude that "no law enforcement officers utilized deadly force." The Attorney General's report contains **no such finding**. Instead, the report limits itself to stating that "the evidence does not prove beyond a reasonable doubt that the actions of NYSP Inv. Ulatowski and RPD PO Baker were unjustified under Article 35 of the New York Penal Law." See Defendant's Exhibit 19, NYS AG Report on the Investigation into the Death of Dedrick James (August 26, 2022) (Bates 00000079).

The report explicitly states that there is no body-worn camera footage of the incident, and the only evidence available regarding what occurred in the bathroom is the officers' own self-serving accounts. Id. at Bates 00000082-00000086. The report also acknowledges that the gun discharged during a close-quarters struggle involving multiple officers and that the weapon was not fired by any officer's service weapon, but by a .380 handgun whose trigger pull and discharge could not be forensically attributed to any specific individual. Id. at Bates 00000089-00000090.

Crucially, the report does **not** find that no law enforcement officer used deadly force—it only concludes that no criminal charges will be pursued. The determination not to prosecute is **not a factual finding** that no deadly force was used, nor is it dispositive of whether deadly force occurred under the Fourth Amendment standard. That issue remains contested and must be resolved by a jury.

134: Deny. The New York State Attorney General's Office did **not** determine that the USMS Task Force's use of physical force as a whole was justified. The Office of Special Investigation (OSI) **only** analyzed whether specific officers—NYSP Investigator Ulatowski, RPD Officer Baker, and Deputy Marshal Smith—used **justified physical force under Article 35 of the New York Penal Law**. See id. at Bates 00000090-00000091.

The report explicitly states: "There is no evidence that any officer used deadly physical force against Mr. James. Yet it is clear that Inv. Ulatowski, PO Baker, and Dep. Marshal Smith used physical force against Mr. James... Under Article 35... they were justified…" Id.

However, the Attorney General's Office lacks legal authority under Executive Law § 70-b to assess or determine the lawfulness of federal agents' conduct. The report acknowledges this limitation: "The actions of USMS Dep. Marshal Smith are not within the legal authority of OAG to prosecute, because Dep. Marshal Smith was not a 'police officer' or a 'peace officer' as defined in Section 70-b." Id. at Bates 00000091 n.1.

Accordingly, the OSI made no findings about the justification or legality of the **Task Force's** use of force as a whole—only the two state/local officers within its jurisdiction. The statement in ¶134 is therefore false and unsupported.

## ADDITIONAL PARAGRAPHS OF MATERIAL FACTS AS TO WHICH IT IS CONTENDED THERE EXISTS A GENUINE ISSUE TO BE TRIED

A. **Dedrick James Is Investigated Over A Nine-Month Period Relating To An Incident Involving His Son**

1. Dedrick James had a two-year-old son, KC, who resided with his mother, Zayvia Cromartie, in Marion, NY. Dedrick was involved in parenting his son, and would care for him while Cromartie was at work. Part of their daily routine involved Dedrick feeding, washing, and brushing KC's teeth. KC did not like brushing his teeth, and would bite down on the toothbrush. On December 27, 2020, while brushing KC's teeth, to avoid causing harm to KC, Dedrick attempted to remove the toothbrush, resulting in two of KC's teeth becoming dislodged. See **Ex. A, Shenea James Dep. 40:3–16 (May 1, 2024).**

2.  As a young, inexperienced parent, Dedrick struggled when he was alone caring for KC. However it is clear that his intentions were good, his desire was to care for and protect the child, and he was trying to be a good father. When KC's teeth were dislodged, it was distressing to Dedrick. See Def. Ex. 2 (Bates 00001005–06).

3.  When Cromartie got home, she called her mother, Lenore Cromartie, who also came over. Upon arrival, Lenore began to attack Dedrick, throw his things out of the home, and tell him he would never see KC again. She and Cromartie then brought KC to the hospital, where she made it clear Dedrick was not welcome. See Ex. A, Shenea James Dep. 41:2–11 (May 1, 2024).

4.  Dedrick went to the hospital to attempt to check on KC, **which prompted Lenore Cromartie to apply for an order of protection**. See **Def. Ex. 2 (Bates 00001005–06).**

5.  Law enforcement began investigating the December 27, 2020 incident. They interviewed Dedrick James about it multiple times. The first interview took place two days later, on December 29, 2020. Dedrick submitted to this interview voluntarily and was forthright about what occurred. There was no indication at that time that Dedrick would be charged with a crime, or that the incident was even being considered as criminal. See Def. Ex. 2 (Bates 00001005–06).

6.  On April 20, 2021, police went to the home of Dedrick James to speak to him. He voluntarily spoke with them outside of his residence. They requested that he come to the station, and he did, sitting down for a *Mirandized* formal interview, where he was again cooperative and forthright. See Def. Ex. 3 (Bates 00001007–08).

7. Investigator Scott Carr contacted the District Attorney's office on April 20, 2021, and was advised that Dedrick James would not be charged in connection to the incident involving KC. See Def. Ex. 3 (Bates 00001008).

8. On July 26, 2021, a decision was made to charge Dedrick with Assault in relation to the KC incident. See Def. Ex. 9 (Bates 00001009).

9. The first attempt to contact Dedrick James regarding his pending charges was made on August 11, 2021, by Investigator Carr. He did not get an answer. It is unclear what number he used to contact Dedrick, or why he believed the number was Dedrick's. See Def. Ex. 9 (Bates 00001009); Def. Ex. 4 (Bates 00000997–98).

10. This is significant, because law enforcement had multiple numbers for Dedrick. They had a T-Mobile number (Def. Ex. 2) and a number that was given to them by Lenore Cromartie, which she stated Dedrick was not answering (Def. Ex. 4). Both of these numbers were obtained in December of 2020, about eight months before they attempted to contact him about his criminal charge.

11. Investigator Carr made one more attempt to call Dedrick on August 23, 2021. See Def. Ex. 9 (Bates 00001009).

12. On August 24, 2021, Investigator Carr went to Dedrick's residence and knocked on the door. It is unknown whether Dedrick was home. No one answered the door. See Def. Ex. 9 (Bates 00001009).

13. On August 25, 2021, an arrest warrant was obtained for Dedrick James. See Def. Ex. 11 (Bates 00000043).

14. The very next day, August 26, 2021, Investigator Carr got in touch with the Marshal's Task Force to request their assistance in apprehending Dedrick James. See Def. Ex. 9

(Bates 00001010). Thereafter, the lead task force member, Trooper Ulatowski, made no attempt to contact Mr. James before the warrant was executed. **See Ex. C, Ulatowski Dep. 25:6–26:11 (Oct. 2, 2024)** (testifying that he made no effort to call or contact James, stating "I didn't see the need to do that").

### B.  Mandatory Rules Governing the Marshals Task Force

15. There are many mandatory rules that govern the actions of the U.S. Marshal's task force when they conduct an enforcement action. These rules are mandatory based on their language, and occur throughout the SOP governing these actions. Examples include:

> • **"If a Special Deputy United States Marshal assigned to USMS Enforcement Operations wishes to utilize USMS Enforcement Operations resources for a fugitive investigation, he or she shall use the following procedures." Ex. E, USMS SOP (Bates 00000938).**
>
> • **"When the USMS is the lead agency of a multi-agency arrest effort, the USMS Enforcement Operations CDUSM/ Chief Inspector or their designee will assume responsibility for advance coordination..." Id.**
>
> • **"If a hostage or a barricaded subject situation arises, the senior USMS Enforcement Operations member on the scene will take command…" Id.**
>
> • **"In the event that SOG or Special Weapons and Tactics (SWAT) are deployed, they will assume command of the scene until the situation has been resolved." Id.**
>
> • **"All arrestees will be restrained in a manner that offers the greatest safety to the officer, suspect, and the public. When available, belly-chains and leg irons will be used on all violent offenders or those suspects who are escape risks. All arrestees will be searched as soon as it is safe to do so." Id.**
>
> • **"All fugitives will be handcuffed behind their back until they are placed into full restraints." Id.**

Ex. E, USMS Standard Operating Procedures, Enforcement Actions.

16. Rules governing arrest warrants are contained in Section IV of the Standard Operating Procedures, which state **"the following procedures for execution of search warrants and arrests will be followed by USMS Enforcement Operations team members." Ex. E, SOP (Bates 00000938).**

17. USMS Task Forces are only authorized for cases meeting specific criteria. The criteria are not discretionary. Among the criteria are that the subject must be charged with a violent felony offense. Id. at Bates 00000939-940, 942.

18. An Enforcement Action Briefing must be created in preparation for a USMS enforcement action. This form is known as USM-45. **See Ex. I, USMS Intro to Operational Planning (Bates 00000968); Ex. E, USMS SOP (Bates 00000944)..**

19. With regard to the execution of a warrant, "time permitting and prior to initiating any enforcement operations in the field, a complete background investigation **will be** conducted." Seventeen areas of investigation are listed. **See Ex. I, USMS Intro to Operational Planning (Bates 00000969-970).**

20. Many tactical considerations are mandated to be considered by the Task Force, including mitigation measures such as "Contain and Call-Out," "Surveillance," and "Contingency Planning." Id. at Bates 00000970.

21. The SOP mandates that "[a]ll members of the arrest team **will be** appropriately identified as police officers: raid jackets, vests, neck badge, etc." Ex. E, SOP (Bates 00000938).

22. It goes on to mandate that "[p]rior to the execution of an arrest warrant or enforcement activity, photos of the fugitive(s) will be shown to each member of the arrest team and a written pre-operational plan **will be** formulated and communicated." Id. at 00000943.

23. It goes on to mandate that "[w]hen there is insufficient time to draft a written pre-operational plan, a verbal plan will be formulated using the Situational Operational Planning Checklist that all USMS Enforcement Operations personnel **will be** issued. Using this checklist, a verbal plan **will be** communicated to all team members." Id.

24. It goes on to mandate that "USMS Enforcement Operations personnel should arrange for the deployment of sufficient manpower and other resources when effecting an arrest or conducting interviews, searches, and surveillances. This includes the use of the Special Operations Group (SOG) or other tactical teams if appropriate. In instances where this is not possible due to exigent circumstances (e.g., a random or otherwise unanticipated encounter with a known fugitive), the arresting officer(s) **must** evaluate the circumstances and weigh the benefits and consequences of attempting an arrest against other alternatives, such as establishing or continuing surveillance." Id.

**C. Training Received By Members Of The Task Force That Negligently Caused Dedrick James's Death.**

25. Deputy Christian DeVinney serves as the designated trainer for the USMS Task Force involved in the arrest of Dedrick James. **See Ex. F, Arrowood Dep. 36:4–16 (Oct. 4, 2024).**

26. According to DeVinney, the task force is intended for use only in apprehending violent offenders, which shapes the level of preparation and safety measures that are expected. **See Ex. J, DeVinney Dep. 19:3–15 (Sept. 17, 2024).**.

27. DeVinney testified that it is critical for task force members to know, in advance of an arrest operation, the nature of the charge, the subject's criminal history, whether weapons

were used or may be present, and the layout and risks of the arrest location. **See Ex. J,**
**DeVinney Dep. 35:13–36:6; Ex. F, Arrowood Dep. 21:11–22, 28:12–19, 31:4–19.**.

28. Arrowood also testified that verifying the accuracy of intelligence—such as the subject's
background and the presence of weapons—is critically important when planning a
warrant execution. **See Ex. F, Arrowood Dep. 22:12–19.**.

29. Arrowood confirmed that proper pre-operational planning should include preparation for
contingencies, such as resistance, flight, or unexpected occupants. See id. at 24:4-13.

30. Despite serving in a leadership role, Richard Arrowood acknowledged unfamiliarity with
the USMS SOP regarding enforcement operations, including its mandatory planning and
risk assessment requirements. **See Ex. F, Arrowood Dep. 19:18–20:20.**

31. Deputy Carlton Smith testified that it is "inherently obvious" that entering a residence is
more dangerous than making an arrest elsewhere, and that Marshals are "never taught" to
enter a building without first exhausting safer alternatives. **See Ex. G, Smith Dep.**
**39:17–22 (May 7, 2024)**.

**D. Planning The Operation That Negligently Caused Dedrick James's Death.**

32. Despite their training, Task Force members knew very little about Dedrick James prior to
their attempt to apprehend him. The lead member of the task force, Ulatowski, did not
even know that Dedrick was the father of KC, the child he was accused of assaulting. See
Ex. C, Ulatowski Dep. 23:24–24:22 (Oct. 2, 2024).

33. The "background" information Ulatowski received from Investigator Carr was limited to
the fact that James was wanted for assault, Carr had been unable to reach him by phone,

James's last known address, and that he was known to drive a white Dodge. See Ex. C,

Ulatowski Dep. 21:19–22:17 (Oct. 2, 2024).

34. The Enforcement Action Briefing (USM-45) omits this key information about James's

vehicle. The "Known Vehicles" section is marked "N/A," despite testimony that the

white Dodge Dart was the basis for believing James was present. See Ex. H, Enforcement

Action Briefing (Bates 00001011); Ex. C, Ulatowski Dep. 27:6–13.

35. Officer Arrowood testified that he did not know anything about Dedrick or any

intelligence gathered prior to the operation. See Ex. F, Arrowood Dep. 47:11–24 (Oct. 4,

2024).

36. Ulatowski testified that he held a verbal briefing about two weeks before the operation to

go over minimal information with some task force members. See Ex. C, Ulatowski Dep.

26:17–27:14 (Oct. 2, 2024).

37. That briefing did not include any discussion of what method would be used to apprehend

the suspect. See Ex. C, Ulatowski Dep. 26:17–27:14.

38. Officer Baker testified that typically the task force meets before operations to determine

the safest method of apprehension. See Ex. B, Baker Dep. 90:20–91:12 (May 8, 2024).

39. In this case, Ulatowski made the decision on how to conduct the operation unilaterally.

See Ex. C, Ulatowski Dep. 31:3–33:8.

40. Not all task force members attended the earlier briefing. Officer Arrowood testified that

he was not present. See Ex. F, Arrowood Dep. 48:18–24. Sergeant Christian DeVinney

likewise testified that he did not attend the earlier briefing, stating that he was not

involved "at the very beginning" and joined the team later "on the street" after they had

already deployed to the location. See Ex. J, DeVinney Dep. 40:23–41:10 (Sept. 17, 2024). It is unclear who, other than Ulatowski and Baker, attended.

41. There was no written pre-operational plan created for the September 15, 2021 arrest attempt. See Ex. J, DeVinney Dep. 52:24–53:3 (Sept. 17, 2024); Ex. C, Ulatowski Dep. 35:22–36:6.

42. Ulatowski explicitly denied considering the Enforcement Action Briefing to be a written pre-operational plan. See Ex. C, Ulatowski Dep. 35:22–36:6.

43. Deputy DeVinney testified that he does not consult the Enforcement Action Briefing as part of task force preparation. See Ex. J, DeVinney Dep. 53:5–15.

44. Arrowood testified that it is routine for the task force to operate without a written pre-operational plan. See Ex. F, Arrowood Dep. 24:14–26:25.

45. Ulatowski testified that he had no concerns about violence from Dedrick James, and did not incorporate such concerns into his planning. See Ex. C, Ulatowski Dep. 24:6–8, 42:16–25, 63:24–25.

46. In contrast, DeVinney testified that concerns around potential violence should have been considered when planning the operation. See Ex. J, DeVinney Dep. 51:9–52:23.

47. DeVinney also testified that no discussion of contingencies—such as resistance, flight, or third-party involvement—occurred in planning this operation. See Ex. J, DeVinney Dep. 72:15–73:2.

48. No specific roles or assignments were given to task force members prior to executing the arrest. See Ex. C, Ulatowski Dep. 43:4–19.


E.  **Executing The Operation That Negligently Caused Dedrick James's Death.**

49. Dedrick James was believed to be inside a residence on Vinewood Place, a short dead-end street. Rather than conduct static surveillance, Ulatowski decided the best method would be to occasionally drive by the house. **See Ex. C, Ulatowski Dep. 28:9–24 (Oct. 2, 2024).**

50. Ulatowski testified that on the date of the incident, September 15, 2021, he drove by the house and saw a white Dodge Dart parked at the location and believed it was Dedrick's vehicle. He chose not to wait for James to enter the vehicle and conduct a vehicle stop. See Ex. C, Ulatowski Dep. 32:25–33:22.

51. This decision was made even though task force officers were positioned at the one outlet from Vinewood Place. See Ex. C, Ulatowski Dep. 33:5–21; Ex. G, Smith Dep. 68:23–25 (May 7, 2024); Ex. J, DeVinney Dep. 41:4–6 (Sept. 17, 2024).

52. Ulatowski delayed execution of the warrant for several hours to complete a random drug test. See Ex. C, Ulatowski Dep. 44:6–25.

53. After returning from the drug test and noting the vehicle was still in the driveway, Ulatowski radioed task force members to respond to the location to execute the warrant. He admitted that he did not meet with the full team that morning, which he acknowledged was unusual. See Ex. C, Ulatowski Dep. 45:19–46:4.

54. Ulatowski reasoned that the team was already familiar with the case based on a verbal briefing held two weeks prior, which not all officers had attended. See id.

55. At the time of approach, the team did not know who was inside the residence. See Ex. C, Ulatowski Dep. 32:19–24.

56. The task force approached in plain clothes, not in marked uniforms. See Ex. F, Arrowood Dep. 62:7–12 (Oct. 4, 2024). Officer Baker and Investigator Ulatowski approached the

front door together, with Baker carrying a large shield. Deputy Smith arrived shortly after and joined them on the porch. See Ex. C, Ulatowski Dep. 48:1–10 (Oct. 2, 2024); Ex. B, Baker Dep. 114:20–115:4 (May 8, 2024); Ex. G, Smith Dep. 75:5–20 (May 7, 2024) ("I was one of the last people that showed up on the scene and I remember getting out of my car and just B-lining to the door with the two guys that were up there. It wasn't necessarily my role, that's what I did.").

57. No visual surveillance was conducted to identify individuals inside the residence or confirm the layout. See Ex. F, Arrowood Dep. 48:12–19.

58. Ulatowski knocked on the door; Dedrick's grandmother answered, stated that Mr. James was home, and agreed to get him. Ulatowski did not plan or state how long he would wait. See Ex. C, Ulatowski Dep. 35:6–21.

59. Despite allowing James's grandmother to retrieve him, Ulatowski viewed her action as a safety concern. See id.

60. Ulatowski admitted he never considered using a "call-out" tactic—described in the SOP—as an alternative. See Ex. E, SOP (Bates 00000938–40); Ex. C, Ulatowski Dep. 33:23–34:3.

61. While James's grandmother went to get him, Ulatowski forcibly entered the home without consent. See Ex. C, Ulatowski Dep. 49:21–50:5.

62. Officer Baker testified that his understanding was that James would come out voluntarily, not that officers would enter. See Ex. B, Baker Dep. 121:3–13 (May 8, 2024).

63. Baker testified that the objective of the task force was to gain cooperation. See Ex. B, Baker Dep. 119:4.

64. James appeared, saw the officers, and backed away with his hands in the air. See Ex. G, Smith Dep. 77:23–78:25.

65. Ulatowski reached for his handcuffs and James turned and ran. See Ex. C, Ulatowski Dep. 51:3–15.

66. Ulatowski did not warn James that he was about to handcuff him. See id. at 52:4–11.

67. Officer Baker claimed that he believed James might be running to retrieve a gun. See Ex. B, Baker Dep. 122:16–18.

68. As James ran, he allegedly placed one hand in his pocket. See id. at 137:16–138:4.

69. Task force officers acknowledged that entry into a residence is inherently dangerous and that safer alternatives are generally preferred. Deputy Smith testified that marshals are "never taught" to enter a building before exhausting other options. See Ex. G, Smith Dep. 39:17–22 (May 7, 2024). However, Sergeant DeVinney testified that officers are trained to clear structures when necessary and that tactical entry remains part of standard CQB training. See Ex. J, DeVinney Dep. 37:16–38:17 (Sept. 17, 2024).

70. Baker testified that officers should avoid rushing into homes and instead plan methodical entries. See Ex. B, Baker Dep. 102:11–103:17.

71. The SOP and testimony identify "containment" and "call-out" as safer alternatives to home entry. See Ex. E, SOP; Ex. G, Smith Dep. 92:5–23.

72. Despite this, Ulatowski, Baker, and Smith pursued James into the home. Smith testified that he "made a beeline" even though that was not his assigned role. See Ex. G, Smith Dep. 75:5–9.

73. The officers followed James into a bathroom. Ulatowski jumped onto James's back, and both fell into the bathtub. See Ex. C, Ulatowski Dep. 52:12–21.

74. Baker testified that Ulatowski and James were face-to-face in the tub. See Ex. B, Baker Dep. 142:3–5.

75. All three officers converged on James in the tub. Smith used a "pain compliance" technique—applying pressure to James's jaw and temple. See Ex. G, Smith Dep. 83:4–85:19.

76. Around this time, the officers became aware of a handgun. See Ex. C, Ulatowski Dep. 53:13–54:3.

77. Ulatowski tried to push James's arm—holding the gun—downward. See id. at 56:2–11

78. Ulatowski grabbed for James's hand but was unsure if he touched the firearm. See id. at 56:19–57:20.

79. Officer Baker had both of his hands on the gun. See Ex. B, Baker Dep. 143:10–15.

80. Baker testified he was stretching across the bathtub, pulling the gun. See id. at 143:16–20.

81. Baker then stepped back and announced, "I'm going to shoot him." See id. at 151:12–17.

82. Smith testified that there was no time to consider non-lethal alternatives due to how quickly events unfolded. See Ex. G, Smith Dep. 87:3–10.

83. A single shot was discharged from the handgun during the struggle. See Ex. B, Baker Dep. 151:21–22.

84. Neither Smith nor Ulatowski could say who fired the gun. See Ex. G, Smith Dep. 86:2–9; Ex. C, Ulatowski Dep. 57:4–5.

85. Baker testified that Ulatowski's hands were near James when the shot fired. See Ex. B, Baker Dep. 153:14–19.

86. After the shot, James was hit and began gurgling blood. See Ex. C, Ulatowski Dep. 58:9–
59:2.

87. As James lay dying, officers handcuffed him. See Ex. B, Baker Dep. 146:10–13.

Dated: New York, New York                 Respectfully Submitted,
       July 17, 2025                       ROTH & ROTH LLP



                              By: _____ ~/s/~ _____

                                   Elliot Dolby Shields, Esq.
                                   *Counsel for Plaintiff*

                                   192 Lexington Ave, Suite 802 New York,
                                   New York 10016

                                   Ph: (212) 425-1020

To:    All parties (via ECF)