```
 1
 2                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF NEW YORK
 3     - - - - - - - - - - - - - - - - - - - - - - - - - -
       SHENEA JAMES, as administrator of the estate of
 4     DEDRICK JAMES, deceased, and SHENEA JAMES
       individually,
 5
                  Plaintiffs,
 6
                               Index No.  6:23-cv-6057
 7     v.
 8     UNITED STATES OF AMERICA, RPD INVESTIGATOR
       RICHARD ARROWOOD, "JOHN DOE RPD OFFICER 1-10"
 9     (names and number of whom are unknown at
       present), MONROE COUNTY SHERIFF TODD BAXTER,
10     RICHARD ROE SHERIFF'S DEPUTIES (names
       and number of whom are unknown at present), other
11     unidentified members of the Rochester Police
       Department, Monroe County Sheriff's Office, and
12     New York State Police,
13                  Defendants.
       - - - - - - - - - - - - - - - - - - - - - - - - - -
14
        Deposition Upon Oral Examination of:
15
                       Shenea L. James
16
17     Location:      United States Attorneys Office
                       Western District
18                     Kenneth B Keating Federal Building
                       100 State Street, Suite 500
19                     Rochester, New York 14614
20
       Date:          May 1, 2024
21
22     Time:          10:00 a.m.
23     Reported By:   SANDRA C. HEWLETT, RPR
                       Alliance Court Reporting, Inc.
24                     109 South Union Street, Suite 400
                       Rochester, New York 14607
25
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

2

```
 1

 2                    A P P E A R A N C E S

 3

 4      Appearing on Behalf of Plaintiffs:

 5      Elliot D. Shields, Esq.
            Roth & Roth LLP
 6          192 Lexington Avenue, Suite 802
            New York, New York  10016
 7          eshields@rothandrothlaw.com

 8

 9      Appearing on Behalf of Defendant United States
        Of America:
10
        Michael S. Cerrone, Esq.
11          United States Attorney's Office
            Western District of New York
12          138 Delaware Avenue
            Buffalo, New York  14202
13          michael.cerrone@usdoj.gov

14

15      Appearing on Behalf of Defendant RPD Investigator
        Richard Arrowood, "John Doe RPD Officer 1-10"
16      (names and number of whom are unknown at present):

17      John M. Campolieto, Esq.
            City of Rochester Law Department
18          City Hall, Room 400A
            30 Church Street
19          Rochester, New York  14614
            campolj@cityofrochester.gov
20

21                       *       *       *

22

23

24

25
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1                    S T I P U L A T I O N S
2       WEDNESDAY, MAY 1, 2024;
3                    (Proceedings in the above-titled matter
4                    commencing at 10:26 a.m.)
5                         *      *      *
6                    IT IS HEREBY STIPULATED by and
7            between the attorneys for the respective
8            parties that this deposition may be taken
9            by the Defendant at this time pursuant to
10           notice;
11                   IT IS FURTHER STIPULATED, that all
12           objections except as to the form of the
13           questions and responsiveness of the
14           answers, be reserved until the time of the
15           trial;
16                   IT IS FURTHER STIPULATED, that
17           pursuant to Federal Rules of Civil
18           Procedure 30(e)(1) the witness requests to
19           review the transcript and make any
20           corrections to same before any Notary
21           Public;
22                   IT IS FURTHER STIPULATED, that if the
23           original deposition has not been duly
24           signed by the witness and returned to the
25           attorney taking the deposition by the time
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                    SHENEA L. JAMES - BY MR. CERRONE
 2                of trial or any hearing in this cause, a
 3                certified transcript of the deposition may
 4                be used as though it were the original;
 5                    IT IS FURTHER STIPULATED, that the
 6                noticing party bears the recording costs in
 7                accordance to Federal Rule 30(b)(3)(A);
 8                    AND IT IS FURTHER STIPULATED, that
 9                the Notary Public, SANDRA C. HEWLETT, RPR,
10                may administer the oath to the witness.
11                          *       *       *
12     SHENEA L. JAMES,
13                called herein as a witness, first being
14                sworn, testified as follows:
15                EXAMINATION BY MR. CERRONE:
16                Q.   Good morning, Ms. James.  My name is
17     Michael Cerrone.  I'm an Assistant United States
18     Attorney and I'm defending this case on behalf of
19     the United States that you have brought.
20                    Just a few ground rules before we
21     start today.
22                    Have you ever been at a deposition
23     like this before?
24                A.   Um, what is it?
25                Q.   There was a 50-h hearing, correct?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2             A.    Yes.
 3             Q.    Is that the only other time you have
 4    been to testimony like this?
 5             A.    Yep.
 6             Q.    Okay.  We're going to just go through
 7    a few ground rules.
 8                   First of all, I need you to respond
 9    with words when I ask you questions.  It's very
10    common for people to want to shake their head or do
11    other non-verbal responses.  So it is very important
12    that I need -- that -- that I get words as answers
13    so it can be taken down stenographically.
14                   Okay?
15             A.    Yes.
16             Q.    For example, if a question calls for
17    a "yes" or "no" answer, if you can actually use the
18    words "yes" or "no."  Okay?
19                   Very important that we don't talk
20    over each other because the stenographer cannot take
21    down what we're saying if we're talking at the same
22    time.
23                   Okay?
24             A.    Okay.
25             Q.    So if you could please allow me to
```



```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2    finish my question before answering and I will try
 3    to do the same.  I will try to allow you to finish
 4    before I ask my next question.
 5              Does that sound okay?
 6         A.   Okay.
 7         Q.   You're very soft-spoken.  If I could
 8    just ask you to keep your voice up a little bit so
 9    everybody can hear, including the court
10    stenographer.
11              Okay?
12         A.   Okay.
13         Q.   I have the tendency to talk too
14    quickly and Sandy is going to kick me with her
15    pointed boots, I think, at some time during the day
16    if I keep that up.
17              But if you would moderate the speed
18    of your testimony so that our court reporter can
19    take down your testimony, that would be very
20    helpful.
21              Okay?
22         A.   Okay.
23         Q.   I will do my best to ask you
24    understandable questions.  If I ask a poor question
25    that you don't understand, I'm sure your attorney,
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2    Mr. Shields, will jump in and ask me to rephrase it
 3    or object.
 4              But you can also -- if you do not
 5    understand my question, tell me you do not
 6    understand it and I will rephrase it.  However, if
 7    you do answer the question, I will assume you
 8    understood it.
 9              Is that fair enough?
10         A.   Yes.
11         Q.   I'm not sure how long we're going to
12    take today.  Hopefully we can just plow right
13    through and -- without a lunch break and get you out
14    of here.  But we'll do our best.  Okay?
15              If you do need to use the ladies'
16    room or stretch your legs at any moment, you just
17    let me know.  However, I will ask that you answer
18    any pending question before we take any break.
19         A.   Okay.
20         Q.   Are you all set to go forward?
21         A.   Yes.
22         Q.   Okay.  Your name is Shenea James,
23    correct?
24         A.   No.
25         Q.   What is your name?
```


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                    SHENEA L. JAMES - BY MR. CERRONE
 2              A.    "Shenea."
 3              Q.    "Shenea."  I'm sorry.
 4                    "Shenea"?
 5              A.    James.
 6              Q.    Okay.  So the first name is
 7      pronounced "Shenea"?
 8              A.    "Shenea."
 9              Q.    And that's spelled S-H-E-N-E-A?
10              A.    Correct.
11              Q.    What is your middle name?
12              A.    Latrice.
13              Q.    How do you spell that?
14              A.    L-A-T-R-I-C-E.
15              Q.    Very good.
16                    Are you currently taking any
17      medication that could affect your ability to testify
18      today?
19              A.    No.
20              Q.    And what is your date of birth?
21              A.    XXXX/82.
22              Q.    How old are you today?
23              A.    42.
24              Q.    Did you review any documents in
25      preparation for your testimony today?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1                    SHENEA L. JAMES - BY MR. CERRONE
2              A.   No.  I spoke with my lawyer.
3              Q.   So you spoke with your lawyer, but
4    you didn't review any paperwork at all?
5              A.   No.
6              Q.   That's correct?
7              A.   Correct.
8              Q.   And when did you speak to your
9    attorney?
10             A.   Yesterday.
11             Q.   And for how long?
12             A.   An hour or two.
13             Q.   One hour or two hours?
14             A.   (The witness indicated non-verbally.)
15             Q.   Yes?
16             A.   Yes.
17             Q.   Have you spoken to anybody else
18   besides your attorney about your testimony today?
19             A.   No.
20             Q.   Are you married?
21             A.   No.
22             Q.   Have you ever been married?
23             A.   No.
24             Q.   And how many children do you have?
25             A.   Three.
```



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1                    SHENEA L. JAMES - BY MR. CERRONE
 2              Q.    And what are their names?
 3              A.    Dedrick, Clyde, Sky.
 4              Q.    Okay.  Your son's name who passed
 5      away, you pronounce his name "Dedrick"?
 6              A.    "Dedrick."
 7              Q.    What is Dedrick's middle name?
 8              A.    Jamon.  J-A-M-O-N.
 9              Q.    What is his date of birth?
10              A.    XXXXX/96.
11              Q.    Who is his father?
12              A.    Otha Rivers.
13              Q.    How do you spell his first name?
14              A.    O-T-H-A.
15              Q.    Last name is like you would expect
16      it?
17              A.    Yes.
18              Q.    R-I-V-E-R-S?
19              A.    Yes.
20              Q.    Do you have an address for him?
21              A.    No.
22              Q.    Do you have any contact -- do you
23      have a phone number for him?
24              A.    No.
25              Q.    Do you know where he resides?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                SHENEA L. JAMES - BY MR. CERRONE
 2            A.   No.
 3            Q.   Do you know if he resides in the
 4   Rochester area?
 5            A.   No.
 6            Q.   When is the last time you had that
 7   contact with him?
 8            A.   2018?  '17?  2017.
 9            Q.   Was that a face-to-face meeting or on
10   the phone?
11            A.   It was face-to-face.
12            Q.   Was it here in the Rochester area?
13            A.   No.
14            Q.   Where was it?
15            A.   In Canandaigua.
16            Q.   Is that where he lives, in
17   Canandaigua?
18            A.   No.
19            Q.   Do you have any idea where he lives?
20            A.   I don't.
21            Q.   Does he live in New York State?
22            A.   I don't know.
23            Q.   Okay.  There is a woman who Dedrick
24   was residing with.  Her name is Betty Ervin,
25   E-R-V-I-N.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2                  It is my understanding that is
 3       Dedrick's grandmother?
 4             A.   Correct.
 5             Q.   Is she your mother?
 6             A.   No.
 7             Q.   Is she Mr. Rivers' mother?
 8             A.   Yes.
 9             Q.   I have an address for her of 6
10       Vinewood, V-I-N-E-W-O-O-D, in Rochester; is that
11       correct?
12             A.   Correct.
13             Q.   Does she still live there?
14             A.   Yes.
15             Q.   Do you have a phone number for her?
16             A.   No.
17             Q.   How often do you see Ms. Ervin?
18             A.   I don't.
19             Q.   When you say you "don't," what do you
20       mean by that?  Is she just not a person that --
21             A.   I don't see her.
22             Q.   You just don't see her.  Okay.
23                  Because she is not your relative?
24             A.   Correct.
25             Q.   And then you said you had a son by
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2      the name of Clyde; is that correct?
 3              A.    Yes.
 4              Q.    C-L-Y-D-E?
 5              A.    Yes.
 6              Q.    What is his last name?
 7              A.    Davis.
 8              Q.    Is he a junior?
 9              A.    Yes.
10              Q.    So his father would be Clyde Davis,
11      Sr.?
12              A.    Yes.
13              Q.    So this would be Dedrick's
14      half-brother?
15              A.    No.  It's his brother.
16              Q.    Okay.  But I mean -- but they have
17      different fathers, correct?
18              A.    Correct.
19              Q.    And do you have Clyde Davis -- does
20      Clyde Davis, Jr. reside with you?
21              A.    He is in college.
22              Q.    He is in college.  Okay.
23                    When he is not in college, does he
24      reside with you?
25              A.    Yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                    SHENEA L. JAMES - BY MR. CERRONE
 2           Q.    What college does he go to?
 3           A.    RPI.
 4           Q.    Do you have a phone number for your
 5    son?
 6           A.    Yes.  (585) 733-5526.
 7           Q.    Thank you.
 8                 And then you said you had another
 9    child.  Is it a son or a daughter?
10           A.    A daughter.
11           Q.    What is her name?
12           A.    Sky.
13           Q.    How do you spell that?
14           A.    S-K-Y.
15           Q.    And what is her last name?
16           A.    M-C-C-L-A-R-Y.
17           Q.    MCC?
18           A.    L-A-R-Y.
19           Q.    L-A-R-Y.
20                 McClary?
21           A.    Correct.
22           Q.    And who is Sky's father?
23           A.    Cordell McClary.
24           Q.    How do you spell that?
25           A.    C-O-R-D-E-L-L.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                 SHENEA L. JAMES - BY MR. CERRONE
 2            Q.    Okay.  And your daughter, does she
 3    live with you?
 4            A.    Yes.
 5            Q.    How old is she?
 6            A.    Nine.
 7            Q.    How old is Clyde, Jr.?
 8            A.    20.
 9            Q.    Is -- he is a sophomore in college?
10    Or a junior?
11            A.    Junior.
12            Q.    I saw a reference in your 50-h
13    testimony that Dedrick had three siblings on his
14    father's side; is that correct?
15            A.    Yes.
16            Q.    Do you know their names?
17            A.    Giovanni is one.
18            Q.    That's a girl or a boy?
19            A.    A boy.
20            Q.    Giovanni?
21            A.    I'm not sure.
22            Q.    Okay.  And how about the other two?
23    Do you know?
24            A.    "Juney"?  "Ginny"?
25            Q.    Julianne or Juliet?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2          A.    Julianne.
 3          Q.    Okay.
 4          A.    And I don't know the other one.  I
 5   can't remember.
 6          Q.    What is your current address?
 7          A.    132 Lehigh Avenue.
 8          Q.    Here in Rochester?
 9          A.    Yes.
10          Q.    What is the zip code?
11          A.    14619.
12          Q.    During your 50-h testimony, you
13   testified that your address was 10 Manhattan Square
14   Drive, Apartment 90, in Rochester; is that correct?
15          A.    Yes.
16          Q.    That was your previous address?
17          A.    Yes.
18          Q.    How long have you lived at your
19   current address?
20          A.    Two years.
21          Q.    How long did you live at 10 Manhattan
22   Square?
23          A.    Three years.
24          Q.    I see a previous address on a form
25   that you filed that was 199 Lowden, L-O-W-D-E-N,
```



```
1                SHENEA L. JAMES - BY MR. CERRONE
2    Lane in Rochester?
3              A.    Lowden Lane.
4              Q.    How long ago did you live there?
5              A.    I lived there --
6              Q.    Was that before the Manhattan Square
7    address?
8              A.    It was after.
9              Q.    That was after it.  Okay.
10                   So your current address is Lehigh.
11   The one before that was Lowden?
12             A.    Correct.
13             Q.    The one before that was Manhattan
14   Square?
15             A.    Correct.
16             Q.    Were you born and raised in the
17   Rochester area?
18             A.    Yes.
19             Q.    Have you lived there your whole
20   time -- your whole life?
21             A.    Yes.
22                   (The following exhibits were marked for
23                   identification:  Letters EXH F and F-1.)
24             Q.    Ms. James, I have put before you
25   Exhibit F, which is a copy of a document entitled
```



```
1                 SHENEA L. JAMES - BY MR. CERRONE
2    "Plaintiff's Response to Defendant USA's First Set
3    of Interrogatories."  It's a document in which you
4    and your attorney answered some questions that I
5    posed to you.  It was signed by your attorney, you
6    will see, on the last page, September 25, 2023.
7                 Correct?
8         A.   Yes.
9         Q.   And document -- Exhibit F-1 is this
10   signature page.  It is entitled "Verification."
11                Is that your signature there?
12        A.   Yes.
13        Q.   And by signing this document, you are
14   indicating that you had read the foregoing responses
15   of Exhibit F, the interrogatories.  (As read):  And
16   with respect to those responses, those responses are
17   true according to your knowledge except as to
18   matters stated therein to be made upon information
19   and belief which I believe to be true.
20                Correct?
21        A.   Yes.
22        Q.   That is your signature on Exhibit
23   F-1?
24        A.   Yes.
25        Q.   This is undated.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2                  Do you recall when you signed this?
 3       Was this recently?  Or at the time that these --
 4       that the interrogatories were sent back in September
 5       of last year?
 6            A.    Yes.
 7            Q.    Do you recall when they were sent?
 8            A.    Um --
 9            Q.    At the same time as the
10       interrogatories were signed in September of last
11       year?
12            A.    Yes.
13            Q.    Okay.  If you could just open this
14       document to -- this is Exhibit F -- to what is the
15       fourth page.  It is not a numbered document.  But
16       the fourth page has interrogatory number 3 which
17       asks about yours and Dedrick's educational history.
18       You will see toward the bottom of the page it
19       indicates Plaintiff, being you, earned your GED from
20       the Family Learning Center in 2001.
21                  Is that correct?
22            A.    Yes.
23            Q.    Did you attend high school?
24            A.    Yes.
25            Q.    Where did you go to high school?
```



```
1              SHENEA L. JAMES - BY MR. CERRONE
2         A.    Wilson Magnet High School.
3         Q.    Wilson Magnet?  That's here in
4    Rochester?
5         A.    Yes.
6         Q.    But you did not graduate?
7         A.    No.
8         Q.    And then interrogatory number 3 also
9    indicates that you have a certificate as a Medical
10   Assistant that you received from the Everest
11   Institute in Rochester, New York in 2012.
12             Correct?
13        A.    Correct.
14        Q.    And any further education beyond what
15   you have listed here in interrogatory number 3?
16        A.    No.
17        Q.    And then if you turn to the next page
18   of Interrogatory Number 4, it asks about yours and
19   Dedrick's work history.  And actually this does not
20   provide the information on your work history.  I
21   have your work history from the 50-h.
22             You testied at your 50-h Hearing
23   that you had two jobs at that time.  The 50-h
24   Hearing was on March 3, 2022.  So approximately two
25   years ago.
```



```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2                    At that time you testified that you
 3        worked for Greenlight Networks providing tech
 4        support and for Hilton East Assisted Living as a
 5        medication technician.
 6                    Do you recall that testimony?
 7              A.   Yes.
 8              Q.   That information you provided was
 9        correct, that back in March of 2022, those were your
10        two jobs?
11              A.   Yes.
12              Q.   What is your current employment?
13              A.   My current employment is for URMC
14        Medical -- Medicine.
15              Q.   Is that a full-time job?
16              A.   Yes.
17              Q.   What is your position?
18              A.   Medical Assistant.
19              Q.   How long have you been with URMC
20        Medicine?
21              A.   A year.  And I work at Amazon.
22              Q.   That is a second position you have
23        currently?
24              A.   Yes.
25              Q.   What do you do at Amazon?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1               SHENEA L. JAMES - BY MR. CERRONE
 2          A.   It's a warehouse.  So I do
 3    pick-to-tote -- you wouldn't understand what it is,
 4    but it is called -- "pick-to-tote" is my --
 5          Q.   What is it called?
 6          A.   Pick-to-tote.
 7          Q.   Pick to?
 8          A.   Tote.
 9          Q.   So are you like a forklift driver?
10    Or are you a --
11          A.   No.  A picker.
12          Q.   You're a picker.
13               So you work in the warehouse?
14          A.   Yes.
15               MR. CAMPOLIETO:  Pick-to-tote or
16          "toe"?
17               THE WITNESS:  Tote.
18               MR. CAMPOLIETO:  Tote.
19          Q.   Tote.
20               Do you work there full-time or
21    part-time?
22          A.   Full-time.
23          Q.   So you work two full-time jobs?
24          A.   Yes.
25          Q.   How long have you worked at Amazon?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2            A.    November 2023 to present.
 3            Q.    And have you been at your URMC
 4     Medicine position for approximately a year, you
 5     said?
 6            A.    Yes.
 7            Q.    Okay.  And what period of time did
 8     you work for Greenlight Networks?
 9            A.    That was July 2021.  Until
10     September 15th, 2021.
11            Q.    2020?
12            A.    '21.
13            Q.    '21.
14                  How about Hilton East Assisted
15     Living?  What dates of employment there?
16            A.    February 2020 until March 2023.
17            Q.    Have you ever been convicted of a
18     crime?
19            A.    No.
20            Q.    Answer was "no"?
21            A.    No.
22            Q.    And other than this case, have you
23     been involved in any other civil litigation?
24            A.    No.
25                  MR. CERRONE:  Off the record.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                   SHENEA L. JAMES - BY MR. CERRONE
 2              (There was a discussion off the record.)
 3         Q.   Was your son, Dedrick, ever married?
 4         A.   No.
 5         Q.   And does he have any children?
 6         A.   Yes.  Allegedly.
 7         Q.   He has a son, correct?
 8         A.   Allegedly, yes.
 9         Q.   And what is the son's name?
10         A.   KC.
11         Q.   K-XXXXXXXXX?
12         A.   Correct.
13         Q.   Do you know what his last name is?
14         A.   CXXXXXXXX.
15         Q.   C-XXXXXXXXXXXXXXX; is that correct?
16         A.   Yes.
17         Q.   Do you know what his date of birth
18    is?
19         A.   XXXXXXXXXXXth.  He's five.
20         Q.   2018?
21         A.   2018.
22              (There was a discussion off the record.)
23         Q.   When I asked if he had a son, you
24    said "allegedly."
25              What do you mean by that?
```



```
 1                    SHENEA L. JAMES - BY MR. CERRONE
 2              A.    Paternity hasn't been established.
 3              Q.    I'm sorry.
 4                    What hasn't been established?
 5              A.    Paternity.
 6              Q.    Paternity.
 7              A.    And I don't know him.
 8              Q.    You don't know the child?
 9              A.    No.
10              Q.    When did you first learn about KC?
11              A.    December 27th, 2020.
12              Q.    Is there any significance to that
13      date that you're able to recall it?
14              A.    Yes.  There was an incident that took
15      place.  And that's how I found out about the baby.
16              Q.    Okay.  This was the incident that led
17      to the arrest warrant issued for Dedrick?
18              A.    Correct.
19              Q.    We'll get into that a little bit
20      later.
21                    Did KC ever live with Dedrick?
22              A.    No.
23              Q.    Did KC -- excuse me.
24                    Did Dedrick ever acknowledge his
25      paternity?
```



```
 1                   SHENEA L. JAMES - BY MR. CERRONE
 2          A.    Yes.
 3          Q.    He did acknowledge it was his son?
 4          A.    Yes.
 5          Q.    Have you ever met KC?
 6          A.    No.
 7          Q.    Do you know who KC's mother is?
 8          A.    Her name is Zayvia Cromartie.
 9          Q.    I have the spelling as Z-A-Y-V-I-A.
10                Is that correct to your knowledge?
11   You are not sure?
12          A.    No.
13          Q.    So I have her last name as Cromartie.
14                Is that your understanding, as well?
15          A.    Yes.
16          Q.    Do you know Zayvia?
17          A.    No.
18          Q.    Have you ever met her?
19          A.    No.
20          Q.    Do you know where she lives?
21          A.    In Marion, New York.  That's correct.
22          Q.    Marion, M-A-R-I-O-N?
23          A.    Yes.
24          Q.    Do you have a phone number for her?
25          A.    I did.  I don't now.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2         Q.   I saw some documentation that
 3    Zayvia's mother is Lenore, L-E-N-O-R-E, Cromartie.
 4              Do you know Lenore Cromartie?
 5         A.   No.
 6         Q.   Have you ever met her?
 7         A.   No.
 8         Q.   Do you have a phone number for Lenore
 9    Cromartie?
10         A.   No.
11         Q.   Do you know what her address is?
12         A.   No.
13         Q.   To your knowledge, does KC live with
14    Zayvia?
15         A.   Yes.
16         Q.   Do you know KC to still be alive?
17         A.   To my knowledge.
18         Q.   Okay.  And do you have contact with
19    anybody that has contact with KC and his mother?
20         A.   No.
21         Q.   So your statement, as far as you know
22    he is still alive, what is that based on?
23         A.   No one told me anything different.
24         Q.   Do you know if your son had any other
25    children besides KC?
```



```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2             A.    No.
 3             Q.    Not that you know of, at least?
 4             A.    Not at that I know of, at least.
 5             Q.    Dedrick's last address prior to his
 6   death was 6 Vinewood Place in Rochester, New York?
 7             A.    Correct.
 8             Q.    And that residence was owned by --
 9   strike that.
10                  The residence is owned by Betty
11   Ervin, his grandmother?
12             A.    Correct.
13             Q.    And again, Betty Ervin is Otha
14   Rivers' mother?
15             A.    Correct.
16             Q.    And Otha Rivers being Dedrick's
17   father?
18             A.    Correct.
19             Q.    For how long a period of time did
20   Dedrick live with his grandmother?
21             A.    Majority of his life.
22             Q.    Did Dedrick ever live with you?
23             A.    Yes.
24             Q.    For how many years would you estimate
25   he lived with you?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                 SHENEA L. JAMES - BY MR. CERRONE
 2            A.   He lived with me from birth until six
 3     years old.
 4            Q.   And then he went to live with
 5     Ms. Ervin?
 6            A.   Yes.
 7            Q.   And what was the reason that he went
 8     to live with Ms. Ervin at about six years old?
 9            A.   Due to my work schedule.  Young.
10     Baby with a baby.
11            Q.   Yeah.
12            A.   Help.
13            Q.   How old were you when you had
14     Dedrick?
15            A.   14.
16            Q.   How old were you when you dropped out
17     of high school?
18            A.   17.
19            Q.   There was a statement in one of the
20     documents that I saw that indicated that his
21     grandmother more or less raised Dedrick.
22                 Would that be a fair statement?
23            A.   Um, no.  Yes.
24            Q.   I mean would it be fair to say that
25     Ms. Ervin played a role in raising him?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1              SHENEA L. JAMES - BY MR. CERRONE

2          A.    Yes.

3          Q.    As well as you?

4          A.    Yes.

5          Q.    Okay.  How would you characterize

6    your relationship with Ms. Ervin?

7          A.    Today?

8          Q.    Yes.  Now.

9          A.    No relationship.

10         Q.    And why is that?

11         A.    A number of reasons.

12         Q.    Such as?

13         A.    Well, before September 15th, I didn't

14   have a relationship with her.  So I don't know.

15   Like you want details?

16         Q.    Yes.

17         A.    Um, so as Dedrick got older, it

18   became like a competition.  So as he got older, he

19   gravitated more to be with me and so she didn't like

20   that.  And so they tried to like turn him against

21   me.

22         Q.    Uh-huh.

23               Let's say in the year before Dedrick

24   died, did you ever visit your son at 6 Vinewood?

25         A.    Yes.



```
1                SHENEA L. JAMES - BY MR. CERRONE
2            Q.    How often?
3            A.    Not often because between that time
4    he was back and forth between her house and my
5    house.
6            Q.    Was he living at both places or would
7    he just come to visit you from time to time?
8            A.    Living at both places.
9            Q.    For how long a period of time did
10   that go on prior to his death in 20 -- in 2021?
11           A.    A year.  No.  I'm sorry.  That --
12   with him going between my house and her house was
13   probably about like two or three years.
14           Q.    When you visited Dedrick at Ms.
15   Ervin's house, did you ever go into his bedroom?
16           A.    Yes.
17           Q.    Did you ever notice that he had a
18   computer system with a live security feed onto his
19   computer?
20           A.    Yes.
21           Q.    Did you ever ask him what that was
22   for?
23           A.    Yes.
24           Q.    And what did he say?
25           A.    To protect his grandmother when he is
```



```
 1                    SHENEA L. JAMES - BY MR. CERRONE
 2      not there.
 3              Q.    Has Dedrick ever lived at an address
 4      175 Fulton in Rochester?
 5              A.    Yes.
 6              Q.    Is that your residence?
 7              A.    Yes.
 8              Q.    That is one of your prior residences?
 9              A.    Yes.
10              Q.    Did Dedrick ever live at 51 Kingsboro
11      Road in Rochester?
12              A.    Yes.
13              Q.    Is that another of your prior
14      residences?
15              A.    No.
16              Q.    Do you know whose residence that was?
17              A.    Betty Ervin.
18              Q.    That's a prior residence for
19      Ms. Ervin prior to her residence at 6 Vinewood?
20              A.    Correct.
21              Q.    Going back to Exhibit Number F,
22      interrogatory number 3 indicates that your son,
23      Dedrick, graduated from the School of Arts in 2015.
24                    Is that correct?
25              A.    Yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1               SHENEA L. JAMES - BY MR. CERRONE
 2          Q.   That's a school here in Rochester?
 3          A.   Yes.
 4          Q.   And it also indicates that he
 5     attended Finger Lakes Community College from
 6     approximately 2015 to 2019.
 7               Is that correct?
 8          A.   Yes.
 9          Q.   And it also indicates in the
10     Interrogatory Answers that you are unsure whether or
11     not your son graduated.
12               Is that correct?
13          A.   Yes.
14          Q.   To your knowledge, did he have any
15     other further education?
16          A.   No.
17          Q.   Did Dedrick have any employment at
18     the time that he had died?
19          A.   Yes.
20          Q.   Who was he working for at that time?
21          A.   I can't pronounce it, but it is
22     Conduit.
23          Q.   Conduit?
24          A.   Conduit, yes.
25          Q.   And it indicates in your 50-h
```



```
 1                 SHENEA L. JAMES - BY MR. CERRONE
 2      testimony that that was a Call Center?
 3               A.    Correct.
 4               Q.    Do you know for how long a period of
 5      time Dedrick worked at Conduit?
 6               A.    I'm not sure.
 7               Q.    Do you know what he did there?
 8               A.    Customer Service.
 9               Q.    He was handling phone calls?
10               A.    Yes.
11               Q.    Do you know what that company,
12      Conduit, does?  What service they provide?
13               A.    No.
14               Q.    Was Dedrick full-time or part-time at
15      Conduit, to your knowledge?
16               A.    Full-time.
17               Q.    He have any other employment at the
18      time of his death other than Conduit?
19               A.    No.  Not to my knowledge.
20               Q.    Okay.
21               (The following exhibit was marked for
22               identification:  Letter EXH G.)
23               Q.    Ms. James, I'm showing you what I
24      have marked as number G -- letter G.  Excuse me.  It
25      is a document entitled, "Patrol Section
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1                    SHENEA L. JAMES - BY MR. CERRONE
2        Investigations from the Rochester Police
3        Department."
4                    Is that a photo of your son on this
5        exhibit?
6             A.   Yes.
7             Q.   And it indicates his name, Dedrick
8        Jamon James; correct?
9             A.   Yes.
10            Q.   It also shows his date of birth?
11            A.   Yes.
12            Q.   And his last known address of 6
13       Vinewood Place?
14            A.   Yes.
15            Q.   If you go to the bottom of this page,
16       it indicates November 19, 2016, prior arrest for
17       OGA --
18                 MR. CERRONE:  Help me.
19                 MR. SHIELDS:  Obstruction of
20            Governmental Administration.
21            Q.   -- Obstruction of Governmental
22       Administration Second, resisting arrest, Vehicle and
23       Traffic Law 375.
24                 Do you have any knowledge of the
25       circumstances leading to this arrest?
```



```
 1                   SHENEA L. JAMES - BY MR. CERRONE
 2                   MR. SHIELDS:  Objection to form.
 3                   But you can answer.
 4           Q.    Do you have any knowledge as to what
 5      this particular item is, this arrest in 2016?
 6           A.    Yes.
 7           Q.    Did he ever tell you about it?
 8           A.    Yes.
 9           Q.    Were you present?
10           A.    No.
11           Q.    What did he tell you about it?
12           A.    Um, he was -- they were in the
13      backyard smoking weed and --
14           Q.    Which backyard?
15           A.    His grandmother's backyard.  Betty
16      Ervin's backyard.  And the police came and he ran.
17                   MR. SHIELDS:  Can we go off the
18                   record?
19                   (There was a discussion off the record.)
20           A.    So --
21           Q.    We had a brief discussion off the
22      record.  Ms. James was just telling us about a -- an
23      incident with Dedrick involving marijuana and I was
24      asking about the 2016 arrest.
25                   But from Exhibit G, it appears as
```



```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2      though --
 3               A.    That's not it.
 4               Q.    -- the one that Ms. James was
 5      referring was the June 20, 2015, arrest; is that
 6      correct?
 7               A.    Yes.
 8               Q.    Okay.
 9               A.    On -- what is that?  What is this
10      date?  2016?
11               Q.    Uh-huh.
12               A.    2016, he was racially profiled and
13      the police followed him to 6 Vinewood, which is his
14      home.  As he pulled into the driveway, they
15      approached him.  He then asked them, "Why are you
16      pulling me over?"
17                     They decided not to give him a reason
18      and demanded him to get out of the car.
19                     And they then pulled him out of the
20      car, shot him to the ground.
21               Q.    You were not present at the time,
22      correct?
23               A.    No.
24               Q.    Is this what Dedrick told you
25      happened?
```



```
 1                   SHENEA L. JAMES - BY MR. CERRONE
 2              A.    Yes.
 3              Q.    Do you know if his grandmother was
 4       present for this incident?
 5              A.    She was in the house.
 6              Q.    Okay.  Do you know if she saw what
 7       happened?
 8              A.    Not sure.
 9              Q.    Do you know if Dedrick was criminally
10       prosecuted on this particular -- with respect to
11       this particular incident?
12              A.    He was not.
13              Q.    And then with respect to the
14       marijuana possession offense in 2018, you indicated
15       that he was smoking marijuana in the backyard of 6
16       Vinewood.  The police came and he ran.
17                   Is that your understanding?
18              A.    It was on Samuel McCree Way, but the
19       backyards of Samuel McCree Way and Vinewood are like
20       connected.
21              Q.    Okay.
22              A.    So -- which is a friend -- which is a
23       friend's backyard.  But their backyards is like
24       (indicating).
25              Q.    They touch each other?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2         A.    Yeah.   The fence blocks it, but it is
 3    the backyard off of Samuel McCree Way.
 4         Q.    So he indicated to you that the
 5    police came and he ran?
 6         A.    Yes.
 7         Q.    And what happened next, to your
 8    knowledge?
 9         A.    They caught him and he was then
10    arrested.
11         Q.    Do you know if he was prosecuted?
12         A.    Not sure.
13         (The following exhibit was marked for
14         identification:   Number EXH H.)
15         Q.    You understand, Ms. James, there was
16    an incident that occurred on or about December 27,
17    2020, with Dedrick's son, KC?
18         A.    Yes.
19         Q.    Do you know what the police claim
20    Dedrick did to KC?  So not your understanding, not
21    Dedrick's.  But what the police claim he did?
22         A.    No.
23         Q.    All right.  I'm showing you what I
24    have marked as -- actually, before I get to that,
25    what does -- did Dedrick ever tell you what happened
```



```
1                  SHENEA L. JAMES - BY MR. CERRONE
2       with his son on that date?
3              A.   On that day?  Dedrick stated that he
4       had been going to Marion, New York to Zayvia's home
5       watching KC while Zayvia was at work.  He then
6       stated that they have a routine every day, get up,
7       he feed him breakfast.  He then washes his face and
8       brushes his teeth.  He stated that KC didn't like
9       getting his teeth brushed.  So wherever he is
10      brushing his teeth, he would bite down on the
11      toothbrush.
12                  On December 27th when Dedrick was
13      brushing his teeth, when KC went to bite down on the
14      toothbrush, Dedrick was trying to snatch the
15      toothbrush before he bit down on it.  And when he
16      did that, two of KC's teeth fell out.
17                  He stated that he then cleaned him
18      up, gave him a bath, laid him down and gave him a
19      bottle.  He said KC was fine.  He was a little -- he
20      was in a little pain from the teeth coming out, but
21      he was fine and he laid him down for a nap.
22                  He then stated that once Zayvia came
23      home, he then told her what was going on and she --
24      they talked about it -- said she had to tell her
25      mother.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1               SHENEA L. JAMES - BY MR. CERRONE
2                    He told her not to tell her mother.
3       "Let's just take him to the hospital to have him
4       looked at."
5                    And that's what they were going to
6       do.  But her -- she still called her mother.
7                    Once her mother got there, she began
8       to attack him, throw his stuff out of the home, tell
9       him he never going to see his son again.
10                   So he never went to the hospital with
11      them.  Zayvia and her mother went to the hospital.
12           Q.   Were you present at the time that
13      this incident happened?
14           A.   No.
15           Q.   So this is what Dedrick told you?
16           A.   This is what Dedrick told me.
17           Q.   "Dedrick."  I'm sorry.
18                   Do you know what medical treatment KC
19      received as a result of this incident?
20           A.   Yes.
21           Q.   What is your knowledge with respect
22      to that?
23           A.   He -- he was on a ventilator.  That's
24      my knowledge.
25           Q.   Do you know why he was placed on a
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2      ventilator?
 3                  A.    No.
 4                  Q.    The New York State Attorney General
 5      produced a report or publicized a report that they
 6      did with respect to Dedrick's death and they stated
 7      in that report that KC was initially taken by his
 8      mother to a hospital in Newark, New York and then
 9      was MEDIVACKED to Strong Memorial where he was
10      admitted to the ICU, intubated and placed on a
11      ventilator due to respiratory failure.
12                  Do you have any knowledge with
13      respect to that other than the fact that he was put
14      on a ventilator?
15                  A.    No.
16                  Q.    Okay.  Did you go and visit KC in the
17      hospital?
18                  A.    I wasn't allowed.
19                  Q.    Did you try?
20                  A.    Yes.  Me and Dedrick.
21                  Q.    Which hospital did you go to?
22                  A.    Strong Hospital.  The Golisano.
23                  Q.    I'm sorry?
24                  A.    Strong Golisano.
25                  THE WITNESS:  Am I saying it right?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              SHENEA L. JAMES - BY MR. CERRONE

 2                   MR. SHIELDS:  "Golisano."

 3              Q.   Golisano?

 4              A.   Yes.

 5                   They stated that we couldn't see him

 6    because paternity was not established.  But he can

 7    call and get updates.

 8              Q.   Did you or Dedrick ever call the

 9    hospital for an update?

10              A.   He did.

11              Q.   He did.

12                   Do you know what he found out?

13              A.   It will always be the same.  He's

14    just on the -- on the ventilator.  No changes.

15              Q.   To your knowledge at some point KC

16    was released from the hospital and went back home

17    with his mother?

18              A.   Yes.

19              Q.   And then again, to your knowledge, he

20    is still alive?

21              A.   Yes.

22              Q.   Do you know how long he was in the

23    hospital for?

24              A.   Um, from December 27th to, I believe,

25    January 9th he was released.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              SHENEA L. JAMES - BY MR. CERRONE
2         Q.   So that would be almost two weeks?
3         A.   Yes.
4         Q.   After being rejected the opportunity
5    to visit KC on this one day, did you or Dedrick go
6    on subsequent occasions to attempt to visit him?
7         A.   No.
8         Q.   Did they -- the day that you
9    attempted to visit, was that the day of the
10   incident, December 27th?
11        A.   No.
12        Q.   What day was it?
13        A.   I don't recall the date, but I
14   believe it was like two days after.
15        Q.   So that would be on or about
16   December 29, 2020?
17        A.   Yes.
18        Q.   Okay.  Did you ever speak to Zayvia
19   about this incident?
20        A.   Yes.
21        Q.   And did Zayvia ever tell you what she
22   understood to have happened in this incident?
23        A.   Yes.
24        Q.   And what did Zayvia tell you?
25        A.   She -- Zayvia stated that when she
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2       came home from work, she was in the shower.  Dedrick
 3       shared with her the incident that took place with
 4       brushing KC's teeth.  She then went in the room to
 5       check on KC and her and Dedrick were deciding to
 6       take the baby to the hospital.  She told her mother
 7       and things got out of hand and Dedrick left and her
 8       and her mother went to the hospital.
 9                  Q.   When did you have this conversation
10       with Zayvia?
11                  A.   The night of the incident, of
12       December 27th.
13                  Q.   Was that by phone or in person?
14                  A.   It was by phone.
15                  Q.   And this was a conversation that you
16       had with her?
17                  A.   Yes.
18                  Q.   Did anybody else participate in that
19       phone call?
20                  A.   Listen?
21                  Q.   Yes.
22                  A.   Yes.
23                  Q.   Dedrick?
24                  A.   Yes.
25                  Q.   Have you ever met Zayvia in person?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1                    SHENEA L. JAMES - BY MR. CERRONE
2              A.   No.
3              Q.   Is that the only time you have ever
4     spoken with her, was that one phone call?
5              A.   Several phone calls while KC was in
6     the hospital.
7              Q.   Did you ever speak to Zayvia's mother
8     about this incident?
9              A.   Yes.
10             Q.   And what did she tell you?
11             A.   Um, she was very irate.  We didn't
12    get anywhere.
13             Q.   Did you speak to her on the phone?
14             A.   Yes.
15             Q.   Just that one time?
16             A.   Yes.
17             Q.   So this would have been shortly after
18    the incident happened?
19             A.   Correct.
20             Q.   So am I to understand there were not
21    much -- strike that.
22                  How long was that conversation with
23    the mother?
24             A.   Um, the first -- it was two phone
25    calls.  So the first phone call was less than two
```



```
1                  SHENEA L. JAMES - BY MR. CERRONE
2      minutes and she hung up on me.
3                      And then she called back and that was
4      probably about five minutes.
5              Q.   And what was the substance of that
6      conversation?
7              A.   "Where is your son?"
8              Q.   And what did you say?
9              A.   "I don't know."
10                     I was trying to figure out what was
11     going on and she just wanted to know where my son
12     was.
13             Q.   Was there anything else of substance
14     said in that conversation with -- besides what you
15     just told me?
16             A.   Yeah.  "I'll come to the hospital and
17     beat your ass."
18             Q.   That's what she said to you?
19             A.   That's what I told her.
20             Q.   That's what you told her?
21             A.   Yes.  She just wanted my son.
22             Q.   After KC was admitted to the
23     hospital, did you speak with Zayvia about KC's
24     condition from time to time?
25             A.   Yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1               SHENEA L. JAMES - BY MR. CERRONE
 2          Q.   What was she able to tell you?
 3          A.   She stated she was scared and he was
 4   on a ventilator and there was no changes.
 5          Q.   She spoke on the phone with you and
 6   Dedrick?  Or just you?
 7          A.   She didn't speak to Dedrick.
 8          Q.   Okay.
 9          A.   She didn't know he was there.  It was
10   just me.  He was just listening.
11          Q.   Okay.  How many times did you speak
12   with her?
13          A.   Several times.
14          Q.   And this would have all been when KC
15   was in the hospital?
16          A.   Yes.
17          Q.   Is that how you found out when KC was
18   released to go home?
19          A.   Yes.
20          Q.   By a conversation with Zayvia?
21          A.   Yes.
22          Q.   Did Zayvia tell you about KC's
23   condition when he was released from the hospital?
24   Whether he had fully recovered?
25          A.   No.
```



```
 1                   SHENEA L. JAMES - BY MR. CERRONE
 2              Q.    She just told you that she was going
 3      home?
 4              A.    Yes.
 5              Q.    Have you spoken to Zayvia since those
 6      conversations?
 7              A.    Maybe one other time after that.
 8      Maybe a few months after the situation.
 9              Q.    And what was said in that
10      conversation?
11              A.    I was reaching out to meet KC.
12              Q.    And tell me what happened in that
13      conversation.
14              A.    She declined.
15              Q.    Pardon me?
16              A.    She declined.
17              Q.    Do you have any knowledge as to
18      whether KC has continued to have any health issues
19      following his release from the hospital?
20              A.    No.
21              Q.    You don't know?
22              A.    I don't know.
23              Q.    It is my understanding approximately
24      two days after the incident on December 29, 2020,
25      you brought your son, Dedrick, to the New York State
```



```
 1                SHENEA L. JAMES - BY MR. CERRONE
 2     Police barracks in Rochester.
 3                    Is that correct?
 4           A.    Yes.
 5           Q.    And why did you do that?  Were you
 6     asked to bring him?
 7           A.    Yes.
 8           Q.    By the police?
 9           A.    Yes.
10           Q.    Did they reach out to you?
11           A.    Yeah.
12           Q.    Explain what you mean by that.
13           A.    Well, the last address they had for
14     me was 10 Manhattan Square, so they came down there
15     looking for me and I was made aware of it.  And so I
16     then went to them.
17           Q.    Did you go to the police station?
18           A.    To the State trooper's office, yes.
19           Q.    So you went by yourself initially?
20           A.    Yes.
21           Q.    And tell me what happened there.
22           A.    They stated that they just -- they
23     needed to talk to Dedrick and he wasn't under
24     arrest.  They just needed to get -- collect
25     information from him.  And if I can bring him down
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2      there to talk to them.
 3                  Q.    And did you bring him down?
 4                  A.    Yes.
 5                  Q.    Was it the same day?
 6                  A.    No.  It was the next day, I believe.
 7                  Q.    Tell me what happened when you
 8      brought Dedrick to the New York State Police
 9      barracks on December 29, 2020.
10                  A.    He went in and talked to them.  I
11      couldn't go back there with him.
12                  Q.    So Dedrick saw the police there by
13      himself?
14                  A.    Correct.
15                  Q.    Did you -- could you hear what --
16                  A.    No.
17                  Q.    -- what was being said between the
18      police and Dedrick?
19                  A.    No.
20                  Q.    Did he later tell you what occurred?
21                  A.    Yes.
22                  Q.    And what is your understanding of
23      what occurred based on what Dedrick told you?
24                  A.    That was the first time.  So the
25      first time they basically just wanted his side of
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1                    SHENEA L. JAMES - BY MR. CERRONE
2       the story as to what happened with KC.  So they just
3       questioned him about that.  And the events that led
4       up to KC going to the hospital.
5               Q.   So he gave his account of what
6       happened?
7               A.   Correct.
8               Q.   That's your understanding?
9               A.   (The witness indicated non-verbally.)
10              Q.   Yes?
11              A.   Yes.
12              Q.   The Attorney General's report states
13      that Dedrick told the police at that time that KC
14      had hurt himself.
15                   Is that your understanding what
16      Dedrick told the police at that time?
17              A.   No.
18              Q.   What is your understanding what
19      Dedrick told the police?
20              A.   I don't know what Dedrick told the
21      police.
22              Q.   Well -- he told you what he told the
23      police, correct?
24              A.   He -- he told me what they wanted.
25      They just wanted his side of the story.  He didn't
```



1          SHENEA L. JAMES - BY MR. CERRONE
2    give me details what his side of the story was
3    because he had already told me his side of the
4    story.  So I'm just assuming -- he just told me what
5    they wanted, pretty much.
6              Q.   And did Dedrick tell you what the
7    police said to him?
8              A.   No.
9              Q.   Do you know who he met with?
10             A.   I don't remember.  But I know they
11   weren't from here.
12             Q.   Was it an Investigator Carr, C-A-R-R?
13   Does that ring a bell?
14             A.   Yes.
15             Q.   It may have been him?
16             A.   Because we had -- well, we got
17   there -- they met us there.
18             Q.   The police did?
19             A.   Yeah.  But they weren't from this
20   county.  They were from Wayne County.
21             Q.   Okay.  Does the name Investigator
22   Carr ring a bell to you?
23             A.   No.
24             Q.   You're not sure?
25             A.   Not sure.



```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2          Q.   It is my understanding that Dedrick
 3     had a second meeting with the New York State Police
 4     on or about April 20 of 2021.
 5               Are you aware of that?
 6          A.   Yes.
 7          Q.   Were you present?
 8          A.   Yes.
 9          Q.   Did you take him there like you did
10     the first time?
11          A.   Yes.
12          Q.   Were you present for the interview
13     this time?  Or no?
14          A.   No.
15          Q.   So the same with the first time?
16          A.   Yes.
17          Q.   You brought him there, but you were
18     not permitted to go into the interview room?
19          A.   Yes.
20          Q.   On December 29, 2020, the first time
21     that he went to the New York State Police, was he
22     represented by counsel?
23          A.   No.
24          Q.   The second meeting, April 20, 2021,
25     was he represented by counsel?
```



```
 1                SHENEA L. JAMES - BY MR. CERRONE
 2              A.   No.
 3              Q.   Do you know if he was ever
 4    represented by counsel with respect to this
 5    incident?
 6              A.   No.
 7              Q.   You don't know; or he was not?
 8              A.   He was not.
 9              Q.   To your knowledge?
10              A.   To my knowledge.
11              Q.   Do you know -- did Dedrick tell you
12    what happened in the interview room on April 20,
13    2021?
14              A.   He just said the same thing that
15    happened the first time.
16              Q.   Did Dedrick tell you that the police
17    at that point in time had an intention to present
18    this case to the District Attorney for prosecution?
19              A.   No.
20              Q.   Did Dedrick tell you that the police
21    told him at that time that they would contact him to
22    arrange for his voluntary surrender?
23              A.   No.
24              Q.   So the only thing that Dedrick told
25    you with respect to the second meeting with the New
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                SHENEA L. JAMES - BY MR. CERRONE
 2      York State Police is that it was essentially the
 3      same as the first one?
 4                A.    Correct.
 5                Q.    Can you recall anything else that he
 6      said to you after that interview with the police?
 7                A.    No.
 8                Q.    Your son died on September 15, 2021;
 9      correct?
10                A.    Yes.
11                Q.    He died at 6 Vinewood Place, the home
12      owned by his grandmother, Betty Ervin?
13                A.    Yes.
14                Q.    And the incident that led to his
15      death happened approximately around 10:30 in the
16      morning; is that correct?
17                A.    Yes.
18                Q.    At the time that -- just prior to
19      September 15, 2021, was he living full-time with
20      Ms. Ervin or was he going back and forth between his
21      home and -- between her home and your home?
22                A.    Back and forth.
23                Q.    Okay.  At the time this incident
24      happened, where were you?
25                A.    At Greenlight.
```



```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2            Q.   At work?
 3            A.   Yes.
 4            Q.   At some point in time did you find
 5       out that something had happened?
 6            A.   Yes.
 7            Q.   How did you find out?
 8            A.   A phone call.
 9            Q.   From who?
10            A.   My 20-year-old's girlfriend.
11            Q.   This would be Clyde's girlfriend?
12            A.   Yes.
13            Q.   What is her name?
14            A.   Amyire.
15            Q.   How do you spell it?  A-M-A-R-I?
16            A.   A-M-Y-E-R?  -- I-R-E.
17            Q.   A-M-Y-I-R-E?
18            A.   Yes.
19            Q.   Okay.  Is she still together with
20       your son?
21            A.   Yes.
22            Q.   What did -- how do you say her name?
23            A.   "Amyire."
24            Q.   What did Amyire -- strike that.
25                 Did Amyire call you on the phone?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                SHENEA L. JAMES - BY MR. CERRONE
 2           A.    Yes.
 3           Q.    What did she tell you?
 4           A.    "Dedrick killed himself."
 5           Q.    That's what she said?
 6           A.    Yes.
 7           Q.    And what did you do next?
 8           A.    I left work and went to 6 Vinewood.
 9           Q.    After speaking with Amyire, did you
10      speak with anyone else before leaving work?
11           A.    No.  I mean just my niece that I work
12      with.  And we left together.
13           Q.    Okay.  In your 50-h testimony there
14      was a reference that you had called your sister to
15      go over to the house?
16           A.    Oh, yes.
17           Q.    What is your sister's name?
18           A.    Deborah Henderson.
19           Q.    What is it again?
20           A.    Deborah Henderson.
21           Q.    How do you spell Deborah?
22           A.    D-E-B-O-R-A-H.
23           Q.    And do you know if she went over to 6
24      Vinewood?
25           A.    Yes.
```



```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2            Q.   She did?
 3            A.   She was there before I got there.
 4      Yes.
 5            Q.   And you left work with your niece?
 6            A.   Yes.
 7            Q.   What's her name?
 8            A.   Deniqua.
 9            Q.   Spell her first name, please.
10            A.   D-E-N --
11            Q.   Sorry.  One more time?
12            A.   D-E-N-I-Q-U-A.
13            Q.   Last name?
14            A.   Holloway.
15            Q.   H-O-L-L-O-W-A-Y?
16            A.   Yes.
17            Q.   Two Ls?
18            A.   Yes.
19            Q.   So you left work with Deniqua to go
20      to 6 Vinewood?
21            A.   Yes.
22            Q.   Who was driving?
23            A.   She was.
24            Q.   And what happened upon your arrival
25      at 6 Vinewood?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                SHENEA L. JAMES - BY MR. CERRONE
 2          A.   I got there.  Yellow tape was up.
 3     Police officers were standing in the door.  I asked
 4     them where was Dedrick.  Nobody answered me.  I
 5     continued to ask them where was Grandma Betty?
 6     Where was Dedrick?  Nobody answered me.  Yeah.
 7          Q.   What happened next?
 8          A.   I crossed the yellow tape.  I went on
 9     the porch.  The door was open.  Two officers were
10     standing in front of the doorway.  I kept asking
11     them where was my son.  I then started calling for
12     Dedrick.  I asked them where was Ms. Betty.  It was
13     like I was just talking to myself and screaming for
14     nothing because nobody was answering me.
15               I continued to stay on the porch
16     screaming in the house over the officers that was
17     standing in front of the door.
18          Q.   Did you try to go into the house?
19          A.   I did.
20          Q.   And were you allowed to enter the
21     house?
22          A.   No, I wasn't.
23          Q.   Tell me what happened next.
24          A.   I continued to ask the two officers
25     that was standing in the door "Where is my son?"
```



```
 1                    SHENEA L. JAMES - BY MR. CERRONE
 2                    But they wouldn't answer.
 3            Q.    Did somebody eventually answer you?
 4            A.    Somebody eventually came.  I asked
 5     them where was Ms. Betty.  They said she was next
 6     door.  And --
 7            Q.    Did the officers -- did the officers
 8     tell you where your son was?
 9            A.    They just kept saying he was in the
10     bathroom.
11            Q.    Did they tell you that he had died?
12            A.    No.
13                  MR. SHIELDS:  Need to take a break?
14                  Just for the record, before we go
15            off, she is crying right now.
16            Q.    Ms. James, would you like to take a
17     break?
18            A.    Yes.
19                  MR. CERRONE:  Let's go off the
20            record.
21            (There was a discussion off the record.)
22            (The proceedings recessed at 11:55 a.m.)
23            (The proceedings reconvened at 11:56 a.m.;
24            appearances as before noted.)
25            (The reporter read back the requested
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2         material.)
 3    SHENEA L. JAMES, resumes;
 4         CONTINUING EXAMINATION BY MR. CERRONE:
 5         Q.   Who was the first person that told
 6    you Dedrick had died?
 7         A.   Are you talking about as far as
 8    police or?
 9         Q.   In general.
10              Who was the first person that told
11    you he had passed?
12         A.   My son's girlfriend.
13         Q.   On the phone?
14         A.   Yes.
15         Q.   How about at the scene?  Who was the
16    first person at the scene that told you your son had
17    died?
18              MR. SHIELDS:  Objection to form.
19         A.   So it was the officers standing at
20    the door and then it was like this investigator guy
21    that came up.  I don't know his name.  I don't
22    recall his name.  And he told me and then he told me
23    that Ms. Betty was next door at the neighbor's
24    house.
25         Q.   Did that investigator also tell you
```



```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2      what had happened to Dedrick?
 3              A.    No.
 4              Q.    Okay.  After the investigator told
 5      you that Betty was next door, what did you do then?
 6              A.    I went next door to Ms. Betty.
 7              Q.    And what happened next?
 8              A.    And when I got in there, she was --
 9      she was crying hysterically.  And I didn't even get
10      a chance to ask her and she just blurted out "They
11      killed him.  He screamed my name before they shot
12      him.  They threw me on the floor, bent my hand back.
13      I just had surgery.  Attacked me with the dogs.
14      Destroyed my house.  And before they killed him, the
15      shot went off.  He had said 'Grandma.'"
16                    And then she heard "pop."
17                    MR. CERRONE:  Could you read back the
18              last answer, please?
19              (The reporter read back the requested
20              material.)
21              Q.    At 6 Vinewood, when you went there
22      prior to going next door, did you know anybody at
23      the scene?
24              A.    Yes.
25              Q.    Who did you know?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2            A.    When I got to the scene, my sister
 3     was there.  My cousin was there.
 4            Q.    Your sister, Deborah?
 5            A.    Yes.
 6            Q.    What is the cousin's name?
 7            A.    Felicia.
 8            Q.    What is her last name?
 9            A.    Jones.
10            Q.    Anybody else you knew was there?
11            A.    Yeah.  My aunt was there.  A couple
12     of my friends was there.
13            Q.    What is your aunt's name?
14            A.    Lynette Griffin.
15            Q.    Lynette?
16            A.    Lynette.
17            Q.    Griffin?
18            A.    Yes.
19            Q.    L-I-N-E-T-T-E?
20            A.    L-Y-N-E-T-T-E.
21            Q.    What friends were there?
22            A.    My friend, Samira, and my friend,
23     Stephanie.  My friend, Lavarr.
24            Q.    Let's start with Samira.
25                  How do you spell her first name?
```



```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2            A.    S-A-M-I-R-A.
 3            Q.    And what is her last name?
 4            A.    Fuller.  F-U-L-L-E-R.
 5            Q.    And Stephanie?  What is her last
 6      name?
 7            A.    Bell.
 8            Q.    Who else was there?
 9            A.    Lavarr Fuller.
10            Q.    Lavarr, how do you spell that?
11            A.    L-A-V-A-R-R.
12            Q.    And anybody else?
13            A.    My nephew, Brandon Lucas, was there.
14      Clyde Davis, Sr.  Clyde Davis, Jr.  Cordell McClary.
15            Q.    These were all of the individuals
16      that came to the scene when they had found out what
17      happened?
18            A.    (The witness indicated non-verbally.)
19            Q.    Yes?
20            A.    Yes.  Sorry.
21            Q.    That's fine.
22                  You mentioned earlier that when you
23      went to the neighbor's house, Ms. Ervin sort of
24      yelled out to you what had happened.
25                  Have you had any conversations with
```



```
 1                SHENEA L. JAMES - BY MR. CERRONE
 2    her since that time about the incident?
 3             A.   Yes.
 4             Q.   Do you know when that happened?
 5             A.   Um, briefly after they finally
 6    wrapped up everything and came out of her house and
 7    she was allowed to go back in.
 8             Q.   You spoke to her then?
 9             A.   Yes.
10             Q.   So this would have been how long
11    after you went to the neighbor's house?  An hour?
12    Two hours later?
13             A.   An hour or two later, yes.
14             Q.   And what did Ms. Ervin tell you?
15             A.   She then said all of the events that
16    led up to them coming into her house.
17             Q.   What did she tell you?
18             A.   She stated that they knocked on the
19    door.  It took her a while to answer.  When they
20    finally got to the door, she cracked it, put her
21    foot behind the door and she said, "May I help you?"
22                  And they said they had a warrant for
23    Dedrick James.
24                  She then turned her head back and
25    yelled, "Dedrick."
```



1          SHENEA L. JAMES - BY MR. CERRONE

2                    And Dedrick was walking down the

3      hall.  He stated, "I got it, Grandma.  I got it."

4                    As soon as they heard his voice, they

5      ambushed her and ambushed him.

6                    And he then ran into the bathroom and

7      they threw her, shoved her on the floor in the

8      living room.  Threw her hands behind her back,

9      trying to put her in handcuffs.  She said there was

10     a dog in her face, several officers and several

11     officers ran up after Dedrick into the bathroom.

12                   As she is over there -- and she said

13     she screamed out "Dedrick" -- and they were making

14     sure that she couldn't move or get up or something.

15     They were holding her down and she just heard a

16     bunch of fumbling in the bathroom.

17                   And then she stated that Dedrick

18     yelled out, "Grandma."  And the shot went off.

19                   She said they hurried up and pushed

20     her out of her house so she had to get out and

21     that's how she ended up next door.

22          Q.   Have you spoken to Ms. Ervin at any

23     other -- on any other occasions other than the two

24     that you have just described?  The first one being

25     when you first went to the neighbor's house and the



```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2   second one being what you just described to us that
 3   occurred approximately one to two hours later?
 4              MR. SHIELDS:  Objection to form.
 5         A.   Yes.
 6         Q.   When did this other conversation
 7   occur?
 8         A.   The next day.  The day after.  The
 9   day after leading up to his burial.  Which was on
10   September 25th.
11         Q.   So you're indicating that you would
12   speak to her on a daily basis for approximately that
13   three to four-day period until he was buried?
14         A.   Every day up until he was buried.
15         Q.   And what was the sum and substance of
16   these conversations that you had with Ms. Ervin?
17         A.   Um, she reiterated the story on
18   several different occasions.  How we were going to
19   proceed to bury him because she had the policy
20   that -- life insurance policy.
21         Q.   Who was the beneficiary of the life
22   insurance policy?
23         A.   Betty Ervin.
24         Q.   Do you know how much the policy was
25   for?
```



```
1                  SHENEA L. JAMES - BY MR. CERRONE
2            A.   No.
3            Q.   Did she ever tell you?
4            A.   No.  We didn't use it, either.
5            Q.   Why not?
6            A.   Because -- only one person is
7     supposed to call and she called instead of letting
8     the funeral home call and so it went under
9     investigation.  So we paid out-of-pocket.
10           Q.   What went under investigation?
11           A.   Um, the life insurance policy.
12           Q.   Did the life insurance -- it did not
13    pay out?
14           A.   No.
15           Q.   And is -- did the -- do you know why?
16           A.   They didn't pay out because -- it
17    went under investigation.
18           Q.   Did the life insurance company claim
19    that it was a suicide?
20           A.   No.  That wasn't the case.
21           Q.   Okay.
22           A.   So -- I guess when you have a life
23    insurance policy, you already know what your policy
24    holds, right, the amount?  But obviously, she forgot
25    or she wasn't thinking.  So her and her daughter
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2    called.  The only person that is supposed to call
 3    was the funeral home.  And so for that, it went
 4    under investigation for 15 days.
 5              Q.   Do you know if the life insurance was
 6    ever paid out?
 7              A.   No.
 8              Q.   Did not?  Or you don't know?
 9              A.   Um, she told me it didn't.
10              Q.   Okay.  Do you know why it didn't pay
11    out?
12              A.   Um, because she couldn't produce a
13    death certificate.
14              Q.   Is there a reason why she could not
15    obtain a death certificate?
16              A.   Because I wouldn't give it to her.
17              Q.   Why?
18              A.   Because I wouldn't give it to her.
19              Q.   You wouldn't?
20              A.   No.
21              Q.   Is that right?
22              A.   Correct.
23              Q.   And why would you not give her the
24    death certificate?
25              A.   Because she -- the funeral was
```



```
 1                SHENEA L. JAMES - BY MR. CERRONE
 2    already paid for.  It already happened.
 3            Q.   Was it Ms. Ervin's intention to use
 4    the funds from the life insurance to pay for the
 5    funeral?
 6            A.   No.
 7            Q.   Has she ever communicated to you what
 8    her intentions were with the life insurance policy?
 9            A.   She communicated to me and the
10    funeral home what her intentions was with the life
11    insurance.
12            Q.   What did she say?
13            A.   She still got to be taken care of
14    because Dedrick took care of her.  Well, that's what
15    her daughter stated.
16            Q.   And is this what led to you and
17    Ms. Ervin no longer having a relationship?
18            A.   Correct.
19            Q.   When is the last time you saw
20    Ms. Ervin?
21            A.   2023.  Maybe like May 2023?
22            Q.   And what was the -- what led to
23    that --
24            A.   Removing his car out of her driveway.
25            Q.   You did that?
```



```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2         A.    Yes.
 3         Q.    Okay.  Did you speak to Ms. Ervin?
 4         A.    Yes.
 5         Q.    And what did the two of you say to
 6    each other?
 7         A.    Um, I told her that I was coming to
 8    get the car.  The tow truck was coming so she needed
 9    to move her car.  And then she just started sharing
10    her horror stories of being in that house.
11         Q.    What do you mean by that?
12         A.    Things that take place with her being
13    in the house that my son was murdered in.
14               She then gave me a couple of parts
15    that he had for the car and that was it.
16         Q.    What did you do with Dedrick's car?
17         A.    Um, it's fixed.  I put it in the
18    shop.  I got it fixed.
19         Q.    Is this your car now?
20         A.    Yes.
21         Q.    That's the last time you have seen
22    Ms. Ervin?
23         A.    Yes.
24         Q.    You have spoken to her on the phone?
25         A.    No.  I went to her house about like a
```



```
1                  SHENEA L. JAMES - BY MR. CERRONE
2       week ago to ask her -- to ask her some things and
3       she said she wasn't well.  She couldn't talk.  And
4       she said that through the door.  So I didn't see
5       her.
6                  Q.   Have you talked to Ms. Ervin about
7       this lawsuit?
8                  A.   No.
9                  Q.   You mentioned that while you were at
10      the scene on September 15, 2021, that an
11      investigator told you that Betty Ervin was at the
12      next-door neighbor's house.
13                 Did any police officer or law
14      enforcement officer on the scene at 6 Vinewood, on
15      September 15, 2021, tell you what happened to
16      Dedrick?
17                 A.   Yes.
18                 Q.   Do you know who it was?
19                 A.   No.
20                 Q.   And what did this person tell you?
21                 A.   It was, um -- somebody from the
22      Attorney General Office, I want to say -- it was a
23      lady and a man.
24                 Q.   This was -- this was on the date of
25      the incident?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

1              SHENEA L. JAMES - BY MR. CERRONE

2          A.    Yes.

3          Q.    They were at the scene?

4          A.    Yes.

5          Q.    Okay.  And they identified themselves

6     as from the Attorney General's Office?

7          A.    I want to say that they -- yes.

8          Q.    Okay.  And what did they tell you?

9          A.    That Dedrick was dead and basically

10    how to go about seeing him.  Because all I wanted to

11    do was see him.

12         Q.    And what did they tell you to do?

13         A.    That I had to contact the -- the

14    coroner, I want to say --

15         Q.    Uh-huh.

16         A.    -- and proceed from there.

17         Q.    Did you have any other conversations

18    with any other law enforcement officers at the scene

19    that day, other than what you have told me?

20         A.    Yes.

21         Q.    Who else did you speak with?

22         A.    The officers that was there.

23         Q.    And did they tell you anything?

24         A.    Eventually from the time that I got

25    there up until -- by the time the people came to get



```
 1                SHENEA L. JAMES - BY MR. CERRONE
 2     the body, that's when they were more talking
 3     to -- and telling me that Dedrick was no longer
 4     there.  They was lying to me.  They were telling me
 5     he wasn't even in there.  They wouldn't tell me he
 6     was dead, but they were telling me he wasn't there.
 7               Q.   Did they tell you anything else?
 8               A.   No.
 9               Q.   Did the officers ever tell you that
10     Dedrick had died?
11               A.   Yeah.  I told you it was a -- I don't
12     know if he was an investigator.  I don't know who he
13     was, but he was the one that told me that Dedrick
14     was dead.
15               Q.   Was this the same man that told you
16     that Betty was next door?
17               A.   Yes.
18               Q.   Okay.  So this investigator did
19     inform you that he had died?
20               A.   Yes.
21                    While the other officers played...
22               Q.   Since the day of the incident, have
23     you had any conversations with any law enforcement
24     officers about what happened on September 15, 2021?
25               A.   Yes.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1              SHENEA L. JAMES - BY MR. CERRONE
2         Q.    And who did you speak with?
3         A.    The Attorney General's Office.
4         Q.    Who did you speak to?
5         A.    I want to say it was Officer Gomez.
6    I believe that was his last -- yeah.  Officer Gomez.
7         Q.    And this was -- you were interviewed
8    by the Attorney General's Office as part of their
9    investigation into the incident?
10        A.    I think the day of the scene.
11        Q.    They spoke to you that day?
12        A.    Yes.
13        Q.    How about after September 15?  Have
14   you spoken to anybody from law enforcement
15   concerning the incident?
16        A.    Yes.  I talked to Detective Gomez.
17   He said he was part of the -- the --
18        Q.    Attorney General?
19        A.    Yeah.
20              And then when they came up with their
21   conclusion -- I had a meeting with them.
22        Q.    Do you recall when you spoke with
23   Detective Gomez after September 15th?
24        A.    Yes.  I spoke with him several times.
25   I don't recall the dates.  I spoke with him several
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

| | |
|---|---|
|1|                    SHENEA L. JAMES - BY MR. CERRONE|
|2|times.  I met up with him several times.|
|3|          Q.   What, if anything, did Detective|
|4|Gomez tell you?|
|5|          A.   He said that they -- so the first|
|6|time I met with him, he was giving me the property|
|7|of Dedrick's from the Coroner's Office.|
|8|               The next time I met with him, he then|
|9|shared with me that they allegedly said Dedrick had|
|10|a gun.|
|11|               The next time I met with him, he told|
|12|me to bring a bag and that they were going to give|
|13|me back his property that they took from the home.|
|14|               The next time I talked to him, he|
|15|told me, "Well, he's gone anyway, so it doesn't|
|16|matter."|
|17|          Q.   Detective Gomez said that?|
|18|          A.   Yes.|
|19|          Q.   Do you know whether Dedrick possessed|
|20|a firearm?|
|21|          A.   No.|
|22|               MR. SHIELDS:  Objection to form.|
|23|          Q.   You do not know?|
|24|          A.   Do I know what?|
|25|          Q.   Do you know whether Dedrick possessed|



```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2   a gun?
 3                   MR. SHIELDS:  Objection to form.
 4          A.   No.
 5          Q.   I couldn't hear your answer.  I'm
 6   sorry.
 7          A.   He did not have any firearms.
 8          Q.   Did you know police found ammunition
 9   for a firearm in his bedroom?
10          A.   Do I know?
11          Q.   Yes.
12          A.   Do I know that they planted the
13   firearm in his bedroom?  Yes.
14          Q.   Is that your contention?  Is that
15   they planted the firearm on him?
16          A.   Correct.
17          Q.   What leads you to believe that?
18          A.   Well, the pictures of the gun, all
19   these extra magazines did not belong to my son.
20   They was not found in that home.  They were planted
21   there after they killed my son.
22          Q.   Do you have any information to
23   support this allegation?
24          A.   Yes.
25          Q.   Okay.  Please go ahead.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2         A.    To support -- for my allegation?
 3         Q.    You have stated that you believe that
 4    the police or law enforcement planted the firearm
 5    and the ammunition on him.
 6         A.    Yes.  In his safe.
 7         Q.    Okay.  What information do you have
 8    to support that allegation?
 9         A.    When I would go see Dedrick, Dedrick
10    opened that safe in front of me several times.
11    There was never any magazines or guns, for that
12    matter, in his safe.
13         Q.    When was the last time he had opened
14    the safe in front of you?
15         A.    Prior to September 15th, um, maybe
16    like August.  It was around August because he was
17    showing me some new necklaces that he had purchased.
18         Q.    Other than the fact that you didn't
19    see any gun or ammunition in the safe in August of
20    2021 when your son showed it to you, do you have any
21    other information to support your contention that
22    law enforcement planted a firearm or ammunition?
23         A.    No.
24         Q.    Do you know whether your son was
25    involved in any gang activity?
```



ALLIANCE
COURT REPORTING, INC.

*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2         A.    He was not.
 3         Q.    Do you know whether your son was
 4    involved in drug dealing?
 5         A.    He was not.
 6         Q.    You indicated that just prior to this
 7    incident your son was living with both Ms. Ervin and
 8    yourself, correct?
 9         A.    Correct.
10         Q.    So is it possible he was engaging in
11    illegal activities while he was with Ms. Ervin and
12    not in your presence?
13              MR. SHIELDS:  Objection to form.
14         A.    No.
15         Q.    It's not possible?
16         A.    No.  I mean when you say that, you
17    mean like what?  I mean he smoked weed.
18              Is that what you mean?
19         Q.    My question was, was it possible that
20    Dedrick was involved in drug dealing?
21         A.    Oh, no.
22         Q.    Why do you say that?
23         A.    Because that's not who he was.
24    That's not what he did.  That's not him.  He was a
25    working young man.
```



```
 1                 SHENEA L. JAMES - BY MR. CERRONE
 2          Q.   Is it your claim in this case that
 3     the police shot Dedrick?
 4          A.   Yes.
 5          Q.   What information do you have to
 6     support that contention?
 7          A.   Um, so when we wrapped it up on --
 8     the Attorney General's Office came to their
 9     conclusion (indicating), they stated that it was
10     seven officers on my son, attacking him in a
11     bathroom.
12               And then when I got the autopsy
13     report, I asked them was it a self-inflicted wound
14     or did someone else shoot him -- pull the trigger
15     rather.
16                    They stated -- I asked them the
17     difference.  And they stated that they can tell by
18     the way that the bullet enters the body that it was
19     not a self-inflicted wound.  Which means that he
20     didn't shoot himself.
21          Q.   Who said that?
22          A.   The -- the autopsy.  Whoever did the
23     autopsy.  Whoever I spoke to from there.
24          Q.   Do you know the person's name?
25          A.   I don't recall their name.  I
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2    specifically asked them that, because that's the
 3    story that the police wanted to tell.
 4          Q.   Other than this statement from this
 5    doctor who did the autopsy, do you have any other
 6    information to support your contention that the
 7    police were the individuals who shot Dedrick that
 8    day?
 9          A.   Yeah.  All of the police were there.
10    And when my baby screamed out "Grandma," they shot
11    him.  He screamed, "Grandma."
12              The gun goes off.  But all these
13    officers in the bathroom, on top of my child.
14              MR. CERRONE:  Off the record.
15              (There was a discussion off the record.)
16              MR. CERRONE:  I'm looking at
17              something that the City's attorney was kind
18              enough to pass to me and it indicates that
19              a Dr. Christine Yoo, Y-O-O, of the Monroe
20              County Medical Examiner's Office conducted
21              Mr. James' autopsy.
22              I think is from the AG's report, is
23              it not?
24              MR. CAMPOLIETO:  I think.
25          Q.   Does that name ring a bell,
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2      Dr. Christine Yoo?
 3              A.    No.  It was a man I spoke with.
 4              Q.    Do you have any recollection what the
 5      name was?
 6              A.    I don't.
 7              Q.    Was this a person that identified
 8      themselves as a doctor?  Or a nurse?  Or some other
 9      position?  Or do you know?
10              A.    It was the person that performed the
11      autopsy.  That person -- I don't remember -- recall
12      the name.
13                  (There was a discussion off the record.)
14                  (The proceedings recessed at 12:34 p.m.)
15                  (The proceedings reconvened at 12:42 p.m.;
16                  appearances as before noted.)
17      SHENEA L. JAMES, resumes;
18                  CONTINUING EXAMINATION BY MR. CERRONE:
19              Q.    We took a short break and your
20      attorney sent me a copy of the autopsy report.  The
21      name of the physician who performed the autopsy was
22      a Christine Y -- middle initial Y -- last name Yoo,
23      Y-O-O.
24                      This is not the individual that made
25      the statement to you?
```



```
1                    SHENEA L. JAMES - BY MR. CERRONE
2            A.    No.
3            Q.    There is a reference in the autopsy
4    report to a male employee of the Coroner's Office
5    being present during the autopsy BY the name of
6    Mr. J. Brown.
7                  Do you recognize that name?
8            A.    Sounds familiar.
9            Q.    Is this the individual that told you
10   that they believed that it was a homicide and not a
11   suicide?
12           A.    I'm not sure.  I'm not sure who I
13   spoke with.  But I know it was a male.
14           Q.    Could you describe how he looks?
15           A.    No.
16           Q.    Was he white?  Black?  Hispanic?
17           A.    We talked on the phone.
18           Q.    You talked on the phone.
19                 Did he identify himself?
20           A.    He did.
21           Q.    But you don't --
22           A.    I just don't recall his name.  There
23   was a lot going on at that time.  I can't.
24           Q.    When did this phone call occur?
25           A.    I don't recall.  But it wasn't too
```



```
1              SHENEA L. JAMES - BY MR. CERRONE
2     far after September 15th.
3              Q.   Did the individual identify
4     themselves as a doctor or some other position?
5              A.   They just said, "We're calling from
6     the" -- I forget what it is called.
7              Q.   The Coroner's Office?
8              A.   Yes.  And they stated that they were
9     the one that did the autopsy on -- and then I
10    proceeded to ask them questions.
11             Q.   What did you ask them?
12             A.   I asked him was it a self-inflicted
13    wound and how could they tell.  And then I asked
14    him, "Or did someone else do it?"  And, "How can
15    they tell?"
16                  And he explained to me the difference
17    between both.
18             Q.   Do you recall what he said?
19             A.   He stated -- he used these big words
20    so I don't remember the big words.
21             Q.   Sure.
22                  Explain it -- I probably wouldn't
23    understand them either so just -- let's talk in
24    non-medical terms.
25             A.   He stated that the way that the
```



```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2      bullet enters the body, um, is -- it's like -- the
 3      way that it enters the body and the way that it
 4      goes, that's how you can tell the difference between
 5      a self-inflicted wound or if someone did it.  I
 6      don't really know how to explain it.
 7              Q.   You're doing fine.
 8              A.   And just like on his death
 9      certificate it says "homicide."  But in y'all's
10      investigation ya'll put "suicide."  Which is a
11      suicide lie.
12              Q.   When you say "homicide," you're
13      referring to the autopsy report?
14              A.   Yes.
15              Q.   Do you have any other information
16      other than what you have told me to support your
17      contention that the officers were the ones that shot
18      your son and that it was not a suicide?
19              A.   Can you repeat that?
20              Q.   Yes.
21                   You have relayed to me this
22      conversation you had with this man on the phone from
23      the Coroner's Office.
24                   Do you have any other information to
25      support your contention that the officers shot your
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1                SHENEA L. JAMES - BY MR. CERRONE
2    son?
3            A.    Besides the Attorney General Office
4    stating that it was seven officers on my son at that
5    time attacking him in the bathroom, no.
6            Q.    What do you mean by that?  No?
7            A.    No.   Besides the Attorney General
8    Office --
9            Q.    Okay.
10           A.    -- stating that it was seven officers
11   on my son -- soaking wet, weighing 145 -- in the
12   bathroom.
13           Q.    Are you aware that the gun that the
14   police allege was Dedrick's had previously been
15   stolen?
16           A.    Am I aware?
17           Q.    Are you aware of that?
18           A.    That the gun that they stated that --
19   that Dedrick allegedly had was stolen?
20           Q.    Correct.
21           A.    Yes.
22           Q.    And who told you that?
23                 MR. SHIELDS:   Objection.
24           Q.    If it wasn't your attorney -- you
25   don't have to tell me if it was your attorney
```



1              SHENEA L. JAMES - BY MR. CERRONE
2        because that's a privileged conversation.
3                    But did anybody other than your
4        attorney inform you that the police believed that
5        the gun that Dedrick had was stolen?
6              A.    I read it in the report.
7              Q.    Okay.  It's your contention it was
8        not Dedrick's gun?
9              A.    No.  It was not his gun.
10             Q.    You base that on the fact that he
11       showed you his safe on one occasion approximately a
12       month before the incident?
13             A.    I base it on that, as well as the
14       protocol when the police see a black man with a gun,
15       they shoot them upon arrival.  And that's not what
16       they did.  I never heard of police wrestling for a
17       gun.  That a black man is holding.  I have never
18       heard that in my life.  That, too.
19                    Because y'all officers are trained to
20       shoot black people upon arrival, especially black
21       men with the possession of a gun.  They're not going
22       to wrestle them for a gun.  They're going to shoot
23       to kill.  That's what y'all trained them to do.
24       That's what y'all did to my son.  And he didn't have
25       a gun.



```
 1                    SHENEA L. JAMES - BY MR. CERRONE
 2              Q.    Are you aware that the Attorney
 3    General's Office concluded there was no evidence
 4    that any officer used deadly physical force against
 5    Mr. James?
 6              A.    Can you repeat that?
 7              Q.    Yes.
 8                    Are you aware that the Attorney
 9    General's Office concluded in its report that there
10    was "no evidence" -- I'm quoting here -- "no
11    evidence that any officer used deadly physical force
12    against Mr. James," close quote.
13                    Are you aware that that was the
14    conclusion reached by the Attorney General's Office?
15              A.    Yes.
16              Q.    Do you agree with it or disagree with
17    it?
18              A.    I disagree with it.
19                    Why?
20              Q.    Why?
21              A.    When I got my baby from the Coroner's
22    and I seen him, he had bruises on his face.  He had
23    bruises over his left eye.  He had bruises on his
24    left cheekbone.  Under his right eye.
25              Q.    Did any of those bruises, to your
```



1          SHENEA L. JAMES - BY MR. CERRONE
2     knowledge, lead to his death?
3          A.    No.  The gunshot wound led to his
4     death.
5          Q.    But the bruises that were on his face
6     that you noticed --
7          A.    Are from them attacking him in the
8     bathroom.
9          Q.    Well, they're consistent with a
10    struggle between him and the officers; correct?
11         A.    Uh-huh.
12         Q.    Yes?
13         A.    The struggle -- yes.
14         Q.    Are you aware that the Attorney
15    General's Office concluded that the officers' use of
16    force against Dedrick was justified?
17         A.    Repeat that.
18         Q.    Are you aware that the Attorney
19    General's Office concluded that the officers' use of
20    force against Dedrick was justified?
21         A.    Yes, I'm aware they stated that.
22         Q.    Do you agree with that conclusion?
23         A.    Absolutely not.
24         Q.    Why?
25         A.    Because the excessive force didn't



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                 SHENEA L. JAMES - BY MR. CERRONE
 2      have to happen if they would allow him to surrender
 3      like he was when they came to the door.
 4             Q.   Did your son have an opportunity to
 5      surrender when the officers came to the house?
 6             A.   Yes.  Wait.  Excuse me?
 7             Q.   Did your son have an opportunity to
 8      surrender to the officers when they arrived at the
 9      house?
10             A.   No.
11             Q.   Why do you say that?
12             A.   Because as soon as his -- when his
13      grandma answered the door and they stated that they
14      were there for a warrant for Dedrick -- and when she
15      yelled "Dedrick" and heard his voice and said -- he
16      said, "Grandma, I got it," he is walking towards the
17      door.  As soon as they hear his voice, they ambush
18      her and him.
19             Q.   This is based on what Ms. Ervin
20      allegedly told you?
21             A.   Yes.
22             Q.   Do you understand that the officers
23      claim that Dedrick at first started to walk towards
24      them but then fled and they chased after him?  Are
25      you aware that that is their contention?
```



```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2                   MR. SHIELDS:  Objection to form.
 3              A.    That he ran into the bathroom?
 4              Q.    Are you aware that that is their
 5     contention, that -- that he ran from the officers
 6     when they entered the house?
 7              A.    Yes.  Why did he run?  Because they
 8     scared him.  Why they scared him?  Because they
 9     already been harassing him.
10              Q.    When were they harassing him?
11              A.    He's been racially profiled ever
12     since he bought a 2006 Dodge Charger.  He has been
13     pulled over constantly by the police.  Why?  Because
14     he a young, black man driving a Charger with a hemi
15     in it.  And that has been happening to him on
16     several occasions.
17              Q.    When was the last time it happened to
18     him?
19              A.    Well, he parked the car and bought a
20     new car for that reason.
21              Q.    When did he own this Dodge Charger?
22              A.    He owned it in 2016.
23              Q.    And when did he sell it?
24              A.    He didn't sell it.  That's the car
25     that I have right now.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2         Q.   I thought the one that you took was a
 3    Dodge Dart?
 4         A.   No.  I never told you what kind of
 5    car I took.  I just said I went to the house and
 6    took the car.
 7         Q.   Okay.  Thank you for clarifying that.
 8              So he owned two cars?
 9         A.   Yes.
10         Q.   So he owned the white Dodge Dart and
11    he also owned a Dodge Charger?
12         A.   Correct.  All black.
13         Q.   So the car that you removed from
14    Ms. Ervin's house was the Dodge Charger?
15         A.   Right.
16         Q.   Not the Dodge Dart?
17         A.   Not the Dodge Dart.
18         Q.   Do you know what happened to the
19    Dodge Dart?
20         A.   The Dodge Dart went back to the
21    dealership.
22         Q.   It was on lease or --
23         A.   Yes.
24         Q.   Do you have any knowledge as to how
25    many times the police, if at all, attempted to
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  SHENEA L. JAMES - BY MR. CERRONE
 2     contact Dedrick to arrange for his voluntary
 3     surrender prior to September 15, 2021?
 4               A.   I am not aware of that.
 5               Q.   Are you aware that the Attorney
 6     General's report contains information that the New
 7     York State Police twice tried to call your son to
 8     voluntarily surrender prior to September 15, 2021?
 9               A.   I am not aware of that.
10               Q.   Are you aware that the police came to
11     6 Vinewood Place on August 24, 2021, in an attempt
12     to obtain his voluntary surrender?
13               A.   I am not aware of that either.
14               Q.   You would agree if your son had
15     voluntarily surrendered prior to September 15, he
16     would still be alive?
17               A.   Yes.
18               Q.   You're the Executor of your son's
19     estate?
20               A.   Yes.
21               Q.   Did your son have any assets other
22     than the two cars?
23               A.   No.
24                    Assets are what?
25               Q.   Assets are money, property, things
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              SHENEA L. JAMES - BY MR. CERRONE
 2    like that.
 3              A.    Besides what they took, no.
 4              Q.    Did he have any jewelry?  Any money?
 5              A.    He did.
 6              Q.    Pardon me?
 7              A.    Yes.
 8              Q.    And who possesses those now?  You?
 9              A.    I have some of his jewelry.  A lot of
10    it was in the safe.  When Detective Gomez called me
11    to go retrieve the things that they took, um, they
12    could no longer find them.  There was only a --
13    supposed to be two cell phones that they had.
14              Q.    What was the cost of the funeral and
15    the burial?
16              A.    15,000.
17              Q.    15,000?
18              A.    Yes.
19              Q.    Who paid for that?
20              A.    My family.
21              Q.    When you say your "family," who
22    contributed?
23              A.    My family.
24                    I mean you want me to name all of the
25    names.
```



```
1              SHENEA L. JAMES - BY MR. CAMPOLIETO
2         Q.    Was it several people?
3         A.    Yes.
4              MR. CERRONE:  I think that is all I
5         have.
6              John, do you have any questions?
7              MR. CAMPOLIETO:  Yes.  Just a few.
8         EXAMINATION BY MR. CAMPOLIETO:
9         Q.    Ms. James, just really probably going
10   to be a few questions here.
11             My name is John Campolieto.  I'm an
12   attorney for the City of Rochester.
13             One question I had was did you come
14   to this deposition with anybody other than your
15   attorney?
16        A.    Yes.
17        Q.    Who did you come with?
18        A.    My boyfriend.
19        Q.    What is his name?
20        A.    William Armstead.
21        Q.    If you look at Exhibit G, bottom --
22             MR. SHIELDS:  She has it.
23        Q.    It has a couple words.
24             Associate?
25        A.    Associate.  Uh-huh.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                   SHENEA L. JAMES - BY MR. CAMPOLIETO
 2           Q.    Who is John Ervin III?
 3           A.    Dedrick's uncle.
 4           Q.    Uncle.
 5                 Does he live at --
 6           A.    No.
 7           Q.    -- 6 --
 8                 Where does he live, if you know?
 9           A.    I don't know where he lives.
10           Q.    But he doesn't live at 6 Vinewood?
11           A.    He does not live at 6 Vinewood.
12           Q.    How old is he?
13           A.    I don't know.
14           Q.    Do you know how old he was in
15     relation to Dedrick?
16                 MR. SHIELDS:  Objection to form.
17           Q.    Was he older than Dedrick?
18           A.    Yes.
19           Q.    By how many years?
20           A.    A lot.
21           Q.    A lot.  Okay.
22                 And the second associate, who is?
23     Kiera Cheatem—Mathis?
24           A.    An ex-girlfriend.
25           Q.    Ex-girlfriend.
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1                SHENEA L. JAMES - BY MR. CAMPOLIETO
2          A.   Why is she on there?
3          Q.   Sticking with this document, if you
4     look, it appears that he was wanted in Stroudsburg,
5     Pennsylvania for a marijuana possession.
6               It says -- under the "wanted" --
7          A.   Uh-huh.
8          Q.   -- word.
9               Were you aware of that?
10         A.   Yes.
11         Q.   Does he -- did Dedrick know anybody
12    in Stroudsburg, Pennsylvania?
13         A.   No.
14         Q.   Why was he there?
15         A.   He was riding through.  Traveling.
16         Q.   Just riding through.
17              Do you know where he was going on
18    that trip?
19         A.   He was going to New York City to
20    visit a classmate that he graduated with.
21         Q.   Who was the classmate, do you know?
22         A.   I don't know his last name.  But I
23    know his name is Jayshawn.
24         Q.   Jayshawn?
25         A.   Uh-huh.
```



```
 1                SHENEA L. JAMES - BY MR. CAMPOLIETO
 2          Q.    When was this trip?
 3          A.    2016.
 4          Q.    So it was a while ago?
 5          A.    Yeah.
 6          Q.    And he passed away in 2020, you said?
 7          A.    2021.
 8          Q.    2021.
 9                Your son graduated from school --
10          A.    Didn't pass away.  He was taken away
11    in 2021.
12          Q.    Your son graduated from School of the
13    Arts in 2015?
14          A.    Yes.
15          Q.    Did he have any trouble -- when I say
16    "trouble," suspensions?  Detention?  Anything of
17    that nature at the School of the Arts?
18                MR. CERRONE:  She has to say "no."
19          A.    No.  I'm sorry.  No.
20                MR. CAMPOLIETO:  That's correct.  I
21          heard "no" in my head.
22          A.    It was in my mouth, but it didn't
23    come out.  But no.
24          Q.    So -- he so he never received any
25    type of discipline while at that school?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1                  SHENEA L. JAMES - BY MR. CAMPOLIETO
 2            A.    No.
 3            Q.    Now, he didn't graduate, but he -- it
 4      appears he attended CCFL --
 5            A.    Yes.  FLCC.
 6            Q.    Finger Lakes Community College.
 7                  MR. SHIELDS:  Objection to form.  She
 8            said she wasn't sure if he graduated.
 9                  MR. CAMPOLIETO:  Okay.
10            Q.    It appears he attended Finger Lakes
11      Community College between the years 2015 to 2019.
12                  Were you aware of any disciplinary
13      proceedings against him at that school or any
14      problems or trouble?
15            A.    No.
16            Q.    Do you know when your son purchased
17      the Dodge Dart?
18                  MR. SHIELDS:  Objection.
19            Q.    Or do you know if your son purchased
20      a Dodge Dart?
21            A.    He financed a Dodge Dart.
22            Q.    Through the bank?  A bank?
23            A.    I'm not sure.
24            Q.    But it wasn't a lease?
25            A.    No.  It was -- it was financed.
```



```
 1                 SHENEA L. JAMES - BY MR. CAMPOLIETO
 2            Q.   It was financed?
 3            A.   Yes.
 4            Q.   So that -- after he passed away, you
 5    turned -- you turned the car in; is that correct?
 6            A.   We allowed them to come and get it.
 7    Yes.
 8            Q.   And do you have records of that
 9    transaction?
10            A.   I don't.
11            Q.   And do you know who would have those
12    records?
13            A.   His grandmother may have them.
14            Q.   The black Dodge Charger, you said it
15    was a 2016?
16            A.   It was a 2006.
17            Q.   2006?
18            A.   Yes.
19            Q.   Where did he purchase this vehicle
20    from?
21            A.   He purchased it from a man out in
22    Canandaigua.
23            Q.   And it was a -- it's a 2006?
24            A.   Yes.
25            Q.   And you currently drive that car?
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1              SHENEA L. JAMES - BY MR. CAMPOLIETO
 2         A.    Yes.
 3         Q.    Do you know how much he purchased it
 4    for?
 5         A.    I don't recall.
 6         Q.    Do you know how he purchased it?  Was
 7    it financed?
 8         A.    No.  Cash.
 9         Q.    It was a cash deal.
10               If you would look at Exhibit F.
11         A.    I don't have that.
12               MR. SHIELDS:  This is the first
13               document.
14               What page?
15               MR. CAMPOLIETO:  The front page.
16         Q.    If you look down to the names of the
17    people that are listed as Defendants, would you read
18    those names?  You can read them to yourself.
19               Do you see the name Richard Arrowood?
20         A.    Uh-huh.
21         Q.    Do you know who Mr. Arrowood is?
22         A.    No.  No.
23         Q.    You don't?
24         A.    Why would I?
25         Q.    Well, he is listed in the caption as
```



```
1              SHENEA L. JAMES - BY MR. CAMPOLIETO
2      a Defendant in the case that you brought against the
3      City of Rochester.
4                  That's okay.  If you don't know who
5      he is, then you don't know -- you wouldn't be able
6      to answer the question "Why are you suing Richard
7      Arrowood?"
8              A.   I'm not aware of who he is.
9                  MR. CAMPOLIETO:  Okay.  That's all of
10             the questions I have.
11                 MR. CERRONE:  Okay.  Thank you very
12             much for your time.
13                     (TIME:  1:04 p.m.)
14                   *      *      *
15
16
17
18
19
20
21
22
23
24
25
```



```
 1

 2                         W I T N E S S

 3    Name                    Examination by              Page

 4    -------------------------------------------------------

 5    Shenea L. James         Mr. Cerrone               4-96

 6      "      "              Mr. Campolieto            96-103

 7                                *      *      *

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
 1

 2                    E X H I B I T S

 3   Exhibit        Description              Marked ID'ed

 4   ------------------------------------------------------

 5   EXH F    Nine-page Plaintiff's Response
              to Defendant USA's First Set of
 6            Interrogatories                  17      17

 7   EXH F1  Verification                      17      17

 8   EXH G    Patrol Section Investigations
              document                         34      34
 9
     EXH H    Three-page Warrant of Arrest     39      39
10

11      (Exhibits retained by the Court Reporter to be
                   returned to Mr. Cerrone)
12
                     *       *       *
13

14

15

16

17            EXHIBITS PREVIOUSLY MARKED

18   Exhibit        Description                      Page

19   ------------------------------------------------------

20
        (No Previously Marked Exhibits Presented)
21
                     *       *       *
22

23

24

25
```



```
 1

 2              D O C U M E N T   R E Q U E S T S

 3     Request                                    Page

 4     ------------------------------------------------------

 5
                    (No Documents Requested)
 6
                         *       *       *
 7

 8

 9

10

11            C E R T I F I E D   Q U E S T I O N S

12     Question                                   Page

13     ------------------------------------------------------

14
                    (No Certified Questions)
15
                         *       *       *
16

17

18

19

20

21

22

23

24

25
```



```
 1
 2                    A C K N O W L E D G M E N T
 3            I, Shenea L. James, declare, swear and aver
 4    that I have read my testimony contained herein and
 5    that my answers are true and correct, with any
 6    exceptions noted on the errata sheet, under penalty
 7    of perjury.
 8
 9            _____
10                    Shenea L. James
11
12    I certify that this transcript was signed in my
13    presence by Shenea L. James on the _____ day of
14    _____, 2024.
15
16    IN WITNESS WHEREOF, I have hereunto set my hand and
17    affixed my seal of office of Rochester, New York on
18    this _____ day of _____, 2024.
19
20            _____
21                    Notary Public
22
23            _____
24                    My Commission Expires:
25
```



1

2                   E R R A T A   S H E E T

3              Witness: Shenea L. James
              Deposition Date:  May 1, 2024
4    Pg #   Line #   Change           Clarification

5    _____ _____ _____ _____

6    _____ _____ _____ _____

7    _____ _____ _____ _____

8    _____ _____ _____ _____

9    _____ _____ _____ _____

10   _____ _____ _____ _____

11   _____ _____ _____ _____

12   _____ _____ _____ _____

13   _____ _____ _____ _____

14   _____ _____ _____ _____

15   _____ _____ _____ _____

16   _____ _____ _____ _____

17   _____ _____ _____ _____

18   _____ _____ _____ _____

19   _____ _____ _____ _____

20   _____ _____ _____ _____

21   _____ _____ _____ _____

22   _____ _____ _____ _____

23   _____ _____ _____ _____

24   _____ _____ _____ _____

25



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

```
1
2                    C E R T I F I C A T I O N
3    STATE OF NEW YORK:
     COUNTY OF MONROE:
4
5                    I, SANDRA C. HEWLETT, RPR, do hereby
6    certify that the foregoing testimony was duly sworn
7    to; that I reported in machine shorthand the
8    foregoing pages of the above-styled cause, and that
9    they were produced by computer-aided transcription
10   (CAT) under my personal supervision and constitute a
11   true and accurate record of the testimony in this
12   proceeding;
13                    I further certify that the witness does
14   request to review the transcript;
15                    I further certify that I am not an
16   attorney or counsel of any parties, nor a relative or
17   employee of any attorney or counsel connected with
18   the action, nor financially interested in the action;
19                    WITNESS my hand in the City of
20   Rochester, County of Monroe, State of New York.
21
22
23   SANDRA C. HEWLETT, RPR
     Freelance Court Reporter and
24   Notary Public No. 01HE5057286
     in and for Monroe County, New York
25
```



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920