UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------X
SHENEA JAMES, as administrator of the
estate of DEDRICK JAMES, deceased, and
SHENEA JAMES, individually,

                              PLAINTIFFS,

        -against-         Case No.:
                         23-CV-0657

THE UNITED STATES OF AMERICA, CITY OF
ROCHESTER, RPD INVESTIGATOR RICHARD
ARROWOOD, "JOHN DOE RPD OFFICERS 1-10"
(names and number of whom are unknown at
present), MONROE COUNTY SHERIFF TODD
BAXTER, MSCO SERGEANT CHRISTIAN DEVINNEY,
RICHARD ROD, "SHERIFF'S DEPUTIES 1-10"
(names and number of whom are unknown at
present), NYSP INVESTIGATOR JEFFREY
ULATOWSKI and other unidentified members of
the Rochester Police Department, Monroe
County Sheriff's Office, and New York State
Police,

                            DEFENDANTS.
-----------------------------------------X

                DATE:  May 8, 2024
                TIME:  10:15 A.M.

(1)

(2)                          DATE:  May 8, 2024

(3)                          TIME:  10:15 A.M.

(4)

(5)              DEPOSITION of the Defendant, THE

(6)      CITY OF ROCHESTER, by the Witness, WILLIAM

(7)      BAKER, taken by the Plaintiff, pursuant to

(8)      a Notice and to the Federal Rules of Civil

(9)      Procedure, held via Zoom videoconference,

(10)     before Sandra Sierra, a Notary Public of

(11)     the State of New York.

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

```
(1)
(2)     A P P E A R A N C E S:
(3)
(4)     ROTH & ROTH, LLP
          Attorneys for the Plaintiffs
(5)       192 Lexington Avenue, Suite 802
          New York, New York 10016
(6)       BY:  ELLIOT DOLBY-SHIELDS, ESQ.
(7)
(8)     HAL KIEBURTZ, ESQ.
          Attorneys for the Defendant
(9)       CITY OF ROCHESTER,
          NEW YORK- LAW DEPARTMENT
(10)      30 Church Street, Room 412A
          Rochester, New York 14614
(11)      BY:  JOHN KIEBURTZ, ESQ.
(12)
(13)    MICHAEL S. CERRONE, ESQ.
          Attorneys for the Defendants
(14)      United States Attorney's Office
          Western District of New York
(15)      138 Delaware Avenue
          Buffalo, New York 14202
(16)      Michael@usdoj.gov.
          BY:  MICHAEL CERRONE, ESQ.
(17)
(18)              *          *          *
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

(1)

(2)    F E D E R A L   S T I P U L A T I O N S

(3)

(4)         IT IS HEREBY STIPULATED AND AGREED

(5)    By and between (among) counsel for the

(6)    respective parties herein, that filing and

(7)    sealing be and the same are hereby waived.

(8)

(9)         IT IS FURTHER STIPULATED AND AGREED

(10)   that all objections, except as to the form

(11)   of the question, shall be reserved to the

(12)   time of the trial.

(13)

(14)        IT IS FURTHER STIPULATED AND AGREED

(15)   that the within deposition may be sworn to

(16)   and signed before any officer authorized to

(17)   administer an oath, with the same force and

(18)   effect as if signed and sworn to before the

(19)   Court.

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)        IT IS HEREBY STIPULATED AND AGREED by

(3)    and between counsel for all parties present

(4)    that this deposition is being conducted by

(5)    Videoconference, that the Court Reporter,

(6)    all counsel, and the witness are all in

(7)    separate remote locations and participating

(8)    via Videoconference (LegalView/Zoom/WebEx)

(9)    meeting under the control of Lexitas Court

(10)   Reporting Service, that the officer

(11)   administering the oath to the witness need

(12)   witness shall be sworn in remotely by the

(13)   Court Reporter after confirming the

(14)   witness's identity, that this

(15)   Videoconference will not be recorded in any

(16)   manner, and that any recording without the

(17)   express written consent of all parties

(18)   shall be considered unauthorized, in

(19)   violation of law, and shall not be used for

(20)   any purpose in this litigation or

(21)   otherwise.

(22)

(23)

(24)

(25)

(1)

(2)        IT IS FURTHER STIPULATED that

(3)    exhibits may be marked by the attorney

(4)    presenting the exhibit to the witness, and

(5)    that a copy of any exhibit presented to a

(6)    witness shall be emailed to or otherwise in

(7)    possession of all counsel prior to any

(8)    questioning of a witness regarding the

(9)    exhibit in question. All parties shall bear

(10)   their own costs in the conduct of this

(11)   deposition by Videoconference, not

(12)   withstanding by a copy of the transcript to

(13)   the deposed party by the taking party in

(14)   Civil Litigation matters.

(15)

(16)

(17)        *              *              *

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

```
(1)                    W. BAKER

(2)    W I L L I A M   B A K E R, called as a

(3)    witness, having been first duly sworn by a

(4)    Notary Public of the State of New York, was

(5)    examined and testified as follows:

(6)    EXAMINATION BY

(7)    MR. DOLBY-SHIELDS:

(8)         Q.    Please state your name for the

(9)    record.

(10)        A.    William Baker.

(11)        Q.    What is your address?

(12)        A.    100 State Street, Rochester,

(13)   New York 14514.

(14)        Q.    Good morning, Officer.

(15)        A.    Good morning.

(16)        Q.    My name is Elliot Shields.  I

(17)   represent a woman whose son was killed and

(18)   I am going to ask you some questions today.

(19)             If there is anything I ask you

(20)   that you don't understand, please say so

(21)   and I will gladly rephrase my question for

(22)   you, okay?

(23)        A.    Okay.

(24)        Q.    Otherwise, if you answer the

(25)   question, we're going to assume that you
```

(1)                    W. BAKER

(2)   understood it.

(3)            Do you understand everything

(4)   I've said so far?

(5)      **A.    Yes.**

(6)      Q.    Do you agree to those terms?

(7)      **A.    Yes.**

(8)      Q.    They are fair?

(9)      **A.    Yes.**

(10)     Q.    Okay.  My first question is,

(11)  how many times have you testified before?

(12)     **A.    Probably dozens of times.  I**

(13)  **don't have an exact number.**

(14)     Q.    Okay.  Were those other times

(15)  primarily in the context of criminal cases?

(16)     **A.    Yes, correct.**

(17)     Q.    Okay.  And you also

(18)  testified --

(19)            MR. DOLBY-SHIELDS:  You guys,

(20)      we lost your video.

(21)            There we go.

(22)            You can hear me still?

(23)      **MR. CERRONE:  If for some**

(24)      **reason the microphone occasionally**

(25)      **mutes itself -- I am not sure why**

(1)                          **W. BAKER**

(2)          **it's doing that -- we'll have to**

(3)          **muddle through.**

(4)                  **MR. DOLBY-SHIELDS:  Okay.**

(5)                  **MR. CERRONE:  It was doing it**

(6)          **yesterday.  My computer, I would say**

(7)          **like every 30 or 40 minutes, it would**

(8)          **sort of disconnect and quickly**

(9)          **reconnect.  If we have any break in**

(10)         **the questions or anything, we will**

(11)         **just ask you to rephrase it.**

(12)                 **MR. DOLBY-SHIELDS:  No problem.**

(13)         Q.    You've also testified for the

(14)    professional standards section?

(15)         **A.    Yes, correct.**

(16)         Q.    How many times?

(17)         **A.    I'm not really sure.  Maybe a**

(18)    **handful of times.**

(19)         Q.    Okay.  And how many times were

(20)    you the subject of an investigation when

(21)    you testified before the professional

(22)    standards section?

(23)         **A.    I think, maybe just a few**

(24)    **times.**

(25)         Q.    More than once?

(1)                    W. BAKER

(2)        **A.      I believe so.**

(3)        Q.      Okay.  And did you also testify

(4)    in the context of being a witness and not

(5)    the subject of the investigation?

(6)        **A.      I believe so.**

(7)            **MR. DOLBY-SHIELDS:  Okay.**

(8)        **Mike, we are going to call for**

(9)        **production of all those prior times**

(10)       **that he's testified before the**

(11)       **professional standards section, the**

(12)       **transcripts.**

(13)           **MR. CERRONE:  Yeah, make the**

(14)       **request in writing, as we talked**

(15)       **about yesterday.**

(16)           **And I will have to think this**

(17)       **through whether we are the proper**

(18)       **party to make that request, because**

(19)       **even though Officer Baker, in the**

(20)       **context of this case, is a special**

(21)       **deputy U.S. Marshal, those documents**

(22)       **would be in the possession of the**

(23)       **City, not the Marshal's Service,**

(24)       **because they arose during the course**

(25)       **of his duties with the City.**

(1)                    **W. BAKER**

(2)             **You can make the request to us,**

(3)        **but I suspect you're going have**

(4)        **probably a more fruitful time**

(5)        **actually getting those documents from**

(6)        **the City themselves.**

(7)              **MR. DOLBY-SHIELDS:  Makes**

(8)        **sense.  I will make the demands to**

(9)        **both the City and the United States,**

(10)       **both on the record here and when I**

(11)       **follow up in writing.**

(12)       Q.    And Officer, have you ever

(13)  testified at a deposition in a civil case

(14)  like this before?

(15)       **A.    I don't believe so.**

(16)       Q.    Okay.  How many times have you

(17)  been named a defendant in a civil case like

(18)  this before?

(19)       **A.    I don't really recall.  Maybe a**

(20)  **few.**

(21)       Q.    Okay.  So one of those times

(22)  arose from when you were a deputy with the

(23)  Livingston County Sheriff's Office?

(24)       **A.    I was never a deputy.**

(25)       Q.    Let me just -- do you remember

```
(1)                      W. BAKER
(2)    a lawsuit where the plaintiff's name was
(3)    Ryan Duria?
(4)         A.    I don't believe so.
(5)         Q.    Okay.  Just so I am clear, I
(6)    want to check if this is you or not.  I am
(7)    going to put this complaint up, and we will
(8)    have this be Exhibit 1.  If you can tell me
(9)    whether this is you or another person.
(10)              MR. CERRONE:  How are we going
(11)         to number these?  Because we went 1
(12)         through 5 yesterday, so are we going
(13)         to continue sequentially from there,
(14)         or are we going to number the
(15)         exhibits like, Baker 1, Smith 1,
(16)         et cetera?
(17)              MR. DOLBY-SHIELDS:  That is a
(18)         good question.  Usually, I renumber
(19)         them, but I think I agree that it
(20)         makes more sense to continue
(21)         sequentially, so let's make this
(22)         Exhibit 3.
(23)              MR. CERRONE:  It will be
(24)         exhibit 6, right?  Because we had 5
(25)         yesterday.
```

```
(1)                     W. BAKER

(2)          MR. DOLBY-SHIELDS:  You're

(3)     correct.  Exhibit 6.

(4)          MR CERRONE:  It's rare that I

(5)     am correct so often.

(6)          MR. DOLBY-SHIELDS:  Okay.  One

(7)     second here.  I will put this up.

(8)          (Whereupon, document was marked

(9)     as Plaintiffs' Exhibit 6 for

(10)    identification as of this date.)

(11)    Q.    So on your screen, Officer, do

(12) you see a complaint where the plaintiff's

(13) name is entitled Ryan Duria?

(14)    A.    Yes.

(15)    Q.    And then --

(16)         MR. CERRONE:  Hold on one

(17)    second.  I am just trying to

(18)    manipulate the object so he can see

(19)    it a little better.

(20)         MR. DOLBY-SHIELDS:  Okay.

(21)    Q.    If we go down a little bit, in

(22) the defendants here, one of the defendants'

(23) names is Deputy William Baker.

(24)         Do you know -- that's not you;

(25) is that what you're saying?
```

```
(1)                    W. BAKER
(2)      A.      Correct.
(3)      Q.      Okay.
(4)           MR. CERRONE:  I remember this
(5)       case.  I think I might have been
(6)       representing the Defendants.
(7)           MR. DOLBY-SHIELDS:  Really.
(8)      Q.      Well, I have no questions about
(9)   that for now if that was not you.
(10)           So then, in your time as a
(11)  Rochester Police Department officer, you
(12)  were name as a defendant in at least one
(13)  lawsuit; is that right?
(14)      A.      I believe so.
(15)      Q.      Okay.  And so I know, one of
(16)  the lawsuits, that's the lawsuit arising
(17)  from the protest, Hall versus Warren,
(18)  arising from the 2020 Daniel Prude protest.
(19)           Are you familiar with that?
(20)      A.      Yes.
(21)      Q.      Do you remember what the
(22)  allegations against you in that case were?
(23)      A.      I don't.
(24)      Q.      Do you remember --
(25)           MR. CERRONE:  What was date of
```

(1)                      **W. BAKER**

(2)          **that lawsuit, Elliot?**

(3)              **MR. DOLBY-SHIELDS:  Well,**

(4)          **that's the class action lawsuit that**

(5)          **arose from the 2020 Daniel Prude**

(6)          **protest.**

(7)              **MR. CERRONE:  Okay.**

(8)          Q.    Do you remember arresting a

(9)     protester name Stanley Martin inside of the

(10)    PSP on September 2nd, 2020?

(11)         **A.    Yes, I believe so.**

(12)         Q.    And if I told you that the

(13)    allegations in that lawsuit against you

(14)    arose from that arrest, does that refresh

(15)    your recollection?

(16)         **A.    Not really.  I don't recall**

(17)    **what the allegations were.**

(18)         Q.    Okay.  All right.  Well, I can

(19)    tell you that there hasn't much action in

(20)    that case to this point, so it would make

(21)    sense that -- for example, I know you

(22)    haven't given a deposition in that case

(23)    yet, so...

(24)              Anyways, do you know if you

(25)    were ever named as a defendant in any other

(1)                    W. BAKER

(2)    cases arising from your time as a Rochester

(3)    Police Department officer?

(4)        **A.    I really don't recall exactly.**

(5)    **I think there might have -- there could**

(6)    **have been one or two, but I don't know if**

(7)    **that was against me or the department.  I**

(8)    **am really not sure.**

(9)        Q.    Okay.  Do you remember giving

(10)   any deposition testimony in any of those

(11)   cases?

(12)       **A.    No, I don't recall that.**

(13)       Q.    Like sitting down in a room

(14)   like we are today, with a court reporter

(15)   and somebody asking you questions?

(16)       **A.    No, I don't recall that.**

(17)       Q.    And did you work at the Daniel

(18)   Prude protest on the street?

(19)            Did you do any other protest

(20)   work or -- well, that's a bad question.

(21)            During the 2020 Daniel Prude

(22)   protest, did you do any work like, for

(23)   example, with the mobile field force with

(24)   the City of Rochester?

(25)       **A.    I don't recall.  I think we**

(1)                    **W. BAKER**

(2)    **were there.  I think, maybe, if that was**

(3)    **the same day, maybe at night.  But I don't**

(4)    **really recall.**

(5)              **MR. DOLBY-SHIELDS:  You guys**

(6)       **cut out.**

(7)       Q.    Last thing I heard you say was

(8)    that you don't really recall.  It may have

(9)    been the same day but you don't really

(10)   recall.

(11)             And now you're muted.

(12)             **MR. CERRONE:  Go ahead.  I'm**

(13)      **sorry about that.**

(14)      Q.    There we go.

(15)      **A.    I am not sure if it was the**

(16)   **same day.  I think I may have been there**

(17)   **but I don't really remember it that well.**

(18)      Q.    Okay.  Now, are you member of

(19)   mobile field force for -- I'm sorry, were

(20)   you a member of the mobile field force, at

(21)   any time, with the City of Rochester?

(22)      **A.    I don't think I was.**

(23)      Q.    Okay.  Do you remember ever

(24)   being out on the streets and policing the

(25)   protests in 2020?

(1)                    W. BAKER

(2)        **A.    I think we may have been out**

(3)    **there, just part of the response, but I**

(4)    **don't recall in what capacity.**

(5)        Q.    Now, did you disagree with the

(6)    Daniel Prude protests?

(7)            **MR. CERRONE:  Object to the**

(8)        **form the question.**

(9)            **You can answer.**

(10)       **A.    Okay.  I guess I don't really**

(11)   **know enough about it to agree or disagree.**

(12)   **I think people can protest if they want to**

(13)   **protest; I don't have a problem with that.**

(14)       Q.    How about Mark Vaughn's actions

(15)   in using force against Daniel Prude; did

(16)   you think that they were justified?

(17)           **MR. CERRONE:  Object to the**

(18)       **form of the question.**

(19)           **You can answer if you can.**

(20)       **A.    I really don't know what he did**

(21)   **or -- I don't really know anything about**

(22)   **his actions.**

(23)       Q.    Sure.

(24)           MR. DOLBY-SHIELDS:  And Mike, I

(25)       am just going to ask you to just say,

```
(1)                        W. BAKER
(2)          "Objection to the form of the
(3)          question," and not interject other
(4)          than that, okay?
(5)      Q.    Now, are you aware that the
(6)  City paid 12 million dollars to settle the
(7)  civil lawsuit brought by Daniel Prude's
(8)  family?
(9)      A.    I don't believe I am.
(10)     Q.    That is not something that was
(11) discussed among members of the Rochester
(12) Police Department?
(13)     A.    I don't think so.  I'm not
(14) really with the task force here; I am kind
(15) of removed from any of that.
(16)     Q.    So that was something I was
(17) going to ask you about a little later.
(18)          As a task force member, on a
(19) day-to-day basis, where do you, for
(20) example, report to work?
(21)     A.    To the federal building at
(22) 100 State Street.
(23)     Q.    You have been doing that since
(24) about September of 2020?
(25)     A.    I have -- probably about that
```

(1)                    **W. BAKER**

(2)  **time.**

(3)        Q.     Okay.

(4)        **A.     Or maybe October.**

(5)        Q.     Okay.  And so, as a member of

(6)  the task force, is that basically your

(7)  full-time job?

(8)        **A.     Yes, it is.**

(9)        Q.     Okay.  So you don't do any

(10)  other like, duties with the Rochester

(11)  Police Department?

(12)        **A.     Correct.**

(13)        Q.     Okay.  Back in 2016, there was

(14)  an incident where you were suspended for

(15)  three days without pay for using excessive

(16)  force at a Black Lives Matter protest in

(17)  downtown Rochester; is that right?

(18)        **A.     I do remember there was another**

(19)  **protest but I just don't really remember**

(20)  **the circumstances of that.**

(21)        Q.     Okay.  Do you remember that you

(22)  pled guilty to those charges and accepted

(23)  the three-day suspension?

(24)        **A.     I really don't.**

(25)        Q.     Just to -- I'm not trying to

(1)                    W. BAKER

(2)    trick you or anything, so I am just going

(3)    to put up that -- this will be Exhibit 7.

(4)                    (Whereupon, document was marked

(5)            as Plaintiffs' Exhibit 7 for

(6)            identification as of this date.)

(7)        Q.    So if we look at this letter

(8)    from October 3rd, 2018, does that refresh

(9)    your recollection?

(10)                    If you want to read it, and

(11)    tell me, when you are done, if it refreshes

(12)    your recollection.

(13)                **MR. CERRONE:  He has control of**

(14)        **the letter.  When you get to the end,**

(15)        **tell him so we can go down.  I don't**

(16)        **have control of it.**

(17)                **THE WITNESS:  Okay.**

(18)                **(Witness reading.)**

(19)        **A.    Okay.  If you can move it down**

(20)    **a little bit.  There, thank you.**

(21)                **Okay, I read it.**

(22)        Q.    Did that refresh your

(23)    recollection as to whether this letter was

(24)    directed to you?

(25)        **A.    I mean, I do just vaguely**

(1)                          **W. BAKER**

(2)     **remember being there but I just really**

(3)     **don't remember the circumstances.**

(4)             **I mean, it appears, from what I**

(5)     **am looking at, that this is me, but I just**

(6)     **really don't remember the specifics of**

(7)     **anything.**

(8)         Q.    Okay.  So let's do this:  Do

(9)     you remember giving testimony, in relation

(10)    to this incident, to PSS?

(11)        **A.    I don't.**

(12)        Q.    I'm going to put up this --

(13)    this will be Exhibit 8, a transcript from

(14)    PSS.

(15)            (Whereupon, document was marked

(16)         as Plaintiffs' Exhibit 8 for

(17)         identification as of this date.)

(18)        Q.    If we go to the top here, it

(19)    says, "PSS number 2016-0628," and if we go

(20)    back to the letter, it's the same PSS

(21)    number, 16-0628.

(22)            Back to Exhibit 8, it says,

(23)    "Statement of Officer William Baker," dated

(24)    August 30th, 2016.

(25)            Let's go down and see -- well,

(1)                    W.  BAKER

(2)    I guess my first question would be, do you

(3)    know if there was any other RPD officer

(4)    named William Baker?

(5)             MR. DOLBY-SHIELDS:  You guys

(6)        just cut out again.

(7)             **MR. CERRONE:  I apologize.  I**

(8)        **don't know why it's doing that.**

(9)             **MR. DOLBY-SHIELDS:  That's ok.**

(10)       **All I heard you say was "uh," so...**

(11)       **A.    Yeah, I believe there was**

(12)   **another Baker; I don't know if it was**

(13)   **William or not.**

(14)            **Sorry, I am just trying to read**

(15)   **through this.**

(16)            **This it's quite a while ago, so**

(17)   **I am not...**

(18)       Q.    Let me do this:  Let me pause

(19)   and put up another exhibit that might help

(20)   us here.

(21)            So that was 8 is the statement.

(22)            There was associated subject

(23)   resistance report, so let me put that up.

(24)            And that will be Exhibit 9, and

(25)   that should have --

(1)                         W. BAKER

(2)         **MR. CERRONE:  What is this**

(3)     **document?**

(4)         **MR. DOLBY-SHIELDS:  This a**

(5)     **subject resistance report from that**

(6)     **July 8th, 2016 protest.**

(7)         **(Whereupon, documents were**

(8)     **marked as Plaintiffs' Exhibit 9 for**

(9)     **identification as of this date.)**

(10)    Q.    At the bottom of the first page

(11) here you can see the officer name, William

(12) Baker, and ID number 1940.

(13)         Let me ask you, is that your ID

(14) number?

(15)        **MR. CERRONE:  What's the date**

(16)    **on the form?**

(17)        **MR. DOLBY-SHIELDS:  The date at**

(18)    **the top of the incident is July 8th,**

(19)    **2016, and then down here at the**

(20)    **bottom of this three-page document --**

(21)    **okay, on the second page -- the only**

(22)    **dates the RPD puts on it are the**

(23)    **dates reviewed by a supervisor.  And**

(24)    **it looks like Sergeant Wheeler, and**

(25)    **then I cannot tell who the platoon**

(1)                    **W. BAKER**

(2)         **commanding officer is, but it's a**

(3)         **lieutenant whose ID number is 11947,**

(4)         **I believe.**

(5)         Q.    So going back to the first page

(6)    here, at the bottom, Officer Baker, my

(7)    question was, the ID number here is 1940.

(8)              Is that your ID number?

(9)         **A.    Yes, correct.**

(10)        Q.    That would indicate that this

(11)   was a subject resistance report that you

(12)   completed?

(13)        **A.    Yes, that's what I am looking**

(14)   **at.**

(15)        Q.    Okay.  Then up here at the

(16)   top -- well, there's number here at the

(17)   top, in red, saying, "20160644."

(18)              Do you know what that number

(19)   is?

(20)        **A.    I do not.**

(21)        Q.    The CR number here is

(22)   16-175268, right?

(23)        **A.    Yes, that appears to be what**

(24)   **our CR numbers are.**

(25)              **I don't remember what the**

(1)                      **W. BAKER**

(2)    **number is, to say that is the same number.**

(3)    **I assume it is, but I am not sure what the**

(4)    **number is at the top.**

(5)        Q.    My question was just if I read

(6)    that right, for the CR number on this

(7)    report.

(8)        **A.    Yes.**

(9)        Q.    If we go back to the statement,

(10)    then -- okay, that would appear here in the

(11)    statement, where the questioning officer

(12)    says -- the related CR numbers are 1617518

(13)    and 1617268, so that would indicate that it

(14)    is related to at least this one incident

(15)    that had the same CR number; is that right?

(16)        **A.    I believe so.**

(17)        Q.    Okay.  Look, all I was really

(18)    trying to do was to match up these CR

(19)    numbers and see if you recalled this

(20)    incident from a 2016 protest, which appears

(21)    to have led to your suspension for three

(22)    days, which, according to this letter, you

(23)    pled guilty to.

(24)            So after looking at those

(25)    documents, does that refresh your

(1)                          W. BAKER

(2)     recollection of the PSS case and your

(3)     guilty plea?

(4)         **A.    I mean, I think -- I vaguely --**

(5)     **I mean, just by looking at it, you know**

(6)     **that that was me that was there, but I**

(7)     **really don't remember much about it.**

(8)         Q.    Okay.  Have there any other

(9)     times in your career that you were

(10)    suspended from the RPD for any reason?

(11)        **A.    I really don't remember.  There**

(12)    **could have been another time.  I don't**

(13)    **really -- I am not really sure.**

(14)        Q.    Earlier, you said there were

(15)    other instances where you recall -- other

(16)    instance where you recall having PSS cases

(17)    against you, where you were subject of the

(18)    investigation.

(19)              Can you tell me everything you

(20)    remember about those other PSS cases?

(21)        **A.    Not really.  I just -- I don't**

(22)    **want give you inaccurate information.  I**

(23)    **know there was a couple; it could have been**

(24)    **two or three.  I just don't really know.**

(25)              **Obviously, there was that one,**

(1)                        **W. BAKER**

(2)    **and I'm not really sure what other ones**

(3)    **are.**

(4)         Q.    Okay.  Do you know if any of

(5)    the other ones involved allegations that

(6)    you used excessive force?

(7)         **A.    I don't recall.**

(8)         Q.    Can you tell me, generally,

(9)    what the RPD's use-of-force policy is?

(10)        **A.    I would need to have that**

(11)   **policy probably in front of me look at it.**

(12)   **I don't know exactly what it is.**

(13)        Q.    Okay.  Well I ask -- so, for

(14)   example, do you know what general order

(15)   number their use-of-force policy is?

(16)        **A.    No.**

(17)        Q.    Is the general order something

(18)   you studied during your time as an RPD

(19)   officer?

(20)        **A.    Yes.  I mean, general orders,**

(21)   **if I recall correctly -- I mean, again, I**

(22)   **don't want to give you inaccurate**

(23)   **information.  I think there is probably at**

(24)   **least 1,000 pages, so I don't recall the**

(25)   **policy -- the full policy or the numbers.**

(1)                    **W. BAKER**

(2)      Q.    Do you recall anything about

(3)  what the rules are, for the RPD, when you

(4)  are permitted to use force against

(5)  somebody?

(6)            MR. KIEBURTZ:  Objection to the

(7)        form.

(8)            MR. CERRONE:  I join in the

(9)        objection.

(10)           MR. KIEBURTZ:  And not

(11)       interrupt -- I don't want to

(12)       interrupt the deposition too much,

(13)       Elliot.

(14)           Would you please agree to that

(15)       an objection by one party would be an

(16)       objection by both parties, U.S. and

(17)       the City of Rochester?

(18)           MR. DOLBY-SHIELDS:  Sure, that

(19)       makes things easier.

(20)           MR. KIEBURTZ:  Thank you.

(21)           I'll stay checked in during

(22)       this line of questioning.

(23)      Q.    You can go ahead and answer the

(24)  question.

(25)           MR. CERRONE:  I'm not sure if I

                    **W. BAKER**

(1)

(2)      **remember what the question is.**

(3)              **Could I have it read back?**

(4)              **(Whereupon, the referred-to**

(5)      **question was read back by the**

(6)      **Reporter.)**

(7)      **A.    I believe it would be a wide**

(8)  **range.  It could be for not complying with**

(9)  **an arrest, fighting, not complying,**

(10) **basically, noncompliance.  You can use**

(11) **force, obviously, if it's -- are we -- what**

(12) **type of force are we talking about?**

(13)             **I mean, I guess I don't know**

(14) **the exact line of questioning.**

(15)             **Physical, deadly?**

(16)     Q.    Sure.  The Rochester Police

(17) Department has set rules that you had to

(18) learn when you became a Plaintiff, correct?

(19)     **A.    Yes.**

(20)     Q.    You have been a police officer

(21) for 17 years, with the Rochester Police

(22) Department?

(23)     **A.    Yes, about that.**

(24)     Q.    And about, maybe the last four

(25) years, you have been with the U.S.

(1)                         W. BAKER

(2)    Marshals?

(3)         **A.      Correct.**

(4)         Q.      So about 13 years that you've

(5)    worked as a Rochester Police Department

(6)    officer?

(7)         **A.      Yes, I believe so.  About that.**

(8)         Q.      During that time, you were on

(9)    the streets interacting with individuals?

(10)         **A.      Correct.**

(11)         Q.      During that time, when you had

(12)    those interactions, sometimes you had to

(13)    use force?

(14)         **A.      Yes.  I mean, probably, out of**

(15)    **all of the interactions over the years,**

(16)    **probably hundreds if not thousands, I've**

(17)    **probably only had to use force maybe -- I**

(18)    **don't know, maybe just a few times, a**

(19)    **handful of times, possibly.**

(20)         Q.      It's something that is part the

(21)    job as a police officer:  Sometimes you're

(22)    required to use force, right?

(23)         **A.      Correct.**

(24)         Q.      And if I told you the Rochester

(25)    Police Department policy says that you have

(1)                    W. BAKER

(2)    to, for example, complete a subject

(3)    resistance report anytime force is used

(4)    greater than mere handcuffing, does that

(5)    sound correct to you?

(6)              **MR. KIEBURTZ:  Objection to the**

(7)         **form.**

(8)         Q.    When there is an objection, you

(9)    can answer -- I don't know if you're

(10)   thinking -- unless your attorney directs

(11)   you not answer.

(12)        **A.    Yes, you do complete a subject**

(13)   **resistance report.**

(14)        Q.    Okay.  So that's one part of

(15)   the Rochester Police Department's rules,

(16)   correct?

(17)        **A.    Correct.**

(18)        Q.    Okay.  Did the rule say that,

(19)   for example, the force used has to be

(20)   reasonable under the circumstances?

(21)              **MR. KIEBURTZ:  Objection to the**

(22)         **form.**

(23)        **A.    Yes.**

(24)        Q.    And it has proportional,

(25)   correct?

(1)                     W. BAKER

(2)        **A.      Correct.**

(3)        Q.     What is the Rochester Police

(4)   Department's policy on the use of deadly

(5)   physical force?

(6)            **MR. KIEBURTZ:   Objection to the**

(7)        **form.**

(8)        **A.      Yourself or somebody else would**

(9)   **have to be in immediate danger of being**

(10)  **killed, or feared for their life.**

(11)       Q.     It has to be proportional,

(12)  correct?

(13)       **A.      Correct.**

(14)       Q.     Now, I want to put up another

(15)  exhibit.  This will be Exhibit 10.  This is

(16)  your professional development section file.

(17)  I just have a quick question here.

(18)            (Whereupon, documents were

(19)       marked as Plaintiffs' Exhibit 10 for

(20)       identification as of this date.)

(21)       Q.     Let's go to the top, first.

(22)            Officer William Baker, let's

(23)  see, ID 1940, that is you, correct?

(24)       **A.      Correct.**

(25)       Q.     So I want to go to your

(1)                    W. BAKER

(2)    evaluation for year 2018 -- 16, which is on

(3)    Page -- starts on Page 28, I believe.  If

(4)    we look up here at the top, the date of the

(5)    evaluation is January 5th, 2017, and it

(6)    says, "Evaluation period, 1/2016 to

(7)    12/2016," okay?

(8)              So my question is, if we go

(9)    down to the second page -- well, why don't

(10)   I give you a chance to read it over

(11)   quickly, and let me know when you are done

(12)   reading it?

(13)             I'll tell you what my question

(14)   going to be, too.

(15)             I don't see any reference to

(16)   the instance at the protest that we

(17)   discussed earlier -- I'm sorry, I might

(18)   have my dates mixed up.

(19)             The protest was on 7/8/2016.  I

(20)   wanted to see -- I didn't see any reference

(21)   to that instance --

(22)             My question was going to be, do

(23)   you know why your PDS file wouldn't have

(24)   referenced that incident if you eventually

(25)   pled guilty and accepted a three-day

(1)                        W. BAKER

(2)    suspension?

(3)        **A.    I do not.**

(4)        Q.    Okay, I will take that down for

(5)    now.

(6)            Okay, let's back up.  Can you

(7)    tell me everything that you did to prepare

(8)    for today's deposition?

(9)        **A.    To prepare for it?**

(10)       Q.    Correct.

(11)       **A.    Just basically, just got ready**

(12)   **and came in.**

(13)       Q.    Okay.  For example, don't tell

(14)   me the substance any of your discussion,

(15)   but did you speak with your attorney?

(16)       **A.    With.**

(17)           **MR. DOLBY-SHIELDS:  You guys**

(18)        **cut out again; all I heard you say**

(19)        **was "with."**

(20)           **MR. CERRONE:  Go ahead.**

(21)       **A.    Could you re-ask the question?**

(22)       Q.    Don't tell me the substance of

(23)   your discussion, but did you have a

(24)   conversation with your attorney to prepare

(25)   for today's deposition?

(1)                    W. BAKER

(2)        **A.    Just basically, just date and**

(3)    **time, where to meet.**

(4)        Q.    Okay.  You didn't like, meet

(5)    yesterday or this morning to basically talk

(6)    about the deposition at all?

(7)        **A.    No.**

(8)        Q.    Did you speak with anyone else

(9)    to prepare for today's deposition, other

(10)   than your attorney?

(11)       **A.    No.**

(12)       Q.    Okay.  Have you ever spoken

(13)   with any other task force members about the

(14)   incident?

(15)       **A.    No.**

(16)       Q.    Okay have you ever spoken with

(17)   any other task force members about this

(18)   lawsuit?

(19)       **A.    No.**

(20)       Q.    Okay.  Did you review any

(21)   documents to prepare for today's

(22)   deposition?

(23)       **A.    I don't believe there is any**

(24)   **that I recall.**

(25)       Q.    You didn't look over any

(1)                    W. BAKER

(2)    incident reports or anything?

(3)         **A.    I don't believe so.**

(4)         Q.    Okay.  All right.

(5)              I am going to ask you some

(6)    questions about your background.  I will

(7)    start with your educational background.

(8)              You graduated from Mohawk

(9)    Community College, in Utica; is that right?

(10)        **A.    Yes.**

(11)        Q.    You got a two-year degree in

(12)   criminal justice; is that right?

(13)        **A.    Yes.**

(14)        Q.    Is that your highest level of

(15)   education?

(16)        **A.    Yes.**

(17)        Q.    All right.  What did you do

(18)   after you graduated from Mohawk Community

(19)   College in 2001?

(20)        **A.    In '01, I was security with**

(21)   **Turning Stone Casino.**

(22)        Q.    How long did you do that for?

(23)        **A.    I believe it was about a year,**

(24)   **maybe.**

(25)        Q.    Was that your only job at the

(1)                      W. BAKER

(2) time?

(3)      **A.    I believe it was.  I believe**

(4) **that was -- you asked right when I**

(5) **graduated, or during?**

(6)            **I believe I was going to school**

(7) **at the same time, so when I graduated, it**

(8) **might have been right around that time.  I**

(9) **was still working there, or was then hired**

(10) **by the Rome Police.**

(11)      Q.    During your time when you were

(12) in school, you worked at Turning Stone

(13) Casino as a security guard?

(14)      **A.    Yes.**

(15)      Q.    Were you deputized as like a

(16) peace officer at that time, or no?

(17)      **A.    No, I believe it was just**

(18) **security, providing security for the**

(19) **facility.**

(20)      Q.    So like, example, you didn't

(21) carry a firearm?

(22)      **A.    Correct.**

(23)      Q.    You said that after you

(24) graduated from Mohawk Community College,

(25) you at some point began working with the

(1)                      W. BAKER

(2)    Rome Police Department?

(3)         **A.    Yes.**

(4)         Q.    What year was that?

(5)         **A.    I believe it was 2001.**

(6)         Q.    Okay.  And when you began with

(7)    the Rome Police Department, you had to

(8)    attend the police academy?

(9)         **A.    Correct.**

(10)        Q.    And that was in 2001?

(11)        **A.    Yes, I believe it was in 2001.**

(12)        Q.    Okay.  And do you remember how

(13)   long the police academy was with the Rome

(14)   Police Department?

(15)        **A.    I believe it was -- I don't**

(16)   **really remember exactly.  I think it was at**

(17)   **least six months to a year.**

(18)        Q.    You graduated from the police

(19)   academy there?

(20)        **A.    Correct.**

(21)        Q.    After graduating the police

(22)   academy, was there a period of field

(23)   training?

(24)        **A.    Yes.**

(25)        Q.    How long was that?

(1)                    W. BAKER

(2)        **A.    I believe it was at least --**

(3)   **probably at least a few months.**

(4)        Q.    In your time with the academy

(5)   and field training, you learned all the

(6)   basic requirements of being a professional

(7)   police officer?

(8)        **A.    Yes, correct.**

(9)        Q.    Before Rome, other than your

(10)  security job, did you have any experience

(11)  in law enforcement?

(12)       **A.    No, I don't believe so.**

(13)       Q.    Then you worked for the Rome

(14)  Police Department for about six years; is

(15)  that right?

(16)       **A.    Correct.**

(17)       Q.    Okay.  What were like, all the

(18)  positions that you held in the Rome Police

(19)  Department?

(20)       **A.    I was a patrol officer.**

(21)       Q.    Okay.  For the entire time that

(22)  you were there?

(23)       **A.    Yes.**

(24)       Q.    Did you have any like, special

(25)  assignments or duties when you were with

                    W. BAKER
(1)
(2)  the Rome Police Department?
(3)      **A.     No.**
(4)      Q.     How large is that department;
(5)  how many officers work for the Rome Police
(6)  Department?
(7)      **A.     I really don't remember.**
(8)  **Maybe 100.  I'm not really positive.**
(9)      Q.     You weren't a member of their
(10)  SWAT team or anything like that?
(11)      **A.     No.**
(12)      Q.     So it was on, I think,
(13)  July 27th, 2007, you began with the
(14)  Rochester Police Department; is that right?
(15)      **A.     That sounds accurate.**
(16)      Q.     And when you transferred, did
(17)  you have to attend the Rochester Police
(18)  Department's police academy?
(19)      **A.     Yes.**
(20)      Q.     And that was six months?
(21)      **A.     No, I believe it was a lateral**
(22)  **academy, so I think it was -- I think it**
(23)  **was at least a few months.  I don't recall**
(24)  **exactly.**
(25)      Q.     So basically, you don't have to

(1)                    W. BAKER

(2)    do all the same training that a brand new

(3)    officer has to do?

(4)        **A.    Correct, because all the laws**

(5)    **and things like that are all the same.**

(6)        Q.    So was the academy more focused

(7)    on just the Rochester Police Department's

(8)    rules and regulations?

(9)        **A.    I believe so.**

(10)       Q.    Okay.  And did you attend that

(11)   academy with other lateral transfers?

(12)       **A.    I don't recall everybody there.**

(13)   **I think there may have been some.**

(14)       Q.    I mean, you attended with other

(15)   new officers, right?  You weren't like --

(16)       **A.    Yes, correct.**

(17)       Q.    I guess my question was

(18)   whether, if you recall, if the other

(19)   students were also lateral transfers or,

(20)   for example, you attended just like, a

(21)   portion of the police academy with other

(22)   like, new recruits.

(23)            Does that make sense?

(24)       **A.    It does.**

(25)           **I believe it was.  I really**

```
(1)                    W. BAKER
(2)    don't remember.  I think it was a
(3)    combination of both.  Some were, some not.
(4)         Q.    Maybe there is just like a
(5)    portion of the regular academy that you
(6)    didn't have to attend because you were
(7)    already a police officer in the State of
(8)    New York?
(9)         A.    Correct.
(10)        Q.    In the police academy, you
(11)   became familiar with the professional
(12)   standards of care for a professional police
(13)   officer in the City of Rochester?
(14)        A.    Yes.
(15)        Q.    You became familiar with fair
(16)   and accepted police practices and
(17)   procedures?
(18)        A.    Yes.
(19)        Q.    And their training manual, and
(20)   regulations and rules?
(21)        A.    Correct.
(22)        Q.    After that, there was a period
(23)   of field training?
(24)        A.    Correct.
(25)        Q.    And do you remember who your
```

(1)                    W. BAKER

(2)    field training officers were?

(3)         **A.     I do not.**

(4)         Q.     Okay.  There were four phases

(5)    the field training; is that right?

(6)         **A.     I think so.**

(7)              **I think it was a few months, I**

(8)    **want to say.**

(9)         Q.     Okay.  Do you remember having

(10)   different training field officers?

(11)        **A.     Yeah, I think I would remember**

(12)   **if it was just one.  It was probably**

(13)   **several.**

(14)        Q.     Was there any kind of test or

(15)   anything you had to take at the end of the

(16)   field training before you could become a

(17)   probationary officer?

(18)        **A.     I do not recall if there was.**

(19)        Q.     Can you give me an overview of

(20)   your assignments and roles with the RPD

(21)   after you completed your field training?

(22)        **A.     I was in patrol for a couple of**

(23)   **years, I believe.  The time, the dates**

(24)   **could be off a bit, but I think it was a**

(25)   **couple of years.  I was in the tactical**

(1)                    **W. BAKER**

(2)  **unit for, I think, a few years.  I was in**

(3)  **the -- back in patrol again for probably at**

(4)  **least a few years, then I was assigned to**

(5)  **the task force where I am now.**

(6)        Q.    What was the process for

(7)  becoming assigned to the U.S. Marshal

(8)  fugitive task force?

(9)        **A.    You had to basically put in an**

(10) **IDC is what it's called, to basically, I**

(11) **guess you could say a resume, kind of, of**

(12) **your career accomplishments and things like**

(13) **that, and then it gets forwarded.**

(14)       Q.    When you say "IDC," that means

(15) interdepartmental communication?

(16)       **A.    Correspondence.**

(17)       Q.    So, interdepartmental

(18) correspondence?

(19)       **A.    Yes.**

(20)       Q.    Was that your application?

(21)       **A.    Correct.**

(22)       Q.    So you put an IDC in, and in

(23) that, you would put your reasons for

(24) wanting to be a member of the task force?

(25)       **A.    Yes.  Reasons and any awards,**

(1)                    **W. BAKER**

(2)    **anything like that, you would put in there.**

(3)         Q.    So it would be like a cover

(4)    letter for a job, basically?

(5)         **A.    Yeah, I guess you could say,**

(6)    **basically.**

(7)         Q.    Okay.  Then you said you also

(8)    compiled a resume where you put all of your

(9)    accomplishments that you felt made you --

(10)        **A.    No, I was saying -- just the**

(11)   **best term for it was kind of like a resume,**

(12)   **I guess.  But maybe more of a cover letter**

(13)   **would be the proper term for it.**

(14)        Q.    So there was not like a

(15)   separate resume that you did, correct?

(16)        **A.    Yes.**

(17)             **MR. DOLBY-SHIELDS:  Mike, we**

(18)       **are going to call for production of**

(19)       **his, I guess, application to join the**

(20)       **U.S. Marshal task force.  I guess I**

(21)       **will make that -- follow up in**

(22)       **writing to both The City and to the**

(23)       **United States.**

(24)             **I am just writing a note to**

(25)       **follow up.**

(1)                          **W. BAKER**

(2)        Q.    Now, before you made that

(3)  application to join the U.S. Marshal task

(4)  force, did you have any kind of, I don't

(5)  know, I want to call them similar -- like,

(6)  similar roles or assignments with the RPD?

(7)  By which I mean, I don't know, for example,

(8)  were you like, a member of the SWAT team or

(9)  anything like that, with RPD?

(10)       **A.    No.**

(11)       Q.    As a member of the tactical

(12) unit, what were your job duties as a member

(13) of the tactical unit?

(14)       **A.    The main focus was on reducing**

(15) **violent crime through patrolling, and going**

(16) **to any gun-related calls, things like that.**

(17) **Any suspicious shooting calls.**

(18)            **We would also look for wanted**

(19) **individuals or people with warrants that**

(20) **were violence-related, to try to curb some**

(21) **of the violence in the community so that**

(22) **people felt safe.**

(23)       Q.    For example, I read in your PDS

(24) file that you did a lot of warrant arrests

(25) during your time with the RPD.

(1)                     W. BAKER

(2)        **A.      Correct.**

(3)        Q.      And was that like a special

(4)   assignment that you had, or is that just

(5)   something that you took upon yourself

(6)   proactively?

(7)        **A.      I would say no.  We don't**

(8)   **actually have, if you want to call it a**

(9)   **warrant unit, but we were assigned warrants**

(10)  **to go -- to go look for people.  Warrants**

(11)  **and wanteds.  I would do that.**

(12)       Q.      When you say "we were

(13)  assigned," would that be like -- that

(14)  wouldn't be an individual assignment to

(15)  you, right?  That would be like maybe

(16)  your -- I don't know the proper term --

(17)  your unit or something else would be

(18)  assigned?

(19)       **A.      Correct.  Yeah, it could be**

(20)  **anyone on patrol, basically.**

(21)            **They call them like, a warrant**

(22)  **tracker.  You would be assigned to go look**

(23)  **for someone.**

(24)       Q.      Okay.  When you say you "were

(25)  assigned," would you get that specific

(1)                     W. BAKER

(2)    assignment from a supervisor; would they

(3)    say, "Officer Baker, can you please go and

(4)    look for this person who has a warrant"?

(5)        **A.    It would be spread**

(6)    **throughout -- it would be spread throughout**

(7)    **patrol.  Everybody in patrol gets them; it**

(8)    **wouldn't just be me.**

(9)        Q.    Okay.  Then let's say that on a

(10)   specific day, you were going to look for

(11)   that person.

(12)           Would you alert the rest of

(13)   patrol in some way that you were going to

(14)   look for that person?

(15)       **A.    Yes, we would typically -- if**

(16)   **we were going to a particular address or**

(17)   **something like that, we would put ourselves**

(18)   **out that address if we were doing a warrant**

(19)   **job, or call out over the radio if we were**

(20)   **on a warrant job.  Or sometimes you may**

(21)   **just be on patrol and see somebody that has**

(22)   **a warrant, or wanted.**

(23)       Q.    Okay.  So one way you would

(24)   alert everyone else is you'd call over the

(25)   radio, like, "Hey, this is Officer Baker, I

(1)                    W. BAKER

(2)    am going to check on this warrant at this

(3)    address"; that is one way?

(4)        **A.    That is a way, yes.**

(5)        Q.    Okay.

(6)            MR. DOLBY-SHIELDS:  You guys

(7)    cut out again.

(8)            **MR. CERRONE:  Did you get his**

(9)        **testimony before we cut out?**

(10)            **MR. DOLBY-SHIELDS:  What I got**

(11)        **was "That is a way, yeah."**

(12)            **MR. CERRONE:  You didn't miss**

(13)        **anything.**

(14)        Q.    Was there any other like,

(15)    formal requirements, like putting a note in

(16)    the computer system before you went out or

(17)    anything, or was it just over the radio?

(18)        **A.    It could be both, I think.  You**

(19)    **could enter it in as that's what you were**

(20)    **doing, or you could do it over the radio.**

(21)    **If it wasn't something in progress, I think**

(22)    **it was -- sometimes it would be just**

(23)    **entered.**

(24)        Q.    Now, how long was the

(25)    application process for -- well, let me

```
(1)                    W. BAKER
(2)   withdraw that question.
(3)            Do you know when you first put
(4)   in or first applied to be a member of the
(5)   U.S. Marshal task force?
(6)        A.    I don't.  I don't remember the
(7)   date.
(8)        Q.    Did it take a while?  What I'm
(9)   asking, I guess, is like, did you apply for
(10)  the first time several years before you
(11)  were accepted?
(12)       A.    Yes, I have applied before.
(13)  Yes.
(14)       Q.    So it wasn't an immediate
(15)  process, basically?
(16)       A.    No, correct.
(17)       Q.    It was something that you were
(18)  interested in doing for a while, and then
(19)  eventually, your application was accepted?
(20)       A.    Basically, yes.
(21)       Q.    Okay.  Then after your
(22)  application was accepted, was there an
(23)  additional process that you had to go
(24)  through for hiring; for example, did you
(25)  have to be interviewed by anybody?
```

(1)                    W. BAKER

(2)         **A.    Yes, we need to go through an**

(3)    **interview process.**

(4)         Q.    Okay.  Whom were you

(5)    interviewed by?

(6)         **A.    I believe -- I don't recall if**

(7)    **it was -- if it was the marshal or if it**

(8)    **was one of the supervisors at that time.**

(9)    **I'm not 100 percent sure of that.  It may**

(10)   **have been a couple of them, I think.**

(11)        Q.    When you say it was "a couple

(12)   of them" would that taken place all

(13)   together in one interview, or do you know

(14)   if there were more than one interview that

(15)   you went through?

(16)        **A.    That's what I am trying to**

(17)   **remember.  I think it might have been -- it**

(18)   **might have been just one, maybe, with the**

(19)   **supervisor at that time, who, I think, was**

(20)   **Shane, I believe.**

(21)        Q.    Okay.  What was Shane's last

(22)   name?

(23)        **A.    Marshall.**

(24)        Q.    That's easy to remember.

(25)              Spelled the same way?

(1)                    W. BAKER

(2)          **MR. CERRONE:   Two Ls.**

(3)     Q.    Okay.  During that interview,

(4)   did they go over any of the prior instances

(5)   that we discussed earlier, where you were

(6)   accused of having committed misconduct?

(7)          **MR. CERRONE:  Object to the**

(8)     **form the question.**

(9)          **But you can answer.**

(10)    **A.    I really -- I don't really**

(11)  **recall the substance of it.**

(12)    Q.    Okay.  So do you remember if

(13)  they reviewed, for example, your PDS file

(14)  with you, from the Rochester Police

(15)  Department?

(16)    **A.    I would assume but I really**

(17)  **don't know.**

(18)    Q.    Do you remember if they went

(19)  over any specific PSS cases with you like

(20)  we did earlier?

(21)    **A.    I really don't recall.**

(22)    Q.    Okay.  Do you remember any of

(23)  the substance of the conversation that you

(24)  had during that interview?

(25)    **A.    No, not really.  I don't**

(1)                         **W. BAKER**

(2)    **believe so.**

(3)         Q.    Okay.  Do you know if they had

(4)    reached out to, for example, any of your

(5)    supervisors at the Rochester Police

(6)    Department to discuss your application?

(7)         **A.    I believe so but I am not**

(8)    **really sure.**

(9)         Q.    Do you remember if they brought

(10)   up any of the comments from any of your

(11)   supervisors at the Rochester Police

(12)   Department?

(13)        **A.    I do not recall that.**

(14)        Q.    Okay.

(15)             MR. DOLBY-SHIELDS:  Again, to

(16)         the extent, Mike, that it wasn't

(17)         covered by my prior request, we just

(18)         call for production of the entire

(19)         application --

(20)             You guys cut out.  I don't know

(21)         if you can hear me.

(22)             **MR. CERRONE:  I heard you say**

(23)         **"entire application."**

(24)             **MR. DOLBY-SHIELDS:  Yes.  We**

(25)         **call for production of the entire**

(1)                    **W. BAKER**

(2)        **application from Officer Baker.  Not**

(3)        **only materials that he provided but**

(4)        **the materials -- any other materials**

(5)        **gathered from the Rochester Police**

(6)        **Department, and any materials related**

(7)        **to the interview and hiring process.**

(8)            **I will follow up in writing to**

(9)        **both the RPD and the United States.**

(10)           **MR. CERRONE:  Thank you.**

(11)           **Do you mind if we take a quick**

(12)       **break to use the men's room.**

(13)           **MR. DOLBY-SHIELDS:  Not a**

(14)       **problem.**

(15)           **(Whereupon, a brief break was**

(16)       **taken.)**

(17)           **MR. CERRONE:  We are ready.**

(18)       Q.    All right.  Officer, I just

(19)   have a couple more questions about your PDS

(20)   file so I am going to put that back up.

(21)   That was Exhibit 10.  So I guess we're on

(22)   Page 51 of the 76-page document, and so

(23)   this one for -- well, it's not dated at the

(24)   top but it says, "Evaluation period,

(25)   12/12/08 to 2/28/09.

(1)                          W. BAKER

(2)              Can you see that?

(3)      **A.      Yes.**

(4)      Q.     I am going to go down here to

(5)  the page that you complete, right?

(6)              It's dated 2/10/09.  So at

(7)  least from 2/10/09, this page basically

(8)  talks about your career goals, right, your

(9)  immediate and long-range goals.

(10)             Down here, I highlighted the

(11)  fugitive task force unit.  That basically

(12)  indicates that since 2009, it was one of

(13)  your goals to join the task force; is that

(14)  right?

(15)     **A.      Correct.**

(16)     Q.     It's kind of something you

(17)  always wanted to do?

(18)     **A.      Yes.**

(19)     Q.     I guess my question is just,

(20)  what made you interested in the fugitive

(21)  task force specifically?

(22)     **A.      I think it basically allows the**

(23)  **opportunity to apprehend some of the most**

(24)  **violent people, not only in our community**

(25)  **but from other communities, that commit**

(1)                    **W. BAKER**

(2)    crimes and hide out here in Rochester, in

(3)    this area.  I think it's a great help to

(4)    the community.  I think they are very

(5)    thankful we are out there and trying to

(6)    reduce -- like, arresting some of these

(7)    people to try to reduce the amount of

(8)    violence on the streets, the shooting and

(9)    homicides.  We work a lot of shooting cases

(10)   and homicide cases.  And I just think it

(11)   really helps the City and, really, the

(12)   country as a whole, to make people safer in

(13)   their communities.

(14)        Q.    Now, the fugitives that the

(15)   task force apprehends, my understanding is

(16)   that they are people that are all basically

(17)   wanted for a warrant or something.

(18)             Can you explain that a little

(19)   bit?

(20)        A.    Yes.  They are typically wanted

(21)   for warrants, for people not only here but

(22)   it could be someone, anyone in the country

(23)   that could be -- that could be, I'll say

(24)   hiding out here or something to try to

(25)   escape charges from another area.

(1)                    **W. BAKER**

(2)        Q.    Okay.  Now, before you were

(3)    accepted to the task force, your PDS file

(4)    generally says that in addition to wanting

(5)    to join the task force, you were interested

(6)    in, for example, joining the RPD SWAT team

(7)    other specialized units.

(8)            My question is, did you ever

(9)    actually apply for any of those other

(10)   specialized units like the SWAT team, with

(11)   the RPD?

(12)       **A.    Yes, I believe I did.  I**

(13)   **believe I did a while ago.  And I wasn't**

(14)   **selected, I believe -- well, I know I**

(15)   **wasn't selected.  I don't remember how long**

(16)   **ago it was, but...**

(17)       Q.    So you did put in those

(18)   applications but you never served on like,

(19)   the SWAT team or any other specialized

(20)   unit?

(21)       **A.    Correct.**

(22)       Q.    Now, I have one question about

(23)   one of your evaluations, so I am going to

(24)   skip up to Page 38 of the 76-page document.

(25)            This is an evaluation dated

(1)                    W. BAKER

(2)    March 21st, 2014, and the period is

(3)    March 12th, 2013 to March 12th, 2014.

(4)              So I will tell you what my

(5)    question is.  This was conducted by

(6)    Sergeant *Mandy Wheeler.  Generally, your

(7)    evaluations seem to have been pretty

(8)    positive but this one was not.

(9)              And I will give you an

(10)   opportunity to read it to see what I am

(11)   talking about, but my question is,

(12)   basically, if you know why this evaluation

(13)   wasn't positive like the other ones.

(14)       **A.    No, I don't really know.  That**

(15)   **was quite a while ago.  I am not really**

(16)   **sure.**

(17)       Q.    Okay.  Do you have any

(18)   recollection of, for example, like, sitting

(19)   down with Sergeant Wheeler to go over this

(20)   evaluation?

(21)       **A.    No, I don't.**

(22)       Q.    Is that the general process for

(23)   an annual evaluation, that you discuss it

(24)   with your supervisor?

(25)       **A.    Yes.**

(1)                        **W. BAKER**

(2)        Q.    Okay.  Do you remember if there

(3)    was any like, turning point in your career

(4)    with RPD where, I don't know, you kind

(5)    of -- or, for example, if this was a

(6)    turning point, where you kind of turned

(7)    things around and started doing more

(8)    proactive work, for example?

(9)                **MR. CERRONE:  Object to the**

(10)          **form the question.**

(11)                **You can answer.**

(12)        **A.    No, I really don't know.  I**

(13)    **don't remember.**

(14)        Q.    Okay.  And just down on the

(15)    final page here of this evaluation again,

(16)    where it puts in -- it's dated March 21st,

(17)    and again, it just says that you were

(18)    interested in the task force, right?

(19)        **A.    Yes.**

(20)        Q.    Now, do you remember, at this

(21)    point in 2014, if you had put in an

(22)    application yet with the task force?

(23)        **A.    I don't recall.**

(24)        Q.    Do you know if there was any

(25)    kind of screening by RPD that is done

(1)                    W. BAKER

(2)    before they send the applications over to

(3)    the U.S. Marshals?

(4)        **A.    I assume, but I don't know.**

(5)        Q.    Did anyone from the RPD ever

(6)    tell you that they were or they were not

(7)    going to send over your application at any

(8)    time?

(9)            **MR. KIEBURTZ:  Object to form.**

(10)       **A.    I don't believe so.**

(11)       Q.    Okay.  This is in reverse

(12)   chronological order.  I am going to Page 31

(13)   now of this 76-page document.

(14)           So this is just the last page

(15)   of the January, I guess it would be the

(16)   2016 evaluation, and this document is dated

(17)   January 4, 2017.  Again, it identifies your

(18)   goals, and the top goal having been the

(19)   U.S. Marshal task force.

(20)           And then below that, your

(21)   supervisor wrote, "It might be helpful to

(22)   put together a portfolio for the task

(23)   force."

(24)           My question is, other than the

(25)   IDC that you mentioned earlier, did you put

(1)                    W. BAKER

(2)    together a portfolio for the task force?

(3)    **A.    No.**

(4)    Q.    Okay.  Again, that was Sergeant

(5)    Wheeler.

(6)         Do you remember having that

(7)    discussion with Sergeant Wheeler about

(8)    putting together a portfolio?

(9)    **A.    No, I don't.**

(10)   Q.    Now I am going to page up to

(11)   Page 14 of this 76-page document.  Okay,

(12)   this is from your evaluation.  I am

(13)   actually going up to Page 11.  This is from

(14)   the evaluation dated February 15, 2019, for

(15)   the period January 1st, 2018 to

(16)   December 31st, 2018.

(17)        My first question here is,

(18)   underneath the second highlighted portion

(19)   here, if you could read that and then I

(20)   have a question about that.

(21)        **MR. CERRONE:  Read it to**

(22)    **yourself.**

(23)   **A.    (Witness reading.)**

(24)        **MR. CERRONE:  All set.**

(25)   **A.    I am just reading through it.**

(1)                        **W. BAKER**

(2)     **Okay.**

(3)          Q.     All right.  So my --I wasn't

(4)     sure, do you know what they were talking

(5)     about here, your supervisor, when they say,

(6)     "Officer Baker and I reviewed and discussed

(7)     GO415, specifically covering pretext stops,

(8)     what they are, what they are used for, and

(9)     their usefulness when performing

(10)    investigations"?

(11)              This is under the section that

(12)    is talking about basically what action plan

(13)    was developed to assist the member.  So

(14)    does that mean that is something they

(15)    wanted you to improve on?

(16)         **A.     I believe so.  I am not sure**

(17)    **what that GO is.**

(18)         Q.     Do you remember having a

(19)    discussion with the supervisor about

(20)    basically improving, and doing more pretext

(21)    vehicle stops?

(22)         **A.     I don't recall that.**

(23)         Q.     Do you recall any conversation

(24)    about basically doing more vehicle stops?

(25)              MR. DOLBY-SHIELDS:  You guys

```
(1)                     W. BAKER
(2)        cut out again.
(3)             MR. CERRONE:  You cut out for
(4)        just a second.
(5)             Can you restate the question,
(6)        please?
(7)        Q.    The question was just, do you
(8)   remember more specifically ever having
(9)   discussion with your supervisors about
(10)  doing more vehicle stops and writing more
(11)  vehicle traffic law tickets?
(12)       A.    I don't really recall that.
(13)       Q.    Okay.  I am going to go down
(14)  to -- well, here on Page 13 again, on this
(15)  document dated February 15, 2019, again, it
(16)  identifies U.S. Marshal --
(17)            Well, let me ask you this:
(18)  "USMTF," that stands for U.S. Marshal
(19)  fugitive task force?
(20)       A.    Yes.
(21)       Q.    At that time, that was the only
(22)  goal that you listed?
(23)       A.    It looks like.
(24)       Q.    I couldn't really read these
(25)  two down here.  I was wondering if you can
```

(1)                    W. BAKER
(2)     help me with that.
(3)              Under where it says, "The
(4)     supervisor offers guidance and assistance
(5)     towards reaching these goals."
(6)          **A.     I am having trouble reading it**
(7)     **as well.**
(8)          Q.     It continued, "participating
(9)     with warrants and wanted-person arrests."
(10)             Does that look right?
(11)         **A.     It could be.**
(12)         Q.     And continuing, "assisting
(13)     United States Marshal fugitive task force."
(14)         **A.     I believe so.  I believe so.**
(15)         Q.     My question about that was,
(16)     prior to being deputized a deputy -- what
(17)     do they call it, deputy marshal; is that
(18)     right?
(19)         **A.     Yes.**
(20)         Q.     Prior to being deputized in
(21)     2020, did you do any work with the fugitive
(22)     task force?
(23)         **A.     I really don't recall.  I think**
(24)     **it would be just like anything -- if they**
(25)     **call on air for assistance, like any other**

(1)                    **W. BAKER**

(2)    **officer, I would go and assist.  But I**

(3)    **really don't remember anything.**

(4)        Q.    You don't remember if you had

(5)    previously assisted them before you

(6)    officially joined the task force?

(7)        **A.    No, I mean, I was not -- I**

(8)    **wasn't assigned to them, if that is what**

(9)    **you're asking.**

(10)            **I mean, I think I may have,**

(11)    **just like anyone else, if they would call**

(12)    **out on the radio for assistance.  But no, I**

(13)    **was never assigned to them.**

(14)        Q.    I guess my question is not

(15)    whether you were assigned; my question is

(16)    in what ways you would have assisted the

(17)    task force prior to joining them officially

(18)    in 2020.

(19)        **A.    I really don't recall.  I would**

(20)    **just assume it would be just like if they**

(21)    **had needed assistance with an arrest or**

(22)    **something, maybe, or transporting someone.**

(23)    **I am not really sure.**

(24)        Q.    So like, just, if you got -- if

(25)    there was an incident, there was a call

(1)                        W. BAKER

(2)    over the radio, you would respond?

(3)        **A.      Correct.**

(4)        Q.    But don't remember any specific

(5)    instances where you did anything like that?

(6)        **A.    No.**

(7)        Q.    Okay.  So I did want to go down

(8)    to Page 14 here.  So this is an additional

(9)    training report, dated -- let's see, I

(10)   don't see the date on it.  But under here,

(11)   it says it relates to an incident that

(12)   occurred on October 24th, 2018.

(13)             Do you see that?

(14)       **A.    I do.**

(15)       Q.    Okay.  Do you remember -- well,

(16)   let me give you a second to read over this

(17)   document and then I wanted to ask you some

(18)   questions about it.

(19)       **A.    (Witness reading.)  Okay.**

(20)       Q.    After reading this document,

(21)   does that -- do you recall this incident?

(22)       **A.    I do not.**

(23)       Q.    Do you recall being --

(24)   attending this additional training?

(25)       **A.    No.**

(1)                     **W. BAKER**

(2)       Q.    Okay.  Let me do this:  I want

(3)    to put up the SRR from that incident.

(4)             Let me just see.

(5)             This is the SRR from that

(6)    incident, dated --

(7)             **MR. CERRONE:  This is a new**

(8)        **exhibit?**

(9)             **MR. DOLBY-SHIELDS:  Correct.**

(10)        **This will be Exhibit 11.**

(11)             **(Whereupon, documents were**

(12)        **marked as Plaintiffs' Exhibit 11 for**

(13)        **identification as of this date.)**

(14)       Q.    Let me give you the opportunity

(15)    to read the narrative there, then I am

(16)    going to ask if that refreshes your

(17)    recollection about the incident.

(18)       **A.    Okay.**

(19)       Q.    Okay.  And then down here, just

(20)    on the second page, it says that you were

(21)    assigned a body camera and that there was

(22)    body-camera video of the incident, right?

(23)       **A.    That's what it says.  I just**

(24)    **don't really recall the incident much.**

(25)             **MR. DOLBY-SHIELDS:  Okay.  I**

(1)                    **W. BAKER**

(2)          **guess this demand would really go to**

(3)          **the City and to Hal.  We demand**

(4)          **production of the body-worn camera**

(5)          **video from that incident, and I will**

(6)          **go ahead and follow up in writing**

(7)          **about that.**

(8)              **MR. CERRONE:  I am just making**

(9)          **a note of that.**

(10)         Q.    After reading this subject

(11)    resistance report and going back to

(12)    Exhibit 10 here on Page 14, the additional

(13)    training report, does that refresh your

(14)    recollection at all about either the

(15)    incident or the additional training that it

(16)    looks like you were required to attend

(17)    after the incident?

(18)         **A.    No, not really.**

(19)         Q.    Do you know if the individual

(20)    filed like, a complaint against you about

(21)    this incident, or how it came about that

(22)    you were ordered to attend this additional

(23)    training?

(24)         **A.    No, I don't.**

(25)         Q.    Do you know if was, for

(1)                    W. BAKER

(2)    example, based on just the supervisor

(3)    reviewing your subject resistance report

(4)    and body-camera video?

(5)        **A.    I am really not sure.**

(6)        Q.    Okay.  Do you recall if there

(7)    were any other times in your career as an

(8)    RPD officer that you were required to

(9)    attend additional training based on any use

(10)   of force during an incident?

(11)       **A.    I don't recall.**

(12)       Q.    Okay.  As far as you recall,

(13)   this was the only time that you were

(14)   required to attend additional training?

(15)       **A.    I am really not sure.  I**

(16)   **believe so.  I really don't know.**

(17)       Q.    Okay.  Do you know if you were

(18)   required to attend additional training

(19)   based on, for example, a use of force?

(20)   That's something that would be included in

(21)   your PDS file, right?

(22)       **A.    I believe so.**

(23)       Q.    This is the only one I saw in

(24)   the PDS files, so as far as I know, that

(25)   would be the only additional training that

```
(1)                    W. BAKER
(2)   you were ever required to attend?
(3)              MR. DOLBY-SHIELDS:  You guys
(4)       just cut out.
(5)              All right, you're back.
(6)       Q.    I didn't hear you say anything
(7)   if you did start to answer.
(8)       A.    No, I believe you're correct.
(9)       Q.    All right.  Just a couple more
(10)  quick questions.
(11)             I am going to go to Page 8, 9.
(12)             So Page 8, this is your
(13)  evaluation dated January 21st, 2020, for
(14)  the period January 1st, 2019 to
(15)  December 31st, 2019.  And if I go to the
(16)  second page of this evaluation, which is
(17)  Page 9 of the PDF, it just says,
(18)  basically -- my question is just about the
(19)  highlighted portion where it says that you
(20)  made a warrant slash wanted folder that you
(21)  would carry around with you to familiarize
(22)  yourself with people who are wanted.
(23)             So basically, that's going to
(24)  what we discussed earlier, how you would
(25)  take it upon yourself to act proactively to
```

(1)                    W. BAKER
(2)    find people with warrants or that were
(3)    wanted; is that what that's talking about?
(4)        **A.    I really don't remember.  It**
(5)    **could have just been a folder with warrant**
(6)    **trackers that I was assigned.  I'm not**
(7)    **really sure.**
(8)        Q.    Basically, we talked about
(9)    earlier how that's something that you, I
(10)   don't know, took it upon yourself to do.
(11)   Before you were transferred from RPD to the
(12)   task force, you would look for folks with
(13)   warrants, or that were wanted?
(14)       **A.    Sometimes, yes.  I mean, it's**
(15)   **all -- it was just another part the job.**
(16)       Q.    I guess my question is, it's
(17)   something that like, your supervisor seemed
(18)   to have praised you for.  I guess that's my
(19)   real question.
(20)            Is that something that you
(21)   liked about the job, that you did as an RPD
(22)   officer, before you were transferred?
(23)       **A.    Well, I mean, I think there was**
(24)   **a lot that I like about the job.  I think**
(25)   **that's just another part the job.  And I**

(1)                          **W. BAKER**

(2)    **obviously liked doing warrant and wanted**

(3)    **things.  That's why I wanted to be on the**

(4)    **task force.  So yes, I think that makes a**

(5)    **big difference in the community, making**

(6)    **those arrests.**

(7)         Q.    I think I have one more

(8)    question about this file.  I am going up to

(9)    Page 6.  Let's see here.

(10)             And so it says, in your

(11)   evaluation dated January 1st--

(12)   January 25th, 2021, for the period

(13)   January 1st, 2020 to December 31st, 2020,

(14)   that you were assigned to the U.S. Marshal

(15)   Service as of September 2020.

(16)             Does that date sound right to

(17)   you -- September 2020 -- when you were

(18)   assigned --

(19)        **A.    Somewhere in that area.  I am**

(20)   **not exactly sure.  It was September or**

(21)   **October, I think.  It was somewhere in the**

(22)   **fall.**

(23)        Q.    Okay.  I am going to take that

(24)   down now.

(25)             When you were assigned to the

(1)                    W. BAKER

(2)   U.S. Marshal task force in the fall of

(3)   2020, did you have to attend like, a

(4)   training academy?

(5)        **A.     Not an academy, per se, like**

(6)   **the academy I went through.  I would say**

(7)   **just training -- just their training.**

(8)        Q.    Okay.  So what happened first

(9)   was that -- the first thing that

(10)  happened -- let me withdraw the question;

(11)  it's a bad question.

(12)            When you were first assigned in

(13)  the fall of 2020, were you required to

(14)  attend training before you started working

(15)  with the task force in the field?

(16)       **A.    I believe it was pretty close**

(17)  **to the start date where we started**

(18)  **training, training as a team.**

(19)       Q.    Okay.  And were you required to

(20)  train with the team before you worked in

(21)  the field with the team?

(22)       **A.     Yes, I believe so.  I believe I**

(23)  **was training with them, and field training**

(24)  **as well.**

(25)       Q.    Okay.  So does that mean you

(1)                        W. BAKER

(2)    did both like, classroom training and field

(3)    training?

(4)        **A.    I think it was mainly training**

(5)    **with the team and -- we would go out -- we**

(6)    **would train operations and then go out and**

(7)    **kind of show how it would be on the**

(8)    **streets.**

(9)        Q.    Okay.  So that was like a --

(10)   basically, a field training?

(11)       **A.    Yes.  I would say it was -- we**

(12)   **trained in control environments and also,**

(13)   **field training on the streets.**

(14)       Q.    So when you say "controlled

(15)   environments," that's not like -- you

(16)   weren't going out and responding to

(17)   apprehend fugitives; it was like an actual

(18)   training?

(19)       **A.    Correct.**

(20)       Q.    Then the additional training

(21)   that was more like field training, that was

(22)   like, going out to apprehend fugitives but

(23)   maybe you wouldn't take as active of a role

(24)   in the apprehension?

(25)       **A.    Yeah, I don't really remember**

(1)                    **W. BAKER**

(2)  **exactly all of it, but I think it was maybe**

(3)  **something similar, or -- maybe not**

(4)  **involving -- maybe just hypothetical**

(5)  **situations out there, like how to cover a**

(6)  **house or something like that, or a vehicle**

(7)  **interdiction or something like that.**

(8)       Q.    Okay.  Do you know if there was

(9)  any kind of formal period of time that you

(10) were either in field training or on

(11) probation when you first joined the

(12) marshals?

(13)      **A.    I really don't recall like, a**

(14) **specific set of time, or dates.**

(15)          **MR. DOLBY-SHIELDS:  Okay.  So**

(16)       **Mike, we're going to call for**

(17)       **production of some things:**

(18)          **One, production of any policies**

(19)       **regarding the training required when**

(20)       **officers first join the task force.**

(21)          **Two, any periods of time when**

(22)       **they are required to do field**

(23)       **training or be on probation.**

(24)          **Then, I guess three would be**

(25)       **any specific training that Officer**

(1)                    **W. BAKER**

(2)         **Baker received when he first joined**

(3)         **the task force.  So, three things.**

(4)              **MR. CERRONE:  One, policies**

(5)         **about training and field training for**

(6)         **new task force members.**

(7)              **Two, policies for periods of**

(8)         **time for field training probation.**

(9)              **Three, specific for Baker,**

(10)        **records of training when he first**

(11)        **joined the task force.**

(12)             **MR. CERRONE:  As with**

(13)        **yesterday, put it in writing and**

(14)        **we'll take a look at it.**

(15)             **MR. DOLBY-SHIELDS:  Okay,**

(16)        **making a note here.**

(17)        Q.    All right, I just want to back

(18)   up for a second.

(19)             When you were with the Rome

(20)   Police Department, did you get any specific

(21)   training about executing warrants?

(22)        **A.    I don't remember that at all.**

(23)   **Yeah, I'm not really sure.**

(24)        Q.    When you were with the

(25)   Rochester Police Department, did you get

(1)                    W. BAKER

(2)    any specific training about executing

(3)    warrants?

(4)        **A.    I'm not sure.**

(5)        Q.    But while you were with the

(6)    Rochester Police Department, you did, in

(7)    fact, you know, execute a lot of

(8)    warrants -- I'm sorry, maybe not execute

(9)    them but apprehend individuals who were

(10)   wanted for warrants, correct?

(11)       **A.    I did arrest some people for**

(12)   **warrants, yes, or wanted people.**

(13)              **MR. DOLBY-SHIELDS:  So I guess**

(14)          **that would go to the City, to Hal.**

(15)          **We're going demand any training from**

(16)          **the RPD specifically regarding**

(17)          **training received by Officer Baker**

(18)          **about apprehending individuals who**

(19)          **were wanted or had warrants.  I will**

(20)          **follow up in writing.**

(21)       Q.    After you joined the task

(22)   force, was there specific training that you

(23)   got, other than what we already spoke

(24)   about, regarding executing warrants for

(25)   fugitives?

W. BAKER

(1)

(2)       **A.      Yes.  I mean, we do ongoing**

(3)   **training with the team for that.**

(4)       Q.    Okay.  And how often do you do

(5)   those ongoing trainings?

(6)       **A.      Probably at least once a month.**

(7)       Q.    When you do those monthly

(8)   trainings, where does that take place?

(9)       **A.      It really all depends.  It**

(10)  **could just be something where it's more a**

(11)  **meeting, it could be something that's more**

(12)  **reality-based, a building somewhere or a**

(13)  **parking lot or something.  Not always in**

(14)  **the same place.**

(15)      Q.    Okay, so they varied?

(16)      **A.      Yes.**

(17)      Q.    When you do those trainings, is

(18)  there like a specific member of the team

(19)  that leads and organizes those trainings?

(20)      **A.      I would say it's a combination**

(21)  **of -- I believe it would be a combination**

(22)  **of the team members that would do some of**

(23)  **the trainings between the sheriffs,**

(24)  **typically, and the marshals.**

(25)      Q.    Is there like, a point person

(1)                    W. BAKER

(2)    from the sheriffs?

(3)        **A.    I know that Sergeant Devinney**

(4)    **does some of the trainings along with the**

(5)    **marshals.**

(6)        Q.    So Sergeant Devinney, from the

(7)    sheriff's office.

(8)        **A.    Yes.**

(9)        Q.    How about from the marshals; is

(10)    there a point person from the marshals?

(11)        **A.    It depends on what we're**

(12)    **training.  One of -- the instructors come**

(13)    **from all over the country sometimes, so**

(14)    **it's not always the same people.**

(15)        Q.    Do you ever travel to other

(16)    cities or states to attend trainings?

(17)        **A.    Yes, sometimes.**

(18)        Q.    Since joining the team in the

(19)    fall of 2020, how many times have you

(20)    traveled to other states to attend

(21)    training?

(22)        **A.    I don't really remember.  Maybe**

(23)    **a couple of times.**

(24)        Q.    How about other cities in

(25)    New York State; how many times have you

(1)                         W. BAKER

(2)    traveled to other cities to do trainings in

(3)    New York State since joining in fall 2020?

(4)        **A.    Probably the same, maybe just a**

(5)    **few times.**

(6)        Q.    When you do these trainings --

(7)    well, let me back up.

(8)              When you do the monthly

(9)    trainings with the team, is there a record

(10)    of that; is there like a sign-in sheet?

(11)        **A.    I don't really recall.**

(12)    **Sometimes, maybe.  I don't really recall**

(13)    **exactly if all of them are.**

(14)        Q.    How about when you go to these

(15)    trainings in other cities or states; would

(16)    there sign-in sheets for those trainings?

(17)        **A.    I really don't remember the**

(18)    **other ones, if there were.  There might be.**

(19)              **MR. DOLBY-SHIELDS:  Mike, we're**

(20)          **going to demand, to the extent they**

(21)          **haven't been produced, any records**

(22)          **and sign-in sheets regarding monthly**

(23)          **trainings and other ongoing trainings**

(24)          **that Officer Baker has attended since**

(25)          **joining the task force in fall 2020.**

(1)                    **W. BAKER**

(2)              **MR. CERRONE:  We've already**

(3)        **produced the training records and**

(4)        **sign-in sheets that we have.**

(5)              **We will take a closer look at**

(6)        **this more-specific request but I**

(7)        **would not anticipate any further**

(8)        **documentation.**

(9)              **MR. DOLBY-SHIELDS:  Okay.**

(10)        Q.    So on that note, Officer Baker,

(11)   what I do want to do is put up what was

(12)   marked Exhibit 1 at yesterday's deposition,

(13)   which are sign-in sheets from the trainings

(14)   that we discussed briefly, and I just have

(15)   a few questions.

(16)              Okay.  Do you see, on your

(17)   screen, a document with a little red

(18)   sticker that says, "Plaintiff's Exhibit 1"

(19)   in the top right?

(20)              **MR. CERRONE:  It appears yellow**

(21)        **on our end but yes, we see it.**

(22)              **MR. DOLBY-SHIELDS:  Oh, what**

(23)        **did I say; orange?**

(24)              **MR. CERRONE:  You said red.**

(25)              **MR. DOLBY-SHIELDS:  I'm sorry.**

(1)                          **W. BAKER**

(2)          **Yellow, yes.**

(3)      Q.    So let me go down here.

(4)          **MR. CERRONE:  Just give the**

(5)      **Bates numbers for the record.**

(6)          **MR. DOLBY-SHIELDS:  For the**

(7)      **record, the Bates numbers from this**

(8)      **exhibit are 525 to 543.**

(9)          **MR. CERRONE:  Thank you.**

(10)     Q.    I am going to go down.  When we

(11) get to the pages that look like you signed

(12) in for --

(13)          We are on now Page 11 of the

(14) 19-page document, Bates 535.

(15)          Do you see your name here sort

(16) of in the middle?

(17)     **A.    Yes.**

(18)     Q.    So this is a training dated

(19) June 22nd, 2021.  In the course title is

(20) "Tack shooting."

(21)          I guess my first question is,

(22) do you recall that training?

(23)     **A.    No, not really.**

(24)     Q.    Okay.  Looks like it was start

(25) time of 9:00 hours and an end time of, it

(1)                   W. BAKER

(2)    looks like it might be a typo here, it says

(3)    17308, probably around 5:00 P.M., if that's

(4)    right.

(5)            But my question is, do you

(6)    remember anything about tack shooting

(7)    training that you attended?

(8)    **A.    I mean, just what's on the**

(9)    **sheet.  I mean, we probably did; we do**

(10)   **shooting.  I just don't know that**

(11)   **specifically.**

(12)   Q.    Okay.  The monthly trainings

(13)   that you discussed earlier, would those be

(14)   full-day, eight-hour trainings, or would

(15)   they something different?

(16)   **A.    No, not necessarily.  They**

(17)   **could maybe just be an hour or a couple**

(18)   **hours.  It kind of all depends on what's**

(19)   **being done.**

(20)   Q.    All right.  If we go down here

(21)   to Page 13 of the 19-page document, Bates

(22)   number 537, there is another one that looks

(23)   like it's got your name, Bill Baker, right?

(24)           So this course title is

(25)   "High-risk fugitive apprehension vehicle

(1)                    W. BAKER

(2)    operations," and it says that the dates

(3)    were 5/11/2021 to 5/13/2021.

(4)                    Do you recall attending a

(5)    three-day training in May of 2021?

(6)        **A.    I am not really sure.  I mean,**

(7)    **I probably did; I'm just not really sure.**

(8)        Q.    Okay.  Do you recall doing any

(9)    trainings about fugitive apprehension in

(10)   vehicle operations since joining the task

(11)   force?

(12)       **A.    Yes, that was part of the**

(13)   **training to come here, what we do.  I just**

(14)   **don't recall exactly this one, if that was**

(15)   **the one that -- I think there was something**

(16)   **before that but I don't remember.**

(17)       Q.    Okay.  Like, you won't remember

(18)   where this training took place?

(19)       **A.    No, I am not positive.**

(20)       Q.    Okay.  Let's scroll down to see

(21)   if there are any other ones.

(22)                    In this 19-page document that

(23)   was produced in this lawsuit, there were

(24)   only two of these training forms that are

(25)   forms numbered U.S. M428, that documented

(1)                    W. BAKER

(2)    any trainings that you received.

(3)              But now, since the joining task

(4)    force, have you attended more than just

(5)    these two trainings?

(6)        **A.    Yes, I definitely attended more**

(7)    **than these trainings.  I don't exactly know**

(8)    **who was putting the trainings on, or where**

(9)    **they were.**

(10)        Q.    Okay.  Do you have any idea

(11)   when the marshal's or Department of Justice

(12)   policy requires that one of these form

(13)   U.S. M428s is required to be completed for

(14)   a training class versus when it's not

(15)   required to be completed?

(16)       **A.    I do not know.**

(17)       Q.    Okay.

(18)             MR. DOLBY-SHIELDS:  So, Mike,

(19)        we're going to call for production of

(20)        any policies about when the U.S. M428

(21)        is required to be completed.

(22)            **MR. CERRONE:  Put it in writing**

(23)        **and we can discuss it.**

(24)       Q.    Let me pull that down.

(25)             Now, part of the training would

(1)                    W. BAKER

(2)   have been about, for example, the

(3)   information that you would gather about the

(4)   fugitive before attempting to apprehend

(5)   them; is that right?

(6)        **A.    Correct.**

(7)        Q.    In general, what is the process

(8)   the task force follows for gathering

(9)   information about a fugitive before

(10)  attempting to apprehend them?

(11)       **A.    Typically, we'll brief it, as**

(12)  **what we know about the -- there will**

(13)  **sometimes be a picture or bulletin, if we**

(14)  **can obtain it, with information such as**

(15)  **their criminal history or anything like**

(16)  **that, indicating any type or possibility of**

(17)  **weapon or anything like that.  And then,**

(18)  **any locations the person could be and, you**

(19)  **know, how we would do the takedown if the**

(20)  **individual was located where we thought we**

(21)  **knew where the individual was.**

(22)       Q.    Okay.  Where does that

(23)  information get gathered from?

(24)       **A.    A variety of investigative**

(25)  **resources.**

(1)                    **W. BAKER**

(2)        Q.    Okay.  Can you give me some,

(3)   for example, of those different

(4)   investigative resources?

(5)        **A.    I mean, it could be different**

(6)   **databases such as criminal-on-the-street**

(7)   **checks, it could be local databases, it**

(8)   **could be information from tips or**

(9)   **something.  It could be a wide variety of**

(10)  **sources.**

(11)       Q.    The task force would conduct

(12)  scouting or surveillance prior to

(13)  attempting to apprehend the fugitive; is

(14)  that right?

(15)       **A.    It would try to sometimes.**

(16)  **Sometimes it doesn't always happen that**

(17)  **way, but sometimes.**

(18)       Q.    Okay.  So that would be to

(19)  gather information about whether the person

(20)  is at the location?

(21)       **A.    Yes.  We would try to conduct**

(22)  **surveillance to see someone is at the**

(23)  **location, or maybe what vehicles they drive**

(24)  **or something like that, or where they may**

(25)  **frequent, or something to that extent.**

(1)                        **W. BAKER**

(2)        Q.    Okay.  Is part of this planning

(3)    process also determining the safest way to

(4)    try to apprehend the fugitive?

(5)        **A.    Yes.**

(6)        Q.    And what types of factors are

(7)    considered -- you guys cut out.

(8)              All right, you're back.

(9)              So I was just asking, what

(10)   types of factors are considered when you

(11)   are trying to determine the safest way to

(12)   apprehend a fugitive?

(13)       **A.    I mean, there is a lot that**

(14)   **goes into it.  There was -- I guess there**

(15)   **is really no perfect, safe way to do it.**

(16)   **Every operational takedown, the way that we**

(17)   **do them each have their own risks involved,**

(18)   **so I don't know if, let's say, any of them**

(19)   **are really the safest but -- I mean, just**

(20)   **because of the nature of the violent**

(21)   **offenders we come in contact with, you**

(22)   **know, they could shoot at us at any time,**

(23)   **whether we enter a building, do a vehicle**

(24)   **interdiction, or open-air takedown, that**

(25)   **risk is always there.**

(1)                    **W. BAKER**

(2)          **So in terms the safest -- I**

(3)    **mean, I think we try to limit what could be**

(4)    **safest for the community.  So we wouldn't,**

(5)    **I would say, do a takedown in front of a**

(6)    **school with kids or something like that.**

(7)    **But in terms of -- you know, other than**

(8)    **that, or to try to mitigate, say, a**

(9)    **high-speed chase, which is why we do**

(10)   **vehicle interdictions.  But again, I don't**

(11)   **know if one is necessarily safer than the**

(12)   **other; it would all have its risks.**

(13)        Q.    Okay.  For example, when you're

(14)   planning your arrest of a fugitive, do you

(15)   consider different options, such as whether

(16)   to knock on the front door of the home

(17)   versus doing like, a controlled vehicle

(18)   stop; is that something you consider?

(19)        **A.    Yes.**

(20)        Q.    Okay.  So what would be the

(21)   process for considering those things; does

(22)   the team get together and discuss which

(23)   option might be safer and more effective

(24)   than the other option?

(25)        **A.    Yes, typically.  Just depending**

(1)                      **W. BAKER**

(2)   **on -- not that something can't happen at**

(3)   **any time, you know, to someone with no**

(4)   **criminal history.  We do take history into**

(5)   **account if, you know, they have a**

(6)   **propensity for weapons or anything like**

(7)   **that, or resisting the police or anything**

(8)   **like that.**

(9)         Q.    Okay.  And do you make the

(10)  determination based on what the team

(11)  decides is the safest option?

(12)        **A.    Yes.**

(13)        Q.    Okay.  And so how do you come

(14)  to that determination about what is safest;

(15)  what factors do you consider?

(16)        **A.    I think some of factors would**

(17)  **be -- I mean, it really all depends on the**

(18)  **takedown.  I mean, obviously, people can**

(19)  **have access to weapons on their person or**

(20)  **in their vehicle or in their house.  I**

(21)  **mean, any of those things could happen.**

(22)              **I think, typically, if there is**

(23)  **a higher propensity that someone -- and**

(24)  **again, you could -- you know, you have no**

(25)  **way of telling that.  But if someone was**

(1)                        **W. BAKER**

(2)     going to shoot at you or something, you

(3)     wouldn't probably just knock on the door;

(4)     you would, you know, take a more tactical

(5)     approach.

(6)              But for some of the what I will

(7)     say lower-level warrants that we have

(8)     sometimes, we may take the approach of

(9)     knocking on the door and trying to gain

(10)    cooperation, you know, compliance,

(11)    basically, for someone to just basically

(12)    comply versus, say, a traffic stop or

(13)    something where they could -- a chase could

(14)    ensue or someone out on foot where a foot

(15)    pursuit could ensue.

(16)              They could also still shoot at

(17)    us, or possibly break into someone else's

(18)    house to try get away, or them hold them

(19)    hostage or something like that.  I guess

(20)    it's risk for all the angles.

(21)         Q.    Since joining the task force,

(22)    have you ever been shot at?

(23)         **A.    I don't believe so.**

(24)         Q.    Okay.  I want to put up

(25)    Exhibit 2 that was marked yesterday, and I

(1)                    W. BAKER

(2)  have a couple of questions about that.

(3)              And you guys cut out again.

(4)              Okay, this is a document that

(5)  was marked Exhibit 2 yesterday, Bates

(6)  number 581 to 716.

(7)              So this is a document

(8)  entitled -- it looks like yesterday, Deputy

(9)  Smith said it was like an online training

(10) for the marshals.  It's entitled "Law

(11) enforcement safety training program,

(12) high-risk fugitive apprehension."

(13)              My first question, looking at

(14) this first page, is this a training that

(15) looks familiar to you, Officer?

(16)              MR. DOLBY-SHIELDS:  You're

(17)      muted.

(18)      **MR. CERRONE:  I am going to try**

(19)      **really hard to make sure that this is**

(20)      **not happening at our future**

(21)      **depositions.  I apologize.**

(22)      **It's a new laptop, and I think**

(23)      **the problem is that I don't have Zoom**

(24)      **installed, so I apologize.**

(25)              **MR. DOLBY-SHIELDS:  No worries.**

(1)                    **W. BAKER**

(2)        Q.    I guess my question --

(3)             Let me withdraw my former

(4)    question.  And my new question is, since

(5)    you joined the marshals, have you done

(6)    these sort of computer or online trainings?

(7)        **A.    Yes.**

(8)        Q.    Looking at this first page --

(9)    let me go to the second page and let you

(10)   read that, and then my question is going to

(11)   be if this is a specific training, based on

(12)   these first two pages, that you remember

(13)   having conducted or completed.

(14)       **A.    I am not -- it looks familiar**

(15)   **but I am just not really positive.**

(16)       Q.    Okay.  I am going to fast

(17)   forward to Page 5.  Let's see, it's, I

(18)   guess, Page 4 of the training, Page 5 of

(19)   the PDF, and Bates number 585.

(20)            So up here at the top, says,

(21)   "Making entry into occupied structures is

(22)   one of the most dangerous duties deputy

(23)   U.S. Marshals conduct during enforcement

(24)   operations."

(25)            So I guess my question is, do

(1)                        W. BAKER

(2)    you agree with that training, that's what

(3)    the training says, that entering occupied

(4)    structures is one of the most dangerous

(5)    things that you guys do?

(6)         **A.    Yes, I think it is one of the**

(7)    **most dangerous.  Yes.**

(8)         Q.    Okay.  I want to fast forward

(9)    to Page 20.  So when I said page 20, I

(10)   guess I meant Page 20 of the PDF, which

(11)   would be Page 19 of the training and Page

(12)   600 of the Bates number.

(13)              This discusses selecting

(14)   strategies associated with and alternatives

(15)   to making entry.

(16)              So I guess my question is, if

(17)   you look at that page and then the next

(18)   page where it says, "Options prior to

(19)   entry, do we have to enter and clear the

(20)   structure?  Why do we have make entry and

(21)   clear?  What alternatives to entry are at

(22)   my disposal?"

(23)              After looking at those couple

(24)   of pages, do you recall doing any training

(25)   at all, being trained about those various

(1)                        W. BAKER

(2)    options other than making entry?

(3)        **A.        Yeah, it does seem familiar.    I**

(4)    **don't recall the exact things.**

(5)        Q.    I want to go through a few of

(6)    these.  Ruse, it talks about basically

(7)    trying to lure someone out of the

(8)    residence.

(9)            Do you remember doing training

(10)   about trying to basically lure somebody to

(11)   come outside?

(12)       **A.        Yeah, I think it's part of the**

(13)   **different strategies we have available to**

(14)   **us.  We do different things sometimes.**

(15)       Q.    That's Page 602, Bates number.

(16)   Page 603 talks about doing a vehicle stop

(17)   or containment.  It says, "Allowing the

(18)   subject to leave the target structure and

(19)   enter a vehicle may be a more efficacious

(20)   strategy for effecting arrest."  Then it

(21)   talks about various dangers that could be

(22)   part of doing a vehicle stop.

(23)            So I guess my question is, do

(24)   you remember doing trainings about weighing

(25)   the risks associated with entry into a

(1)                    W. BAKER

(2)  structure versus doing a vehicle stop?

(3)      **A.     Yes.**

(4)      Q.    Okay.  And what are some of the

(5)  things you would consider when you are

(6)  deciding whether to do a vehicle stop

(7)  versus entering into the building to arrest

(8)  a fugitive?

(9)      **A.     One of the considerations is**

(10) **that -- I mean, it always there.  With a**

(11) **structure versus car, it's typically, you**

(12) **don't know the layout of the structure.**

(13) **That in itself, you know.  Whereas, the**

(14) **person in the structure knows that layout,**

(15) **and who may be inside of the structure.**

(16)          **But also, with a lot of**

(17) **vehicles -- vehicle stops as well, a lot of**

(18) **them are completely tinted vehicles,**

(19) **windshield and all, we really can't see in**

(20) **the vehicles, either.  So I guess, both**

(21) **structures and vehicles have their dangers.**

(22)     Q.    Okay.  So basically, you're

(23) saying, just with respect to vehicles,

(24) like, tinted windows would be something

(25) that could make a vehicle stop more

```
(1)                    W. BAKER
(2)  dangerous than a vehicle stop involving a
(3)  vehicle that doesn't have tinted windows?
(4)       A.    Correct.
(5)       Q.    And then one of the things that
(6)  could make entry into a residence or some
(7)  other structure building more dangerous
(8)  could be that you guys just don't know the
(9)  layout, but the person you're trying to
(10) apprehend would know the layout?
(11)      A.    Correct.
(12)      Q.    That would be giving them a
(13) tactical advantage inside of the building?
(14)      A.    Possibly.
(15)      Q.    Next, Page 604, containment and
(16) callout without a breach.
(17)           So basically, this would just
(18) mean you go to the building, you surround
(19) it, you then just say, "Hey, Fredrick," or
(20) whoever, "we are outside, we've got a
(21) warrant for you.  Can you please just come
(22) outside?"
(23)           MR. CERRONE:  Object to the
(24)      form of the question.
(25)           You can answer.
```

(1)                    **W. BAKER**

(2)        **A.      Sometimes that would be**

(3)    **utilized.  But something like that would**

(4)    **typically create quite a scene.  And**

(5)    **resources, you would have, basically, a**

(6)    **loudspeaker, and everybody would come out,**

(7)    **which could -- come out into the street or**

(8)    **neighborhood, which could create another**

(9)    **officer safety issue, possibly.  You know,**

(10)   **someone familiar with the subject could be**

(11)   **firing at us as we are doing that.  So you**

(12)   **can do that, or you could also go up to the**

(13)   **door more discretely and try to get**

(14)   **cooperation.**

(15)       Q.      Have you ever done this?  Like,

(16)   containment and callout without a breach,

(17)   have you ever done it like that?

(18)       **A.      I believe we have done it few**

(19)   **times.**

(20)       Q.      Instead of -- so you would go

(21)   up and knock on the door and try to get

(22)   them to come outside instead of going up

(23)   and knocking on the door and then going

(24)   into the building?

(25)       **A.      I think, some of them, we have**

(1)                    **W. BAKER**

(2)    **done, maybe when we know the person is in**

(3)    **there, the callouts.  If we don't know the**

(4)    **person is in there, I think that's why we**

(5)    **knock sometimes.**

(6)         Q.    I guess my question here is,

(7)    when it says, "Attempt to initiate contact

(8)    with the suspect occupants," are you saying

(9)    that when you do like a containment and

(10)   callout, that you would try to initiate

(11)   contact in a way other than going up and

(12)   knocking on the door?

(13)        **A.    Possibly.  If we possibly know**

(14)   **that the person is in there.**

(15)             **We don't always know that.**

(16)             **So we can do a callout and, you**

(17)   **know, just no one would answer the callout.**

(18)        Q.    Can a callout been done by

(19)   knocking on the door and then, you know,

(20)   just waiting outside and saying, "Hey, come

(21)   out," instead of immediately rushing into

(22)   the home?

(23)        **A.    It could be.  I mean, there is**

(24)   **different pros and cons to that.**

(25)        Q.    Okay.  What would some of those

(1)                    W. BAKER

(2)   pros and cons be?

(3)        **A.    The, I guess the pro to that**

(4)   **would be if the subject does comply, they**

(5)   **are compliant, there is no problem, there**

(6)   **is no issue, and they just come out.**

(7)             **If you do do it like that and**

(8)   **they have no intention of complying or**

(9)   **coming out, it gives them more time to**

(10)  **think, and develop a plan to possibly**

(11)  **ambush us or shoot us.  So sometimes we do**

(12)  **have to act quickly so that doesn't occur,**

(13)  **or to mitigate that.**

(14)       Q.    What if you have like, no

(15)  information that that the person had a

(16)  history of using guns, or have a gun with

(17)  them, would you have decide to stay outside

(18)  and try to negotiate with them to come out

(19)  instead of rushing into the house?

(20)            **MR. CERRONE:  Object to the**

(21)      **form the question.**

(22)       **A.    I think every scenario is**

(23)  **different.  I think any time you try to**

(24)  **arrest anyone for anything, whether or**

(25)  **not -- whether a major or minor crime,**

```
(1)                    W. BAKER
(2)   there is always that possibility that
(3)   someone could get hurt, officer or suspect.
(4)   But, typically, if it is a lower-level
(5)   warrant or something like that, I think
(6)   they usually -- just knocking sometimes,
(7)   and just, just trying to basically gain
(8)   their cooperation, and say, you know, "You
(9)   have a warrant or something, just come with
(10)  us," is sometimes more effective.
(11)       Q.    Have you ever had a situation
(12)  where you responded a residence and the
(13)  person refuses to come out voluntarily,
(14)  where, instead of forcibly entering the
(15)  residence, you've stayed outside and tried
(16)  to negotiate with the person to come out
(17)  and surrender?
(18)            MR. CERRONE:  Object to the
(19)       form of the question.
(20)       A.    I believe we have had some of
(21)  those incidents.  Those may have been
(22)  incidents where the person was likely
(23)  armed.
(24)       Q.    Okay.  So that would be
(25)  something you might do if you had
```

(1)                    W. BAKER
(2)    information that the person was likely
(3)    armed, to basically choose the safer option
(4)    of not rushing into the residence?
(5)             **MR. CERRONE:  Object to the**
(6)        **form the question.**
(7)             **You can answer.**
(8)    **A.     Correct.  It would be to**
(9)    **basically -- knowing versus the unknown, if**
(10)   **you know that they have a weapon, to wait.**
(11)            **I wouldn't say when we do do**
(12)   **these operations, like rushing in.**
(13)   **Typically, it's usually -- we usually have**
(14)   **a plan put together and -- I don't know,**
(15)   **necessarily, if we rush it.  It's more of a**
(16)   **methodical, strategic entry, trying to do**
(17)   **it the safest way possible.**
(18)   Q.     So would, for example, one of
(19)   the things that you would plan for be to
(20)   knock on the door, and then would the plan
(21)   be that if he doesn't -- if the fugitive
(22)   doesn't immediately come out, to try to
(23)   negotiate with them to come out; would that
(24)   be something you would plan for in advance?
(25)            **A.     Yes, if we know the person is**

(1)                    **W. BAKER**

(2)     **in there.  A lot of times we don't know**

(3)     **that.  But sometimes we could do that.**

(4)             **Or also, if we know the person**

(5)     **is in there, and we think we have caught**

(6)     **them by surprise, possibly we may try to**

(7)     **enter quicker to -- so they don't have time**

(8)     **to develop a plan to shoot us or something**

(9)     **like that.**

(10)        Q.    Okay.  Now, have you ever been

(11)    shot at when you were executing a plan to

(12)    try to apprehend somebody at a residence?

(13)            **MR. CERRONE:  Marshals, RPD, or**

(14)        **both?**

(15)            **MR. DOLBY-SHIELDS:  Let's say**

(16)        **just marshals.**

(17)        **A.    I don't recall so.**

(18)        Q.    How about during your time as

(19)    an RPD officer; were you ever shot at when

(20)    you were arresting someone at a residence?

(21)        **A.    I don't think so.**

(22)        Q.    Okay, let me go to the next

(23)    page here.  Okay, this is still talking

(24)    about containment on Page 605.

(25)            Page 606 says, "Breach and

```
(1)                    W. BAKER
(2)  limited penetration."
(3)           So can you explain this is to
(4)  me?  I am not exactly sure what this is
(5)  saying.
(6)           This is saying that you would
(7)  forcibly enter but not go all the way
(8)  inside or something?
(9)      A.    Correct.
(10)     Q.    Okay.  So that would be like
(11) you break open the door, stay outside, and
(12) like, call in to the people inside?
(13)     A.    That is an option.
(14)           Many of the shootings occur at
(15) the door, so that's --
(16)           Through different instances,
(17) training has showed that they get -- the
(18) team gets fired upon at the door many
(19) times.  So by breaching that, it allows us
(20) to mitigate that a little bit, to be able
(21) to see if the suspect is inside or waiting
(22) for us at the door.
(23)     Q.    It gives you a little more
(24) opportunity to see what's going on inside,
(25) to lower the risk to team members?
```

(1)                    W. BAKER

(2)        **A.    Correct.**

(3)        Q.    So the idea would be that like,

(4)   staying outside at that point is safer than

(5)   going right in?

(6)        **A.    It could be, possibly,**

(7)   **depending what information is gained, if**

(8)   **there was any additional information.**

(9)        Q.    Got it.  Then going down to the

(10)  next page, Page number 607, and this one is

(11)  entitled "Controlled entry," up here at the

(12)  top, it says, "All other options have

(13)  failed or were impractical."

(14)            Is that what you were taught,

(15)  that the controlled entry should only be

(16)  done when all other options have failed or

(17)  were deemed to be impractical?

(18)       **A.    In terms of actually breaching**

(19)  **and going in, sometimes we -- you know, we**

(20)  **will try other options.**

(21)       Q.    Okay.  So were you taught, in

(22)  this training and other trainings, that a

(23)  controlled entry -- entering the building

(24)  should only done when other options failed

(25)  or were impractical?

(1)                    W. BAKER

(2)          **MR. CERRONE:  Objection to the**

(3)      **form of the question.**

(4)          **You can answer.**

(5)     **A.     Yes.  And just to be clear,**

(6) **too, with the breaching, it doesn't -- it**

(7) **wouldn't necessarily mean that the door --**

(8) **if someone opens the door.  Like, if we are**

(9) **breaching, it's usually striking the door**

(10) **with a ram, usually, and not if someone**

(11) **opens the door for us or something like**

(12) **that.**

(13)     Q.     So you mean like a forcible

(14) entry?

(15)     **A.     Correct.**

(16)     Q.     But basically, what this page

(17) is saying is that entry should be the tool

(18) the last resort, correct?

(19)          **MR. CERRONE:  Object to the**

(20)      **form of the question.**

(21)     **A.     I wouldn't say last resort; I**

(22) **would say it's just another option to**

(23) **actually breach, forcible entry.  We do try**

(24) **to typically do other options before that.**

(25)     Q.     Okay.  And the reason is

(1)                    W. BAKER

(2)    because entering into a residence, as we

(3)    discussed earlier, is dangerous?

(4)        **A.    Yes, correct.  I believe, just**

(5)    **as dangerous as others.**

(6)            **MR. DOLBY-SHIELDS:  You guys**

(7)        **cut out right there.**

(8)            **MR. CERRONE:  Pardon me one**

(9)        **second.**

(10)        Q.    Officer Baker, we just took a

(11)    quick break.

(12)            After taking that break, are

(13)    there answers to questions that you gave

(14)    earlier that you would either like to

(15)    change the answer to or clarify in any way?

(16)        **A.    I don't believe so.**

(17)        Q.    I had up Exhibit 2 from

(18)    yesterday, so I am going to put that back

(19)    up.

(20)            We were discussing controlled

(21)    entries and entries into buildings, and

(22)    this document has said that the controlled

(23)    entry should be done when all other options

(24)    have failed or were impractical.

(25)            So my question is, basically,

(1)                    W. BAKER

(2)     that means that that is the tool of last

(3)     resort; is that right?

(4)               **MR. CERRONE:  Object to the**

(5)          **form of the question.**

(6)          **A.     If you're actually doing, say,**

(7)     **a dynamic breach, yes, usually.**

(8)          Q.     Okay.  And that is because

(9)     entry into the building, as we discussed

(10)    earlier, is dangerous because it would give

(11)    the fugitive a tactical advantage?

(12)         **A.     Probably.  We try to have the**

(13)    **advantage when do enter a building based on**

(14)    **our tactics.  But possibly.**

(15)         Q.     Because, generally, the

(16)    fugitive inside the building would know the

(17)    layout of the building, for example?

(18)         **A.     Correct, we would try to**

(19)    **gain -- through resources, try to gain the**

(20)    **layout.  But, yes, they would know the**

(21)    **layout better than we would.**

(22)         Q.     Let me pull that down.

(23)               Let's discuss the incident

(24)    involving Dedrick James.  That occurred on

(25)    the morning of September 15th, 2021.

(1)                    W. BAKER

(2)          On that day, were you working

(3)    in your capacity as a deputy U.S. Marshal?

(4)        **A.    Yes.**

(5)        Q.    And a member of the fugitive

(6)    task force?

(7)        **A.    Correct.**

(8)        Q.    And do you know who the team

(9)    leader was on that day?

(10)          MR. DOLBY-SHIELDS:  You guys

(11)     cut out again.

(12)          All right, you are back.

(13)        Q.    So I had asked if you knew who

(14)    the team leader was on September 15th,

(15)    2021.

(16)        **A.    I really don't recall who the**

(17)    **team leader was at that time.**

(18)        Q.    Is that someone -- the team

(19)    leader, that is -- is that someone that

(20)    would change on a daily basis, or is that

(21)    kind of like a more permanent position?

(22)        **A.    It could be, depending on**

(23)    **resources available, and who was here and**

(24)    **not here.  It could -- it does change.**

(25)        Q.    Okay.

(1)                    W. BAKER

(2)        A.      It could be a variety of

(3)    people.

(4)        Q.      Got it.  Now, several days

(5)    before the execution of the warrant on

(6)    September 15th, 2021, the task force had a

(7)    briefing, is that right, about this warrant

(8)    for Dedrick James?

(9)        A.      I believe so.  I don't remember

(10)   exactly the brief, but I believe there was

(11)   one.

(12)       Q.      Okay.  Let me just make sure I

(13)   understand.

(14)               You remember that there was a

(15)   brief before the execution of the warrant;

(16)   is that right?

(17)       A.      Yes.  I just don't really

(18)   remember too much about it.

(19)       Q.      What do you remember about it?

(20)       A.      I just remember we were briefed

(21)   that he was -- he had a warrant for assault

(22)   second, I believe it was, from Wayne

(23)   County.  I don't recall him having any

(24)   criminal history or violent criminal

(25)   history, or anything that would indicate

(1)                    **W. BAKER**

(2)    **that he would be armed or dangerous or**

(3)    **anything like that.  And we -- you know,**

(4)    **after the brief, we all approached the**

(5)    **residence.**

(6)         Q.    The brief that you recall

(7)    occurred on the morning of the incident?

(8)         **A.    Yes, I believe it was.  I think**

(9)    **we did another one prior to that because I**

(10)   **think we were looking for him, but I**

(11)   **just -- I don't remember -- I don't**

(12)   **remember myself going to the residence**

(13)   **before, but I think we were looking for him**

(14)   **in case anyone saw him, you know, before**

(15)   **that day.**

(16)        Q.    Okay.  I read some reports

(17)   that, several days before the execution of

(18)   the warrant, that there was a brief about

(19)   the warrant and about Dedrick James.

(20)             Do you recall that prior

(21)   briefing?

(22)        **A.    That is very possible.  I**

(23)   **believe there was; I just really don't**

(24)   **remember the substance of it exactly.**

(25)        Q.    Do you remember if Jeff

(1)                     W. BAKER

(2)   Ulatowski was the one that was leading this

(3)   investigation?

(4)        A.    I think he was, on our end.

(5)             But I think there was another

(6)   investigator that was involved in the

(7)   original incident, if I recall correctly,

(8)   that the subject had a warrant for.  So I

(9)   think maybe there was communication between

(10)  the two investigators, you know, it was --

(11)  the information that was relayed to us.  I

(12)  don't believe I had communication with the

(13)  other investigator.

(14)       Q.    Okay.  Now, at either of those

(15)  briefs, a few days before or on the morning

(16)  of, did you discuss the potential risks

(17)  associated with approach and entry to the

(18)  residence?

(19)       A.    Yes.  That's why we did

(20)  approach it the way we did.  There was no

(21)  indication that, you know, unfortunately,

(22)  what occurred was going to occur at all.

(23)             We treat the scenarios as

(24)  similar as we can, so we are always on our

(25)  toes.  So we were still treating it as if

```
(1)                    W. BAKER
(2)   something could happen, which it always
(3)   could.
(4)            But at the same time, it was a
(5)   pretty low-level warrant than what we're
(6)   typically doing.  But I still had a shield,
(7)   we still had a team, and we were still
(8)   treating it as if anything -- any violence
(9)   could occur, but we didn't believe it was
(10)  likely.
(11)      Q.   Okay.  You said you had a
(12)  shield.
(13)            Now, were you assigned the
(14)  shield?
(15)      A.   Yes.
(16)      Q.   Okay.  There's a tool that's
(17)  used to breach the door, also.
(18)            Can you tell what that is
(19)  called; like a ram?
(20)      A.   Yeah.  So that is -- that's
(21)  used if we're doing a forcible entry but
(22)  that wasn't the case here.
(23)            I am not exactly sure, but I
(24)  believe Jeff or I, someone knocked on the
(25)  door, and I believe the grandmother
```

(1)                    **W. BAKER**

(2)    **answered and was -- everything seemed okay.**

(3)    **We were just talking to the grandmother,**

(4)    **who said he was home, and we were with the**

(5)    **task force, that we had a warrant.**

(6)              **So it seemed pretty -- that it**

(7)    **was going to be a compliant -- no**

(8)    **incident -- that he would just basically**

(9)    **come to us and comply.**

(10)    Q.    I just want to back up for a

(11)   second before we talk about any

(12)   conversations or anything.

(13)              My question is, when you guys

(14)   approached the door, did anybody have a

(15)   breaching tool like the shield -- I mean

(16)   like the ram, even if it wasn't used?

(17)    **A.    I think somebody may have.  I**

(18)   **am really not positive.**

(19)    Q.    Okay.

(20)    **A.    Which we do do, just in case.**

(21)              **I don't know if someone did**

(22)   **have it or not.**

(23)    Q.    And before you approached,

(24)   during the briefings, was it discussed that

(25)   the home had a surveillance system set up,

```
(1)                    W. BAKER
(2)    with various cameras?
(3)         A.    I am not sure if that was
(4)    discussed at the prior briefing or if it
(5)    was something that we realized when we were
(6)    there, the amount of cameras.
(7)              Maybe someone may have seen one
(8)    of them or something at the brief, but I
(9)    really don't recall.
(10)        Q.    And do you know how many
(11)   officers were involved in approaching the
(12)   house, I guess, total, between setting up
(13)   the perimeter and approaching on the front
(14)   porch?
(15)        A.    I am not positive.  Maybe there
(16)   was eight, ten.  I am not exactly sure.
(17)        Q.    And everyone was equipped with
(18)   weapons and kind of like the gear that you
(19)   guys wear?
(20)        A.    Yes, we were all clearly
(21)   identifiable as police.
(22)        Q.    So you all approached,
(23)   surrounded the perimeter, and then several
(24)   of you went on the front porch; is that
(25)   right?
```

(1)                    W. BAKER

(2)        **A.    Yes.  I don't remember how**

(3)    **many.**

(4)        Q.    Now, do you remember who went

(5)    onto the front porch?

(6)        **A.    I know that Jeff and I were**

(7)    **there.  I don't recall who else was right**

(8)    **there with us.  It may have been Carl.  I**

(9)    **am not positive.**

(10)       Q.    And there was someone at the

(11)    scene, also, with a dog; is that right?  A

(12)    law enforcement dog, like a police dog?

(13)                MR. DOLBY-SHIELDS:  You guys

(14)        cut out.

(15)                **MR. CERRONE:  You didn't miss**

(16)        **anything.**

(17)                **MR. DOLBY-SHIELDS:  Okay.**

(18)       Q.    So my question was just whether

(19)    you remember one of the task force members

(20)    having a police K9 or a police dog.

(21)       **A.    I think someone may have.  I**

(22)    **don't recall if it was a county or state**

(23)    **K9.  I am not exactly sure.**

(24)       Q.    So did you guys discuss, at any

(25)    point, the -- like, did you weigh the fact

(1)                      W. BAKER

(2)    he had -- the house had this surveillance

(3)    system, this set of security cameras on the

(4)    outside, and what that might indicate?

(5)         **A.    I think we did mention it, just**

(6)    **basically, more or less, to be cognizant**

(7)    **that if the subject was in the house, that**

(8)    **he could potentially see us approaching and**

(9)    **see our movements, and, you know, just to**

(10)   **be cognizant of that.**

(11)        Q.    Now, when ten officers, in the

(12)   gear that you guys are wearing, with long

(13)   guns and dogs, approached the house, did

(14)   you ever discuss how that could frighten

(15)   the fugitive you're trying to apprehend?

(16)             **MR. CERRONE:  Objection to the**

(17)        **form.**

(18)        **A.    Yes, it's taken into**

(19)   **consideration.  That is why, on the initial**

(20)   **approach, there was just couple of us at**

(21)   **the door, just talking to grandma, just**

(22)   **like we're talking right now.  No one was**

(23)   **yelling; everybody was fine.**

(24)             **I think the other officers were**

(25)   **back a distance, perimeter, and just stand**

(1)                    W. BAKER

(2)  back a little.

(3)          We were just trying to --

(4)  basically, just gain cooperation and ask if

(5)  he was there.

(6)          I don't believe we knew he was

(7)  there at the time, if I recall correctly.

(8)          And then the grandmother did

(9)  say that he was there.  And we just

(10) continued to talking to him like,

(11) initially, like we were talking to grandma,

(12) just to put his hands up, and just that he

(13) was under arrest for a warrant.

(14)     Q.    Okay.  Prior to executing the

(15) warrant, did you know the details of what

(16) the warrant was for?

(17)     A.    I believe it was for -- I

(18) believe it was assault second, where he was

(19) accused of, I believe, pulling a toothbrush

(20) out of his child's mouth, which resulted in

(21) him pulling, I think, two of the teeth out,

(22) if I recall right.  I believe that's what

(23) it was for.

(24)     Q.    I think you said earlier

(25) basically, that you had no intel that you

```
(1)                    W. BAKER
(2)  knew of, from beforehand, that he was like,
(3)  a high-risk apprehension?
(4)       A.    Correct.
(5)       Q.    There was no indication that he
(6)  might be armed with a weapon?
(7)       A.    Correct.
(8)       Q.    No indication he might have
(9)  guns in the house?
(10)      A.    No.
(11)      Q.    No indication he had been
(12) involved in any prior shooting incidents?
(13)      A.    Correct.
(14)      Q.    No indication that he was
(15) involved in any gang activity?
(16)      A.    Correct.
(17)      Q.    Were you aware that Dedrick had
(18) voluntarily spoken with law enforcement
(19) about the incident on several occasions
(20) prior to the execution of the warrant?
(21)           MR. CERRONE:  Objection to the
(22)      form.
(23)      A.    I am not positive but maybe
(24) there was something mentioned, you know, an
(25) investigator spoke to him at some point.  I
```

(1)                        **W. BAKER**

(2)    **don't really remember exactly.**

(3)         Q.    Prior to executing the warrant,

(4)    what was the plan for how to safely

(5)    apprehend Dedrick?

(6)         **A.    Well, prior to executing it, it**

(7)    **would have been to knock on the door to**

(8)    **first see if he was there, and then once it**

(9)    **was realized he was there, to basically**

(10)   **have him come to us voluntarily, to put his**

(11)   **hands up so we could just simply handcuff**

(12)   **him while he was standing, while we were**

(13)   **talking to him.  And that was it.**

(14)             **And then if things didn't go as**

(15)   **planned, then we would -- you know, if he**

(16)   **wasn't complying -- if the grandmother said**

(17)   **that he was there, he didn't come out or**

(18)   **anything, then we would go in, because we**

(19)   **had lost the surprise factor at that point.**

(20)   **We would begin to look for him in the**

(21)   **residence.**

(22)        Q.    Was it ever discussed, if he

(23)   didn't come out voluntarily, to just sit

(24)   outside with the perimeter set up and wait

(25)   for him come out and surrender?

W. BAKER

(2)    **A.    I think we did discuss -- I**
(3)    **can't remember if we maybe called his name**
(4)    **a couple of times to have him come to the**
(5)    **door.  I think that was the initial -- I**
(6)    **think that was the initial plan but, for,**
(7)    **basically, our safety, as soon as he ran**
(8)    **into other room, you know, we thought the**
(9)    **safest way to apprehend him, for everyone,**
(10)   **would be the element of surprise, and to**
(11)   **basically apprehend him at that moment,**
(12)   **rather than wait for callouts, or for him**
(13)   **to possibly develop a plan of how to maybe**
(14)   **ambush us or shoot us.  With the**
(15)   **surveillance cameras and such, that he**
(16)   **could maybe develop a plan.  And possibly,**
(17)   **he was running to get a gun, you know, is**
(18)   **also a consideration.**

(19)            **So basically, try to stop him**
(20)   **before he does that, so we are able to**
(21)   **effect the arrest the safest way possible**
(22)   **for everyone.**

(23)    **Q.    So I still want to talk about,**
(24)   **before entry --**

(25)            MR. DOLBY-SHIELDS:  You guys

(1)                    W. BAKER

(2)        cut out again.

(3)              You're back.

(4)     Q.    I want to focus on the planning

(5)  before the entry.

(6)              Did you guys ever consider, for

(7)  example, doing a controlled car stop;

(8)  waiting Dedrick to exit the house, get into

(9)  his car, then make a controlled stop?

(10)     **A.    I think that is always a**

(11)  **consideration.**

(12)              **And again, I don't recall if I**

(13)  **was part that or not, but I think that -- I**

(14)  **think some surveillance was conducted prior**

(15)  **to this day, I think.  And that was the**

(16)  **hope, is that someone would see him coming**

(17)  **out, either walking or in a car.**

(18)              **But that never happened, so at**

(19)  **some point, you do have to try to go to**

(20)  **some of these residences.**

(21)              **And I think that's what we did,**

(22)  **if I recall correctly.  I think they did**

(23)  **spend some time surveilling it, if I**

(24)  **remember right.**

(25)     Q.    Do you remember if this

(1)                 W. BAKER

(2)    surveillance was done just to see whether

(3)    he was present at the location, or if it

(4)    was done to see if he was going to get into

(5)    the car and then drive away so you guys

(6)    could do a controlled stop?

(7)        **A.    I think it would have been**

(8)    **twofold; I think it would have been both**

(9)    **intel gathering and, if that did occur, try**

(10)   **to do that.  Or possibly wait, to try to**

(11)   **follow the vehicle, if possible, without**

(12)   **being alerted, until he maybe gets out of**

(13)   **the vehicle or something like that.**

(14)           **But all the situations, you**

(15)   **know, like we discussed before, there is**

(16)   **risks involved in each one of those:  The**

(17)   **house, the vehicle, or on foot.**

(18)       Q.    On the day of the incident,

(19)   prior to the executing the warrant, do you

(20)   know, when you got together, if there was

(21)   any discussion of waiting and seeing if he

(22)   would get in the vehicle, for some period

(23)   of time, before approaching and knocking on

(24)   the door?

(25)       **A.    I think that -- as I said, I**

(1)                    **W. BAKER**

(2)    **think that was always done.  I think there**

(3)    **was a period of time that maybe the**

(4)    **investigator had conducted surveillance**

(5)    **hoping for that happen.  So I think this**

(6)    **was the day that it was planned to approach**

(7)    **the residence.**

(8)         Q.    Do you know how long, or how

(9)    many times surveillance would be conducted

(10)   to wait for someone to leave the residence

(11)   and get into the car, to do a controlled

(12)   stop, before you guys give up on that

(13)   option and, instead, try to make entry into

(14)   the residence?

(15)        **A.    I don't believe there was an**

(16)   **exact amount of time for that because,**

(17)   **again, there is risks involved in each way.**

(18)        **I think a lot of the**

(19)   **surveillance is done because we don't**

(20)   **always know if the person is there, so**

(21)   **it's --**

(22)        **It could start from an intel**

(23)   **gathering and then very quickly turn into**

(24)   **an apprehension type of operation.  So it**

(25)   **really varies.**

(1)                    **W. BAKER**

(2)           **We could see someone enter a**

(3)    **house and they may not be known to ever,**

(4)    **say, leave the house, or leave the house**

(5)    **very rarely, and in those situations, we**

(6)    **would approach the residence.  And/or if we**

(7)    **have been sitting for hours, multiple**

(8)    **times, we would also approach the**

(9)    **residence.**

(10)       Q.    Do you know if Dedrick's car

(11)   had tinted windows?

(12)       **A.    I don't recall.**

(13)       Q.    Now, when you did eventually

(14)   approach the house, did you do that in a

(15)   car or did you that on foot?

(16)       **A.    We drove up to the house in our**

(17)   **vehicles, then we activated our emergency**

(18)   **lights, then we exited the vehicles and**

(19)   **approached the residence.**

(20)       Q.    Okay.  Do you know if you were

(21)   in the first car, the second car, or

(22)   something else?

(23)       **A.    I don't really recall.  I think**

(24)   **I was probably in the first or second**

(25)   **because I was with Jeff to approach the**

(1)                          **W. BAKER**

(2)    **front door.**

(3)         Q.    So you and Jeff walked up to

(4)    the front door together, first?

(5)         **A.    I believe so.**

(6)              **MR. DOLBY-SHIELDS:  You guys**

(7)          **just cut out again.  Okay.**

(8)         Q.    Do you remember Deputy Smith

(9)    also approaching the front door?

(10)        **A.    I believe he was there as well.**

(11)        Q.    And you said before that you

(12)   had a shield?

(13)        **A.    Correct.**

(14)        Q.    Okay.  And you said before that

(15)   Jeff is the one who knocked on the door?

(16)        **A.    I don't remember exactly who**

(17)   **knocked, if he knocked or maybe Carl**

(18)   **knocked.  But yes, I do remember someone**

(19)   **knocked on the door.**

(20)        Q.    Okay.  And how long was it

(21)   between when someone knocked on the door

(22)   and when the door was answered?

(23)        **A.    I really don't remember.  I**

(24)   **don't think it was too long.**

(25)        Q.    Okay.  And you didn't have a

(1)                    W. BAKER
(2)    body camera on at that time, correct?
(3)        **A.    No, I was not assigned one.**
(4)        Q.    And as far as you know, no one
(5)    on the task force was wearing a body-worn
(6)    camera?
(7)        **A.    I am not sure.  I don't believe**
(8)    **so.**
(9)        Q.    Since the incident, has the
(10)   task force started wearing body-worn
(11)   cameras?
(12)       **A.    I do not really know when.  I**
(13)   **know some people do.  I really don't know**
(14)   **when that started.**
(15)       Q.    Okay.  Do you wear a body-worn
(16)   camera?
(17)       **A.    No, I am not assigned one.**
(18)       Q.    Is that something that you
(19)   could ask for?
(20)       **A.    It's a policy.  And it's not a**
(21)   **policy for me to be assigned one.  They**
(22)   **would have to put that into a policy.**
(23)       Q.    Okay.  My understanding is that
(24)   the policy says that you are permitted to
(25)   where one but you're not required; is that

(1)                    W. BAKER

(2)    right?

(3)         **A.    I really don't know.  I believe**

(4)    **it's a policy where it's -- I don't think**

(5)    **it's my option.  Either I have to wear it**

(6)    **or I don't.**

(7)         Q.    Okay.  Are you saying that some

(8)    task force members have been assigned

(9)    body-worn camera?

(10)        **A.    I am not positive.  I think**

(11)   **that some -- I think some may be, but I am**

(12)   **really not sure.**

(13)             **It could be from other agency.**

(14)        Q.    Okay.  So basically, you're not

(15)   sure whether the members of the Rochester

(16)   task force, if any of them are wearing

(17)   body-worn cameras at this time?

(18)        **MR. CERRONE:  When you say**

(19)        **"Rochester Task Force," are you**

(20)        **referring to what; RPD, U.S. task**

(21)        **force?  What are you referring to?**

(22)        **MR. DOLBY-SHIELDS:  I am**

(23)        **referring to the U.S. Marshal task**

(24)        **force that operates -- well, that**

(25)        **Deputy or Officer Baker is a member**

```
(1)                    W. BAKER
(2)        of, which, I guess I am not 100
(3)        percent sure what the term for your
(4)        local task force is.
(5)             Is it the western district task
(6)        force?
(7)        A.    Yes.
(8)        Q.    Western District of New York?
(9)        A.    It's the New York New Jersey
(10)   fugitive -- regional fugitive task force,
(11)   western district.
(12)        Q.    So if I am referring your task
(13)   force, that is what I am mean.
(14)             My question is whether you're
(15)   aware of anyone that's a member of your
(16)   task force that has been assigned body-worn
(17)   cameras.
(18)        A.    I don't know if they are
(19)   assigned.
(20)             Again, I think there may be one
(21)   or two people that may have them.
(22)             I don't know they are assigned
(23)   or if it's something that, like you
(24)   mentioned, if it's an option or something.
(25)             But it's not an option, in my
```

(1)                    **W. BAKER**

(2)    **understanding, for us; it's either you have**

(3)    **to wear one or you don't.**

(4)              **Right now, I am not assigned**

(5)    **one.**

(6)         Q.    When you say that there might

(7)    have been one or two people, who are those

(8)    one or two people you think might have

(9)    them?

(10)        **A.    I am not really sure.  The only**

(11)   **thing I recall is that maybe -- there could**

(12)   **be some people on some of our operations**

(13)   **that might have them.  But I could be wrong**

(14)   **about that.**

(15)        Q.    You don't have a specific

(16)   person in mind that you think might have

(17)   them?

(18)        **A.    I don't, no.**

(19)        Q.    You're aware that the Rochester

(20)   Police Department requires all of its

(21)   officers to wear body-worn cameras?

(22)        **A.    I believe -- for uniform**

(23)   **officers, I believe they do.**

(24)        Q.    When you were with RPD, were

(25)   you assigned a body-worn camera?

```
(1)                    W. BAKER
(2)          MR. DOLBY-SHIELDS:  You guys
(3)      cut out right after my question.
(4)      Q.    My question is -- and I didn't
(5)  hear an answer if there was one -- when you
(6)  were with the RPD, were you assigned a
(7)  body-worn camera?
(8)      A.    Yes.
(9)      Q.    So when you came to the
(10)  Marshal's Service, you stopped wearing the
(11)  body-worn camera, around fall 2020?
(12)      A.    That would probably be
(13)  accurate.
(14)      Q.    Back to the date of the
(15)  incident.
(16)          So you knocked on the door, and
(17)  some period after someone knocked on the
(18)  door, the grandma answered the door; is
(19)  that right?
(20)      A.    Yes, I believe that was his
(21)  grandma.
(22)      Q.    Do you remember what the first
(23)  thing that happened was after grandma
(24)  answered the door?
(25)      A.    I don't remember exactly.  I
```

(1)                    **W. BAKER**

(2)    **just remember we were in conversation, I**

(3)    **think, with grandma, asking if Dedrick was**

(4)    **home, if he was there, and I believe she**

(5)    **said that he was.  And then he appeared**

(6)    **from a back room.**

(7)         Q.    Okay.  Was the warrant ever

(8)    presented to the grandmother?

(9)         **A.    I don't recall.**

(10)        Q.    Is that something that you

(11)   ordinarily do before making entry into the

(12)   home?

(13)        **A.    Not for that type of situation,**

(14)   **no.**

(15)        Q.    Okay.  Do you remember anything

(16)   specific that was said to the grandma?

(17)        **A.    I really don't know.  I think**

(18)   **it was -- I think it was just like, you**

(19)   **know, "Is he home?  He has a warrant.  We**

(20)   **are with the task force, or the troopers."**

(21)             **And I think she said he was**

(22)   **there.  I think she -- I don't remember,**

(23)   **really, the timing of it, but I think he**

(24)   **then -- I do remember he then did appear**

(25)   **from the back -- like a back room.**

(1)                    **W. BAKER**

(2)        Q.    So I am going to ask you, in

(3)    these series of questions, I am going to go

(4)    detailed, one by one.  So if you can just

(5)    answer the specific questions and not

(6)    volunteer additional information.  I am

(7)    going to follow up and ask about that.

(8)        **A.    Okay.**

(9)        Q.    Do you remember if Ulatowski

(10)   ask grandma to send Dedrick outside after

(11)   she indicated that he was in the residence?

(12)       **A.    That's possible.  I really**

(13)   **don't remember.**

(14)       Q.    Do you remember if the grandma

(15)   said, at any time, that she would get

(16)   Dedrick and send him outside?

(17)       **A.    I don't recall.**

(18)       Q.    Do you remember how long the

(19)   conversation was with the grandma before

(20)   you guys entered into the residence?

(21)       **A.    I mean, the door was already**

(22)   **open.**

(23)            **You mean when we actually went**

(24)   **in, or --**

(25)       Q.    Correct.

(1)                     W. BAKER

(2)        **A.      From the time she answered**

(3)    **door, I think it was -- I really don't know**

(4)    **the timing.  Maybe it was a few minutes.**

(5)        Q.      So there was a period of time

(6)    when the grandmother opened the door, the

(7)    door was open, and you guys were still on

(8)    the porch, right?

(9)        **A.      Yes, I believe so.**

(10)       Q.      Okay.  Then at some point after

(11)   the grandma opened the door, you entered

(12)   through the door into the residence?

(13)       **A.      Yes.  I can't remember the**

(14)   **time.**

(15)           **We may have asked, "Do you mind**

(16)   **if we step in to talk to you?"**

(17)           **I don't really remember if we**

(18)   **were already talking to her in the**

(19)   **residence or if it was on the porch.**

(20)       Q.      Okay.  Do you remember how long

(21)   it was between the time that the door was

(22)   opened and when you saw Dedrick exit from

(23)   the back room?

(24)       **A.      Again, I don't really remember**

(25)   **the timing of it.  It might have been a few**

```
(1)                    W. BAKER
(2)   minutes; could have been less than that.  I
(3)   don't really remember.
(4)       Q.    Do you know why you didn't wait
(5)   outside on the front porch for Dedrick to
(6)   come outside?
(7)       A.    No, I don't know.
(8)             If she'd said he was coming
(9)   out, I guess -- I am not really sure.
(10)            I do remember, you know, when
(11)  he appeared, that Jeff just motioned to him
(12)  to just come over to us, that he had a
(13)  warrant, so...
(14)      Q.    When Jeff motioned to him, were
(15)  you guys already inside of the residence?
(16)      A.    I don't recall if we were right
(17)  in the threshold on the doorway or we were
(18)  still on the porch.  I don't really recall.
(19)      Q.    You might have been on the
(20)  porch or you might have been inside?
(21)      A.    Correct.
(22)            MR. CERRONE:  Object to the
(23)       form.  He said "threshold," not
(24)       "inside."
(25)      Q.    Okay.  Do you know if you could
```

(1)                    W. BAKER

(2)  have been inside when Jeff motioned to him

(3)  to come?

(4)      **A.    It's possible.  I really -- I**

(5)  **am really not sure.**

(6)      Q.    Okay.  So when you first saw

(7)  Dedrick exit from the back room, what is

(8)  the first thing that happened?

(9)      **A.    If I remember right, I think he**

(10)  **just said something to the effect like --**

(11)  **he said something like, you know, "Why are**

(12)  **you guys here," or something like that.**

(13)  **"What are you doing here," or something to**

(14)  **that effect.  And he like, threw his hands**

(15)  **up or something.**

(16)      Q.    You said that he threw his

(17)  hands up.

(18)          What do you mean?

(19)      **A.    I think he just like, I don't**

(20)  **know, maybe just threw his hands up in the**

(21)  **air or something, like a**

(22)  **why-are-you-guys-here type of thing.  You**

(23)  **know, like, gesturing towards us.  He was**

(24)  **facing us.**

(25)          **And then he just, immediately,**

(1)                         **W. BAKER**

(2)    **I think, put one of his hands like,**

(3)    **immediately into his pocket, and then he**

(4)    **ran into the bathroom.**

(5)          Q.    Okay.  And did you have your

(6)    shield in your hands, still, when you saw

(7)    Dedrick?

(8)          **A.    Yes.**

(9)          Q.    Do you know if -- I think it

(10)   was Officer Edwards that had the dog.

(11)          Do you know if Officer Edwards

(12)   had entered the home with the dog?

(13)         **A.    I don't know.  If he did, it**

(14)   **was behind me, probably.**

(15)         Q.    Did you say anything to Dedrick

(16)   before he ran to the bathroom?

(17)         **A.    I don't recall.  I think --**

(18)         **Typically, we have like a**

(19)   **contact cover person, so I think Jeff was**

(20)   **kind of the designated contact.  He was**

(21)   **speaking with him, dialog with him for a**

(22)   **short period of time.  And I was the cover**

(23)   **with the shield.**

(24)         Q.    Do you remember anything else,

(25)   specifically, that Jeff said to him?

W. BAKER

(1)

(2)      **A.    No, not really.  I think it was**

(3)  **just something to the effect that, you**

(4)  **know, "Hey, you got a warrant; you just**

(5)  **have to come with us."  I think that was**

(6)  **pretty much the extent of it.**

(7)            **Then he ran.**

(8)      Q.    Do you remember what Dedrick

(9)  was wearing?

(10)     **A.    I want to say -- I don't think**

(11) **he had a shirt on.  Like, jeans and no**

(12) **shirt, maybe.  I'm not positive.**

(13)     Q.    Did you see Dedrick throw money

(14) in the air?

(15)     **A.    It's possible.  When he threw**

(16) **his hands up, maybe it's possible.**

(17)           **I was just focused on his**

(18) **hands, basically.  He threw them -- one of**

(19) **them went in his pocket, so that was kind**

(20) **of my focus.**

(21)     Q.    So you're saying as he ran into

(22) the bathroom, that is when you saw him

(23) reach into his pocket?

(24)     **A.    Yeah.  I think it was pretty**

(25) **simultaneous.  He put his hand in his**

                          **W. BAKER**

(1)

(2)    **pocket and he ran into the bathroom**

(3)    **immediately.**

(4)        Q.    Did you see him take a gun out

(5)    of his pocket?

(6)        **A.    No, not at that point.  I think**

(7)    **I saw the gun when I entered -- when I**

(8)    **entered the bathroom.**

(9)        Q.    Okay.  When you entered the

(10)   bathroom -- well, let me back up.

(11)            So Dedrick starts to run

(12)   towards the bathroom, and what is the first

(13)   thing that happens next?

(14)       **A.    Jeff was closest to him because**

(15)   **he was -- he had a short dialog with him**

(16)   **which, we thought he was going to just**

(17)   **comply and come to Jeff to handcuff him.**

(18)            **So Jeff was in front and I was**

(19)   **behind Jeff, so as he ran -- Jeff ran to**

(20)   **take him into custody, you know, and I was**

(21)   **behind Jeff, so I ran behind him to try to**

(22)   **take him into custody as safe as possible**

(23)   **before he was able to produce a weapon or**

(24)   **something.**

(25)       Q.    So Jeff follows him into the

```
(1)                    W. BAKER
(2)  bathroom first, then you follow into the
(3)  bathroom second?
(4)        A.    I believe that was the order.
(5)            Maybe Carl was behind me or
(6)  there, but I think that was -- I think it
(7)  was Jeff, then me, I believe.
(8)        Q.    Okay.  Did you observe Jeff
(9)  bear hug Dedrick and fall into the tub with
(10) him?
(11)       A.    Yes, that's the way it
(12) appeared.  When I -- I was, you know,
(13) pretty close behind him, and when I went
(14) in, I yelled, you know, that he had the
(15) gun.  I think I just yelled, "Gun, gun,
(16) gun."
(17)            So I think he had just taken it
(18) out of his pocket.  I believe he had it --
(19) he had it pointed right at Jeff's head.
(20)       Q.    Okay, when you say that he had
(21) it pointed at Jeff's head, that is when
(22) they were in the tub?
(23)       A.    Correct.
(24)       Q.    So I understand Dedrick was
(25) face-down in the tub and his arms were
```

(1)                    W. BAKER

(2)    underneath him; is that right?

(3)         A.    No.  I believe, initially, when

(4)    Jeff tackled him into the tub, he was

(5)    face-to-face with him.  And so he was on

(6)    his back, like, in the end of tub, with the

(7)    gun -- he had his arm extended around, with

(8)    the gun pointed at Jeff's head.

(9)              I am not sure if Jeff even

(10)   knew, at that moment, that he was pointing

(11)   gun at his head.  Because Jeff was like, on

(12)   top of him, so I don't know if he could see

(13)   that, if he could see his arm extended

(14)   around at that angle.

(15)        Q.    Okay.  So I had it in my head

(16)   that Dedrick was face-down in the tub, and

(17)   you're saying that, no, he was lying on his

(18)   back in the tub?

(19)        A.    Initially -- it all happened

(20)   extremely quickly.

(21)              The first -- initially, it was

(22)   like that.  Then he did -- he did end up

(23)   being able to position himself, kind of

(24)   curl up, where he was now face-down in the

(25)   tub with the gun under him, under his body.

(1)                        **W. BAKER**

(2)        Q.    So he went from -- so,

(3)    initially, after being tackled by Jeff, he

(4)    was on his back, and at some point, he

(5)    rotated his body over to be face-down?

(6)        **A.    Yes.  So as Jeff tackled him**

(7)    **into the tub, I immediately grabbed on to**

(8)    **the gun.  When I saw it pointed Jeff's**

(9)    **head, I had both hands on the entire gun.**

(10)            **It was a small -- I think it**

(11)    **was like a .380 handgun, so I just took**

(12)    **both of my hands and covered the entire**

(13)    **thing, the barrel, so if did shoot at Jeff,**

(14)    **at least it would hit my hand and not his**

(15)    **head.**

(16)            **But I was trying to pull the**

(17)    **gun away from him, and I was stretched out**

(18)    **quite a bit.  Just because of the way they**

(19)    **fell into the tub, I was kind of completely**

(20)    **stretched, trying to hold on to the gun.**

(21)            **He was able to bring it**

(22)    **underneath him, like, fighting me,**

(23)    **resisting me from giving me the gun, and**

(24)    **tucked it under him, moved his body**

(25)    **sideways during the struggle, and ended up**

(1)                    **W. BAKER**

(2)    **on his -- on his stomach.**

(3)        Q.    So when you first grabbed the

(4)    gun with both of your hands, he was like,

(5)    face-up in the tub?

(6)        **A.    Yes, that's what I recall, is**

(7)    **that he was -- he was face-up, or somehow**

(8)    **had the gun around him.  I believe he was**

(9)    **face-up because, when he tackled him, I**

(10)   **believe they were face-to-face.**

(11)       Q.    Okay.  And do you remember what

(12)   hand Dedrick had the gun in?

(13)       **A.    I don't really recall.  I think**

(14)   **it was the left hand.  I am not positive.**

(15)       Q.    When Jeff tackled Dedrick in

(16)   the tub, was Dedrick's head closer to the

(17)   side of the tub that had the shower knobs,

(18)   or the other side, the back of the tub?

(19)       **A.    It would have been the side**

(20)   **that, I think, of the sink -- like, when**

(21)   **you enter the bathroom, it was the far**

(22)   **side, the far end of the tub, so not the**

(23)   **closest end to the doorway.**

(24)       Q.    Okay.

(25)       **A.    I just don't really recall**

(1)                    **W. BAKER**

(2)    **where the knobs were.  I think, maybe that**

(3)    **was the knob side.  I am not positive.**

(4)        Q.    I want to put up some pictures

(5)    so that we can try to see it together.  One

(6)    second.

(7)              I am going to put up -- this

(8)    will be Exhibit 12.  These are pictures

(9)    produced in discovery by the government,

(10)   Bates numbered 498 through 502.

(11)              (Whereupon, photos were marked

(12)          as Plaintiffs' Exhibit 12 for

(13)          identification as of this date.)

(14)       Q.    Let me just go to the first

(15)   page.  This is the cover page, and it has

(16)   an additional four photos?

(17)              So the first page here, which

(18)   could be -- it's numbered 499, it's just

(19)   tiny, here at the bottom.  Let me ask you a

(20)   couple of questions.

(21)              So the person in the foreground

(22)   of this picture, that's Deputy Smith,

(23)   correct?

(24)       **A.    Yes.**

(25)       Q.    Do you know any of the other

```
(1)                    W. BAKER
(2)   individuals depicted in -- these three
(3)   other individuals behind Deputy Smith?
(4)        A.    No, I don't believe so.
(5)        Q.    To your knowledge, they are not
(6)   members of the task force?
(7)        A.    I don't think so.
(8)        Q.    Let's go to the next page,
(9)   which would be 500.
(10)            So in this picture, after the
(11)  incident, we see Dedrick on the floor,
(12)  handcuffed; is that right?
(13)       A.    It appears to be.
(14)       Q.    Okay.  And then you see the
(15)  sink behind the Dedrick in the picture?
(16)       A.    Yes.
(17)       Q.    Okay.  In this picture,
(18)  Dedrick's head, it's, I guess, closer to
(19)  the side the picture that's on the opposite
(20)  side the sink; is that right?
(21)       A.    Yes.
(22)       Q.    Is that the way that Dedrick's
(23)  body was laid in the tub after Ulatowski
(24)  had tackled him, or was his body kind of
(25)  turned around after he was taken out of the
```

```
(1)                    W. BAKER
(2)   tub?
(3)           MR. CERRONE:  Objection to the
(4)        form.
(5)           You can answer.
(6)      A.    I don't exactly remember.  I
(7)   just remember we did take him out of the
(8)   tub to try to, you know -- basically, to
(9)   try to render medical aid to him.
(10)     Q.    So let me go to the next
(11)  picture.  That is going to be Bates 501.
(12)          In this picture, we can see the
(13)  tub itself.
(14)          And so my question is, when
(15)  Dedrick was tackled, you earlier said that
(16)  his head was on the side where the sink
(17)  was.  So that would kind of be --
(18)     A.    I believe so.  I believe it was
(19)  that.
(20)     Q.    If you could see in this
(21)  picture, if you can describe for us, when
(22)  you grabbed on to the barrel of the gun,
(23)  where were you located, if you can identify
(24)  it, in this picture?
(25)     A.    I don't think he was fully in
```

(1)                    **W. BAKER**

(2)     the tub at that point, so I think it was --

(3)     you know, as I remember, I was extended

(4)     out, reaching over Jeff's whole body to try

(5)     to reach the gun.  So I was probably

(6)     standing, maybe -- I really don't know

(7)     exactly, but maybe where his -- kind of

(8)     where his knees are, maybe, or further

(9)     back, possibly.

(10)         Q.    So Dedrick's body would have

(11)    been down in the tub, and Jeff was on top

(12)    of him?

(13)              Like, he wasn't --

(14)        **A.    Yeah, like, I believe -- I**

(15)    don't recall exactly where they were, but I

(16)    think -- I think they were over -- like,

(17)    part -- I think, part of them -- their

(18)    body, maybe their feet or something were in

(19)    the air or on the ground, then the other

(20)    part, the upper body, was like, in the tub

(21)    area.

(22)              And then I believe, at one

(23)    point -- at some point, I believe --

(24)              MR. DOLBY-SHIELDS:  We just

(25)        lost you.

(1)                    **W. BAKER**

(2)              MR. CERRONE:  He said "at some

(3)          point, I believe," and then it cut

(4)          out.

(5)              MR. DOLBY-SHIELDS:  That's

(6)          right.  That is when it cut out.

(7)          That is what I got.

(8)          A.     At some point -- I believe he

(9)     was maybe fully in the tub at some point

(10)    during the struggle.

(11)         Q.    Okay.  So first, he's kind of

(12)    maybe -- his knees are over the side of the

(13)    tub; is that kind of what you're saying?

(14)         A.    I think it's possible that

(15)    maybe he wasn't fully in, and Jeff was on

(16)    top of him.  And then I was trying to keep

(17)    my feet planted as much as I could for

(18)    leverage, but also to try to grab the gun.

(19)    So I was extended and my arms were

(20)    stretched out.  I think that is why it was

(21)    like that.

(22)         Q.    Okay.  And so you had grabbed

(23)    the gun, then you said that at some point,

(24)    Dedrick turned his body over, and he was

(25)    kind of face-down?

(1)                    W. BAKER

(2)        **A.      He ended up -- I mean, it all**

(3)  **happened very, very quickly.  I don't know**

(4)  **how many seconds.**

(5)               **But, yes, he basically ended**

(6)  **up -- as I had a hold of it, he was -- as I**

(7)  **was losing my grip, he was able to get it**

(8)  **underneath his body on top of it.**

(9)        Q.    Do you remember Deputy Smith

(10) coming in and making contact with Dedrick's

(11) body, also?

(12)       **A.      I don't recall.  I think he was**

(13) **in there.  I'm not sure.**

(14)       Q.    And at some point, you let go

(15) of the gun and Dedrick, and backed up; is

(16) that right?

(17)             **MR. CERRONE:  Object to the**

(18)  **form of the question.**

(19)       **A.      Basically, I was losing my**

(20) **grip.  As he was pulling away, I was losing**

(21) **my footing and my grip, my hands.  And at**

(22) **that point, I realized that he had a good**

(23) **chance of then being able to shoot Jeff or**

(24) **myself or somebody else, and I then**

(25) **transitioned quickly to my firearm,**

(1)                    **W. BAKER**

(2)    **thinking I was going to have to shoot him**

(3)    **to stop the threat of him shooting us.**

(4)         Q.    Did you have a Taser on you?

(5)         **A.    No.**

(6)         Q.    Did you have any other kind of

(7)    less-lethal weapon on you?

(8)         **A.    I don't believe.**

(9)         Q.    The firearm was basically your

(10)   only option for a weapon to go to?

(11)        **A.    Correct.**

(12)        Q.    Okay.  So you lost your grip,

(13)   you stepped back, and you said that you

(14)   were going to shoot him; is that what

(15)   happened?

(16)        **A.    I verbally said, "I am going to**

(17)   **shoot him," so that everybody knew, so that**

(18)   **they won't think that it was him shooting**

(19)   **us -- shooting at us or anything like that.**

(20)              **I said, "I'm going to shoot**

(21)   **him," and that is when a shot went off from**

(22)   **his weapon.**

(23)              **But I didn't initially know**

(24)   **where that shot came from; I didn't know if**

(25)   **it was from his or someone else.  But then**

(1)                    **W. BAKER**

(2)    **I saw the blood coming out, he just**

(3)    **appeared motionless, and that's when I**

(4)    **realized it was him.**

(5)              **I was yelling at Jeff, he was**

(6)    **okay, and I think he said he was, and so**

(7)    **I -- it appeared he had shot himself.**

(8)              **Then we took him out of the tub**

(9)    **to try to render aid.**

(10)    Q.    Before the shot went off, did

(11)    you see like, a red laser in the bathroom?

(12)    **A.    I do remember like, a laser**

(13)    **light bouncing off the tub, so I assume it**

(14)    **was from his gun.  I really wasn't sure.**

(15)    Q.    At the time that the gun was

(16)    discharged or fired, Jeff was in the tub

(17)    with him; is that right?

(18)    **A.    Again, I believe it might have**

(19)    **been -- he might have been halfway in and**

(20)    **halfway out type of thing.  I don't exactly**

(21)    **remember.  I just I know I he was --**

(22)              MR. DOLBY-SHIELDS:  You cut out

(23)         again.

(24)              MR. CERRONE:  He said, "I know

(25)         he was, um."

**W. BAKER**

**A.** I was there, obviously.

When I was losing my grip and said that I was going to shoot him, I believe like, simultaneously -- because I was on top of Jeff, so I could kind of see like, his movements and feel his body. And at that time, I believe he had disengaged like, from the subject simultaneously as I said I was going to shoot him, because Jeff didn't want to get accidentally shot by me. Then after that -- after he disengaged and then he shot himself.

Q. Now, when the gun went off, where were Jeff's hands?

**A.** I don't recall. I think he was -- I think he was still like, near him. I just don't really remember where. I don't think he was completely off of him but I believe he was disengaged from him.

I just remember there was a difference in like, movement, like, kind of, "Back up, like, I am going to shoot him," so he didn't get shot.

Q. What you mean by "disengaged"

```
(1)                    W. BAKER
(2)    is like, you could notice a difference in
(3)    how he was handling Dedrick physically?
(4)         A.    Yeah.  It seem -- it just
(5)    appeared to me that he had kind of like
(6)    backed off of him.  Because it was very
(7)    close -- very close quarters.  And, you
(8)    know, I felt I would be able to shoot him
(9)    without shooting Jeff, but I am sure that
(10)   Jeff wanted to be out of the way of that.
(11)        Q.    Do you know where Smith was at
(12)   the time?
(13)              Because yesterday, Smith
(14)   testified that he was doing incompliance
(15)   techniques to the jaw area of Dedrick when
(16)   he was in the tub.
(17)              Do you remember that?
(18)        A.    That's possible.  I really
(19)   don't remember.  My focus was just on the
(20)   gun.
(21)        Q.    And at the time that the shot
(22)   went off, you said Dedrick had turned over
(23)   and the gun was below this body, underneath
(24)   him?
(25)        A.    I believe so, if I'm
```

(1)                        **W. BAKER**

(2)    **remembering it right.**

(3)         Q.    So you lost your grip on the

(4)    gun, Dedrick kind of turned and the gun

(5)    went underneath his body, and then you

(6)    said, "I'm going to shoot him," and then at

(7)    that point is when the gun went off

(8)    underneath Dedrick and he shot himself; is

(9)    that what you're saying?

(10)        **A.    That is how I am remembering**

(11)   **it.**

(12)        Q.    And at the time, do you know

(13)   where Deputy Smith's hands were?

(14)        **MR. CERRONE:  Object to the**

(15)     **form the question.**

(16)        **You can answer.**

(17)        **A.    I don't know.**

(18)        Q.    You said before that at the

(19)   time, you don't know where Jeff's hands

(20)   were?

(21)        **A.    Correct.**

(22)        Q.    Immediately after the shot went

(23)   off, what did you do?

(24)        **MR. CERRONE:  Object to the**

(25)     **form the question.**

(1)                     **W. BAKER**

(2)              **You can answer.**

(3)        **A.    I didn't know where the shot**

(4)  **came from, so I think I yelled to Jeff,**

(5)  **"Are you okay?"  Because I thought maybe**

(6)  **the subject shot Jeff.  But I wasn't -- I**

(7)  **wasn't sure.  He said he was okay.**

(8)              **And I could see the blood**

(9)  **coming out from the subject, you know, into**

(10) **the tub.  So then we -- he appeared**

(11) **motionless, so then we moved to get him out**

(12) **of the tub so we could perform medical**

(13) **treatment on him.**

(14)             **And I think -- I don't know if**

(15) **someone removed the gun or left it in the**

(16) **tub.  I don't really remember.  But I do**

(17) **believe the gun was recovered there.**

(18)      Q.    But you weren't the one that

(19) recovered the gun?

(20)      **A.    I don't believe so.**

(21)      Q.    Did you help take Dedrick out

(22) of the tub?

(23)      **A.    I believe so.  I believe I was**

(24) **trying to get him out of the tub.**

(25)      Q.    Do you remember what part of

(1)                          W. BAKER

(2) his body you physically touched to pick him

(3) up and remove him from the tub?

(4)     **A.    I thought, maybe -- I think,**

(5) **maybe it was his legs.  I am really not**

(6) **positive.**

(7)     Q.    Okay.  I mean, do you remember

(8) kind of turning his body around so that his

(9) head, instead of being on the side where

(10) the sink was --

(11)          **MR. CERRONE:  Can you re-ask**

(12)       **the question, Elliot?  Unfortunately,**

(13)       **you broke up just as you were**

(14)       **starting that question.**

(15)     Q.    Sure.  My question is, do you

(16) remember -- when you took him out of the

(17) tub, do you remember his body being kind of

(18) turned around, from his head being over on

(19) the side of the tub where the sink is to

(20) the other side?

(21)     **A.    I don't really remember.  I**

(22) **just know -- I think a couple of people**

(23) **helped like, getting him out of the tub.  I**

(24) **am sure he was probably turned around in**

(25) **maybe different ways.  I don't exactly**

(1)                        **W. BAKER**

(2)    **remember.**

(3)        Q.    Okay.  I am going to take that

(4)    picture down.

(5)            After removing Dedrick from the

(6)    tub, what did you -- you said you rendered

(7)    some first aid; is that what you did?

(8)        **A.    I think, at that point, I**

(9)    **helped take him out of the tub, and the**

(10)   **other immediate concern was that, I think**

(11)   **somebody else there was -- our medic, our**

(12)   **designated medic, I think, and they started**

(13)   **working on him.**

(14)           **And we had to immediately clear**

(15)   **the rest the house to make sure that there**

(16)   **weren't other people in there that would**

(17)   **possibly try to shoot us or something.**

(18)       Q.    So did you participate in

(19)   clearing the rest the house?

(20)       **A.    Yes, I believe so.  I believe**

(21)   **we took them out of the tub and then a**

(22)   **couple other members were helping to render**

(23)   **aid, then we had to clear the house for any**

(24)   **other threats.**

(25)       Q.    Okay.  Did you go inside of the

(1)                      W. BAKER

(2) bedroom at any time, that Dedrick had

(3) exited from when you first entered the

(4) house?

(5)        **A.    I believe that may have been**

(6) **either the first room after the bathroom or**

(7) **the second room.  I am not exactly sure.  I**

(8) **think I do remember going in and just**

(9) **seeing like a big screen, like surveillance**

(10) **cameras or something in there.**

(11)        Q.    When you say "big screen," you

(12) mean like a computer screen or something

(13) else?

(14)        **A.    Like a computer screen, or**

(15) **maybe it was a smaller TV.**

(16)        Q.    When you saw that screen, did

(17) it have a live feed playing, at that time,

(18) from the cameras outside the house?

(19)        **A.    That, I don't really remember.**

(20) **I just remember seeing the screen.**

(21)        Q.    Okay.  And after clearing the

(22) house, what did you do next?

(23)        **A.    At that point, I don't know if**

(24) **they -- I can't remember if they determined**

(25) **he was deceased in that room or if -- if he**

(1)                    **W. BAKER**

(2)    **was transported.  But I remember -- I don't**

(3)    **recall if someone escorted me outside.  You**

(4)    **know, I think I ended up outside with a**

(5)    **supervisor or something like that, and then**

(6)    **that was it.  I don't think I went back**

(7)    **into the residence.**

(8)         Q.    Did you speak with the grandma

(9)    at any point after the shooting?

(10)        **A.    I don't think so.**

(11)        Q.    Did you speak with any other

(12)   friends or family members who showed up at

(13)   the scene after the incident?

(14)        **A.    No, I don't believe so.**

(15)        Q.    Okay.  Did you speak with a

(16)   supervisor at the scene after the incident?

(17)        **A.    I think -- just basically, I**

(18)   **think they just basically just said, you**

(19)   **know, just to wait there.  I don't know**

(20)   **that I necessarily really spoke to them**

(21)   **like, about the incident or anything.**

(22)        Q.    How long did you wait at the

(23)   scene, outside of house, after the

(24)   incident, before you went somewhere else?

(25)        **A.    I don't think I was there that**

(1)                      **W. BAKER**

(2)     **long.  I think, maybe -- maybe they took**

(3)     **photos or something, I think, at the scene,**

(4)     **possibly, but I don't -- I think I left**

(5)     **shortly after that.**

(6)          Q.    Okay.  When you left, where did

(7)     you go?

(8)          **A.    I believe I went to our public**

(9)     **safety building.**

(10)         Q.    What happened when you got to

(11)    the public safety building?

(12)         **A.    I think, at that point, I was**

(13)    **deposed on the incident.**

(14)         Q.    Do you remember who deposed you

(15)    about the incident?

(16)         **A.    I don't.**

(17)         Q.    Do you know if it was someone

(18)    from the RPD or somewhere else?

(19)         **A.    I don't know if it was RPD or**

(20)    **troopers or a combination of both.  I am**

(21)    **not positive.**

(22)         Q.    Okay.  And then, at some point

(23)    after the incident, you signed a statement;

(24)    is that right?

(25)         **A.    I believe so.  I believe, my**

(1)                    **W. BAKER**

(2) **deposition, I think.**

(3)      Q.    That was not the same day,

(4) right; that was a later time?

(5)      **A.    I don't remember that.  It**

(6) **might have been same day.  I'm not sure.**

(7)      Q.    Okay.  I don't mean to trick

(8) you so I'll just put up your statement.

(9)           MR. DOLBY-SHIELDS:  That will

(10)      be Exhibit 13.

(11)           (Whereupon, documents were

(12)      marked as Plaintiffs' Exhibit 13 for

(13)      identification as of this date.)

(14)      Q.    On the screen, Officer Baker,

(15) do you see this cover page -- and for the

(16) record, this document is Bates number

(17) 2012203, and it says, "Supporting

(18) deposition of Bill Baker.

(19)           If we go down here, just

(20) regarding the dates --

(21)           Now, all signatures -- it says,

(22) "Deponent signature."  Do you recognize

(23) that as your signature?

(24)      **A.    Yes.**

(25)      Q.    Okay.  That's dated 9/23/21?

(1)                    W. BAKER

(2)         **A.      Yes.**

(3)         Q.      And the incident took place on

(4)  9/15/2021; is that right?

(5)         **A.      Okay, maybe it was a different**

(6)  **day, yeah.  I'm not really sure.**

(7)         Q.      Okay.  Do you know why the

(8)  signed statement would have been done not

(9)  on the date of the incident?

(10)        **A.      I'm not positive.  I think,**

(11)  **maybe, sometimes -- I think there is some**

(12)  **science behind it, psychologically or**

(13)  **something, maybe, that if it's after, you**

(14)  **tend to remember more from the incident for**

(15)  **it to set in, I guess.  I think there was**

(16)  **something about that but I'm not positive.**

(17)        Q.      Are you saying that you read

(18)  some type of scientific study that says

(19)  your memory gets better over time?

(20)        **A.      I just thought -- I don't know**

(21)  **if I read it or if it was something -- I**

(22)  **don't know if it would have been something**

(23)  **that was talked about at some point.**

(24)             **But I don't know if it was for**

(25)  **this incident; it could be something else.**

(1)                    **W. BAKER**

(2)    **I thought I remembered something about**

(3)    **that, but I really don't know.**

(4)        Q.    After the incident, other than

(5)    this incident report, did you create any

(6)    other written record of what happened?

(7)        **A.    I am not sure.  I don't believe**

(8)    **so.  I don't think so.**

(9)        Q.    On the date of the incident,

(10)   you said that you did get deposed by

(11)   someone or interviewed by someone at the

(12)   PSP; is that right?

(13)       **A.    I thought, but maybe it wasn't**

(14)   **that day.**

(15)       Q.    My understanding is that the

(16)   task force members that were involved in

(17)   the incident did go to the PSP and get

(18)   interviewed by somebody.

(19)            So I guess my question is, if

(20)   you remember going to the PSP from the

(21)   scene of the incident and being interviewed

(22)   by someone -- whether that was --

(23)       **A.    I guess -- I'm not -- I guess I**

(24)   **don't really remember, then, if it was that**

(25)   **day or a couple of days after.  I am not**

(1)                          **W. BAKER**

(2)    **really sure.  It may have been the**

(3)    **troopers.  I am not really sure.**

(4)        Q.    After the incident -- I am

(5)    going to take that down -- did you speak to

(6)    other task members about what happened?

(7)        **A.    No, I don't think so.**

(8)        Q.    After the incident, did you

(9)    talk to anyone about what had happened?

(10)       **A.    No.**

(11)       Q.    You just kept it to yourself?

(12)       **A.    Yeah.  It was -- there was**

(13)   **nothing to talk about.  I mean, I think --**

(14)   **I don't know if it was ever talked about at**

(15)   **some point as a training or anything like**

(16)   **that.  I am not really sure.  Sometimes**

(17)   **they'll debrief incidents, you know, later**

(18)   **on or something, of what -- due to the**

(19)   **incident, how it went or anything.  But I**

(20)   **really don't remember.**

(21)       Q.    Did you talk with like, family

(22)   or friends about the incident?

(23)       **A.    No.**

(24)       Q.    Okay.  Do you have a therapist

(25)   that you talked to about the incident?

(1)                    W. BAKER

(2)        **A.      No.**

(3)        Q.     After an incident like this,

(4)   did the RPD or the Marshal's Services

(5)   provide any kind of like, mental health

(6)   options for you?

(7)        **A.      I think they -- I think maybe**

(8)   **they do have like, something.  I am not**

(9)   **positive.**

(10)       Q.     Okay.  Did you take advantage

(11)  of any of those services?

(12)       **A.      I don't recall if I did.**

(13)       Q.     You may have spoken to like, a

(14)  counselor but you don't remember?

(15)       **A.      Yeah, I really don't remember.**

(16)            **MR. DOLBY-SHIELDS:  Okay.  So,**

(17)       **Mike, to the extent he did speak with**

(18)       **any kind of counselor who was**

(19)       **provided, you know, we demand any**

(20)       **records of those counseling sessions.**

(21)       **I will make a note to follow up with**

(22)       **you about that.**

(23)            **MR. CERRONE:  I am not sure how**

(24)       **those would be discoverable but, ask**

(25)       **away.**

**W. BAKER**

(1)

(2)    Q.    Do you remember if there was

(3) any sort of debriefing after the incident,

(4) among the team members?

(5)    **A.    No, I don't think so.**

(6)    Q.    Was there ever any kind of

(7) discussion about how things could have been

(8) done differently?

(9)    **A.    I don't recall if there was or**

(10) **wasn't.  It might have been later on or**

(11) **something.  I really don't remember.**

(12)    Q.    Was there like, an after-action

(13) report that was created?

(14)    **A.    I don't know that.**

(15)    Q.    Do you recall ever discussing

(16) how things could have been done more

(17) safely?

(18)    **A.    I am not really sure.**

(19)    Q.    Other than -- well, actually, I

(20) want to put back up Exhibit 13 real quick,

(21) which was your supporting deposition.

(22)    Do you know if this either

(23) indicates -- or, do you know who the

(24) witness was, whose signature this is?

(25)    **A.    I do not.**

```
(1)                    W. BAKER

(2)              No, I'm not sure.

(3)        Q.    Okay.  I just was trying to see

(4)    on here if it said anywhere but, I don't

(5)    think --

(6)              Okay.  Other than giving this

(7)    deposition, you also spoke with and gave a

(8)    statement to someone from the New York

(9)    State Attorney General's office; is that

(10)   right?

(11)       A.    Yes.

(12)       Q.    Okay.  Other than the

(13)   deposition and the attorney general's

(14)   office, did you give any other statements

(15)   to any other person as part of any

(16)   investigation of the incident?

(17)       A.    No.

(18)       Q.    Okay.  So just those two

(19)   statements is what you remember giving?

(20)       A.    I believe so.

(21)             MR. DOLBY-SHIELDS:  Okay.  I

(22)        think those are all of my questions

(23)        for today.

(24)             MR. CERRONE:  Hal, anything

(25)        from you?
```

```
(1)                    W. BAKER
(2)          MR. KIEBURTZ:  No, thank you.
(3)          MR. CERRONE:  Okay.  Thank you,
(4)     everyone.
(5)          Elliot, we have been in touch
(6)     with Betty Irvine to let her know
(7)     that she's not going to testify on
(8)     the 14th next week because of a
(9)     general conflict.
(10)          She indicated she does not want
(11)     to testify, and she claims her
(12)     medical providers advised her not to
(13)     testify.
(14)          I think that's probably the
(15)     same roadblock you've ended up with,
(16)     so I sort leave it in your hands.  At
(17)     least you have some family contacts
(18)     to perhaps convince her to.
(19)     Otherwise, we'll have to circle --
(20)     that's a to-be-continued.
(21)          I think the other
(22)     to-be-continued is, let's see if we
(23)     can get some dates so we can --
(24)     probably, the next two witnesses are
(25)     going to be Ulatowski and Devinney, I
```

(1)                    W. BAKER

(2)      would think, right?

(3)              MR. DOLBY-SHIELDS:  Right.  Let

(4)      me shoot an email, call you about

(5)      that.

(6)              I've got this trial will be

(7)      done -- hopefully, it's a short

(8)      trial, the court claims -- June 5th,

(9)      6th, 7th.  But still, all the trial

(10)     prep, you know, you have to do even

(11)     though it's kind of a short trial.

(12)     So I don't want to push those off to

(13)     June.

(14)             Yeah, let's continue those

(15)     discussions, not waste the court

(16)     reporter's time and stuff.

(17)             See how good I was about the

(18)     timing?  I told you we would be done

(19)     by 2:00.

(20)             (Continued on next page to

(21)     include jurat.)

(22)

(23)

(24)

(25)

(1)                    W. BAKER

(2)        MR. CERRONE:  Not bad.  I will

(3)    give you a lot of credit.  You are

(4)    one of the more efficient plaintiff's

(5)    attorneys out there.

(6)        MR. DOLBY-SHIELDS:  I

(7)    appreciate it.

(8)        (Whereupon, at 1:58 P.M., the

(9)    Examination of this witness was

(10)    concluded.)

(11)

(12)            °         °         °         °

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

```
(1)                        W. BAKER
(2)                  D E C L A R A T I O N
(3)
(4)          I hereby certify that having been
(5)     first duly sworn to testify to the truth, I
(6)     gave the above testimony.
(7)
(8)          I FURTHER CERTIFY that the foregoing
(9)     transcript is a true and correct transcript
(10)    of the testimony given by me at the time
(11)    and place specified hereinbefore.
(12)
(13)
(14)
                     _____
(15)                      WILLIAM BAKER
(16)
(17)
(18)    Subscribed and sworn to before me
(19)    this _____ day of _____ 2024.
(20)
(21)
        _____
(22)         NOTARY PUBLIC
(23)
(24)
(25)
```

```
(1)                    W. BAKER

(2)              E X H I B I T S

(3)

(4)    PLAINTIFF'S EXHIBITS

(5)

(6)    EXHIBIT   EXHIBIT                   PAGE

(7)    NUMBER    DESCRIPTION

(8)       6      Document                   13

(9)       7      Document                   21

(10)      8      Document                   22

(11)      9      Documents                  24

(12)     10      Documents                  33

(13)     11      Documents                  68

(14)     12      Photos                    145

(15)     13      Documents                 162

(16)

(17)    (Exhibits retained by Counsel not emailed

(18)           to reporter for marking.)

(19)

(20)

(21)                  I N D E X

(22)

(23)    EXAMINATION BY                     PAGE

(24)    MR. DOLBY-SHIELDS                    7

(25)
```

(1)                    W. BAKER

(2)      INFORMATION AND/OR DOCUMENTS REQUESTED

(3)    INFORMATION AND/OR DOCUMENTS        PAGE

(4)    The transcripts of all prior times

(5)    Deponent has testified before the

(6)    professional standards section       10

(7)

(8)    Application to join the U.S. Marshal

(9)    task force                           46

(10)

(11)   The entire application from

(12)   Officer Baker.  Not only materials

(13)   that he provided but any other

(14)   materials gathered from the Rochester

(15)   Police Department, and any materials

(16)   related to the interview and hiring

(17)   process                              54

(18)

(19)   Body-worn camera video              69

(20)

(21)   Any policies regarding the training

(22)   required when officers first join

(23)   the task force                       76

(24)

(25)

(1)                    W. BAKER

(2)    INFORMATION AND/OR DOCUMENTS REQUESTED

(3)    INFORMATION AND/OR DOCUMENTS (cont.)   PAGE

(4)    any periods of time when they are

(5)    required to do field training or be

(6)    on probation                          76

(7)

(8)    Any specific training that

(9)    Officer Baker received when he

(10)   first joined the task force          76

(11)

(12)   Any training from the RPD

(13)   specifically regarding training

(14)   received by Officer Baker about

(15)   apprehending individuals who were

(16)   Wanted or had warrants               78

(17)

(18)   Any policies about when the

(19)   U.S. M428 is required to be

(20)   completed                            86

(21)

(22)   Any records of the counseling

(23)   sessions                             166

(24)

(25)

(1)                        W. BAKER

(2)                  C E R T I F I C A T E

(3)

(4)    STATE OF NEW YORK        )

(5)                            :  SS.:

(6)    COUNTY OF KINGS          )

(7)

(8)        I, SANDRA SIERRA, a Notary Public for

(9)    and within the State of New York, do hereby

(10)   certify:

(11)       That the witness whose examination is

(12)   hereinbefore set forth was duly sworn and

(13)   that such examination is a true record of

(14)   the testimony given by that witness.

(15)       I further certify that I am not

(16)   related to any of the parties to this

(17)   action by blood or by marriage and that I

(18)   am in no way interested in the outcome of

(19)   this matter.

(20)       IN WITNESS WHEREOF, I have hereunto

(21)   set my hand this 3rd day of June 2024.

(22)

(23)

(24)   _____

(25)                 SANDRA SIERRA

(1)    ERRATA SHEET FOR: WILLIAM BAKER

(2)        WILLIAM BAKER, being duly sworn, deposes and

(3)        says: I have reviewed the transcript of my

(4)        proceeding taken on 05/08/2024. The following

(5)        changes are necessary to correct my testimony.

(6)    _____

(7)    PAGE LINE     CHANGE                REASON

(8)    ----|----|---------------------|--------------

(9)    ----|----|---------------------|--------------

(10)   ----|----|---------------------|--------------

(11)   ----|----|---------------------|--------------

(12)   ----|----|---------------------|--------------

(13)   ----|----|---------------------|--------------

(14)   ----|----|---------------------|--------------

(15)   ----|----|---------------------|--------------

(16)   ----|----|---------------------|--------------

(17)   ----|----|---------------------|--------------

(18)   ----|----|---------------------|--------------

(19)   ----|----|---------------------|--------------

(20)   ----|----|---------------------|--------------

(21)        Witness Signature:_____

(22)   Subscribed and sworn to, before me

(23)   this ___ day of _____, 20 ___ .

(24)   _____     _____

(25)   (NOTARY PUBLIC)          MY COMMISSION EXPIRES

May 8, 2024

[Page 178]

| A | | | | |
|---|---|---|---|---|
| **A.M (2)** | **actual (1)** | 35:20 69:6 | 132:5 134:5 | 171:7 |
| 1:19 2:3 | 75:17 | **aid (4)** | 147:5 155:16 | **apprehend (...** |
| **able (8)** | **addition (1)** | 147:9 152:9 | 156:2 | 56:23 75:17,22 |
| 105:20 122:20 | 58:4 | 158:7,23 | **answered (5)** | 78:9 87:4,10 |
| 140:23 | **additional (14)** | **air (4)** | 115:2 127:22 | 88:13 89:4,12 |
| 142:23 | 51:23 67:8,24 | 65:25 137:21 | 132:18,24 | 98:10 104:12 |
| 143:21 150:7 | 69:12,15,22 | 139:14 | 135:2 | 118:15 121:5 |
| 150:23 154:8 | 70:9,14,18,25 | 148:19 | **answers (1)** | 122:9,11 |
| **academy (15)** | 75:20 106:8 | **alert (2)** | 108:13 | **apprehendin...** |
| 39:8,13,19,22 | 134:6 145:16 | 49:12,24 | **anticipate (1)** | 78:18 175:15 |
| 40:4 41:18,22 | **address (4)** | **alerted (1)** | 82:7 | **apprehends (...** |
| 42:6,11,21 | 7:11 49:16,18 | 124:12 | **anybody (2)** | 57:15 |
| 43:5,10 74:4 | 50:3 | **allegations (4)** | 51:25 115:14 | **apprehensio...** |
| 74:5,6 | **administer (1)** | 14:22 15:13,17 | **anytime (1)** | 75:24 84:25 |
| **accepted (7)** | 4:17 | 28:5 | 32:3 | 85:9 93:12 |
| 20:22 34:25 | **administerin...** | **Allowing (1)** | **Anyways (1)** | 120:3 125:24 |
| 43:16 51:11 | 5:11 | 96:17 | 15:24 | **approach (10)** |
| 51:19,22 58:3 | **administrato...** | **allows (2)** | **apologize (3)** | 92:5,8 113:17 |
| **access (1)** | 1:3 | 56:22 105:19 | 23:7 93:21,24 | 113:20 |
| 91:19 | **advance (1)** | **alternatives (...** | **appear (2)** | 118:20 125:6 |
| **accidentally ...** | 103:24 | 95:14,21 | 26:10 133:24 | 126:6,8,14,25 |
| 153:11 | **advantage (4)** | **ambush (2)** | **appeared (7)** | **approached ...** |
| **accomplishm...** | 98:13 109:11 | 101:11 122:14 | 133:5 136:11 | 112:4 115:14 |
| 45:12 46:9 | 109:13 | **AMERICA (1)** | 141:12 152:3 | 115:23 |
| **account (1)** | 166:10 | 1:9 | 152:7 154:5 | 116:22 |
| 91:5 | **advised (1)** | **amount (3)** | 156:10 | 118:13 |
| **accurate (2)** | 169:12 | 57:7 116:6 | **appears (5)** | 126:19 |
| 41:15 132:13 | **after-action (...** | 125:16 | 22:4 25:23 | **approaching...** |
| **accused (2)** | 167:12 | **And/or (5)** | 26:20 82:20 | 116:11,13 |
| 53:6 119:19 | **against- (1)** | 126:6 174:2,3 | 146:13 | 118:8 124:23 |
| **act (2)** | 1:7 | 175:2,3 | **application (...** | 127:9 |
| 71:25 101:12 | **agency (1)** | **angle (1)** | 45:20 46:19 | **area (5)** |
| **action (4)** | 129:13 | 142:14 | 47:3 50:25 | 57:3,25 73:19 |
| 15:4,19 63:12 | **ago (4)** | **angles (1)** | 51:19,22 54:6 | 148:21 |
| 176:17 | 23:16 58:13,16 | 92:20 | 54:19,23 55:2 | 154:15 |
| **actions (2)** | 59:15 | **annual (1)** | 60:22 61:7 | **arising (3)** |
| 18:14,22 | **agree (5)** | 59:23 | 174:8,11 | 14:16,18 16:2 |
| **activated (1)** | 8:6 12:19 | **answer (19)** | **applications ...** | **arm (2)** |
| 126:17 | 18:11 29:14 | 7:24 18:9,19 | 58:18 61:2 | 142:7,13 |
| **active (1)** | 95:2 | 29:23 32:9,11 | **applied (2)** | **armed (4)** |
| 75:23 | **AGREED (4)** | 53:9 60:11 | 51:4,12 | 102:23 103:3 |
| **activity (1)** | 4:4,9,14 5:2 | 71:7 98:25 | **apply (2)** | 112:2 120:6 |
| 120:15 | **ahead (4)** | 100:17 103:7 | 51:9 58:9 | **arms (2)** |
| | 17:12 29:23 | 107:4 108:15 | **appreciate (1)** | 141:25 149:19 |

May 8, 2024

[Page 179]

| | | | | |
|---|---|---|---|---|
| **arose (4)** | **assist (2)** | 4:16 | 9:1 10:1,19 | 94:1 95:1 |
| 10:24 11:22 | 63:13 66:2 | **available (2)** | 11:1 12:1,15 | 96:1 97:1 |
| 15:5,14 | **assistance (4)** | 96:13 110:23 | 13:1,23 14:1 | 98:1 99:1 |
| **arrest (10)** | 65:4,25 66:12 | **Avenue (2)** | 15:1 16:1 | 100:1 101:1 |
| 15:14 30:9 | 66:21 | 3:5,15 | 17:1 18:1 | 102:1 103:1 |
| 66:21 78:11 | **assisted (2)** | **awards (1)** | 19:1 20:1 | 104:1 105:1 |
| 90:14 96:20 | 66:5,16 | 45:25 | 21:1 22:1,23 | 106:1 107:1 |
| 97:7 101:24 | **assisting (1)** | **aware (4)** | 23:1,4,12 | 108:1,10 |
| 119:13 | 65:12 | 19:5 120:17 | 24:1,12 25:1 | 109:1 110:1 |
| 122:21 | **associated (4)** | 130:15 | 25:6 26:1 | 111:1 112:1 |
| **arresting (3)** | 23:22 95:14 | 131:19 | 27:1 28:1 | 113:1 114:1 |
| 15:8 57:6 | 96:25 113:17 | | 29:1 30:1 | 115:1 116:1 |
| 104:20 | **assume (6)** | ————— | 31:1 32:1 | 117:1 118:1 |
| **arrests (3)** | 7:25 26:3 | **B** | 33:1,22 34:1 | 119:1 120:1 |
| 47:24 65:9 | 53:16 61:4 | **B (2)** | 35:1 36:1 | 121:1 122:1 |
| 73:6 | 66:20 152:13 | 7:2 173:2 | 37:1 38:1 | 123:1 124:1 |
| **ARROWOO...** | **Attempt (1)** | **back (37)** | 39:1 40:1 | 125:1 126:1 |
| 1:10 | 100:7 | 20:13 22:20,22 | 41:1 42:1 | 127:1 128:1 |
| **asked (3)** | **attempting (3)** | 25:5 26:9 | 43:1 44:1 | 129:1,25 |
| 38:4 110:13 | 87:4,10 88:13 | 30:3,5 35:6 | 45:1 46:1 | 130:1 131:1 |
| 135:15 | **attend (14)** | 45:3 55:20 | 47:1 48:1 | 132:1 133:1 |
| **asking (5)** | 39:8 41:17 | 69:11 71:5 | 49:1,3,25 | 134:1 135:1 |
| 16:15 51:9 | 42:10 43:6 | 77:17 81:7 | 50:1 51:1 | 136:1 137:1 |
| 66:9 89:9 | 69:16,22 70:9 | 89:8 108:18 | 52:1 53:1 | 138:1 139:1 |
| 133:3 | 70:14,18 71:2 | 110:12 | 54:1 55:1,2 | 140:1 141:1 |
| **assault (2)** | 74:3,14 80:16 | 115:10 | 56:1 57:1 | 142:1 143:1 |
| 111:21 119:18 | 80:20 | 118:25 119:2 | 58:1 59:1 | 144:1 145:1 |
| **assigned (27)** | **attended (6)** | 123:3 132:14 | 60:1 61:1 | 146:1 147:1 |
| 45:4,7 48:9,13 | 42:14,20 81:24 | 133:6,25,25 | 62:1 63:1,6 | 148:1 149:1 |
| 48:18,22,25 | 84:7 86:4,6 | 135:23 137:7 | 64:1 65:1 | 150:1 151:1 |
| 66:8,13,15 | **attending (2)** | 140:10 142:6 | 66:1 67:1 | 152:1 153:1 |
| 68:21 72:6 | 67:24 85:4 | 142:18 143:4 | 68:1 69:1 | 154:1 155:1 |
| 73:14,18,25 | **attorney (7)** | 144:18 148:9 | 70:1 71:1 | 156:1 157:1 |
| 74:12 114:13 | 6:3 32:10 | 151:13 | 72:1 73:1 | 158:1 159:1 |
| 128:3,17,21 | 35:15,24 | 153:23 160:6 | 74:1 75:1 | 160:1 161:1 |
| 129:8 130:16 | 36:10 168:9 | 167:20 | 76:1 77:1,2,9 | 162:1,14,18 |
| 130:19,22 | 168:13 | **backed (2)** | 78:1,17 79:1 | 163:1 164:1 |
| 131:4,25 | **Attorney's (1)** | 150:15 154:6 | 80:1 81:1,24 | 165:1 166:1 |
| 132:6 | 3:14 | **background ...** | 82:1,10 83:1 | 167:1 168:1 |
| **assignment (3)** | **attorneys (4)** | 37:6,7 | 84:1,23 85:1 | 169:1 170:1 |
| 48:4,14 49:2 | 3:4,8,13 171:5 | **bad (3)** | 86:1 87:1 | 171:1 172:1 |
| **assignments ...** | **August (1)** | 16:20 74:11 | 88:1 89:1 | 172:15 173:1 |
| 40:25 44:20 | 22:24 | 171:2 | 90:1 91:1 | 174:1,12 |
| 47:6 | **authorized (1)** | **Baker (201)** | 92:1 93:1 | 175:1,9,14 |
| | | 2:7 7:1,10 8:1 | | |

176:1 177:1,2
**barrel (2)**
143:13 147:22
**based (6)**
70:2,9,19
91:10 94:11
109:13
**basic (1)**
40:6
**basically (53)**
20:6 30:10
35:11 36:2,5
41:25 45:9,10
46:4,6 48:20
51:15,20 56:7
56:11,22
57:16 59:12
63:12,20,24
71:18,23 72:8
75:10 92:11
92:11 96:6,10
97:22 98:17
99:5 102:7
103:3,9
107:16
108:25 115:8
118:6 119:4
119:25 121:9
122:7,11,19
129:14
139:18 147:8
150:5,19
151:9 160:17
160:18
**basis (2)**
19:19 110:20
**Bates (11)**
83:5,7,14
84:21 93:5
94:19 95:12
96:15 145:10
147:11
162:16
**bathroom (12)**

138:4,16
139:22 140:2
140:8,10,12
141:2,3
144:21
152:11 159:6
**BAXTER (1)**
1:11
**bear (2)**
6:9 141:9
**becoming (1)**
45:7
**bedroom (1)**
159:2
**began (3)**
38:25 39:6
41:13
**believe (109)**
10:2,6 11:15
12:4 14:14
15:11 19:9
23:11 25:4
26:16 30:7
31:7 34:3
36:23 37:3,23
38:3,3,6,17
39:5,11,15
40:2,12 41:21
42:9,25 44:23
52:6,20 54:2
54:7 58:12,13
58:14 61:10
63:16 65:14
65:14 70:16
70:22 71:8
74:16,22,22
79:21 92:23
99:18 102:20
108:4,16
111:9,10,22
112:8,23
113:12 114:9
114:24,25
119:6,17,18

119:19,22
125:15 127:5
127:10 128:7
129:3 131:22
131:23
132:20 133:4
135:9 141:4,7
141:18 142:3
144:8,10
146:4 147:18
147:18
148:14,22,23
149:3,8 151:8
152:18 153:5
153:8,20
154:25
156:17,20,23
156:23
158:20,20
159:5 160:14
161:8,25,25
164:7 168:20
**best (1)**
46:11
**better (3)**
13:19 109:21
163:19
**Betty (1)**
169:6
**big (3)**
73:5 159:9,11
**Bill (2)**
84:23 162:18
**bit (6)**
13:21 21:20
44:24 57:19
105:20
143:18
**Black (1)**
20:16
**blood (3)**
152:2 156:8
176:17
**body (20)**

68:21 128:2
142:25 143:5
143:24
146:23,24
148:4,10,18
148:20
149:24 150:8
150:11 153:7
154:23 155:5
157:2,8,17
**body-camera...**
68:22 70:4
**body-worn (...**
69:4 128:5,10
128:15 129:9
129:17
130:16
131:21,25
132:7,11
174:19
**bottom (4)**
24:10,20 25:6
145:19
**bouncing (1)**
152:13
**brand (1)**
42:2
**breach (6)**
98:16 99:16
104:25
107:23 109:7
114:17
**breaching (5)**
105:19 106:18
107:6,9
115:15
**break (7)**
9:9 55:12,15
92:17 105:11
108:11,12
**brief (8)**
55:15 87:11
111:10,15
112:4,6,18

116:8
**briefed (1)**
111:20
**briefing (3)**
111:7 112:21
116:4
**briefings (1)**
115:24
**briefly (1)**
82:14
**briefs (1)**
113:15
**bring (1)**
143:21
**broke (1)**
157:13
**brought (2)**
19:7 54:9
**Buffalo (1)**
3:15
**building (15)**
19:21 79:12
89:23 97:7
98:7,13,18
99:24 106:23
109:9,13,16
109:17 161:9
161:11
**buildings (1)**
108:21
**bulletin (1)**
87:13

_____
C
_____
**C (4)**
3:2 172:2
176:2,2
**call (17)**
10:8 46:18
47:5 48:8,21
49:19,24
54:18,25
65:17,25
66:11,25

76:16 86:19
105:12 170:4
**called (4)**
7:2 45:10
114:19 122:3
**callout (6)**
98:16 99:16
100:10,16,17
100:18
**callouts (2)**
100:3 122:12
**calls (2)**
47:16,17
**camera (10)**
68:21 69:4
128:2,6,16
129:9 131:25
132:7,11
174:19
**cameras (10)**
116:2,6 118:3
122:15
128:11
129:17
130:17
131:21
159:10,18
**capacity (2)**
18:4 110:3
**car (10)**
97:11 123:7,9
123:17 124:5
125:11
126:10,15,21
126:21
**care (1)**
43:12
**career (5)**
27:9 45:12
56:8 60:3
70:7
**Carl (3)**
117:8 127:17
141:5

**carry (2)**
38:21 71:21
**case (12)**
1:7 10:20
11:13,17 14:5
14:22 15:20
15:22 27:2
112:14
114:22
115:20
**cases (8)**
8:15 16:2,11
27:16,20
53:19 57:9,10
**Casino (2)**
37:21 38:13
**caught (1)**
104:5
**CERRONE (...**
3:13,16 8:23
9:5 10:13
12:10,23 13:4
13:16 14:4,25
15:7 17:12
18:7,17 21:13
23:7 24:2,15
29:8,25 35:20
50:8,12 53:2
53:7 54:22
55:10,17 60:9
62:21,24 64:3
68:7 69:8
77:4,12 82:2
82:20,24 83:4
83:9 86:22
93:18 98:23
101:20
102:18 103:5
104:13 107:2
107:19 108:8
109:4 117:15
118:16
120:21
129:18

136:22 147:3
149:2 150:17
152:24
155:14,24
157:11
166:23
168:24 169:3
171:2
**certify (4)**
172:4,8 176:10
176:15
**cetera (1)**
12:16
**chance (2)**
34:10 150:23
**change (4)**
108:15 110:20
110:24 177:7
**changes (1)**
177:5
**charges (2)**
20:22 57:25
**chase (2)**
90:9 92:13
**check (2)**
12:6 50:2
**checked (1)**
29:21
**checks (1)**
88:7
**child's (1)**
119:20
**choose (1)**
103:3
**CHRISTIA...**
1:11
**chronologica...**
61:12
**Church (1)**
3:10
**circle (1)**
169:19
**circumstanc...**
20:20 22:3

32:20
**cities (4)**
80:16,24 81:2
81:15
**City (16)**
1:9 2:6 3:9
10:23,25 11:6
11:9 16:24
17:21 19:6
29:17 43:13
46:22 57:11
69:3 78:14
**civil (5)**
2:8 6:14 11:13
11:17 19:7
**claims (2)**
169:11 170:8
**clarify (1)**
108:15
**class (2)**
15:4 86:14
**classroom (1)**
75:2
**clear (6)**
12:5 95:19,21
107:5 158:14
158:23
**clearing (2)**
158:19 159:21
**clearly (1)**
116:20
**close (4)**
74:16 141:13
154:7,7
**closer (3)**
82:5 144:16
146:18
**closest (2)**
140:14 144:23
**cognizant (2)**
118:6,10
**College (3)**
37:9,19 38:24
**combination ...**

43:3 79:20,21
161:20
**come (28)**
80:12 85:13
89:21 91:13
96:11 98:21
99:6,7,22
100:20 101:6
101:18 102:9
102:13,16
103:22,23
115:9 121:10
121:17,23,25
122:4 136:6
136:12 137:3
139:5 140:17
**coming (6)**
101:9 123:16
136:8 150:10
152:2 156:9
**commanding...**
25:2
**comments (1)**
54:10
**COMMISSI...**
177:25
**commit (1)**
56:25
**committed (1)**
53:6
**communicati...**
45:15 113:9,12
**communities...**
56:25 57:13
**community (8)**
37:9,18 38:24
47:21 56:24
57:4 73:5
90:4
**compiled (1)**
46:8
**complaint (3)**
12:7 13:12
69:20

complete (3)
32:2,12 56:5
completed (7)
25:12 44:21
86:13,15,21
94:13 175:20
completely (3)
97:18 143:19
153:19
compliance (1)
92:10
compliant (2)
101:5 115:7
comply (4)
92:12 101:4
115:9 140:17
complying (4)
30:8,9 101:8
121:16
computer (5)
9:6 50:16 94:6
159:12,14
concern (1)
158:10
concluded (1)
171:10
conduct (4)
6:10 88:11,21
94:23
conducted (6)
5:4 59:5 94:13
123:14 125:4
125:9
confirming (1)
5:13
conflict (1)
169:9
cons (2)
100:24 101:2
consent (1)
5:17
consider (5)
90:15,18 91:15
97:5 123:6

consideratio...
118:19 122:18
123:11
consideratio...
97:9
considered (3)
5:18 89:7,10
considering (1)
90:21
cont (1)
175:3
contact (6)
89:21 100:7,11
138:19,20
150:10
contacts (1)
169:17
containment ...
96:17 98:15
99:16 100:9
104:24
context (3)
8:15 10:4,20
continue (3)
12:13,20
170:14
continued (3)
65:8 119:10
170:20
continuing (1)
65:12
control (4)
5:9 21:13,16
75:12
controlled (11)
75:14 90:17
106:11,15,23
108:20,22
123:7,9 124:6
125:11
conversation...
35:24 53:23
63:23 133:2
134:19

conversation...
115:12
convince (1)
169:18
cooperation ...
92:10 99:14
102:8 119:4
copy (2)
6:5,12
correct (68)
8:16 9:15 13:3
13:5 14:2
20:12 25:9
30:18 31:3,10
31:23 32:5,16
32:17,25 33:2
33:12,13,23
33:24 35:10
38:22 39:9,20
40:8,16 42:4
42:16 43:9,21
43:24 45:21
46:15 48:2,19
51:16 56:15
58:21 67:3
68:9 71:8
75:19 78:10
87:6 98:4,11
103:8 105:9
106:2 107:15
107:18 108:4
109:18 110:7
120:4,7,13,16
127:13 128:2
134:25
136:21
141:23
145:23
151:11
155:21 172:9
177:5
correctly (4)
28:21 113:7
119:7 123:22

corresponde...
45:16,18
costs (1)
6:10
counsel (5)
4:5 5:3,6 6:7
173:17
counseling (2)
166:20 175:22
counselor (2)
166:14,18
country (3)
57:12,22 80:13
county (6)
1:11,14 11:23
111:23
117:22 176:6
couple (17)
27:23 44:22,25
52:10,11
55:19 71:9
80:23 84:17
93:2 95:23
118:20 122:4
145:20
157:22
158:22
164:25
course (3)
10:24 83:19
84:24
court (8)
1:2 4:19 5:5,9
5:13 16:14
170:8,15
cover (7)
46:3,12 76:5
138:19,22
145:15
162:15
covered (2)
54:17 143:12
covering (1)
63:7

CR (6)
25:21,24 26:6
26:12,15,18
create (3)
99:4,8 164:5
created (1)
167:13
credit (1)
171:3
crime (2)
47:15 101:25
crimes (1)
57:2
criminal (6)
8:15 37:12
87:15 91:4
111:24,24
criminal-on-...
88:6
curb (1)
47:20
curl (1)
142:24
custody (2)
140:20,22
cut (20)
17:6 23:6
35:18 50:7,9
54:20 64:2,3
71:4 89:7
93:3 108:7
110:11
117:14 123:2
127:7 132:3
149:3,6
152:22

_____
**D**

D (3)
4:2 172:2
173:21
daily (1)
110:20
danger (1)

33:9
**dangerous (9)**
94:22 95:4,7
98:2,7 108:3
108:5 109:10
112:2
**dangers (2)**
96:21 97:21
**Daniel (7)**
14:18 15:5
16:17,21 18:6
18:15 19:7
**databases (2)**
88:6,7
**date (22)**
1:18 2:2 13:10
14:25 21:6
22:17 24:9,15
24:17 33:20
34:4 36:2
51:7 67:10
68:13 73:16
74:17 132:14
145:13
162:13 163:9
164:9
**dated (14)**
22:23 55:23
56:6 58:25
60:16 61:16
62:14 64:15
67:9 68:6
71:13 73:11
83:18 162:25
**dates (8)**
24:22,23 34:18
44:23 76:14
85:2 162:20
169:23
**day (18)**
17:3,9,16
49:10 110:2,9
112:15
123:15

124:18 125:6
162:3,6 163:6
164:14,25
172:19
176:21
177:23
**day-to-day (1)**
19:19
**days (6)**
20:15 26:22
111:4 112:17
113:15
164:25
**deadly (2)**
30:15 33:4
**debrief (1)**
165:17
**debriefing (1)**
167:3
**deceased (2)**
1:4 159:25
**December (3)**
62:16 71:15
73:13
**decide (1)**
101:17
**decides (1)**
91:11
**deciding (1)**
97:6
**Dedrick (36)**
1:4 109:24
111:8 112:19
120:17 121:5
123:8 133:3
134:10,16
135:22 136:5
137:7 138:7
138:15 139:8
139:13
140:11 141:9
141:24
142:16
144:12,15

146:11,15
147:15
149:24
150:15 154:3
154:15,22
155:4,8
156:21 158:5
159:2
**Dedrick's (6)**
126:10 144:16
146:18,22
148:10
150:10
**deemed (1)**
106:17
**defendant (5)**
2:5 3:8 11:17
14:12 15:25
**defendants (4)**
1:16 3:13
13:22 14:6
**defendants' (1)**
13:22
**definitely (1)**
86:6
**degree (1)**
37:11
**Delaware (1)**
3:15
**demand (5)**
69:2,3 78:15
81:20 166:19
**demands (1)**
11:8
**department (...**
1:14 3:9 14:11
16:3,7 19:12
20:11 30:17
30:22 31:5,25
39:2,7,14
40:14,19 41:2
41:4,6,14
53:15 54:6,12
55:6 77:20,25

78:6 86:11
131:20
174:15
**Department'...**
32:15 33:4
41:18 42:7
**depending (3)**
90:25 106:7
110:22
**depends (4)**
79:9 80:11
84:18 91:17
**depicted (1)**
146:2
**Deponent (2)**
162:22 174:5
**deposed (4)**
6:13 161:13,14
164:10
**deposes (1)**
177:2
**deposition (19)**
2:5 4:15 5:4
6:11 11:13
15:22 16:10
29:12 35:8,25
36:6,9,22
82:12 162:2
162:18
167:21 168:7
168:13
**depositions (1)**
93:21
**DEPUTIES (...**
1:12
**deputized (3)**
38:15 65:16,20
**deputy (15)**
10:21 11:22,24
13:23 65:16
65:17 93:8
94:22 110:3
127:8 129:25
145:22 146:3

150:9 155:13
**describe (1)**
147:21
**DESCRIPTI...**
173:7
**designated (2)**
138:20 158:12
**detailed (1)**
134:4
**details (1)**
119:15
**determinatio...**
91:10,14
**determine (1)**
89:11
**determined (1)**
159:24
**determining ...**
89:3
**develop (4)**
101:10 104:8
122:13,16
**developed (1)**
63:13
**development...**
33:16
**Devinney (4)**
1:11 80:3,6
169:25
**dialog (2)**
138:21 140:15
**difference (3)**
73:5 153:22
154:2
**different (12)**
44:10 84:15
88:3,5 90:15
96:13,14
100:24
101:23
105:16
157:25 163:5
**differently (1)**
167:8

directed (1)
21:24
directs (1)
32:10
disagree (2)
18:5,11
discharged (1)
152:16
disconnect (1)
9:8
discoverable ...
166:24
discovery (1)
145:9
discretely (1)
99:13
discuss (9)
54:6 59:23
86:23 90:22
109:23
113:16
117:24
118:14 122:2
discussed (13)
19:11 34:17
53:5 63:6
71:24 82:14
84:13 108:3
109:9 115:24
116:4 121:22
124:15
discusses (1)
95:13
discussing (2)
108:20 167:15
discussion (7)
35:14,23 62:7
63:19 64:9
124:21 167:7
discussions (1)
170:15
disengaged (4)
153:8,12,20,25
disposal (1)

95:22
distance (1)
118:25
district (6)
1:2,2 3:14
130:5,8,11
document (24)
13:8 21:4
22:15 24:3,20
55:22 58:24
61:13,16
62:11 64:15
67:17,20
82:17 83:14
84:21 85:22
93:4,7 108:22
162:16 173:8
173:9,10
documentati...
82:8
documented ...
85:25
documents (...
10:21 11:5
24:7 26:25
33:18 36:21
68:11 162:11
173:11,12,13
173:15 174:2
174:3 175:2,3
DOE (1)
1:10
dog (6)
117:11,12,12
117:20
138:10,12
dogs (1)
118:13
doing (27)
9:2,5 19:23
23:8 49:18
50:20 51:18
60:7 63:20,24
64:10 73:2

85:8 90:17
95:24 96:9,16
96:22,24 97:2
99:11 109:6
114:6,21
123:7 137:13
154:14
DOLBY-SHI...
3:6 7:7 8:19
9:4,12 10:7
11:7 12:17
13:2,6,20
14:7 15:3
17:5 18:24
23:5,9 24:4
24:17 29:18
35:17 46:17
50:6,10 54:15
54:24 55:13
63:25 68:9,25
71:3 76:15
77:15 78:13
81:19 82:9,22
82:25 83:6
86:18 93:16
93:25 104:15
108:6 110:10
117:13,17
122:25 127:6
129:22 132:2
148:24 149:5
152:22 162:9
166:16
168:21 170:3
171:6 173:24
dollars (1)
19:6
door (42)
90:16 92:3,9
99:13,21,23
100:12,19
103:20
105:11,15,18
105:22 107:7

107:8,9,11
114:17,25
115:14
118:21 121:7
122:5 124:24
127:2,4,9,15
127:19,21,22
132:16,18,18
132:24
134:21 135:3
135:6,7,11,12
135:21
doorway (2)
136:17 144:23
downtown (1)
20:17
dozens (1)
8:12
drive (2)
88:23 124:5
drove (1)
126:16
due (1)
165:18
duly (4)
7:3 172:5
176:12 177:2
Duria (2)
12:3 13:13
duties (5)
10:25 20:10
40:25 47:12
94:22
dynamic (1)
109:7

_____
E
_____
E (10)
3:2,2 4:2,2 7:2
172:2 173:2
173:21 176:2
176:2
earlier (13)
27:14 34:17

53:5,20 61:25
71:24 72:9
84:13 108:3
108:14
109:10
119:24
147:15
easier (1)
29:19
easy (1)
52:24
education (1)
37:15
educational (1)
37:7
Edwards (2)
138:10,11
effect (5)
4:18 122:21
137:10,14
139:3
effecting (1)
96:20
effective (2)
90:23 102:10
efficacious (1)
96:19
efficient (1)
171:4
eight (1)
116:16
eight-hour (1)
84:14
either (10)
69:14 76:10
97:20 108:14
113:14
123:17 129:5
131:2 159:6
167:22
element (1)
122:10
Elliot (6)
3:6 7:16 15:2

29:13 157:12
169:5
**else's (1)**
92:17
**email (1)**
170:4
**emailed (2)**
6:6 173:17
**emergency (1)**
126:17
**ended (5)**
143:25 150:2,5
160:4 169:15
**enforcement ...**
40:11 93:11
94:23 117:12
120:18
**ensue (2)**
92:14,15
**enter (9)**
50:19 89:23
95:19 96:19
104:7 105:7
109:13 126:2
144:21
**entered (8)**
50:23 134:20
135:11
138:12 140:7
140:8,9 159:3
**entering (5)**
95:3 97:7
102:14
106:23 108:2
**entire (7)**
40:21 54:18,23
54:25 143:9
143:12
174:11
**entitled (4)**
13:13 93:8,10
106:11
**entries (2)**
108:21,21

**entry (23)**
94:21 95:15,19
95:20,21 96:2
96:25 98:6
103:16
106:11,15,23
107:14,17,23
108:23 109:9
113:17
114:21
122:24 123:5
125:13
133:11
**environment...**
75:12,15
**equipped (1)**
116:17
**ERRATA (1)**
177:1
**escape (1)**
57:25
**escorted (1)**
160:3
**ESQ (5)**
3:6,8,11,13,16
**estate (1)**
1:4
**et (1)**
12:16
**evaluation (15)**
34:2,5,6 55:24
58:25 59:12
59:20,23
60:15 61:16
62:12,14
71:13,16
73:11
**evaluations (2)**
58:23 59:7
**eventually (3)**
34:24 51:19
126:13
**everybody (5)**
42:12 49:7

99:6 118:23
151:17
**exact (4)**
8:13 30:14
96:4 125:16
**exactly (24)**
16:4 28:12
39:16 41:24
73:20 76:2
81:13 85:14
86:7 105:4
111:10
112:24
114:23
116:16
117:23 121:2
127:16
132:25 147:6
148:7,15
152:20
157:25 159:7
**examination ...**
7:6 171:9
173:23
176:11,13
**examined (1)**
7:5
**example (26)**
15:21 16:23
19:20 28:14
32:2,19 35:13
38:20 42:20
47:7,23 51:24
53:13 54:4
58:6 59:18
60:5,8 70:2
70:19 87:2
88:3 90:13
103:18
109:17 123:7
**excessive (2)**
20:15 28:6
**execute (2)**
78:7,8

**executing (8)**
77:21 78:2,24
104:11
119:14 121:3
121:6 124:19
**execution (4)**
111:5,15
112:17
120:20
**exhibit (37)**
6:4,5,9 12:8,22
12:24 13:3,9
21:3,5 22:13
22:16,22
23:19,24 24:8
33:15,15,19
55:21 68:8,10
68:12 69:12
82:12,18 83:8
92:25 93:5
108:17 145:8
145:12
162:10,12
167:20 173:6
173:6
**exhibits (4)**
6:3 12:15
173:4,17
**exit (3)**
123:8 135:22
137:7
**exited (2)**
126:18 159:3
**experience (1)**
40:10
**EXPIRES (1)**
177:25
**explain (2)**
57:18 105:3
**express (1)**
5:17
**extended (4)**
142:7,13 148:3
149:19

**extent (5)**
54:16 81:20
88:25 139:6
166:17
**extremely (1)**
142:20

---

**F**

**F (2)**
4:2 176:2
**face-down (5)**
141:25 142:16
142:24 143:5
149:25
**face-to-face (...**
142:5 144:10
**face-up (3)**
144:5,7,9
**facility (1)**
38:19
**facing (1)**
137:24
**fact (2)**
78:7 117:25
**factor (1)**
121:19
**factors (4)**
89:6,10 91:15
91:16
**failed (4)**
106:13,16,24
108:24
**fair (2)**
8:8 43:15
**fall (8)**
73:22 74:2,13
80:19 81:3,25
132:11 141:9
**familiar (7)**
14:19 43:11,15
93:15 94:14
96:3 99:10
**familiarize (1)**
71:21

May 8, 2024

[Page 186]

**family (4)**
19:8 160:12
  165:21
  169:17
**far (6)**
8:4 70:12,24
  128:4 144:21
  144:22
**fast (2)**
94:16 95:8
**feared (1)**
33:10
**February (2)**
62:14 64:15
**federal (2)**
2:8 19:21
**feed (1)**
159:17
**feel (1)**
153:7
**feet (2)**
148:18 149:17
**fell (1)**
143:19
**felt (3)**
46:9 47:22
  154:8
**field (23)**
16:23 17:19,20
  39:22 40:5
  43:23 44:2,5
  44:10,16,21
  74:15,21,23
  75:2,10,13,21
  76:10,22 77:5
  77:8 175:5
**fighting (2)**
30:9 143:22
**file (8)**
33:16 34:23
  47:24 53:13
  55:20 58:3
  70:21 73:8
**filed (1)**

69:20
**files (1)**
70:24
**filing (1)**
4:6
**final (1)**
60:15
**find (1)**
72:2
**fine (1)**
118:23
**firearm (3)**
38:21 150:25
  151:9
**fired (2)**
105:18 152:16
**firing (1)**
99:11
**first (42)**
7:3 8:10 23:2
  24:10 25:5
  33:21 51:3,4
  51:10 62:17
  74:8,9,12
  76:11,20 77:2
  77:10 83:21
  93:13,14 94:8
  94:12 121:8
  126:21,24
  127:4 132:22
  137:6,8
  140:12 141:2
  142:21 144:3
  145:14,17
  149:11 158:7
  159:3,6 172:5
  174:22
  175:10
**floor (1)**
146:11
**focus (4)**
47:14 123:4
  139:20
  154:19

**focused (2)**
42:6 139:17
**folder (2)**
71:20 72:5
**folks (1)**
72:12
**follow (10)**
11:11 46:21,25
  55:8 69:6
  78:20 124:11
  134:7 141:2
  166:21
**following (1)**
177:4
**follows (3)**
7:5 87:8
  140:25
**foot (4)**
92:14,14
  124:17
  126:15
**footing (1)**
150:21
**force (82)**
4:17 16:23
  17:19,20
  18:15 19:14
  19:18 20:6,16
  28:6 29:4
  30:11,12
  31:13,17,22
  32:3,19 33:5
  36:13,17 45:5
  45:8,24 46:20
  47:4 51:5
  56:11,13,21
  57:15 58:3,5
  60:18,22
  61:19,23 62:2
  64:19 65:13
  65:22 66:6,17
  70:10,19
  72:12 73:4
  74:2,15 76:20

77:3,6,11
78:22 81:25
85:11 86:4
87:8 88:11
92:21 110:6
111:6 115:5
117:19 128:5
128:10 129:8
129:16,19,21
129:24 130:4
130:6,10,13
130:16
133:20 146:6
164:16 174:9
174:23
175:10
**forcible (3)**
107:13,23
114:21
**forcibly (2)**
102:14 105:7
**foregoing (1)**
172:8
**foreground (1)**
145:21
**form (27)**
4:10 18:8,18
  19:2 24:16
  29:7 32:7,22
  33:7 53:8
  60:10 61:9
  86:12 98:24
  101:21
  102:19 103:6
  107:3,20
  109:5 118:17
  120:22
  136:23 147:4
  150:18
  155:15,25
**formal (2)**
50:15 76:9
**former (1)**
94:3

**forms (2)**
85:24,25
**forth (1)**
176:12
**forward (2)**
94:17 95:8
**forwarded (1)**
45:13
**four (3)**
30:24 44:4
  145:16
**Fredrick (1)**
98:19
**frequent (1)**
88:25
**friends (2)**
160:12 165:22
**frighten (1)**
118:14
**front (11)**
28:11 90:5,16
  116:13,24
  117:5 127:2,4
  127:9 136:5
  140:18
**fruitful (1)**
11:4
**fugitive (23)**
45:8 56:11,20
  64:19 65:13
  65:21 84:25
  85:9 87:4,9
  88:13 89:4,12
  90:14 93:12
  97:8 103:21
  109:11,16
  110:5 118:15
  130:10,10
**fugitives (4)**
57:14 75:17,22
  78:25
**full (1)**
28:25
**full-day (1)**

May 8, 2024

[Page 187]

84:14
**full-time (1)**
20:7
**fully (3)**
147:25 149:9
149:15
**further (7)**
4:9,14 6:2 82:7
148:8 172:8
176:15
**future (1)**
93:20

**G**

**gain (5)**
92:9 102:7
109:19,19
119:4
**gained (1)**
106:7
**gang (1)**
120:15
**gather (2)**
87:3 88:19
**gathered (3)**
55:5 87:23
174:14
**gathering (3)**
87:8 124:9
125:23
**gear (2)**
116:18 118:12
**general (6)**
28:14,17,20
59:22 87:7
169:9
**general's (2)**
168:9,13
**generally (4)**
28:8 58:4 59:6
109:15
**gesturing (1)**
137:23
**getting (2)**

11:5 157:23
**give (13)**
27:22 28:22
34:10 44:19
59:9 67:16
68:14 83:4
88:2 109:10
125:12
168:14 171:3
**given (3)**
15:22 172:10
176:14
**gives (2)**
101:9 105:23
**giving (6)**
16:9 22:9
98:12 143:23
168:6,19
**gladly (1)**
7:21
**go (58)**
8:21 13:21
17:12,14
21:15 22:18
22:19,25 26:9
29:23 33:21
33:25 34:8
35:20 48:10
48:10,22 49:3
51:23 52:2
53:4 56:4
59:19 63:17
64:13 66:2
67:7 69:2,6
71:11,15 75:5
75:6 78:14
81:14 83:3,10
84:20 94:9
96:5 98:18
99:12,20
104:22 105:7
121:14,18
123:19 134:3
145:14 146:8

147:10
150:14
151:10
158:25 161:7
162:19
164:17
**GO415 (1)**
63:7
**goal (2)**
61:18 64:22
**goals (5)**
56:8,9,13
61:18 65:5
**goes (1)**
89:14
**going (80)**
7:18,25 10:8
11:3 12:7,10
12:12,14
18:25 19:17
21:2 22:12
25:5 34:14,22
37:5 38:6
46:18 47:15
49:10,13,16
50:2 55:20
56:4 58:23
61:7,12 62:10
62:13 64:13
68:16 69:11
71:11,23 73:8
73:23 75:16
75:22 76:16
78:15 81:20
83:10 86:19
92:2 93:18
94:10,16
99:22,23
100:11
105:24 106:5
106:9,19
108:18
112:12
113:22 115:7

124:4 134:2,3
134:7 140:16
145:7 147:11
151:2,14,16
151:20 153:4
153:10,23
155:6 158:3
159:8 164:20
165:5 169:7
169:25
**good (5)**
7:14,15 12:18
150:22
170:17
**government ...**
145:9
**grab (1)**
149:18
**grabbed (4)**
143:7 144:3
147:22
149:22
**graduated (6)**
37:8,18 38:5,7
38:24 39:18
**graduating (1)**
39:21
**grandma (12)**
118:21 119:11
132:18,21,23
133:3,16
134:10,14,19
135:11 160:8
**grandmothe...**
114:25 115:3
119:8 121:16
133:8 135:6
**great (1)**
57:3
**greater (1)**
32:4
**grip (6)**
150:7,20,21
151:12 153:3

155:3
**ground (1)**
148:19
**guard (1)**
38:13
**guess (39)**
18:10 23:2
30:13 42:17
45:11 46:5,12
46:19,20 51:9
55:21 56:19
61:15 66:14
69:2 72:16,18
76:24 78:13
83:21 89:14
92:19 94:2,18
94:25 95:10
95:16 96:23
97:20 100:6
101:3 116:12
130:2 136:9
146:18
163:15
164:19,23,23
**guidance (1)**
65:4
**guilty (4)**
20:22 26:23
27:3 34:25
**gun (36)**
101:16 122:17
140:4,7
141:15,15,15
141:16 142:7
142:8,11,25
143:8,9,17,20
143:23 144:4
144:8,12
147:22 148:5
149:18,23
150:15
152:14,15
153:14
154:20,23

155:4,4,7
156:15,17,19
**gun-related (1)**
47:16
**guns (3)**
101:16 118:13
120:9
**guys (29)**
8:19 17:5 23:5
35:17 50:6
54:20 63:25
71:3 89:7
93:3 95:5
98:8 108:6
110:10
115:13
116:19
117:13,24
118:12
122:25 123:6
124:5 125:12
127:6 132:2
134:20 135:7
136:15
137:12

**H**

**H (1)**
173:2
**Hal (4)**
3:8 69:3 78:14
168:24
**halfway (2)**
152:19,20
**Hall (1)**
14:17
**hand (5)**
139:25 143:14
144:12,14
176:21
**handcuff (2)**
121:11 140:17
**handcuffed (1)**
146:12

**handcuffing ...**
32:4
**handful (2)**
9:18 31:19
**handgun (1)**
143:11
**handling (1)**
154:3
**hands (17)**
119:12 121:11
137:14,17,20
138:2,6
139:16,18
143:9,12
144:4 150:21
153:15
155:13,19
169:16
**happen (5)**
88:16 91:2,21
114:2 125:5
**happened (12)**
74:8,10 123:18
132:23 137:8
142:19 150:3
151:15
161:10 164:6
165:6,9
**happening (1)**
93:20
**happens (1)**
140:13
**hard (1)**
93:19
**head (12)**
141:19,21
142:8,11,15
143:9,15
144:16
146:18
147:16 157:9
157:18
**health (1)**
166:5

**hear (4)**
8:22 54:21
71:6 132:5
**heard (4)**
17:7 23:10
35:18 54:22
**held (2)**
2:9 40:18
**help (4)**
23:19 57:3
65:2 156:21
**helped (2)**
157:23 158:9
**helpful (1)**
61:21
**helping (1)**
158:22
**helps (1)**
57:11
**hereinbefore...**
172:11 176:12
**hereunto (1)**
176:20
**Hey (4)**
49:25 98:19
100:20 139:4
**hide (1)**
57:2
**hiding (1)**
57:24
**high-risk (3)**
84:25 93:12
120:3
**high-speed (1)**
90:9
**higher (1)**
91:23
**highest (1)**
37:14
**highlighted (3)**
56:10 62:18
71:19
**hired (1)**
38:9

**hiring (3)**
51:24 55:7
174:16
**history (6)**
87:15 91:4,4
101:16
111:24,25
**hit (1)**
143:14
**hold (4)**
13:16 92:18
143:20 150:6
**home (8)**
90:16 100:22
115:4,25
133:4,12,19
138:12
**homicide (1)**
57:10
**homicides (1)**
57:9
**hope (1)**
123:16
**hopefully (1)**
170:7
**hoping (1)**
125:5
**hostage (1)**
92:19
**hour (1)**
84:17
**hours (3)**
83:25 84:18
126:7
**house (23)**
76:6 91:20
92:18 101:19
116:12 118:2
118:7,13
120:9 123:8
124:17 126:3
126:4,4,14,16
158:15,19,23
159:4,18,22

160:23
**hug (1)**
141:9
**hundreds (1)**
31:16
**hurt (1)**
102:3
**hypothetical ...**
76:4

**I**

**ID (6)**
24:12,13 25:3
25:7,8 33:23
**IDC (4)**
45:10,14,22
61:25
**idea (2)**
86:10 106:3
**identifiable (1)**
116:21
**identificatio...**
13:10 21:6
22:17 24:9
33:20 68:13
145:13
162:13
**identifies (2)**
61:17 64:16
**identify (1)**
147:23
**identity (1)**
5:14
**immediate (4)**
33:9 51:14
56:9 158:10
**immediately ...**
100:21 103:22
137:25 138:3
140:3 143:7
155:22
158:14
**impractical (4)**
106:13,17,25

108:24
**improve (1)**
63:15
**improving (1)**
63:20
**inaccurate (2)**
27:22 28:22
**incident (54)**
20:14 22:10
24:18 26:14
26:20 34:24
36:14 37:2
66:25 67:11
67:21 68:3,6
68:17,22,24
69:5,15,17,21
70:10 109:23
112:7 113:7
115:8 120:19
124:18 128:9
132:15
146:11
160:13,16,21
160:24
161:13,15,23
163:3,9,14,25
164:4,5,9,17
164:21 165:4
165:8,19,22
165:25 166:3
167:3 168:16
**incidents (4)**
102:21,22
120:12
165:17
**include (1)**
170:21
**included (1)**
70:20
**incomplianc...**
154:14
**indicate (4)**
25:10 26:13
111:25 118:4

**indicated (2)**
134:11 169:10
**indicates (2)**
56:12 167:23
**indicating (1)**
87:16
**indication (5)**
113:21 120:5,8
120:11,14
**individual (4)**
48:14 69:19
87:20,21
**individually ...**
1:4
**individuals (7)**
31:9 47:19
78:9,18 146:2
146:3 175:15
**information ...**
27:22 28:23
87:3,9,14,23
88:8,19
101:15 103:2
106:7,8
113:11 134:6
174:2,3 175:2
175:3
**initial (3)**
118:19 122:5,6
**initially (6)**
119:11 142:3
142:19,21
143:3 151:23
**initiate (2)**
100:7,10
**inside (13)**
15:9 97:15
98:13 105:8
105:12,21,24
109:16
136:15,20,24
137:2 158:25
**installed (1)**
93:24

**instance (3)**
27:16 34:16,21
**instances (4)**
27:15 53:4
67:5 105:16
**instructors (1)**
80:12
**intel (3)**
119:25 124:9
125:22
**intention (1)**
101:8
**interacting (1)**
31:9
**interactions ...**
31:12,15
**interdepart...**
45:15,17
**interdiction (...**
76:7 89:24
**interdictions...**
90:10
**interested (5)**
51:18 56:20
58:5 60:18
176:18
**interject (1)**
19:3
**interrupt (2)**
29:11,12
**interview (7)**
52:3,13,14
53:3,24 55:7
174:16
**interviewed (...**
51:25 52:5
164:11,18,21
**investigation...**
9:20 10:5
27:18 113:3
168:16
**investigation...**
63:10
**investigative ...**

87:24 88:4
**investigator ...**
1:9,13 113:6
113:13
120:25 125:4
**investigators...**
113:10
**involved (9)**
28:5 89:17
113:6 116:11
120:12,15
124:16
125:17
164:16
**involving (3)**
76:4 98:2
109:24
**Irvine (1)**
169:6
**issue (2)**
99:9 101:6

**J**

**James (6)**
1:3,4,4 109:24
111:8 112:19
**January (9)**
34:5 61:15,17
62:15 71:13
71:14 73:11
73:12,13
**jaw (1)**
154:15
**jeans (1)**
139:11
**Jeff (38)**
112:25 114:24
117:6 126:25
127:3,15
136:11,14
137:2 138:19
138:25
140:14,17,18
140:19,19,21

140:25 141:7
141:8 142:4,9
142:11 143:3
143:6,13
144:15
148:11
149:15
150:23 152:5
152:16 153:6
153:10 154:9
154:10 156:4
156:6
**Jeff's (7)**
141:19,21
142:8 143:8
148:4 153:15
155:19
**JEFFREY (1)**
1:13
**Jersey (1)**
130:9
**job (12)**
20:7 31:21
37:25 40:10
46:4 47:12
49:19,20
72:15,21,24
72:25
**JOHN (2)**
1:10 3:11
**join (8)**
29:8 46:19
47:3 56:13
58:5 76:20
174:8,22
**joined (7)**
66:6 76:11
77:2,11 78:21
94:5 175:10
**joining (8)**
58:6 66:17
80:18 81:3,25
85:10 86:3
92:21

**July (3)**
24:6,18 41:13
**June (4)**
83:19 170:8,13
176:21
**jurat (1)**
170:21
**justice (2)**
37:12 86:11
**justified (1)**
18:16

**K**

**K (1)**
7:2
**K9 (2)**
117:20,23
**keep (1)**
149:16
**kept (1)**
165:11
**kids (1)**
90:6
**KIEBURTZ ...**
3:8,11 29:6,10
29:20 32:6,21
33:6 61:9
169:2
**killed (2)**
7:17 33:10
**kind (35)**
19:14 44:14
45:11 46:11
47:4 56:16
60:4,6,25
75:7 76:9
84:18 110:21
116:18
138:20
139:19
142:23
143:19
146:24
147:17 148:7

149:11,13,25
151:6 153:6
153:22 154:5
155:4 157:8
157:17 166:5
166:18 167:6
170:11
**KINGS (1)**
176:6
**knees (2)**
148:8 149:12
**knew (6)**
87:21 110:13
119:6 120:2
142:10
151:17
**knob (1)**
145:3
**knobs (2)**
144:17 145:2
**knock (6)**
90:16 92:3
99:21 100:5
103:20 121:7
**knocked (9)**
114:24 127:15
127:17,17,18
127:19,21
132:16,17
**knocking (6)**
92:9 99:23
100:12,19
102:6 124:23
**know (164)**
13:24 14:15
15:21,24 16:6
18:11,20,21
23:3,8,12
25:18 27:5,23
27:24 28:4,12
28:14 30:13
31:18 32:9
34:11,23 47:5
47:7 48:16

51:3 52:13
53:17 54:3,20
58:14 59:12
59:14 60:4,12
60:24 61:4
63:4 69:19,25
70:16,17,24
72:10 76:8
78:7 80:3
84:10 86:7,16
87:12,19
89:18,22 90:7
90:11 91:3,5
91:24 92:4,10
97:12,13 98:8
98:10 99:9
100:2,3,13,15
100:17,19
102:8 103:10
103:14,25
104:2,4
106:19
109:16,20
110:8 112:3
112:14
113:10,21
115:21
116:10 117:6
118:9 119:15
120:24
121:15 122:8
122:17
124:15,20
125:8,20
126:10,20
128:4,12,13
128:13 129:3
130:18,22
133:17,19
135:3 136:4,7
136:10,25
137:11,20,23
138:9,11,13
139:4 140:20

141:12,14
142:12
145:25 147:8
148:3,6 150:3
151:23,24
152:21,24
154:8,11
155:12,17,19
156:3,9,14
157:22
159:23 160:4
160:19,19
161:17,19
163:7,20,22
163:24 164:3
165:14,17
166:19
167:14,22,23
169:6 170:10
**knowing (1)**
103:9
**knowledge (1)**
146:5
**known (1)**
126:3
**knows (1)**
97:14

**L**

**L (5)**
4:2,2 7:2,2
172:2
**laid (1)**
146:23
**laptop (1)**
93:22
**large (1)**
41:4
**laser (2)**
152:11,12
**lateral (3)**
41:21 42:11,19
**law (7)**
3:9 5:19 40:11

64:11 93:10
117:12
120:18
**laws (1)**
42:4
**lawsuit (9)**
12:2 14:13,16
15:2,4,13
19:7 36:18
85:23
**lawsuits (1)**
14:16
**layout (7)**
97:12,14 98:9
98:10 109:17
109:20,21
**leader (4)**
110:9,14,17,19
**leading (1)**
113:2
**leads (1)**
79:19
**learn (1)**
30:18
**learned (1)**
40:5
**leave (5)**
96:18 125:10
126:4,4
169:16
**led (1)**
26:21
**left (4)**
144:14 156:15
161:4,6
**LegalView/Z...**
5:8
**legs (1)**
157:5
**less-lethal (1)**
151:7
**let's (17)**
12:21 22:8,25
33:21,22 35:6

May 8, 2024

[Page 191]

49:9 67:9
73:9 85:20
89:18 94:17
104:15
109:23 146:8
169:22
170:14
**letter (7)**
21:7,14,23
22:20 26:22
46:4,12
**level (1)**
37:14
**leverage (1)**
149:18
**Lexington (1)**
3:5
**Lexitas (1)**
5:9
**lieutenant (1)**
25:3
**life (1)**
33:10
**light (1)**
152:13
**lights (1)**
126:18
**liked (2)**
72:21 73:2
**limit (1)**
90:3
**limited (1)**
105:2
**line (3)**
29:22 30:14
177:7
**listed (1)**
64:22
**litigation (2)**
5:20 6:14
**little (9)**
13:19,21 19:17
21:20 57:18
82:17 105:20

105:23 119:2
**live (1)**
159:17
**Lives (1)**
20:16
**Livingston (1)**
11:23
**LLP (1)**
3:4
**local (2)**
88:7 130:4
**located (2)**
87:20 147:23
**location (3)**
88:20,23 124:3
**locations (2)**
5:7 87:18
**long (13)**
37:22 39:13,25
50:24 58:15
118:12 125:8
127:20,24
134:18
135:20
160:22 161:2
**long-range (1)**
56:9
**look (18)**
21:7 26:17
28:11 34:4
36:25 47:18
48:10,22 49:4
49:10,14
65:10 72:12
77:14 82:5
83:11 95:17
121:20
**looking (9)**
22:5 25:13
26:24 27:5
93:13 94:8
95:23 112:10
112:13
**looks (9)**

24:24 64:23
69:16 83:24
84:2,22 93:8
93:15 94:14
**losing (4)**
150:7,19,20
153:3
**lost (5)**
8:20 121:19
148:25
151:12 155:3
**lot (11)**
47:24 57:9
72:24 78:7
79:13 89:13
97:16,17
104:2 125:18
171:3
**loudspeaker ...**
99:6
**low-level (1)**
114:5
**lower (1)**
105:25
**lower-level (2)**
92:7 102:4
**Ls (1)**
53:2
**lure (2)**
96:7,10
**lying (1)**
142:17

———————
**M**
**M (1)**
7:2
**M428 (3)**
85:25 86:20
175:19
**M428s (1)**
86:13
**main (1)**
47:14
**major (1)**

101:25
**making (8)**
69:8 73:5
77:16 94:21
95:15 96:2
133:11
150:10
**Mandy (1)**
59:6
**manipulate (1)**
13:18
**manner (1)**
5:16
**manual (1)**
43:19
**March (4)**
59:2,3,3 60:16
**Mark (1)**
18:14
**marked (12)**
6:3 13:8 21:4
22:15 24:8
33:19 68:12
82:12 92:25
93:5 145:11
162:12
**marking (1)**
173:18
**marriage (1)**
176:17
**marshal (16)**
10:21 45:7
46:20 47:3
51:5 52:7
61:19 64:16
64:18 65:13
65:17 73:14
74:2 110:3
129:23 174:8
**marshal's (4)**
10:23 86:11
132:10 166:4
**Marshall (1)**
52:23

**marshals (12)**
31:2 61:3
76:12 79:24
80:5,9,10
93:10 94:5,23
104:13,16
**Martin (1)**
15:9
**match (1)**
26:18
**materials (7)**
55:3,4,4,6
174:12,14,15
**matter (2)**
20:16 176:19
**matters (1)**
6:14
**mean (43)**
21:25 22:4
27:4,5 28:20
28:21 30:13
31:14 42:14
47:7 63:14
66:7,10 72:14
72:23 74:25
79:2 84:8,9
85:6 88:5
89:13,19 90:3
91:17,18,21
97:10 98:18
100:23 107:7
107:13
115:15
130:13
134:21,23
137:18 150:2
153:25 157:7
159:12 162:7
165:13
**means (2)**
45:14 109:2
**meant (1)**
95:10
**medic (2)**

May 8, 2024

[Page 192]

158:11,12
**medical (3)**
147:9 156:12
169:12
**meet (2)**
36:3,4
**meeting (2)**
5:9 79:11
**member (15)**
17:18,20 19:18
20:5 41:9
45:24 47:8,11
47:12 51:4
63:13 79:18
110:5 129:25
130:15
**members (16)**
1:13 19:11
36:13,17 77:6
79:22 105:25
117:19 129:8
129:15 146:6
158:22
160:12
164:16 165:6
167:4
**memory (1)**
163:19
**men's (1)**
55:12
**mental (1)**
166:5
**mention (1)**
118:5
**mentioned (3)**
61:25 120:24
130:24
**mere (1)**
32:4
**methodical (1)**
103:16
**MICHAEL (2)**
3:13,16
**Michael@us...**

3:16
**microphone ...**
8:24
**middle (1)**
83:16
**Mike (8)**
10:8 18:24
46:17 54:16
76:16 81:19
86:18 166:17
**million (1)**
19:6
**mind (3)**
55:11 131:16
135:15
**minor (1)**
101:25
**minutes (3)**
9:7 135:4
136:2
**misconduct (1)**
53:6
**mitigate (3)**
90:8 101:13
105:20
**mixed (1)**
34:18
**mobile (3)**
16:23 17:19,20
**Mohawk (3)**
37:8,18 38:24
**moment (2)**
122:11 142:10
**money (1)**
139:13
**Monroe (2)**
1:11,14
**month (1)**
79:6
**monthly (4)**
79:7 81:8,22
84:12
**months (5)**
39:17 40:3

41:20,23 44:7
**more-specifi...**
82:6
**morning (6)**
7:14,15 36:5
109:25 112:7
113:15
**motioned (3)**
136:11,14
137:2
**motionless (2)**
152:3 156:11
**mouth (1)**
119:20
**move (1)**
21:19
**moved (2)**
143:24 156:11
**movement (1)**
153:22
**movements (2)**
118:9 153:7
**MSCO (1)**
1:11
**muddle (1)**
9:3
**multiple (1)**
126:7
**muted (2)**
17:11 93:17
**mutes (1)**
8:25

────────
**N**
**N (4)**
3:2 4:2 172:2
173:21
**name (11)**
7:8,16 12:2
13:13 14:12
15:9 24:11
52:22 83:15
84:23 122:3
**named (3)**

11:17 15:25
23:4
**names (3)**
1:10,12 13:23
**narrative (1)**
68:15
**nature (1)**
89:20
**near (1)**
153:17
**necessarily (5)**
84:16 90:11
103:15 107:7
160:20
**necessary (1)**
177:5
**need (3)**
5:11 28:10
52:2
**needed (1)**
66:21
**negotiate (3)**
101:18 102:16
103:23
**neighborhoo...**
99:8
**never (4)**
11:24 58:18
66:13 123:18
**new (27)**
1:2,14 2:11 3:5
3:5,9,10,14
3:15 7:4,13
42:2,15,22
43:8 68:7
77:6 80:25
81:3 93:22
94:4 130:8,9
130:9 168:8
176:4,9
**night (1)**
17:3
**noncomplian...**
30:10

**Notary (5)**
2:10 7:4
172:22 176:8
177:25
**note (6)**
46:24 50:15
69:9 77:16
82:10 166:21
**notice (2)**
2:8 154:2
**number (29)**
1:10,12 8:13
12:11,14
22:19,21
24:12,14 25:3
25:7,8,16,18
25:21 26:2,2
26:4,6,15
28:15 84:22
93:6 94:19
95:12 96:15
106:10
162:16 173:7
**numbered (3)**
85:25 145:10
145:18
**numbers (6)**
25:24 26:12,19
28:25 83:5,7
**NYSP (1)**
1:13

────────
**O**
────────
**O (2)**
4:2 172:2
**oath (2)**
4:17 5:11
**object (16)**
13:18 18:7,17
53:7 60:9
61:9 98:23
101:20
102:18 103:5
107:19 109:4

136:22
150:17
155:14,24
**objection (13)**
19:2 29:6,9,15
29:16 32:6,8
32:21 33:6
107:2 118:16
120:21 147:3
**objections (1)**
4:10
**observe (1)**
141:8
**obtain (1)**
87:14
**obviously (5)**
27:25 30:11
73:2 91:18
153:2
**occasionally ...**
8:24
**occasions (1)**
120:19
**occupants (1)**
100:8
**occupied (2)**
94:21 95:3
**occur (5)**
101:12 105:14
113:22 114:9
124:9
**occurred (4)**
67:12 109:24
112:7 113:22
**October (4)**
20:4 21:8
67:12 73:21
**offenders (1)**
89:21
**offers (1)**
65:4
**office (6)**
1:14 3:14
11:23 80:7

168:9,14
**officer (50)**
4:16 5:10 7:14
10:19 11:12
13:11 14:11
16:3 22:23
23:3 24:11
25:2,6 26:11
28:19 30:20
31:6,21 33:22
38:16 40:7,20
42:3 43:7,13
44:17 49:3,25
55:2,18 63:6
66:2 70:8
72:22 76:25
78:17 81:24
82:10 93:15
99:9 102:3
104:19
108:10
129:25
138:10,11
162:14
174:12 175:9
175:14
**officers (12)**
1:10 41:5
42:15 44:2,10
76:20 116:11
118:11,24
131:21,23
174:22
**officially (2)**
66:6,17
**Oh (1)**
82:22
**ok (1)**
23:9
**okay (192)**
7:22,23 8:10
8:14,17 9:4
9:19 10:3,7
11:16,21 12:5

13:6,20 14:3
14:15 15:7,18
16:9 17:18,23
18:10 19:4
20:3,5,9,13
20:21 21:17
21:19,21 22:8
24:21 25:15
26:10,17 27:8
28:4,13 32:14
32:18 34:7
35:4,6,13
36:4,12,16,20
37:4 39:6,12
40:17,21
42:10 44:4,9
46:7 48:24
49:9,23 50:5
51:21 52:4,21
53:3,12,22
54:3,14 58:2
59:17 60:2,14
61:11 62:4,11
63:2 64:13
67:7,15,19
68:2,18,19,25
70:6,12,17
73:23 74:8,19
74:25 75:9
76:8,15 77:15
79:4,15 82:9
82:16 83:24
84:12 85:8,17
85:20 86:10
86:17 87:22
88:2,18 89:2
90:13,20 91:9
91:13 92:24
93:4 94:16
95:8 97:4,22
100:25
102:24
104:10,22,23
105:10

106:21
107:25 109:8
110:25
111:12
112:16
113:14
114:11,16
115:2,19
117:17
119:14
126:20 127:7
127:14,20,25
128:15,23
129:7,14
133:7,15
134:8 135:10
135:20
136:25 137:6
138:5 140:9
141:8,20
142:15
144:11,24
146:14,17
149:11,22
151:12 152:6
156:5,7 157:7
158:3,25
159:21
160:15 161:6
161:22 162:7
162:25 163:5
163:7 165:24
166:10,16
168:3,6,12,18
168:21 169:3
**once (3)**
9:25 79:6
121:8
**ones (5)**
28:2,5 59:13
81:18 85:21
**ongoing (3)**
79:2,5 81:23
**online (2)**

93:9 94:6
**open (3)**
105:11 134:22
135:7
**open-air (1)**
89:24
**opened (3)**
135:6,11,22
**opens (2)**
107:8,11
**operates (1)**
129:24
**operation (1)**
125:24
**operational (1)**
89:16
**operations (6)**
75:6 85:2,10
94:24 103:12
131:12
**opportunity ...**
56:23 59:10
68:14 105:24
**opposite (1)**
146:19
**option (11)**
90:23,24 91:11
103:3 105:13
107:22
125:13 129:5
130:24,25
151:10
**options (10)**
90:15 95:18
96:2 106:12
106:16,20,24
107:24
108:23 166:6
**orange (1)**
82:23
**order (4)**
28:14,17 61:12
141:4
**ordered (1)**

69:22
**orders (1)**
28:20
**ordinarily (1)**
133:11
**organizes (1)**
79:19
**original (1)**
113:7
**outcome (1)**
176:18
**outside (19)**
96:11 98:20,22
99:22 100:20
101:17
102:15
105:11 106:4
118:4 121:24
134:10,16
136:5,6
159:18 160:3
160:4,23
**overview (1)**
44:19

―――――――
**P**
**P (3)**
3:2,2 4:2
**P.M (2)**
84:3 171:8
**page (60)**
24:10,21 25:5
34:3,3,9
55:22 56:5,7
58:24 60:15
61:12,14
62:10,11,13
64:14 67:8
68:20 69:12
71:11,12,16
71:17 73:9
83:13 84:21
93:14 94:8,9
94:17,18,18

95:9,9,10,11
95:11,17,18
96:15,16
98:15 104:23
104:24,25
106:10,10
107:16
145:15,15,17
146:8 162:15
170:20 173:6
173:23 174:3
175:3 177:7
**pages (4)**
28:24 83:11
94:12 95:24
**paid (1)**
19:6
**Pardon (1)**
108:8
**parking (1)**
79:13
**part (16)**
18:3 31:20
32:14 72:15
72:25 85:12
86:25 89:2
96:12,22
123:13
148:17,17,20
156:25
168:15
**participate (1)**
158:18
**participating...**
5:7 65:8
**particular (1)**
49:16
**parties (6)**
4:6 5:3,17 6:9
29:16 176:16
**party (4)**
6:13,13 10:18
29:15
**patrol (8)**

40:20 44:22
45:3 48:20
49:7,7,13,21
**patrolling (1)**
47:15
**pause (1)**
23:18
**pay (1)**
20:15
**PDF (3)**
71:17 94:19
95:10
**PDS (7)**
34:23 47:23
53:13 55:19
58:3 70:21,24
**peace (1)**
38:16
**penetration (1)**
105:2
**people (24)**
18:12 47:19,22
48:10 56:24
57:7,12,16,21
71:22 72:2
78:11,12
80:14 91:18
105:12 111:3
128:13
130:21 131:7
131:8,12
157:22
158:16
**percent (2)**
52:9 130:3
**perfect (1)**
89:15
**perform (1)**
156:12
**performing (1)**
63:9
**perimeter (4)**
116:13,23
118:25

121:24
**period (14)**
34:6 39:22
43:22 55:24
59:2 62:15
71:14 73:12
76:9 124:22
125:3 132:17
135:5 138:22
**periods (3)**
76:21 77:7
175:4
**permanent (1)**
110:21
**permitted (2)**
29:4 128:24
**person (26)**
12:9 49:4,11
49:14 79:25
80:10 87:18
88:19 91:19
97:14 98:9
100:2,4,14
101:15
102:13,16,22
103:2,25
104:4 125:20
131:16
138:19
145:21
168:15
**phases (1)**
44:4
**photos (4)**
145:11,16
161:3 173:14
**physical (2)**
30:15 33:5
**physically (2)**
154:3 157:2
**pick (1)**
157:2
**picture (11)**
87:13 145:22

146:10,15,17
146:19
147:11,12,21
147:24 158:4
**pictures (2)**
145:4,8
**place (6)**
52:12 79:8,14
85:18 163:3
172:11
**Plaintiff (2)**
2:7 30:18
**plaintiff's (5)**
12:2 13:12
82:18 171:4
173:4
**Plaintiffs (2)**
1:5 3:4
**Plaintiffs' (8)**
13:9 21:5
22:16 24:8
33:19 68:12
145:12
162:12
**plan (12)**
63:12 101:10
103:14,19,20
103:24 104:8
104:11 121:4
122:6,13,16
**planned (2)**
121:15 125:6
**planning (3)**
89:2 90:14
123:4
**planted (1)**
149:17
**platoon (1)**
24:25
**playing (1)**
159:17
**plea (1)**
27:3
**please (6)**

7:8,20 29:14
49:3 64:6
98:21
**pled (3)**
20:22 26:23
34:25
**pocket (6)**
138:3 139:19
139:23 140:2
140:5 141:18
**point (32)**
15:20 38:25
60:3,6,21
79:25 80:10
106:4 117:25
120:25
121:19
123:19
135:10 140:6
143:4 148:2
148:23,23
149:3,8,9,23
150:14,22
155:7 158:8
159:23 160:9
161:12,22
163:23
165:15
**pointed (4)**
141:19,21
142:8 143:8
**pointing (1)**
142:10
**police (50)**
1:14,15 14:11
16:3 19:12
20:11 30:16
30:20,21 31:5
31:21,25
32:15 33:3
38:10 39:2,7
39:8,13,14,18
39:21 40:7,14
40:18 41:2,5

41:14,17,18
42:7,21 43:7
43:10,12,16
53:14 54:5,11
55:5 77:20,25
78:6 91:7
116:21
117:12,20,20
131:20
174:15
**policies (6)**
76:18 77:4,7
86:20 174:21
175:18
**policing (1)**
17:24
**policy (13)**
28:9,11,15,25
28:25 31:25
33:4 86:12
128:20,21,22
128:24 129:4
**porch (8)**
116:14,24
117:5 135:8
135:19 136:5
136:18,20
**portfolio (3)**
61:22 62:2,8
**portion (4)**
42:21 43:5
62:18 71:19
**position (2)**
110:21 142:23
**positions (1)**
40:18
**positive (18)**
41:8 59:8,13
85:19 94:15
115:18
116:15 117:9
120:23
129:10
139:12

144:14 145:3
157:6 161:21
163:10,16
166:9
**possession (2)**
6:7 10:22
**possibility (2)**
87:16 102:2
**possible (11)**
103:17 112:22
122:21
124:11
134:12 137:4
139:15,16
140:22
149:14
154:18
**possibly (16)**
31:19 92:17
98:14 99:9
100:13,13
101:10 104:6
106:6 109:14
122:13,16
124:10 148:9
158:17 161:4
**potential (1)**
113:16
**potentially (1)**
118:8
**practices (1)**
43:16
**praised (1)**
72:18
**prep (1)**
170:10
**prepare (5)**
35:7,9,24 36:9
36:21
**present (4)**
1:11,13 5:3
124:3
**presented (2)**
6:5 133:8

**presenting (1)**
6:4
**pretext (2)**
63:7,20
**pretty (7)**
59:7 74:16
114:5 115:6
139:6,24
141:13
**previously (1)**
66:5
**primarily (1)**
8:15
**prior (20)**
6:7 10:9 53:4
54:17 65:16
65:20 66:17
88:12 95:18
112:9,20
116:4 119:14
120:12,20
121:3,6
123:14
124:19 174:4
**pro (1)**
101:3
**proactive (1)**
60:8
**proactively (2)**
48:6 71:25
**probably (25)**
8:12 11:4
19:25 28:11
28:23 31:14
31:16,17 40:3
44:12 45:3
79:6 81:4
84:3,9 85:7
92:3 109:12
126:24
132:12
138:14 148:5
157:24
169:14,24

**probation (4)**
76:11,23 77:8
175:6
**probationar...**
44:17
**problem (5)**
9:12 18:13
55:14 93:23
101:5
**Procedure (1)**
2:9
**procedures (1)**
43:17
**proceeding (1)**
177:4
**process (11)**
45:6 50:25
51:15,23 52:3
55:7 59:22
87:7 89:3
90:21 174:17
**produce (1)**
140:23
**produced (4)**
81:21 82:3
85:23 145:9
**production (8)**
10:9 46:18
54:18,25 69:4
76:17,18
86:19
**professional ...**
9:14,21 10:11
33:16 40:6
43:11,12
174:6
**program (1)**
93:11
**progress (1)**
50:21
**propensity (2)**
91:6,23
**proper (3)**
10:17 46:13

48:16
proportional...
32:24 33:11
pros (2)
100:24 101:2
protest (14)
14:17,18 15:6
16:18,19,22
18:12,13
20:16,19 24:6
26:20 34:16
34:19
protester (1)
15:9
protests (2)
17:25 18:6
provide (1)
166:5
provided (3)
55:3 166:19
174:13
providers (1)
169:12
providing (1)
38:18
Prude (6)
14:18 15:5
16:18,21 18:6
18:15
Prude's (1)
19:7
PSP (4)
15:10 164:12
164:17,20
PSS (8)
22:10,14,19,20
27:2,16,20
53:19
psychologica...
163:12
public (7)
2:10 7:4 161:8
161:11
172:22 176:8

177:25
pull (3)
86:24 109:22
143:16
pulling (3)
119:19,21
150:20
purpose (1)
5:20
pursuant (1)
2:7
pursuit (1)
92:15
push (1)
170:12
put (35)
12:7 13:7 21:3
22:12 23:19
23:23 33:14
45:9,22,23
46:2,8 49:17
51:3 55:20
58:17 60:21
61:22,25 68:3
77:13 82:11
86:22 92:24
103:14
108:18
119:12
121:10
128:22 138:2
139:25 145:4
145:7 162:8
167:20
puts (2)
24:22 60:16
putting (3)
50:15 62:8
86:8

Q

quarters (1)
154:7
question (76)

4:11 6:9 7:21
7:25 8:10
12:18 16:20
18:8,18 19:3
23:2 25:7
26:5 29:24
30:2,5 33:17
34:8,13,22
35:21 42:17
51:2 53:8
56:19 58:8,22
59:5,11 60:10
61:24 62:17
62:20 64:5,7
65:15 66:14
66:15 71:18
72:16,19 73:8
74:10,11
83:21 84:5
93:13 94:2,4
94:4,10,25
95:16 96:23
98:24 100:6
101:21
102:19 103:6
107:3,20
108:25 109:5
115:13
117:18
130:14 132:3
132:4 147:14
150:18
155:15,25
157:12,14,15
164:19
questioning (4)
6:8 26:11
29:22 30:14
questions (15)
7:18 9:10 14:8
16:15 37:6
55:19 67:18
71:10 82:15
93:2 108:13

134:3,5
145:20
168:22
quick (5)
33:17 55:11
71:10 108:11
167:20
quicker (1)
104:7
quickly (7)
9:8 34:11
101:12
125:23
142:20 150:3
150:25
quite (4)
23:16 59:15
99:4 143:18

R

R (5)
3:2 4:2 7:2
172:2 176:2
radio (6)
49:19,25 50:17
50:20 66:12
67:2
ram (3)
107:10 114:19
115:16
ran (9)
122:7 138:4,16
139:7,21
140:2,19,19
140:21
range (1)
30:8
rare (1)
13:4
rarely (1)
126:5
re-ask (2)
35:21 157:11
reach (2)

139:23 148:5
reached (1)
54:4
reaching (2)
65:5 148:4
read (18)
21:10,21 23:14
26:5 30:3,5
34:10 47:23
59:10 62:19
62:21 64:24
67:16 68:15
94:10 112:16
163:17,21
reading (8)
21:18 34:12
62:23,25 65:6
67:19,20
69:10
ready (2)
35:11 55:17
real (2)
72:19 167:20
reality-based...
79:12
realized (4)
116:5 121:9
150:22 152:4
really (119)
9:17 11:19
14:7 15:16
16:4,8 17:4,8
17:9,17 18:10
18:20,21
19:14 20:19
20:24 22:2,6
26:17 27:7,11
27:13,13,21
27:24 28:2
39:16 41:7,8
42:25 53:10
53:10,16,21
53:25 54:8
57:11,11

May 8, 2024

[Page 197]

59:14,15
60:12 64:12
64:24 65:23
66:3,19,23
68:24 69:2,18
70:5,15,16
72:4,7 75:25
76:13 77:23
79:9 80:22
81:11,12,17
83:23 85:6,7
89:15,19
91:17 93:19
94:15 97:19
110:16
111:17
112:23
115:18 116:9
121:2 125:25
126:23
127:23
128:12,13
129:3,12
131:10
133:17,23
134:12 135:3
135:17,24
136:3,9,18
137:4,5 139:2
144:13,25
148:6 152:14
153:18
154:18
156:16 157:5
157:21
159:19
160:20 163:6
164:3,24
165:2,3,16,20
166:15
167:11,18
**reason (4)**
8:24 27:10
107:25 177:7

**reasonable (1)**
32:20
**reasons (2)**
45:23,25
**recall (77)**
11:19 15:16
16:4,12,16,25
17:4,8,10
18:4 27:15,16
28:7,21,24
29:2 36:24
41:23 42:12
42:18 44:18
52:6 53:11,21
54:13 60:23
63:22,23
64:12 65:23
66:19 67:21
67:23 68:24
70:6,11,12
76:13 81:11
81:12 83:22
85:4,8,14
95:24 96:4
104:17
110:16
111:23 112:6
112:20 113:7
116:9 117:7
117:22 119:7
119:22
123:12,22
126:12,23
131:11 133:9
134:17
136:16,18
138:17 144:6
144:13,25
148:15
150:12
153:16 160:3
166:12 167:9
167:15
**recalled (1)**

26:19
**received (5)**
77:2 78:17
86:2 175:9,14
**recognize (1)**
162:22
**recollection (...**
15:15 21:9,12
21:23 27:2
59:18 68:17
69:14
**reconnect (1)**
9:9
**record (8)**
7:9 11:10 81:9
83:5,7 162:16
164:6 176:13
**recorded (1)**
5:15
**recording (1)**
5:16
**records (5)**
77:10 81:21
82:3 166:20
175:22
**recovered (2)**
156:17,19
**recruits (1)**
42:22
**red (4)**
25:17 82:17,24
152:11
**reduce (2)**
57:6,7
**reducing (1)**
47:14
**reference (2)**
34:15,20
**referenced (1)**
34:24
**referred-to (1)**
30:4
**referring (4)**
129:20,21,23

130:12
**refresh (5)**
15:14 21:8,22
26:25 69:13
**refreshes (2)**
21:11 68:16
**refuses (1)**
102:13
**regarding (8)**
6:8 76:19
78:16,24
81:22 162:20
174:21
175:13
**regional (1)**
130:10
**regular (1)**
43:5
**regulations (2)**
42:8 43:20
**related (5)**
26:12,14 55:6
174:16
176:16
**relates (1)**
67:11
**relation (1)**
22:9
**relayed (1)**
113:11
**remember (1...**
11:25 14:4,21
14:24 15:8
16:9 17:17,23
20:18,19,21
22:2,3,6,9
25:25 27:7,11
27:20 30:2
39:12,16 41:7
43:2,25 44:9
44:11 51:6
52:17,24
53:12,18,22
54:9 58:15

60:2,13,20
62:6 63:18
64:8 66:3,4
67:4,15 72:4
75:25 77:22
80:22 81:17
84:6 85:16,17
94:12 96:9,24
111:9,14,18
111:19,20
112:11,12,24
112:25 117:2
117:4,19
121:2 122:3
123:24,25
127:8,16,18
127:23
132:22,25
133:2,15,22
133:24 134:9
134:13,14,18
135:13,17,20
135:24 136:3
136:10 137:9
138:24 139:8
144:11 147:6
147:7 148:3
150:9 152:12
152:21
153:18,21
154:17,19
156:16,25
157:7,16,17
157:21 158:2
159:8,19,20
159:24 160:2
161:14 162:5
163:14
164:20,24
165:20
166:14,15
167:2,11
168:19
**remembered...**

May 8, 2024

[Page 198]

164:2
rememberin...
155:2,10
remote (1)
5:7
remotely (1)
5:12
remove (1)
157:3
removed (2)
19:15 156:15
removing (1)
158:5
render (3)
147:9 152:9
158:22
rendered (1)
158:6
renumber (1)
12:18
rephrase (2)
7:21 9:11
report (13)
19:20 23:23
24:5 25:11
26:7 32:3,13
67:9 69:11,13
70:3 164:5
167:13
reporter (5)
5:5,13 16:14
30:6 173:18
reporter's (1)
170:16
Reporting (1)
5:10
reports (2)
37:2 112:16
represent (1)
7:17
representing...
14:6
request (5)
10:14,18 11:2

54:17 82:6
REQUESTE...
174:2 175:2
required (17)
31:22 69:16
70:8,14,18
71:2 74:13,19
76:19,22
86:13,15,21
128:25
174:22 175:5
175:19
requirement...
40:6 50:15
requires (2)
86:12 131:20
reserved (1)
4:11
residence (24)
96:8 98:6
102:12,15
103:4 104:12
104:20 108:2
112:5,12
113:18
121:21 125:7
125:10,14
126:6,9,19
134:11,20
135:12,19
136:15 160:7
residences (1)
123:20
resistance (7)
23:23 24:5
25:11 32:3,13
69:11 70:3
resisting (2)
91:7 143:23
resort (3)
107:18,21
109:3
resources (5)
87:25 88:4

99:5 109:19
110:23
respect (1)
97:23
respective (1)
4:6
respond (1)
67:2
responded (1)
102:12
responding (1)
75:16
response (1)
18:3
rest (3)
49:12 158:15
158:19
restate (1)
64:5
resulted (1)
119:20
resume (4)
45:11 46:8,11
46:15
retained (1)
173:17
reverse (1)
61:11
review (1)
36:20
reviewed (4)
24:23 53:13
63:6 177:3
reviewing (1)
70:3
RICHARD (2)
1:9,12
right (74)
12:24 14:13
15:18 20:17
25:22 26:6,15
31:22 37:4,9
37:12,17 38:4
38:8 40:15

41:14 42:15
44:5 48:15
55:18 56:5,8
56:14 60:18
63:3 65:10,18
68:22 70:21
71:5,9 73:16
77:17 82:19
84:4,20,23
87:5 88:14
89:8 106:5
108:7 109:3
110:12 111:7
111:16
116:25 117:7
117:11
118:22
119:22
123:24 129:2
131:4 132:3
132:19 135:8
136:16 137:9
141:19 142:2
146:12,20
149:6 150:16
152:17 155:2
161:24 162:4
163:4 164:12
168:10 170:2
170:3
risk (3)
89:25 92:20
105:25
risks (6)
89:17 90:12
96:25 113:16
124:16
125:17
roadblock (1)
169:15
Rochester (35)
1:9,14 2:6 3:9
3:10 7:12
14:11 16:2,24

17:21 19:11
20:10,17
29:17 30:16
30:21 31:5,24
32:15 33:3
41:14,17 42:7
43:13 53:14
54:5,11 55:5
57:2 77:25
78:6 129:15
129:19
131:19
174:14
ROD (1)
1:12
role (1)
75:23
roles (2)
44:20 47:6
Rome (10)
38:10 39:2,7
39:13 40:9,13
40:18 41:2,5
77:19
room (11)
3:10 16:13
55:12 122:8
133:6,25
135:23 137:7
159:6,7,25
rotated (1)
143:5
ROTH (2)
3:4,4
RPD (30)
1:9,10 23:3
24:22 27:10
28:18 29:3
44:20 47:6,9
47:25 55:9
58:6,11 60:4
60:25 61:5
70:8 72:11,21
78:16 104:13

May 8, 2024

[Page 199]

104:19
129:20
131:24 132:6
161:18,19
166:4 175:12
**RPD's (1)**
28:9
**rule (1)**
32:18
**rules (6)**
2:8 29:3 30:17
32:15 42:8
43:20
**run (1)**
140:11
**running (1)**
122:17
**Ruse (1)**
96:6
**rush (1)**
103:15
**rushing (4)**
100:21 101:19
103:4,12
**Ryan (2)**
12:3 13:13

——————
**S**
——————

**S (5)**
3:2,13 4:2,2
173:2
**safe (3)**
47:22 89:15
140:22
**safely (2)**
121:4 167:17
**safer (5)**
57:12 90:11,23
103:3 106:4
**safest (10)**
89:3,11,19
90:2,4 91:11
91:14 103:17
122:9,21

**safety (5)**
93:11 99:9
122:7 161:9
161:11
**Sandra (3)**
2:10 176:8,25
**saw (10)**
70:23 112:14
135:22 137:6
138:6 139:22
140:7 143:8
152:2 159:16
**saying (15)**
13:25 25:17
46:10 97:23
100:8,20
105:5,6
107:17 129:7
139:21
142:17
149:13 155:9
163:17
**says (30)**
22:19,22 26:12
31:25 34:6
55:24 58:4
60:17 65:3
67:11 68:20
68:23 71:17
71:19 73:10
82:18 84:2
85:2 94:20
95:3,18 96:17
100:7 104:25
106:12
128:24
162:17,21
163:18 177:3
**scenario (1)**
101:22
**scenarios (1)**
113:23
**scene (7)**
99:4 117:11

160:13,16,23
161:3 164:21
**school (3)**
38:6,12 90:6
**science (1)**
163:12
**scientific (1)**
163:18
**scouting (1)**
88:12
**screen (9)**
13:11 82:17
159:9,11,12
159:14,16,20
162:14
**screening (1)**
60:25
**scroll (1)**
85:20
**se (1)**
74:5
**sealing (1)**
4:7
**second (20)**
13:7,17 24:21
34:9 62:18
64:4 67:16
68:20 71:16
77:18 94:9
108:9 111:22
115:11
119:18
126:21,24
141:3 145:6
159:7
**seconds (1)**
150:4
**section (6)**
9:14,22 10:11
33:16 63:11
174:6
**security (6)**
37:20 38:13,18
38:18 40:10

118:3
**see (49)**
13:12,18 22:25
24:11 26:19
33:23 34:15
34:20,20
49:21 56:2
59:10 67:9,10
67:13 68:4
73:9 82:16,21
83:15 85:20
88:22 94:17
97:19 105:21
105:24 118:8
118:9 121:8
123:16 124:2
124:4 126:2
139:13 140:4
142:12,13
145:5 146:11
146:14
147:12,20
152:11 153:6
156:8 162:15
168:3 169:22
170:17
**seeing (3)**
124:21 159:9
159:20
**seen (1)**
116:7
**selected (2)**
58:14,15
**selecting (1)**
95:13
**send (4)**
61:2,7 134:10
134:16
**sense (4)**
11:8 12:20
15:21 42:23
**separate (2)**
5:7 46:15
**September (8)**

15:10 19:24
73:15,17,20
109:25
110:14 111:6
**sequentially ...**
12:13,21
**Sergeant (8)**
1:11 24:24
59:6,19 62:4
62:7 80:3,6
**series (1)**
134:3
**served (1)**
58:18
**Service (4)**
5:10 10:23
73:15 132:10
**services (2)**
166:4,11
**sessions (2)**
166:20 175:23
**set (9)**
30:17 62:24
76:14 115:25
118:3 121:24
163:15
176:12,21
**setting (1)**
116:12
**settle (1)**
19:6
**Shane (1)**
52:20
**Shane's (1)**
52:21
**she'd (1)**
136:8
**sheet (3)**
81:10 84:9
177:1
**sheets (4)**
81:16,22 82:4
82:13
**SHENEA (2)**

May 8, 2024

[Page 200]

1:3,4
**SHERIFF (1)**
1:11
**sheriff's (4)**
1:12,14 11:23
80:7
**sheriffs (2)**
79:23 80:2
**shield (7)**
114:6,12,14
115:15
127:12 138:6
138:23
**Shields (1)**
7:16
**shirt (2)**
139:11,12
**shoot (19)**
89:22 92:2,16
101:11 104:8
122:14
143:13
150:23 151:2
151:14,17,20
153:4,10,23
154:8 155:6
158:17 170:4
**shooting (12)**
47:17 57:8,9
83:20 84:6,10
120:12 151:3
151:18,19
154:9 160:9
**shootings (1)**
105:14
**short (4)**
138:22 140:15
170:7,11
**shortly (1)**
161:5
**shot (15)**
92:22 104:11
104:19
151:21,24

152:7,10
153:11,13,24
154:21 155:8
155:22 156:3
156:6
**show (1)**
75:7
**showed (2)**
105:17 160:12
**shower (1)**
144:17
**side (12)**
144:17,18,19
144:22 145:3
146:19,20
147:16
149:12 157:9
157:19,20
**sideways (1)**
143:25
**Sierra (3)**
2:10 176:8,25
**sign-in (5)**
81:10,16,22
82:4,13
**signature (4)**
162:22,23
167:24
177:21
**signatures (1)**
162:21
**signed (5)**
4:16,18 83:11
161:23 163:8
**similar (4)**
47:5,6 76:3
113:24
**simply (1)**
121:11
**simultaneous...**
139:25
**simultaneous...**
153:5,9
**sink (6)**

144:20 146:15
146:20
147:16
157:10,19
**sit (1)**
121:23
**sitting (3)**
16:13 59:18
126:7
**situation (2)**
102:11 133:13
**situations (3)**
76:5 124:14
126:5
**six (3)**
39:17 40:14
41:20
**skip (1)**
58:24
**slash (1)**
71:20
**small (1)**
143:10
**smaller (1)**
159:15
**Smith (8)**
12:15 93:9
127:8 145:22
146:3 150:9
154:11,13
**Smith's (1)**
155:13
**somebody (10)**
16:15 29:5
33:8 49:21
96:10 104:12
115:17
150:24
158:11
164:18
**son (1)**
7:17
**soon (1)**
122:7

**sorry (6)**
17:13,19 23:14
34:17 78:8
82:25
**sort (5)**
9:8 83:15 94:6
167:3 169:16
**sound (2)**
32:5 73:16
**sounds (1)**
41:15
**sources (1)**
88:10
**speak (7)**
35:15 36:8
160:8,11,15
165:5 166:17
**speaking (1)**
138:21
**special (3)**
10:20 40:24
48:3
**specialized (3)**
58:7,10,19
**specific (16)**
48:25 49:10
53:19 67:4
76:14,25 77:9
77:20 78:2,22
79:18 94:11
131:15
133:16 134:5
175:8
**specifically (7)**
56:21 63:7
64:8 78:16
84:11 138:25
175:13
**specifics (1)**
22:6
**specified (1)**
172:11
**Spelled (1)**
52:25

**spend (1)**
123:23
**spoke (4)**
78:23 120:25
160:20 168:7
**spoken (4)**
36:12,16
120:18
166:13
**spread (2)**
49:5,6
**SRR (2)**
68:3,5
**SS (1)**
176:5
**stand (1)**
118:25
**standards (5)**
9:14,22 10:11
43:12 174:6
**standing (2)**
121:12 148:6
**stands (1)**
64:18
**Stanley (1)**
15:9
**start (5)**
37:7 71:7
74:17 83:24
125:22
**started (6)**
60:7 74:14,17
128:10,14
158:12
**starting (1)**
157:14
**starts (2)**
34:3 140:11
**state (13)**
1:14 2:11 7:4,8
7:12 19:22
43:7 80:25
81:3 117:22
168:9 176:4,9

May 8, 2024

[Page 201]

**statement (8)**
22:23 23:21
26:9,11
161:23 162:8
163:8 168:8
**statements (2)**
168:14,19
**states (10)**
1:2,9 3:14 11:9
46:23 55:9
65:13 80:16
80:20 81:15
**stay (3)**
29:21 101:17
105:11
**stayed (1)**
102:15
**staying (1)**
106:4
**step (1)**
135:16
**stepped (1)**
151:13
**sticker (1)**
82:18
**STIPULAT...**
4:4,9,14 5:2
6:2
**stomach (1)**
144:2
**Stone (2)**
37:21 38:12
**stop (14)**
90:18 92:12
96:16,22 97:2
97:6,25 98:2
122:19 123:7
123:9 124:6
125:12 151:3
**stopped (1)**
132:10
**stops (5)**
63:7,21,24
64:10 97:17

**strategic (1)**
103:16
**strategies (2)**
95:14 96:13
**strategy (1)**
96:20
**street (5)**
3:10 7:12
16:18 19:22
99:7
**streets (5)**
17:24 31:9
57:8 75:8,13
**stretched (3)**
143:17,20
149:20
**striking (1)**
107:9
**structure (8)**
95:20 96:18
97:2,11,12,14
97:15 98:7
**structures (3)**
94:21 95:4
97:21
**struggle (2)**
143:25 149:10
**students (1)**
42:19
**studied (1)**
28:18
**study (1)**
163:18
**stuff (1)**
170:16
**subject (18)**
9:20 10:5
23:22 24:5
25:11 27:17
32:2,12 69:10
70:3 96:18
99:10 101:4
113:8 118:7
153:9 156:6,9

**Subscribed (2)**
172:18 177:22
**substance (5)**
35:14,22 53:11
53:23 112:24
**Suite (1)**
3:5
**supervisor (1...**
24:23 49:2
52:19 59:24
61:21 63:5,19
65:4 70:2
72:17 160:5
160:16
**supervisors (4)**
52:8 54:5,11
64:9
**supporting (2)**
162:17 167:21
**sure (57)**
8:25 9:17 16:8
17:15 18:23
26:3 27:13
28:2 29:18,25
30:16 52:9
54:8 59:16
63:4,16 66:23
70:5,15 72:7
73:20 77:23
78:4 85:6,7
93:19 105:4
111:12
114:23 116:3
116:16
117:23 128:7
129:12,15
130:3 131:10
136:9 137:5
142:9 150:13
152:14 154:9
156:7 157:15
157:24
158:15 159:7
162:6 163:6

164:7 165:2,3
165:16
166:23
167:18 168:2
**surprise (3)**
104:6 121:19
122:10
**surrender (2)**
102:17 121:25
**surround (1)**
98:18
**surrounded (...**
116:23
**surveillance ...**
88:12,22
115:25 118:2
122:15
123:14 124:2
125:4,9,19
159:9
**surveilling (1)**
123:23
**suspect (4)**
11:3 100:8
102:3 105:21
**suspended (2)**
20:14 27:10
**suspension (3)**
20:23 26:21
35:2
**suspicious (1)**
47:17
**SWAT (5)**
41:10 47:8
58:6,10,19
**sworn (9)**
4:15,18 5:12
7:3 172:5,18
176:12 177:2
177:22
**system (3)**
50:16 115:25
118:3

**T**

**T (6)**
4:2,2 172:2
173:2 176:2,2
**tack (2)**
83:20 84:6
**tackled (7)**
142:4 143:3,6
144:9,15
146:24
147:15
**tactical (6)**
44:25 47:11,13
92:4 98:13
109:11
**tactics (1)**
109:14
**take (22)**
35:4 44:15
51:8 55:11
71:25 73:23
75:23 77:14
79:8 82:5
91:4 92:4,8
140:4,20,22
147:7 156:21
158:3,9 165:5
166:10
**takedown (5)**
87:19 89:16,24
90:5 91:18
**taken (7)**
2:7 52:12
55:16 118:18
141:17
146:25 177:4
**talk (7)**
36:5 115:11
122:23
135:16 165:9
165:13,21
**talked (5)**
10:14 72:8
163:23

165:14,25
**talking (13)**
30:12 59:11
63:4,12 72:3
104:23 115:3
118:21,22
119:10,11
121:13
135:18
**talks (4)**
56:8 96:6,16
96:21
**target (1)**
96:18
**Taser (1)**
151:4
**task (65)**
19:14,18 20:6
36:13,17 45:5
45:8,24 46:20
47:3 51:5
56:11,13,21
57:15 58:3,5
60:18,22
61:19,22 62:2
64:19 65:13
65:22 66:6,17
72:12 73:4
74:2,15 76:20
77:3,6,11
78:21 81:25
85:10 86:3
87:8 88:11
92:21 110:6
111:6 115:5
117:19 128:5
128:10 129:8
129:16,19,20
129:23 130:4
130:5,10,12
130:16
133:20 146:6
164:16 165:6
174:9,23

175:10
**taught (2)**
106:14,21
**team (24)**
41:10 47:8
58:6,10,19
74:18,20,21
75:5 79:3,18
79:22 80:18
81:9 90:22
91:10 105:18
105:25 110:8
110:14,17,18
114:7 167:4
**techniques (1)**
154:15
**teeth (1)**
119:21
**tell (14)**
12:8 15:19
21:11,15
24:25 27:19
28:8 34:13
35:7,13,22
59:4 61:6
114:18
**telling (1)**
91:25
**ten (2)**
116:16 118:11
**tend (1)**
163:14
**term (4)**
46:11,13 48:16
130:3
**terms (4)**
8:6 90:2,7
106:18
**test (1)**
44:14
**testified (9)**
7:5 8:11,18
9:13,21 10:10
11:13 154:14

174:5
**testify (5)**
10:3 169:7,11
169:13 172:5
**testimony (7)**
16:10 22:9
50:9 172:6,10
176:14 177:5
**thank (6)**
21:20 29:20
55:10 83:9
169:2,3
**thankful (1)**
57:5
**therapist (1)**
165:24
**thing (9)**
17:7 74:9
131:11
132:23 137:8
137:22
140:13
143:13
152:20
**things (19)**
29:19 42:5
45:12 47:16
60:7 73:3
76:17 77:3
90:21 91:21
95:5 96:4,14
97:5 98:5
103:19
121:14 167:7
167:16
**think (168)**
9:23 10:16
12:19 14:5
16:5,25 17:2
17:16,22 18:2
18:12,16
19:13 27:4
28:23 39:16
41:12,22,22

42:13 43:2
44:6,7,11,24
45:2 50:18,21
52:10,17,19
56:22 57:3,4
57:10 65:23
66:10 72:23
72:24 73:4,7
73:21 75:4
76:2 85:15
90:3 91:16,22
93:22 95:6
96:12 99:25
100:4 101:10
101:22,23
102:5 104:5
104:21 112:8
112:10,13
113:4,5,9
115:17
117:21 118:5
118:24
119:21,24
122:2,5,6
123:10,13,14
123:15,21,22
124:7,8,25
125:2,2,5,18
126:23
127:24 129:4
129:10,11
130:20 131:8
131:16 133:3
133:17,18,21
133:22,23
135:3 137:9
137:19 138:2
138:9,17,19
139:2,5,10,24
140:6 141:6,6
141:15,17
143:10
144:13,20
145:2 146:7

147:25 148:2
148:16,16,17
149:14,20
150:12
151:18 152:6
153:16,17,19
156:4,14
157:4,22
158:8,10,12
159:8 160:4,6
160:10,17,18
160:25 161:2
161:3,4,12
162:2 163:10
163:11,15
164:8 165:7
165:13 166:7
166:7 167:5
168:5,22
169:14,21
170:2
**thinking (2)**
32:10 151:2
**thought (8)**
87:20 122:8
140:16 156:5
157:4 163:20
164:2,13
**thousands (1)**
31:16
**threat (1)**
151:3
**threats (1)**
158:24
**three (7)**
20:15 26:21
27:24 76:24
77:3,9 146:2
**three-day (3)**
20:23 34:25
85:5
**three-page (1)**
24:20
**threshold (2)**

May 8, 2024

[Page 203]

136:17,23
**threw (5)**
137:14,16,20
139:15,18
**throw (1)**
139:13
**tickets (1)**
64:11
**time (68)**
1:19 2:3 4:12
11:4 14:10
16:2 17:21
20:2 27:12
28:18 31:8,11
36:3 38:2,7,8
38:11,16 40:4
40:21 44:23
47:25 51:10
52:8,19 61:8
64:21 70:13
76:9,14,21
77:8 83:25,25
89:22 91:3
101:9,23
104:7,18
110:17 114:4
119:7 123:23
124:23 125:3
125:16 128:2
129:17
134:15 135:2
135:5,14,21
138:22
152:15 153:8
154:12,21
155:12,19
159:2,17
162:4 163:19
170:16
172:10 175:4
**times (25)**
8:11,12,14
9:16,18,19,24
10:9 11:16,21

27:9 31:18,19
70:7 80:19,23
80:25 81:5
99:19 104:2
105:19 122:4
125:9 126:8
174:4
**timing (4)**
133:23 135:4
135:25
170:18
**tinted (4)**
97:18,24 98:3
126:11
**tiny (1)**
145:19
**tips (1)**
88:8
**title (2)**
83:19 84:24
**to-be-contin...**
169:20,22
**today (3)**
7:18 16:14
168:23
**today's (4)**
35:8,25 36:9
36:21
**TODD (1)**
1:11
**toes (1)**
113:25
**told (3)**
15:12 31:24
170:18
**tool (4)**
107:17 109:2
114:16
115:15
**toothbrush (1)**
119:19
**top (17)**
22:18 24:18
25:16,17 26:4

33:21 34:4
55:24 61:18
82:19 94:20
106:12
142:12
148:11
149:16 150:8
153:6
**total (1)**
116:12
**touch (1)**
169:5
**touched (1)**
157:2
**tracker (1)**
48:22
**trackers (1)**
72:6
**traffic (2)**
64:11 92:12
**train (2)**
74:20 75:6
**trained (2)**
75:12 95:25
**training (79)**
39:23 40:5
42:2 43:19,23
44:2,5,10,16
44:21 67:9,24
69:13,15,23
70:9,14,18,25
74:4,7,7,14
74:18,18,23
74:23 75:2,3
75:4,10,13,18
75:20,21
76:10,19,23
76:25 77:5,5
77:8,10,21
78:2,15,17,22
79:3 80:12,21
82:3 83:18,22
84:7 85:5,13
85:18,24

86:14,25 93:9
93:11,14
94:11,18 95:2
95:3,11,24
96:9 105:17
106:22
165:15
174:21 175:5
175:8,12,13
**trainings (25)**
79:5,8,17,19
79:23 80:4,16
81:2,6,9,15
81:16,23,23
82:13 84:12
84:14 85:9
86:2,5,7,8
94:6 96:24
106:22
**transcript (5)**
6:12 22:13
172:9,9 177:3
**transcripts (2)**
10:12 174:4
**transferred (3)**
41:16 72:11,22
**transfers (2)**
42:11,19
**transitioned ...**
150:25
**transported ...**
160:2
**transporting...**
66:22
**travel (1)**
80:15
**traveled (2)**
80:20 81:2
**treat (1)**
113:23
**treating (2)**
113:25 114:8
**treatment (1)**
156:13

**trial (5)**
4:12 170:6,8,9
170:11
**trick (2)**
21:2 162:7
**tried (1)**
102:15
**troopers (3)**
133:20 161:20
165:3
**trouble (1)**
65:6
**true (2)**
172:9 176:13
**truth (1)**
172:5
**try (36)**
47:20 57:7,24
88:15,21 89:4
90:3,8 92:18
93:18 99:13
99:21 100:10
101:18,23
103:22 104:6
104:12
106:20
107:23
109:12,18,19
122:19
123:19 124:9
124:10
125:13
140:21 145:5
147:8,9 148:4
149:18 152:9
158:17
**trying (20)**
13:17 20:25
23:14 26:18
52:16 57:5
89:11 92:9
96:7,10 98:9
102:7 103:16
118:15 119:3

May 8, 2024

[Page 204]

143:16,20
149:16
156:24 168:3
**tub (40)**
141:9,22,25
142:4,6,16,18
142:25 143:7
143:19 144:5
144:16,17,18
144:22
146:23 147:2
147:8,13
148:2,11,20
149:9,13
152:8,13,16
154:16
156:10,12,16
156:22,24
157:3,17,19
157:23 158:6
158:9,21
**tucked (1)**
143:24
**turn (1)**
125:23
**turned (7)**
60:6 146:25
149:24
154:22 155:4
157:18,24
**turning (5)**
37:21 38:12
60:3,6 157:8
**TV (1)**
159:15
**two (16)**
16:6 27:24
53:2 64:25
76:21 77:7
85:24 86:5
94:12 113:10
119:21
130:21 131:7
131:8 168:18

169:24
**two-year (1)**
37:11
**twofold (1)**
124:8
**type (7)**
30:12 87:16
125:24
133:13
137:22
152:20
163:18
**types (2)**
89:6,10
**typically (13)**
49:15 57:20
79:24 87:11
90:25 91:22
97:11 99:4
102:4 103:13
107:24 114:6
138:18
**typo (1)**
84:2

_____

**U**

**U (1)**
4:2
**U.S (22)**
10:21 29:16
30:25 45:7
46:20 47:3
51:5 61:3,19
64:16,18
73:14 74:2
85:25 86:13
86:20 94:23
110:3 129:20
129:23 174:8
175:19
**uh (1)**
23:10
**Ulatowski (5)**
1:13 113:2

134:9 146:23
169:25
**um (1)**
152:25
**unauthorize...**
5:18
**underneath (7)**
62:18 142:2
143:22 150:8
154:23 155:5
155:8
**understand (4)**
7:20 8:3
111:13
141:24
**understandi...**
57:15 128:23
131:2 164:15
**understood (1)**
8:2
**unfortunatel...**
113:21 157:12
**unidentified ...**
1:13
**uniform (1)**
131:22
**unit (7)**
45:2 47:12,13
48:9,17 56:11
58:20
**United (7)**
1:2,9 3:14 11:9
46:23 55:9
65:13
**units (2)**
58:7,10
**unknown (3)**
1:10,12 103:9
**upper (1)**
148:20
**use (9)**
29:4 30:10
31:13,17,22
33:4 55:12

70:9,19
**use-of-force ...**
28:9,15
**usefulness (1)**
63:9
**USMTF (1)**
64:18
**usually (7)**
12:18 102:6
103:13,13
107:9,10
109:7
**Utica (1)**
37:9
**utilized (1)**
99:3

_____

**V**

**vaguely (2)**
21:25 27:4
**varied (1)**
79:15
**varies (1)**
125:25
**variety (3)**
87:24 88:9
111:2
**various (3)**
95:25 96:21
116:2
**Vaughn's (1)**
18:14
**vehicle (24)**
63:21,24 64:10
64:11 76:6
84:25 85:10
89:23 90:10
90:17 91:20
96:16,19,22
97:2,6,17,25
98:2,3 124:11
124:13,17,22
**vehicles (8)**
88:23 97:17,18

97:20,21,23
126:17,18
**verbally (1)**
151:16
**versus (8)**
14:17 86:14
90:17 92:12
97:2,7,11
103:9
**video (5)**
8:20 68:22
69:5 70:4
174:19
**videoconfere...**
2:9 5:5,8,15
6:11
**violation (1)**
5:19
**violence (3)**
47:21 57:8
114:8
**violence-rela...**
47:20
**violent (4)**
47:15 56:24
89:20 111:24
**voluntarily (4)**
102:13 120:18
121:10,23
**volunteer (1)**
134:6

_____

**W**

**W (171)**
7:1,2 8:1 9:1
10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1

28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1

116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1
**wait (8)**
103:10 121:24
122:12
124:10
125:10 136:4
160:19,22
**waiting (4)**
100:20 105:21
123:8 124:21
**waived (1)**
4:7
**walked (1)**
127:3

**walking (1)**
123:17
**want (27)**
12:6 18:12
21:10 27:22
28:22 29:11
33:14,25 44:8
47:5 48:8
67:7 68:2
77:17 82:11
92:24 95:8
96:5 115:10
122:23 123:4
139:10 145:4
153:11
167:20
169:10
170:12
**wanted (19)**
34:20 47:18
49:22 56:17
57:17,20
63:15 67:17
71:20,22 72:3
72:13 73:2,3
78:10,12,19
154:10
175:16
**wanted-pers...**
65:9
**wanteds (1)**
48:11
**wanting (2)**
45:24 58:4
**warrant (34)**
47:24 48:9,21
49:4,18,20,22
50:2 57:17
71:20 72:5
73:2 98:21
102:5,9 111:5
111:7,15,21
112:18,19
113:8 114:5

115:5 119:13
119:15,16
120:20 121:3
124:19 133:7
133:19
136:13 139:4
**warrants (16)**
47:19 48:9,10
57:21 65:9
72:2,13 77:21
78:3,8,10,12
78:19,24 92:7
175:16
**Warren (1)**
14:17
**wasn't (18)**
50:21 51:14
54:16 58:13
58:15 59:13
63:3 66:8
114:22
115:16
121:16
148:13
149:15
152:14 156:6
156:7 164:13
167:10
**waste (1)**
170:15
**way (25)**
49:13,23 50:3
50:4,11 52:25
88:17 89:3,11
89:15,16
91:25 100:11
103:17 105:7
108:15
113:20 122:9
122:21
125:17
141:11
143:18
146:22

154:10
176:18
**Wayne (1)**
111:22
**ways (2)**
66:16 157:25
**we'll (4)**
9:2 77:14
87:11 169:19
**we're (10)**
7:25 55:21
76:16 78:15
80:11 81:19
86:19 114:5
114:21
118:22
**we've (2)**
82:2 98:20
**weapon (7)**
87:17 103:10
120:6 140:23
151:7,10,22
**weapons (3)**
91:6,19 116:18
**wear (5)**
116:19 128:15
129:5 131:3
131:21
**wearing (6)**
118:12 128:5
128:10
129:16
132:10 139:9
**week (1)**
169:8
**weigh (1)**
117:25
**weighing (1)**
96:24
**went (22)**
12:11 50:16
52:15 53:18
74:6 116:24
117:4 134:23

May 8, 2024

[Page 206]

139:19
141:13 143:2
151:21
152:10
153:14
154:22 155:5
155:7,22
160:6,24
161:8 165:19
**weren't (5)**
41:9 42:15
75:16 156:18
158:16
**western (5)**
1:2 3:14 130:5
130:8,11
**Wheeler (5)**
24:24 59:6,19
62:5,7
**WHEREOF ...**
176:20
**why-are-you...**
137:22
**wide (2)**
30:7 88:9
**William (11)**
2:6 7:10 13:23
22:23 23:4,13
24:11 33:22
172:15 177:1
177:2
**windows (3)**
97:24 98:3
126:11
**windshield (1)**
97:19
**withdraw (3)**
51:2 74:10
94:3
**withstanding...**
6:12
**witness (19)**
2:6 5:6,11,12
6:4,6,8 7:3

10:4 21:17,18
62:23 67:19
167:24 171:9
176:11,14,20
177:21
**witness's (1)**
5:14
**witnesses (1)**
169:24
**woman (1)**
7:17
**wondering (1)**
64:25
**work (8)**
16:17,20,22
19:20 41:5
57:9 60:8
65:21
**worked (4)**
31:5 38:12
40:13 74:20
**working (5)**
38:9,25 74:14
110:2 158:13
**worries (1)**
93:25
**wouldn't (9)**
34:23 48:14
49:8 75:23
90:4 92:3
103:11 107:7
107:21
**writing (10)**
10:14 11:11
46:22,24 55:8
64:10 69:6
77:13 78:20
86:22
**written (2)**
5:17 164:6
**wrong (1)**
131:13
**wrote (1)**
61:21

---
**X**
---
**X (4)**
1:3,16 173:2
173:21

---
**Y**
---
**yeah (18)**
10:13 23:11
44:11 46:5
48:19 50:11
75:25 77:23
96:3,12
114:20
139:24
148:14 154:4
163:6 165:12
166:15
170:14
**year (4)**
34:2 37:23
39:4,17
**years (10)**
30:21,25 31:4
31:15 40:14
44:23,25 45:2
45:4 51:10
**yelled (3)**
141:14,15
156:4
**yelling (2)**
118:23 152:5
**yellow (2)**
82:20 83:2
**yesterday (11)**
9:6 10:15
12:12,25 36:5
77:13 92:25
93:5,8 108:18
154:13
**yesterday's (1)**
82:12
**York (18)**
1:2,14 2:11 3:5
3:5,10,14,15

7:4,13 43:8
80:25 81:3
130:8,9 168:8
176:4,9
**YORK- (1)**
3:9

---
**Z**
---
**Zoom (2)**
2:9 93:23

---
**0**
---
**01 (1)**
37:20
**05/08/2024 (1)**
177:4

---
**1**
---
**1 (6)**
12:8,11,15,15
82:12,18
**1-10 (2)**
1:10,12
**1,000 (1)**
28:24
**1/2016 (1)**
34:6
**1:58 (1)**
171:8
**10 (6)**
33:15,19 55:21
69:12 173:12
174:6
**10:15 (2)**
1:19 2:3
**100 (5)**
7:12 19:22
41:8 52:9
130:2
**10016 (1)**
3:5
**11 (5)**
62:13 68:10,12
83:13 173:13
**11947 (1)**

25:3
**12 (4)**
19:6 145:8,12
173:14
**12/12/08 (1)**
55:25
**12/2016 (1)**
34:7
**12th (2)**
59:3,3
**13 (8)**
31:4 64:14
84:21 162:10
162:12
167:20 173:8
173:15
**138 (1)**
3:15
**14 (3)**
62:11 67:8
69:12
**14202 (1)**
3:15
**145 (1)**
173:14
**14514 (1)**
7:13
**14614 (1)**
3:10
**14th (1)**
169:8
**15 (2)**
62:14 64:15
**15th (3)**
109:25 110:14
111:6
**16 (1)**
34:2
**16-0628 (1)**
22:21
**16-175268 (1)**
25:22
**1617268 (1)**
26:13

May 8, 2024

[Page 207]

**1617518 (1)**
26:12
**162 (1)**
173:15
**166 (1)**
175:23
**17 (1)**
30:21
**17308 (1)**
84:3
**19 (1)**
95:11
**19-page (3)**
83:14 84:21
85:22
**192 (1)**
3:5
**1940 (3)**
24:12 25:7
33:23
**1st (3)**
62:15 71:14
73:13
**1st-- (1)**
73:11

_____ **2**

**2 (3)**
92:25 93:5
108:17
**2/10/09 (2)**
56:6,7
**2/28/09 (1)**
55:25
**2:00 (1)**
170:19
**20 (4)**
95:9,9,10
177:23
**2001 (4)**
37:19 39:5,10
39:11
**2007 (1)**
41:13

**2009 (1)**
56:12
**2012203 (1)**
162:17
**2013 (1)**
59:3
**2014 (3)**
59:2,3 60:21
**2016 (6)**
20:13 22:24
24:6,19 26:20
61:16
**2016-0628 (1)**
22:19
**20160644 (1)**
25:17
**2017 (2)**
34:5 61:17
**2018 (5)**
21:8 34:2
62:15,16
67:12
**2019 (4)**
62:14 64:15
71:14,15
**2020 (19)**
14:18 15:5,10
16:21 17:25
19:24 65:21
66:18 71:13
73:13,13,15
73:17 74:3,13
80:19 81:3,25
132:11
**2021 (6)**
73:12 83:19
85:5 109:25
110:15 111:6
**2024 (4)**
1:18 2:2
172:19
176:21
**21 (1)**
173:9

**21st (3)**
59:2 60:16
71:13
**22 (1)**
173:10
**22nd (1)**
83:19
**23-CV-0657 ...**
1:7
**24 (1)**
173:11
**24th (1)**
67:12
**25th (1)**
73:12
**27th (1)**
41:13
**28 (1)**
34:3
**2nd (1)**
15:10

_____ **3**

**3 (1)**
12:22
**30 (2)**
3:10 9:7
**30th (1)**
22:24
**31 (1)**
61:12
**31st (3)**
62:16 71:15
73:13
**33 (1)**
173:12
**38 (1)**
58:24
**380 (1)**
143:11
**3rd (2)**
21:8 176:21

_____ **4**

**4 (2)**

61:17 94:18
**40 (1)**
9:7
**412A (1)**
3:10
**46 (1)**
174:9
**498 (1)**
145:10
**499 (1)**
145:18

_____ **5**

**5 (4)**
12:12,24 94:17
94:18
**5/11/2021 (1)**
85:3
**5/13/2021 (1)**
85:3
**5:00 (1)**
84:3
**500 (1)**
146:9
**501 (1)**
147:11
**502 (1)**
145:10
**51 (1)**
55:22
**525 (1)**
83:8
**535 (1)**
83:14
**537 (1)**
84:22
**54 (1)**
174:17
**543 (1)**
83:8
**581 (1)**
93:6
**585 (1)**
94:19

**5th (2)**
34:5 170:8

_____ **6**

**6 (5)**
12:24 13:3,9
73:9 173:8
**600 (1)**
95:12
**602 (1)**
96:15
**603 (1)**
96:16
**604 (1)**
98:15
**605 (1)**
104:24
**606 (1)**
104:25
**607 (1)**
106:10
**68 (1)**
173:13
**69 (1)**
174:19
**6th (1)**
170:9

_____ **7**

**7 (4)**
21:3,5 173:9
173:24
**7/8/2016 (1)**
34:19
**716 (1)**
93:6
**76 (3)**
174:23 175:6
175:10
**76-page (4)**
55:22 58:24
61:13 62:11
**78 (1)**
175:16
**7th (1)**

May 8, 2024

[Page 208]

170:9

---

**8**

**8 (9)**
1:18 2:2 22:13
22:16,22
23:21 71:11
71:12 173:10
**802 (1)**
3:5
**86 (1)**
175:20
**8th (2)**
24:6,18

---

**9**

**9 (5)**
23:24 24:8
71:11,17
173:11
**9/15/2021 (1)**
163:4
**9/23/21 (1)**
162:25
**9:00 (1)**
83:25