1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

------------------------------------------------x
SHENEA JAMES, as administrator of the estate of
DEDRICK JAMES, deceased, and SHENEA JAMES,
individually,

                    Plaintiff,

       -against-              Case No.
                                    23-CV-6057

THE UNITED STATES OF AMERICA, CITY OF ROCHESTER,
RPD INVESTIGATOR RICHARD ARROWOOD, "JOHN DOE RPD
OFFICERS 1-10" (names and number of whom are
unknown at present), MONROE COUNTY SHERIFF TODD
BAXTER, MSCO SERGEANT CHRISTIAN DEVINNEY, RICHARD
ROD, "SHERIFF'S DEPUTIES 1-10", (names and number
of whom are unknown at present), NYSP
INVESTIGATOR JEFFREY ULATOWSKI and other
unidentified members of the Rochester Police
Department, Monroe County Sheriff's Office, and
New York State Police,

                    Defendants.
------------------------------------------------x

                        October 2, 2024
                        11:08 a.m.

       DEPOSITION OF JEFFREY SCOTT ULATOWSKI,

s/h/a NYSP INVESTIGATOR JEFFREY ULATOWSKI, taken

by the attorneys for the respective parties,

pursuant to Notice, held via web conference at

the above date and time, before Nichole Bugeja, a

Stenotype Reporter and Notary Public of the State

of New York.

2

1   A P P E A R A N C E S:

2


3   ROTH & ROTH, LLP
          Attorneys for Plaintiff
4         192 Lexington Avenue, Suite 802
          New York, New York 10016
5
    BY:  ELLIOT SHIELDS, ESQ.
6

7


8


9   MICHAEL S. CERRONE, ESQ.
          Attorneys for Defendants
10        United States Attorney's Office
          Western District of New York
11        138 Delaware Avenue
          Buffalo, New York 14202
12
    BY:  MICHAEL CERRONE, Assistant U.S. Attorney
13

14


15


16  HAL KIEBURTZ, ESQ.
          Attorneys for Defendant
17        City of Rochester
          New York - Law Department
18        30 Church Street, Room 412A
          Rochester, New York 14614
19
    BY:  JOHN M. CAMPOLIETO, ESQ.
20

21


22


23


24


25

3

1      F E D E R A L   S T I P U L A T I O N S

2

3          IT IS HEREBY STIPULATED AND AGREED by and

4    between the attorneys for the respective parties

5    herein, that the sealing, filing and

6    certification of the within deposition be waived;

7          IT IS FURTHER STIPULATED AND AGREED that

8    all objections, except as to form, are reserved

9    to the time of trial;

10         IT IS FURTHER STIPULATED AND AGREED that

11   the transcript of this deposition may be signed

12   before any Notary Public, with the same force and

13   effect as if signed before a clerk or Judge of

14   the Court;

15         IT IS FURTHER STIPULATED AND AGREED that

16   all rights provided to all parties by the

17   F.R.C.P. cannot be deemed waived, and the

18   appropriate sections of the F.R.C.P. shall be

19   controlling with respect thereto.

20

21                    oo0oo

22

23

24

25

4

1

2          THE COURT REPORTER:  It is hereby

3     stipulated and agreed by and between counsel

4     for all parties present that this deposition

5     is being conducted remotely via Zoom under

6     the control of Bee Reporting Agency, Inc.

7          It is further stipulated that this

8     videoconference will not be recorded in any

9     manner, and that any recording without the

10     express written consent of all parties shall

11     be considered unauthorized, in violation of

12     law, and shall not be used for any purpose

13     in this litigation or otherwise.

14          Before I swear in the witness, I will

15     ask each counsel to stipulate on the record

16     that I, the court reporter, may swear in the

17     witness even though I'm not physically

18     present with the witness, and that there is

19     no objection to that at this time, nor will

20     there be an objection to it at a later date.

21          MR. SHIELDS:  Plaintiff stipulates.

22          MR. CERRONE:  The Government stipulates.

23          MR. CAMPOLIETO:  City of Rochester

24     stipulates also.

25

5

1      J E F F R E Y   S C O T T   U L A T O W S K I,

2      called as a witness, having been duly sworn

3      by a Notary Public of the State of New York,

4      was examined and testified as follows:

5             THE COURT REPORTER:  Please state your

6       full name for the record.

7             THE WITNESS:  Jeffrey Scott Ulatowski.

8             THE COURT REPORTER:  What is your

9      address?

10            THE WITNESS:  26 Federal Plaza, New

11      York, New York 10278.

12     EXAMINATION BY

13     ELLIOT SHIELDS, ESQ.:

14        Q.   Good morning, Investigator.

15        A.   Good morning.

16        Q.   Is that your proper title?

17        A.   Investigator, correct.  Yeah.  Am I

18     looking at the right --

19        Q.   Yes.

20        A.   Okay, got you.  All right.

21        Q.   My name is Elliot Shields.  I represent

22     the woman who's son was killed.  I'm going to ask

23     you some questions today.

24            My first question is:  Have you ever

25     testified at a deposition in a civil case like

6

1                     J. Ulatowski

2    this before?

3        A.    I've not.

4        Q.    So I'll just go over some general ground

5    rules that your attorney probably explained

6    already, but we've got the court reporter here

7    today, so one thing I'd ask you, primarily for

8    her benefit, is that you wait for me to complete

9    my question before you begin to answer so that

10   she can write down everything that I say, and

11   everything that you say in the record that she's

12   making for us, okay?

13       A.    Okay.

14       Q.    Other than that, if there's anything

15   that I say that you don't understand, please ask

16   me to rephrase my question, and I'll gladly to

17   that for you, okay?

18       A.    Okay.

19       Q.    Now, I know you said you've never

20   testified at a civil deposition before; have you

21   ever testified in any other types of court

22   proceedings?

23       A.    Yes.

24       Q.    About how many times?

25       A.    Several dozen.  I don't know.  Several

7

1                        J. Ulatowski

2    dozen.

3        Q.   So generally, you're familiar with

4    providing sworn testimony under oath?

5        A.   Yup.

6        Q.   Now, can you just first start out by

7    telling me everything that you did to prepare for

8    today's deposition?

9        A.   Drove here and showed up.

10       Q.   Did you -- don't tell me any of the

11   substance of any of your conversations with your

12   attorney, but did you have conversations with

13   your attorney about the deposition?

14       A.   Yes.

15       Q.   When was that?

16       A.   Couple weeks ago.  I don't have the

17   exact date.

18       Q.   Was that on the phone or something else?

19       A.   It was on a Zoom meeting through the

20   phone, through my phone.

21       Q.   About how long did that meeting last?

22       A.   Maybe an hour, tops.

23       Q.   Have you spoken with your attorney on

24   any other occasions to prepare for the

25   deposition?

8

1                          J. Ulatowski

2        A.    No.

3        Q.    How about any of the other task force

4    members?  Have you spoken with any of the other

5    task force members in preparation for your

6    deposition?

7        A.    I spoke briefly with Bill Baker several

8    months ago.

9        Q.    What did you guys talk about?

10        A.    I was curious about the -- basically,

11    the logistics of this thing, and I was surprised

12    to find out how long the testimony went

13    hours-wise.  So that was the gist of the

14    conversation.

15        Q.    Do you remember anything else specific

16    that you guys talked about, other than the length

17    of the deposition?

18        A.    We talked about if there were any

19    surprises; the answer was no.  That was about it.

20        Q.    How about any other task force members

21    or was it just Bill Baker?

22        A.    Just Bill.

23        Q.    How about, did you review any documents

24    to prepare for the deposition?

25        A.    No.

9

1                         J. Ulatowski

2      Q.   Any other records like videos or

3   anything like that?

4      A.   No.

5      Q.   All right.  Just some background

6   questions before we get into some other stuff.

7   Can you just tell me what your highest level of

8   education is?

9      A.   Three-and-a-half years of college.

10     Q.   When did you do that?

11     A.   College -- my last class in college

12   would have been in 1995.

13     Q.   Where did you attend college?

14     A.   SUNY Albany.

15     Q.   Did you earn a degree from SUNY Albany?

16     A.   I did not.

17     Q.   What did you do after you left SUNY

18   Albany?

19     A.   I joined the New York City Police

20   Department in June of 1995.

21     Q.   So you went through the academy with the

22   NYPD?

23     A.   Correct.

24     Q.   You began the academy in June of 1995

25   or --

1                    J. Ulatowski

2      A.   Yes.

3      Q.   -- something else?  Okay.

4           Can you take me through your career with

5   the NYPD?

6      A.   Yup.  June of '95 was the start of the

7   academy.  That ended up being a nine-month

8   academy due to budget concerns out of anybody's

9   control, certainly not mine.  After having

10  graduated from the academy, I was assigned to the

11  52 Precinct in the Bronx.

12          I spent maybe six months there, then got

13  drafted as the low man on the totem pole at the

14  precinct to go to the 30th Precinct in Manhattan,

15  Harlem area, for what was called the tracer unit.

16  We did low-level crimes and warrants, was the

17  basic gist of the tracer unit, and then from

18  there, I went to the Manhattan North Task Force

19  for another few months, at which time, I went to

20  the New York State Police Academy.  I effectively

21  resigned from the NYPD, and then took the trooper

22  job in October of '97.

23     Q.   Any reason that prompted you to resign

24  from NYPD and go to the state troopers?

25     A.   The commute.

11

1                          J. Ulatowski

2      Q.   I'm assuming you didn't live in the five

3   boroughs or something, it was a long commute?

4      A.   I did not, no.

5      Q.   Any disciplinary issues when you were

6   with the NYPD?

7      A.   No.

8      Q.   So you said October 1997, you went to

9   the New York State Police; is that right?

10     A.   Yes.

11     Q.   Did you say that you had to redo the

12   academy with the state police?

13     A.   Yes.

14     Q.   How long was the academy with the state

15   police?

16     A.   Six months.

17     Q.   Can you take me through your career with

18   the New York State Police, all the positions

19   you've held and places you've been stationed?

20     A.   Sure.  After the academy, which was six

21   months, I was assigned to SP Middletown, which is

22   in Orange County, as a patrol trooper.  I was a

23   patrol trooper for six -- six years or so.

24          I was promoted to investigator in 2004.

25   I believe it was June of '04 when I first made

12

1                       J. Ulatowski

2    investigator.  I was assigned to, of all places,

3    the Monticello Raceway, which is up in Sullivan

4    County, where they had state police,

5    investigators in the back doing, essentially,

6    background investigations on the employees that

7    work there, amongst any other criminal activity

8    that occurred there.

9           From there, I'd say I was there about a

10   year and a half, roughly, and then I transferred

11   up to the Rochester area, where there was a

12   similar racetrack in Farmington where they had

13   the video lottery unit there as well.  So I ended

14   up there, and then that video lottery unit kind

15   of went away, state police-wise, and then I found

16   myself at SP Canandaigua, also in the town of

17   Farmington, as a back room investigator, which is

18   essentially a detective that -- we call it the

19   back room.  It's a back room investigator.  You

20   field all sorts of felony-level crimes and --

21   essentially.

22          So from there, I did about eight years

23   as a back room investigator at Canandaigua, and

24   then in 2014, I believe that was -- that was

25   July -- no, that was April.  I think it was April

13

```
 1                    J. Ulatowski
 2   of '14, I was assigned to U.S. Marshals Task
 3   Force here in Rochester.  So from 2014, I turned
 4   out of this building here and --
 5           MR. CERRONE:  Just for the record, 100
 6       State Street, Rochester, New York.
 7       A.   So I was with the Marshals for about
 8   another eight years, and then two years ago, in
 9   2022, July of '22, I transferred down to the JTTF
10   with the FBI.  The Joint Terrorism Task Force,
11   with the FBI and the NYPD down in Federal Plaza
12   in New York City.
13       Q.   I did suggest that we do the deposition
14   in Manhattan to save you travel time since I'm
15   here, too, but that was not something we could
16   all agree, so sorry about that.
17       A.   No worries.
18       Q.   So at the time of the incident
19   underlying this case, in September 2021, you were
20   assigned to the task force in Rochester; is that
21   right?
22       A.   Correct.  U.S. Marshals Task Force in
23   Rochester.
24       Q.   You had continuously been a member of
25   the U.S. Marshals Task Force in Rochester since
```

14

1                         J. Ulatowski

2    April of 2014, is that what you said?

3         A.   Correct.

4         Q.   Is there any type of like, I don't know,

5    breaks that you have to take after you're

6    assigned to the task force?  Like is there a time

7    limitation, I guess is what I'm asking, for how

8    long you can serve as a task force member?

9         A.   Not for my job, no.

10        Q.   Now, when you were with the task force

11   in Rochester, did you have any specific role

12   within the task force?

13        A.   I wouldn't call it a specific role, no.

14   A task force officer from the state police.

15        Q.   So I guess my question is:  Did you have

16   any kind of roles or assignments that were

17   different from other task force members or did

18   all task force members basically do the same

19   exact thing?

20        A.   I'd say we all did the same thing.

21        Q.   When you joined the task force, did you

22   get any type of specialized training?

23        A.   Not immediately, but through -- over the

24   course of the years, I went to several different

25   trainings with members of my task force.

15

1                        J. Ulatowski

2        Q.    So I guess there's no academy equivalent

3    for the task force?

4        A.    Correct.

5        Q.    So how do you learn, for example, task

6    force-specific policies and regulations when you

7    join the task force?

8        A.    It becomes pretty clear that

9    administratively speaking, the task force -- the

10   federal task force has greater, I would say --

11   well, I don't want to say greater but

12   administrative functions that need to be in place

13   before you can go out and seek out a warrant

14   suspect.

15          I mean, in the end, that's what I was

16   assigned there to do, is seek out an arrest

17   warrant suspect.  So having been a police officer

18   for quite a while, it wasn't unfamiliar territory

19   for me, so --

20       Q.    Okay.

21          Just in terms of doing, I guess, warrant

22   executions or seeking out warrant suspects, are

23   there any specific rules and regulations for the

24   task force with respect to those topics?

25       A.    I'd say mainly administratively

16

1                    J. Ulatowski

2   speaking, being certain -- administratively, the

3   warrants are entered into the task force module,

4   for lack of a better term, something I never did,

5   but would ask one of the U.S. Marshal, actual

6   Marshal members, to assist me with putting that

7   into the system, if you will.

8           MR. CERRONE:  Could we just go off the

9       record for one second?

10          MR. SHIELDS:  Sure.

11          (At this time, there was a pause in the

12      proceeding.)

13      Q.   All right, Investigator.

14          So let me ask you this:  When you were

15   with the NYPD, they've got a patrol guide, right?

16   That's their rules and regulations that you've

17   got to follow as an NYPD officer, right?

18      A.   Sure.

19      Q.   Does the task force have an equivalent

20   set of rules that you have to follow as a task

21   force member?

22      A.   Not to my knowledge.

23      Q.   They didn't give you -- like when you

24   join the NYPD, they give you the book, right;

25   here's the patrol guide, make sure you understand

17

1                          J. Ulatowski

2    and you comply with all of these rules and

3    regulations.  That never happened when you joined

4    the task force?

5        A.   I was not handed a book, no.

6        Q.   To your knowledge, is there any set of

7    rules and regulations that task force members are

8    required to follow similar to the NYPD Patrol

9    Guide?

10       A.   The laws of the state of New York and

11   the United States, I would say, but I don't know.

12   If they have their own book, it's secret to me.

13       Q.   Now, before we went off the record there

14   for a second, I think you had described, just

15   generally, that you'd received some training over

16   the years when you were with the task force.

17            Can you give me some more details about

18   the trainings that you attended as a task force

19   member?

20       A.   Yes, we went to -- in Utica, there was a

21   facility there where I spent -- I went there

22   twice, maybe three times, where there's a

23   facility where they -- we trained in

24   close-quarters combat.  Mainly, that's the theme

25   of the training.

18

1                    J. Ulatowski

2          Also, in Atlantic City, I went there

3    three times with the task force; similar

4    training, close-quarters combat.  Items that are

5    very specific to the nature of the work that we

6    do.  So vehicle take-downs, again, CQB, some

7    tactic stuff, but -- yeah.

8      Q.   When you say CQB, that's close-quarters

9    combat or something else?

10     A.   Yeah, close-quarters combat.  I'm sorry.

11   I'm calling it CQB, maybe I'm off on that one,

12   but that's what's coming to my mind.

13   Close-quarters combat.

14     Q.   I just wanted to make sure --

15     A.   Yeah.  Yeah.  Yeah.

16     Q.   Can you give me any more details about

17   trainings that you received on executing

18   high-risk search warrants or high-risk arrest

19   warrant?

20     A.   That would play into the close-quarters

21   combat where you're essentially -- if you're

22   entering a room or on a high-risk warrant,

23   certain motions you make, certain directions you

24   go, and where personnel are placed.  Stuff like

25   that.

19

J. Ulatowski

1

2    Q.    Do you remember when your last training

3    session was before the incident with Dedrick

4    James in September 2021?

5    A.    I can't recall specifically, no.

6    Q.    Do you guys have like, I don't know,

7    regular trainings?  I know, for example, with

8    NYPD, there's a certain amount of training hours

9    that officers are required to complete every

10   year.  Is there any kind of equivalent for the

11   task force, like you know, twenty hours a year of

12   training or something like that?

13   A.    I believe there is, and there's an

14   administrative gentleman in Buffalo who takes

15   care of that and makes sure -- makes certain that

16   we stay up with those hours.  Don't ask me what

17   the specific hours are, that would be an internal

18   Marshals thing, but yes, I also went to other

19   scheduled training events in the Buffalo area.

20          I remember going to several of those

21   types of training over the course of the years,

22   where we would get together as a group and again,

23   go over very similar tactics and back to the

24   basics kind of stuff.

25   Q.    Did you --

20

1                       J. Ulatowski

2       A.   I don't know what the actual requirement

3   is.

4       Q.   Sure.

5            So I guess my question is:  Did you guys

6   have like regular scheduled trainings like, I

7   don't know, a monthly training with just the task

8   force in the Rochester area, anything like that?

9       A.   There were many impromptu ones where we

10  could make certain we had enough personnel to put

11  together and say, hey, Monday afternoon, we all

12  need to get together.  Was there one every month?

13  No.  No, nothing specific, to my recollection.

14      Q.   Was there someone who would coordinate

15  those trainings, like a specific task force

16  member?

17      A.   Probably DeVinney.  Sergeant DeVinney

18  with the sheriff's office was -- took the lead

19  role in that for the local stuff.

20      Q.   Did he have any kind of like specialized

21  title or anything like that, like training

22  coordinator?

23      A.   Not as it relates the marshal's office,

24  not -- no.  Not to my knowledge.

25      Q.   So it would have been just like kind of

21

J. Ulatowski

1

2      an informal person who led the trainings, not

3      like a specialized role that's assigned to him?

4          A.   I wouldn't describe Chris DeVinney as

5      informal that's not at all --

6          Q.   I guess I mean -- I didn't mean it like

7      that.  I meant like is there a piece of paper

8      somewhere, to your knowledge, that would have

9      given him the formal title of like training

10     coordinator for the Rochester area U.S. Marshals

11     Task Force?

12         A.   I have no idea.

13         Q.   Let's move to the James case.  Can you

14     tell me when you first became aware of the

15     warrant for Dedrick James?

16         A.   So probably two weeks prior to the

17     incident, maybe three weeks prior to the

18     incident.

19         Q.   How did you become aware of that

20     warrant?

21         A.   Investigator Scott Carr gave me a call

22     and said that he was looking for some assistance

23     in finding a warrant suspect.

24         Q.   What other specific information did

25     Investigator Carr provide you?

22

1                          J. Ulatowski

2      A.   The suspect's pedigree; photo,

3   obviously.  He informed me that he believed that

4   he was living at -- forgive me, the name of the

5   street is Vineland?

6           MR. CERRONE:  Vinewood.

7      A.   Vinewood?

8      Q.   I believe that's it, yes.

9      A.   All right.  He provided me with the best

10  known address he had for the target suspect.  He

11  offered that he believed the suspect to be

12  driving a white Dodge, and that was the gist of

13  it.  He explained that he had called him, had

14  some conversations with him, tried to get him to

15  turn himself in, and I think that he had gone and

16  knocked on the door at least once, if not twice,

17  no luck.

18          So essentially, when Investigator Carr

19  exhausted all of his leads, to say, that's when

20  he would have given me a call, is kind of the

21  position that I find myself in.

22     Q.   Can you kind of explain a little more

23  how that works?  Investigator Carr, he's an

24  investigator with the New York State Police; is

25  that right?

1                       J. Ulatowski

2      A.   Since retired, but yes.  At the time, he

3  was.

4      Q.   Would you kind of be like the point of

5  contact on the task force when the state police

6  are looking for someone, is that how that works?

7      A.   Yes.  For that specific case, yes.

8      Q.   Did he give you any other information

9  about Dedrick?  Like you had mentioned, for

10  example, that Carr had prior conversations about

11  potentially Dedrick turning himself in; is that

12  right?

13      A.   That's what I recall Investigator Carr

14  telling me, that he had those conversations.

15  Maybe one, maybe several, I don't know, but they

16  were fruitless.

17      Q.   So that's what you remember about them,

18  that they were fruitless, meaning that he had

19  basically refused to agree to turn himself in?

20      A.   That was my understanding, correct.

21      Q.   Which is why he was contacting you to

22  apprehend him?

23      A.   Yeah.

24      Q.   Did he tell you anything about, for

25  example, Dedrick potentially being, I don't know,

24

J. Ulatowski

1

2    having committed prior violent crimes or having

3    assaulted law enforcement officers or anything

4    like that, that you needed to be aware of for

5    preparation of executing the warrant?

6        A.    No.  No, there wasn't any major concern

7    about Dedrick's violent criminal past for

8    Dedrick.  There was no concern there.

9        Q.    Just to be clear for the record, when

10   you say there was no concern, you mean that there

11   were no like reported incidents of violent crimes

12   or anything like that in Dedrick's past?

13       A.    Not to my recollection.

14       Q.    Do you remember what the specific

15   charges against Dedrick were?

16       A.    The charge -- the warrant was for

17   assault-second on a -- from what I was explained,

18   on a small child, was the origin of the warrant,

19   based on Investigator Carr's investigation.

20       Q.    Was your understanding that the child

21   was Dedrick's son?

22       A.    Can't recall.

23       Q.    Do you guys receive a copy of the

24   warrant during these conversations?

25       A.    I would have gotten a copy, yeah.

1                    J. Ulatowski

2      Q.   Was there anything in any of the

3  information that Investigator Carr provided that

4  gave you any indication that Dedrick might be

5  armed or dangerous in any way, other than --

6      A.   No.

7      Q.   No, okay.

8           And you had said that Investigator Carr

9  maybe spoke with Dedrick on the phone and knocked

10 on his door; are you aware of any other attempts

11 to contact Dedrick?

12     A.   Not to my knowledge, no.

13     Q.   Were you aware that Dedrick had, in

14 fact, gone and spoken with the police voluntarily

15 on several occasions about the incident?

16     A.   Now that you say that, I think I recall

17 that he had -- did have at least a conversation

18 with Dedrick.  I don't know where that took place

19 or how it took place, but thereafter, he was

20 unresponsive, was my understanding, which was why

21 Investigator Carr would have given me a call at

22 that point.

23     Q.   After Investigator Carr contacted you,

24 before the execution of the warrant on

25 September 15, 2020, did you make any attempts to

26

1                          J. Ulatowski

2    contact Dedrick prior to the execution of the

3    warrant?

4        A.   I did not.

5        Q.   Is that standard?  Once you guys get

6    the, I guess, referral, would you ever try to

7    make contact with the person prior to executing

8    the warrant?

9        A.   That would be pretty unusual.

10       Q.   Is the basic gist like those avenues

11   have been exhausted, and so once you're

12   contacted, it's time to execute the warrant, is

13   that the idea?

14       A.   It seemed as though the communication

15   lines had broken down, so correct.  I didn't have

16   any reason to try to contact him.

17       Q.   Now, can you take me through the

18   planning process for the execution of the

19   warrant?  When did you start planning the

20   operation to apprehend Dedrick?

21       A.   As we spoke briefly earlier, two weeks

22   prior to the incident, two, potentially three, we

23   would typically have like a morning briefing at

24   the beginning of every week with task force

25   members present in the office right here.

J. Ulatowski

2      So I would have presented -- I recall

3  presenting and saying, hey, I have this warrant,

4  it's an assault-second on a child, his name is

5  Dedrick James, I have an address; briefed up all

6  the guys that were in the room on that -- those

7  specifics, and then I went off and did my own

8  investigation, really just doing a couple

9  drive-bys, and based on Investigator Carr's

10  information given to me, that he believed that

11  Dedrick James was driving and operating that

12  Dodge Dart, a white Dodge Dart, that was really

13  kind of the focus of my investigation at that

14  point.

15      So to -- I'm circling back; to answer

16  your question, yes.  I briefed the task force

17  probably two weeks prior, and then the day of, I

18  would have radioed everybody to say, hey, look,

19  the car's here, I would like to knock on the

20  door.

21      Q.   So you described the investigation that

22  you did a little bit, and you said that you drove

23  by the location to look for the car that Dedrick

24  allegedly was driving, and that information came

25  from Investigator Carr; is that right?

```
 1                    J. Ulatowski
 2      A.   Correct.
 3      Q.   I just wanted to make sure Investigator
 4  Carr gave you the information about the car.
 5           Now, did you do any other surveillance
 6  or intelligence gathering, other than driving by
 7  the residence at 6 Vinewood Place to look and see
 8  it Dedrick's car was there?
 9      A.   I determined that surveillance wasn't a
10  good option for that location, based on the dead
11  end, the short dead end.  I didn't feel
12  comfortable putting any of my team members in a
13  short dead end where the vehicle would,
14  essentially, get picked out by any one of the
15  neighbors within -- in my experience, within a
16  few minutes, especially if someone doesn't hop
17  out and go into the house like normal, so I
18  didn't feel that was a safe option.
19           So surveillance, like static
20  surveillance if you will, in my opinion, was not
21  a viable option.  So my -- honestly, my plan was
22  just keep driving by the house and up and down
23  the road and see if I could see the car, and
24  ultimately, I did.
25      Q.   Now, when you say ultimately, you did,
```

1                          J. Ulatowski

2    you mean on the date of the execution,

3    September 15, 2020?

4         A.   Yes.  Now that I think about it out

5    loud, it's -- I recall I may have -- the night

6    before, afternoon before, I think I noticed that

7    it was there, but something took us away from it,

8    some other task force operation or another higher

9    priority target.  So I do recall the day before,

10   I did see the vehicle there, but we had to -- I

11   had to break off for one reason or another and

12   couldn't stay on it all night.

13            So the first thing I did the next

14   morning was drive by and observe that the vehicle

15   was still there in the driveway at Vinewood

16   Place.

17        Q.   Had you observed the vehicle there on

18   any other occasions, other than the night before,

19   so that would have been September 14th, and then

20   the morning of September 15th?

21        A.   I had not seen it before then.

22        Q.   Had you ever seen Dedrick actually

23   driving the vehicle or getting in and out of it?

24        A.   No.

25        Q.   When you drove by the house, did you

30

1                      J. Ulatowski

2    actually drive down the dead-end street or did

3    you just drive past the dead-end street, if

4    you --

5        A.   No, I recall having driven down -- up

6    the dead-end street, yes, turning around, and

7    seeing the car.

8        Q.   Did you make any other observations

9    about the location, the house or anything?

10           MR. CERRONE:  Object to the form.  You

11       could answer if you understand.

12       A.   Maybe you can try again.  I'm not sure.

13   What did the house look like, you're asking me to

14   remember that or --

15       Q.   Yes.  So I guess I'll just ask this

16   specific question, which is:  Did you observe,

17   for example, surveillance cameras on the exterior

18   of the house when you drove --

19       A.   Yes.

20       Q.   -- by?

21       A.   Yes.

22       Q.   Is that something that you would have

23   noted anywhere?

24       A.   Not specifically.  It's good tactical

25   knowledge on our part to know that cameras are

31

1                              J. Ulatowski

2     there.

3          Q.    Is that something that you took into

4     consideration when planning the execution of the

5     arrest warrant?

6          A.    I'm sure I took it into consideration,

7     but if we didn't knock on the doors of homes that

8     have cameras on them, you'd probably never knock

9     on too many doors.

10         Q.    Is that something that you briefed your

11    team about, hey, there's cameras here, so we need

12    to change our strategy in X, Y, Z ways or

13    anything like that?

14         A.    It didn't change the strategy, no.

15         Q.    How about before executing the warrant,

16    did you obtain any like floor plans for the

17    residence?

18         A.    I did not.

19         Q.    Did you do anything else to learn what

20    the layout of the house was?

21         A.    No.  Other than casual observations from

22    the street and the obvious, where the windows

23    are, where the doors are, where the typical exits

24    would be.  I mean -- but no, I didn't --

25         Q.    Okay.

32

1                    J. Ulatowski

2          Did you do any kind of formal risk

3    assessment for the operation?

4          A.   No, nothing formal.  No.

5          Q.   Did you do any kind of informal risk

6    assessment?

7          A.   In my mind this was a very standard

8    lower level, lower risk warrant, so -- I've

9    knocked on a thousand doors, so figured it would

10   go the same way.

11         Q.   I guess before we get into, you know,

12   what did happen, just sticking with the planning

13   beforehand a little bit.  If you said it was

14   normal, did you do anything to evaluate, I guess,

15   the potential dangers that might be associated

16   here, that might be different from other warrants

17   where you would plan to knock on the door?

18         A.   Nothing struck out at me.

19         Q.   How about, did you consider whether

20   anybody else might be home at the residence, like

21   his grandmother?

22         A.   You always expect someone else to be

23   home.  I didn't know if she would be home or

24   anybody would be home, honestly.

25         Q.   Did you consider any other alternative

33

1                          J. Ulatowski

2    methods to apprehend Dedrick?

3        A.    This, to me, seemed like the best plan.

4    When the vehicle was observed in the driveway, it

5    was a very good indicator to me that he likely

6    was inside the residence at that point, and it

7    seemed like the best plan, to surround the house

8    and knock on the door.

9        Q.    So I'm just going to go through a few

10   other things.  I heard what you just said, but

11   did you ever consider, for example, waiting for

12   him to leave the house and get into his car, and

13   then doing a controlled traffic stop?

14       A.    Without the surveillance piece, due to

15   the dead-end street, I didn't find that to be a

16   viable option if no one could -- if none of the

17   team members or myself could put good eyes on

18   Dedrick, putting him in that car.

19            I thought it would have been very

20   difficult to do that.  So yes -- to answer your

21   question, yes, I considered it, but I didn't

22   consider it as an option.

23       Q.    How about like a surrounding call-out

24   strategy?  So instead of knocking on the door and

25   entering, like surrounding the house and asking

1                      J. Ulatowski

2    him to come outside?

3        A.    I didn't consider it.  It seemed like,

4    again, kind of a routine warrant investigation.

5    Again, I've knocked on a thousand doors, and lots

6    of times people answer the door and -- and answer

7    your questions.

8        Q.    How about knocking on the door and

9    waiting for Dedrick to come to the door, instead

10   of knocking on the door and then immediately

11   entering the residence?

12       A.    Are we getting into the specifics of

13   what actually happened now?  Because I'm not sure

14   I understand --

15       Q.    Sure.  Yes, that was a bad question, so

16   let me ask it another way.

17            Did you consider that, you know, if you

18   knock on the door, is there any type of plan

19   like, oh, okay, we're going to knock, maybe he's

20   not going to want to come to the door

21   immediately.  We'll knock, we'll wait a minute or

22   two at the door for him to voluntarily come to us

23   before we'll enter into the residence, did you

24   consider that?

25            MR. CERRONE:  Just to be clear on this,

35

1                          J. Ulatowski

2          Elliot, this question is asking about his

3          thinking, his thought process prior to the

4          incident?

5               MR. CERRONE:  Yes, correct.

6          Q.    I mean, you know, as you walk up to the

7    door and you're about to knock, in your mind, are

8    you going to give him a certain amount of time to

9    comply and come to the door before you make entry

10   into the residence?

11         A.    Honestly, it's a case-by-case basis.  I

12   knocked on that particular door, very soon

13   thereafter, Grandma answered and indicated to me

14   that Dedrick was, in fact, in the home, and that

15   she was going to go retrieve him.

16              So at that point, there was a safety

17   concern for everybody around; me, Grandma,

18   Dedrick, everybody around the house.  So to back

19   out of the house and assume that he's going to

20   come to the door, it's a safety concern for

21   everyone at that scene.

22         Q.    I'll get back into that in a minute.

23   Let me ask you this:  Was there ever a written

24   operational plan created for the warrant

25   execution?

36

1                          J. Ulatowski

2       A.    No, just administrative Marshals

3    paperwork.  Forgive me, it's been several years,

4    three years or so, an FD-something that gets

5    entered in the system.  Other than that, no, not

6    an operational plan.  An administrative function

7    ahead of time.

8       Q.    Is that the 45, you're referring to?

9       A.    If you test me on the numbers of the

10   federal documents, I'm not -- I don't recall.

11      Q.    It's not a memory test, so let me throw

12   up what I'm referring to and just make sure we're

13   on the same page.

14          MR. SHIELDS:  I guess we'll do this as

15       Exhibit 1 for this deposition, and I'll

16       display it on the screen here.

17          (Whereupon, a USMS Enforcement Action

18       Briefing was deemed marked as Plaintiff's

19       Exhibit 1 for Identification, as of this

20       date.)

21      Q.    Investigator, on your screen, do you see

22   the document that has the -- well, do you see a

23   document on your screen?

24      A.    I do.

25      Q.    Is it entitled James versus the United

37

1                         J. Ulatowski

2    States, MSCUS Marshal Service Enforcement Action

3    Briefing?

4         A.   That's what I see, yes.

5         Q.   So let me go down here to the second

6    page.  This is really faint here at the top, Form

7    USM 45, if you can see that.

8         A.   Okay.  Yup.

9         Q.   Okay.  I'll scroll through, it's a

10   two-page form here.

11             Now, so I guess my question is:  Is that

12   the document that you were referring to?

13        A.   That's the only document I'm aware of,

14   yes.  Operational, yes.

15        Q.   Before you sit down, I had a couple of

16   questions.  I want to zoom in on the picture.  If

17   we zoom in on the picture here, it looks like

18   that's a screen shot from your iPhone; is that

19   right?

20        A.   Potentially.  I don't know.  I see my

21   name.  It's --

22        Q.   I guess my question is:  It looks like

23   there's -- so this would be your camera roll,

24   this is what it appears to be to me, does that

25   look right to you?

38

1                      J. Ulatowski

2     A.   It appears to be a camera roll, yes.

3          MR. SHIELDS:  I don't know if you guys

4     have a copy of this, but if you look at the

5     form --

6          MR. CERRONE:  What's the Bates number on

7     the document?

8          MR. SHIELDS:  I'm sorry.  I believe it

9     is 93.

10    Q.   What I wanted to know is what the

11   document in the camera roll is next to the

12   picture of Dedrick's face?  Because I think on

13   the PDF, you can sort of see it looks like the

14   picture of Dedrick's face was pulled off of

15   another separate document, and I wanted to know

16   what that other separate document was, if you can

17   tell?

18    A.   I really couldn't read that and tell.  I

19   could guess, but I don't know if you want me

20   guessing.  It's potentially off of a computer

21   screen.  I can't see it clearly enough, so I

22   don't know.

23    Q.   Sure.  Maybe if your attorney has the

24   document, if you could see it more clearly there,

25   if you could take a look, but other than that --

39

J. Ulatowski

1

2      I guess my question would be:  Is there

3  like a standard form or something that would have

4  been sent to you by Investigator Carr, that would

5  contain this picture?

6          MR. CERRONE:  Elliot, just hold on one

7      second.  Investigator Ulatowski is just

8      getting his reading glasses.

9          MR. SHIELDS:  Sure.

10          MR. CERRONE:  I pulled up the document

11      on my laptop so we can blow it up and see if

12      he could answer your question.

13      A.  So if you're asking about this camera

14  roll, right, and then the middle picture on the

15  camera roll, is that your question, about what is

16  that?

17      Q.  Yes.

18      A.  It looks to me like going into the CJIMS

19  system -- and this is an educated guess -- where

20  you could pull up, potentially, an additional

21  photo of a suspect, depending on different

22  circumstances, but that -- and then -- I'm saying

23  that the middle photo, to the right of the middle

24  photo looks like his actual photograph, and to

25  the left, you see that kind of box, that white

J. Ulatowski

 1

 2    box, my guess is that would have been his

 3    pedigree information in there, likely from,

 4    again, eJustice or a, you know, police

 5    information system.  That's my guess.

 6        Q.    Okay.

 7            MR. SHIELDS:  Mike, we would just call

 8        for production of that document, to the

 9        extent that that was something that was sent

10        from state police, Investigator Carr, to

11        Investigator Ulatowski.

12            MR. CERRONE:  Okay, no problem.  As in

13        the past, just put that in writing and we'll

14        take it under consideration.

15            MR. SHIELDS:  No problem.

16        Q.    I think that you testified,

17    Investigator, that this was not a document that

18    you would have completed; is that right?

19        A.    This particular USM 45?

20        Q.    Correct.

21        A.    I did not complete that.  Not to my

22    recollection.

23        Q.    Do you see, in the top left corner, how

24    it lists you as the lead investigator?  Can you

25    just explain to me what that means, if anything?

                            J. Ulatowski

1

2      A.    It means that the Dedrick James warrant

3   was part of my caseload, so I was the lead

4   investigator for the Dedrick James case.

5      Q.    So I guess that I'm unfamiliar with how

6   that works internally with the U.S. Marshals Task

7   Force, so could you just give me an overview of

8   that?  It sounds like each person on the task

9   force has a specific caseload; is that right?

10     A.    Yeah, for sure.  So my cases would come

11  from, obviously, the state police warrant cases

12  that demanded our attention, and likewise, county

13  sheriffs would -- their workload would come from

14  the county court warrants, and Rochester Police

15  Department similar, and so on and so on, and

16  parole.

17          So if it's a warrant that you're

18  presenting to the task force that you'd like to

19  work on and find this person, that is your case,

20  for lack of a better term.

21     Q.    Got it.  So that's kind of why the

22  different law enforcement agencies all work

23  together in one task force, and you'd be the

24  contact, for example, for the state police.

25          So I guess my question would be:  Would

1                          J. Ulatowski

2    all your investigations that you were assigned

3    come from the state police, then?

4        A.    Not -- not necessarily, no.  I would

5    actively look -- I would proactively go to the

6    county and say, hey, do you guys need help.  They

7    very typically have a far vast more majority of

8    the warrants, so I would take the lead on some of

9    their cases as well.

10       Q.    Just getting back to this 45, a couple

11   more questions.  One thing that it lists here,

12   known safety considerations, and the one box that

13   is checked is assault LEO, I'm assuming that's

14   law enforcement officer?

15       A.    That's what would be my assumption, yes.

16       Q.    Did you have any information suggesting

17   that Dedrick had previously assaulted or been

18   charged with assaulting a law enforcement

19   officer?

20       A.    I think a while back, he had been

21   charged with resisting arrest, but I don't think

22   anything ever came of that.

23       Q.    Did that information go into the warrant

24   execution plan in any way?

25       A.    Not -- not in this specific case, no.

43

J. Ulatowski

1          MR. SHIELDS:  I'm going to pull that

3     down.

4     Q.   For this specific planning, as the lead

5     investigator, did you assign people different

6     roles for this warrant execution or how does that

7     work?

8     A.   It's kind of a fluid thing when you get

9     to the scene.  As the lead investigator, and this

10    is typical but not all the time, but as the lead

11    investigator, you would be the person charged

12    with or expected to, essentially, knock on the

13    door and talk to whoever's going to answer the

14    door.

15          So there's a very natural flow.  We've

16    worked together for a very long time, the team,

17    so did I specifically assign specific personnel

18    to specific spots prior to knocking on this door?

19    The answer is no.

20    Q.   So there was a briefing, you said, about

21    two weeks before, and then on the morning of; is

22    that right?

23    A.   The morning of -- no, there was not

24    another briefing the morning of, because I found

25    the car quite early and then notified the task

44

```
 1                    J. Ulatowski
 2   force that, hey, this car's here, I'm going to
 3   try and keep eyes on this thing the best I can
 4   until everybody gets here so we can knock on the
 5   door.
 6       Q.   Can you take me through what happened
 7   between the time that you put eyes on the car,
 8   notified the team, and then knocked on the door?
 9   You're saying the team didn't get together and
10   talk about execution in any way at that point?
11       A.   I -- so it was a little unusual for me
12   when I observed the vehicle there that morning,
13   again, as we discussed earlier, that was there
14   the evening prior, I sat there best I could as
15   long as I could, and then I actually a got a
16   phone call from my job and had to leave the scene
17   to go take a random drug test.
18            So when I found that I had to
19   immediately report to that, I did reach out for
20   Rich Arrowood, to the best of my recollection,
21   and said, Richie, can you do your best to keep
22   eyes on this car, I've got to run, go take care
23   of that, and then hopefully, when I get back, the
24   vehicle's still there, and then we can knock on
25   the door.
```

1                    J. Ulatowski

2           So -- does that answer your question?

3      So that cook me a couple -- I don't want to say a

4      couple hours, but it can take some time to -- at

5      most, it would have taken two hours for me to get

6      back to the scene, if you will, after having

7      first observed the vehicle that morning.

8           Q.   I'm assuming you passed the test?

9           A.   I did.

10          Q.   So that happened.  Did anything else

11     happen between putting eyes on the car and going

12     and executing the warrant?

13          So Arrowood came, I'm assuming, he was

14     able to keep eyes on the car, and then at some

15     point after that, the warrant was executed?

16          MR. CAMPOLIETO:  Objection.  Go ahead.

17          MR. CERRONE:  You could answer.

18          A.   Yes.  The answer is yes.

19          Q.   Is there a staging area where you meet

20     before executing a warrant, and then go to the

21     house together?

22          A.   Not all the time.  It's not -- that's

23     not written in stone, if you will.  I don't

24     recall staging specifically for that particular

25     warrant just prior to.  I don't recall having

46

J. Ulatowski

1    done that.  They were familiar with the case from

2    the briefing that I had provided a couple weeks

3    ago.

4    

5            Throughout the course of those couple

6    weeks, I would have, you know, random

7    off-the-cuff conversation, hey, I'm still looking

8    for that guy, I haven't found that car yet, but

9    when I do, I'd like to knock on the door.  If

10   you're going to ask me who specifically I had

11   that conversation with, I couldn't tell you.

12           So the answer to your question, was

13   there a staged area briefing before we went and

14   knocked on that door that morning, the best of my

15   recollection is no.

16       Q.   Take me through what happened after you

17   came back after your drug test, and then

18   execution of the warrant.  So from getting back

19   to the scene, you see the car again, and then at

20   some point, you guys approach the front door and

21   knock.

22           Can you tell me what happens in between

23   there?

24       A.   Did you just ask me to start from when I

25   knocked on the door, is that what I just heard

1                        J. Ulatowski

2    you ask?

3        Q.    What happened after you finished your

4    drug test?

5        A.    I returned to the scene.  Richie advised

6    me that the car was still there, and then at that

7    point -- at that point, there were enough

8    personnel in place -- I -- now that I think about

9    it, they were likely staged somewhere right down

10   the road, but I'm recalling never having made it

11   to that staging point, because when I was on my

12   way back from the random drug test, I was in

13   radio communication at that point and said, yes,

14   the car's still there, I'm almost there, you guys

15   are ready, let's roll up.

16            That would be the typical thing you

17   would say, if everybody's ready, let's roll up.

18   So I would have just driven to the scene, made

19   the right or left onto Vinewood Place, and

20   effectively rolled up to of the scene.

21       Q.    So take me through what happens.  You

22   roll up to the scene, you get out of your car,

23   other guys are there, and you approach the door

24   together?

25       A.    Yeah.  I assume you're looking for more

48

```
 1                        J. Ulatowski
 2    specifics.  I stepped out of my vehicle, I
 3    approached the door with -- Billy Baker and Carl
 4    Smith were at the door with me, effectively.  I
 5    do recall Sean Edwards with the sheriff's office,
 6    K-9 was at the bottom of the stairs, to the best
 7    of my recollection, and essentially, the
 8    remainder of the task force members that were
 9    there would have been in some sort of perimeter
10    position, whichever position, again, they would
11    have naturally flowed to.
12        Q.   After everyone's in place in the
13    perimeter positions and stuff, before knocking,
14    was there any final, I don't know, surveillance,
15    like looking through windows to see if Dedrick
16    was in a certain room, anything like that?
17        A.   I don't specifically recall doing that
18    myself.  If other members were doing that, I have
19    no knowledge of that.
20        Q.   Do you know how many total members there
21    were present for the operation?
22        A.   I think the number was fourteen.
23    Don't -- don't quote me on that, but I think it
24    was in that area.  Total, including myself.
25        Q.   Can you just take me through what your
```

                          J. Ulatowski

1
2    thoughts were, your plan was, when you knocked on

3    the door?

4        A.    The plan is to knock on the door and see

5    who answers the Grandma answered the door.

6        Q.    Do you remember anything specific that

7    you said to Grandma?

8        A.    I explained to Grandma, I introduced --

9    I said, hi, my name is Jeff.  I'm with the state

10   police.  I'm hoping that Dedrick James is home,

11   can you tell me if he's home or not.  She

12   indicated that yes, in fact, that he was home,

13   and that she would go and retrieve him.

14       Q.    What happened next?

15       A.    So at that point, I would have made a

16   radio transmission to the task force members that

17   the target's inside according to Grandma or

18   whatever exactly came out of my mouth, I don't

19   know, but something to that effect, the target's

20   inside.

21            So Grandma turned around, I made sure

22   the door was open, because I know that's a safety

23   concern, to shut the door back after you know a

24   target is inside the residence, and then Grandma

25   shuffled back towards the back of the house.

J. Ulatowski

2      Very soon thereafter, Dedrick came out

3  from what I believe was the rear bedroom, and so

4  at that point, I'm standing in the threshold of

5  the door, surrounded Bill and -- Bill Baker and

6  Carl Smith were somewhere very nearby to me,

7  whether or not they were inside at that point, I

8  cannot recall, but at that point, I did put eyes

9  on and observe Dedrick James come out of the back

10  of the -- the back of the house.

11      Q.   What did you first do when you saw

12  Dedrick?

13      A.   I explained to him that my name is Jeff,

14  I'm with the state police, and that we have a

15  warrant for your arrest and we need to take you

16  into custody.

17      Q.   Do you remember what you specifically

18  said to him?

19      A.   Very specifically, no.

20      Q.   I guess question is if you have like

21  standard set of commands or something that you

22  say every time?

23      A.   No.

24      Q.   So you told him, hey, look, I'm Jeff,

25  state police, we've got a warrant; did he say

51

1                        J. Ulatowski

2    anything in response?

3         A.   He was agitated that we were in there.

4    Did he say -- he said, what's the warrant for, I

5    think he may have said.  There was a

6    back-and-forth conversation about it's not a

7    big -- I was explaining to him that this is not a

8    big deal.  You just need to come with us, we'll

9    go see the judge.

10             He seemed to become very compliant and

11    walking towards me, at which point, I said,

12    you're doing good Dedrick, keep walking towards

13    me, and then as soon as I grabbed my handcuffs,

14    that's when he kind of spun around and ran to the

15    bathroom.

16         Q.   That was going to be my next question,

17    if there was anything that you remember, that

18    prompted him to run towards the bathroom.

19             So I guess my question would be:  Did

20    anything else happen, other than you reaching for

21    your handcuffs?

22         A.   Nope.  In -- and look, I can't put

23    myself in his mind, but in my mind, when he heard

24    the click, I don't have handcuffs on me right

25    now, but when he heard the click, that triggered

52

1                              J. Ulatowski

2    something, and he spun around and boogied to the

3    bathroom.

4        Q.   Before you reached for your handcuffs,

5    did you tell him that you were going to arrest

6    him and place him in handcuffs?

7        A.   I told him that you have a warrant for

8    your arrest and you need to come with us.  Did I

9    say, hey, I'm going to place you into handcuffs,

10   you need to come with me?  No, I did not say

11   that.

12       Q.   So you reached for your handcuffs, he

13   runs towards the bathroom; what happens next?

14       A.   I ran immediately after him.  I followed

15   him into the bathroom.

16       Q.   When you got into the bathroom, what's

17   the first thing that happened?

18       A.   I jumped on his back in order to gain

19   control of him, and then the -- the fluid motion

20   of that led us to fall into the bathtub.  Each of

21   us face down into the bathtub.

22       Q.   So you approached him from behind, and

23   can you describe the physical contact that you

24   made with him, was it like a bear hug or

25   something else?

53

1                          J. Ulatowski

2        A.    Well, a bear hug would be accurate,

3     yeah.

4        Q.    And then the two of you fell face first

5     into the bathtub?

6        A.    That's correct.

7        Q.    Were your faces on the side of the tub

8     near the drain or on the other side?

9        A.    The bathtub was off to the right.  If

10    you're asking where the spigot was, I can't

11    recall if it was near our heads or it was behind

12    us.  I don't know.

13       Q.    Now, how did you become aware that

14    Dedrick had a gun?

15       A.    He pointed it in my face.

16       Q.    So you became aware because the gun was

17    in your face?

18       A.    That's correct.

19       Q.    Did you ever see like a laser dot from

20    the gun?

21       A.    During the struggle -- okay.  So as we

22    fell into the bathtub and I'm trying to gain

23    control of him to put him in handcuffs, so our

24    right shoulders are matching.  Above -- to the

25    right of his ear and directly in my face was the

54

                              J. Ulatowski

1

2     barrel of a gun.  That's the first time I saw

3     that gun.

4             So when I saw that gun, I made enough of

5     a -- tried to gain some space from that by

6     pushing up, and then at the same time, pushing

7     that gun down and away.  So to answer your

8     question, did I see a red laser dot, yes.  It

9     was -- it would have been during -- somewhere in

10    between that set of circumstances, between when I

11    first saw the gun in my face to after it went

12    off.

13    Q.   Thank you.  I was going to ask you next

14    to describe the physical confrontation, so I

15    think that you pretty much did that.

16            Is there anything else that happened

17    during the physical confrontation, I guess,

18    between the time that you tackled him and when

19    the shot went off, other than what you've already

20    described?

21    A.   From my perspective, that's effectively

22    what happened.  I mean, it was -- yeah, no.

23    Nothing else happened.  He was not willing to --

24    certainly not willing to be handcuffed at that

25    point, and he was definitely violently struggling

55

1                        J. Ulatowski

2    against me to get away from me, which is why we

3    fell into the bathtub.

4        Q.   Did you hear Officer Baker say that he

5    was going to shoot?

6        A.   I heard Baker say, gun, gun, gun.  I

7    don't recall him saying, I'm going to shoot.  I

8    do recall hearing, gun.

9        Q.   Where were you physically located when

10   the shot was fired?

11       A.   Directly on top of Mr. James.  Directly

12   on top of him in the bathtub.

13       Q.   Was your torso making contact with his

14   torso, with his back?

15       A.   Torso to back, correct.

16       Q.   Because you had said before that you

17   sort of pushed up, so I was wondering if you were

18   actually still contacting him or if you had

19   pushed off of him?

20       A.   I did gain some space in order to get me

21   away from him and push the gun out of my face.  I

22   mean, call it what you want; was my back off a

23   few inches -- and mean my chest off a few inches

24   of his back at that point, probably, but I don't

25   know.

56

1                          J. Ulatowski

2        Q.   Can you describe for me, when you say

3    you pushed the gun, what you did, how that played

4    out?

5        A.   Yup.  Again, as soon as I saw that gun

6    in my face, I got some space, as much space as I

7    could, but to also -- quickly enough to get that

8    gun out of my -- out of my face, and pushed it

9    down.  And then at that point, our arms went kind

10   of together underneath his chest, and the gun

11   went off.

12       Q.   Do you know if Dedrick was holding the

13   gun with his right hand or his left hand?

14       A.   My best guess is right hand, but I don't

15   know.

16       Q.   So when you pushed the gun, you pushed

17   it like underneath his body, you're saying?

18       A.   Correct.  Out of the way of my face.

19       Q.   Did you ever physically touch the gun or

20   were you just touching his hand?

21       A.   My intention was -- oh, yeah.  My

22   intention was to -- at that point, we're

23   forgetting about handcuffs, right?  At that

24   point, I'm trying to secure that weapon so that

25   it can't hurt anybody, so I don't specifically

57

1                              J. Ulatowski

2    recall feeling the gun until after the shot went

3    off.

4        Q.   Do you know how the shot went off?

5        A.   I have no idea.

6        Q.   Did you pull the trigger?

7        A.   No.

8        Q.   So Dedrick pulled the trigger?

9        A.   That was the only other person in that

10   bathtub that could have.

11       Q.   It was either you or Dedrick, because

12   you were the only two people in the bathtub?

13       A.   Well, Baker was above me to my right

14   shoulder, and Carl Smith was somewhere over to my

15   left, but I was the only one that would have had

16   intimate contact with Dedrick at that point.  So

17   yes, he pulled the trigger one way or another.

18       Q.   Were you like touching his hand or the

19   gun in any way when the trigger was pulled?

20       A.   I have no idea.  My intention was to

21   secure that gun from the hand of Dedrick James at

22   the time.

23       Q.   Have you ever received any training,

24   either in CQB or something else, about trying to

25   disarm someone who has a gun?

58

1                          J. Ulatowski

2        A.    I've had some defensive tactics over the

3    years in both academies and in my state police

4    career.  They'll have a winter in-service once a

5    year where they'll go over some defensive

6    tactics.  Sometimes they would pepper in gun

7    stuff like you speak of, but was I ever trained

8    for that specific situation, no.

9        Q.    Now, immediately after the shot was

10   fired, what happened?

11       A.    At that point I was able to secure the

12   gun.  I now had the gun in my right hand, in my

13   possession.  I probably yelled to Baker and

14   whoever else was in that room that, I have the

15   gun, I have the gun.

16              I stood up and away, and then at that

17   point, other members of the team went in to

18   provide Mr. James with medical attention.  Me

19   personally, I got myself out of that situation,

20   took a few steps back, and the rest of the team

21   came and kind of passed -- and passed me,

22   essentially.

23       Q.    So you immediately realized that Dedrick

24   had been shot; is that right?

25       A.    Oh, yeah.  There was blood, gurgling and

59

1                    J. Ulatowski

2   blood everywhere, yeah.  For sure.

3       Q.   You sure secured the gun; is that right?

4       A.   Correct.

5       Q.   Where did you put the gun after you took

6   it out of the bathroom?

7       A.   I held on to it for -- honestly, I held

8   onto it until -- it was in my possession until, I

9   believe, a Rochester Police Department evidence

10  technician took it from me.  Other than that, it

11  was never out of my possession.

12      Q.   After the incident, when did you first

13  provide a statement about what happened?

14      A.   A formal sit-down written statement?  I

15  went -- I don't know the date.  A month, a few

16  weeks later, a month later, I sat down with the

17  RPD investigators.  Detectives, excuse me.  I

18  don't know the date of that formal statement.

19      Q.   How about informally, did you have to

20  like speak with a supervisor or something like

21  that about what happened?

22      A.   Yeah, I had to -- I'm trying to recall.

23  A couple officers came by the scene and asked me

24  what happened.  If you're asking me formal

25  written, it wasn't until the RPD thing.

1                    J. Ulatowski

2   Otherwise, nothing -- nothing formal, other than

3   when the -- whoever was lieutenant or captain

4   came to the scene.

5       Q.   When you say the lieutenant or captain

6   came to the scene, would that have been someone

7   with the state police or the RPD or something

8   else?

9       A.   State police.  Yeah, I mean, there were

10  obviously all sorts of executive management

11  officers at the scene, but mine showed up as

12  well.

13      Q.   Do you know if the state police ever did

14  like an internal investigation?

15      A.   Oh, yeah, for sure.  They did.  I sat

16  down with IAB -- well, they call it -- the

17  Professional Standards Bureau, yes, sometime

18  several months after my sit-down with the RPD

19  investigators.  I don't know the date on that

20  either, but yes, there was an internal

21  investigation.

22          MR. SHIELDS:  Mike, I don't know for

23      sure if that was produced.  I don't think it

24      was.  To the extent that that was not

25      produced, we call for production of the

61

1                     J. Ulatowski

2      state police internal investigation, and

3      I'll follow up in writing.

4          MR. CERRONE:  Thank you.

5      Q.   Do you remember who you spoke with from

6  the state police during the internal

7  investigation?

8      A.   The internal investigation,

9  lieutenant -- I'm staring at his face, but I

10  can't come up with his name.  There were a couple

11  gentleman there.  I don't recall their names.

12  Honestly, I don't.

13     Q.   Before giving any of your statements to

14  the RPD or to the state police, did you discuss

15  the incident with the other task force members?

16     A.   I was very careful not to.  I was

17  assigned an attorney fairly quickly through my

18  union, so there was very limited conversation

19  about what had happened immediately thereafter.

20     Q.   So I want go back to just some topics we

21  discussed a little bit earlier.  The task force,

22  are you aware or have you ever been given a copy

23  of the U.S. Marshals Task Force standard

24  operating procedures?

25     A.   Not that I recall.

62

1                    J. Ulatowski

2        Q.   That will make this set of questions a

3    little quicker.  Well, let me just ask you, if

4    you don't recall getting standard operating

5    procedures, then would it be fair to say that

6    you're unaware of, for example, specific

7    procedures that it calls for conducting before

8    executing a warrant?

9            MR. CERRONE:  Object to the form of the

10        question.  You could answer.

11       A.   You've got to help me out with that one.

12   Can you rephrase that?

13       Q.   Yes, sure.

14            For example, do you know if a complete

15   background investigation was conducted in the

16   manner outlined by the standard operating

17   procedures prior to the execution of the warrant?

18            MR. CERRONE:  Object to the form of the

19        question.  You could answer.

20       A.   The -- if you're asking about the

21   standard operating procedures as are written in

22   the United States Marshal Service Deputy's

23   handbook, as we discussed before, I've never

24   personally seen that, so --

25       Q.   Okay.  I mean, it's for the task force,

63

1                          J. Ulatowski

2    so that's why I was asking about it.

3            The standard operating procedures for

4    the U.S. Marshals Task Force, you said you've

5    never seen that?

6        A.    No.

7        Q.    So would it be fair to say that you're

8    unaware of any, for example, required risk

9    assessment protocols prior to a warrant

10   execution, as outlined in the standard operating

11   procedures?

12       A.    If you're asking me if the Marshals

13   Service requires an ops plan for every warrant,

14   not to my knowledge.

15       Q.    In hindsight, looking back on the

16   incident, do you think there, for example, might

17   have been any safer alternatives for apprehending

18   Dedrick, other than entering the residence?

19       A.    No.  I think that was the best option.

20       Q.    Do you think anything could have been

21   done differently in planning the operation?

22       A.    No.  I think it was a pretty standard

23   arrest warrant, again, that we've all done a

24   thousand times, and there was nothing to indicate

25   to us that it would end in a violent nature.

64

1                     J. Ulatowski

2      Q.   After this incident, has the task force

3   implemented any changes in its procedures?

4      A.   I have no idea.

5      Q.   I guess you were only there for a

6   certain amount of time after this incident,

7   right?  You left in 2022; is that right?

8      A.   Yup.  Yeah, a few -- a few months, so --

9   no.  Yeah, it would have been July of 2022, if I

10  recall correctly, that I left.  So did they

11  implement other procedures, no, not to my

12  knowledge.  Not to my recollection.

13     Q.   Just to be clear for the record, as a

14  result of this incident and the various

15  investigations, you were never disciplined in any

16  way?

17     A.   I was not.

18     Q.   Were you ever, I don't know, like given

19  any memos or required to do any additional

20  training, anything like that?

21     A.   As it relates to this specific incident?

22     Q.   Yes, as a result of the incident.

23     A.   No.

24     Q.   Do you know if the task force ever began

25  wearing body cameras after the incident?

65

1                     J. Ulatowski

2      A.   That's very specific to each department.

3  By the time I left -- I don't think anyone was at

4  the time I left, but again, don't quote me on

5  that.  Each department is different.

6      Q.   So at the time, no members of the task

7  force were wearing body cameras; is that right?

8      A.   Not to my knowledge, correct.

9          MR. SHIELDS:  Those are all my questions

10     for you today, Investigator.  If there's

11     anything else that you want to add about the

12     incident that I didn't ask you about, feel

13     free to do so, but otherwise, I have no

14     other questions for you.

15          MR. CERRONE:  Thanks, Elliot.

16          John, do you have any questions?

17          MR. CAMPOLIETO:  I do, if you would give

18     me a couple minutes.  Thank you.

19  EXAMINATION BY

20  JOHN M. CAMPOLIETO, ESQ.:

21     Q.   Investigator, good morning.

22          As I said at the beginning, my name is

23  John Campolieto, and I'm a defense attorney for

24  the City of Rochester.  In this case, I represent

25  Richard Arrowood.

66

1                    J. Ulatowski

2     A.   Okay.  Hi, good morning.  Good

3  afternoon.

4     Q.   Good morning.

5          If you would just indulge me for a

6  couple of minutes, please, I just want to ask you

7  a couple of questions about the moments prior to

8  the execution of the warrant.

9          You had mentioned that around 9 o'clock,

10  you had spoken to Richard Arrowood; is that

11  correct?

12     A.   Correct.

13     Q.   What was the purpose of speaking with

14  Investigator Arrowood at that point?

15     A.   If you're talking about my first

16  conversation with him, it would have been to say,

17  hey, Richie, his car is here but I've got to run,

18  can you please keep eyes on it for me until I get

19  back.

20     Q.   Where was Investigator Arrowood when

21  this first conversation took place with him on

22  September 15, 2020?

23     A.   I don't know where he was.  I mean --

24     Q.   Was this a phone conversation?

25     A.   I recall it being a phone conversation,

```
 1                    J. Ulatowski
 2  yes.
 3      Q.   Were officers or members of the task
 4  force stationed around Dedrick James' residence
 5  at that time?
 6      A.   I wouldn't say at the time of the
 7  initial phone call to Richie when I first showed
 8  up in the morning and realized the car was there.
 9  Again, I -- the timing is not -- I'm trying to
10  recall specifically, but I likely would have
11  called Richie and said -- I'm trying to think
12  about it, because I would have had to go to the
13  impromptu drug test probably at 8 o'clock or
14  something.
15           So perhaps on my way out of there, I
16  gave him a quick call, hey, can you get eyes on
17  this car before I leave.  Am I answering your
18  question?  I'm trying to answer your question.
19      Q.   Yes.  No, that's fine.  We'll get the
20  information from Arrowood himself, but what I'm
21  trying to gather is:  Were any members in place
22  for the execution of that warrant that day, at
23  that time that you talked to Arrowood for the
24  first time?
25      A.   The first time, I would say no.  Not
```

J. Ulatowski

1

2    until -- he very well may have called the rest of

3    the crew to get them involved and wait for Jeff

4    to get back, he shouldn't be too long type of

5    thing, but I don't know exactly.

6        Q.   When you returned from the drug test

7    that you took, where was Arrowood when you

8    returned to the house?

9        A.   I recall that he was still in a

10   surveillance position in his surveillance

11   vehicle.  That's where I think that he was.

12   That's what I recall.

13       Q.   Did you talk to him when you returned?

14       A.   I certainly would have gave him a call

15   when I was on my way back from having to deal

16   with what I had to deal with there.

17       Q.   What did he say to you when you first

18   contacted him after returning from the drug test?

19       A.   Honestly, I don't recall.  I would

20   surmise that he told me the car is still here.

21   That would be my best guess, but what he --

22       Q.   And then when you returned to the actual

23   house where Dedrick James was staying, did you,

24   in fact, view that car the white Dart, I believe?

25       A.   Yup.  Yup, I did.

69

1                    J. Ulatowski

2     Q.   Did you have any further conversations

3   with Arrowood that day, if you recall?

4     A.   I don't recall.

5          MR. CAMPOLIETO:  I don't have any

6      further questions at this time.

7          (Whereupon, the examination of this

8      witness was concluded at 12:40 p.m.)

9          (Whereupon, a USMS Enforcement Action

10      Briefing was marked as Plaintiff's Exhibit 1

11      for Identification, as of this date.)

12              *        *        *        *

13

14

15

16

17

18

19

20

21

22

23

24

25

70

1

2                    A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK     )
                                 :ss
5    COUNTY OF             )

6

7

8              I, JEFFREY SCOTT ULATOWSKI, hereby

9    certify that I have read the transcript of my

10   testimony taken under oath in my deposition of

11   October 2, 2024; that the transcript is a true,

12   complete and correct record of my testimony, and

13   that the answers on the record as given by me are

14   true and correct.

15

16

17                              _____

18                              JEFFREY SCOTT ULATOWSKI

19

20

21   Signed and subscribed to before me,

22   this _____ day of _____ , 2024.

23   _____

24         NOTARY PUBLIC

25

1

2                          I N D E X

3   WITNESS                    EXAMINATION BY    PAGES

4   Jeffrey S. Ulatowski       Mr. Shields       5-65

5                              Mr. Campolieto   65-69

6

7

8                      DOCUMENT REQUEST         PAGE

9   Document that appears in the camera roll      40
    in the photograph in Plaintiff's Exhibit 1

10
    State police internal investigation          60
11

12

13  PLAINTIFF'S          EXHIBITS              PAGE

14     Exhibit 1      USMS Enforcement Action   36/69
                      Briefing
15

16

17

18

19

20

21

22

23

24

25

72

1

2                    C E R T I F I C A T I O N

3          I, NICHOLE BUGEJA, a Notary Public

4     within and for the State of New York, do

5     hereby certify:

6          That the testimony in the within

7     proceeding was held before me at the

8     aforesaid time and place.

9          That said witness was duly sworn before

10    the commencement of the testimony, and that

11    the testimony was taken stenographically by

12    me, then transcribed under my supervisor,

13    and that the within transcript is a true

14    record of the testimony of said witness.

15         I further certify that I am not related

16    to any of the parties to this action by

17    blood or marriage, that I am not interested

18    directly or indirectly in the matter in

19    controversy, nor am I in the employ of any

20    of the counsel.

21         IN WITNESS WHEREOF, I have hereunto set

22    my hand this 22nd day of October, 2024.

23

24    _____
                NICHOLE BUGEJA

25

**A**

a.m 1:16
able 45:14 58:11
academies 58:3
academy 9:21,24 10:7,8,10,20
  11:12,14,20 15:2
accurate 53:2
action 36:17 37:2 69:9 71:14 72:16
actively 42:5
activity 12:7
actual 16:5 20:2 39:24 68:22
add 65:11
additional 39:20 64:19
address 5:9 22:10 27:5
administrative 15:12 19:14 36:2,6
administratively 15:9,25 16:2
administrator 1:3
advised 47:5
aforesaid 72:8
afternoon 20:11 29:6 66:3
against- 1:6
agencies 41:22
Agency 4:6
agitated 51:3
ago 7:16 8:8 13:8 46:4
agree 13:16 23:19
agreed 3:3,7,10,15 4:3
ahead 36:7 45:16
Albany 9:14,15,18
allegedly 27:24
alternative 32:25
alternatives 63:17
AMERICA 1:8
amount 19:8 35:8 64:6
answer 6:9 8:19 27:15 30:11 33:20
  34:6,6 39:12 43:13,19 45:2,17,18
  46:12 54:7 62:10,19 67:18
answered 35:13 49:5
answering 67:17
answers 49:5 70:13
anybody 32:20,24 56:25
anybody's 10:8
appears 37:24 38:2 71:9
apprehend 23:22 26:20 33:2
apprehending 63:17
approach 46:20 47:23
approached 48:3 52:22
appropriate 3:18
April 12:25,25 14:2
area 10:15 12:11 19:19 20:8 21:10
  45:19 46:13 48:24
armed 25:5
arms 56:9
arrest 15:16 18:18 31:5 42:21
  50:15 52:5,8 63:23
Arrowood 1:8 44:20 45:13 65:25
  66:10,14,20 67:20,23 68:7 69:3
asked 59:23

asking 14:7 30:13 33:25 35:2 39:13
  53:10 59:24 62:20 63:2,12
assault 42:13
assault-second 24:17 27:4
assaulted 24:3 42:17
assaulting 42:18
assessment 32:3,6 63:9
assign 43:5,17
assigned 10:10 11:21 12:2 13:2,20
  14:6 15:16 21:3 42:2 61:17
assignments 14:16
assist 16:6
assistance 21:22
Assistant 2:12
associated 32:15
assume 35:19 47:25
assuming 11:2 42:13 45:8,13
assumption 42:15
Atlantic 18:2
attempts 25:10,25
attend 9:13
attended 17:18
attention 41:12 58:18
attorney 2:12 6:5 7:12,13,23 38:23
  61:17 65:23
Attorney's 2:10
attorneys 1:20 2:3,9,16 3:4
Avenue 2:4,11
avenues 26:10
aware 21:14,19 24:4 25:10,13
  37:13 53:13,16 61:22

**B**

back 12:5,17,19,23 19:23 27:15
  35:18,22 42:10,20 44:23 45:6
  46:17,18 47:12 49:23,25,25 50:9
  50:10 52:18 55:14,15,22,24 58:20
  61:20 63:15 66:19 68:4,15
back-and-forth 51:6
background 9:5 12:6 62:15
bad 34:15
Baker 8:7,21 48:3 50:5 55:4,6
  57:13 58:13
barrel 54:2
based 24:19 27:9 28:10
basic 10:17 26:10
basically 8:10 14:18 23:19
basics 19:24
basis 35:11
Bates 38:6
bathroom 51:15,18 52:3,13,15,16
  59:6
bathtub 52:20,21 53:5,9,22 55:3,12
  57:10,12
BAXTER 1:10
bear 52:24 53:2
bedroom 50:3
Bee 4:6
began 9:24 64:24

beginning 26:24 65:22
believe 11:25 12:24 19:13 22:8 38:8
  50:3 59:9 68:24
believed 22:3,11 27:10
benefit 6:8
best 22:9 33:3,7 44:3,14,20,21
  46:14 48:6 56:14 63:19 68:21
better 16:4 41:20
big 51:7,8
Bill 8:7,21,22 50:5,5
Billy 48:3
bit 27:22 32:13 61:21
blood 58:25 59:2 72:17
blow 39:11
body 56:17 64:25 65:7
boogied 52:2
book 16:24 17:5,12
boroughs 11:3
bottom 48:6
box 39:25 40:2 42:12
break 29:11
breaks 14:5
briefed 27:5,16 31:10
briefing 26:23 36:18 37:3 43:20,24
  46:3,13 69:10 71:14
briefly 8:7 26:21
broken 26:15
Bronx 10:11
budget 10:8
Buffalo 2:11 19:14,19
Bugeja 1:22 72:3,24
building 13:4
Bureau 60:17

**C**

C 2:1 5:1 70:2 72:2,2
call 12:18 14:13 21:21 22:20 25:21
  40:7 44:16 55:22 60:16,25 67:7
  67:16 68:14
call-out 33:23
called 5:2 10:15 22:13 67:11 68:2
calling 18:11
calls 62:7
camera 37:23 38:2,11 39:13,15
  71:9
cameras 30:17,25 31:8,11 64:25
  65:7
Campolieto 2:19 4:23 45:16 65:17
  65:20,23 69:5 71:5
Canandaigua 12:16,23
captain 60:3,5
car 27:23 28:4,8,23 30:7 33:12,18
  43:25 44:7,22 45:11,14 46:8,19
  47:6,22 66:17 67:8,17 68:20,24
car's 27:19 44:2 47:14
care 19:15 44:22
career 10:4 11:17 58:4
careful 61:16
Carl 48:3 50:6 57:14

**Carr** 21:21,25 22:18,23 23:10,13
  25:3,8,21,23 27:25 28:4 39:4
  40:10
**Carr's** 24:19 27:9
**case** 1:6 5:25 13:19 21:13 23:7 41:4
  41:19 42:25 46:2 65:24
**case-by-case** 35:11
**caseload** 41:3,9
**cases** 41:10,11 42:9
**casual** 31:21
**CERRONE** 2:9,12 4:22 13:5 16:8
  22:6 30:10 34:25 35:5 38:6 39:6
  39:10 40:12 45:17 61:4 62:9,18
  65:15
**certain** 16:2 18:23,23 19:8,15
  20:10 35:8 48:16 64:6
**certainly** 10:9 54:24 68:14
**certification** 3:6
**certify** 70:9 72:5,15
**change** 31:12,14
**changes** 64:3
**charge** 24:16
**charged** 42:18,21 43:11
**charges** 24:15
**checked** 42:13
**chest** 55:23 56:10
**child** 24:18,20 27:4
**Chris** 21:4
**CHRISTIAN** 1:10
**Church** 2:18
**circling** 27:15
**circumstances** 39:22 54:10
**City** 1:8 2:17 4:23 9:19 13:12 18:2
  65:24
**civil** 5:25 6:20
**CJIMS** 39:18
**class** 9:11
**clear** 15:8 24:9 34:25 64:13
**clearly** 38:21,24
**clerk** 3:13
**click** 51:24,25
**close-quarters** 17:24 18:4,8,10,13
  18:20
**college** 9:9,11,11,13
**combat** 17:24 18:4,9,10,13,21
**come** 34:2,9,20,22 35:9,20 41:10,13
  42:3 50:9 51:8 52:8,10 61:10
**comfortable** 28:12
**coming** 18:12
**commands** 50:21
**commencement** 72:10
**committed** 24:2
**communication** 26:14 47:13
**commute** 10:25 11:3
**complete** 6:8 19:9 40:21 62:14
  70:12
**completed** 40:18
**compliant** 51:10
**comply** 17:2 35:9

**computer** 38:20
**concern** 24:6,8,10 35:17,20 49:23
**concerns** 10:8
**concluded** 69:8
**conducted** 4:5 62:15
**conducting** 62:7
**conference** 1:21
**confrontation** 54:14,17
**consent** 4:10
**consider** 32:19,25 33:11,22 34:3,17
  34:24
**consideration** 31:4,6 40:14
**considerations** 42:12
**considered** 4:11 33:21
**contact** 23:5 25:11 26:2,7,16 41:24
  52:23 55:13 57:16
**contacted** 25:23 26:12 68:18
**contacting** 23:21 55:18
**contain** 39:5
**continuously** 13:24
**control** 4:6 10:9 52:19 53:23
**controlled** 33:13
**controlling** 3:19
**controversy** 72:19
**conversation** 8:14 25:17 46:7,11
  51:6 61:18 66:16,21,24,25
**conversations** 7:11,12 22:14 23:10
  23:14 24:24 69:2
**cook** 45:3
**coordinate** 20:14
**coordinator** 20:22 21:10
**copy** 24:23,25 38:4 61:22
**corner** 40:23
**correct** 5:17 9:23 13:22 14:3 15:4
  23:20 26:15 28:2 35:5 40:20 53:6
  53:18 55:15 56:18 59:4 65:8
  66:11,12 70:12,14
**correctly** 64:10
**counsel** 4:3,15 72:20
**county** 1:9,12 11:22 12:4 41:12,14
  42:6 70:5
**couple** 7:16 27:8 37:15 42:10 45:3
  45:4 46:3,5 59:23 61:10 65:18
  66:6,7
**course** 14:24 19:21 46:5
**court** 1:1 3:14 4:2,16 5:5,8 6:6,21
  41:14
**CQB** 18:6,8,11 57:24
**created** 35:24
**crew** 68:3
**crimes** 10:16 12:20 24:2,11
**criminal** 12:7 24:7
**curious** 8:10
**custody** 50:16

            **D**

**D** 3:1 70:2 71:2
**dangerous** 25:5
**dangers** 32:15

**Dart** 27:12,12 68:24
**date** 1:22 4:20 7:17 29:2 36:20
  59:15,18 60:19 69:11
**day** 27:17 29:9 67:22 69:3 70:22
  72:22
**dead** 28:10,11,13
**dead-end** 30:2,3,6 33:15
**deal** 51:8 68:15,16
**deceased** 1:4
**Dedrick** 1:4 19:3 21:15 23:9,11,25
  24:8,15 25:4,9,11,13,18 26:2,20
  27:5,11,23 29:22 33:2,18 34:9
  35:14,18 41:2,4 42:17 48:15
  49:10 50:2,9,12 51:12 53:14
  56:12 57:8,11,16,21 58:23 63:18
  67:4 68:23
**Dedrick's** 24:7,12,21 28:8 38:12,14
**deemed** 3:17 36:18
**Defendant** 2:16
**Defendants** 1:14 2:9
**defense** 65:23
**defensive** 58:2,5
**definitely** 54:25
**degree** 9:15
**Delaware** 2:11
**demanded** 41:12
**department** 1:12 2:17 9:20 41:15
  59:9 65:2,5
**depending** 39:21
**deposition** 1:18 3:6,11 4:4 5:25
  6:20 7:8,13,25 8:6,17,24 13:13
  36:15 70:10
**DEPUTIES** 1:10
**Deputy's** 62:22
**describe** 21:4 52:23 54:14 56:2
**described** 17:14 27:21 54:20
**details** 17:17 18:16
**detective** 12:18
**Detectives** 59:17
**determined** 28:9
**DeVinney** 1:10 20:17,17 21:4
**different** 14:17,24 32:16 39:21
  41:22 43:5 65:5
**differently** 63:21
**difficult** 33:20
**directions** 18:23
**directly** 53:25 55:11,11 72:18
**disarm** 57:25
**disciplinary** 11:5
**disciplined** 64:15
**discuss** 61:14
**discussed** 44:13 61:21 62:23
**display** 36:16
**District** 1:1,2 2:10
**document** 36:22,23 37:12,13 38:7
  38:11,15,16,24 39:10 40:8,17
  71:8,9
**documents** 8:23 36:10
**Dodge** 22:12 27:12,12

**DOE** 1:8
**doing** 12:5 15:21 27:8 33:13 48:17 48:18 51:12
**door** 22:16 25:10 27:20 32:17 33:8 33:24 34:6,8,9,10,18,20,22 35:7,9 35:12,20 43:13,14,18 44:5,8,25 46:9,14,20,25 47:23 48:3,4 49:3,4 49:5,22,23 50:5
**doors** 31:7,9,23 32:9 34:5
**dot** 53:19 54:8
**dozen** 6:25 7:2
**drafted** 10:13
**drain** 53:8
**drive** 29:14 30:2,3
**drive-bys** 27:9
**driven** 30:5 47:18
**driveway** 29:15 33:4
**driving** 22:12 27:11,24 28:6,22 29:23
**drove** 7:9 27:22 29:25 30:18
**drug** 44:17 46:17 47:4,12 67:13 68:6,18
**due** 10:8 33:14
**duly** 5:2 72:9

**E**

**E** 2:1,1 3:1,1 5:1,1 70:2,2 71:2 72:2
**ear** 53:25
**earlier** 26:21 44:13 61:21
**early** 43:25
**earn** 9:15
**educated** 39:19
**education** 9:8
**Edwards** 48:5
**effect** 3:13 49:19
**effectively** 10:20 47:20 48:4 54:21
**eight** 12:22 13:8
**either** 57:11,24 60:20
**eJustice** 40:4
**Elliot** 2:5 5:13,21 35:2 39:6 65:15
**employ** 72:19
**employees** 12:6
**ended** 10:7 12:13
**enforcement** 24:3 36:17 37:2 41:22 42:14,18 69:9 71:14
**enter** 34:23
**entered** 16:3 36:5
**entering** 18:22 33:25 34:11 63:18
**entitled** 36:25
**entry** 35:9
**equivalent** 15:2 16:19 19:10
**especially** 28:16
**ESQ** 2:5,9,16,19 5:13 65:20
**essentially** 12:5,18,21 18:21 22:18 28:14 43:12 48:7 58:22
**estate** 1:3
**evaluate** 32:14
**evening** 44:14
**events** 19:19

**everybody** 27:18 35:17,18 44:4
**everybody's** 47:17
**everyone's** 48:12
**evidence** 59:9
**exact** 7:17 14:19
**exactly** 49:18 68:5
**examination** 5:12 65:19 69:7 71:3
**examined** 5:4
**example** 15:5 19:7 23:10,25 30:17 33:11 41:24 62:6,14 63:8,16
**excuse** 59:17
**execute** 26:12
**executed** 45:15
**executing** 18:17 24:5 26:7 31:15 45:12,20 62:8
**execution** 25:24 26:2,18 29:2 31:4 35:25 42:24 43:6 44:10 46:18 62:17 63:10 66:8 67:22
**executions** 15:22
**executive** 60:10
**exhausted** 22:19 26:11
**Exhibit** 36:15,19 69:10 71:9,14
**EXHIBITS** 71:13
**exits** 31:23
**expect** 32:22
**expected** 43:12
**experience** 28:15
**explain** 22:22 40:25
**explained** 6:5 22:13 24:17 49:8 50:13
**explaining** 51:7
**express** 4:10
**extent** 40:9 60:24
**exterior** 30:17
**eyes** 33:17 44:3,7,22 45:11,14 50:8 66:18 67:16

**F**

**F** 3:1 5:1,1 72:2
**F.R.C.P** 3:17,18
**face** 38:12,14 52:21 53:4,15,17,25 54:11 55:21 56:6,8,18 61:9
**faces** 53:7
**facility** 17:21,23
**fact** 25:14 35:14 49:12 68:24
**faint** 37:6
**fair** 62:5 63:7
**fairly** 61:17
**fall** 52:20
**familiar** 7:3 46:2
**far** 42:7
**Farmington** 12:12,17
**FBI** 13:10,11
**FD-something** 36:4
**federal** 5:10 13:11 15:10 36:10
**feel** 28:11,18 65:12
**feeling** 57:2
**fell** 53:4,22 55:3
**felony-level** 12:20

**field** 12:20
**figured** 32:9
**filing** 3:5
**final** 48:14
**find** 8:12 22:21 33:15 41:19
**finding** 21:23
**fine** 67:19
**finished** 47:3
**fired** 55:10 58:10
**first** 5:24 7:6 11:25 21:14 29:13 45:7 50:11 52:17 53:4 54:2,11 59:12 66:15,21 67:7,24,25 68:17
**five** 11:2
**floor** 31:16
**flow** 43:15
**flowed** 48:11
**fluid** 43:8 52:19
**focus** 27:13
**follow** 16:17,20 17:8 61:3
**followed** 52:14
**follows** 5:4
**force** 3:12 8:3,5,20 10:18 13:3,10 13:20,22,25 14:6,8,10,12,14,17 14:18,21,25 15:3,7,9,10,24 16:3 16:19,21 17:4,7,16,18 18:3 19:11 20:8,15 21:11 23:5 26:24 27:16 29:8 41:7,9,18,23 44:2 48:8 49:16 61:15,21,23 62:25 63:4 64:2,24 65:7 67:4
**force-specific** 15:6
**forgetting** 56:23
**forgive** 22:4 36:3
**form** 3:8 30:10 37:6,10 38:5 39:3 62:9,18
**formal** 21:9 32:2,4 59:14,18,24 60:2
**found** 12:15 43:24 44:18 46:8
**fourteen** 48:22
**free** 65:13
**front** 46:20
**fruitless** 23:16,18
**full** 5:6
**function** 36:6
**functions** 15:12
**further** 3:7,10,15 4:7 69:2,6 72:15

**G**

**G** 70:2
**gain** 52:18 53:22 54:5 55:20
**gather** 67:21
**gathering** 28:6
**general** 6:4
**generally** 7:3 17:15
**gentleman** 19:14 61:11
**getting** 29:23 34:12 39:8 42:10 46:18 62:4
**gist** 8:13 10:17 22:12 26:10
**give** 16:23,24 17:17 18:16 23:8 35:8 41:7 65:17

given 21:9 22:20 25:21 27:10 61:22
    64:18 70:13
giving 61:13
gladly 6:16
glasses 39:8
go 6:4 10:14,24 15:13 16:8 18:24
    19:23 28:17 32:10 33:9 35:15
    37:5 42:5,23 44:17,22 45:16,20
    49:13 51:9 58:5 61:20 67:12
going 5:22 19:20 33:9 34:19,20
    35:8,15,19 39:18 43:2,13 44:2
    45:11 46:10 51:16 52:5,9 54:13
    55:5,7
good 5:14,15 28:10 30:24 33:5,17
    51:12 65:21 66:2,2,4
gotten 24:25
Government 4:22
grabbed 51:13
graduated 10:10
Grandma 35:13,17 49:5,7,8,17,21
    49:24
grandmother 32:21
greater 15:10,11
ground 6:4
group 19:22
guess 14:7,15 15:2,21 20:5 21:6
    26:6 30:15 32:11,14 36:14 37:11
    37:22 38:19 39:2,19 40:2,5 41:5
    41:25 50:20 51:19 54:17 56:14
    64:5 68:21
guessing 38:20
guide 16:15,25 17:9
gun 53:14,16,20 54:2,3,4,7,11 55:6
    55:6,6,8,21 56:3,5,8,10,13,16,19
    57:2,19,21,25 58:6,12,12,15,15
    59:3,5
gurgling 58:25
guy 46:8
guys 8:9,16 19:6 20:5 24:23 26:5
    27:6 38:3 42:6 46:20 47:14,23

___

**H**

HAL 2:16
half 12:10
hand 56:13,13,14,20 57:18,21
    58:12 72:22
handbook 62:23
handcuffed 54:24
handcuffs 51:13,21,24 52:4,6,9,12
    53:23 56:23
handed 17:5
happen 32:12 45:11 51:20
happened 17:3 34:13 44:6 45:10
    46:16 47:3 49:14 52:17 54:16,22
    54:23 58:10 59:13,21,24 61:19
happens 46:22 47:21 52:13
Harlem 10:15
heads 53:11
hear 55:4

heard 33:10 46:25 51:23,25 55:6
hearing 55:8
held 1:21 11:19 59:7,7 72:7
help 42:6 62:11
hereunto 72:17
hey 20:11 27:3,18 31:11 42:6 44:2
    46:7 50:24 52:9 66:17 67:16
hi 49:9 66:2
high-risk 18:18,18,22
higher 29:8
highest 9:7
hindsight 63:15
hold 39:6
holding 56:12
home 32:20,23,23,24 35:14 49:10
    49:11,12
homes 31:7
honestly 28:21 32:24 35:11 59:7
    61:12 68:19
hop 28:16
hopefully 44:23
hoping 49:10
hour 7:22
hours 19:8,11,16,17 45:4,5
hours-wise 8:13
house 28:17,22 29:25 30:9,13,18
    31:20 33:7,12,25 35:18,19 45:21
    49:25 50:10 68:8,23
hug 52:24 53:2
hurt 56:25

___

**I**

IAB 60:16
idea 21:12 26:13 57:5,20 64:4
Identification 36:19 69:11
immediately 14:23 34:10,21 44:19
    52:14 58:9,23 61:19
implement 64:11
implemented 64:3
impromptu 20:9 67:13
in-service 58:4
inches 55:23,23
incident 13:18 19:3 21:17,18 25:15
    26:22 35:4 59:12 61:15 63:16
    64:2,6,14,21,22,25 65:12
incidents 24:11
including 48:24
indicate 63:24
indicated 35:13 49:12
indication 25:4
indicator 33:5
indirectly 72:18
individually 1:4
indulge 66:5
informal 21:2,5 32:5
informally 59:19
information 21:24 23:8 25:3 27:10
    27:24 28:4 40:3,5 42:16,23 67:20
informed 22:3

initial 67:7
inside 33:6 49:17,20,24 50:7
intelligence 28:6
intention 56:21,22 57:20
interested 72:17
internal 19:17 60:14,20 61:2,6,8
    71:10
internally 41:6
intimate 57:16
introduced 49:8
investigation 24:19 27:8,13,21 34:4
    60:14,21 61:2,7,8 62:15 71:10
investigations 12:6 42:2 64:15
investigator 1:8,11,19 5:14,17
    11:24 12:2,17,19,23 16:13 21:21
    21:25 22:18,23,24 23:13 24:19
    25:3,8,21,23 27:9,25 28:3 36:21
    39:4,7 40:10,11,17,24 41:4 43:5,9
    43:11 65:10,21 66:14,20
investigators 12:5 59:17 60:19
involved 68:3
iPhone 37:18
issues 11:5
Items 18:4

___

**J**

J 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1
    13:1 14:1 15:1 16:1 17:1 18:1
    19:1 20:1 21:1 22:1 23:1 24:1
    25:1 26:1 27:1 28:1 29:1 30:1
    31:1 32:1 33:1 34:1 35:1 36:1
    37:1 38:1 39:1 40:1 41:1 42:1
    43:1 44:1 45:1 46:1 47:1 48:1
    49:1 50:1 51:1 52:1 53:1 54:1
    55:1 56:1 57:1 58:1 59:1 60:1
    61:1 62:1 63:1 64:1 65:1 66:1
    67:1 68:1 69:1
James 1:3,4,4 19:4 21:13,15 27:5
    27:11 36:25 41:2,4 49:10 50:9
    55:11 57:21 58:18 68:23
James' 67:4
Jeff 49:9 50:13,24 68:3
Jeffrey 1:11,18,19 5:7 70:8,18 71:4
job 10:22 14:9 44:16
John 1:8 2:19 65:16,20,23
join 15:7 16:24
joined 9:19 14:21 17:3
Joint 13:10
JTTF 13:9
judge 3:13 51:9
July 12:25 13:9 64:9
jumped 52:18
June 9:20,24 10:6 11:25

___

**K**

K 5:1 70:2
K-9 48:6
keep 28:22 44:3,21 45:14 51:12
    66:18

___

**KIEBURTZ** 2:16
**killed** 5:22
**kind** 12:14 14:16 19:10,24 20:20,25
    22:20,22 23:4 27:13 32:2,5 34:4
    39:25 41:21 43:8 51:14 56:9
    58:21
**knock** 27:19 31:7,8 32:17 33:8
    34:18,19,21 35:7 43:12 44:4,24
    46:9,21 49:4
**knocked** 22:16 25:9 32:9 34:5
    35:12 44:8 46:14,25 49:2
**knocking** 33:24 34:8,10 43:18
    48:13
**know** 6:19,25 14:4 17:11 19:6,7,11
    20:2,7 23:15,25 25:18 30:25
    32:11,23 34:17 35:6 37:20 38:3
    38:10,15,19,22 40:4 46:6 48:14
    48:20 49:19,22,23 53:12 55:25
    56:12,15 57:4 59:15,18 60:13,19
    60:22 62:14 64:18,24 66:23 68:5
**knowledge** 16:22 17:6 20:24 21:8
    25:12 30:25 48:19 63:14 64:12
    65:8
**known** 22:10 42:12

### L

**L** 3:1,1 5:1 70:2
**lack** 16:4 41:20
**laptop** 39:11
**laser** 53:19 54:8
**law** 2:17 4:12 24:3 41:22 42:14,18
**laws** 17:10
**layout** 31:20
**lead** 20:18 40:24 41:3 42:8 43:4,9
    43:10
**leads** 22:19
**learn** 15:5 31:19
**leave** 33:12 44:16 67:17
**led** 21:2 52:20
**left** 9:17 39:25 40:23 47:19 56:13
    57:15 64:7,10 65:3,4
**length** 8:16
**LEO** 42:13
**let's** 21:13 47:15,17
**level** 9:7 32:8
**Lexington** 2:4
**lieutenant** 60:3,5 61:9
**likewise** 41:12
**limitation** 14:7
**limited** 61:18
**lines** 26:15
**lists** 40:24 42:11
**litigation** 4:13
**little** 22:22 27:22 32:13 44:11 61:21
    62:3
**live** 11:2
**living** 22:4
**LLP** 2:3
**local** 20:19

**located** 55:9
**location** 27:23 28:10 30:9
**logistics** 8:11
**long** 7:21 8:12 11:3,14 14:8 43:16
    44:15 68:4
**look** 27:18,23 28:7 30:13 37:25
    38:4,25 42:5 50:24 51:22
**looking** 5:18 21:22 23:6 46:7 47:25
    48:15 63:15
**looks** 37:17,22 38:13 39:18,24
**lots** 34:5
**lottery** 12:13,14
**loud** 29:5
**low** 10:13
**low-level** 10:16
**lower** 32:8,8
**luck** 22:17

### M

**M** 2:19 65:20 70:2
**major** 24:6
**majority** 42:7
**making** 6:12 55:13
**man** 10:13
**management** 60:10
**Manhattan** 10:14,18 13:14
**manner** 4:9 62:16
**marked** 36:18 69:10
**marriage** 12:11
**Marshal** 16:5,6 37:2 62:22
**marshal's** 20:23
**Marshals** 13:2,7,22,25 19:18 21:10
    36:2 41:6 61:23 63:4,12
**matching** 53:24
**matter** 72:18
**mean** 15:15 21:6,6 24:10 29:2
    31:24 35:6 54:22 55:22,23 60:9
    62:25 66:23
**meaning** 23:18
**means** 40:25 41:2
**meant** 21:7
**medical** 58:18
**meet** 45:19
**meeting** 7:19,21
**member** 13:24 14:8 16:21 17:19
    20:16
**members** 1:12 8:4,5,20 14:17,18,25
    16:6 17:7 26:25 28:12 33:17 48:8
    48:18,20 49:16 58:17 61:15 65:6
    67:3,21
**memory** 36:11
**memos** 64:19
**mentioned** 23:9 66:9
**methods** 33:2
**MICHAEL** 2:9,12
**middle** 39:14,23,23
**Middletown** 11:21
**Mike** 40:7 60:22
**mind** 18:12 32:7 35:7 51:23,23

**mine** 10:9 60:11
**minute** 34:21 35:22
**minutes** 28:16 65:18 66:6
**module** 16:3
**moments** 66:7
**Monday** 20:11
**Monroe** 1:9,12
**month** 20:12 59:15,16
**monthly** 20:7
**months** 8:10 12,19 11:16,21
    60:18 64:8
**Monticello** 12:3
**morning** 5:14,15 26:23 29:14,20
    43:21,23,24 44:12 45:7 46:14
    65:21 66:2,4 67:8
**motion** 52:19
**motions** 18:23
**mouth** 49:18
**move** 21:13
**MSCO** 1:10
**MSCUS** 37:2

### N

**N** 2:1 3:1 70:2,2 71:2 72:2
**name** 5:6,21 22:4 27:4 37:21 49:9
    50:13 61:10 65:22
**names** 1:9,10 61:11
**natural** 43:15
**naturally** 48:11
**nature** 18:5 63:25
**near** 53:8,11
**nearby** 50:6
**necessarily** 42:4
**need** 15:12 20:12 31:11 42:6 50:15
    51:8 52:8,10
**needed** 24:4
**neighbors** 28:15
**never** 6:19 16:4 17:3 31:8 47:10
    59:11 62:23 63:5 64:15
**New** 1:2,13,24 2:4,4,10,11,17,18
    5:3,10,11 9:19 10:20 11:9,18 13:6
    13:12 17:10 22:24 70:4 72:4
**Nichole** 1:22 72:3,24
**night** 29:5,12,18
**nine-month** 10:7
**Nope** 51:22
**normal** 28:17 32:14
**North** 10:18
**Notary** 1:23 3:12 5:3 70:24 72:3
**noted** 30:23
**Notice** 1:21
**noticed** 29:6
**notified** 43:25 44:8
**number** 1:9,10 38:6 48:22
**numbers** 36:9
**NYPD** 9:22 10:5,21,24 11:6 13:11
    16:15,17,24 17:8 19:8
**NYSP** 1:11,19

**O**

**O** 3:1 5:1,1 70:2 72:2
**o'clock** 66:9 67:13
**oath** 7:4 70:10
**Object** 30:10 62:9,18
**objection** 4:19,20 45:16
**objections** 3:8
**observations** 30:8 31:21
**observe** 29:14 30:16 50:9
**observed** 29:17 33:4 44:12 45:7
**obtain** 31:16
**obvious** 31:22
**obviously** 22:3 41:11 60:10
**occasions** 7:24 25:15 29:18
**occurred** 12:8
**October** 1:15 10:22 11:8 70:11 72:22
**off-the-cuff** 46:7
**offered** 22:11
**office** 1:12 2:10 20:18,23 26:25 48:5
**officer** 14:14 15:17 16:17 42:14,19 55:4
**officers** 1:9 19:9 24:3 59:23 60:11 67:3
**oh** 34:19 56:21 58:25 60:15
**okay** 5:20 6:12,13,17,18 10:3 15:20 25:7 31:25 34:19 37:8,9 40:6,12 53:21 62:25 66:2
**once** 22:16 26:5,11 58:4
**ones** 20:9
**oo0oo** 3:21
**open** 49:22
**operating** 27:11 61:24 62:4,16,21 63:3,10
**operation** 26:20 29:8 32:3 48:21 63:21
**operational** 35:24 36:6 37:14
**opinion** 28:20
**ops** 63:13
**option** 28:10,18,21 33:16,22 63:19
**Orange** 11:22
**order** 52:18 55:20
**origin** 24:18
**outlined** 62:16 63:10
**outside** 34:2
**overview** 41:7

**P**

**P** 2:1,1 3:1
**p.m** 69:8
**page** 36:13 37:6 71:8,13
**PAGES** 71:3
**paper** 21:7
**paperwork** 36:3
**parole** 41:16
**part** 30:25 41:3
**particular** 35:12 40:19 45:24

**parties** 1:20 3:4,16 4:4,10 72:16
**passed** 45:8 58:21,21
**patrol** 11:22,23 16:15,25 17:8
**pause** 16:11
**PDF** 38:13
**pedigree** 22:2 40:3
**people** 34:6 43:5 57:12
**pepper** 58:6
**perimeter** 48:9,13
**person** 21:2 26:7 41:8,19 43:11 57:9
**personally** 58:19 62:24
**personnel** 18:24 20:10 43:17 47:8
**perspective** 54:21
**phone** 7:18,20,20 25:9 44:16 66:24 66:25 67:7
**photo** 22:2 39:21,23,24
**photograph** 39:24 71:9
**physical** 52:23 54:14,17
**physically** 4:17 55:9 56:19
**picked** 18:24
**picture** 37:16,17 38:12,14 39:5,14
**piece** 21:7 33:14
**place** 15:12 25:18,19 28:7 29:16 47:8,19 48:12 52:6,9 66:21 67:21 72:8
**placed** 18:24
**places** 11:19 12:2
**Plaintiff** 1:5 2:3 4:21
**Plaintiff's** 36:18 69:10 71:9,13
**plan** 28:21 32:17 33:3,7 34:18 35:24 36:6 42:24 49:2,4 63:13
**planning** 26:18,19 31:4 32:12 43:4 63:21
**plans** 31:16
**play** 18:20
**played** 56:3
**Plaza** 5:10 13:11
**please** 5:5 6:15 66:6,18
**point** 23:4 25:22 27:14 33:6 35:16 44:10 45:15 46:20 47:7,7,11,13 49:15 50:4,7,8 51:11 54:25 55:24 56:9,22,24 57:16 58:11,17 66:14
**pointed** 53:15
**pole** 10:13
**police** 1:12,13 9:19 10:20 11:9,12 11:15,18 12:4 14:14 15:17 22:24 23:5 25:14 40:4,10 41:11,14,24 42:3 49:10 50:14,25 58:3 59:9 60:7,9,13 61:2,6,14 71:10
**police-wise** 12:15
**policies** 15:6
**position** 22:21 48:10,10 68:10
**positions** 11:18 48:13
**possession** 58:13 59:8,11
**potential** 32:15
**potentially** 23:11,25 26:22 37:20 38:20 39:20
**precinct** 10:11,14,14

**preparation** 8:5 24:5
**prepare** 7:7,24 8:24
**present** 1:9,11 4:4,18 26:25 48:21
**presented** 27:2
**presenting** 27:3 41:18
**pretty** 15:8 26:9 54:15 63:22
**previously** 42:17
**primarily** 6:7
**prior** 21:16,17 23:10 24:2 26:2,7,22 27:17 35:3 43:18 44:14 45:25 62:17 63:9 66:7
**priority** 29:9
**proactively** 42:5
**probably** 6:5 20:17 21:16 27:17 31:8 55:24 58:13 67:13
**problem** 40:12,15
**procedures** 61:24 62:5,7,17,21 63:3,11 64:3,11
**proceeding** 16:12 72:7
**proceedings** 6:22
**process** 26:18 35:3
**produced** 60:23,25
**production** 40:8 60:25
**Professional** 60:17
**promoted** 11:24
**prompted** 10:23 51:18
**proper** 5:16
**protocols** 63:9
**provide** 21:25 58:18 59:13
**provided** 3:16 22:9 25:3 46:3
**providing** 7:4
**Public** 1:23 3:12 5:3 70:24 72:3
**pull** 39:20 43:2 57:6
**pulled** 38:14 39:10 57:8,17,19
**purpose** 4:12 66:13
**pursuant** 1:21
**push** 55:21
**pushed** 55:17,19 56:3,8,16,16
**pushing** 54:6,6
**put** 20:10 33:17 40:13 44:7 50:8 51:22 53:23 59:5
**putting** 16:6 28:12 33:18 45:11

**Q**

**question** 5:24 6:9,16 14:15 20:5 27:16 30:16 33:21 34:15 35:2 37:11,22 39:2,12,15 41:25 45:2 46:12 50:20 51:16,19 54:8 62:10 62:19 67:18,18
**questions** 5:23 9:6 34:7 37:16 42:11 62:2 65:9,14,16 66:7 69:6
**quick** 67:16
**quicker** 62:3
**quickly** 56:7 61:17
**quite** 15:18 43:25
**quote** 48:23 65:4

**R**

**R** 2:1 3:1 5:1 72:2

**racetrack** 12:12
**Raceway** 12:3
**radio** 47:13 49:16
**radioed** 27:18
**ran** 51:14 52:14
**random** 44:17 46:6 47:12
**reach** 44:19
**reached** 52:4,12
**reaching** 51:20
**read** 38:18 70:9
**reading** 39:8
**ready** 47:15,17
**realized** 58:23 67:8
**really** 27:8,12 37:6 38:18
**rear** 50:3
**reason** 10:23 26:16 29:11
**recall** 19:5 23:13 24:22 25:16 27:2
    29:5,9 30:5 36:10 45:24,25 48:5
    48:17 50:8 53:11 55:7,8 57:2
    59:22 61:11,25 62:4 64:10 66:25
    67:10 68:9,12,19 69:3,4
**recalling** 47:10
**receive** 24:23
**received** 17:15 18:17 57:23
**recollection** 20:13 24:13 40:22
    44:20 46:15 48:7 64:12
**record** 4:15 5:6 6:11 13:5 16:9
    17:13 24:9 64:13 70:12,13 72:14
**recorded** 4:8
**recording** 4:9
**records** 9:2
**red** 54:8
**redo** 11:11
**referral** 26:6
**referring** 36:8,12 37:12
**refused** 23:19
**regular** 19:7 20:6
**regulations** 15:6,23 16:16 17:3,7
**related** 72:15
**relates** 20:23 64:21
**remainder** 48:8
**remember** 8:15 19:2,20 23:17
    24:14 30:14 49:6 50:17 51:17
    61:5
**remotely** 4:5
**rephrase** 6:16 62:12
**report** 44:19
**reported** 24:11
**reporter** 1:23 4:2,16 5:5,8 6:6
**Reporting** 4:6
**represent** 5:21 65:24
**REQUEST** 71:8
**required** 17:8 19:9 63:8 64:19
**requirement** 20:2
**requires** 63:13
**reserved** 3:8
**residence** 28:7 31:17 32:20 33:6
    34:11,23 35:10 49:24 63:18 67:4
**resign** 10:23

**resigned** 10:21
**resisting** 42:21
**respect** 3:19 15:24
**respective** 1:20 3:4
**response** 51:2
**rest** 58:20 68:2
**result** 64:14,22
**retired** 23:2
**retrieve** 35:15 49:13
**returned** 47:5 68:6,8,13,22
**returning** 68:18
**review** 8:23
**Rich** 44:20
**Richard** 1:8,10 65:25 66:10
**Richie** 44:21 47:5 66:17 67:7,11
**right** 5:18,20 9:5 11:9 13:21 16:13
    16:15,17,24 22:9,25 23:12 26:25
    27:25 37:19,25 39:14,23 40:18
    41:9 43:22 47:9,19 51:24 53:9,24
    53:25 56:13,14,23 57:13 58:12,24
    59:3 64:7,7 65:7
**rights** 3:16
**risk** 32:2,5,8 63:8
**road** 28:23 47:10
**Rochester** 1:8,12 2:17,18 4:23
    12:11 13:3,6,20,23,25 14:11 20:8
    21:10 41:14 59:9 65:24
**ROD** 1:10
**role** 14:11,13 20:19 21:3
**roles** 14:16 43:6
**roll** 37:23 38:2,11 39:14,15 47:15
    47:17,22 71:9
**rolled** 47:20
**room** 2:18 12:17,19,23 18:22
    27:6 48:16 58:14
**ROTH** 2:3,3
**roughly** 12:10
**routine** 34:4
**RPD** 1:8,8 59:17,25 60:7,18 61:14
**rules** 6:5 15:23 16:16,20 17:2,7
**run** 44:22 51:18 66:17
**runs** 52:13

---

**S**

**S** 2:1,9 3:1,1 5:1,1 71:4
**s/h/a** 1:19
**safe** 28:18
**safer** 63:17
**safety** 35:16,20 42:12 49:22
**sat** 44:14 59:16 60:15
**save** 13:14
**saw** 50:11 54:2,4,11 56:5
**saying** 27:3 39:22 44:9 55:7 56:17
**scene** 35:21 43:9 44:16 45:6 46:19
    47:5,18,20,22 59:23 60:4,6,11
**scheduled** 19:19 20:6
**Scott** 1:18 5:7 21:21 70:8,18
**screen** 36:16,21,23 37:18 38:21
**scroll** 37:9

**sealing** 3:5
**Sean** 48:5
**search** 18:18
**second** 16:9 17:14 37:5 39:7
**secret** 17:12
**sections** 3:18
**secure** 56:24 57:21 58:11
**secured** 59:3
**see** 28:7,23,23 29:10 36:21,22 37:4
    37:7,20 38:13,21,24 39:11,25
    40:23 46:19 48:15 49:4 51:9
    53:19 54:8
**seeing** 30:7
**seek** 15:13,16
**seeking** 15:22
**seen** 29:21,22 62:24 63:5
**sent** 39:4 40:9
**separate** 38:15,16
**September** 13:19 19:4 25:25 29:3
    29:19,20 66:22
**Sergeant** 1:10 20:17
**serve** 14:8
**Service** 37:2 62:22 63:13
**session** 19:3
**set** 16:20 17:6 50:21 54:10 62:2
    72:21
**SHENEA** 1:3,4
**SHERIFF** 1:9
**sheriff's** 1:10,12 20:18 48:5
**sheriffs** 41:13
**Shields** 2:5 4:21 5:13,21 16:10
    36:14 38:3,8 39:9 40:7,15 43:2
    60:22 65:9 71:4
**shoot** 55:5,7
**short** 28:11,13
**shot** 37:18 54:19 55:10 57:2,4 58:9
    58:24
**shoulder** 57:14
**shoulders** 53:24
**showed** 7:9 60:11 67:7
**shuffled** 49:25
**shut** 49:23
**side** 53:7,8
**signed** 3:11,13 70:21
**similar** 12:12 17:8 18:3 19:23
    41:15
**sit** 37:15
**sit-down** 59:14 60:18
**situation** 58:8,19
**six** 10:12 11:16,20,23,23
**small** 24:18
**Smith** 48:4 50:6 57:14
**son** 5:22 24:21
**soon** 35:12 50:2 51:13 56:5
**sorry** 13:16 18:10 38:8
**sort** 38:13 48:9 55:17
**sorts** 12:20 60:10
**sounds** 41:8
**SP** 11:21 12:16

space 54:5 55:20 56:6,6
speak 58:7 59:20
speaking 15:9 16:2 66:13
specialized 14:22 20:20 21:3
specific 8:15 14:11,13 15:23 18:5
    19:17 20:13,15 21:24 23:7 24:14
    30:16 41:9 42:25 43:4,17,18 49:6
    58:8 62:6 64:21 65:2
specifically 19:5 30:24 43:17 45:24
    46:10 48:17 50:17,19 56:25 67:10
specifics 27:7 34:12 48:2
spent 10:12 17:21
spigot 53:10
spoke 8:7 25:9 26:21 61:5
spoken 7:23 8:4 25:14 66:10
spots 43:18
spun 51:14 52:2
ss 70:4
staged 46:13 47:9
staging 45:19,24 47:11
stairs 48:6
standard 26:5 32:7 39:3 50:21
    61:23 62:4,16,21 63:3,10,22
Standards 60:17
standing 50:4
staring 61:9
start 7:6 10:6 26:19 46:24
state 1:13,23 5:3,5 10:20,24 11:9
    11:12,14,18 12:4,15 13:6 14:14
    17:10 22:24 23:5 40:10 41:11,24
    42:3 49:9 50:14,25 58:3 60:7,9,13
    61:2,6,14 70:4 71:10 72:4
statement 59:13,14,18
statements 61:13
States 1:1,8 2:10 17:11 37:2 62:22
static 28:19
stationed 11:19 67:4
stay 19:16 29:12
staying 68:23
stenographically 72:11
Stenotype 1:23
stepped 48:2
steps 58:20
sticking 32:12
stipulate 4:15
stipulated 3:3,7,10,15 4:3,7
stipulates 4:21,22,24
stone 45:23
stood 58:16
stop 33:13
strategy 31:12,14 33:24
street 2:18 13:6 22:5 30:2,3,6 31:22
    33:15
struck 32:18
struggle 53:21
struggling 54:25
stuff 9:6 18:7,24 19:24 20:19 48:13
    58:7
subscribed 70:21

substance 7:11
suggest 13:13
suggesting 42:16
Suite 2:4
Sullivan 12:3
SUNY 9:14,15,17
supervisor 59:20 72:12
sure 11:20 16:10,18,25 18:14 19:15
    20:4 28:3 30:12 31:6 34:13,15
    36:12 38:23 39:9 41:10 49:21
    59:2,3 60:15,23 62:13
surmise 68:20
surprised 8:11
surprises 8:19
surround 33:7
surrounded 50:5
surrounding 33:23,25
surveillance 28:5,9,19,20 30:17
    33:14 48:14 68:10,10
suspect 15:14,17 21:23 22:10,11
    39:21
suspect's 22:2
suspects 15:22
swear 4:14,16
sworn 5:2 7:4 72:9
system 16:7 36:5 39:19 40:5

---

**T**

T 3:1,1 5:1,1,1 70:2 72:2,2
tackled 54:18
tactic 18:7
tactical 30:24
tactics 19:23 58:2,6
take 10:4 11:17 14:5 26:17 38:25
    40:14 42:8 44:6,17,22 45:4 46:16
    47:21 48:25 50:15
take-downs 18:6
taken 1:19 45:5 70:10 72:11
takes 19:14
talk 8:9 43:13 44:10 68:13
talked 8:16,18 67:23
talking 66:15
target 22:10 29:9 49:24
target's 49:17,19
task 8:3,5,20 10:18 13:2,10,20,22
    13:25 14:6,8,10,12,14,17,18,21
    14:25 15:3,5,7,9,10,24 16:3,19,20
    17:4,7,16,18 18:3 19:11 20:7,15
    21:11 23:5 26:24 27:16 29:8 41:6
    41:8,18,23 43:25 48:8 49:16
    61:15,21,23 62:25 63:4 64:2,24
    65:6 67:3
team 28:12 31:11 33:17 43:16 44:8
    44:9 58:17,20
technician 59:10
tell 7:10 9:7 21:14 23:24 38:17,18
    46:11,22 49:11 52:5
telling 7:7 23:14
term 16:4 41:20

terms 15:21
territory 15:18
Terrorism 13:10
test 36:9,11 44:17 45:8 46:17 47:4
    47:12 67:13 68:6,18
testified 5:4,25 6:20,21 40:16
testimony 7:4 8:12 70:10,12 72:6
    72:10,11,14
Thank 54:13 61:4 65:18
Thanks 65:15
theme 17:24
thereto 3:19
thing 6:7 8:11 14:19,20 19:18 29:13
    42:11 43:8 44:3 47:16 52:17
    59:25 68:5
things 33:10
think 12:25 17:14 22:15 25:16 29:4
    29:6 38:12 40:16 42:20,21 47:8
    48:22,23 51:5 54:15 60:23 63:16
    63:19,20,22 65:3 67:11 68:11
thinking 35:3
thought 33:19 35:3
thoughts 49:2
thousand 32:9 34:5 63:24
three 17:22 18:3 21:17 26:22 36:4
Three-and-a-half 9:9
threshold 50:4
throw 36:11
time 1:22 3:9 4:19 10:19 13:14,18
    14:6 16:11 23:2 26:12 35:8 36:7
    43:10,16 44:7 45:4,22 50:22 54:2
    54:6,18 57:22 64:6 65:3,4,6 67:5
    67:6,23,24,25 69:6 72:8
times 6:24 17:22 18:3 34:6 63:24
timing 67:9
title 5:16 20:21 21:9
today 5:23 6:7 65:10
today's 7:8
TODD 1:9
told 50:24 52:7 68:20
top 37:6 40:23 55:11,12
topics 15:24 61:20
tops 7:22
torso 55:13,14,15
total 48:20,24
totem 10:13
touch 56:19
touching 56:20 57:18
town 12:16
tracer 15:16,17
traffic 33:13
trained 17:23 58:7
training 14:22 17:15,25 18:4 19:2,8
    19:12,19,21 20:7,21 21:9 57:23
    64:20
trainings 14:25 17:18 18:17 19:7
    20:6,15 21:2
transcribed 72:12
transcript 3:11 70:9,11 72:13

**transferred** 12:10 13:9
**transmission** 49:16
**travel** 13:14
**trial** 3:9
**tried** 22:14 54:5
**trigger** 57:6,8,17,19
**triggered** 51:25
**trooper** 10:21 11:22,23
**troopers** 10:24
**true** 70:11,14 72:13
**try** 26:6,16 30:12 44:3
**trying** 53:22 56:24 57:24 59:22
    67:9,11,18,21
**tub** 53:7
**turn** 22:15 23:19
**turned** 13:3 49:21
**turning** 23:11 30:6
**twenty** 19:11
**twice** 17:22 22:16
**two** 13:8 21:16 26:21,22 27:17
    34:22 43:21 45:5 53:4 57:12
**two-page** 37:10
**type** 14:4,22 34:18 68:4
**types** 6:21 19:21
**typical** 31:23 43:10 47:16
**typically** 26:23 42:7

**U**

U 3:1 5:1
**U.S** 2:12 13:2,22,25 16:5 21:10
    41:6 61:23 63:4
**Ulatowski** 1:11,18,19 5:7 6:1 7:1
    8:1 9:1 10:1 11:1 12:1 13:1 14:1
    15:1 16:1 17:1 18:1 19:1 20:1
    21:1 22:1 23:1 24:1 25:1 26:1
    27:1 28:1 29:1 30:1 31:1 32:1
    33:1 34:1 35:1 36:1 37:1 38:1
    39:1,7 40:1,11 41:1 42:1 43:1
    44:1 45:1 46:1 47:1 48:1 49:1
    50:1 51:1 52:1 53:1 54:1 55:1
    56:1 57:1 58:1 59:1 60:1 61:1
    62:1 63:1 64:1 65:1 66:1 67:1
    68:1 69:1 70:8,18 71:4
**ultimately** 28:24,25
**unauthorized** 4:11
**unaware** 62:6 63:8
**underlying** 13:19
**underneath** 56:10,17
**understand** 6:15 16:25 30:11 34:14
**understanding** 23:20 24:20 25:20
**unfamiliar** 15:18 41:5
**unidentified** 1:12
**union** 61:18
**unit** 10:15,17 12:13,14
**United** 1:1,8 2:10 17:11 36:25
    62:22
**unknown** 1:9,11
**unresponsive** 25:20
**unusual** 26:9 44:11

**USM** 37:7 40:19
**USMS** 36:17 69:9 71:14
**Utica** 17:20

**V**

**various** 64:14
**vast** 42:7
**vehicle** 18:6 28:13 29:10,14,17,23
    33:4 44:12 45:7 48:2 68:11
**vehicle's** 44:24
**versus** 36:25
**viable** 28:21 33:16
**video** 12:13,14
**videoconference** 4:8
**videos** 9:2
**view** 68:24
**Vineland** 22:5
**Vinewood** 22:6,7 28:7 29:15 47:19
**violation** 4:11
**violent** 24:2,7,11 63:25
**violently** 54:25
**voluntarily** 25:14 34:22

**W**

W 5:1 70:2
**wait** 6:8 34:21 68:3
**waiting** 33:11 34:9
**waived** 3:6,17
**walk** 35:6
**walking** 51:11,12
**want** 15:11 34:20 37:16 38:19 45:3
    55:22 61:20 65:11 66:6
**wanted** 18:14 28:3 38:10,15
**warrant** 15:13,17,21,22 18:19,22
    21:15,20,23 24:5,16,18,24 25:24
    26:3,8,12,19 27:3 31:5,15 32:8
    34:4 35:24 41:2,11,17 42:23 43:6
    45:12,15,20,25 46:18 50:15,25
    51:4 52:7 62:8,17 63:9,13,23 66:8
    67:22
**warrants** 10:16 16:3 18:18 32:16
    41:14 42:8
**wasn't** 15:18 24:6 28:9 59:25
**way** 25:5 32:10 34:16 42:24 44:10
    47:12 56:18 57:17,19 64:16 67:15
    68:15
**ways** 31:12
**we'll** 34:21,21,23 36:14 40:13 51:8
    67:19
**we're** 34:19 36:12 56:22
**we've** 6:6 43:15 50:25 63:23
**weapon** 56:24
**wearing** 64:25 65:7
**web** 1:21
**week** 26:24
**weeks** 7:16 21:16,17 26:21 27:17
    43:21 46:3,6 59:16
**went** 8:12 9:21 10:18,19 11:8 12:15
    14:24 17:13,20,21 18:2 19:18

    27:7 46:13 54:11,19 56:9,11 57:2
    57:4 58:17 59:15
**Western** 1:2 2:10
**WHEREOF** 72:21
**whichever** 48:10
**white** 22:12 27:12 39:25 68:24
**whoever's** 43:13
**willing** 54:23,24
**windows** 31:22 48:15
**winter** 58:4
**witness** 4:14,17,18 5:2,7,10 69:8
    71:3 72:9,14,21
**woman** 5:22
**wondering** 55:17
**work** 12:7 18:5 41:19,22 43:7
**worked** 43:16
**workload** 41:13
**works** 22:23 23:6 41:6
**worries** 13:17
**wouldn't** 14:13 21:4 67:6
**write** 6:10
**writing** 40:13 61:3
**written** 4:10 35:23 45:23 59:14,25
    62:21

**X**

x 1:3,14 31:12 71:2

**Y**

Y 5:1 31:12
**yeah** 5:17 18:7,10,15,15,15 23:23
    24:25 41:10 47:25 53:3 54:22
    56:21 58:25 59:2,22 60:9,15 64:8
    64:9
**year** 12:10 19:10,11 58:5
**years** 9:9 11:23 12:22 13:8,8 14:24
    17:16 19:21 36:3,4 58:3
**yelled** 58:13
**York** 1:2,13,24 2:4,4,10,11,17,18
    5:3,11,11 9:19 10:20 11:9,18 13:6
    13:12 17:10 22:24 70:4 72:4
**Yup** 7:5 10:6 37:8 56:5 64:8 68:25
    68:25

**Z**

Z 31:12
**zoom** 4:5 7:19 37:16,17

**0**

**04** 11:25

**1**

**1** 36:15,19 69:10 71:9,14
**1-10** 1:9,10
**100** 13:5
**10016** 2:4
**10278** 5:11
**11:08** 1:16
**12:40** 69:8

**138** 2:11
**14** 13:2
**14202** 2:11
**14614** 2:18
**14th** 29:19
**15** 25:25 29:3 66:22
**15th** 29:20
**192** 2:4
**1995** 9:12,20,24
**1997** 11:8

---

**2**

**2** 1:15 70:11
**2004** 11:24
**2014** 12:24 13:3 14:2
**2020** 25:25 29:3 66:22
**2021** 13:19 19:4
**2022** 13:9 64:7,9
**2024** 1:15 70:11,22 72:22
**22** 13:9
**22nd** 72:22
**23-CV-6057** 1:7
**26** 5:10

---

**3**

**30** 2:18
**30th** 10:14
**36/69** 71:14

---

**4**

**40** 71:9
**412A** 2:18
**45** 36:8 37:7 40:19 42:10

---

**5**

**5-65** 71:4
**52** 10:11

---

**6**

**6** 28:7
**60** 71:10
**65-69** 71:5

---

**7**

---

**8**

**8** 67:13
**802** 2:4

---

**9**

**9** 66:9
**93** 38:9
**95** 10:6
**97** 10:22