1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - -X
SHENEA JAMES, as Administrator of the
Estate of DEDRICK JAMES, Deceased, and
SHENEA JAMES, Individually,

                  Plaintiff,

    - against -

                           Case No:
                           23-CV-0657
THE UNITED STATES OF AMERICA, CITY OF
ROCHESTER, RPD INVESTIGATOR RICHARD
ARROWOOD, "JOHN DOE RPD OFFICERS 1-10"
(names and number of whom are unknown at
present), MONROE COUNTY SHERIFF TODD
BAXTER, MSCO SERGEANT CHRISTIAN
DEVINNEY, RICHARD ROD, "SHERIFF'S
DEPUTIES 1-10" (names and number of whom
are unknown at present) NYSP
INVESTIGATOR JEFFREY ULATOWSKI and other
unidentified members of the ROCHESTER
POLICE DEPARTMENT, MONROE COUNTY
SHERIFF'S OFFICE, and NEW YORK STATE
POLICE,

                  Defendants.
- - - - - - - - - - - - - - - - - - - - - -X

             October 4, 2024
             11:00 A.M.


      DEPOSITION OF RICHARD ARROWOOD, one of

the Defendants herein, taken by the attorney

for the Plaintiff, pursuant to Notice, held

via web conference at the above date and

time before Sharon Cassidy, a Stenotype Reporter

and Notary Public within and for the State of

New York.

              *    *    *    *

2

```
 1

 2    A P P E A R A N C E S:

 3

 4    ROTH & ROTH, LLP
              Attorneys for the Plaintiff
 5            192 Lexington Avenue, Suite 802
              New York, New York 10016
 6
      BY:   ELLIOT SHIELDS, ESQ.
 7

 8

 9    UNITED STATES ATTORNEY'S OFFICE
      WESTERN DISTRICT OF NEW YORK
10            Attorneys for the Defendant
              The United States of America
11            138 Delaware Avenue
              Buffalo, New York 14202
12
      BY:   MICHAEL S. CERRONE, ESQ.
13

14

15    LAW DEPARTMENT OF CITY HALL OF ROCHESTER
              Attorneys for the Defendant
16            City of Rochester
              30 Church Street, Room 412A
17            Rochester, New York 14614

18    BY:   JOHN M. CAMPOLIETO, ESQ.

19

20

21

22

23

24

25
```

3

1

2                    FEDERAL STIPULATIONS

3         IT IS HEREBY STIPULATED AND AGREED, by
    and between the parties hereto, through their
4   respective Counsel, that the certification,
    sealing and filing of the within examination
5   will be and the same are hereby waived;

6         IT IS FURTHER STIPULATED AND AGREED that
    all objections, except as to the form of the
7   question, will be reserved to the time of the
    trial;
8
          IT IS FURTHER STIPULATED AND AGREED that
9   the within examination may be signed before any
    Notary Public with the same force and effect as
10  if signed and sworn to before the Court.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1

2          THE REPORTER:  It is hereby

3      stipulated and agreed by and between

4      counsel for all parties present that this

5      deposition is being conducted remotely by

6      video conference, and that the court

7      reporter, witness and all counsel are in

8      separate remote locations and

9      participating via Zoom or any web

10     conference meeting platform under the

11     control of Bee Reporting Agency, Inc.

12          It is further stipulated that this

13     videoconference will not be recorded in

14     any manner and that any recording without

15     the express written consent of all

16     parties shall be considered unauthorized,

17     in violation of law and shall not be used

18     for any purpose in this litigation or

19     otherwise.

20          Before I swear in the witness, I

21     will ask each counsel to stipulate on the

22     record that I, the court reporter, may

23     swear in the witness even though I am not

24     physically in the presence of the witness

25     and that there is no objection to that at

5

1

2          this time, nor will there be an objection

3          at a future date.

4                MR. SHIELDS:  No objection.

5                MR. CAMPOLIETO:  No objection.

6                MR. CERRONE:  No objection.

7                THE REPORTER:  Mr. Arrowood, can you

8          please produce government-issued ID?

9                MR. ARROWOOD:  (Complying.)

10               (Whereupon, the Witness presented

11         government issued ID as identification.)

12               THE REPORTER:  Thank you.

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1

2   R I C H A R D    A R R O W O O D,

3        The witness herein, having first been

4   duly sworn or affirmed by Sharon Cassidy, a

5   Notary Public within and for the State of New

6   York, was examined and testified as follows:

7   DIRECT EXAMINATION BY ELLIOT SHIELDS, ESQ.:

8        Q.   Please state your name for the record.

9        A.   Richard Arrowood.

10       Q.   Please state your current business

11  address for the record.

12       A.   185 Exchange Boulevard, Rochester, New

13  York.

14       Q.   Good morning, Investigator.

15       A.   Good morning.

16       Q.   Is it Investigator, is that the

17  correct title?

18       A.   As of a few days ago.  It is Detective

19  now.

20       Q.   Detective, does that mean you are no

21  longer with the RPD?

22       A.   Yes, I am still with the RPD.

23       Q.   So did they change the titles for

24  their roles with the RPD then?

25       A.   They changed the name of it.

7

1                    Richard Arrowood

2        Q.   My understanding before was that they

3    didn't have a title for Detective; is that

4    right?

5        A.   Say that again.

6        Q.   I just didn't know that there was a

7    role with the RPD, Detective, you know, just a

8    label of your job title.  I had this

9    conversation with other officers I deposed

10   before and they said, oh, no, we don't have the

11   title of Detective at the RPD, so that is why I

12   was confused.

13       A.   Yes, they just changed the title.

14       Q.   From Investigator to Detective?

15       A.   Correct.

16       Q.   So my first question for you is, have

17   you ever given testimony at a civil deposition

18   like this before?

19       A.   Not that I recall.

20       Q.   But you have testified in court in

21   criminal cases?

22       A.   Correct.

23       Q.   I am going to go over some ground

24   rules before we get started.  The most important

25   thing is that you and I don't speak at the same

8

1                    Richard Arrowood

2    time, and that's for the court reporter to get

3    everything down in the little book that will be

4    used at the trial in this case.

5         A.   Okay.

6         Q.   If there is anything that I ask you

7    that you don't understand, please tell me and I

8    will gladly rephrase my question for you.

9         A.   Okay.

10        Q.   Can you give me an estimate about how

11   many times you have testified in court before?

12        A.   Hundreds.

13        Q.   Same general rules as when you

14   testified in court.

15        A.   Okay.

16        Q.   Can you tell me everything that you

17   did to prepare for today's deposition?

18        A.   I met with John and reviewed a few

19   reports.

20        Q.   When did you meet with John?  Don't

21   tell me anything you talked about, obviously

22   that is privileged.  When was that meeting?

23        A.   Yesterday.

24        Q.   About how long was it?

25        A.   Half-hour maybe.

9

1                    Richard Arrowood

2        Q.    In preparation for your deposition,

3    did you speak with anyone else about the case?

4        A.    No.

5        Q.    Did you ever speak with any other task

6    force members about this lawsuit?

7        A.    I am sure it has come up in

8    conversation in the past.

9        Q.    Have you spoken with any other task

10   force members about their deposition testimony?

11       A.    No.

12       Q.    You said that you reviewed a few

13   reports.  Can you tell me what reports you

14   reviewed?

15       A.    Like the letter -- I don't know the

16   specific names of it.  It was just general

17   information about them.

18       Q.    Reports from this case?

19       A.    Yes.

20       Q.    Any reports that you filled out?

21       A.    No.

22       Q.    I just want to switch to some

23   background questions.  Can you tell me what your

24   highest level of education is?

25       A.    A few college courses.

1                    Richard Arrowood

2        Q.    When was that?

3        A.    The last time I took a college course,

4    that I remember, is '08, '09 maybe.

5        Q.    Was that while you were working with

6    the RPD?

7        A.    Yes.

8        Q.    When did you graduate high school?

9        A.    '88.

10       Q.    What did you do after you graduated

11   high school?

12       A.    Welder in the navy.

13       Q.    How long were you in the navy for?

14       A.    Almost six years.

15       Q.    And then what did you do after you

16   completed your time with the navy?

17       A.    Police officer in West Virginia.

18       Q.    What department was that?

19       A.    Capitol Charleston, West Virginia.

20       Q.    What year did you start there and what

21   year did you end there?

22       A.    '94 to '96.

23       Q.    When you began your career in West

24   Virginia, did you have to go to the police

25   academy?

11

1                    Richard Arrowood

2        A.    Yes.

3        Q.    How long was the police academy there?

4        A.    Roughly six months.

5        Q.    They taught you general laws of

6    arrest, police practices, stuff like that?

7        A.    Yes.

8        Q.    How about like how to conduct search

9    warrants, best practices for apprehending

10   suspects?

11       A.    Yes.

12       Q.    When you were with that department,

13   did you have any disciplinary issues?

14       A.    No, not that I remember.

15       Q.    When you were with that department,

16   did you ever discharge your firearm in the

17   course of your police duties?

18       A.    No.

19       Q.    What happened after 1996, where did

20   you go from there?

21       A.    City of Rochester, the police

22   department.

23       Q.    What brought you to the City of

24   Rochester?

25       A.    I married a girl from here.

12

1                    Richard Arrowood

2        Q.    So you transferred to the Rochester

3    Police Department?

4        A.    I was hired by the Rochester Police

5    Department.

6        Q.    When you got hired by the Rochester

7    Police Department, did you have to go to the

8    academy?

9        A.    Yes.

10        Q.    How long was that?

11        A.    Roughly six months.

12        Q.    Was that in 1996 or something else?

13        A.    '96.

14        Q.    Again, they taught you general best

15    practices for police officers and how to comply

16    with the laws in the State of New York?

17        A.    Yes.

18        Q.    Did that include apprehension of

19    suspects?

20        A.    Yes.

21        Q.    Did you have classes on, for example,

22    executing search warrants?

23        A.    Yes.

24        Q.    Search warrants, arrest warrants also?

25        A.    Yes.

13

1                    Richard Arrowood

2        Q.    After the academy, the next step is

3    field training; is that right?

4        A.    Yes.

5        Q.    How long is field training?

6        A.    Three phases of four weeks each and

7    then five phases of two weeks.  So three, three

8    and a half months, maybe four.

9        Q.    Do you remember who your FTOs were?

10       A.    Yes.

11       Q.    Can you tell me who they were?

12       A.    Dave Williams, he was first and final.

13   I can picture the other face and then I can't

14   spit out the name.  I could picture the other

15   two officers.  One guy is retired now.  I'm

16   sorry, maybe I will remember later.

17       Q.    Field training, it is general

18   on-the-ground training, learning how to put into

19   practice the things that you learned in the

20   academy, is that generally right?

21       A.    Yes.

22       Q.    For example, did you have to make

23   arrests during your field training?

24       A.    Yes.

25       Q.    Did you have to apply for any arrests

14

1                    Richard Arrowood

2   or search warrants during your field training?

3        A.   I'm sure for warrants, arrest

4   warrants.  I am pretty sure not for search

5   warrants.

6        Q.   And then did you execute those search

7   warrants during your field training?

8        A.   I don't remember any specific

9   instances.

10       Q.   Can you kind of take you me through

11  your career with the RPD after you finished your

12  field training through today?

13       A.   In a nutshell, I did about

14  twenty years on patrol.  I got selected to go to

15  Marshals after -- whatever the math is, '96 to

16  2018, and spent about almost three years, just

17  shy of three years with the Marshals, got made

18  Investigator, spent about a year as Investigator

19  and then they asked me to come back to the

20  Marshals and here I am.

21       Q.   Can you take me through -- when did

22  you first join the Marshals?

23       A.   I believe it was February of '18.

24       Q.   What was your rank at that time?

25       A.   Officer.

1                    Richard Arrowood

2        Q.   At some point were you promoted to

3    Sergeant?

4        A.   No.  I was offered Sergeant, but I was

5    already Investigator.

6        Q.   There are different tracks; is that

7    right?

8        A.   I guess that is one way to put it,

9    yes.

10        Q.   Like an Investigator in the hierarchy

11    is above a Sergeant?

12        A.   Correct.

13        Q.   When were you promoted to

14    Investigator?

15        A.   I believe like September of '20.

16        Q.   So you were with the Marshals at that

17    time?

18        A.   Yes.

19        Q.   When you were promoted to

20    Investigator, did you have to receive any

21    additional training?

22        A.   Yes.

23        Q.   Can you describe that training for me?

24        A.   Field training with another

25    Investigator.

16

1                    Richard Arrowood

2        Q.   Let me ask you this:  When you joined

3    the Marshals in 2018, on a day-to-day basis,

4    would you be working exclusively with the

5    Marshals or would you also still be doing like

6    regular RPD duties?

7        A.   No, I wasn't doing regular RPD duties

8    anymore.  I was with the Marshals.  I didn't

9    answer to RPD.

10       Q.   So basically exclusively you would

11   work with the Marshals once you were deputized?

12       A.   Yes.

13       Q.   So how did it work when you did your

14   field training as an Investigator, was that like

15   through the Marshals or did you go back to the

16   RPD for that?

17       A.   Rephrase that.

18       Q.   At the time that you were promoted to

19   an Investigator, were you still working

20   exclusively with the U.S. Marshals?

21       A.   For a year as Investigator with RPD.

22       Q.   I'm sorry, I was confused about that.

23   In 2018, you go to the Marshals, you're an

24   officer and then -- I'm sorry, I forget what

25   year you were promoted to Investigator?

17

1                    Richard Arrowood

2        A.   I believe September of '20.

3        Q.   In September of '20, you go back to

4   the RPD for about a year?

5        A.   Yes.

6        Q.   Can you just give me a general

7   overview of what your job duties are as an

8   Investigator with the RPD?

9        A.   Investigating crimes, get fielded to

10  patrol investigations.  It is usually felonies.

11  It could range from a simple larceny to grand

12  larceny all the way to a shooting.

13       Q.   So your job is to basically dig and

14  get more details about crimes and apprehending

15  suspects?

16       A.   Yes.

17       Q.   Aside from the field training, did you

18  receive any other training about good and

19  accepted police practices for your role as an

20  Investigator?

21       A.   I don't remember any specific other

22  training.

23       Q.   I guess my question is, is there any

24  kind of academy training when you get promoted

25  to Investigator or is it just the field

1                    Richard Arrowood

2    training?

3         A.    Field training.

4         Q.    After that field training, is there

5    further ongoing training in your role as an

6    Investigator?

7         A.    Not officially.

8         Q.    When you joined the task force, was

9    there specific training that the task force

10   provided when you first joined the task force?

11        A.    We eventually do get training.

12        Q.    Is there like an academy when you

13   first join?

14        A.    When I first joined, there wasn't.

15        Q.    How did you learn how to perform your

16   job duties as a task force member?

17        A.    Probably a lot of like field training.

18        Q.    Basically on-the-ground training with

19   other members of the task force?

20        A.    In the beginning, yes.

21        Q.    Were you, for example, assigned to

22   someone that would be the equivalent of a field

23   training officer?

24        A.    The deputies always oversaw us.  We

25   weren't supposed to be out in -- we weren't

19

1                    Richard Arrowood

2    supposed to be doing operations without a U.S.

3    Marshal being with us.

4        Q.   You said the deputies oversaw you and

5    you weren't supposed to do anything without a

6    U.S. Marshal being with you.  I have a couple of

7    follow ups to that.  When you say the deputies

8    oversaw you, do you mean the Sheriff's Deputies?

9        A.   U.S. Marshals.

10        Q.   On the team, there is only a few U.S.

11    Marshals, right?

12        A.   Yes.

13        Q.   Would it be fair to say there is more

14    members from the team from the RPD and the

15    Sheriff's Office and the State Police then there

16    are Marshals?

17        A.   Yes.

18        Q.   When you joined the U.S. Marshals, did

19    you receive any rules, regulations, that would

20    be, for example, the equivalent of the Rochester

21    Police Department's general orders?

22        A.   Yes.

23        Q.   What were those called?

24        A.   Just Marshals' -- I don't know the

25    specific name of it.  Just U.S. Marshals'

1                     Richard Arrowood

2    policies and procedures.

3         Q.   Did they give you a booklet or

4    anything?

5         A.   I don't remember specifically.

6         Q.   Would that have been like their

7    standard operating procedures?

8         A.   Yes.

9         Q.   Is that something that you carry

10   around with you during your job duties to refer

11   to?

12        A.   No.

13        Q.   My understanding is that the police

14   academy for the RPD will be given tests, you

15   know, about your knowledge of the general

16   orders.  Was there ever any kind of equivalent

17   to that for the Marshals with their standard

18   operating procedures?

19        A.   I don't remember having a test on

20   them.

21        Q.   Let's back up a little bit.  One thing

22   in your role as both an Investigator and with

23   the Marshals would include intelligence

24   gathering; is that fair to say?

25             MR. CAMPOLIETO:  Note my objection.

1                     Richard Arrowood

2          A.   Yes.

3          Q.   Would you agree that thorough

4     intelligence gathering is critical for officer

5     safety in operational success?

6          A.   Yes.

7          Q.   What types of intelligence gathering

8     should be done before executing a high-risk

9     warrant?

10         A.   In general?

11         Q.   Let's say a high-risk arrest warrant,

12    you know, in general, what do best practices

13    require in terms of intelligence gathering

14    before that warrant is executed?

15              MR. CAMPOLIETO:  Objection.  You can

16         answer.

17         A.   The nature of the crime, the history

18    of the subject, weapons involved, weapons

19    possibly in play, how many, you know, weapons,

20    how many subjects, you know, the background of

21    the location.  You know, is it a drug house, is

22    it a regular house.

23         Q.   When you are gathering that

24    intelligence, how should the accuracy of that

25    intelligence be verified before the warrant is

1                    Richard Arrowood

2    executed?

3              MR. CAMPOLIETO:  Objection.

4         A.   (No response.)

5         Q.   When your attorney objects, it is a

6    note for the record, in the written record.  If

7    he is going to direct you not to answer, he will

8    make it very explicit and say, don't answer that

9    question.  Do you want me to repeat the

10   question?

11        A.   Yes.

12        Q.   When you are planning an operation and

13   gathering intelligence, what are the best

14   practices for ensuring the accuracy or verifying

15   the accuracy of the intelligence before the

16   warrant is executed to ensure officer safety and

17   operational success?

18        A.   The importance of the accuracy, it is

19   very important.

20        Q.   I'm sorry, that was a long question.

21   Let me try to make it clearer.  What are the

22   best practices for going about verifying the

23   accuracy of the intelligence that has been

24   gathered?

25              MR. CAMPOLIETO:  Objection.  But you

23

1                    Richard Arrowood

2        can answer.

3        A.   Can you make it a more simple

4    question?  The importance of the accuracy of the

5    intelligence, you know...

6        Q.   Sure.  When you gather intelligence,

7    you need to make sure it is accurate, correct?

8        A.   Correct.

9        Q.   How do you do that?

10       A.   How do you determine if the

11   information is accurate?

12       Q.   Yes.  How do you verify the accuracy

13   of the intelligence?

14       A.   I have confidence in police reports

15   and prior police reports, you know, reports done

16   by fellow officers and things and I guess you

17   judge by where the information comes from.

18       Q.   So one thing is the credibility of the

19   source of the information?

20       A.   Yes.

21       Q.   I guess what I am getting at is,

22   before you execute a warrant, you know, for

23   officer's safety issues specifically, you want

24   to make sure that there is only one person in a

25   house instead of ten, right?

1                    Richard Arrowood

2           MR. CAMPOLIETO:  Objection.

3      A.   Yes, if that could be done.

4      Q.   How about operational planning, can

5  you describe the components of comprehensive

6  operational planning for a warrant execution?

7           MR. CAMPOLIETO:  Objection.

8      A.   We brief it, you gather all of the

9  information, you make sure your guys understand,

10 you know, hopefully have a good understanding of

11 the location and maybe some contingency plans,

12 you know, good coverage, proper amount of guys

13 to, you know, do the task.

14     Q.   So one thing you mentioned is an

15 operational plan.  How important is it to have a

16 written preoperational plan?

17     A.   A written preoperational plan?

18     Q.   Yes.

19     A.   I don't know if that is important.

20     Q.   So the U.S. Marshals' standard

21 operating procedures generally require a written

22 preoperational plan, that is why I am asking

23 that question.

24          MR. CAMPOLIETO:  Object to the form

25     of the question.

1                    Richard Arrowood

2        Q.   Let me ask another question.  How

3    often in your time with the Marshals before

4    there is an execution of an arrest warrant is a

5    written preoperational plan completed?

6        A.   Each situation is different.  I don't

7    have, you know, specific, when we have something

8    written down and when we don't.

9        Q.   When was the last time that you

10   remember having a written preoperational plan?

11       A.   Like a detailed plan?

12       Q.   Yes.

13       A.   I don't remember.

14       Q.   Anything in writing that is

15   disseminated or briefed to the team?

16       A.   I don't remember.

17       Q.   In your time with the RPD, were you

18   ever on the SWAT team?

19       A.   Yes.

20       Q.   With the SWAT team, there is a

21   preoperational plan, correct?

22       A.   Yes.

23       Q.   That's written out and you guys will

24   sit down and have a brief meeting prior to the

25   operation?

26

1                    Richard Arrowood

2        A.    Yes.

3        Q.    Is the similar process followed with

4    the U.S. Marshals?

5        A.    The U.S. Marshals is not a SWAT team.

6        Q.    My question is, is there a similar

7    process where there is a written preoperational

8    plan that you sit down with the U.S. Marshals'

9    team and brief before execution of a warrant?

10        A.    I am sure it happens.  I don't

11    remember the last time that happened.  We do get

12    involved in more serious cases.  I just don't

13    remember specific...

14        Q.    It is fair to say that the process is

15    different, correct?

16        A.    Correct.

17        Q.    It sounds like the process is less

18    formal; is that fair?

19            MR. CAMPOLIETO:  Objection.

20        A.    Yes, I would say it is less formal.

21        Q.    So you don't follow like a standard

22    procedure where there is a written operational

23    plan that is briefed every time a warrant is

24    executed, correct?

25        A.    Correct.

27

1                    Richard Arrowood

2        Q.    As opposed to the SWAT team at the RPD

3    where that does happen, correct?

4        A.    Yes.

5        Q.    What contingency measures should be

6    included in an operational plan before an arrest

7    warrant is executed?

8             MR. CAMPOLIETO:   Objection.   You can

9        answer.

10       A.    So what contingency plan should be --

11       Q.    What contingency measures, what types

12   of risks should you be thinking about and

13   planning for when you are preparing an

14   operational plan to execute a warrant?

15       A.    Maybe just have a plan if he leaves

16   before you are able to knock on the door or get

17   in a car or walks down the street.

18       Q.    Those are the types of things that

19   should be considered and planned for before you

20   go to execute a warrant, right?

21       A.    Right.

22       Q.    And those are the types of things that

23   should be discussed at a briefing with the team

24   prior to the execution of a warrant, right?

25       A.    Yes.

1                    Richard Arrowood

2        Q.   How about risk assessment, can you

3    explain the process for conducting a risk

4    assessment before a warrant execution?

5        A.   Repeat that, please.

6        Q.   Sure.  What are the types of -- what

7    factors should be considered when evaluating

8    potential dangers prior to executing a warrant?

9        A.   If there is injury, you know, maybe

10   the route to the closest hospital to where you

11   are doing the operation.

12       Q.   I think you mentioned earlier that it

13   is important to know, for example, how many

14   people might be inside the residence.  Is that

15   another thing?

16       A.   Yes.

17       Q.   And whether they are potentially

18   armed?

19       A.   Yes.

20       Q.   Anything else like that that could go

21   to officer safety?

22       A.   I am sure I could sit here and ponder

23   answers, I am sure there are other answers to

24   give.

25       Q.   These are the all types of things that

1                    Richard Arrowood

2    should go into any comprehensive plan before a

3    warrant is executed, correct?

4        A.    Correct.

5        Q.    That's what best practices would

6    require?

7              MR. CAMPOLIETO:  Objection.

8        A.    Yes.

9        Q.    Different tactical considerations,

10   like what are the best practices for deciding

11   between entering a residence versus waiting for

12   a suspect to leave to apprehend him?

13       A.    What are some of the best -- repeat

14   that.

15       Q.    Sure.  What are the best practices for

16   deciding between entering a residence to

17   apprehend a suspect versus setting up like

18   surveillance and waiting for that person to

19   leave the residence and apprehend them outside

20   or something else?

21       A.    For example, if he was a shooter, I

22   would probably want to wait for him to leave the

23   house.

24       Q.    When you say if he was a shooter, do

25   you mean if you are going to apprehend somebody

30

1                    Richard Arrowood

2    who is a suspected, like, shooter in a crime

3    that you are going to arrest him for, is that

4    what you mean?

5         A.   Yes.

6         Q.   What other types of things should you

7    weigh in terms of risks for the different

8    apprehension methods?

9         A.   Say that again.

10        Q.   Sure.  How should law enforcement

11   weigh the risks of different apprehension

12   methods?  It sounds like what you are saying --

13        A.   This is more or less what I have

14   answered with the question before that.

15        Q.   I guess my question is really, you

16   said if he was a shooter, that means you might

17   wait for him to leave the residence.  So to me,

18   I guess what that means is, you're saying

19   entering the home would be more dangerous than

20   waiting for him to leave the home?

21        A.   Yes, he would be more comfortable in

22   the house.  I would think there would be more of

23   a risk of us getting shot if we go in the house

24   to confront someone who just shot somebody.  So

25   I would probably wait to have him in an area

1                    Richard Arrowood

2    where he is not so comfortable like in his own

3    house where he knows every inch of his house.

4         Q.   So, in general, it would be safer to

5    apprehend somebody outside of their house than

6    inside their house; is that fair?

7         A.   Every situation is different.  I just

8    gave an example.  Every situation is different.

9    Maybe if he is a fast guy on his feet, maybe if

10   he is a fast runner, you know, you want to wait

11   for him to get on foot and he is six-two and one

12   hundred and eighty pounds and he can run, you

13   know, a mile really, really fast and jump

14   fences, you want to take him outside or do you

15   want to get him in the house.

16        Q.   Those are all things that would go

17   into the intelligence gathering and operational

18   planning process, correct?

19        A.   Correct.

20        Q.   Can you describe the ideal command

21   structure for a warrant execution operation?

22             MR. CAMPOLIETO:  Objection.

23        A.   A command structure of a warrant

24   execution operation?

25        Q.   Just an ideal command structure, maybe

1                     Richard Arrowood

2    not exactly what happens with the Marshals, but,

3    you know, what should the hierarchy of the team

4    that is executing the warrant be in?

5              MR. CAMPOLIETO:  Objection.

6         A.   I guess the Case Agent would be the

7    one with last say on the case, I guess, if that

8    is the hierarchy.

9         Q.   So there should be someone that is

10   basically in charge?

11             MR. CAMPOLIETO:  Objection.

12        A.   Yes.  I mean, I think the Case Agent

13   has a lot of weigh on the case because it is his

14   case.

15        Q.   On the U.S. Marshals, is there a

16   general hierarchy within the team?

17        A.   A general hierarchy of the team, I

18   would guess that the U.S. Marshals, the Deputy

19   U.S. Marshal on a day-to-day basis, you know,

20   it's a U.S. Marshals' team, so I would venture

21   to say they are the ones that are more or less

22   in charge.

23        Q.   So with the RPD SWAT team, there is

24   like the SWAT team commander, right?

25        A.   Yes.

33

1                    Richard Arrowood

2        Q.   Was that Aaron Springer when you were

3    on the team or somebody else?

4        A.   Yes.

5        Q.   So Springer would have been the

6    commanding officer, everything would have to be

7    cleared by him at that time for the SWAT team?

8        A.   I think it was Baxter and then Eric

9    Paul.

10       Q.   So whoever it was, they had the final

11   say on any SWAT team operation when you were a

12   SWAT commander, right?

13       A.   On a SWAT team, they would have the

14   say.

15       Q.   Is there any equivalent person on the

16   U.S. Marshals' task force?

17            MR. CAMPOLIETO:  Objection.

18       A.   The Marshal.

19       Q.   You mean like the person that is

20   actually not out in the field with you?

21       A.   I mean, you are asking me about the

22   hierarchy of the U.S. Marshals.  The U.S.

23   Marshals of the City of Rochester is the guy.

24       Q.   And then in the SWAT team, there would

25   be like an assistant commander and then there

1                    Richard Arrowood

2    would be team leaders.  Is there any similar

3    hierarchy in the Marshals' task force?

4          MR. CAMPOLIETO:  Objection.

5    A.   Not that I am aware of.

6    Q.   For example, on the task force, do you

7    have any specific designated role?

8    A.   I am the -- I would say my role is

9    developed in being the surveillance guy.

10   Q.   Is that an informal role, like you

11   don't have a title written down on a piece of

12   paper as the surveillance guy?

13   A.   Yes.

14   Q.   Is that kind of how the team operates

15   like informally like that?

16   A.   With me, I guess.

17   Q.   I guess what I am saying is, people

18   kind of just develop into specified roles that

19   they occupy informally instead of having like a

20   commanding officer designate them officially

21   into some specific role; is that fair to say?

22         MR. CAMPOLIETO:  Objection.

23   A.   With me, I would say it's fair to say.

24   Q.   Like there is not like an entry team

25   and a perimeter team for the U.S. Marshals?

35

1                     Richard Arrowood

2        A.    No, not on paper.

3        Q.    But in practice, is that how it works?

4        A.    Skill levels, people's skill levels,

5   you know, different people's skill levels I

6   would say comes into play.

7        Q.    Is there like a designated tactical

8   leader?

9        A.    On paper, there is not a designated

10  leader.

11       Q.    But that is not on paper anywhere,

12  that is kind of informally how it has been

13  decided?

14       A.    I would agree with that.

15       Q.    For example, there is no requirement

16  that DeVinney like signoff on operational plans

17  before a warrant is executed?

18            MR. CAMPOLIETO:  Objection.  You can

19            answer, if you know.

20       A.    I don't know.

21       Q.    So as far as you know, there's not?

22       A.    What was the question?

23       Q.    As far as you know, there's no

24  requirement that DeVinney signoff on operational

25  plans before a warrant is executed?

36

1                    Richard Arrowood

2        A.   He doesn't officially have to signoff

3    on an operational plan.

4        Q.   You said that you have gotten some

5    training since you've joined the U.S. Marshals.

6    Can you describe what types of training task

7    force members received for warrant executions?

8        A.   Usually attend annual training out of

9    state.  There's a lot of shooting, a lot of room

10   entry techniques.  Periodically throughout the

11   year DeVinney will conduct training with us, the

12   same, vehicle operations, entry operations,

13   shooting.

14       Q.   How often does the DeVinney training

15   occur?

16       A.   Bi-monthly, sometimes monthly.

17       Q.   Do you do like scenario based

18   exercises for warrant executions?

19            MR. CAMPOLIETO:  Objection.

20       A.   Yes, we do scenario based as well.

21       Q.   Can you kind of describe that for me?

22       A.   You get a scenario, you get, you know,

23   roughly seeing like a man with a gun and shots

24   fired and, you know, you've got to react to it.

25       Q.   Do you have like a facility where you

37

1                    Richard Arrowood

2   will practice warrant execution?

3        A.   There is no set facilities.  It is

4   whatever is available for them to find.

5        Q.   Like the training facilities or

6   whatever the normal training facilities in the

7   area?

8        A.   Yes.

9        Q.   Can you tell me how many times you

10  have discharged your firearm in your law

11  enforcement career?

12       A.   Separate incidents, maybe five.

13       Q.   I think I know about two of them.  So

14  you shot at a dog in 2017, right, were you

15  including that?

16       A.   Yes.

17       Q.   And then there was the incident in

18  Buffalo on June 19, 2020?

19       A.   Yes, Buffalo area.

20       Q.   Can you tell me about the other three

21  incidents?

22       A.   Deer.

23       Q.   All deer?

24       A.   Yes.

25       Q.   Like a deer that gets hit by a car and

38

1                    Richard Arrowood

2   needs to be put out of its misery basically?

3        A.   I think all three of them were hit by

4   a car.

5        Q.   So the only non-deer incidents was the

6   dog and the Smith incident?

7        A.   Yes, that I recall.

8        Q.   Can you walk us through the planning

9   process for the Dana Smith operation in Buffalo?

10       A.   Walk through the planning operation?

11       Q.   Yes.  So my understanding is that

12  Mr. Smith was tracked to a house in the Buffalo

13  area and the task force executed a warrant

14  operation there; is that right?

15       A.   Yes.

16       Q.   Can you tell me about the

17  investigation and planning process prior to the

18  execution of the warrant in that case?

19       A.   Briefed by the MSCO guys on the case,

20  you know, the serious violence of the case.  It

21  was a pretty brutal murder.  We learned that he

22  was in Niagara Falls, we met up there and

23  briefed and sat it.  I believe we went back and

24  I believe we briefed it again and sat it and

25  then, you know...

39

1                    Richard Arrowood

2        Q.   When you -- I am unfamiliar with some

3    of the terms.  So when you say you sat it, does

4    that mean like surveillance or something else?

5        A.   Conduct a surveillance.

6        Q.   What kind of surveillance was

7    conducted?

8        A.   Eyes, you know, visible surveillance

9    of a person.

10       Q.   To make sure that he was at the

11   location?

12       A.   Yes.

13       Q.   Do you know if there was a written

14   operational plan that was created for that

15   warrant execution?

16       A.   I don't remember making up one, so I

17   am assuming, no, there wasn't one.

18       Q.   You said it was briefed a couple of

19   times with the team?

20       A.   Yes.

21       Q.   Earlier you said if there was a

22   dangerous shooter, that might be an instance

23   where you would wait for the suspect to leave

24   the residence.  Is that something that was

25   considered in the Dana Smith incident?

1                    Richard Arrowood

2       A.    So simplify that question again.

3       Q.    Yes.  When we were discussing various

4   options earlier, one thing I believe you

5   testified to was that if the person was a

6   shooter, that might be an instance where you

7   would wait for them to leave the residence to

8   apprehend them instead of going into the house.

9             So my question is, is that something

10   you considered with the Dana Smith incident,

11   waiting for him to leave the house to make the

12   apprehension versus making entry?

13       A.    So he did leave and went back and then

14   the order was given to surround the house.  That

15   wasn't my order.

16       Q.    Who gave that order?

17       A.    The Marshal.

18       Q.    So the Marshal for the -- what is it,

19   the New Jersey Atlantic Task Force, is that your

20   task force?

21       A.    Yes.

22       Q.    So like the actual Marshal for that

23   area's task force said to go and surround the

24   perimeter?

25       A.    Yes.

41

1                    Richard Arrowood

2        Q.    Is it normal that that Marshal is

3    involved in the warrant apprehensions?

4        A.    He sometimes periodically is involved.

5        Q.    When he is involved, then he would be

6    like the commanding officer?

7        A.    He is the Marshal.

8        Q.    Do you know why he was involved there;

9    was it because it was a more dangerous

10   apprehension?

11            MR. CAMPOLIETO:  Objection.

12       A.    I don't know why.

13       Q.    Do you know if there were any other

14   types of risk assessments conducted before that

15   warrant was executed since it was a dangerous

16   suspect that you were apprehending?

17       A.    I am sure we had risk assessments, but

18   I don't remember specifically.

19       Q.    Do you remember any specifics of any

20   of the briefings, what types of things you

21   talked about before the warrant was executed?

22       A.    Three or four years, I don't remember

23   specifics.

24       Q.    Do you remember if there were any

25   alternative methods of apprehending him that

42

1                    Richard Arrowood

2    were considered, such as waiting for him to

3    leave the house?

4            MR. CAMPOLIETO:  Objection.  The

5        previous answer, he stated he left the

6        house.

7        A.    He did leave the house.

8        Q.    You said he left the house and he went

9    back in.  I guess my question is -- the

10   apprehension was made when he was inside the

11   house.  So was there ever a consideration of

12   trying to apprehend him, like waiting for him to

13   leave the house again to apprehend him?

14       A.    I remember there was concern that he

15   was spooked, which means he was, you know, alert

16   and we believed he was alerted to the police

17   presence there.  I remember there being fear

18   that he would run and get out and get away from

19   us.  I believe that is why the order was given

20   to surround the house.

21       Q.    Earlier you said that your role had

22   sort of developed into like a surveillance type

23   of role, but in this case you made entry into

24   the house.  Why was your role different in this

25   situation?

43

1                    Richard Arrowood

2        A.    When the order was given to surround

3   the house, I was one of the first guys there, I

4   was probably the first guy there, and then this

5   guy came and walked outside and looked down the

6   street and I saw him and he runs back in the

7   house and I am right after him in pursuit.

8        Q.    Can you take me through the incident

9   from there, the order is given, you show up at

10  the house, you see him and then you chase him

11  into the house?

12       A.    I think I just said that.

13       Q.    Can you just take me through what

14  happened from there?

15       A.    Me and Chuck chased him in the house,

16  he is hiding behind the door, digging in his

17  crotch for something and then he runs to the

18  back of the house and then there was a struggle

19  there.  Then he runs to the front, the back of

20  the house and there is a struggle there.  Then,

21  you know, I am put in a position where I had to

22  discharge my firearm and he was taken into

23  custody.

24       Q.    Can you explain a little bit more

25  about -- you said you were put in a situation

                        Richard Arrowood

1

2    where you had to discharge your firearm.  Can

3    you explain that, like what happened?

4        A.   So he pulled a knife out.  I could

5    have broken away from him, I was on my feet,

6    Chuck wasn't, he was wrestling with the guy.  He

7    was like in a sitting position.  He couldn't get

8    away from Smith and I had to make the decision

9    to protect my partner.

10       Q.   So they were in a physical altercation

11   and Smith had a knife and so that would present

12   a deadly force and so you shot him?

13            MR. CAMPOLIETO:  Objection.  You can

14       answer.

15       A.   Yes.

16       Q.   Were you conducting the surveillance

17   prior to the execution of the warrant or

18   somebody else?

19       A.   Yes, I was conducting the

20   surveillance.  I don't know if anybody else was

21   conducting surveillance, but I was conducting

22   surveillance.

23       Q.   So that's why you were there first?

24            MR. CAMPOLIETO:  Objection.

25       A.   Yes.

45

1                    Richard Arrowood

2       Q.   After the incident, was there like a

3  formal debriefing conducted?

4       A.   There were a formal debriefing

5  afterwards.

6       Q.   Did that result in like an

7  after-action report being written?

8       A.   I don't know.

9       Q.   Is it typical for the U.S. Marshals

10  Task Force to write after-action reports?

11            MR. CAMPOLIETO:  Objection.  You can

12        answer.

13       A.   So is it typical that the U.S.

14  Marshals write an action report?  I am not a

15  supervisor with the Marshals, so I don't know.

16       Q.   I guess my understanding is from your

17  testimony and other member's testimony is that

18  there is not really a supervisor on the team,

19  right, so you would all kind of be in the

20  position to write an after-action report, right?

21       A.   I wasn't tasked with writing an

22  after-action report and I don't know who was or

23  if that was tasked out.

24       Q.   In your time with the U.S. Marshals

25  Task Force, have you ever been tasked with

1                    Richard Arrowood

2    writing an after-action report?

3         A.   Not that I remember, no.

4         Q.   After the Smith incident, were there

5    any discussions held about how the operation

6    could have been conducted differently or more

7    safely?

8              MR. CAMPOLIETO:  Objection.

9         A.   I don't remember having a conversation

10   like that afterwards, no.

11        Q.   Were there any changes made to the

12   task force's policies or practices after that

13   incident?

14        A.   Not that I am aware of.

15        Q.   How did that incident inform your

16   approach to future operations, if at all?

17        A.   I don't think it had a direct impact

18   on my operations.

19        Q.   I mean, I just assumed that being

20   involved in a shooting is always a difficult

21   thing, no matter what, right?  I mean, that is

22   why I asked if it changed your approach in any

23   way to try and be avoid being put in that

24   position again.

25             MR. CAMPOLIETO:  Objection.

1                    Richard Arrowood

2        A.   It is one of the bad parts of the job.

3    It didn't change anything.

4        Q.   After that incident, you were given

5    several awards, correct?

6        A.   Several?  I might have gotten one or

7    two.

8        Q.   One was the Distinguished Service

9    Award; is that right?

10        A.   I don't remember.

11        Q.   Let's talk about the Dedrick James'

12    operation.  Do you remember what intelligence

13    was gathered about Dedrick James about the

14    warrant execution?

15        A.   I just remember having a brief

16    understanding of the incident that made him

17    wanted.

18        Q.   When you said that made him wanted, do

19    you mean, like, what led to the issuance of the

20    warrant for his arrest?

21        A.   Yes, what he did.

22        Q.   Do you know if there was like a full

23    background check that was conducted?

24        A.   I don't know.

25        Q.   My understanding is that you were

48

1                    Richard Arrowood

2    involved in the surveillance prior to the

3    execution of the warrant; is that right?

4         A.   Yes.

5         Q.   Can you take me through what your role

6    was in the warrant execution, in the

7    surveillance that you did?  Just tell me what

8    happened basically.

9         A.   I remember assisting with the

10   surveillance and then the decision was made to,

11   you know, approach the house and I assisted by

12   going into the backyard and take a perimeter

13   point to keep contain of the house.

14        Q.   Let's back up a little bit.  Was there

15   a briefing beforehand?

16        A.   Before the case or before approaching

17   the house?

18        Q.   Let me back up a little bit, those are

19   bad questions.  When you first became aware of

20   the warrant, was that like at a briefing with

21   the team or something else?

22        A.   I don't remember.  I am not saying

23   there wasn't, I just don't remember the

24   briefing.

25        Q.   How does that typically work when

49

1                    Richard Arrowood

2   someone brings a warrant to the rest of the

3   team, how is the rest of the team made aware of

4   it?

5        A.   My common practice is -- well, common

6   practice is we meet up somewhere and discuss the

7   case.

8        Q.   Is there any kind of written rule

9   about how information about a warrant is

10  disseminated to the rest of the team?

11       A.   A specific rule about how it is

12  disseminated?

13       Q.   Yes, like a rule that, hey, you need

14  to type up a one-page memo with certain

15  information contained in it and give a copy of

16  that memo to all of the team members.  Is there

17  any kind of rule like that?

18       A.   No.

19       Q.   So the way it would normally be done

20  is getting together in person to discuss the

21  warrant?

22       A.   I'm sorry, could you repeat that?

23       Q.   The question was, the way that the

24  information about the warrant would be

25  communicated to the rest of the team members

50

1                          Richard Arrowood

2     would be gathering in person to discuss the

3     warrant; is that right?

4          A.    There is a common practice of

5     disseminating information.  The common practice

6     would be to meet up and discuss the case.

7          Q.    That is like when the case first comes

8     into the assigned officer?

9          A.    I believe that would be, yes, that

10    would be a good idea.

11         Q.    So you're one of the RPD guys.  So RPD

12    has a warrant that they want to pass onto the

13    task force, they contact you, you give the

14    warrant and then you tell the rest of the team

15    members about it?

16         A.    Yes.

17         Q.    So that would be like before --

18    normally that would occur before the first day

19    -- normally that would occur before the day that

20    the warrant is executed, you would get it, you

21    would do some intelligence, gathering

22    surveillance and then later execute the warrant,

23    is that the general process or something else?

24              MR. CAMPOLIETO:  Objection.  You can

25         answer.

51

1                    Richard Arrowood

2        A.   Yes, you get the case, you know, you

3    let the guys know and you come up with a plan

4    and you tell the rest of the guys about it.

5        Q.   The person that comes up with the plan

6    would be like the assigned team member?

7        A.   Whoever the case agent would be would

8    be the guy who would probably to decide on how

9    to pursue the case.

10       Q.   So the case agent would decide how to

11   pursue the case.  Does that have to be signed

12   off by any particular member of the team or like

13   a vote of all of the team members or anything

14   like that?

15       A.   I am not aware of signing off on

16   anything.

17       Q.   Do you know if there was a written

18   operational plan created for the Dedrick James'

19   incident?

20       A.   I don't know.  Not that I am aware of.

21       Q.   Do you know how the decision was made

22   to enter the James' residence?

23       A.   Do I know how the decision was made to

24   enter the residence?

25       Q.   Yes.  I guess it was a bad question.

52

1                    Richard Arrowood

2    Versus some other method of apprehension, like

3    waiting for him to leave the house?

4        A.   Well, we conducted surveillance for, I

5    mean, for a time.

6        Q.   On the day of the incident, how were

7    you asked to conduct surveillance?

8        A.   How?  Watching it.

9        Q.   I mean, did another team member

10   contact you and ask you to go to the residence

11   to do surveillance?

12       A.   Yes.

13       Q.   Who was that?

14       A.   Jeff.

15       Q.   He was the Case Agent?

16       A.   Yes.

17       Q.   He testified basically that he was

18   doing surveillance and then he had to go to do a

19   random drug test, so he asked you to come and do

20   the surveillance; is that right?

21       A.   That is possibly how it went down.

22       Q.   Do you remember how long you were

23   conducting surveillance for?

24       A.   For a time in the morning, I believe.

25       Q.   Do you remember what you were looking

53

1                        Richard Arrowood

2    for when you were conducting the surveillance?

3          A.    I remember there was a car involved.

4          Q.    Did you ever see Dedrick James enter

5    or leave the house?

6          A.    I don't remember seeing him entering

7    or leaving.  I don't think so.

8          Q.    Do you remember seeing his car?

9          A.    Yes, I believe his car was there.

10         Q.    So the car was there the whole time?

11         A.    I don't know about the whole time.  I

12   believe I remember seeing it.

13         Q.    When you went to the scene, Jeff was

14   there and basically you released him, is that

15   what happened or something else?

16         A.    Well, if he left to go to do a drug

17   test, then, yes, I believe that is a good

18   assumption that I relieved him.

19         Q.    Did he eventually come back?

20         A.    Yes.

21         Q.    Did he relieve you when he came back

22   or what happened when he came back?

23         A.    I don't remember.

24         Q.    Do you remember on the day of the

25   incident if there was another pre-execution

54

1                    Richard Arrowood

2    briefing with other team members?

3         A.   I don't remember a pre-execution

4    briefing.

5         Q.   How does it work before you execute a

6    warrant like this, do you guys get together in a

7    staging area and then approach the house

8    together or something else?

9              MR. CAMPOLIETO:  Objection.

10        A.   Every case is different.

11        Q.   Do you remember what happened here?

12        A.   I just remember we were conducting

13   surveillance and I remember we were approaching

14   the house.  I don't remember all of the details.

15        Q.   Do you remember any factors that were

16   considered in assessing the risks of this

17   particular operation?

18        A.   I remember it was a little low level,

19   this guy injured a little kid with a toothbrush

20   by pulling the toothbrush too fast out of his

21   mouth, you know, that was the violence of this

22   case.  It didn't involve a gun, it was not a

23   shooting, you know, it was a pretty low level

24   case, almost something that you would leave to

25   patrol officers, you know.

55

1                    Richard Arrowood

2      Q.   Do you know why it wasn't left to the

3   patrol officers?

4      A.   It was a State Police case, it wasn't

5   City of Rochester case.

6      Q.   So would State Police not have had

7   jurisdiction or something to come and arrest

8   him?

9      A.   Would the State Police not have

10  jurisdiction?  Yes, State Police had

11  jurisdiction.

12     Q.   Do you know why the State Police

13  didn't just show up and arrest him?

14     A.   That is what Jeff is, Jeff is State

15  Police.

16     Q.   I guess instead of like referring it

17  to the task force, is there any reason why one

18  of his colleagues from the State Police couldn't

19  just have knocked on the door?

20     A.   He is the State Police guy.  I mean,

21  he is working mostly in the City of Rochester, I

22  mean, send it to him.  That's what I would do.

23     Q.   My understanding is that your team

24  generally gets involved when it's more dangerous

25  warrant situations.  Is that not the case?

56

1                    Richard Arrowood

2         A.   That is usually the case.  But

3    different agencies bring on different cases.

4    You know, it was an assault, so it met the

5    criteria.  It was a felony assault, it meets the

6    criteria.  You know, if it doesn't meet the

7    criteria, if it is like a larceny, like

8    shoplifting over $1,000 and there was no

9    violence, I mean, that doesn't meet our

10   criteria.  But since it was an assault second,

11   it met our criteria.

12        Q.   That makes sense.  Do you know if it

13   was ever discussed like trying to apprehend him

14   in a different manner, like waiting for him to

15   get in his car and conducting a controlled

16   traffic stop?

17        A.   I know we were conducting

18   surveillance.  I mean, I don't -- I know it

19   would have been ideal to see him come out and

20   take him.

21        Q.   You don't remember being given

22   instructions when you were doing surveillance to

23   pull him over, if he left the house and got the

24   in car?

25        A.   I don't remember, no.  They wouldn't

1                    Richard Arrowood

2    be telling me to do that.

3        Q.   What would you have done if he had

4    gotten in his car and started to drive away when

5    you were doing the surveillance?

6        A.   Alert the rest of the team.

7        Q.   When a warrant like this is executed,

8    do team members come with like less lethal

9    equipment as an option to use, I don't know,

10   like a TASER?

11       A.   So I believe some of the members have

12   TASERS.

13       Q.   Are there any other less lethal

14   options that you guys normally carry during a

15   warrant execution like this?

16       A.   Some of the guys might have batons.

17   Beyond that, I am not aware.

18       Q.   How about like bean bag guns?

19       A.   No, not that I am aware of.

20       Q.   Do you know if there was any

21   designated tactical leader for this operation,

22   other than Ulatowski being the Case Agent?

23       A.   He is the guy that I remember being in

24   charge of the case.

25       Q.   Slightly different question from

58

1                    Richard Arrowood

2    before.  Is there like a specific command

3    structure during the execution of a warrant,

4    like is it just follow the Case Agent's lead or

5    something else?

6        A.   I just remember this being such a low

7    level case and I remember Jeff being the lead on

8    this.

9        Q.   When you say a low level case, that

10   would be like after conducting all of the

11   background information and everything, there was

12   nothing that indicated that it would be a

13   dangerous apprehension --

14           MR. CAMPOLIETO:  Objection.

15       Q.   -- or is that just based on the nature

16   of the crime that he was being arrested for?

17       A.   Again, I didn't do the research and I

18   am answering my questions because of what I know

19   and it's a toothbrush with a little kid, you

20   know, it's a pretty minor case, so I believe

21   that is why the decision was made.

22       Q.   You said during the incident you were

23   part of the perimeter team; is that right?

24       A.   Yes.

25       Q.   Can you take me through the incident,

1                    Richard Arrowood

2    again, from the approach, you went to the

3    perimeter and kind of explain what you remember?

4         A.   I remember walking to the house, going

5    into the backyard and taking a point at the back

6    of the house more toward the driveway side or

7    toward -- if I am looking at the house, I was

8    more -- I am in the backyard, being at the back

9    of the house, looking at the house, I was more

10   to the left, that's what I remember.

11        Q.   When you guys are conducting an

12   operation, how do you communicate, by the radio

13   or something else?

14        A.   Radio.

15        Q.   Does the task force have like a

16   special radio or a certain channel that you use?

17        A.   We usually use a tactical channel.

18        Q.   Do you know if that channel is

19   recorded?

20        A.   I don't know.

21        Q.   So you're in the back and then what

22   happens, eventually you -- what happens next,

23   after they approach the front?

24        A.   I was in the back and at the time I

25   remember hearing someone radio that he is

60

1                    Richard Arrowood

2    running and it made me more alert.  Nobody came

3    out a window or anything.  So, you know, I

4    eventually know that the perimeter was all set

5    to break down.

6         Q.   Did you hear the gunshot?

7         A.   I don't remember hearing the gunshot.

8         Q.   Could you hear anything else from

9    within the house?

10        A.   I don't remember, no.  Nothing that I

11   remember.

12        Q.   Did you ever enter the house at all?

13        A.   I could have.  But I specifically

14   don't remember going inside the house.

15        Q.   Did you ever speak with the

16   grandmother?

17        A.   I don't remember talking to her.

18        Q.   Did you ever take any statements from

19   or speak with any other witnesses?

20        A.   I don't remember doing that, no.

21        Q.   After the incident, was there like a

22   debrief meeting?

23        A.   Immediately after, I don't remember

24   having a debrief meeting.  There could have

25   been, but I don't remember.

1                    Richard Arrowood

2       Q.   At some point did you guys get

3   together and talk about what happened?

4       A.   I am sure we did.  I just don't

5   remember.

6       Q.   As a result of this incident, were

7   there any changes to the protocols of the task

8   force that were made?

9       A.   I don't remember.  I don't think there

10  were any changes made.

11      Q.   Are there any changes that you would

12  recommend to improve officer's safety for future

13  warrants based on what happened in this

14  situation?

15      A.   I don't know anything that we could do

16  to make it safer.

17      Q.   At the time of this incident, the task

18  members were not required to wear body cameras,

19  right?

20      A.   Yes, we weren't.  I don't think

21  anybody had body cameras back then.

22      Q.   Today, do task force members wear body

23  cameras?

24      A.   I believe the Sheriff's Office wear

25  them and I believe the U.S. Deputies wear them.

62

1                    Richard Arrowood

2        Q.   RPD doesn't wear them?

3        A.   Correct.

4        Q.   Do you know why that is?

5        A.   It's policy that RPD is not issued a

6    camera while in plainclothes details.

7        Q.   I guess I didn't realize that

8    Marshals' assignment was a plainclothes detail,

9    but that is what you are telling me.  So my

10   question is, U.S. Marshals' assignment from the

11   RPD is a plainclothes detail?

12       A.   Yes.

13       Q.   Just a few other questions.  Have you

14   ever been named as a defendant in any other

15   lawsuits arising from your career as a law

16   enforcement officer?

17       A.   Yes.

18       Q.   How many?

19       A.   The protesting, you know, the

20   protestors, the riots in Rochester.

21       Q.   Do you know if you were just named as

22   a defendant in one of those lawsuits or more

23   than one?

24       A.   I believe I am only named in one of

25   the riot lawsuits.

63

1                    Richard Arrowood

2        Q.   Were you a member of the Mobile Field

3   Force during that time?

4        A.   Yes.

5        Q.   What was your role on the Mobile Field

6   Force at that time?

7        A.   Just another team member.

8        Q.   So you weren't like a supervisor or

9   anything like that?

10       A.   No.

11       Q.   When you were named as a defendant in

12   that lawsuit, did you read a copy of the

13   Complaint that was filed?

14       A.   I believe I looked it over.

15       Q.   Do you recall the allegations?

16       A.   I believe the person alleging

17   wrongdoing was the lady in the wheelchair.

18       Q.   Stephanie Woodward?

19       A.   I believe so.

20       Q.   I just want to show you a copy of the

21   Complaint and ask you one question.  Give me one

22   second, I am going to try and share the screen.

23            MR. CAMPOLIETO:  This is the

24       Complaint of the Woodward case?

25            MR. SHIELDS:  Correct.

64

1              Richard Arrowood

2         MR. SHIELDS:  So this is the Second

3    Amended Complaint that was filed.

4         Q.   Can you see that on your screen?

5         A.   Yes.

6         Q.   My question is, if you can tell, I

7    don't know if you can, if you are depicted in

8    the Complaint, in this picture, if you can tell,

9    if one of these people, one of the police

10   officers is you?

11        A.   It might.  I mean, I don't know a

12   hundred percent for sure.  But that might be me

13   directly right in the middle.

14        Q.   When you say directly in the middle,

15   do you mean the officer that appears to be

16   closest to Ms. Woodward?

17        A.   Yes.  I can't see the face, so I don't

18   know.

19        Q.   Let me ask you this:  At the time of

20   the protest, did you have a beard?

21        A.   I don't know.

22        Q.   I mean, I grow a beard and I shave it

23   off periodically.  Is that something you do or

24   do you always have a beard or is that something

25   new for you?

65

1                    Richard Arrowood

2          A.    Lately I have been keeping it.

3          Q.    But you don't recall in September of

4     2020 if you had a beard or not?

5          A.    I mean, during this time, I am not

6     sure.

7          Q.    I am going to take that down.  I just

8     have a couple more questions about that case.

9                Do you know at the time if the

10    Rochester Police Department had any wheelchair

11    accessible transportation vehicles?

12         A.    I don't know.

13         Q.    Do you recall how Ms. Woodward was

14    transported, if at all, with her wheelchair

15    after her arrest?

16         A.    I didn't do the transport.  I don't

17    know.

18         Q.    Do you recall on that day whether the

19    Sheriff's Deputies were transporting arrestees

20    in County owned transportation vehicles?

21         A.    Say that question again.

22         Q.    So basically Ms. Woodward's allegation

23    in that Complaint is that neither the RPD nor

24    the County of Monroe had wheelchair accessible

25    transportation vehicles and on that day, the

66

1                     Richard Arrowood

2    City had contracted with the County to use

3    Sheriff's Deputies' vans to transport the

4    arrestees.  Do you recall that at all, whether

5    the County Sheriffs had been tasked with

6    transporting arrestees on that day?

7         A.   I don't know.

8         Q.   Do you recall if there were any

9    discussions among the officers who arrested Ms.

10   Woodward about how she might be transported

11   after her arrest?

12        A.   I don't know.  I wasn't part of the

13   transportation.

14        Q.   Do you recall being part of the

15   arrest?

16        A.   I remember approaching her and dealing

17   with her.

18        Q.   Can you tell me what you remember

19   about approaching her and dealing with her?

20        A.   I remember her being in a wheelchair.

21        Q.   Do you remember anything that you said

22   to her or she said to you?

23        A.   No, I don't remember the specific

24   conversation.

25        Q.   Do you remember any officers saying to

1                    Richard Arrowood

2    her, what's wrong with you?

3         A.   No.

4         Q.   Do you remember her explaining that

5    part of her disability is that she has to use

6    the bathroom frequently?

7         A.   I just know that she was in a

8    wheelchair.

9         Q.   Do you remember any discussion among

10   the officers about potentially transporting her

11   by lifting her out of her wheelchair and placing

12   her in a police vehicle?

13        A.   No, I don't.

14        Q.   In your time with the RPD, have you

15   ever transported a wheelchair user after an

16   arrest?

17             MR. CAMPOLIETO:  Objection.  You can

18        answer.

19        A.   I am sure I have.  I just don't

20   remember.

21             MR. CERRONE:  I want to jump in

22        here.  Discovery is generally pretty

23        broad and open ended in civil cases, but

24        I think we are getting far afield.  I

25        think a certain amount of questions

```
 1                    Richard Arrowood
 2      concerning the Woodward case would not be
 3      inappropriate.  But getting into the
 4      case, specific questions about that
 5      particular case, that has absolutely
 6      nothing to do with this case, and I would
 7      just respectfully ask plaintiff's counsel
 8      to move on.
 9           MR. SHIELDS:  I am going to move on.
10      My understanding is that for the U.S.
11      Marshals, basically they have to have a
12      clean disciplinary record, so I wanted to
13      get to the point of saying, okay, what
14      happened here and was there any kind of
15      investigation or discipline that was
16      looked into after the incident because I
17      feel like that could potentially impact
18      his membership with the Marshals'
19      service, that is how it is relevant.
20           MR. CAMPOLIETO:  Well, there is no
21      discipline, we know that.  There is no
22      discipline.  If you want to finish up,
23      please go ahead.
24           MR. SHIELDS:  I am almost done.
25      Q.   At the time of the Woodward incident,
```

69

1                    Richard Arrowood

2    were you aware of any RPD policies or procedures

3    for transporting arrestees with mobility issues

4    like Ms. Woodward?

5         A.   Was I aware of any policies?

6         Q.   Yes.  Do you know if the RPD has any

7    policies about what you are supposed to do when

8    you arrest a wheelchair user?

9         A.   I am sure there is a policy somewhere,

10   but I don't know.  I didn't transport her, I

11   wasn't involved in transporting her.

12        Q.   So what happened after you placed her

13   under arrest?

14             MR. CAMPOLIETO:  Objection.  You can

15        answer.

16        A.   I just remember dealing with her for a

17   short time and I believe another officer, you

18   know, took over and then I didn't have any more

19   contact with her.

20        Q.   So after the initial contact, you

21   weren't involved in any of the decisions about

22   getting her to the public safety building?

23        A.   I was not involved in any of the

24   transporting.  I was not involved in any

25   decisionmaking on how to get her there.

70

1                     Richard Arrowood

2        Q.   Are you aware of any changes in RPD's

3   policies after the Woodward incident or as a

4   result of her lawsuit with respect to

5   transporting individuals with mobility issues?

6             MR. CAMPOLIETO:  Objection.  There

7        are discussions and there are changes, I

8        don't think that this is the appropriate

9        witness.  But he can answer it, if he

10       can.

11       A.   I don't know of any changes coming

12  about or because of that.  I don't know.

13       Q.   Is there anything else about the

14  Dedrick James' incident with respect to changes

15  or best practices in warrant operations that we

16  haven't covered that you would like to add?

17       A.   I don't know of any changes because of

18  that incident.

19       Q.   Anything else that is pertinent to the

20  incident or your role that we haven't discussed?

21       A.   Not that I am aware of.

22            MR. SHIELDS:  Detective, thank you

23       for your time.  Those are all of my

24       questions for today.

25            MR. CERRONE:  I have no questions

1                    Richard Arrowood

2        from the United States.  Thank you,

3        Detective.

4            MR. SHIELDS:  Do you have any

5        questions, John?

6            MR. CAMPOLIETO:  No questions.

7            THE REPORTER:  Counsel, will you be

8        ordering a copy of the transcript?

9            MR. CERRONE:  I am taking a copy,

10       e-mail only.

11           MR. CAMPOLIETO:  I will take a copy,

12       e-mail and hard copy.

13           THE REPORTER:  Thank you.

14           (Whereupon, the examination of this

15       witness was concluded at 12:40 P.M.)

16

17

18

19

20

21

22

23

24

25

72

1

2                    A C K N O W L E D G E M E N T

3

STATE OF NEW YORK      )
4        ss:
COUNTY OF              )

5

6        I, RICHARD ARROWOOD, hereby certify that

7    I have read the transcript of my testimony taken

8    under oath in my deposition of October 4, 2024;

9    that the transcript is a true, complete and

10   correct record of what was asked, answered and

11   said during this deposition, and that the

12   answers on the record as given by me are true

13   and correct.

14

15                        _____
                                    RICHARD ARROWOOD
16

17   Subscribed and sworn to before me

18   this     day of              , 2024.

19

20   _____
                  Notary Public
21

22

23

24

25

73

1

2                         I N D E X

3

   EXAMINATION OF        BY                    PAGE
4  Richard Arrowood     Mr. Shields           6-71

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

74

1

2                    C E R T I F I C A T E

3          I, SHARON CASSIDY, a Notary Public of the

4    State of New York do hereby:

5          That the testimony in the within

6    proceeding was held before me at the aforesaid

7    time and place.

8          That said witness was duly sworn before

9    the commencement of the testimony, and that he

10   testimony was taken stenographically by me, then

11   transcribed under my supervision, and that the

12   within transcript is a true record of the

13   testimony of said witness.

14          I further certify that I am not related

15   to any of the parties to this action by blood or

16   marriage, that I am not interested directly or

17   indirectly in the matter in controversy, nor am

18   I in the employ of any of the counsel.

19          IN WITNESS WHEREOF, I have hereunto set

20   my hand this 31st day of October, 2024.

21

22

23          _____
                    SHARON CASSIDY

24

25

**A**

**A.M** 1:16
**Aaron** 33:2
**able** 27:16
**absolutely** 68:5
**academy** 10:25 11:3 12:8 13:2,20
  17:24 18:12 20:14
**accepted** 17:19
**accessible** 65:11,24
**accuracy** 21:24 22:14,15,18,23
  23:4,12
**accurate** 23:7,11
**action** 45:14 74:15
**actual** 40:22
**add** 70:16
**additional** 15:21
**address** 6:11
**Administrator** 1:3
**affirmed** 6:4
**afield** 67:24
**aforesaid** 74:6
**after-action** 45:7,10,20,22 46:2
**agencies** 56:3
**Agency** 4:11
**agent** 32:6,12 51:7,10 52:15 57:22
**Agent's** 58:4
**ago** 6:18
**agree** 21:3 35:14
**agreed** 3:3,6,8 4:3
**ahead** 68:23
**alert** 42:15 57:6 60:2
**alerted** 42:16
**allegation** 65:22
**allegations** 63:15
**alleging** 63:16
**altercation** 44:10
**alternative** 41:25
**Amended** 64:3
**America** 1:7 2:10
**amount** 24:12 67:25
**annual** 36:8
**answer** 16:9 21:16 22:7,8 23:2 27:9
  35:19 42:5 44:14 45:12 50:25
  67:18 69:15 70:9
**answered** 30:14 72:10
**answering** 58:18
**answers** 28:23,23 72:12
**anybody** 44:20 61:21
**anymore** 16:8
**appears** 64:15
**apply** 13:25
**apprehend** 29:12,17,19,25 31:5
  40:8 42:12,13 56:13
**apprehending** 11:9 17:14 41:16,25
**apprehension** 12:18 30:8,11 40:12
  41:10 42:10 52:2 58:13
**apprehensions** 41:3
**approach** 46:16,22 48:11 54:7 59:2

59:23
**approaching** 48:16 54:13 66:16,19
**appropriate** 70:8
**area** 30:25 37:7,19 38:13 54:7
**area's** 40:23
**arising** 62:15
**armed** 28:18
**arrest** 11:6 12:24 14:3 21:11 25:4
  27:6 30:3 47:20 55:7,13 65:15
  66:11,15 67:16 69:8,13
**arrested** 58:16 66:9
**arrestees** 65:19 66:4,6 69:3
**arrests** 13:23,25
**Arrowood** 1:8,18 5:7,9 6:9 7:1 8:1
  9:1 10:1 11:1 12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1 26:1 27:1
  28:1 29:1 30:1 31:1 32:1 33:1
  34:1 35:1 36:1 37:1 38:1 39:1
  40:1 41:1 42:1 43:1 44:1 45:1
  46:1 47:1 48:1 49:1 50:1 51:1
  52:1 53:1 54:1 55:1 56:1 57:1
  58:1 59:1 60:1 61:1 62:1 63:1
  64:1 65:1 66:1 67:1 68:1 69:1
  70:1 71:1 72:6,15 73:4
**Aside** 17:17
**asked** 14:19 46:22 52:7,19 72:10
**asking** 24:22 33:21
**assault** 56:4,5,10
**assessing** 54:16
**assessment** 28:2,4
**assessments** 41:14,17
**assigned** 18:21 50:8 51:6
**assignment** 62:8,10
**assistant** 33:25
**assisted** 48:11
**assisting** 48:9
**assumed** 46:19
**assuming** 39:17
**assumption** 53:18
**Atlantic** 40:19
**attend** 36:8
**attorney** 1:19 22:5
**ATTORNEY'S** 2:9
**Attorneys** 2:4,10,15
**available** 37:4
**Avenue** 2:5,11
**avoid** 46:23
**Award** 47:9
**awards** 47:5
**aware** 34:5 46:14 48:19 49:3 51:15
  51:20 57:17,19 69:2,5 70:2,21

**B**

**back** 14:19 16:15 17:3 20:21 38:23
  40:13 42:9 43:6,18,19 48:14,18
  53:19,21,22 59:5,8,21,24 61:21
**background** 9:23 21:20 47:23
  58:11

**backyard** 48:12 59:5,8
**bad** 47:2 48:19 51:25
**bag** 57:18
**based** 36:17,20 58:15 61:13
**basically** 16:10 17:13 18:18 32:10
  38:2 48:8 52:17 53:14 65:22
  68:11
**basis** 16:3 32:19
**bathroom** 67:6
**batons** 57:16
**Baxter** 1:10 33:8
**bean** 57:18
**beard** 64:20,22,24 65:4
**Bee** 4:11
**began** 10:23
**beginning** 18:20
**believe** 14:23 15:15 17:2 38:23,24
  40:4 42:19 50:9 52:24 53:9,12,17
  57:11 58:20 61:24,25 62:24 63:14
  63:16,19 69:17
**believed** 42:16
**best** 11:9 12:14 21:12 22:13,22
  29:5,10,13,15 70:15
**Beyond** 57:17
**Bi-monthly** 36:16
**bit** 20:21 43:24 48:14,18
**blood** 74:15
**body** 61:18,21,22
**book** 8:3
**booklet** 20:3
**Boulevard** 6:12
**break** 60:5
**brief** 24:8 25:24 26:9 47:15
**briefed** 25:15 26:23 38:19,23,24
  39:18
**briefing** 27:23 48:15,20,24 54:2,4
**briefings** 41:20
**bring** 56:3
**brings** 49:2
**broad** 67:23
**broken** 44:5
**brought** 11:23
**brutal** 38:21
**Buffalo** 2:11 37:18,19 38:9,12
**building** 69:22
**business** 6:10

**C**

**C** 2:2 6:2 72:2 74:2,2
**called** 19:23
**camera** 62:6
**cameras** 61:18,21,23
**CAMPOLIETO** 2:18 5:5 20:25
  21:15 22:3,25 24:2,7,24 26:19
  27:8 29:7 31:22 32:5,11 33:17
  34:4,22 35:18 36:19 41:11 42:4
  44:13,24 45:11 46:8,25 50:24
  54:9 58:14 63:23 67:17 68:20
  69:14 70:6 71:6,11

**Capitol** 10:19
**car** 27:17 37:25 38:4 53:3,8,9,10 56:15,24 57:4
**career** 10:23 14:11 37:11 62:15
**carry** 20:9 57:14
**case** 1:6 8:4 9:3,18 32:6,7,12,13,14 38:18,19,20 42:23 48:16 49:7 50:6,7 51:2,7,9,10,11 52:15 54:10 54:22,24 55:4,5,25 56:2 57:22,24 58:4,7,9,20 63:24 65:8 68:2,4,5,6
**cases** 7:21 26:12 56:3 67:23
**Cassidy** 1:22 6:4 74:3,23
**CERRONE** 2:12 5:6 67:21 70:25 71:9
**certain** 49:14 59:16 67:25
**certification** 3:4
**certify** 72:6 74:14
**change** 6:23 47:3
**changed** 6:25 7:13 46:22
**changes** 46:11 61:7,10,11 70:2,7,11 70:14,17
**channel** 59:16,17,18
**charge** 32:10,22 57:24
**Charleston** 10:19
**chase** 43:10
**chased** 43:15
**check** 47:23
**CHRISTIAN** 1:10
**Chuck** 43:15 44:6
**Church** 2:16
**City** 1:7 2:15,16 11:21,23 33:23 55:5,21 66:2
**civil** 7:17 67:23
**classes** 12:21
**clean** 68:12
**cleared** 33:7
**clearer** 22:21
**closest** 28:10 64:16
**colleagues** 55:18
**college** 9:25 10:3
**come** 9:7 14:19 51:3 52:19 53:19 55:7 56:19 57:8
**comes** 23:17 35:6 50:7 51:5
**comfortable** 30:21 31:2
**coming** 70:11
**command** 31:20,23,25 58:2
**commander** 32:24 33:12,25
**commanding** 33:6 34:20 41:6
**commencement** 74:9
**common** 49:5,5 50:4,5
**communicate** 59:12
**communicated** 49:25
**Complaint** 63:13,21,24 64:3,8 65:23
**complete** 72:9
**completed** 10:16 25:5
**comply** 12:15
**Complying** 5:9
**components** 24:5

**comprehensive** 24:5 29:2
**concern** 42:14
**concerning** 68:2
**concluded** 71:15
**conduct** 11:8 36:11 39:5 52:7
**conducted** 4:5 39:7 41:14 45:3 46:6 47:23 52:4
**conducting** 28:3 44:16,19,21,21 52:23 53:2 54:12 56:15,17 58:10 59:11
**conference** 1:21 4:6,10
**confidence** 23:14
**confront** 30:24
**confused** 7:12 16:22
**consent** 4:15
**consideration** 42:11
**considerations** 29:9
**considered** 4:16 27:19 28:7 39:25 40:10 42:2 54:16
**contact** 50:13 52:10 69:19,20
**contain** 48:13
**contained** 49:15
**contingency** 24:11 27:5,10,11
**contracted** 66:2
**control** 4:11
**controlled** 66:15
**controversy** 74:17
**conversation** 7:9 9:8 46:9 66:24
**copy** 49:15 63:12,20 71:8,9,11,12
**correct** 6:17 7:15,22 15:12 23:7,8 25:21 26:15,16,24,25 27:3 29:3,4 31:18,19 47:5 62:3 63:25 72:10 72:13
**counsel** 3:4 4:4,7,21 68:7 71:7 74:18
**County** 1:9,13 65:20,24 66:2,5 72:4
**couple** 19:6 39:18 65:8
**course** 10:3 11:17
**courses** 9:25
**court** 1:2 3:10 4:6,22 7:20 8:2,11 8:14
**coverage** 24:12
**covered** 70:16
**created** 39:14 51:18
**credibility** 23:18
**crime** 21:17 30:2 58:16
**crimes** 17:9,14
**criminal** 7:21
**criteria** 56:5,6,7,10,11
**critical** 21:4
**crotch** 43:17
**current** 6:10
**custody** 43:23

**D**
**D** 6:2,2 72:2 73:2
**Dana** 38:9 39:25 40:10
**dangerous** 30:19 39:22 41:9,15 55:24 58:13

**dangers** 28:8
**date** 1:21 5:3
**Dave** 13:12
**day** 50:18,19 52:6 53:24 65:18,25 66:6 72:18 74:20
**day-to-day** 16:3 32:19
**days** 6:18
**deadly** 44:12
**dealing** 66:16,19 69:16
**debrief** 60:22,24
**debriefing** 45:3,4
**Deceased** 1:4
**decide** 51:8,10
**decided** 35:13
**deciding** 29:10,16
**decision** 44:8 48:10 51:21,23 58:21
**decisionmaking** 69:25
**decisions** 69:21
**Dedrick** 1:4 47:11,13 51:18 53:4 70:14
**deer** 37:22,23,25
**defendant** 2:10,15 62:14,22 63:11
**Defendants** 1:14,19
**Delaware** 2:11
**department** 1:13 2:15 10:18 11:12 11:15,22 12:3,5,7 65:10
**Department's** 19:21
**depicted** 64:7
**deposed** 7:9
**deposition** 1:18 4:5 7:17 8:17 9:2 9:10 72:8,11
**deputies** 1:11 18:24 19:4,7,8 61:25 65:19
**Deputies'** 66:3
**deputized** 16:11
**Deputy** 32:18
**describe** 15:23 24:5 31:20 36:6,21
**designate** 34:20
**designated** 34:7 35:7,9 57:21
**detail** 62:8,11
**detailed** 25:11
**details** 17:14 54:14 62:6
**Detective** 6:18,20 7:3,7,11,14 70:22 71:3
**determine** 23:10
**develop** 34:18
**developed** 34:9 42:22
**DeVinney** 1:10 35:16,24 36:11,14
**different** 15:6 25:6 26:15 29:9 30:7 30:11 31:7,8 35:5 42:24 54:10 56:3,3,14 57:25
**differently** 46:6
**difficult** 46:20
**dig** 17:13
**digging** 43:16
**direct** 6:7 22:7 46:17
**directly** 64:13,14 74:16
**disability** 67:5
**discharge** 11:16 43:22 44:2

discharged 37:10
disciplinary 11:13 68:12
discipline 68:15,21,22
Discovery 67:22
discuss 49:6,20 50:2,6
discussed 27:23 56:13 70:20
discussing 40:3
discussion 67:9
discussions 46:5 66:9 70:7
disseminated 25:15 49:10,12
disseminating 50:5
Distinguished 47:8
DISTRICT 1:2,2 2:9
DOE 1:8
dog 37:14 38:6
doing 16:5,7 19:2 28:11 52:18
   56:22 57:5 60:20
door 27:16 43:16 55:19
drive 57:4
driveway 59:6
drug 21:21 52:19 53:16
duly 6:4 74:8
duties 11:17 16:6,7 17:7 18:16
   20:10

                 E
E 2:2,2 72:2,2,2 73:2 74:2,2
e-mail 71:10,12
earlier 28:12 39:21 40:4 42:21
education 9:24
effect 3:9
eighty 31:12
ELLIOT 2:6 6:7
employ 74:18
ended 67:23
enforcement 30:10 37:11 62:16
ensure 22:16
ensuring 22:14
enter 51:22,24 53:4 60:12
entering 29:11,16 30:19 53:6
entry 34:24 36:10,12 40:12 42:23
equipment 57:9
equivalent 18:22 19:20 20:16 33:15
Eric 33:8
ESQ 2:6,12,18 6:7
Estate 1:4
estimate 8:10
evaluating 28:7
eventually 18:11 53:19 59:22 60:4
exactly 32:2
examination 3:4,9 6:7 71:14 73:3
examined 6:6
example 12:21 13:22 18:21 19:20
   28:13 29:21 31:8 34:6 35:15
Exchange 6:12
exclusively 16:4,10,20
execute 14:6 23:22 27:14,20 50:22
   54:5
executed 21:14 22:2,16 26:24 27:7

29:3 35:17,25 38:13 41:15,21
   50:20 57:7
executing 12:22 21:8 28:8 32:4
execution 24:6 25:4 26:9 27:24
   28:4 31:21,24 37:2 38:18 39:15
   44:17 47:14 48:3,6 57:15 58:3
executions 36:7,18
exercises 36:18
explain 28:3 43:24 44:3 59:3
explaining 67:4
explicit 22:8
express 4:15
Eyes 39:8

                 F
F 74:2
face 13:13 64:17
facilities 37:3,5,6
facility 36:25
factors 28:7 54:15
fair 19:13 20:24 26:14,18 31:6
   34:21,23
Falls 38:22
far 35:21,23 67:24
fast 31:9,10,13 54:20
fear 42:17
February 14:23
FEDERAL 3:2
feel 68:17
feet 31:9 44:5
fellow 23:16
felonies 17:10
felony 56:5
fences 31:14
field 13:3,5,17,23 14:2,7,12 15:24
   16:14 17:17,25 18:3,4,17,22
   33:20 63:2,5
fielded 17:9
filed 63:13 64:3
filing 3:4
filled 9:20
final 13:12 33:10
find 37:4
finish 68:22
finished 14:11
firearm 11:16 37:10 43:22 44:2
fired 36:24
first 6:3 7:16 13:12 14:22 18:10,13
   18:14 43:3,4 44:23 48:19 50:7,18
five 13:7 37:12
follow 19:7 26:21 58:4
followed 26:3
follows 6:6
foot 31:11
force 3:9 9:6,10 18:8,9,10,16,19
   33:16 34:3,6 36:7 38:13 40:19,20
   40:23 44:12 45:10,25 50:13 55:17
   59:15 61:8,22 63:3,6
force's 46:12

forget 16:24
form 3:6 24:24
formal 26:18,20 45:3,4
four 13:6,8 41:22
frequently 67:6
front 43:19 59:23
FTOs 13:9
full 47:22
further 3:6,8 4:12 18:5 74:14
future 5:3 46:16 61:12

                 G
G 72:2
gather 23:6 24:8
gathered 22:24 47:13
gathering 20:24 21:4,7,13,23 22:13
   31:17 50:2,21
general 8:13 9:16 11:5 12:14 13:17
   17:6 19:21 20:15 21:10,12 31:4
   32:16,17 50:23
generally 13:20 24:21 55:24 67:22
getting 23:21 30:23 49:20 67:24
   68:3 69:22
girl 11:25
give 8:10 17:6 20:3 28:24 49:15
   50:13 63:21
given 7:17 20:14 40:14 42:19 43:2
   43:9 47:4 56:21 72:12
gladly 8:18
go 7:23 10:24 11:20 12:7 14:14
   16:15,23 17:3 27:20 28:20 29:2
   30:23 31:16 40:23 52:10,13 53:16
   68:23
going 7:23 22:7,22 29:25 30:3 40:8
   48:12 59:4 60:14 63:22 65:7 68:9
good 6:14,15 17:18 24:10,12 50:10
   53:17
gotten 36:4 47:6 57:4
government 5:11
government-issued 5:8
graduate 10:8
graduated 10:10
grand 17:11
grandmother 60:16
ground 7:23
grow 64:22
guess 15:8 17:23 23:16,21 30:15,18
   32:6,7,18 34:16,17 42:9 45:16
   51:25 55:16 62:7
gun 36:23 54:22
guns 57:18
gunshot 60:6,7
guy 13:15 31:9 33:23 34:9,12 43:4
   43:5 44:6 51:8 54:19 55:20 57:23
guys 24:9,12 25:23 38:19 43:3
   50:11 51:3,4 54:6 57:14,16 59:11
   61:2

                 H

**H** 6:2
**half** 13:8
**Half-hour** 8:25
**HALL** 2:15
**hand** 74:20
**happen** 27:3
**happened** 11:19 26:11 43:14 44:3
48:8 53:15,22 54:11 61:3,13
68:14 69:12
**happens** 26:10 32:2 59:22,22
**hard** 71:12
**hear** 60:6,8
**hearing** 59:25 60:7
**held** 1:20 46:5 74:6
**hereto** 3:3
**hereunto** 74:19
**hey** 49:13
**hiding** 43:16
**hierarchy** 15:10 32:3,8,16,17 33:22
34:3
**high** 10:8,11
**high-risk** 21:8,11
**highest** 9:24
**hired** 12:4,6
**history** 21:17
**hit** 37:25 38:3
**home** 30:19,20
**hopefully** 24:10
**hospital** 28:10
**house** 21:21,22 23:25 29:23 30:22
30:23 31:3,3,5,6,15 38:12 40:8,11
40:14 42:3,6,7,8,11,13,20,24 43:3
43:7,10,11,15,18,20 48:11,13,17
52:3 53:5 54:7,14 56:23 59:4,6,7
59:9,9 60:9,12,14
**hundred** 31:12 64:12
**Hundreds** 8:12

**I**
**ID** 5:8,11
**idea** 50:10
**ideal** 31:20,25 56:19
**identification** 5:11
**Immediately** 60:23
**impact** 46:17 68:17
**importance** 22:18 23:4
**important** 7:24 22:19 24:15,19
28:13
**improve** 61:12
**inappropriate** 68:3
**inch** 31:3
**incident** 37:17 38:6 39:25 40:10
43:8 45:2 46:4,13,15 47:4,16
51:19 52:6 53:25 58:22,25 60:21
61:6,17 68:16,25 70:3,14,18,20
**incidents** 37:12,21 38:5
**include** 12:18 20:23
**included** 27:6
**including** 37:15

**indicated** 58:12
**indirectly** 74:17
**Individually** 1:4
**individuals** 70:5
**inform** 46:15
**informal** 34:10
**informally** 34:15,19 35:12
**information** 9:17 23:11,17,19 24:9
49:9,15,24 50:5 58:11
**initial** 69:20
**injured** 54:19
**injury** 28:9
**inside** 28:14 31:6 42:10 60:14
**instance** 39:22 40:6
**instances** 14:9
**instructions** 56:22
**intelligence** 20:23 21:4,7,13,24,25
22:13,15,23 23:5,6,13 31:17
47:12 50:21
**interested** 74:16
**Investigating** 17:9
**investigation** 38:17 68:15
**investigations** 17:10
**Investigator** 1:8,12 6:14,16 7:14
14:18,18 15:5,10,14,20,25 16:14
16:19,21,25 17:8,20,25 18:6
20:22
**involve** 54:22
**involved** 21:18 26:12 41:3,4,5,8
46:20 48:2 53:3 55:24 69:11,21
69:23,24
**issuance** 47:19
**issued** 5:11 62:5
**issues** 11:13 23:23 69:3 70:5

**J**
**James** 1:3,4,4 47:13 53:4
**James'** 47:11 51:18,22 70:14
**Jeff** 52:14 53:13 55:14,14 58:7
**JEFFREY** 1:12
**Jersey** 40:19
**job** 7:8 17:7,13 18:16 20:10 47:2
**John** 1:8 2:18 8:18,20 71:5
**join** 14:22 18:13
**joined** 16:2 18:8,10,14 19:18 36:5
**judge** 23:17
**jump** 31:13 67:21
**June** 37:18
**jurisdiction** 55:7,10,11

**K**
**K** 72:2
**keep** 48:13
**keeping** 65:2
**kid** 54:19 58:19
**kind** 14:10 17:24 20:16 34:14,18
35:12 36:21 39:6 45:19 49:8,17
59:3 68:14
**knife** 44:4,11

**knock** 27:16
**knocked** 55:19
**know** 7:6,7 9:15 19:24 20:15 21:12
21:19,20,21 23:5,15,22 24:10,12
24:13,19 25:7 28:9,13 31:10,13
32:3,19 35:5,19,20,21,23 36:22
36:24 37:13 38:20,25 39:8,13
41:8,12,13 42:15 43:21 44:20
45:8,15,22 47:22,24 48:11 51:2,3
51:17,20,21,23 53:11 54:21,23,25
55:2,12 56:4,6,12,17,18 57:9,20
58:18,20 59:18,20 60:3,4 61:15
62:4,19,21 64:7,11,18,21 65:9,12
65:17 66:7,12 67:7 68:21 69:6,10
69:18 70:11,12,17
**knowledge** 20:15
**knows** 31:3

**L**
**L** 72:2
**label** 7:8
**lady** 63:17
**larceny** 17:11,12 56:7
**Lately** 65:2
**law** 2:15 4:17 30:10 37:10 62:15
**laws** 11:5 12:16
**lawsuit** 9:6 63:12 70:4
**lawsuits** 62:15,22,25
**lead** 58:4,7
**leader** 35:8,10 57:21
**leaders** 34:2
**learn** 18:15
**learned** 13:19 38:21
**learning** 13:18
**leave** 29:12,19,22 30:17,20 39:23
40:7,11,13 42:3,7,13 52:3 53:5
54:24
**leaves** 27:15
**leaving** 53:7
**led** 47:19
**left** 42:5,8 53:16 55:2 56:23 59:10
**Let's** 20:21 21:11 47:11 48:14
**lethal** 57:8,13
**letter** 9:15
**level** 9:24 54:18,23 58:7,9
**levels** 35:4,4,5
**Lexington** 2:5
**lifting** 67:11
**litigation** 4:18
**little** 8:3 20:21 43:24 48:14,18
54:18,19 58:19
**LLP** 2:4
**location** 21:21 24:11 39:11
**locations** 4:8
**long** 8:24 10:13 11:3 12:10 13:5
22:20 52:22
**longer** 6:21
**looked** 43:5 63:14 68:16
**looking** 52:25 59:7,9

**lot** 18:17 32:13 36:9,9
**low** 54:18,23 58:6,9

**M**

**M** 2:18 72:2
**making** 39:16 40:12
**man** 36:23
**manner** 4:14 56:14
**marriage** 74:16
**married** 11:25
**Marshal** 19:3,6 32:19 33:18 40:17
  40:18,22 41:2,7
**Marshals** 14:15,17,20,22 15:16
  16:3,5,8,11,15,20,23 19:9,11,16
  19:18 20:17,23 25:3 26:4,5 32:2
  32:15,18 33:22,23 34:25 36:5
  45:9,14,15,24 68:11
**Marshals'** 19:24,25 24:20 26:8
  32:20 33:16 34:3 62:8,10 68:18
**math** 14:15
**matter** 46:21 74:17
**mean** 6:20 19:8 29:25 30:4 32:12
  33:19,21 39:4 46:19,21 47:19
  52:5,9 55:20,22 56:9,18 64:11,15
  64:22 65:5
**means** 30:16,18 42:15
**measures** 27:5,11
**meet** 8:20 49:6 50:6 56:6,9
**meeting** 4:10 8:22 25:24 60:22,24
**meets** 56:5
**member** 18:16 51:6,12 52:9 63:2,7
**member's** 45:17
**members** 1:12 9:6,10 18:19 19:14
  36:7 49:16,25 50:15 51:13 54:2
  57:8,11 61:18,22
**membership** 68:18
**memo** 49:14,16
**mentioned** 24:14 28:12
**met** 8:18 38:22 56:4,11
**method** 52:2
**methods** 30:8,12 41:25
**MICHAEL** 2:12
**middle** 64:13,14
**mile** 31:13
**minor** 58:20
**misery** 38:2
**Mobile** 63:2,5
**mobility** 69:3 70:5
**Monroe** 1:9,13 65:24
**monthly** 36:16
**months** 11:4 12:11 13:8
**morning** 6:14,15 52:24
**mouth** 54:21
**move** 68:8,9
**MSCO** 1:10 38:19
**murder** 38:21

**N**

**N** 2:2 72:2,2 73:2

**name** 6:8,25 13:14 19:25
**named** 62:14,21,24 63:11
**names** 1:9,11 9:16
**nature** 21:17 58:15
**navy** 10:12,13,16
**need** 23:7 49:13
**needs** 38:2
**neither** 65:23
**new** 1:2,13,24 2:5,5,9,11,17 6:5,12
  12:16 40:19 64:25 72:3 74:4
**Niagara** 38:22
**non-deer** 38:5
**normal** 37:6 41:2
**normally** 49:19 50:18,19 57:14
**Notary** 1:23 3:9 6:5 72:20 74:3
**note** 20:25 22:6
**Notice** 1:20
**number** 1:9,11
**nutshell** 14:13
**NYSP** 1:11

**O**

**O** 6:2,2,2 72:2
**oath** 72:8
**Object** 24:24
**objection** 4:25 5:2,4,5,6 20:25
  21:15 22:3,25 24:2,7 26:19 27:8
  29:7 31:22 32:5,11 33:17 34:4,22
  35:18 36:19 41:11 42:4 44:13,24
  45:11 46:8,25 50:24 54:9 58:14
  67:17 69:14 70:6
**objections** 3:6
**objects** 22:5
**obviously** 8:21
**occupy** 34:19
**occur** 36:15 50:18,19
**October** 1:16 72:8 74:20
**offered** 15:4
**Office** 1:13 2:9 19:15 61:24
**officer** 10:17 14:25 16:24 18:23
  21:4 22:16 28:21 33:6 34:20 41:6
  50:8 62:16 64:15 69:17
**officer's** 23:23 61:12
**officers** 1:8 7:9 12:15 13:15 23:16
  54:25 55:3 64:10 66:9,25 67:10
**officially** 18:7 34:20 36:2
**oh** 7:10
**okay** 8:5,9,15 68:13
**on-the-ground** 13:18 18:18
**once** 16:11
**one-page** 49:14
**ones** 32:21
**ongoing** 18:5
**open** 67:23
**operates** 34:14
**operating** 20:7,18 24:21
**operation** 22:12 25:25 28:11 31:21
  31:24 33:11 38:9,10,14 46:5
  47:12 54:17 57:21 59:12

**operational** 21:5 22:17 24:4,6,15
  26:22 27:6,14,31 31:17 35:16,24
  36:3 39:14 51:18
**operations** 19:2 36:12,12 46:16,18
  70:15
**opposed** 27:2
**option** 57:9
**options** 40:4 57:14
**order** 40:14,15,16 42:19 43:2,9
**ordering** 71:8
**orders** 19:21 20:16
**outside** 29:19 31:5,14 43:5
**oversaw** 31:24 19:4,8
**overview** 17:7
**owned** 65:20

**P**

**P** 2:2,2
**P.M** 71:15
**PAGE** 73:3
**paper** 34:12 35:2,9,11
**part** 58:23 66:12,14 67:5
**participating** 4:9
**particular** 51:12 54:17 68:5
**parties** 3:3 4:4,16 74:15
**partner** 44:9
**parts** 47:2
**pass** 50:12
**patrol** 14:14 17:10 54:25 55:3
**Paul** 33:9
**people** 28:14 34:17 64:9
**people's** 35:4,5
**percent** 64:12
**perform** 18:15
**perimeter** 34:25 40:24 48:12 58:23
  59:3 60:4
**periodically** 36:10 41:4 64:23
**person** 23:24 29:18 33:15,19 39:9
  40:5 49:20 50:2 51:5 63:16
**pertinent** 70:19
**phases** 13:6,7
**physical** 44:10
**physically** 4:24
**picture** 13:13,14 64:8
**piece** 34:11
**place** 74:7
**placed** 69:12
**placing** 67:11
**plainclothes** 62:6,8,11
**Plaintiff** 1:5,20 2:4
**plaintiff's** 68:7
**plan** 24:15,16,17,22 25:5,10,11,21
  26:8,23 27:6,10,14,15 29:2 36:3
  39:14 51:3,5,18
**planned** 27:19
**planning** 22:12 24:4,6 27:13 31:18
  38:8,10,17
**plans** 24:11 35:16,25
**platform** 4:10

**play** 21:19 35:6
**please** 5:8 6:8,10 8:7 28:5 68:23
**point** 15:2 48:13 59:5 61:2 68:13
**police** 1:13,14 10:17,24 11:3,6,17
  11:21 12:3,4,7,15 17:19 19:15,21
  20:13 23:14,15 42:16 55:4,6,9,10
  55:12,15,18,20 64:9 65:10 67:12
**policies** 20:2 46:12 69:2,5,7 70:3
**policy** 62:5 69:9
**ponder** 28:22
**position** 43:21 44:7 45:20 46:24
**possibly** 21:19 52:21
**potential** 28:8
**potentially** 28:17 67:10 68:17
**pounds** 31:12
**practice** 13:19 35:3 37:2 49:5,6
  50:4,5
**practices** 11:6,9 12:15 17:19 21:12
  22:14,22 29:5,10,15 46:12 70:15
**pre-execution** 53:25 54:3
**preoperational** 24:16,17,22 25:5
  25:10,21 26:7
**preparation** 9:2
**prepare** 8:17
**preparing** 27:13
**presence** 4:24 42:17
**present** 1:9,11 4:4 44:11
**presented** 5:10
**pretty** 14:4 38:21 54:23 58:20
  67:22
**previous** 42:5
**prior** 23:15 25:24 27:24 28:8 38:17
  44:17 48:2
**privileged** 8:22
**probably** 18:17 29:22 30:25 43:4
  51:8
**procedure** 26:22
**procedures** 20:2,7,18 24:21 69:2
**proceeding** 74:6
**process** 26:3,7,14,17 28:3 31:18
  38:9,17 50:23
**produce** 5:8
**promoted** 15:2,13,19 16:18,25
  17:24
**proper** 24:12
**protect** 44:9
**protest** 64:20
**protesting** 62:19
**protestors** 62:20
**protocols** 61:7
**provided** 18:10
**public** 1:23 3:9 6:5 69:22 72:20
  74:3
**pull** 56:23
**pulled** 44:4
**pulling** 54:20
**purpose** 4:18
**pursuant** 1:20
**pursue** 51:9,11

**pursuit** 43:7
**put** 13:18 15:8 38:2 43:21,25 46:23

**Q**

**question** 3:7 7:16 8:8 17:23 22:9,10
  22:20 23:4 24:23,25 25:2 26:6
  30:14,15 35:22 40:2,9 42:9 49:23
  51:25 57:25 62:10 63:21 64:6
  65:21
**questions** 9:23 48:19 58:18 62:13
  65:8 67:25 68:4 70:24,25 71:5,6

**R**

**R** 2:2 6:2,2,2,2 74:2
**radio** 59:12,14,16,25
**random** 52:19
**range** 17:11
**rank** 14:24
**react** 36:24
**read** 63:12 72:7
**realize** 62:7
**really** 30:15 31:13,13 45:18
**reason** 55:17
**recall** 7:19 38:7 63:15 65:3,13,18
  66:4,8,14
**receive** 15:20 17:18 19:19
**received** 36:7
**recommend** 61:12
**record** 4:22 6:8,11 22:6,6 68:12
  72:10,12 74:12
**recorded** 4:13 59:19
**recording** 4:14
**refer** 20:10
**referring** 55:16
**regular** 16:6,7 21:22
**regulations** 19:19
**related** 74:14
**released** 53:14
**relevant** 68:19
**relieve** 53:21
**relieved** 53:18
**remember** 10:4 11:14 13:9,16 14:8
  17:21 20:5,19 25:10,13,16 26:11
  26:13 39:16 41:18,19,22,24 42:14
  42:17 46:3,9 47:10,12,15 48:9,22
  48:23 52:22,25 53:3,6,8,12,23,24
  54:3,11,12,13,14,15,18 56:21,25
  57:23 58:6,7 59:3,4,10,25 60:7,10
  60:11,14,17,20,23,25 61:5,9
  66:16,18,20,21,23,25 67:4,9,20
  69:16
**remote** 4:8
**remotely** 4:5
**repeat** 22:9 28:5 29:13 49:22
**rephrase** 8:8 16:17
**report** 45:7,14,20,22 46:2
**reporter** 1:22 4:2,7,22 5:7,12 8:2
  71:7,13
**Reporting** 4:11

**reports** 8:19 9:13,13,18,20 23:14
  23:15,15 45:10
**require** 21:13 24:21 29:6
**required** 61:18
**requirement** 35:15,24
**research** 58:17
**reserved** 3:7
**residence** 28:14 29:11,16,19 30:17
  39:24 40:7 51:22,24 52:10
**respect** 70:4,14
**respectfully** 68:7
**respective** 3:4
**response** 22:4
**rest** 49:2,3,10,25 50:14 51:4 57:6
**result** 45:6 61:6 70:4
**retired** 13:15
**reviewed** 8:18 9:12,14
**Richard** 1:8,10,18 6:9 7:1 8:1 9:1
  10:1 11:1 12:1 13:1 14:1 15:1
  16:1 17:1 18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1 26:1 27:1
  28:1 29:1 30:1 31:1 32:1 33:1
  34:1 35:1 36:1 37:1 38:1 39:1
  40:1 41:1 42:1 43:1 44:1 45:1
  46:1 47:1 48:1 49:1 50:1 51:1
  52:1 53:1 54:1 55:1 56:1 57:1
  58:1 59:1 60:1 61:1 62:1 63:1
  64:1 65:1 66:1 67:1 68:1 69:1
  70:1 71:1 72:6,15 73:4
**right** 7:4 13:3,20 15:7 19:11 23:25
  27:20,21,24 32:24 33:12 37:14
  38:14 43:7 45:19,20 46:21 47:9
  48:3 50:3 52:20 58:23 61:19
  64:13
**riot** 62:25
**riots** 62:20
**risk** 28:2,3 30:23 41:14,17
**risks** 27:12 30:7,11 54:16
**Rochester** 1:8,12 2:15,16,17 6:12
  11:21,24 12:2,4,6 19:20 33:23
  55:5,21 62:20 65:10
**ROD** 1:10
**role** 7:7 17:19 18:5 20:22 34:7,8,10
  34:21 42:21,23,24 48:5 63:5
  70:20
**roles** 6:24 34:18
**room** 2:16 36:9
**ROTH** 2:4,4
**roughly** 11:4 12:11 36:23
**route** 28:10
**RPD** 1:8,8 6:21,22,24 7:7,11 10:6
  14:11 16:6,7,9,16,21 17:4,8 19:14
  20:14 25:17 27:2 32:23 50:11,11
  62:2,5,11 65:23 67:14 69:2,6
**RPD's** 70:2
**rule** 49:8,11,13,17
**rules** 7:24 8:13 19:19
**run** 31:12 42:18
**runner** 31:10

**running** 60:2
**runs** 43:6,17,19

### S

**S** 2:2,12
**safely** 46:7
**safer** 31:4 61:16
**safety** 21:5 22:16 23:23 28:21
  61:12 69:22
**sat** 38:23,24 39:3
**saw** 43:6
**saying** 30:12,18 34:17 48:22 66:25
  68:13
**scenario** 36:17,20,22
**scene** 53:13
**school** 10:8,11
**screen** 63:22 64:4
**sealing** 3:4
**search** 11:8 12:22,24 14:2,4,6
**second** 56:10 63:22 64:2
**see** 43:10 53:4 56:19 64:4,17
**seeing** 36:23 53:6,8,12
**selected** 14:14
**send** 55:22
**sense** 56:12
**separate** 4:8 37:12
**September** 15:15 17:2,3 65:3
**Sergeant** 1:10 15:3,4,11
**serious** 26:12 38:20
**service** 47:8 68:19
**set** 37:3 60:4 74:19
**setting** 29:17
**share** 63:22
**Sharon** 1:22 6:4 74:3,23
**shave** 64:22
**SHENEA** 1:3,4
**SHERIFF** 1:9
**Sheriff's** 1:10,13 19:8,15 61:24
  65:19 66:3
**Sheriffs** 66:5
**Shields** 2:6 5:4 6:7 63:25 64:2 68:9
  68:24 70:22 71:4 73:4
**shooter** 29:21,24 30:2,16 39:22
  40:6
**shooting** 17:12 36:9,13 46:20 54:23
**shoplifting** 56:8
**short** 69:17
**shot** 30:23,24 37:14 44:12
**shots** 36:23
**show** 43:9 55:13 63:20
**shy** 14:17
**side** 59:6
**signed** 3:9,10 51:11
**signing** 51:15
**signoff** 35:16,24 36:2
**similar** 26:3,6 34:2
**simple** 17:11 23:3
**simplify** 40:2
**sit** 25:24 26:8 28:22

**sitting** 44:7
**situation** 25:6 31:7,8 42:25 43:25
  61:14
**situations** 55:25
**six** 10:14 11:4 12:11
**six-two** 31:11
**skill** 35:4,4,5
**Slightly** 57:25
**Smith** 38:6,9,12 39:25 40:10 44:8
  44:11 46:4
**somebody** 29:25 30:24 31:5 33:3
  44:18
**sorry** 13:16 16:22,24 22:20 49:22
**sort** 42:22
**sounds** 26:17 30:12
**source** 23:19
**speak** 7:25 9:3,5 60:15,19
**special** 59:16
**specific** 9:16 14:8 17:21 18:9 19:25
  25:7 26:13 34:7,21 49:11 58:2
  66:23 68:4
**specifically** 20:5 23:23 41:18 60:13
**specifics** 41:19,23
**specified** 34:18
**spent** 14:16,18
**spit** 13:14
**spoken** 9:9
**spooked** 42:15
**Springer** 33:2,5
**ss** 72:4
**staging** 54:7
**standard** 20:7,17 24:20 26:21
**start** 10:20
**started** 7:24 57:4
**state** 1:13,23 6:5,8,10 12:16 19:15
  36:9 55:4,6,9,10,12,14,18,20 72:3
  74:4
**stated** 42:5
**statements** 60:18
**States** 1:2,7 2:9,10 71:2
**stenographically** 74:10
**Stenotype** 1:22
**step** 13:2
**Stephanie** 63:18
**stipulate** 4:21
**stipulated** 3:3,6,8 4:3,12
**STIPULATIONS** 3:2
**stop** 56:16
**street** 2:16 27:17 43:6
**structure** 31:21,23,25 58:3
**struggle** 43:18,20
**stuff** 11:6
**subject** 21:18
**subjects** 21:20
**Subscribed** 72:17
**success** 21:5 22:17
**Suite** 2:5
**supervision** 74:11
**supervisor** 45:15,18 63:8

**supposed** 18:25 19:2,5 69:7
**sure** 9:7 14:3,4 23:6,7,24 24:9
  26:10 28:6,22,23 29:15 30:10
  39:10 41:17 61:4 64:12 65:6
  67:19 69:9
**surround** 40:14,23 42:20 43:2
**surveillance** 29:18 34:9,12 39:4,5,6
  39:8 42:22 44:16,20,21,22 48:2,7
  48:10 50:22 52:4,7,11,18,20,23
  53:2 54:13 56:18,22 57:5
**suspect** 29:12,17 39:23 41:16
**suspected** 30:2
**suspects** 11:10 12:19 17:15
**SWAT** 25:18,20 26:5 27:2 32:23,24
  33:7,11,12,13,24
**swear** 4:20,23
**switch** 9:22
**sworn** 3:10 6:4 72:17 74:8

### T

**T** 72:2 74:2,2
**tactical** 29:9 35:7 57:21 59:17
**take** 14:10,21 31:14 43:8,13 48:5
  48:12 56:20 58:25 60:18 65:7
  71:11
**taken** 1:19 43:22 72:7 74:10
**talk** 47:11 61:3
**talked** 8:21 41:21
**talking** 60:17
**TASER** 57:10
**TASERS** 57:12
**task** 9:5,9 18:8,9,10,16,19 24:13
  33:16 34:3,6 36:6 38:13 40:19,20
  40:23 45:10,25 46:12 50:13 55:17
  59:15 61:7,17,22
**tasked** 45:21,23,25 66:5
**taught** 11:5 12:14
**team** 19:10,14 25:15,18,20 26:5,9
  27:2,23 32:3,16,17,20,23,24 33:3
  33:7,11,13,24 34:2,14,24,25
  39:19 45:18 48:21 49:3,3,10,16
  49:25 50:14 51:6,12,13 52:9 54:2
  55:23 57:6,8 58:23 63:7
**techniques** 36:10
**tell** 8:7,16,21 9:13,23 13:11 37:9,20
  38:16 48:7 50:14 51:4 64:6,8
  66:18
**telling** 57:2 62:9
**ten** 23:25
**terms** 21:13 30:7 39:3
**test** 20:19 52:19 53:17
**testified** 6:6 7:20 8:11,14 40:5
  52:17
**testimony** 7:17 9:10 45:17,17 72:7
  74:5,9,10,13
**tests** 20:14
**thank** 5:12 70:22 71:2,13
**thing** 7:25 20:21 23:18 24:14 28:15
  40:4 46:21

**things** 13:19 23:16 27:18,22 28:25 30:6 31:16 41:20
**think** 28:12 30:22 32:12 33:8 37:13 38:3 43:12 46:17 53:7 61:9,20 67:24,25 70:8
**thinking** 27:12
**thorough** 21:3
**three** 13:6,7,7 14:16,17 37:20 38:3 41:22
**time** 1:22 3:7 5:2 8:2 10:3,16 14:24 15:17 16:18 25:3,9,17 26:11,23 33:7 45:24 52:5,24 53:10,11 59:24 61:17 63:3,6 64:19 65:5,9 67:14 68:25 69:17 70:23 74:7
**times** 8:11 37:9 39:19
**title** 6:17 7:3,8,11,13 34:11
**titles** 6:23
**today** 14:12 61:22 70:24
**today's** 8:17
**TODD** 1:9
**toothbrush** 54:19,20 58:19
**tracked** 38:12
**tracks** 15:6
**traffic** 56:16
**training** 13:3,5,17,18,23 14:2,7,12 15:21,23,24 16:14 17:17,18,22,24 18:2,3,4,5,9,11,17,18,23 36:5,6,8 36:11,14 37:5,6
**transcribed** 74:11
**transcript** 71:8 72:7,9 74:12
**transferred** 12:2
**transport** 65:16 66:3 69:10
**transportation** 65:11,20,25 66:13
**transported** 65:14 66:10 67:15
**transporting** 65:19 66:6 67:10 69:3 69:11,24 70:5
**trial** 3:7 8:4
**true** 72:9,12 74:12
**try** 22:21 46:23 63:22
**trying** 42:12 56:13
**twenty** 14:14
**two** 13:7,15 37:13 47:7
**type** 42:22 49:14
**types** 21:7 27:11,18,22 28:6,25 30:6 36:6 41:14,20
**typical** 45:9,13
**typically** 48:25

**U**

**U.S** 16:20 19:2,6,9,10,18,25 24:20 26:4,5,8 32:15,18,19,20 33:16,22 33:22 34:25 36:5 45:9,13,24 61:25 62:10 68:10
**Ulatowski** 1:12 57:22
**unauthorized** 4:16
**understand** 8:7 24:9
**understanding** 7:2 20:13 24:10 38:11 45:16 47:16,25 55:23 68:10
**unfamiliar** 39:2

**unidentified** 1:12
**United** 1:2,7 2:9,10 71:2
**unknown** 1:9,11
**ups** 19:7
**use** 57:9 59:16,17 66:2 67:5
**user** 67:15 69:8
**usually** 17:10 36:8 56:2 59:17

**V**

**vans** 66:3
**various** 40:3
**vehicle** 36:12 67:12
**vehicles** 65:11,20,25
**venture** 32:20
**verified** 21:25
**verify** 23:12
**verifying** 22:14,22
**versus** 29:11,17 40:12 52:2
**video** 4:6
**videoconference** 4:13
**violation** 4:17
**violence** 38:20 54:21 56:9
**Virginia** 10:17,19,24
**visible** 39:8
**vote** 51:13

**W**

**W** 6:2 72:2
**wait** 29:22 30:17,25 31:10 39:23 40:7
**waiting** 29:11,18 30:20 40:11 42:2 42:12 52:3 56:14
**waived** 3:5
**walk** 38:8,10
**walked** 43:5
**walking** 59:4
**walks** 27:17
**want** 9:22 22:9 23:23 29:22 31:10 31:14,15 50:12 63:20 67:21 68:22
**wanted** 47:17,18 68:12
**warrant** 21:9,11,14,25 22:16 23:22 24:6 25:4 26:9,23 27:7,14,20,24 28:4,8 29:3 31:21,23 32:4 35:17 35:25 36:7,18 37:2 38:13,18 39:15 41:3,15,21 44:17 47:14,20 48:3,6,20 49:2,9,21,24 50:3,12,14 50:20,22 54:6 55:25 57:7,15 58:3 70:15
**warrants** 11:9 12:22,24,24 14:2,3,4 14:5,7 61:13
**wasn't** 16:7 18:14 39:17 40:15 44:6 45:21 48:23 55:2,4 66:12 69:11
**Watching** 52:8
**way** 15:8 17:12 46:23 49:19,23
**weapons** 21:18,18,19
**wear** 61:18,22,24,25 62:2
**web** 1:21 4:9
**weeks** 13:6,7
**weigh** 30:7,11 32:13

**Welder** 10:12
**went** 38:23 40:13 42:8 52:21 53:13 59:2
**weren't** 18:25,25 19:5 61:20 63:8 69:21
**West** 10:17,19,23
**WESTERN** 1:2 2:9
**wheelchair** 63:17 65:10,14,24 66:20 67:8,11,15 69:8
**WHEREOF** 74:19
**Williams** 13:12
**window** 60:3
**witness** 4:7,20,23,24 5:10 6:3 70:9 71:15 74:8,13,19
**witnesses** 60:19
**Woodward** 63:18,24 64:16 65:13 66:10 68:2,25 69:4 70:3
**Woodward's** 65:22
**work** 16:11,13 48:25 54:5
**working** 10:5 16:4,19 55:21
**works** 35:3
**wouldn't** 56:25
**wrestling** 44:6
**write** 45:10,14,20
**writing** 25:14 45:21 46:2
**written** 4:15 22:6 24:16,17,21 25:5 25:8,10,23 26:7,22 34:11 39:13 45:7 49:8 51:17
**wrong** 67:2
**wrongdoing** 63:17

**X**

**X** 1:3,15 73:2

**Y**

**year** 10:20,21 14:18 16:21,25 17:4 36:11
**years** 10:14 14:14,16,17 41:22
**Yesterday** 8:23
**York** 1:2,13,24 2:5,5,9,11,17 6:6,13 12:16 72:3 74:4

**Z**

**Zoom** 4:9

**0**

**08** 10:4
**09** 10:4

**1**

**1-10** 1:8,11
**1,000** 56:8
**10016** 2:5
**11:00** 1:16
**12:40** 71:15
**138** 2:11
**14202** 2:11
**14614** 2:17
**18** 14:23

**185** 6:12
**19** 37:18
**192** 2:5
**1996** 11:19 12:12

_____ **2** _____
**20** 15:15 17:2,3
**2017** 37:14
**2018** 14:16 16:3,23
**2020** 37:18 65:4
**2024** 1:16 72:8,18 74:20
**23-CV-0657** 1:7

_____ **3** _____
**30** 2:16
**31st** 74:20

_____ **4** _____
**4** 1:16 72:8
**412A** 2:16

_____ **5** _____

_____ **6** _____
**6-71** 73:4

_____ **7** _____

_____ **8** _____
**802** 2:5
**88** 10:9

_____ **9** _____
**94** 10:22
**96** 10:22 12:13 14:15