May 7, 2024

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
----------------------------------------x
SHENEA JAMES, as administrator of the estate of
DEDRICK JAMES, deceased, and SHENEA JAMES,
individually,

                        Plaintiff,

        -against-              Index No:
                              23-CV-6057(DLG)(MJP)


THE UNITED STATES OF AMERICA, CITY OF
ROCHESTER, RPD INVESTIGATOR RICHARD ARROWOOD,
"JOHN DOE RPD OFFICERS 1-10" (names and numbers
of whom are unknown at present), MONROE COUNTY
SHERIFF TODD BRAXTER, MSCO SERGEANT CHRISTIAN
DEVINNEY, "RICHARD ROE SHERIFF'S DEPUTIES 1-10"
(names and numbers of whom are unknown at
present), NYSP INVESTIGATOR JEFFREY ULATOWSKI
and other unidentified members of the Rochester
Police Department, Monroe County Sheriff's
Office, and NEW YORK STATE POLICE,
                        Defendants.
----------------------------------------x

        EXAMINATION BEFORE TRIAL of the
Defendant, THE UNITED STATES OF AMERICA, by
CARLTON SMITH, taken by the Plaintiff and
Co-Defendants, pursuant to Court Order, held
via videoconference, on May 7, 2024, at 10:05
a.m., before a Notary Public of the State of
New York.

(1)
(2)   **A P P E A R A N C E S:**
(3)    **ROTH & ROTH, LLP**
              **Attorneys for Plaintiff**
(4)           **192 Lexington Avenue, Suite 802**
              **New York, New York 10016**
(5)
      **BY:     ELLIOT DOLBY SHIELDS, ESQ.**
(6)
              **VIA VIDEOCONFERENCE**
(7)
(8)
(9)
      UNITED STATES ATTORNEY OFFICE
(10)          Attorneys for Defendant
              138 Delaware Avenue
(11)          Buffalo, New York 14202
(12)   BY:     MICHAEL S. CERRONE, ESQ.
              Assistant United States Attorney
(13)          Western District of New York
(14)          VIA VIDEOCONFERENCE
(15)
(16)
      CITY OF ROCHESTER - LAW DEPARTMENT
(17)          Attorneys for Defendant
              30 Church Street, Room 412A
(18)          Rochester, New York 14614
(19)   BY:     JOHN CAMPOLIETO, ESQ.
              Municipal Attorney
(20)
              VIA VIDEOCONFERENCE
(21)
(22)
      DISMISSED PARTY:
(23)
       Monroe County Sheriff's Office
(24)
(25)

(1)

(2)                S T I P U L A T I O N S

(3)

(4)        IT IS HEREBY STIPULATED AND AGREED by
and between the attorneys for the respective
parties herein, that filing, sealing and
(5)  certification be and the same are hereby
waived.

(6)        IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the form of
(7)  the question shall be reserved to the time of
the trial.

(8)        IT IS FURTHER STIPULATED AND AGREED
that the within deposition may be signed and
(9)  sworn to before any officer authorized to
administer an oath, with the same force and
(10)  effect as if signed and sworn to before the
Court and that a copy of this examination shall
(11)  be furnished without charge to the attorney
representing the witness testifying herein.

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)
(2)          V I D E O C O N F E R E N C E
               S T I P U L A T I O N S :
(3)
(4)    IT IS HEREBY STIPULATED AND AGREED by and
       between counsel for all parties present:
(5)
       That this deposition is being conducted by
(6)    videoconference;
(7)    That the Court Reporter, all counsel, and the
       witness are all in separate remote locations
(8)    and participating via videoconference
       (LegalView/Zoom/WebEx) meeting under the
(9)    control of Lexitas Court Reporting Service; and
(10)   That the officer administering the oath to the
       witness need not be in the place of the deposition,
(11)   and the witness shall be sworn in remotely by the
       court reporter after confirming the witness's
(12)   identity;
(13)   That this videoconference will not be recorded
       in any manner, and that any recording without
(14)   the express written consent of all parties
       shall be considered unauthorized, in violation
(15)   of law, and shall not be used for any purpose
       in this litigation or otherwise.
(16)
       IT IS FURTHER STIPULATED that exhibits may be
(17)   marked by the attorney presenting the exhibit
       to the witness, and that a copy of any exhibit
(18)   presented to a witness shall be e-mailed to or
       otherwise in possession of all counsel prior to
(19)   any questioning of a witness regarding the
       exhibit in question.
(20)
       All parties shall bear their own costs in the
(21)   conduct of this deposition by videoconference.
(22)
(23)
(24)
(25)

(1)

(2)    C A R L T O N   S M I T H,  the witness herein,

(3)    having been first duly sworn by a Notary Public

(4)    of the State of New York, was examined and

(5)    testified as follows:

(6)    EXAMINATION BY

(7)    **MR. SHIELDS:**

(8)    Q.    State your name for the record, please.

(9)    **A.    Carlton Smith.**

(10)   Q.    State your business address for the

(11)   record, please.

(12)   **A.    100 State Street, Rochester, New York**

(13)   **14614, United States Marshal's Office.**

(14)   Q.    Good morning, Deputy.

(15)   **A.    Good morning.**

(16)   Q.    My name is Elliot Shields.  I represent

(17)   a woman whose son was killed.  And I'm going to

(18)   be asking you some questions today.  First some

(19)   ground rules for the deposition.

(20)          Will you tell me if you don't understand

(21)   my question?

(22)   **A.    Yes.**

(23)   Q.    And will you tell me if you find my

(24)   question confusing?

(25)   **A.    Yes.**

**CARLTON SMITH**

(1)

(2) Q.     And will you tell me if you don't know

(3) the answer to my question?

(4) **A.     Yes.**

(5) Q.     Okay.  And will you tell me if I assume

(6) an incorrect fact in a question?

(7) **A.     I'm not sure what you mean by that.**

(8) Q.     Sure.  So if I make an assumption and

(9) that's not true, will you tell me?

(10) **A.     Yes.**

(11) Q.     Okay.  And will you need me to remind

(12) you of the rules?

(13) **A.     I don't think you need to remind me of**

(14) **the rules.**

(15) Q.     Okay.  If there is anything that I ask

(16) you that you don't understand, just say so and

(17) I will gladly rephrase my question for you,

(18) okay?

(19) **A.     Yes.**

(20) Q.     Otherwise, if you answer the question,

(21) we will assume that you understood it.

(22) **A.     Okay.**

(23) Q.     And have you understood what I have said

(24) to you so far?

(25) **A.     Yes.**

```
                        CARLTON SMITH
```

(1)

(2)    Q.    And do you agree with those terms?

(3)    **A.    Yes.**

(4)    Q.    And they are fair?

(5)    **A.    Yes.**

(6)    Q.    Now, my first question is, how many

(7)    times have you testified before?

(8)          **MR. CERRONE:  In a deposition or**

(9)          **a trial or both?**

(10)         **MR. SHIELDS:  Well, if he wants**

(11)         **clarification, let him ask.**

(12)   **A.    Well, can you be more specific?  This is**

(13)   **the first time that I have been deposed of.**

(14)   Q.    Okay.  So this is the first time that

(15)   you sat and gave a civil testimony such as this

(16)   case?

(17)   **A.    Yes.**

(18)   Q.    And have you testified in court before?

(19)   **A.    Yes, that I recall.**

(20)   Q.    So you only testified before a judge in

(21)   court once in your entire career?

(22)   **A.    I believe so, that I recall.**

(23)   Q.    Okay.  Any other times that you have

(24)   given testimony under oath, other than that one

(25)   time in court?

```
                    CARLTON SMITH
```

(1)

(2) **A.      I'm trying to remember.  I think so.**

(3) Q.      And when you say you think so, you think

(4) that one time in court was the only time that

(5) you testified in court before?

(6) **A.      I've had a long career.  That's all that**

(7) **I can remember.**

(8) Q.      Okay.  Well, sometimes folks will say

(9) like two hundred times or something.  But maybe

(10) it's different for marshals.

(11) **A.      Well, I haven't don't it that many**

(12) **times.  Maybe once internally, but that would**

(13) **be it.**

(14) Q.      When you say "once internally," do you

(15) mean some kind of internal investigation with

(16) the U.S. Marshal Service, but not in court?

(17) **A.      Yes.**

(18) Q.      Okay.  Can you tell me everything that

(19) you had to prepare for today's deposition?

(20) **A.      I just spent maybe 45 minutes or so with**

(21) **Counsel Cerrone.**

(22) Q.      Okay.  Did you speak with anyone else in

(23) preparation for today's deposition?

(24) **A.      No.**

(25) Q.      Okay.  Like you didn't talk to any other

(1)                   CARLTON SMITH

(2)  task force members about what happened?

(3)  **A.      No.**

(4)  Q.      Okay.  Did you review any documents?

(5)  **A.      Yes.**

(6)  Q.      Okay.  What documents did you review?

(7)  **A.      I'm trying to go off my memory.  They**

(8)  **were shown to me that day, I'm just trying to**

(9)  **remember what they were.  I don't remember off**

(10) **the top of my head what they were.**

(11) Q.      Okay.  Were they like documents related

(12) to the incident that brings us here today, this

(13) lawsuit?

(14) **A.      Yes, yes.**

(15) Q.      Okay.  And do you remember the date of

(16) the incident that gives rise to this lawsuit?

(17) **A.      I believe it was 2021, maybe November,**

(18) **October, November.**

(19) Q.      Okay.  If I said it was September 15,

(20) 2021, does that sound right to you?

(21) **A.      I would concur.  I just don't remember**

(22) **the exact date.**

(23) Q.      Okay.  I'm just going to switch gears

(24) and ask you some background questions.  Let's

(25) start with your educational background.  Can

(1)                     CARLTON SMITH

(2)    you tell me what was your highest level of

(3)    education?

(4)    **A.      Some college.**

(5)    Q.      Okay.  Where did you do some college?

(6)    **A.      It was when I was in the military.**

(7)    **Central Tech, Texas.**

(8)    Q.      Okay, okay.  Central Tech, in Texas?

(9)    **A.      Yes.**

(10)   Q.      And what years did you go to Central

(11)   Tech?

(12)   **A.      I didn't actually go to the school.**

(13)   **There were classes.  It was back in the '90s.**

(14)   Q.      Okay.  And so when you say --

(15)   **A.      It would be better if I just said that I**

(16)   **graduated high school, that would be easier.**

(17)   Q.      Okay.  What year did you graduate high

(18)   school?

(19)   **A.      1995.**

(20)   Q.      And where did you go to high school?

(21)   **A.      Waverly Jr. Senior High School.**

(22)   Q.      And when is that located?

(23)   **A.      Waverly, New York.**

(24)   Q.      And can you gave me on overview of your

(25)   job experience been when you graduated high

CARLTON SMITH

(1)

(2) school in 1995 and when you joined the U.S.

(3) Marshal Service?

(4) **A.      After graduating high school, I joined**

(5) **the active duty U.S. Army, and that was for**

(6) **five years, active duty.  From there, I was**

(7) **employed with the Thornborough Prisons for two**

(8) **years.  After that, Federal Air Marshal with**

(9) **the Federal Air Marshal Service.  And then**

(10) **after that, the United States Marshal Service.**

(11) **I'm not sure of the years, I apologize.**

(12) Q.      Okay.  What year did you join the U.S.

(13) Marshal Service?

(14) **A.      2002.**

(15) Q.      So you must have been with the Federal

(16) Air Marshal Service for a short period of time?

(17) **A.      That's correct.**

(18) Q.      And what's the Federal Air Marshal

(19) Service?

(20) **A.      To provide security in U.S. air crafts**

(21) **over the skies.**

(22) Q.      Okay.  So you joined them shortly after

(23) 9/11?

(24) **A.      Correct.**

(25) Q.      Okay.  And what made you choose to join

(1)                    CARLTON SMITH

(2)    the U.S. Marshal Service?

(3)    **A.      I had applied for the U.S. Marshal**

(4)    **Service before becoming an Air Marshal, and it**

(5)    **took that long for the process to start.**

(6)    Q.      Okay.  And let me back up.  So you were

(7)    active duty with the Army from 1995 to 2000; is

(8)    that right?

(9)    **A.      Yes.**

(10)   Q.      Okay.  Were you ever deployed?

(11)   **A.      Yes.**

(12)   Q.      Okay.  What were your deployments?

(13)   **A.      To Bosnia.**

(14)   Q.      Was that it?

(15)   **A.      Yes.  I mean, there were other**

(16)   **institutions in America that I deployed to, but**

(17)   **they are not technically called deployments, if**

(18)   **you will.**

(19)   Q.      Okay.  I was just thinking oversea

(20)   deployments?

(21)   **A.      Overseas, just Bosnia and Hungary.**

(22)   Q.      Okay.  Did you see any combat?

(23)   **A.      It was a peace-keeping position after**

(24)   **the Bosnia war, no.**

(25)   Q.      And then you got out before the Iraq

(1)                    CARLTON SMITH

(2)    war?

(3)    **A.      Yes.**

(4)    Q.      Were you on reserves or anything after

(5)    active duty?

(6)    **A.      I was in IRR for a short time, but that**

(7)    **was it.**

(8)    Q.      Okay.  So you were never deployed after

(9)    that?

(10)   **A.      Correct.**

(11)   Q.      Okay.  So can you take me through your

(12)   job history with the U.S. Marshal Service since

(13)   you joined in 2002?

(14)   **A.      After getting hired, I went to the basic**

(15)   **academy.  After graduating, I went to the**

(16)   **District of Maryland.  And I was a deputy there**

(17)   **for approximately two to three years.  The key**

(18)   **word, "approximate."  From there, I became an**

(19)   **1811 Criminal Investigator, which at the time**

(20)   **was a basic promotion.  And then to the**

(21)   **District of Columbia Superior Court.  And I was**

(22)   **probably in Superior Court, for, again, three**

(23)   **or four years, approximately.  And then finally**

(24)   **getting transferred to the Rochester, New York,**

(25)   **office.  And that was in 2007 that I came to**

(1)                    **CARLTON SMITH**

(2)    **Rochester.**

(3)    Q.      Okay.  And when you were transferred to

(4)    Rochester, what was your title?

(5)    **A.      Deputy U.S. Marshal.**

(6)    Q.      Okay.  And is that the same as it is

(7)    today?

(8)    **A.      Yes.**

(9)    Q.      So like earlier, you said you became an

(10)   1811 Criminal Investigator and that was a

(11)   promotion.  Have you gotten any similar

(12)   promotions since you have been transferred to

(13)   Rochester?

(14)   **A.      At the time when I came on, you came on**

(15)   **as E82, basic Deputy Marshal.  You weren't**

(16)   **technically a criminal investigator yet.  You**

(17)   **had to go back to school again to become a**

(18)   **Criminal Investigator Deputy Marshal, so that's**

(19)   **what it was.  So it wasn't a promotion, if you**

(20)   **will.**

(21)   Q.      So when you were promoted to

(22)   Investigator, you had to go back to a new

(23)   academy?

(24)   **A.      The same academy, but a new class, yes.**

(25)   Q.      So do you still have the title of

(1)                    CARLTON SMITH

(2)    Investigator or are you just a Deputy U.S.

(3)    Marshal?

(4)    **A.      Everybody has the same title now.**

(5)    **Criminal Investigator Deputy U.S. Marshal, yes.**

(6)    Q.      Okay.  And generally, what are your job

(7)    duties on a day-to-day basis?

(8)    **A.      Right now?**

(9)    Q.      Correct.

(10)   **A.      Produce prisoners in court, judicial**

(11)   **security, securing the court room, transporting**

(12)   **prisoners, serving summons, subpoenas.  That's**

(13)   **the gist of it.**

(14)   Q.      Okay.  How much of your time is spent in

(15)   the courthouse versus like doing other tasks

(16)   out in the community?

(17)   **A.      At this time now?**

(18)   Q.      Well, yes.  Let me back up.  Is your

(19)   role, your job duties today, the same as they

(20)   were in 2021?

(21)   **A.      No.**

(22)   Q.      Okay.  What has changed since September,

(23)   2021?

(24)   **A.      In September of 2021, I was working**

(25)   **fugitive investigations.  And I'm no longer**

CARLTON SMITH

(1)

(2) **working fugitive investigations, I'm working**

(3) **courtroom security.**

(4) Q.    Okay.  So let me back up.  When did you

(5) begin doing fugitive investigations?

(6) A.    **I'm guessing I started doing those in**

(7) **Rochester -- do you mean in Rochester?**

(8) Q.    Sure.  Well, let's go back to the very

(9) beginning when you first ever started doing

(10) that.

(11) A.    **Probably when I was in Superior Court,**

(12) **in the District of Columbia.  Probably 2005ish.**

(13) Q.    And at that time, did you get any

(14) particular training about doing any fugitive

(15) investigations in 2005ish?

(16) A.    **Just the same two academies that**

(17) **everybody else has, plus additional inhouse**

(18) **training.**

(19) Q.    Okay.  So when you began doing fugitive

(20) investigation in D.C. around 2005, is that

(21) something that you had to apply for?

(22) A.    **At that time, we had to put in an**

(23) **internal request to do that, yes.**

(24) Q.    Okay.  So after you put in the internal

(25) request, what was the next step?

(1)                    CARLTON SMITH

(2)   **A.      Just an e-mail replying yes, you can**

(3)   **work fugitives on the warrant squad now.**

(4)   Q.      Okay.  And then after that, did you

(5)   receive any additional training about doing

(6)   fugitive investigations?

(7)   **A.      It was the same training that everybody**

(8)   **else has.  It was just out of the academy at**

(9)   **that time.**

(10)  Q.      So I guess my question is, it sounds

(11)  like to me that no, you didn't get any

(12)  additional training.  The only training that

(13)  you received was training at the academy?

(14)  **A.      I don't want to say that.  I don't know**

(15)  **if I can say no.  I think you are assuming.  I**

(16)  **can't remember exactly what interior training**

(17)  **that I had prior to starting warrants in**

(18)  **Superior Court.**

(19)  Q.      So I guess I'm familiar, for example,

(20)  with like the RPD Swat Team.  So that's kind of

(21)  how I'm analyzing it in my head.  You apply for

(22)  the swat team and you get specialized training

(23)  for swat.  Is there a similar specialized

(24)  training for fugitive investigations?

(25)  **A.      Not to start with, no.**

CARLTON SMITH

(1)

(2) Q.      Okay.

(3) A.      **No, you can go from court security to**

(4) **warrants today with just a manager telling you**

(5) **yes, you can.  That's all that it is.**

(6) **Because everybody has the same training.**

(7) **I mean, there is additional training.  Let's**

(8) **say next week if I start fugitives today, next**

(9) **week I can go to task force training that they**

(10) **do maybe once a year.**

(11) Q.      Okay.  So when you were in D.C., how

(12) long did you do fugitive investigations for,

(13) after you started it in approximately 2005?

(14) A.      **I don't recall.  Probably maybe two,**

(15) **three, years, at the most.**

(16) Q.      Okay.  And then you transferred to

(17) Rochester in 2007?

(18) A.      **Yes.**

(19) Q.      And after you transferred to Rochester,

(20) did you continue to do fugitive investigations?

(21) A.      **Initially, I was in courthouse security.**

(22) **We call it Operations.  And it encompasses**

(23) **everybody except working investigations.**

(24) Q.      Okay.  And when you say investigations,

(25) does that generally mean like investigating

(1)                      CARLTON SMITH

(2)    crimes?

(3)    **A.        Fugitive investigations.**

(4)    Q.     Okay.  And just so I understand,

(5)    fugitive investigations would be people who are

(6)    wanted on a warrant or have outstanding

(7)    criminal charges, but haven't yet been brought

(8)    into custody?

(9)    **A.        Yes, I think that's fair, yes.**

(10)   Q.     Okay.  And in Rochester, when did you

(11)   first start doing fugitive investigations?

(12)   **A.        Approximately, probably, 2008, I think,**

(13)   **give or take.  I don't know.  Early or late**

(14)   **2008.  Maybe late 2007.**

(15)   Q.     Okay.  So maybe a year or so after you

(16)   were transferred?

(17)   **A.        That's fair.**

(18)   Q.     And did you request to be transferred

(19)   back to Rochester?

(20)   **A.        Yes.**

(21)   Q.     Because it's your hometown?

(22)   **A.        It's as closest that I can get to the**

(23)   **hometown, yes.**

(24)   Q.     Okay.  And when you started to do

(25)   fugitive investigations sometime around 2008,

(1)                     CARLTON SMITH

(2)    in Rochester, did you have to get training

(3)    specific to doing fugitive investigations at

(4)    that time?

(5)    **A.      No.**

(6)    Q.      Okay.  Now, is what you have been

(7)    calling fugitive investigation, is that

(8)    something different from the fugitive task

(9)    force?

(10)   **A.      No, it's the same.**

(11)   Q.      Okay.  So when you do fugitive

(12)   investigations, does it mean that you are a

(13)   member of the fugitive task force?

(14)   **A.      Yes.**

(15)   Q.      And after you started doing fugitive

(16)   investigation around 2008, how long did you do

(17)   fugitive investigations for?

(18)   **A.      Probably until shortly after what I'm**

(19)   **here for today.**

(20)   Q.      So from about 2008 until sometime around

(21)   2022?

(22)   **A.      That's fair, yes.**

(23)   Q.      And during that time, did you have like

(24)   in-service trainings with the U.S. Marshal

(25)   Service?

(1)                    CARLTON SMITH

(2)  **A.     Yes.**

(3)  Q.     And what's the frequency that you do

(4)  internal trainings with the U.S. Marshal

(5)  Service?

(6)  **A.     That's hard to put a number on.  Mostly**

(7)  **each year, we have a week of task force**

(8)  **training.  But depending on the budget, there**

(9)  **may be a year that goes by that we don't.  But**

(10) **mostly, we have a week of training.**

(11)         **Other than that, some members of the**

(12) **task force put on their own training which**

(13) **involves building entry, foot movement,**

(14) **shooting.  There is various other trainings.**

(15) Q.     Okay.  And when you say -- so on an

(16) annual basis, you said generally there is about

(17) one week of task force training.  And when you

(18) say task force, you mean the fugitive task

(19) force; is that right?

(20) **A.     Yes.  That training is put on for the**

(21) **task force as a whole, yes.  But not everybody**

(22) **can always attend, yes.**

(23) Q.     So you said it may depend on the budget,

(24) so some years they may cancel it?

(25) **A.     Yes.**

CARLTON SMITH

(1)

(2)  Q.      Now, during the task force training, the

(3)  people that would attend that, is that just

(4)  U.S. Deputy marshals that are employed directly

(5)  by the federal government, like yourself?

(6)  **A.      No, that includes everybody on the task**

(7)  **force that is able to go.  Deputy U.S.**

(8)  **Marshals, county officers, city officers.**

(9)  **Whoever is available to go.**

(10) Q.      Okay.  So all of the local and state

(11) local officers that are deputies on the U.S.

(12) Task Force also?

(13) **A.      Yes.**

(14) Q.      And you said that those would be in

(15) various locations around the country?

(16) **A.      Yes.**

(17) Q.      Mostly on the eastern seaboard, yes?

(18) **A.      At that time.  But it's different now.**

(19) Q.      Okay.  When did that change?

(20) **A.      Well, back in 2010, 2011.  I mean, there**

(21) **is training put all over.  But mostly with our**

(22) **a week of task force training, it's usually in**

(23) **Atlantic City.**

(24) Q.      And is your tasks force the Great Lakes

(25) Task Force?

```
(1)                    CARLTON SMITH
(2)    A.       No.
(3)    Q.       Okay.  Which once is yours?
(4)    A.       Rochester falls under the Regional New
(5)    Jersey Task Force.
(6)    Q.       And you said that the annual trainings
(7)    are usually in Atlantic City?
(8)    A.       Usually, yes.
(9)    Q.       And where else?
(10)   A.       In Utica, New York, that I have been to.
(11)   I forgot what that venue is called there.
(12)   Q.       And when you go to these task force
(13)   trainings, do they provide you, for example,
(14)   handouts and lesson plans?
(15)   A.       No.  They tell us what the training
(16)   consists of, but there is no handouts or lesson
(17)   plans.
(18)   Q.       Okay.  How would they tell you?
(19)   A.       You were out on the first day.  Somebody
(20)   greets you.  Usually, we know who it is.  They
(21)   will say this is what we are going to do
(22)   tomorrow, and the next day, and the next day.
(23)   It's just verbal.
(24)   Q.       And how are you alerted to the training;
(25)   like who organizes the training?
```

CARLTON SMITH

(1)

(2) **A.      That's an echelon or two above me.  I**

(3) **don't have the answer to that.**

(4) Q.      Okay.  And who will tell you there is a

(5) training that's happening in two months and in

(6) Atlantic City and you have to go?  How would

(7) that be communicated to you?

(8) **A.      It would come from the supervisor.**

(9) Q.      So if your title is Deputy U.S. Marshal,

(10) what's the title of your supervisor?

(11) **A.      Supervisory Deputy U.S. Marshal.**

(12) Q.      Okay.  I'm assuming you have had

(13) different supervisory deputy officers

(14) throughout your time?

(15) **A.      Yes.**

(16) Q.      Have you had only a few or ten?

(17) **A.      A handful.  It's hard to put a number on**

(18) **it.  Maybe five or six, at the most.**

(19) Q.      Okay.  And can you give me their names

(20) that you remember?

(21) **A.      Probably Shane Marshall.**

(22) Q.      Currently?

(23) **A.      Current, Shane Marshall (phonetic), yes.**

(24) **And there has been Aaron Ward (phonetic).  Dan**

(25) **Larish (phonetic), who is now retired.  Charles**

**CARLTON SMITH**

(1)

(2) **Salina (phonetic), who is now the U.S. Marshal.**

(3) **That covers everybody that I can recall.**

(4) Q.      Okay.  We have Shane Marshall, Aaron

(5) Ward, Dan Larish and Charles Salina?

(6) **A.      Yes.  And there were a couple of people**

(7) **who might have acted at the time.**

(8) Q.      Okay.  And those would be your direct

(9) supervisor who would review, I don't know, if

(10) there was an incident, you would go over what

(11) happened with them after the incident?

(12) **A.      Yes.**

(13) Q.      And so for example, if you had a

(14) use-of-force incident, they would review your

(15) reports and talk to you about them afterwards?

(16) **A.      Yes.**

(17) Q.      And going back to training, you said

(18) that in addition to the one-week task force

(19) trainings that would occur on an annual basis,

(20) some task members would hold their own

(21) trainings; is that what you said?

(22) **A.      Yes.**

(23) Q.      And can you tell me what you mean by

(24) that?  Do you mean like one agency like the

(25) County Sheriff's Office would have a training

                          CARLTON SMITH

(1)

(2)  that you guys would attend?

(3)  A.     Yes, that's a good example, yes.

(4)  Q.     And would that be organized by a task

(5)  force member who is --

(6)  A.     Correct, yes.

(7)              MR. SHIELDS:  And to the

(8)          extent -- I know that there were some

(9)          training sign-in sheets.  But to the

(10)         extent that there is actual materials

(11)         from any of these trainings that Deputy

(12)         Smith has attended, we just make a

(13)         demand for any materials from the

(14)         trainings, communications about the

(15)         trainings.

(16)             MR. CERRONE:  I would ask that

(17)         you follow up in writing and we will be

(18)         happy to take a look at it.

(19)             MR. SHIELDS:  Okay.

(20)  Q.     All right, so let me ask you this.  If

(21)  there were trainings put on by task force

(22)  members, is there somebody, I don't know, who

(23)  would take the lead in putting on those

(24)  trainings; how would that work, generally?

(25)  A.     For example, there is Christian

CARLTON SMITH

(1)

(2) **DeVinney, who was -- and I don't know if he**

(3) **still is a -- swat officer.  And he would put**

(4) **on his trainings sometimes and invite the task**

(5) **force to attend those.  That's the best**

(6) **example.**

(7) Q.    So Christian DeVinney is with the New

(8) York County Sheriff's Office, right?

(9) **A.    Yes.**

(10) Q.    And he would do swat trainings for the

(11) New York County Sheriff's Office and invite --

(12) **A.    No, no.**

(13) Q.    Okay.

(14) **A.    He is a swat member and part of his swat**

(15) **training, sometimes he would help put on some**

(16) **training for just the task force guys.**

(17) Q.    Okay.  So it wouldn't be like he has a

(18) county swat training and he would invite you.

(19) Instead, he would organize specific training

(20) for the task force?

(21) **A.    Yes.**

(22) Q.    So at those trainings, there are task

(23) force members that would attend?

(24) **A.    For the most part, yes, that I can**

(25) **recall.**

(1)                    **CARLTON SMITH**

(2)    Q.      Okay.  Other than Christian DeVinney, do

(3)    you remember any other task force members that

(4)    organizing training for the task force?

(5)    **A.      If there are, I don't know.**

(6)    Q.      But you specifically remember DeVinney

(7)    doing trainings?

(8)    **A.      Yes.**

(9)    Q.      And how often would DeVinney organize

(10)   training for the task force?

(11)   **A.      That's hard to put a number on.  I**

(12)   **can't -- I don't know offhand.  It was just**

(13)   **random, if you will.  I don't know how to**

(14)   **explain that.  I'm not sure how to answer that**

(15)   **question better.  It was random.**

(16)   Q.      Okay.

(17)              **MR. SHIELDS:  And to the extent**

(18)         **it wasn't covered in the previous**

(19)         **demands, we would demand specific**

(20)         **trainings organized by Christian**

(21)         **DeVinney as well.**

(22)              **MR. CERRONE:  Okay, no problem.**

(23)         **Just follow up with an e-mail.**

(24)              **MR. SHIELDS:  Sure, thanks.**

(25)   Q.      And during your time on the task force,

(1)                  CARLTON SMITH

(2)    can you estimate how many trainings that you

(3)    attended that were organized by DeVinney?

(4)    **A.       That's hard to put a number on.  Three**

(5)    **to four times, maybe more, maybe less.  It's**

(6)    **hard to put a number on that because it's been**

(7)    **so long.**

(8)    Q.       Sure.  In your time on the task force

(9)    since coming to Rochester, how many trainings

(10)   did you attend that were hosted by the U.S.

(11)   Marshal Service?

(12)   **A.       Probably, at least five, six, seven**

(13)   **times.  That's a fair number.  I can't -- it's**

(14)   **hard to give an exact numbers.**

(15)   Q.       And were those U.S. Marshal Service

(16)   trainings all like week-long trainings?

(17)   **A.       Not all of them.  And the week long,**

(18)   **usually, Sunday or Monday would be your travel**

(19)   **day.  And you were training Tuesday, Wednesday,**

(20)   **Thursday.  And maybe Friday, Saturday would be**

(21)   **your travel back.**

(22)   Q.       Okay.  So you basically get a week to go

(23)   to the training, but there are travel days

(24)   built in also?  So not every day was a training

(25)   day?

(1)                    CARLTON SMITH

(2)    **A.        Correct.**

(3)    Q.        And how about the DeVinney trainings?

(4)    Since they were local, would it be one-day

(5)    trainings or something different?

(6)    **A.        Usually a one-day training.**

(7)    Q.        Like a four-hour block or an eight-hour

(8)    block?

(9)    **A.        That's fair.**

(10)   Q.        And those local trainings, where would

(11)   they take place?

(12)   **A.        Some of the internal ones that have been**

(13)   **put on by the Marshall Service have been in**

(14)   **Alden, New York.  I think it's the Erie County**

(15)   **shooting range.  Sometimes at the RPD West**

(16)   **office, there is a formal training facility**

(17)   **there.  There was one more out on the east side**

(18)   **of Rochester, but I don't know what that is.**

(19)   **And I think that's it, I think.**

(20)   Q.        I know that there is like a training

(21)   center on Scottsville Road; do you go there?

(22)   **A.        Many, many, years ago.  But that was not**

(23)   **for task force training.**

(24)   Q.        Okay.  Are there any other task force

(25)   trainings that we haven't spoken about?

CARLTON SMITH

(1)

(2)    A.    None that I can think of.

(3)    Q.    Okay.  Now, are you taught that as a

(4)    U.S. Marshal and the law enforcement arm of the

(5)    federal government, that the U.S. Marshal

(6)    aspires to be like a leader in law enforcement

(7)    agencies around the country?

(8)                    MR. CERRONE:  Objection to the

(9)            form of the question.  You can answer.

(10)    A.    I would have -- if you could rephrase

(11)    that.  I'm not sure what you mean by that.

(12)    Q.    Sure.  You know, as the law enforcement

(13)    agency for the federal government, does the

(14)    U.S. Marshal Service aspire to be a role model

(15)    for other U.S. agencies?

(16)    A.    I'm not sure how to answer that.  I

(17)    don't know if that's a -- I don't know how to

(18)    answer that.

(19)    Q.    Sure.

(20)    A.    I think every agency probably has this

(21)    feeling.  No one thinks they are better than

(22)    anyone else.  Everyone aspires to be the best

(23)    that they can be.

(24)    Q.    Okay.  Do the U.S. Marshals, for

(25)    example, try to be a leader in best practices

(1)                    CARLTON SMITH

(2)    as an agency?

(3)    **A.     As an agency, I would agree that that's**

(4)    **a fair statement.**

(5)    Q.     Okay.  Other than apprehending

(6)    fugitives, does the task force do anything

(7)    else?

(8)    **A.     No, not that I can think of.**

(9)    Q.     Okay.  And I just want to go back to the

(10)   academy.

(11)   **A.     Yes.**

(12)   Q.     And how long was that academy training?

(13)   **A.     I want to say it was ten weeks.**

(14)   Q.     And where was that training?

(15)   **A.     At the Federal Law Enforcement Training**

(16)   **Center, in Waco, Georgia.**

(17)   Q.     Okay.  And you received training about

(18)   proper police procedures and practices, stuff

(19)   like that?

(20)   **A.     Yes, that's fair, yes.**

(21)   Q.     Use of force?

(22)   **A.     Yes.**

(23)   Q.     Deadly physical force?

(24)   **A.     Lethal force, control antics, all the**

(25)   **way up to lethal force, yes.**

```
                        CARLTON SMITH
```

(1)

(2)    Q.     Okay.  Civil rights?

(3)    **A.     Through our legal classes, yes.**

(4)    Q.     So for example, you learned like

(5)    probably cause?

(6)    **A.     There were basic legal classes.**

(7)    Q.     So you learned like the laws of arrest?

(8)    **A.     Most of it entailed 4th Amendment**

(9)    **issues.**

(10)   Q.     So that would include like use of force

(11)   and whether or not you had a legal basis to

(12)   arrest somebody for committing a crime?

(13)   **A.     Yes.**

(14)   Q.     Okay.  Stuff like treatment of

(15)   prisoners?

(16)   **A.     Yes.**

(17)   Q.     And so through that training, you became

(18)   familiar with good and anticipated police

(19)   practices and procedures?

(20)   **A.     That's fair, yes.**

(21)   Q.     With like the professional standards of

(22)   care for police officers?

(23)   **A.     Yes.**

(24)   Q.     Okay.  And I know that, for example,

(25)   like local police departments have like patrol

(1)                    CARLTON SMITH

(2)    guides.  Does the U.S. Marshal Service have

(3)    something like that?

(4)    **A.        SOPs, I think you are getting at.**

(5)    Q.      All right.  So those are Standard

(6)    Operation Procedures?

(7)    **A.        Yes.  And I think that every office has**

(8)    **it.**

(9)    Q.      So does the Rochester office have like a

(10)   standard operation procedures manual where they

(11)   are compiled in one place?

(12)   **A.        I think there is SOPs, yes.**

(13)              **MR. SHIELDS:  And Counsel, to**

(14)        **the extent that there is a Standard**

(15)        **Operating Procedures manual, we will**

(16)        **call for production of that.**

(17)              **MR. CERRONE:  Okay, taken under**

(18)        **advisement.  Just put it in writing,**

(19)        **please.**

(20)   Q.      Does the Fugitive Tasks Force, have its

(21)   own specific standard operating procedures

(22)   manual?

(23)   **A.        Yes.**

(24)   Q.      Any kind of like rules or regulations

(25)   that apply just specifically to the Fugitive

```
(1)                    CARLTON SMITH
(2)    Tasks Force?
(3)    A.      No.  None that I'm aware of.
(4)    Q.      Okay.  And one thing you learned in all
(5)    of that training that we spoke about is that
(6)    law enforcement officers are required to make
(7)    safe decisions, correct?
(8)              MR. CERRONE:  Objection to the
(9)         form of the question.
(10)             MR. SHIELDS:  Can you please
(11)        read that question back?
(12)             (Whereupon, the record was read
(13)        by the reporter.)
(14)             MR. CERRONE:  Objection.
(15)   A.      Everybody wants to make safe decisions.
(16)   Everybody tries to make safe decisions.  I
(17)   don't think -- I think it's more of a
(18)   common-sense thing that you make a safe
(19)   decision or want to make a safe decision.  I'm
(20)   not sure how to answer that question other than
(21)   that.
(22)   Q.      Sure.  Let me ask it in a different way.
(23)   As a law enforcement officer, you are never
(24)   permitted to expose the public to unnecessary
(25)   harm; would you agree with that?
```

(1)                    CARLTON SMITH

(2)  **A.     As an LEO working with fugitives, you**

(3)  **want to try to limit your exposure to the**

(4)  **public, as best you can.**

(5)  Q.     So sometimes there will be necessary

(6)  exposure to harm.  But my question is, you are

(7)  not permitted to unnecessarily expose the

(8)  public to harm?

(9)  **A.     I'm going to have to ask you to rephrase**

(10) **that, I'm sorry.**

(11) Q.     Okay, sure.  So my question was, as a

(12) law enforcement officer, you are not supposed

(13) to expose the public, unnecessarily, to threat

(14) or harm?

(15)           **MR. CERRONE:  Objection to the**

(16)      **form of the question.**

(17) **A.     I would just say you don't want to**

(18) **unnecessarily exposed the public.  There is no**

(19) **written requirement.**

(20) Q.     Sure.  So let's say there is two choices

(21) that you have and choice once is a safer than

(22) choice two.  Would you say you are required to

(23) go with choice one if choice two unnecessarily

(24) exposes the public to harm?

(25)           **MR. CERRONE:  Objection to the**

(1)                    **CARLTON SMITH**

(2)          **form of the question.**

(3)   **A.      Everybody tries to be as safe as**

(4)   **possible.**

(5)   Q.      Okay.  So you would want to avoid

(6)   placing yourself or your team in unnecessary

(7)   danger; is that correct?

(8)   **A.      That's correct.**

(9)   Q.      And you would want to not expose the

(10)  public to unnecessary danger, correct?

(11)  **A.      Correct.**

(12)  Q.      And one thing that you learned in your

(13)  training is that entry into an unoccupied

(14)  building is inherently dangerous, correct?

(15)  **A.      The entire job is dangerous, not just a**

(16)  **building.  It could be the front yard.  For**

(17)  **example, what just happened in Charlotte.  It**

(18)  **doesn't matter if it is in a building or not in**

(19)  **a building.**

(20)  Q.      So I guess my question was, in your

(21)  training, did they specifically say in any of

(22)  your trainings that entry into an unoccupied

(23)  building is more dangerous than certain other

(24)  tasks, which are still dangerous, but, you

(25)  know?

CARLTON SMITH

(1)

(2) **A.      I'm not sure what your exact question**

(3) **is.  Can you rephrase, maybe?**

(4) Q.      Sure.  I mean one of the things that I

(5) read is that entry into a building is something

(6) that marshals are taught is inherently

(7) dangerous; would you agree to that?

(8) **A.      Yes, that's fair.  I would agree.**

(9) Q.      And would you agree that entry into an

(10) unoccupied building is more dangerous than

(11) other situations that you have encountered on

(12) the job?

(13)              **MR. CERRONE:  Objection to the**

(14)         **form of the question.  You can answer.**

(15) **A.      I don't think it is any more dangerous**

(16) **than going into an unoccupied building.  It**

(17) **could be standing outside it the front yard**

(18) **with a gun.  It's just as dangerous as if he is**

(19) **in the house.**

(20) Q.      Okay.  But if he is standing in the

(21) front yard without a gun, it might be less

(22) dangerous than entry into a house where there

(23) is a gun hidden in a draw that he could access,

(24) right?

(25) **A.      If he is not in handcuffs.  I don't know**

(1)                    **CARLTON SMITH**

(2)  **if he has a gun in the front yard.  If he is**

(3)  **already in custody, then I would say that is**

(4)  **more safe, yes.**

(5)  Q.     Okay.  How about entry into a home

(6)  versus like making a controlled car stop?

(7)               MR. CERRONE:  Objection to the

(8)          form of the question.  You can answer.

(9)  **A.     I wouldn't say it's anymore dangerous.**

(10) **I think that maybe another officer might agree**

(11) **or disagree with that, or with me.**

(12) Q.     Okay.  Were you ever taught that, in

(13) your training, that entry into an unoccupied

(14) building to apprehend a fugitive should be a

(15) tool of last resort?

(16) **A.     No.**

(17) Q.     Okay.  So you were never taught that

(18) entry into an unoccupied building to apprehend

(19) a fugitive should be done after other measures

(20) of arrest have failed?

(21) **A.     No.  It's inherently obvious that it**

(22) **might be more dangerous, but there is nothing**

(23) **that says you have to do that last, no.**

(24) Q.     So you were never trained that since it

(25) may be more dangerous, you should attempt to

CARLTON SMITH

(1)

(2) apprehend the fugitive, in other ways first?

(3) **A.    No.  I mean, you can try to apprehend in**

(4) **other ways first.  But there has never been**

(5) **anything taught or in policy that says that.**

(6) Q.    In practice as your time on the U.S.

(7) Task Force, has it been your practice to try

(8) other methods before making an entry in, let's

(9) say, a residence?

(10) **A.    I think that each situation is**

(11) **different.  Each investigation is different.**

(12) Q.    So can you give on me an example where

(13) you would attempt to apprehend someone another

(14) way prior to gaining entrance into the

(15) residence?

(16) **A.    The best that I can say is depending on**

(17) **where the target is, if you will, the fugitive,**

(18) **it might depend on where there are.  If you**

(19) **know at the time that they are in the house,**

(20) **then you are going to try to go in the house.**

(21) **Or maybe if you know for a fact there are guns**

(22) **there, you may wait for them to come outside.**

(23) **Each situation is different.**

(24) **    Or if the target you are following is in**

(25) **a car, you might try to stop the car.  Or if**

**CARLTON SMITH**

(1)

(2) **it's in the public where too many people are**

(3) **around, you might wait for him to go in the**

(4) **house.  Each situation is different.**

(5) Q.      So if a situation where you may think

(6) there may be guns in the house, is that a time

(7) that you may try to apprehend them at a

(8) different location?

(9) **A.      If we notice there are guns in the**

(10) **house, odds are, we are going to try not to go**

(11) **in the house.**

(12) Q.      So would that mean that if you do plan

(13) to enter the house, that would generally mean

(14) that you don't have an indication that there

(15) are guns in the house?

(16) **A.      Well, it depends on a lot of things.**

(17) **The criminal history, if we know there is guns.**

(18) **Everybody might have a gun.  We always go in**

(19) **the situation knowing that whoever we are going**

(20) **after, they might have a gun.  So you try to be**

(21) **as safe the possible.**

(22) Q.      So for example, if you are doing your

(23) surveillance of a house and the person leaves,

(24) you might signal the task force, say, hey we

(25) are tailing this fugitive, he is in a 2004 four

(1)                    CARLTON SMITH

(2)    BMW.  We are going to track him and try to stop

(3)    them.  Is that an example?

(4)    **A.      Has that happened, yes.**

(5)    Q.      Okay.  So that's just like --

(6)    **A.      That could happen, yes.**

(7)    Q.      Okay.

(8)    **A.      I'm not sure what else to say.  I mean,**

(9)    **there is many different ways.**

(10)   Q.      Sure.  When you are planning to

(11)   apprehend a fugitive, does the task force

(12)   develop like an operational plan?

(13)   **A.      It tries to, yes.**

(14)   Q.      So the operational plan, it would be

(15)   whatever is appropriate for the situation?

(16)   **A.      In general, yes.**

(17)   Q.      So that would take into consideration

(18)   various factors?

(19)   **A.      That's fair, yes.**

(20)   Q.      So before you develop an operational

(21)   plan, you would do, for example, scouting of

(22)   the residence if you were planning on arresting

(23)   them at their home?

(24)   **A.      A lot of surveillance, yes.  Depending**

(25)   **on who we are going after, it would involve a**

(1)                    **CARLTON SMITH**

(2) **lot of surveillance, yes.**

(3) Q.    And when you say "a lot of

(4) surveillance," could you describe, typically,

(5) what that would mean?

(6) **A.    The surveillance, we are usually going**

(7) **to try to see if the person who are going after**

(8) **is there after whatever we are watching.**

(9) Q.    Okay.  And is there any other

(10) information that you are trying to gather

(11) through surveillance?

(12) **A.    Well, everything that we see while we**

(13) **are doing surveillance obviously plays a part**

(14) **in decisions that we make.  For example, if**

(15) **there are kids present, if there is other**

(16) **people that come in.  There is a lot of things**

(17) **that come into play.  But I would say for the**

(18) **most part, most of the surveillance we do is to**

(19) **see if the person is there.**

(20) Q.    And for example, you mentioned kids.  So

(21) you are looking for other factors to see if you

(22) can execute the warrant safely at that

(23) location?

(24) **A.    That's fair.**

(25) Q.    You are looking for things like

(1)                    CARLTON SMITH

(2)    aggressive dogs that might live at the home?

(3)    **A.      That's fair, yes.**

(4)    Q.      Other occupants of the residence?

(5)    **A.      That's fair.**

(6)    Q.      And I guess, you mentioned guns before.

(7)    Any indication that the person might have guns

(8)    in the residence?

(9)    **A.      Usually, we don't get to see that during**

(10)   **surveillance.  But, yes.**

(11)   Q.      Any like particular, the layout of the

(12)   home, stuff like that?

(13)   **A.      That's hard to gather from surveillance.**

(14)   Q.      And in addition to surveillance, you

(15)   would gather intelligence?  I think that's

(16)   something that you mentioned?

(17)   **A.      In general, yes.**

(18)   Q.      And can you describe like the

(19)   intelligence-gathering process?

(20)   **A.      I think we kind of just went over it.**

(21)   **I'm not sure how to answer it, just by watching**

(22)   **it.**

(23)   Q.      So in addition to scouting the location,

(24)   what other types of gathering of the suspect

(25)   takes place?

(1)                    CARLTON SMITH

(2)    **A.    Doing background work, computer work,**

(3)    **looking for who might be family, who might not**

(4)    **be family, does this person go to this**

(5)    **particular address.  We get that, talking to**

(6)    **the neighbors, other family members.  That's**

(7)    **probably the gist of it.**

(8)    Q.    And I think some of the stuff you

(9)    mentioned earlier was looking into their

(10)    criminal history?

(11)    **A.    Yes.**

(12)    Q.    Trying to determine if they had

(13)    committed violent crimes previously?

(14)    **A.    Yes.  But I would look at it again, me**

(15)    **personally.  Me personally, you always think**

(16)    **that someone would have a gun on them.  And**

(17)    **when I look at criminal history, it would tell**

(18)    **you if this person had ever been arrested at**

(19)    **that address.**

(20)    Q.    So you anticipated one of my questions,

(21)    which would be how would you make a

(22)    determination of whether you think the person

(23)    might have a gun at that location.

(24)    **A.    You wouldn't make that determination.**

(25)    Q.    But you said that you assume at any time

(1)                        CARLTON SMITH

(2)     that you enter a residence, that that person

(3)     might have a firearm?

(4)     **A.      I try to assume that everybody is**

(5)     **dangerous, yes.**

(6)     Q.      And how do you take into account the

(7)     operational plan, you know?  How to execute the

(8)     arrest safely assuming that the person might

(9)     have a gun?

(10)    **A.      I'm not sure what you mean, exactly.**

(11)    **I'm sorry.  Be maybe if you can reword that?**

(12)    Q.      So if you guys sat down to make the

(13)    operational plan, what do you say when you say,

(14)    okay, I'm going to make entry, he might have a

(15)    gun, and this is how we are going to proceed?

(16)    **A.      I'm not sure.**

(17)    Q.      How do you take that into account when

(18)    you are trying to determine how to safely

(19)    apprehend the fugitive?

(20)    **A.      Many times, operational plans are not**

(21)    **sitting down and talking to your team mates.  A**

(22)    **lot of times, it's immediate over the radio or**

(23)    **even when you get out of the car, you try to go**

(24)    **back to your training in that scenario.  You**

(25)    **try to go back to your training and be as safe**

(1)                    CARLTON SMITH

(2)    as possible.

(3)    Q.    So just to back up.  Like for example,

(4)    when I'm thinking about an operational plan, I

(5)    guess one thing that I'm thinking, which may be

(6)    a disconnect with us, you say okay, we need to

(7)    apprehend this person -- withdrawn.  What's the

(8)    process when the task force gets a request to

(9)    apprehend a fugitive; what's the first thing

(10)   that happens?

(11)   **A.    There is a couple of different ways.**

(12)   **Number one, if it is a federal case, meaning a**

(13)   **U.S. Fugitive court signs a warrant, those**

(14)   **warrants almost automatically goes into your**

(15)   **warrant system, if you will.  Number two, if a**

(16)   **county or a local department has a case that**

(17)   **they want to work, they always bring it to the**

(18)   **U.S. Marshal's office or relay it to the**

(19)   **deputy.  And they have to put that warrant into**

(20)   **your warrant system to adopt the case.  I think**

(21)   **that's what your question is.**

(22)   Q.    Sure.  So yes.  And then after that,

(23)   when the task force says, okay, we are going to

(24)   apprehend this person, what's the next step

(25)   that takes place for determining how that

(1)                     CARLTON SMITH

(2) person will be apprehended?

(3) A.      Usually, the case agent conducts their

(4) own investigation try to get the background of

(5) the case, any intelligence that they can come

(6) up with.  If there is surveillance to be done,

(7) they might be the task force to do the

(8) surveillance.  They might get intelligence that

(9) their investigators, detectives, and pass along

(10) to the task force.

(11)         But the next step would be if one of the

(12) case agents says, "I want to work this case

(13) today," and there may be surveillance at the

(14) address.

(15) Q.      Now, who is the case agent; is that a

(16) task force member or something else?

(17) A.      Any specification?

(18) Q.      Yeah, generally?

(19) A.      Whoever brings the case to the task

(20) force.  For example, if it's a county case, the

(21) County Deputy would bring the case and the task

(22) force would be the agent.

(23) Q.      So that person would not necessarily be

(24) a member of the task force?

(25) A.      No, they usually are a member of the

(1)                    **CARLTON SMITH**

(2)    **U.S. Task Force.**

(3)    Q.    Okay.  So let's say there is a fugitive,

(4)    a task force member would be contacted by

(5)    like -- so in this case, there was a warrant

(6)    out of Wayne County.  So someone would contact

(7)    a task force agent about bringing the task

(8)    force?

(9)    **A.    The case agent explains to the task**

(10)   **force yes.  But not for the whole case, but for**

(11)   **means of arresting that person, yes.  That's**

(12)   **the case agent who is assigned to the task**

(13)   **force.**

(14)   Q.    Okay.  So the case agent would be the

(15)   point-person for figuring out logistics or

(16)   planning for the apprehension?

(17)   **A.    For the most part, that's fair, yes.**

(18)   Q.    Okay.  And in the case that we are here

(19)   to talk about, about Dedrick James, do you know

(20)   who the case agent was?

(21)   **A.    Jeffrey Ulatowski.**

(22)   Q.    Okay.  So he was like a team leader?

(23)   **A.    He was the case agent.**

(24)   Q.    And the team "leader," is that like a

(25)   specific term?  Is that a different role that

(1)                    CARLTON SMITH

(2) someone has on the task force?

(3) **A.      Yes, that's fair, yes.**

(4) Q.      And so I guess that brings me to, are

(5) there specific roles that people have assigned

(6) to them on the task force?

(7) **A.      Not specific, no.  We try to always have**

(8) **a team leader, but nobody has a specific role.**

(9) **I'm not sure how to answer that.**

(10) Q.      Sure.  So for example, with the RPD Swat

(11) Team, there is like a commander and an

(12) assistant command or, and then individualized

(13) teams like a sniper team, and it's all broken

(14) down and they have a hierarchy.  Does the task

(15) force have anything like that?

(16) **A.      No, the task force has a commander out**

(17) **in New York City and a deputy commander out in**

(18) **New York City.  But down in Rochester, you try**

(19) **to have a team leader, but there is no one like**

(20) **that in the office or the Buffalo office.**

(21) Q.      Okay.  And at the time of this incident

(22) in September of 2021, do you know who the team

(23) leader was?

(24) **A.      It might have been myself or Christian**

(25) **DeVinney.  I don't think it was -- I would say**

(1)                    **CARLTON SMITH**

(2)    **either myself or Christian, whoever was on**

(3)    **scene.  That's the best answer I can give.**

(4)    Q.    Okay.  Is that person's role to kind of

(5)    take operational command at the scene or

(6)    something else?

(7)    **A.    Usually.**

(8)    Q.    Okay.

(9)              **MR. SHIELDS:  Let's take a quick**

(10)        **break.**

(11)              **MR. CERRONE:  Sure.**

(12)              **(Whereupon, a recess was taken**

(13)        **at this time.)**

(14)              **MR. SHIELDS:  Can I please have**

(15)        **this marked?**

(16)              **(Whereupon, a color photocopied**

(17)        **Training Records document was marked as**

(18)        **Plaintiff's Exhibit 1, for**

(19)        **identification, as of this date.)**

(20)    Q.    So the first exhibit, it's a document

(21)    that was exchanged by your attorney.

(22)              **MR. SHIELDS:  And for the**

(23)        **record, it's BATES number 525 to 543.**

(24)    Q.    So these are training records on your

(25)    screen.  This is just the cover page.  Can you

(1)                    CARLTON SMITH

(2)    see that (indicating)?

(3)    **A.      Yes.**

(4)    Q.      So I'm just going to scroll through them

(5)    (complies).  So they are just basically

(6)    entitled Training Attendance Records.  So, my

(7)    first question, when you go to the trainings

(8)    that you described earlier, there would be a

(9)    sign-in sheet?

(10)   **A.      Yes.**

(11)   Q.      And I guess this first one doesn't

(12)   really have any information about what the

(13)   training was, right?

(14)   **A.      Yes.  That does not appear to, no.**

(15)   Q.      So I'm just going to scroll through

(16)   these (complies).  And this one says Deputy

(17)   Travel Course, but it doesn't list you, it only

(18)   has Ulatowski.  And this one on Page, BATES 531

(19)   (indicating), so it says District Building

(20)   Entry Training 9/9/2016.  Do you have any

(21)   recollection of that training at all?

(22)   **A.      No.**

(23)   Q.      And it says 9:00 a.m. to 17:00 hours, so

(24)   that would be 9:00 to 5:00 training?

(25)   **A.      Yes.**

(1)                    **CARLTON SMITH**

(2)    Q.      But as we sit here today, you don't have

(3)    a recollection of what that training entailed?

(4)                    **MR. CERRONE:  Objection.  You**

(5)            **can answer.**

(6)    **A.      Other than the title, no.**

(7)    Q.      Okay.  And this looks like it is an

(8)    eight-hour training.  Do you know if this would

(9)    have been a portion of one of those week-long

(10)   trainings or something else?

(11)   **A.      I would be speculating on what it is.  I**

(12)   **can do that.**

(13)                   **MR. CERRONE:  No.**

(14)                   **THE WITNESS:  Okay.**

(15)   Q.      Well, my question is, it looks like a

(16)   one-day training that you took.  So I wanted to

(17)   ask some questions about it.  But if you don't

(18)   have any recollection, then, I guess there's no

(19)   questions for me to ask.

(20)   **A.      Okay.**

(21)   Q.      And I mean, District Building Entry

(22)   Training, does that ring a bell for you at all

(23)   about what that would be about?

(24)   **A.      In general, yes.  But what we did that**

(25)   **day, I don't remember.**

(1)                          **CARLTON SMITH**

(2)    Q.       Okay.  In general, what would that be?

(3)    **A.       I'm guessing, I'm guessing.  Again, I'm**

(4)    **speculating.  Just entry training into a**

(5)    **building.**

(6)    Q.       Okay.

(7)    **A.       And to what building, I couldn't tell**

(8)    **you.**

(9)    Q.       Okay.

(10)                     **MR. SHIELDS:  And Counsel, to**

(11)            **the extent it hasn't been produced, we**

(12)            **demand any training materials with**

(13)            **respect to this specific training on**

(14)            **September 9, 2016.**

(15)                     **MR. CERRONE:  Okay.  Please put**

(16)            **it in writing and we will take it under**

(17)            **advisement.**

(18)    Q.       Okay.  So now we are on Page 535.  Now

(19)    this one is dated June 22, 2021.  And the

(20)    course title was Tax Shooting Day Two of Two.

(21)    Looking at this page, do you have any

(22)    recollection of this training?

(23)    **A.       No.**

(24)    Q.       And again, it looks like -- well, it

(25)    says starting at 9:00, ending at 17:308.  Would

(1)                    CARLTON SMITH

(2)     that mean a little after 5:00 p.m.; if you have

(3)     any idea?

(4)     **A.      I'm going to guess that's a typo by**

(5)     **whoever put it in, but I don't know.**

(6)     Q.      Okay.  Now earlier when you were talking

(7)     about the week-long training, do you recall

(8)     throughout your career periodically having just

(9)     one-day eight hour trainings like this?

(10)    **A.      Yes, I know we have.  Exactly what they**

(11)    **were, I don't know as we sit here.  But, yes.**

(12)    Q.      Okay.  Some agencies have, for example,

(13)    requirements of a certain number of training

(14)    hours that need to be completed on a regular

(15)    basis.  Do the marshals have any requirements

(16)    like that?

(17)    **A.      I don't know.  At the time, I don't**

(18)    **think so.**

(19)    Q.      But your supervisors never came to you

(20)    and said, hey deputy, you have to complete

(21)    another four hours to make sure that you have

(22)    your numbers of hours this year?

(23)    **A.      No.**

(24)    Q.      Okay.  I'm not sure what this

(25)    handwritten page goes to.  It look like a U.S.

(1)                    CARLTON SMITH

(2)    M428, which would be this form right here

(3)    (indicating).  "Instructions, use form to keep

(4)    a record of individuals attending and

(5)    completing training classes."  Does that make

(6)    sense?

(7)    **A.     I apologize.  What was the question**

(8)    **again?**

(9)    Q.     The question is, there is no sign-in

(10)   sheet because blank is an idiot and forgot the

(11)   print the U.S. M428.  So this looks like a

(12)   sign-in sheet for some training?

(13)   **A.     Yes.**

(14)   Q.     Okay.  And here is your name and this is

(15)   a training, Page BATES Number 538.  The course

(16)   title High Risk Vehicle Operations, Western New

(17)   York.  And it was dated May 11th to May 13,

(18)   2021, and that's you right there, your

(19)   signature?

(20)   **A.     Yes.**

(21)   Q.     Okay.  Do you have any recollection of

(22)   that training?

(23)   **A.     I would be guessing.  I have an idea,**

(24)   **but I can't actually say that it is what it is.**

(25)   **I don't remember exactly where or what it was,**

(1)                    **CARLTON SMITH**

(2)    **but I have an idea.**

(3)    Q.    Okay.  What's the idea that you have?

(4)    **A.    Vehicle Operations, we would also go**

(5)    **to -- at least I think that one, we would go do**

(6)    **a Vehicle Pin Training at the Buffalo Bills**

(7)    **stadium parking lot.**

(8)    Q.    I'm sorry, I missed what you said?

(9)    **A.    Vehicle Pin Training.  Stopping a**

(10)   **vehicle with a fugitive inside of it.**

(11)   Q.    Okay.  And you said vehicle pin, like

(12)   P-I-N?

(13)   **A.    Correct.**

(14)   Q.    And can you describe what that means,

(15)   like a pin?  I'm unfamiliar with that term.

(16)   **A.    Trying to stop a vehicle in a manner to,**

(17)   **when the vehicle can't move when your fugitive**

(18)   **is inside of it.**

(19)   Q.    So kind of like boxing them in?

(20)   **A.    Yes, that's fair, yes.**

(21)   Q.    So you would have several different law

(22)   enforcement vehicles that would kind of go on

(23)   the front and the back and the sides?

(24)   **A.    Yes, that's fair, yes.**

(25)   Q.    Okay.  Anything else you remember from

(1)                    CARLTON SMITH

(2)    that training.  It looks like it was a

(3)    three-day training?

(4)    **A.    I think that's what that training was,**

(5)    **but I can't say for sure.**

(6)    Q.    Okay.  So going down here it looks like

(7)    it says Vehicle Pinning 5/25 to 5/22.  So maybe

(8)    that's the one that you were just talking

(9)    about?

(10)   **A.    It might be.  Again, it's hard to**

(11)   **remember.  I can't remember all of these**

(12)   **trainings.**

(13)   Q.    Okay.

(14)            **MR. SHIELDS:  And to the extent**

(15)            **it wasn't covered in our previous**

(16)            **demands, we demand written materials**

(17)            **and/or communications for all the of**

(18)            **trainings that Deputy Smith attended.**

(19)            **MR. CERRONE:  I just ask that**

(20)            **you put it in writing and we will take**

(21)            **it under advisement.**

(22)   Q.    Okay.

(23)            **MR. SHIELDS:  Can I please have**

(24)            **this marked?**

(25)            **(Whereupon, a color photocopied**

(1)                    **CARLTON SMITH**

(2)          **Training Materials document was marked**

(3)          **as Plaintiff's Exhibit 2, for**

(4)          **identification, as of this date.)**

(5)    Q.      And this is another set of training

(6)    materials that are BATES 581 to 716.  And I'm

(7)    not going to go page by page, but my questions

(8)    are generally, if you can see this first page,

(9)    BATES 582, does that look like something that

(10)   you are familiar with, Deputy?  That you have

(11)   seen before?

(12)   **A.      In general, yes.**

(13)   Q.      Okay.  So --

(14)   **A.      But the numbers 582 mean nothing to me,**

(15)   **though.**

(16)              **MR. CERRONE:  Well, that's just**

(17)          **numbers that we put in.**

(18)              **THE WITNESS:  Okay.**

(19)   Q.      And my first question, about this

(20)   document, it's got this little "next" button at

(21)   the bottom.  So to me, that would indicate that

(22)   it would be an online training?

(23)   **A.      We had several of those, yes.**

(24)   Q.      So my question would be, if that's

(25)   something that you do, I don't know, regularly

CARLTON SMITH

(1)
(2)    or is that a way that the U.S. Marshals, you
(3)    know, will have you do different types of
(4)    trainings, like an online training that you
(5)    have to click through?
(6)    **A.    Yes.**
(7)    Q.    And how frequently do you do trainings
(8)    like that?
(9)    **A.    I think -- it's depending on what it is.**
(10)   **Once a year or every six months, depending on a**
(11)   **what it is.**
(12)   Q.    Okay.  Now, this specific training here
(13)   entitled Law Enforcement Safety Training
(14)   Program, High Risk Fugitive Apprehension, do
(15)   you recall just based on that title, having
(16)   done that?
(17)   **A.    I'm sure I have, but I don't remember**
(18)   **it.**
(19)   Q.    Is there, to your knowledge, like a
(20)   centralized location where all of your training
(21)   and personnel records would be kept?
(22)   **A.    There probably is.  But again, that's**
(23)   **and echelon above me.**
(24)   Q.    Yeah, I keep making analogies to RPD,
(25)   but that's what I know.  And I know for RPD,

```
                        CARLTON SMITH
```

(1)

(2) there is a specific section within where

(3) training records are held.  But up don't know

(4) specifically the name of the section or the

(5) equivalent of that?

(6) **A.      No, I don't know, because it's web-based**

(7) **trainings that we do.  I don't know where that**

(8) **goes to once you click "enter, submit."  I have**

(9) **no idea.**

(10) Q.     But you assume there is some kind of

(11) records kept of the training?

(12) **A.      I would assume so.  I wouldn't know.**

(13) Q.     Okay.  So just looking at the first few

(14) slides, and see if that jogs your memory, if

(15) this is something that you have completed

(16) previously.

(17)        So this first slide on BATES 583 says

(18) Terminal Performance Objective, and it

(19) basically says, hey look, this is what you are

(20) going to be learning about, right?

(21) **A.      Yes.**

(22) Q.     Okay.  And then it says "with an exam

(23) score of at least 80 percent."  So does that

(24) mean after you complete, I guess, the training,

(25) that you have to take a little test at the end?

(1)                        CARLTON SMITH

(2)   **A.      For most of these classes, it is usually**

(3)   **a small written test at the end.**

(4)   Q.      So the written test would be something

(5)   that you take on the computer?

(6)   **A.      It would be on the computer.  I call it**

(7)   **a written test, but you have to click your**

(8)   **answers in.**

(9)   Q.      Okay.

(10)                **MR. SHIELDS:  So Counsel,**

(11)          **another thing we will demand is any**

(12)          **records that Deputy Smith, I guess, took**

(13)          **those trainings and his exam scores.**

(14)          **And I will follow up in writing on that**

(15)          **too.**

(16)                **MR. CERRONE:  Okay, thank you.**

(17)   Q.      So in this packet here, there are two

(18)   trainings.  So I will just fast forward down to

(19)   the second one and see -- well, as we scroll

(20)   through the first one, does looking at any of

(21)   these slides, for example, slides BATES Number

(22)   591, with the aggressive dog, does that refresh

(23)   your recollection at all as to whether there is

(24)   a training that you remember taking?

(25)   **A.      This specific one, I can't recall doing**

CARLTON SMITH

(1)

(2)     that.  I remember the aggressive dog, I don't

(3)     remember these pictures.

(4)     Q.     Okay.  What were you going to say about

(5)     most of your web-base?

(6)     A.     Most of our web-base trainings look

(7)     similar to this as far as the way that it's

(8)     setup.  That's all.

(9)     Q.     Sure.  So like this page here, BATES

(10)    Number 649 generally has the same layout as the

(11)    previous training in the first page of the

(12)    previous training, right; is that what you

(13)    mean?

(14)    A.     Yes, they all look alike.

(15)    Q.     Okay.  And this one is entitled U.S. Law

(16)    Enforcement Safety Training Branch.  At the top

(17)    it says USMS Vehicle Operations.  And then on

(18)    the second page, BATES Number 650, it says

(19)    Terminal Performance Objectives.  So as we go

(20)    down here, do you remember, I guess as we look

(21)    at these first few slides, whether you remember

(22)    taking this one about high risk vehicle

(23)    operations?

(24)    A.     I don't remember this, no.

(25)    Q.     Okay.  So I'm going to switch gears and

(1)                  CARLTON SMITH

(2)    talk about the incident.  So on the date of the

(3)    incident, September 15, 2021, you were working

(4)    in your capacity as Deputy U.S. Marshal that

(5)    day?

(6)    **A.      Yes.**

(7)    Q.      And at that time, you were a member of

(8)    the Fugitive Task Force?

(9)    **A.      Yes.**

(10)   Q.      And you said earlier you thought that

(11)   the team leader was either yourself or -- well,

(12)   withdraw that question.  Do you know who the

(13)   team leader was on that day?

(14)   **A.      No, I don't.  It might have been myself.**

(15)   **I don't remember.**

(16)   Q.      Okay.  And you said that the Case

(17)   Officer -- is that what it was called -- was it

(18)   Ulatowski?

(19)   **A.      Case Agent.**

(20)   Q.      Okay.  And do you remember, prior to

(21)   September 15, 2021, was there an operational

(22)   plan that had been developed for apprehending

(23)   Dedrick James?

(24)   **A.      No.**

(25)   Q.      Okay.  Was there any type of planning

CARLTON SMITH

(1)

(2)    that had been conducted for apprehending

(3)    Dedrick James prior to September 15, 2021?

(4)    A.    **It was some surveillance done, I**

(5)    **believe, but no specific operational planning.**

(6)    **I'm not sure what you mean by that term.**

(7)    Q.    Sure.  Was there any type of discussions

(8)    about how the task force would go about

(9)    apprehending Dedrick James prior to September

(10)   15, 2021?

(11)   A.    **In the beginning, you said the call out**

(12)   **when I think you are assuming things.**

(13)   Q.    Sure.

(14)   A.    **I think you are kind of assuming some**

(15)   **things there because there is no way for us to**

(16)   **operationally plan for, in advance, if you**

(17)   **will, like weeks or days in advance of how we**

(18)   **are going to arrest somebody.**

(19)   Q.    Okay.  Yeah, I guess, so there was no

(20)   plan, in this instance, for example, to

(21)   apprehend Dedrick James inside of his residence

(22)   versus like while he is leaving work?

(23)   A.    **No.**

(24)   Q.    Okay.

(25)   A.    **And that's just for every case, no.**

**CARLTON SMITH**

(1)

(2) Q.    Okay.  Prior to September 15, 2021, how

(3) did you become aware of the warrant for Dedrick

(4) James?

(5) **A.    Ulatowski, I believe, brought it to my**

(6) **attention that the State Police had a warrant**

(7) **out in Wayne County and Jeff brought the**

(8) **warrant to our office.  We put in the warrant**

(9) **and they were basically asking us if we could**

(10) **find/arrest him.  Based on the intel that they**

(11) **had already gotten, if I remember correctly.**

(12) Q.    Okay. So Jeff brought the warrant to

(13) the task force and then you said they already

(14) had intel?

(15) **A.    I don't remember as much as possible,**

(16) **but I believe the State Police investigators, I**

(17) **think had intel that Dedrick was staying at his**

(18) **grandmother's house in Rochester.**

(19) Q.    Okay.  That was going to be my next

(20) question, what intel you remember the State

(21) Police having at that time?

(22) **A.    How they got to that, I couldn't tell**

(23) **you.**

(24) Q.    So by intel, meaning that he was at the

(25) location, 6 Firewood Place, which was his

(1)                    CARLTON SMITH

(2)  grandmother's house?

(3)  **A.     I think I over spoke.  Can you repeat**

(4)  **that?**

(5)  Q.     So my question was, because you had

(6)  mentioned intel, my question was going to be,

(7)  if that intel was that Dedrick was presiding or

(8)  residing at his grandmother's house, which was

(9)  at 6 Firewood Place.

(10) **A.     Not necessarily that day.  I think it**

(11) **was just that they learned somehow, that he was**

(12) **residing at his grandmother's house.**

(13)                 **MR. CERRONE:  Can we please go**

(14)         **off the record?**

(15)                 **(Whereupon, a discussion was**

(16)         **held off the record.)**

(17) Q.     So we had been talking about the intel

(18) that the State Police had about Dedrick

(19) residing at his grandmother's house.  Do you

(20) recall any other intel that the State Police

(21) had gathered, other than the fact that he was

(22) at that location?

(23) **A.     Jeff had related to either myself or**

(24) **others, that if he saw the car there -- what**

(25) **car, I don't remember -- but the car, that most**

(1)                        **CARLTON SMITH**

(2)    **likely, Dedrick would be there.  That's the**

(3)    **only other intel that I can recall.**

(4)    Q.      Okay.  So just information about where

(5)    he resided and the car that he owned or drove

(6)    at the time?

(7)    **A.      Yes.**

(8)    Q.      And obviously, if the car is there, you

(9)    would think he was inside, that that would be a

(10)   time that you could try to apprehend him?

(11)   **A.      Yes.**

(12)   Q.      Okay.  Now prior to the execution the

(13)   warrant, there were people who were scouting at

(14)   that location?

(15)   **A.      Just Jeff, that I can remember.**

(16)   Q.      And was that scouting basically to see

(17)   if he was home, if the car was there; just to

(18)   see if you believe he was home?

(19)   **A.      Just to drive by to see the car, yes.**

(20)   Q.      Okay.  And on the day of the incident,

(21)   someone drove by, the car was there, and then

(22)   what happened next?

(23)   **A.      On the date of the incident, I believe**

(24)   **Jeff had driven by, because we were already out**

(25)   **on the street doing a different investigation.**

CARLTON SMITH

(1)
(2) **And at some point, Jeff drove by and saw the**
(3) **car there.  And he made an announcement,**
(4) **probably over the radio, "hey, my car is here.**
(5) **I want to execute this investigation, the**
(6) **warrant, the arrest process."**
(7) Q.     Okay.  So what's the process from there?
(8) You would want to ensure that there were
(9) adequate numbers of you?
(10) **A.     The process is, hey, everybody, this is**
(11) **what I got, this is the address.  And then**
(12) **everybody kind of surrounds the house.  That**
(13) **was the process.**
(14) Q.     So I guess my question is, if you were
(15) trying to coordinate different members from
(16) different law enforcement -- RPD, State
(17) Police -- like at the time, do you have to
(18) ensure that they are all available, because
(19) they could be off doing different work,
(20) correct?
(21) **A.     That's correct.**
(22) Q.     So how do you handle that?  You put a
(23) call out to all of those people and see if they
(24) are available first?
(25) **A.     Like I just said.  We were already out**

CARLTON SMITH

(1)

(2) previously so we already had an idea of who was

(3) available.  So we had an idea of who would be

(4) available.  So that's why Jeff put out the

(5) call.

(6) Q.    Okay.  Do you know if anyone other than

(7) Jeff did any scouting at the location prior to

(8) the execution?

(9) A.    I don't know that information.  That, I

(10) don't know.

(11) Q.    And from the intelligence that had been

(12) gathered prior to the warrant execution, was

(13) there any indication that Dedrick was

(14) considered like a high risk apprehension?

(15) A.    Other than what his warrant was for, I

(16) didn't have.  Me, personally, I don't think

(17) there was any other information other than what

(18) he was warranted for, that I can really recall

(19) at the time.

(20) Q.    Do you remember what his warrant was

(21) for?

(22) A.    Assault.

(23) Q.    Now, there is a lot of different kinds

(24) of assaults?

(25) A.    It was some type of assault on a child.

(1)                          **CARLTON SMITH**

(2)     Q.     Okay.  So it wasn't an assault involving

(3)     a gun or anything like that?

(4)     **A.     No.**

(5)     Q.     Was there any indication that Dedrick

(6)     might be armed?

(7)     **A.     I don't believe there was.**

(8)     Q.     Was there any occasion, other than the

(9)     assault charge on the child, that he was

(10)    particularly dangerous in any way?

(11)    **A.     That I can remember, no.**

(12)    Q.     Any indication, other than your general

(13)    assumption, that he might have guns in the

(14)    house?

(15)    **A.     Just the general assumption, not a**

(16)    **concrete.**

(17)    Q.     Any indication that he had been

(18)    previously involved in any shooting incidents

(19)    or anything like that?

(20)    **A.     I don't think there was that I remember.**

(21)    Q.     Any intel that was he was involved in

(22)    gang activity in any way?

(23)    **A.     No, not that I remember.**

(24)    Q.     That would be the type of stuff that

(25)    would be like on the intel sheet?

(1)                    CARLTON SMITH

(2)    **A.      Yeah, we have talked about it.  I think**

(3)    **it was just this kid was wanted for assault on**

(4)    **his kid and I don't think there was anything**

(5)    **more to it than that.**

(6)    Q.      So it sounds like you are saying this

(7)    was pretty much, I don't know, straightforward

(8)    in terms of what you guys discussed prior to

(9)    executing the warrant?

(10)   **A.      Yes.**

(11)   Q.      And do you remember having any

(12)   discussions about the execution of the

(13)   warrant -- withdrawn.  Do you remember having

(14)   like formal kind of briefings about executing

(15)   the warrant prior to the date of it being

(16)   executed?

(17)   **A.      No.**

(18)   Q.      So on the date of the incident, you

(19)   gathered everyone together and there was a

(20)   short briefing prior to the execution; is that

(21)   right?

(22)   **A.      Over the radio and prior to setting up**

(23)   **the perimeter.**

(24)   Q.      Was there a staging area, I don't know,

(25)   where you gathered first?

(1)                    CARLTON SMITH

(2)    **A.      I feel like the staging area was on the**

(3)    **street perpendicular to Vinewood, I think.**

(4)    Q.      Okay.  Had you ever previously been to

(5)    Vinewood to take any kind of observation of the

(6)    house prior to execution of the warrant?

(7)    **A.      I'm sorry, can you repeat that?**

(8)    Q.      Had you ever observed the house prior to

(9)    execution of the warrant?

(10)   **A.      No.**

(11)   Q.      And Vinewood is like a little dead-end

(12)   street?

(13)   **A.      From my recollection, yes.**

(14)   Q.      And did you guys make a plan, for

(15)   example, for who would approach the porch and

(16)   knock on the door?

(17)   **A.      No, there wasn't a lot of time.  It was**

(18)   **kind of whose case it was or whoever was on the**

(19)   **seen first.  You would -- there was nothing**

(20)   **written down as to who would do what and there**

(21)   **wasn't a lot of time do that.**

(22)   Q.      Okay.  So there weren't like formal

(23)   assignments; is that what you are saying?

(24)   **A.      Correct.**

(25)   Q.      Okay.  How was it decided like who would

CARLTON SMITH

(1)

(2)   be the officers to setup on the permitter of

(3)   the home and who went to the door?

(4)   **A.     In general, usually the case agents**

(5)   **would go to the door.  And there is a lot of**

(6)   **extra guys, if you will.  We tried to make sure**

(7)   **that the perimeter is set up and two or three**

(8)   **men go up to the door.  And then everyone else**

(9)   **just fills in bodies as needed.**

(10)  Q.     So in general, what are the various

(11)  roles of an agent when a warrant is being

(12)  executed like this?

(13)  **A.     We try to make sure that someone is**

(14)  **assigned to a shield or a breach or a**

(15)  **permitter, contact officers.  But it's in**

(16)  **general.**

(17)  Q.     Okay.  So different guys surrounding the

(18)  house, that's the permitter?

(19)  **A.     Yes.**

(20)  Q.     And then contact, those would be the

(21)  people that would go to the door?

(22)  **A.     Yes.**

(23)  Q.     And when you say breacher, that's

(24)  someone with a tool to open the door if you had

(25)  to?

(1)                     CARLTON SMITH

(2)    **A.      If needed.**

(3)    Q.      Okay.  And in this situation, what was

(4)    your role?

(5)    **A.      I was one of the last people that showed**

(6)    **up on the scene and I remember getting out of**

(7)    **my car and just B-lining to the door with the**

(8)    **two guys that were up there.  It wasn't**

(9)    **necessarily my role, that's what I did.**

(10)   Q.      Okay.  So you arrived when, basically,

(11)   the warrant was about to the executed?

(12)   **A.      As those guys were standing on the front**

(13)   **porch, I was making my way to the front porch.**

(14)   **Maybe Jeff had already knocked, I don't**

(15)   **remember.**

(16)   Q.      Okay.  So what's the first thing that

(17)   you remember about walking up to the front

(18)   porch?

(19)   **A.      Seeing Investigator Ulatowski and Baker**

(20)   **at the front door and everyone else kind of**

(21)   **around the permitter.  That's what I remember,**

(22)   **initially.**

(23)   Q.      So Ulatowski and Baker were on the porch

(24)   and then you walked up to the porch with them?

(25)   **A.      Yes.**

(1)                         **CARLTON SMITH**

(2)    Q.      And what happened next?

(3)    **A.      I'm trying to remember exactly.    I**

(4)    **believe Ulatowski knocked.    How many times he**

(5)    **knocked, I don't remember.    But that's what**

(6)    **happened next.**

(7)    Q.      Okay.    And what happened after he

(8)    knocked?

(9)    **A.      At some point -- and I don't know how**

(10)   **many times he knocked -- but at some point, I**

(11)   **believe, because I didn't see, I believe his**

(12)   **grandmother opens the door.    And I'm sorry I**

(13)   **don't know her name.    But she opens the door**

(14)   **and just says is Dedrick here, where is**

(15)   **Dedrick.    And at the same time he is saying**

(16)   **that -- and this is from my advantage point --**

(17)   **it was obvious to me that Jeff saw Dedrick.**

(18)   **And basically, he said "Dedrick come here.    We**

(19)   **have a warrant for you."    Those words.**

(20)   Q.      Do you know how long it was between when

(21)   Jeff had knocked and when grandma answered the

(22)   door?

(23)   **A.      I don't remember.**

(24)   Q.      Okay.    So do you remember anything that

(25)   grandma said back to Jeff?

(1)                    CARLTON SMITH

(2)    **A.      No, I don't remember the words that were**

(3)    **exchanged between those two.  I don't think I**

(4)    **heard her.**

(5)    Q.      Okay.  So were you standing off to the

(6)    side of the doorway or something?

(7)    **A.      Yes, to the side against the wall.  I'm**

(8)    **not sure how to explain that.**

(9)    Q.      So basically, grandma wouldn't be able

(10)   to see you?

(11)   **A.      Correct.  From my advantage point, she**

(12)   **wouldn't be able to see me.  She may have been**

(13)   **able to look out the window.**

(14)   Q.      Do you remember Jeff asking grandma to

(15)   ask Dedrick to come outside?

(16)   **A.      He may have.  I don't remember.**

(17)   Q.      Would that have been like a typical

(18)   thing to do under these circumstances, asks him

(19)   to come outside?

(20)   **A.      Yeah, that's fair.**

(21)   Q.      Okay.  So I think you said grandma

(22)   answered the door, Jeff and grandma spoke, you

(23)   don't remember exactly what they said.  And

(24)   then Jeff saw Dedrick in the house; is that

(25)   what happened?

(1)                    CARLTON SMITH

(2)   A.     It became obvious to me that at some

(3)   point, he sees Dedrick and either asks him to

(4)   come out or said, Dedrick come here.  Come talk

(5)   to us.  I don't remember the exact words.  And

(6)   it was obviously that Dedrick was not coming

(7)   out at that point.

(8)   Q.     And how did that become obvious?

(9)   A.     Because Jeff started making entry after

(10)  he was asking him to come outside, I believe.

(11)  And it quickly went from not just walking in,

(12)  but running, which keyed to me to start running

(13)  because Jeff is running.  And as I entered the

(14)  house, through the household, if I remember, I

(15)  see Dedrick backing up with his hands kind of

(16)  walking back like that, if you can see that

(17)  (indicating).

(18)  Q.     So the first thing that you remember

(19)  seeing when you saw Dedrick was him backing up

(20)  with his hands in the air?

(21)  A.     I had tunnel vision, but yes.  He was

(22)  kind of going backwards and his hand were up

(23)  like this (indicating), doing something with

(24)  his hands.  But his hands were up, yes, walking

(25)  backwards.

**CARLTON SMITH**

(1)

(2)  Q.    Okay.  And when you saw that, you said

(3)  that Jeff had run in the house.  Were you guys

(4)  still running at that point?

(5)  **A.    Maybe not actually running, but maybe a**

(6)  **quick walk.  But yes, it quickly became a run.**

(7)  **As Dedrick was going backwards, he immediately**

(8)  **turns.  And I couldn't see it from my advantage**

(9)  **point, but it was obvious that he immediately**

(10) **turned and darted back in the bathroom because**

(11) **Jeff and Baker had darted into the bathroom**

(12) **after him.**

(13) Q.    So does that means that you were the

(14) third person to enter the house?

(15) **A.    That's correct.**

(16) Q.    And do you remember what Dedrick was

(17) wearing?

(18) **A.    I don't remember.**

(19) Q.    Okay.  Did you see anything in his hands

(20) at any point before he entered the bathroom?

(21) **A.    I wish I had.  I had tunnel vision.  I**

(22) **don't think that he had anything in his hands,**

(23) **that I can remember.**

(24) Q.    Okay.  Did you observe him throwing

(25) money in the air?

(1)                    CARLTON SMITH

(2)  **A.      I didn't see that.  I think he might**

(3)  **have been already in the bathroom.  I don't**

(4)  **remember anything about the money.**

(5)  Q.      Did you hear any other officers say that

(6)  he like through money in the air at some point?

(7)  **A.      I have heard other people say it.  I**

(8)  **just had tunnel vision.  I didn't see it.**

(9)  Q.      Okay.  Before he entered the bathroom,

(10) you never saw him holding a gun?

(11) **A.      No.**

(12) Q.      After you entered the house, what was

(13) grandma doing?

(14) **A.      I have no idea.**

(15) Q.      Did you have any contact with grandma

(16) after you entered the house before you went to

(17) the bathroom?

(18) **A.      If I saw her, it might have been just**

(19) **walking by her.  But I never spoke to grandma**

(20) **at all, no.**

(21) Q.      Okay, so you didn't have any, for

(22) example, physical contact with the grandmother?

(23) **A.      No.**

(24) Q.      Are you aware that grandma says someone

(25) pushed her to the ground?

```
                    CARLTON SMITH
```

(1)

(2)  **A.      I'm not aware of that.**

(3)  Q.      Okay.  Did you see anyone push grandma

(4)  to the ground?

(5)  **A.      No.**

(6)  Q.      So in this report, Ulatowski said that

(7)  Dedrick, at first, appeared to be compliant and

(8)  walking towards the door.  Did you see that?

(9)  **A.      I couldn't see that from my vantage**

(10) **point.**

(11) Q.      So that would have been when you were

(12) still outside the porch towards the side door?

(13) **A.      Yes.**

(14) Q.      So what's the next thing that happened

(15) after you went to the house?

(16) **A.      From the time that I entered the**

(17) **house -- and this all happened so, so fast.**

(18) **From the time I entered the house, these guys**

(19) **might have been already in the bathroom.  I**

(20) **feel like I saw Dedrick backing up the last**

(21) **second and he darted into the bathroom.  That**

(22) **much, I do remember.**

(23) Q.      Okay.

(24) **A.      And these guys were right behind him.**

(25) Q.      So you see everyone enter the bathroom

```
(1)                    CARLTON SMITH
(2)    and then what do you do next?
(3)    A.     I followed them into the bathroom.
(4)    Q.     Okay.  What's the first thing you saw
(5)    when you got to the bathroom?
(6)    A.     It was obvious to me that Dedrick was in
(7)    the bathtub and the other two guys were somehow
(8)    trying to take him into custody inside the
(9)    bathtub.
(10)   Q.     And when you say they were "trying to
(11)   take him into custody inside the bathtub," what
(12)   do you mean by that?
(13)   A.     Trying to get him into handcuffs to
(14)   control him.
(15)   Q.     Was Dedrick moving; was his body moving?
(16)   A.     It became obvious to me that he was
(17)   resisting, trying to fight, I guess, for a lack
(18)   of better words.
(19)   Q.     Okay.  And was Ulatowski on top of him
(20)   in the bathtub?
(21)   A.     I don't remember the exact
(22)   configuration, but I think that Jeff was.
(23)   Q.     Okay.  And where was Baker?
(24)   A.     In some manner, on top of Jeff in the
(25)   bathtub.  Or I think it's best to say he was in
```

(1)                    **CARLTON SMITH**

(2)    **the bathtub, but I don't remember what**

(3)    **configuration that Baker was.**

(4)    Q.     Okay.  And at some point, did you make

(5)    physical contact with Dedrick in any way?

(6)    **A.     Yes.**

(7)    Q.     Okay.  And what did you do?

(8)    **A.     I was trying to apply pressure points.**

(9)    **All that I had exposer to was maybe from his**

(10)   **neck up to the top of his head.  And so I was**

(11)   **trying to put any pressure points to try to get**

(12)   **him to comply.**

(13)   Q.     And when you say "comply," do you mean

(14)   put his hands behind his back to be handcuff?

(15)   **A.     Yes.  And to stop resisting.**

(16)   Q.     And did you see Jeff like tackle Dedrick

(17)   into the bathtub?

(18)   **A.     No.**

(19)   Q.     When you came into the bathroom, were

(20)   Dedrick's arms underneath his body?

(21)   **A.     I don't know where his arms were.  I**

(22)   **don't know where his arms were.  I just knew**

(23)   **that these guys were in the bathtub, fighting,**

(24)   **if you will.**

(25)   Q.     Do you remember hearing either Jeff or

(1)                    CARLTON SMITH

(2)    Baker say anything to Dedrick?

(3)    **A.      Just -- I don't remember what words were**

(4)    **spoken, no.**

(5)    Q.      Do you remember that they, in fact, said

(6)    things, but you don't remember what was said

(7)    or?

(8)    **A.      Very quickly, it became obvious that**

(9)    **somehow, either Ulatowski or Baker saw a gun**

(10)   **produced, and someone yelled out "gun."  Which**

(11)   **I immediately went into tunnel vision and I**

(12)   **tried to do everything that I possibly could to**

(13)   **try to control him.  But that's it.  They were**

(14)   **probably fighting over the gun.  I don't know**

(15)   **because I wasn't laying with them in the**

(16)   **bathtub.**

(17)   Q.      And before the shot was fired, you never

(18)   saw a gun?

(19)   **A.      No.**

(20)   Q.      But at some point before the shot was

(21)   fired, you were aware that Jeff or Baker had

(22)   seen a gun?

(23)   **A.      I was obvious that someone had seen a**

(24)   **gun because someone yelled out gun.  Like in**

(25)   **law enforcement, if there is a gun, someone**

**CARLTON SMITH**

(1)

(2) **would yell out gun.**

(3) Q.    So from the point when they yelled out

(4) gun, basically, you changed your technique you

(5) were using to try to get him to comply?  Or

(6) what did you do?

(7) **A.    I wouldn't say change technique.  I**

(8) **immediately went into, oh shit-mode and tried**

(9) **to put a little more pressure in anywhere I**

(10) **could.**

(11) Q.    And you said you were doing pressure

(12) points to his neck area?

(13) **A.    I would say the jaw area and maybe the**

(14) **temple, the mandibular pressure points.**

(15) **Anything that I could on his head, trying to**

(16) **squeeze to try to get him to comply.**

(17) Q.    So are those pain compliance techniques?

(18) **A.    Thank you.  Yes, pain compliance**

(19) **techniques.**

(20) Q.    And what the next thing that you

(21) remember happening?

(22) **A.    Hearing a gunshot.  And I don't know**

(23) **what words were spoken, but guys asking are you**

(24) **shot.  We were trying to figure out where the**

(25) **shot came from and if anybody was injured.**

(1)                    **CARLTON SMITH**

(2)  Q.      Do you know who shot the gun?

(3)  **A.      I have no idea.  I'm assuming Dedrick**

(4)  **did, but I don't know.  Because I wasn't in the**

(5)  **bathtub.**

(6)  Q.      Where were your eyes focused at the

(7)  moment that the shot went off?

(8)  **A.      Tunnel vision on his head, watching his**

(9)  **head.  It was just tunnel vision.**

(10)  Q.      Okay.  So after the shot went off, you

(11)  said everyone was just asking if they were

(12)  okay?

(13)  **A.      Trying to figure out who got shot, yeah.**

(14)  **We were trying to figure out where the shot**

(15)  **came from and trying to make sure that**

(16)  **everybody was okay.**

(17)  Q.      Before the shot went off, did you see a

(18)  red laser pointer dot?

(19)  **A.      I don't recall anything about a red**

(20)  **laser.  Not saying that it wasn't, but I don't**

(21)  **recall anything about that.**

(22)  Q.      Okay.  Do you remember Baker saying that

(23)  he was going to shoot him?

(24)  **A.      I don't remember.  Like, I don't**

(25)  **remember what words were spoken, but he might**

(1)                      **CARLTON SMITH**

(2)    **have, if he sees a gun.**

(3)    Q.    At the time, did you have any less

(4)    lethal options or weapons on you?

(5)    **A.    I'm pretty sure I had my taser on me**

(6)    **that day.**

(7)    Q.    Did you ever consider using your taser

(8)    during the incident?

(9)    **A.    I didn't get a chance.  This all**

(10)   **happened very, very fast.**

(11)   Q.    Are there any other less lethal options

(12)   that task force members carry with them?

(13)   **A.    This day or in general?**

(14)   Q.    I guess in general?

(15)   **A.    Most guys carry tasers, some guys carry**

(16)   **a batons.  Not everybody carries a taser, but**

(17)   **if they do, it's usually a taser as a less**

(18)   **lethal option.**

(19)   Q.    Okay.  You have to be taser certificated

(20)   in order to get the taser?

(21)   **A.    Yes.**

(22)   Q.    And how about a beanbag gun?

(23)   **A.    You would have to be certificated.  But**

(24)   **that day, I know nobody had a beanbag gun.**

(25)   Q.    Well, I know that most swat teams

CARLTON SMITH

(1)

(2) require at least one entry team member to have

(3) like a beanbag on them.  That's not something

(4) that --

(5) **A.      We are not on the swat team.   I'm not**

(6) **trying to be smart.   Some guys think that way,**

(7) **but we are not.**

(8) Q.      All right.   Now, before making entry

(9) into the residence, did you guys discuss any

(10) potential alternatives for apprehending Dedrick

(11) other than entry into the residence?

(12) **A.      No.**

(13) Q.      Did you guys, for example, discuss any

(14) strategies for trying to get Dedrick outside

(15) other than Jeff asking him to come outside?

(16) **A.      That was the simple run-of-the-mill.**

(17) **You get there, you knock on the door, say come**

(18) **out.   Just a run-of-the-mill execution of a**

(19) **warrant attempt.**

(20) Q.      Now, when you say just a

(21) run-of-the-mill, are you saying what happened

(22) here, other than the shooting, is sort of

(23) typical?

(24) **A.      Because we knock on, over here,**

(25) **thousands of doors trying to catch fugitives.**

(1)                    **CARLTON SMITH**

(2)    **It was just another door to knock on to try to**

(3)    **get someone into custody.**

(4)    Q.    So I guess my question is, if this is

(5)    generally just a typical door knock, how often,

(6)    when you do a door knock --

(7)    **A.    I don't want to say it's not important,**

(8)    **but.**

(9)    Q.    No, no, I get it.  So my question is,

(10)   when you do a typical door knock like this, how

(11)   often do you have to end up in the residence to

(12)   apprehend the fugitive?

(13)   **A.    I can't put a number, but a lot.**

(14)   Q.    Like more than half?

(15)   **A.    It's hard to put a number on it.  I**

(16)   **would just say a lot.  I don't know.  I can't**

(17)   **put a number on it.**

(18)   Q.    So it's something that happens

(19)   frequently on your job?

(20)   **A.    Yes, yes.**

(21)   Q.    And when you do have to enter a

(22)   residence to apprehend a fugitive, how often

(23)   does that person, like, have a gun?

(24)   **A.    In the home or on them?**

(25)   Q.    Yeah, I guess when you are trying to

(1)                   CARLTON SMITH

(2)    apprehend them, how often is there a situation

(3)    where the person presents a gun?

(4)    **A.      Do you mean has it ever happened?**

(5)    Q.      Sure, yeah.  Let me back up.  Other than

(6)    this incident, have you ever had a situation

(7)    where you entered a residence to apprehend a

(8)    fugitive and they, you know, presented a gun?

(9)    **A.      Over my career, nobody has ever pulled a**

(10)   **gun and pointed it at me, no.**

(11)   Q.      Had there any been any other situations

(12)   that you have been involved in like this where

(13)   you entered a home and the person maybe didn't

(14)   point the gun at you, but like had a gun on

(15)   them?

(16)   **A.      I'm sure that's absolutely happened.  To**

(17)   **give you an example, no.  But I'm positive that**

(18)   **that has happened.**

(19)   Q.      Okay.  And throughout your career, has

(20)   there been an instance since where you entered

(21)   a home and someone was shot?

(22)   **A.      Can you restate the question?**

(23)   Q.      Sure.  My question is basically, is this

(24)   the only time in your career that you have

(25)   entered into a residence to apprehend a

(1)                    CARLTON SMITH

(2)    fugitive where someone was shot?

(3)    **A.      No.**

(4)    Q.      Okay.  How many other times have you

(5)    been involved in incidents where someone was

(6)    shot inside a residence when you were trying to

(7)    apprehend a fugitive?

(8)    **A.      One other time.**

(9)    Q.      Okay.  So it's not something that

(10)   happens frequently?

(11)   **A.      No.  Me personally, one other time.**

(12)   Q.      Okay.  And was that the fugitive or a

(13)   law enforcement officer that was shot on that

(14)   other occasion?

(15)   **A.      A fugitive was shot.**

(16)   Q.      And was that fugitive shot because they

(17)   presented a gun?

(18)   **A.      No.  They were shot because they**

(19)   **presented a knife.**

(20)   Q.      Okay.  In general, does the task force

(21)   consider alternatives to entering the home to

(22)   apprehend a fugitive?

(23)   **A.      Can you repeat that question?  I'm**

(24)   **sorry.**

(25)   Q.      Sure.  One of the things that was

(1)                    CARLTON SMITH

(2)    discussed in the training materials that we had

(3)    put up as Exhibit 2 were various alternatives

(4)    for apprehending fugitives, alternatives other

(5)    than entering the home.  In general, when you

(6)    are going to apprehend a fugitive, do you

(7)    consider those alternatives?

(8)    **A.      We consider them, yes.**

(9)    Q.      Such as --

(10)   **A.      Such as?  I'm sorry?**

(11)   Q.      Yeah, one of them is called Containment

(12)   and Call Out.  Is that one of the things that

(13)   you guys would do?

(14)   **A.      It's possible.**

(15)   Q.      So would that basically be what Jeff

(16)   tried to do?  You guys set up the perimeter and

(17)   then someone calls out the person to say, "Hey,

(18)   look, we've got a warrant.  Will you come

(19)   outside"?

(20)   **A.      "Come to the front door.  Show us your**

(21)   **hands.  Come to the front door."  Or if we see**

(22)   **them walking on the sidewalk, nobody else is**

(23)   **around.  Every scenario is different.**

(24)   Q.      How about, do you ever, for example,

(25)   setup at the house and just wait for the person

CARLTON SMITH

(1)

(2) to naturally exit to go to work or something

(3) like that?

(4) **A.    Yes.**

(5) Q.    Okay.  When would you do that instead of

(6) going up and nothing on the door?

(7) **A.    If we are not sure that the guy is in**

(8) **the house to begin with.  That's usually**

(9) **when -- I mean, right off the top of my head,**

(10) **that's when I would do it.**

(11) **If I'm not sure that the guy was in**

(12) **there, I would wait until he comes out.  And**

(13) **guess up, he was there.  And then if he comes**

(14) **out the front door, I would say "C'mon guys,**

(15) **let's approach."  Or if he goes back into the**

(16) **house, we might talk about it over the radio as**

(17) **to what step we want to take after that.**

(18) Q.    And how about, do you ever decide,

(19) instead of going up to the house, to wait for

(20) them to come out of the house and get into

(21) their car and make a control stopped?

(22) **A.    That happens.  That's not the only way**

(23) **to do it, but it happens.**

(24) Q.    And what I'm getting at, do you

(25) consider, for example, whether one or more of

(1)                    CARLTON SMITH

(2)    those alternatives might be safer for the

(3)    apprehension than the other alternative?

(4)    **A.       Nothing an essentially safer.**

(5)    Q.      So my question would be, the method that

(6)    you would go about apprehending the person,

(7)    that's not determined based on what you believe

(8)    is the safest way to do it?

(9)    **A.       We try to do it as safest as possible.**

(10)   **That's all that I can say.  Depending on**

(11)   **whether it is in the car, on the sidewalk, or**

(12)   **in the house.  I'm not sure how else to answer**

(13)   **your question.  There is nothing in policy that**

(14)   **says we have to do it which way.  It is**

(15)   **whatever we deem is safest for the general**

(16)   **public.**

(17)   Q.      In your experience, is entering a

(18)   residence either more dangerous or less

(19)   dangerous than other methods for apprehending a

(20)   fugitive?

(21)   **A.       That's hard to answer.  It might be more**

(22)   **dangerous depending on the scenario.  Every**

(23)   **scenario is different.**

(24)   Q.      You don't recall anything from your

(25)   training that says entry into a residence is

(1)                    CARLTON SMITH

(2)   inherently more dangerous than any other

(3)   alternatives?

(4)   **A.      That's not always true.  I may have seen**

(5)   **that, but again, that doesn't mean it's policy.**

(6)   **It's up to the case agent to determine when and**

(7)   **where we will arrest somebody.  If he decide we**

(8)   **want to knock on a door, that's what we will**

(9)   **do.  And then if we want to stop and pin, then**

(10)  **we would do that.**

(11)  Q.      Okay.

(12)  **A.      And I'm not trying to sound smart in any**

(13)  **way.**

(14)  Q.      No, that's something that I read in the

(15)  materials, and that's something that you said

(16)  the task force has discretion based on your

(17)  experience?

(18)  **A.      Yes, yes.**

(19)  Q.      Okay.

(20)              **MR. SHIELDS:  Can I please have**

(21)         **this marked?**

(22)              **(Whereupon, a color photocopied**

(23)         **U.S. Marshal Report was marked as**

(24)         **Plaintiff's Exhibit 3, for**

(25)         **identification, as of this date.)**

**CARLTON SMITH**

(1)

(2) Q.    This is the U.S. Marshal Report about

(3) the incident, and this document is BATES Number

(4) 95 to 102.  And just a few questions here.

(5)        On this page, BATES 100, my questions

(6) were, what's NCIC mean?

(7) **A.    That's an the National Crime and**

(8) **Information Center.**

(9) Q.    Okay.  So does that mean that there was

(10) no information from the National Criminal

(11) Information Center for Dedrick; is that what

(12) that means?

(13) **A.    That's not what that means.  That means**

(14) **it's not a U.S. initiated warrant.**

(15) Q.    Okay.  And this other highlight, U.S.

(16) M11, what does at that mean (indicating)?

(17) **A.    That means any report generated.  That's**

(18) **what that means.**

(19) Q.    Okay.  And so basically, this would be

(20) the report that was generated for the U.S.

(21) Marshal Service, the incident report?

(22) **A.    That's my guess as I sit here, yes.**

(23) Q.    Now, did you complete this incident

(24) report or was it completed by somebody else?

(25) And let me know if you need me to scroll some

```
(1)                    CARLTON SMITH

(2)    place else to figure it out?

(3)    A.      Can I read it real fast?

(4)    Q.      Oh, yeah, sure.  No problem.

(5)    A.      (Complies.)  This was generated by my

(6)    supervisor.

(7)    Q.      Okay.  And so did you speak with your

(8)    supervisor -- well, let me withdraw.  So did

(9)    you get that information because it says

(10)   authorized by Shane Marshal; is that right?

(11)   A.      Yes.

(12)   Q.      So Shane was your supervisor.  Did you

(13)   have a conversation with Shane Marshal about

(14)   what happened here?

(15)   A.      I'm sure I did, yes.

(16)   Q.      So this is where he would have gotten

(17)   all of that information from?

(18)   A.      From myself and others, yes.

(19)   Q.      Okay.  Would it be typical after an

(20)   incident like that, that your supervisor would

(21)   interview other people as well?

(22)   A.      For such an event, yes, that would be

(23)   fair.

(24)   Q.      Okay.

(25)                    MR. SHIELDS:  Can I please have
```

```
                        CARLTON SMITH
(1)
(2)        this marked?

(3)               (Whereupon, color photocopied

(4)        photographs were marked as Plaintiff's

(5)        Exhibit 4, for identification, as of

(6)        this date.)

(7)               MR. SHIELDS:  And this is BATES

(8)        document 103 to 112.  And these are

(9)        photographs that were exchanged in

(10)       Discovery, nine photographs.

(11)   Q.     So the first one, do you know who this

(12)   person is?

(13)   A.     It's Bill Baker.

(14)   Q.     And on the date of the accident, did he

(15)   have that face covering on, if you remember?

(16)   A.     I'm sure he did, but I don't remember.

(17)   Q.     So that's the picture, BATES 104.  Do

(18)   you know how -- and obviously this was sort of

(19)   in the height of COVID -- do you know if that's

(20)   something that he would wear because of COVID?

(21)   A.     I don't want to speak for him.  He would

(22)   sometimes wear a mask, but I can't say that's

(23)   the reason.  Most likely it was.

(24)   Q.     Okay.  Now, these little vest things, is

(25)   that something that's given out by the Marshall
```

(1)                    CARLTON SMITH

(2)     Service; does that make sense?

(3)     **A.      Yes, it makes sense.  I'm trying to**

(4)     **answer.  No, we don't supply vests, but on that**

(5)     **particular day, I vaguely remember Bill Baker**

(6)     **not having a vest when he came to the task**

(7)     **force, so we gave him one to borrow.**

(8)     Q.      Okay.  Was he like a new task force

(9)     member at the time?

(10)    **A.      Newer.  That's what I would say, newer.**

(11)    **Not necessarily brand knew.  I don't know how**

(12)    **long he had been on at that point.**

(13)    Q.      Would that be more or less than a year?

(14)    **A.      I don't want to say for sure because I**

(15)    **don't remember exactly how long.**

(16)    Q.      Okay.  And I was assuming, reading the

(17)    patch, it says U.S. Marshal on it?

(18)    **A.      Yes.**

(19)    Q.      And this vest, is it like a bullet-proof

(20)    vest or something else?

(21)    **A.      The vest has plates in it.  It's a plate**

(22)    **carrier that you are looking at and it's plates**

(23)    **on the inside of it.**

(24)    Q.      And when you say "plates," do you mean

(25)    like for protection from being shot?

```
                        CARLTON SMITH
(1)
(2)   A.      Correct.
(3)   Q.      Okay.  So then down here, that's his RPD
(4)   badge, if you know (indicating)?
(5)   A.      Yes, that's what it appears to be.
(6)   Q.      And this is you (indicating)?
(7)   A.      Yes.
(8)   Q.      And can you kind of describe for me like
(9)   what is on, what tools are on your vest that we
(10)  can see?
(11)  A.      Can you scroll down a little?
(12)  Q.      (Complies.)
(13)  A.      Okay.  I see a handcuff pouch, a
(14)  Tourniquet pouch, a magazine pouch.  And I
(15)  believe on the front in the black, that's my
(16)  taser pouch.
(17)  Q.      That's right in the middle there?
(18)  A.      Yes, I believe that's what that is.
(19)  Q.      And then you have got your firearm on
(20)  your right side, but the left side of the
(21)  picture?
(22)  A.      Yes.
(23)  Q.      And how about these upper pockets above
(24)  the taser pouch and the rounds?  What are in
(25)  those pockets?
```

CARLTON SMITH

(1)

(2)  A.      A handcuff pouch and a Tourniquet pouch.

(3)  And the in the middle there is a small

(4)  flashlight pouch.

(5)  Q.      And then it looks like to the side of

(6)  that, is that a separate tool next to the T.K.

(7)  pouch; is that the Tourniquet pouch.

(8)  A.      Yeah, that's a knife.  A little dagger

(9)  knife that I carry, yes.

(10)  Q.      Okay.  And then to the side of that

(11)  would be just the radio?

(12)  A.      Yes.

(13)  Q.      Okay.

(14)  A.      There is a medical pouch that my arm is

(15)  draped over next to the radio.

(16)  Q.      So that would be your left arm?

(17)  A.      Yes.

(18)  Q.      Okay.  The arm with the snake tattoo?

(19)  A.      Yes.

(20)  Q.      The Don't Shit on Me tattoo?

(21)  A.      Yes.

(22)  Q.      And what does it say right above that,

(23)  Liberty Or Die.

(24)  A.      Something to that effect, yes.

(25)  Q.      Well, what does it actually say?

(1)                    CARLTON SMITH

(2) **A.      Liberty or Death, I believe it says.**

(3) Q.      And how about below it, what does that

(4) say down there?

(5) **A.      Don't Shit on Me.**

(6) Q.      And how about the colorful tattoo on

(7) your right arm, what's that one?

(8) **A.      The flag, the American flag.**

(9) Q.      And your dog tags?

(10) **A.      My father's dog tags.**

(11) Q.      Okay, was he in the Army?

(12) **A.      Yes.**

(13)              **MR. CERRONE:  Counsel, how much**

(14)       **longer do we have here?**

(15)              **MR. SHIELDS:  I don't think not**

(16)       **that much longer.**

(17) Q.      And how about this other tattoo on your

(18) upper arm that we can see?

(19) **A.      It's a skull with red, white, and blue**

(20) **feathers draped off of horns.  It's got like a**

(21) **bull skull, if you will.  Pretty lame.**

(22) Q.      Does it symbolize anything meaning for

(23) you?

(24)              **MR. CERRONE:  Objection.**

(25) **A.      Patriotism, that's all.**

**CARLTON SMITH**

(1)

(2)  Q.    So from the back, basically, we just

(3)  see, the medical pouch is what's on the left

(4)  side of the picture?

(5)          MR. CERRONE:  And just for the

(6)      record, we are at BATES 108.

(7)          MR. SHIELDS:  Correct, BATES

(8)      108.

(9)  A.    Yes, that's a medical pouch, I believe,

(10)  yes.

(11)  Q.    And what is in your back right pocket,

(12)  is that a phone?

(13)  A.    Probably my phone, I think.

(14)  Q.    Do you carry anything in your pockets of

(15)  your, it looks like they are cargo pants?

(16)  A.    I mean not usually.  But maybe my

(17)  credentials, I don't know.

(18)  Q.    So next would be BATES 109.  I can't

(19)  really see it, but the picture after 108, do

(20)  you know who that is?

(21)  A.    I'm pretty sure that's Chuck Carol, Jr.,

(22)  I think.

(23)  Q.    Okay.  Does looking at him from

(24)  behind --

(25)  A.    Don't quote me.  I think that's Chuck

CARLTON SMITH

(1)

(2) **Carol, Jr.  I can't say for sure.**

(3) Q.     Okay.  And I was going to say 109 is a

(4) picture from the same person from behind, and I

(5) was going to ask if that helps you to identify

(6) him at all?

(7) **A.     No.**

(8) Q.     And then picture BATES Number 111, do

(9) you know who that is?

(10) **A.     That's Christian DeVinney.**

(11) Q.     Okay.  And are these glow sticks that he

(12) has?

(13) **A.     Yes, it is.**

(14) Q.     Okay.  What do you guys carry glee

(15) sticks for?

(16) **A.     For example, in an active shooter**

(17) **situation, if you enter the building, you find**

(18) **the shooter, you take out the shooter, and**

(19) **there is multiple agencies responding.  If you**

(20) **are on the phone with dispatch, you might say,**

(21) **for example, this is officer Chris DeVinney,**

(22) **I'm in the bathroom.  When the cops come in,**

(23) **please tell them don't shoot me.  I'm marked**

(24) **with a red glow stick.**

(25) Q.     Got it.  And let me ask you, is it

(1)                        CARLTON SMITH

(2)    typical that you guy dress in plain clothes?

(3)    **A.      Yes.**

(4)    Q.      So that would be one of the reasons you

(5)    would carry glow sticks, to kind of like

(6)    identify yourself like you just said?

(7)    **A.      The glow sticks are not to identify**

(8)    **ourselves, they are to make use of, if needed.**

(9)    **The patch that says U.S. Marshal is what**

(10)   **identifies us or police or whatever**

(11)   **identifiers.**

(12)   Q.      Okay.  And the question about DeVinney,

(13)   is this like a regular, just a long gun; like

(14)   what kind of gun is that?

(15)   **A.      It's an A.R. long gun.**

(16)   Q.      Okay.  And what happens after the

(17)   shooting; what did you do after Dedrick was

(18)   shot?

(19)   **A.      At some point, he was brought out of the**

(20)   **bathtub.  Also, at some point, simultaneously**

(21)   **probably, Sergeant DeVinney and somebody else**

(22)   **came in and immediately tried medical on**

(23)   **Dedrick.  And I was still standing there.  And**

(24)   **I remember seeing him and trying to help.  And**

(25)   **I did something to help.  I don't remember what**

(1)                    **CARLTON SMITH**

(2)    **I did, but I was kind of shocked.  And**

(3)    **eventually, someone pulled me out to get me out**

(4)    **of the house.**

(5)    Q.    Is that basically because you were there

(6)    when the shooting happened?

(7)    **A.    Yes.**

(8)    Q.    And what happened after you got pulled

(9)    out of the house?

(10)   **A.    We waited for the ambulance to show up.**

(11)   **Waiting for supervisors and investigators to**

(12)   **show up.  I was waiting for my supervisor to**

(13)   **show up.  There was a lot of time spent out in**

(14)   **front of the house.  The reasons for that, I**

(15)   **don't know.  We were just waiting for**

(16)   **investigators and supervisors.**

(17)   Q.    Okay.  How long were you in front of the

(18)   house for?

(19)   **A.    I don't remember.  At least a half hour,**

(20)   **probably.**

(21)   Q.    Okay.  Before you exited the house, did

(22)   you enter any other rooms or help clear the

(23)   house at all?

(24)   **A.    No.**

(25)   Q.    Okay.  So you went right from the

```
(1)                    CARLTON SMITH
(2)   bathroom to outside?
(3)   A.      Yes.
(4)   Q.      And did you speak with anybody when you
(5)   were waiting outside of the house?
(6)   A.      Just my teammates.
(7)   Q.      And what did you tell them?
(8)   A.      It wasn't more of a telling them
(9)   anything.  It was more of a, holy shit, I can't
(10)  believe that just happened, type of
(11)  conversation.
(12)  Q.      Did you speak with Shenea James,
(13)  Dedrick's mother?
(14)  A.      I never spoke to her.  If I did, I don't
(15)  remember speaking to her.
(16)  Q.      Okay.  Do you remember seeing her arrive
(17)  at the scene?
(18)  A.      No.
(19)  Q.      Do you remember any other friends or
(20)  family of Dedrick being there?
(21)  A.      I don't remember any of that.
(22)  Q.      Do you remember seeing the grandmother
(23)  at all after the shooting?
(24)  A.      No, I don't.
(25)  Q.      Do you remember a security system at
```

(1)                    CARLTON SMITH

(2)    Dedrick's house?

(3)    **A.      No, I don't.**

(4)    Q.      It's not something that was like

(5)    discussed before execution of the warrant?

(6)    **A.      Not before, no.**

(7)    Q.      Do you remember having any discussions

(8)    about it afterwards, at all?

(9)    **A.      Yes, with an RPD investigator who was**

(10)   **investigating the incident when they showed me**

(11)   **pictures of inside the house.**

(12)   Q.      Okay.  And that was the first time you

(13)   were aware of the security system?

(14)   **A.      Correct.**

(15)   Q.      Okay.  Was there like a team debriefing

(16)   after the incident?

(17)   **A.      I'm sure there was.  Immediately after,**

(18)   **most likely not.  But at some point, yes.**

(19)   Q.      Okay.  Do you remember what was

(20)   discussed at the debriefing?

(21)   **A.      Probably just a -- I don't know exactly,**

(22)   **no.**

(23)   Q.      Do you remember discussing, for example,

(24)   like how things could have been done

(25)   differently?

(1)                    CARLTON SMITH

(2) **A.      We probably did, but I can't say for**

(3) **sure that we did.**

(4) Q.      Did you discuss, for example, like how

(5) things might have been done more safely?

(6) **A.      We might have.**

(7) Q.      When there is a debriefing, is there an

(8) after-the-accident report that's created?

(9) **A.      No.**

(10) Q.      Is there kind of like, I don't know, a

(11) written report after an incident like this

(12) about, you know, the debriefing at all?

(13) **A.      Other than the incident report, no.**

(14) Q.      Yeah, that's what I was getting at.

(15) Other than the incident report, there is no

(16) other writing; is that correct?  So the answer

(17) a no?

(18) **A.      No.**

(19) Q.      Okay.  So you said that after the

(20) incident, you spoke with your supervisor and an

(21) investigator from the RPD; is that right?

(22) **A.      Yes.**

(23) Q.      Did you speak with anyone else about the

(24) incident as part of any investigation?

(25) **A.      That day?**

**CARLTON SMITH**

(1)

(2) Q.    Whether it be that day or later on?

(3) **A.    I'm not sure.  Can you say the question**
(4) **again, please?**

(5) Q.    Well, that was a bad question, so let me
(6) back up.  So that day when you spoke to your
(7) supervisor, was that at the scene or somewhere
(8) else?

(9) **A.    I spoke with him at the scene, yes, and**
(10) **after.**

(11) Q.    And did you speak with any other
(12) supervisors or people investigating the
(13) incident at the scene?

(14) **A.    No.**

(15) Q.    Where did you go after you left the
(16) scene?

(17) **A.    To the public safety building.**

(18) Q.    Okay.  And what happened when you got to
(19) the public safety building?

(20) **A.    The investigators at RPD wanted to speak**
(21) **with each of us in reference to the incident**
(22) **that had just taken place.  And I don't know if**
(23) **it was voluntarily or not, but that's why I was**
(24) **there.**

(25) Q.    And did you speak to an investigator?

```
(1)                   CARLTON SMITH
(2)    A.      Yes.
(3)    Q.      Do you remember what his first name was?
(4)    A.      Letchenger (phonetic).  I don't remember
(5)    his first name.
(6)    Q.      Was it Kevin?
(7)    A.      Maybe Josh.
(8)    Q.      Yes, I think there is two of them.
(9)    A.      Yes.  Also, I may -- or there was
(10)   another RPD investigator.  I remember I spoke
(11)   with a few of them when the New York State
(12)   investigators were talking to me.
(13)   Q.      When you say "New York State
(14)   investigator," do you mean from the Attorney
(15)   General's Office?
(16)   A.      Correct, yes.
(17)   Q.      And was that on that day or some later
(18)   time?
(19)   A.      No, that was some later time.
(20)   Q.      Okay.  And did you also speak with
(21)   anyone from the U.S. Marshal Service's Less
(22)   Than Lethal Review Board?
(23)   A.      We never speak with them.  Usually, we
(24)   fill out our report and send it in.  But we
(25)   never speak to them.
```

CARLTON SMITH

(1)

(2) Q.    Okay.  Other than your supervisor, did

(3) you speak with anybody at the U.S. Marshal

(4) Service about the incident as part of any

(5) investigation?

(6) **A.    As part of the investigation, I don't**

(7) **think so.  Maybe from the Course Review Board.**

(8) **I can't say for sure.  In our official**

(9) **capacity, I think you are asking?**

(10) Q.    Correct.

(11) **A.    Investigative capacity, I don't think**

(12) **so.**

(13) Q.    Unofficially, did you speak to anybody

(14) else?

(15) **A.    Just the guys in the office.  And I**

(16) **guess the U.S. officials wanted to talk to me.**

(17) Q.    So who was that at the time?

(18) **A.    Charles Salina.**

(19) Q.    So you spoke to Charles Salina at some

(20) point after the incident?

(21) **A.    I spoke with everybody after the**

(22) **incident.**

(23) Q.    And you said this was the only incident

(24) that someone was involved in that someone was

(25) shot and killed, other than an occasion with

(1)                    CARLTON SMITH

(2)    someone with a knife?

(3)    **A.        Correct, yes.**

(4)    Q.    Okay.  Your attorney produced, as part

(5)    of this case, the text messages from the date

(6)    of the incident, BATES Numbers 561 to 569.  And

(7)    this will be Exhibit 5.

(8)            **MR. SHIELDS:  Can I please have**

(9)            **this marked?**

(10)            **(Whereupon, a color photocopied**

(11)            **text messages document was marked as**

(12)            **Plaintiff's Exhibit 5, for**

(13)            **identification, as of this date.)**

(14)    Q.    So i just have a few questions, if you

(15)    remember, about some of the texts from that

(16)    day.

(17)            Now, I believe they start -- well, let

(18)    me back up.  Have you ever seen this document

(19)    before?

(20)    **A.        Yes.**

(21)    Q.    Okay.  So my first question, the texts,

(22)    I think they go reverse chronological order.

(23)    So the time of the first one starts at 7:30.

(24)    And then the next thing one, 8:16; is that

(25)    right, if you remember?

(1)                    CARLTON SMITH

(2)  **A.      I don't know if that's right, honestly.**

(3)  **We have seen them all over the place, but that**

(4)  **might be right.  I will take your word for it**

(5)  **if it is.**

(6)  Q.     Okay.  Now, what was your telephone

(7)  number?

(8)  **A.        XXX-XXX-XXXX.**

(9)  Q.     So if, you know, when there is multiple

(10) telephone numbers like this, can you tell -- is

(11) that like a group text that you had with the

(12) task force or?

(13) **A.     I'm assuming so.**

(14) Q.     Okay.  So it might not necessarily be

(15) with the task force, it might be a different

(16) text thread?

(17) **A.      Yes.**

(18) Q.     So for example, this second text here

(19) which looks like it was sent at 8:16 -- and

(20) this is page BATES Number 568 -- and it says

(21) "Where are you going?  I was summoned to a drug

(22) test.  The car is still parked on the same spot

(23) on Vinewood."  Do you know who sent that text?

(24) **A.      I'm assuming Ulatowski.**

(25) Q.     Okay.  So because he was the one doing

CARLTON SMITH

(1)
(2) the scouting?

(3) **A.    Yes.  And he was partners with Rico.**

(4) Q.    Rico was another task force member?

(5) **A.    Rico was a nickname, yes, for another**
(6) **T.F. officer.**

(7) Q.    And who was that the nickname for?

(8) **A.    Give me a second.  Rick, it's Rick.  His**
(9) **last name -- give me a second.  I don't**
(10) **remember his last name.  His last name is**
(11) **slipping my mind right now.  It's Rick.**

(12) Q.    Okay.

(13) **A.    Vandermar (phonetic).  Thank you.**

(14) Q.    Okay.  So when you were talking earlier
(15) about having been out at another location or
(16) something with the task force, is that sort of
(17) what these texts are talking about?  Where, for
(18) example, it says in this text from 8:20, "Maybe
(19) we can watch both Strathmore and Vinewood?

(20) **A.    I'm assuming so, yes.  For different**
(21) **cases.**

(22) Q.    Okay.  And then various people are
(23) saying, "Okay, well I might be tied up for a
(24) bit in ops"?

(25) **A.    Correct.**

**CARLTON SMITH**

(1)

(2) Q.    So people kind of giving their

(3) availability?

(4) **A.    Yes.**

(5) Q.    Okay.  So I have highlighted a few of

(6) these, and I realized 10:08 would be a little

(7) bit before the incident.  If you remember, do

(8) you remember the exact time that the warrant

(9) was executed?

(10) **A.    No.**

(11) Q.    Okay.  I think it was sometime after

(12) 10:30 or so.  But the highlighted stuff that I

(13) have here, do you know what folks are talking

(14) about when they are saying "What's wrong with

(15) the county, man?"  Do you know what that is

(16) referring to?

(17) **A.    I would be speculating.  I have an idea,**

(18) **but I would be speculating.**

(19) Q.    So this is BATES 567.  And what's your

(20) speculation about what this is referring to?

(21) **A.    It's got to do with, I think, the**

(22) **suggestion of body cameras, but I don't know.**

(23) Q.    Okay.  So up here -- well, going one by

(24) one.  So the next one, that isn't highlighted.

(25) "I'm not going to lie, OGC has made my asshole

(1)                        CARLTON SMITH

(2)     pucker up, man."  And first of all, what is

(3)     OGC?

(4)     **A.       Officer of General Counsel.**

(5)     Q.       Do you know who sent that text?

(6)     **A.       I think one of my coworkers.**

(7)     Q.       Okay.  I'm assuming you don't know

(8)     offhand whose phone number this is, or do you?

(9)     **A.       I'm pretty certain I think I do.   I**

(10)    **think it's Deputy Morerro (phonetic), but I**

(11)    **don't want to say for sure.**

(12)    Q.       So when you are saying this thing about

(13)    body cameras?

(14)    **A.       I speculate that it's about body**

(15)    **cameras.  I'm not positive.**

(16)    Q.       Okay.  And when you say that, is it

(17)    based on this one text about where it says

(18)    "What's wrong with the county, man," or these

(19)    other texts?

(20)    **A.       I'm trying to remember the context, and**

(21)    **I can't say for certain.  But I think it was a**

(22)    **subject of body cameras.**

(23)    Q.       Okay.  And like where it says up here at

(24)    10:09, "DeVinney should have known."  And then

(25)    it says, "In what way about BWC"?

```
                        CARLTON SMITH
```

(1)

(2)     **A.      That why I said body camera, BWC.**

(3)     Q.      And above that, is that the same thing

(4)     where it says "Coverage if something goes wrong"?

(5)     **A.      I don't know what that is referencing.**

(6)     **Again, maybe body cameras.**

(7)     Q.      And then if we fast forward up here

(8)     where it says, "I don't know.  They definitely

(9)     don't give us the warm and fuzzy at all," that

(10)    looks like the same number as you thought was

(11)    Morerro?

(12)    **A.      Yes.**

(13)    Q.      And do you know what he is referencing

(14)    there?

(15)    **A.      I think General Counsel.**

(16)    Q.      Was there something going on with the

(17)    General Counsel's Office at that time?

(18)    **A.      It was, yes.**

(19)    Q.      And do you know what that was?

(20)    **A.      Speculating there was some, at the time,**

(21)    **there was some probable cause arrest being**

(22)    **made.  The general counsel may or may not have**

(23)    **liked us going in as a task force for legal**

(24)    **reasons.  I think that's what it was.  And they**

(25)    **had actually come to our office to give a class**

                    **CARLTON SMITH**

(1)

(2) **on that, which I wasn't there that day.**

(3)         **But they actually came to our office, I**

(4) **think, in reference to maybe the probable cause**

(5) **arrest being made.  But I don't remember exactly.**

(6) Q.      And above that, it just says, "Did you

(7) do a five?"  Is that like a form or something?

(8) **A.      That's a form, yes.**

(9) Q.      And what's that form for?

(10) **A.      That form is like a quick operational**

(11) **brief plan.  It's a form that you state who the**

(12) **target or fugitive's name, you put in who is**

(13) **all present from your task force, and you try**

(14) **to assign guys on this form to certain**

(15) **positions.  You like put in the address of the**

(16) **fugitive's home, those types of things.**

(17) Q.      Okay.  And would that like, for example,

(18) have a picture of the fugitive and some

(19) identifying information of the fugitive?

(20) **A.      We don't put a picture of the fugitive.**

(21) **99.99 times, we don't put a picture of the**

(22) **fugitive.**

(23) Q.      Okay.  And then where it says "Likely

(24) won't be covered if the smallest thing is

(25) missing or went wrong."  So that was a text at

```
                     CARLTON SMITH
```

(1)

(2)  10:11.  Do you know if -- that looks like it is

(3)  from Morerro also.  Do you know what he is

(4)  referencing there?

(5)  **A.      He is referencing OGC.  He attended the**

(6)  **OGC briefing and he was basically relaying to**

(7)  **me, and whoever else was reading, to make sure**

(8)  **that all of our ducks were in a row as far as**

(9)  **the 45, or whatever.**

(10)  Q.    So that wasn't referring to this

(11)  incident?

(12)  **A.      It might have been.  I don't know.**

(13)  Q.    Okay.  And then the next text is at

(14)  11:04.  And so that would be, I think, shortly

(15)  after this incident.  It says, "Guessing you

(16)  guys are okay.  But let us know if you need

(17)  anything with the guns."  And then a bunch of

(18)  them --

(19)           **MR. CERRONE:  It's "gun," in**

(20)       **particular.**

(21)           **MR. SHIELDS:  Oh, I'm sorry.**

(22)  Q.    "If you need any help with the gun."  Do

(23)  you know who that text is from?

(24)  **A.      No, I don't.  I don't recognize the number.**

(25)  Q.    Okay.  And then I have a question about

```
(1)                    CARLTON SMITH
(2)   this text at 11:13.  It says, "Now they want to
(3)   ask me a million questions.  I was like, I
(4)   don't know.  Seriously, are you okay?  I can
(5)   hear it in your voice and that freaks me out."
(6)   And do you know who sent that text message?
(7)   A.      My wife.
(8)   Q.      Okay.  So you called her after the incident?
(9)   A.      At some point.
(10)  Q.      And do you know who was asking her questions?
(11)  Did the investigator ask her questions too?
(12)  A.      Her coworkers.
(13)  Q.      Okay.  One question I had generally
(14)  about these texts, was this like your personal
(15)  cell phone or do you have a cell phone that's
(16)  provided by the U.S. Marshal Service?
(17)  A.      Provided by the U.S. Marshal Service.
(18)  Q.      Okay.  And after the incident, did you
(19)  also use your personal cell phone or only your
(20)  Marshal Service cell phone?
(21)  A.      You got to be more specific.
(22)  Q.      I guess -- yeah, I was assuming.  So let
(23)  me back up.  Do you carry with you, both, your
(24)  own personal cell phone and the cell phone
(25)  provided by the U.S. Marshal Service?
```

(1)                     CARLTON SMITH

(2)   **A.      Sometimes.**

(3)   Q.      Do you remember if it was on the date of

(4)   the incident?

(5)   **A.      I don't remember that.**

(6)   Q.      On an instance like this, would you use

(7)   both your personal cell phone and the U.S. Marshal

(8)   cell phone to report about the incident?

(9)   **A.      Not about the incident, no.**

(10)  Q.      Okay.  Just with your statement that you

(11)  gave to the Attorney General's Office, do you

(12)  remember when that happened?

(13)  **A.      I don't remember.**

(14)  Q.      Did you go to them or did they come to

(15)  you when they took your statement?

(16)  **A.      I went to them.**

(17)  Q.      Was that over on Exchange Boulevard in

(18)  that red building?

(19)  **A.      No, it was not on Exchange, but a public**

(20)  **safety building, I believe it was.**

(21)  Q.      Okay.  And other than that statement and

(22)  the statements that we talked about earlier

(23)  with RPD, and to your supervisor with the U.S.

(24)  Marshal Service, did you ever give any other

(25)  statements about the incident?

```
(1)                      CARLTON SMITH
(2)     A.       No other official statement, no.
(3)     Q.       Did you ever make any posts on Facebook
(4)     or anything like that?
(5)     A.       No.
(6)                  MR. SHIELDS:  All right.  I think
(7)            those are all of my questions for you
(8)            today, Deputy.  I appreciate your time.
(9)                  THE WITNESS:  Thank you.
(10)                 MR. CERRONE:  Thank you.
(11)                 MR. CAMPOLIETO:  Thank you.
(12)                 (Time Noted: 1:15 p.m.)
(13)
(14)                 _____
(15)                      CARLTON SMITH
(16)
(17)    Subscribed and sworn to before me
(18)    this _____ day of _____, 2024.
(19)
(20)    _____
(21)         Notary Public
(22)
(23)
(24)
(25)
```

```
(1)

(2)                       I N D E X

(3)

(4)    WITNESS             EXAMINATION BY        PAGE

(5)    Deputy Carlton      Mr. Shields             5
       Smith

(6)

(7)

(8)                        EXHIBITS

(9)    PLAINTIFF'S         DESCRIPTION           PAGE

(10)   1                   Training Records        51
                           document, color
(11)                       photocopy

(12)   2                   Training Materials      59
                           document, color
(13)                       photocopy

(14)   3                   U.S. Marshal Report     96
                           document, color
(15)                       photocopy

(16)   4                   Photographs,            98
                           color photocopies

(17)

       5                   Text messages          113
(18)                       document, color
                           photocopy

(19)

(20)

(21)

(22)

(23)

(24)

(25)   Cont'd On Next Page.
```

(1)
(2)                  REQUESTS FOR PRODUCTION
(3)     DESCRIPTION                              PAGE
(4)     Materials/communications from trainings  26,58
(5)     Specific trainings organized by Christian 28
        DeVinney
(6)
        Standard Operating Procedures manual     34
(7)
        Training materials with respect to       54
(8)     specific training on September 9, 2016
(9)     Records of Deputy Smith's trainings and  62
        exam scores
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

(1)

(2)                 C E R T I F I C A T E

(3)

(4)          I, TERAZA CONWAY, hereby certify that

(5)    the Examination Before Trial of CARLTON SMITH

(6)    was held before me on the 7th day of May, 2024;

(7)    that said witness was duly sworn before the

(8)    commencement of his testimony; that the

(9)    testimony was taken stenographically by myself

(10)   and then transcribed by myself; that the party

(11)   was represented by counsel as appears herein;

(12)         That the within transcript is a true

(13)   record of the Examination Before Trial of said

(14)   witness;

(15)         That I am not connected by blood or

(16)   marriage with any of the parties; that I am not

(17)   interested directly or indirectly in the

(18)   outcome of this matter; that I am not in the

(19)   employ of any of the counsel.

(20)         IN WITNESS WHEREOF, I have hereunto set

(21)   my hand this 7th day of June, 2024.

(22)

(23)   _____

(24)               TERAZA CONWAY

(25)

May 7, 2024

```
(1)    ERRATA SHEET FOR: CARLTON SMITH
          CARLTON SMITH, being duly sworn, deposes and
(2)    says: I have reviewed the transcript of my
       proceeding taken on 05/07/2024. The following
(3)    changes are necessary to correct my testimony.
(4)    _____
(5)    PAGE LINE     CHANGE              REASON
(6)    ----|----|--------------------|--------------
(7)    ----|----|--------------------|--------------
(8)    ----|----|--------------------|--------------
(9)    ----|----|--------------------|--------------
(10)   ----|----|--------------------|--------------
(11)   ----|----|--------------------|--------------
(12)   ----|----|--------------------|--------------
(13)   ----|----|--------------------|--------------
(14)   ----|----|--------------------|--------------
(15)   ----|----|--------------------|--------------
(16)   ----|----|--------------------|--------------
(17)   ----|----|--------------------|--------------
(18)   ----|----|--------------------|--------------
(19)   ----|----|--------------------|--------------
(20)   ----|----|--------------------|--------------
(21)   ----|----|--------------------|--------------
(22)   ----|----|--------------------|--------------
(23)        Witness Signature:_____
       Subscribed and sworn to, before me
(24)   this ___ day of _____, 20 ___.

       _____      _____
(25)   (NOTARY PUBLIC)           MY COMMISSION EXPIRES
```

**A**

**a.m (2)**
1:23 52:23
**A.R (1)**
105:15
**Aaron (2)**
24:24 25:4
**able (4)**
22:7 77:9,12
77:13
**absolutely (1)**
90:16
**academies (1)**
16:16
**academy (7)**
13:15 14:23,24
17:8,13 32:10
32:12
**access (1)**
38:23
**accident (1)**
98:14
**account (2)**
46:6,17
**acted (1)**
25:7
**active (5)**
11:5,6 12:7
13:5 104:16
**activity (1)**
71:22
**actual (1)**
26:10
**addition (3)**
25:18 44:14,23
**additional (4)**
16:17 17:5,12
18:7
**address (6)**
5:10 45:5,19
48:14 69:11
119:15
**adequate (1)**
69:9

**administer (1)**
3:9
**administerin...**
4:10
**administrato...**
1:3
**adopt (1)**
47:20
**advance (2)**
65:16,17
**advantage (3)**
76:16 77:11
79:8
**advisement (3)**
34:18 54:17
58:21
**after-the-acc...**
109:8
**against- (1)**
1:7
**agencies (4)**
31:7,15 55:12
104:19
**agency (5)**
25:24 31:13,20
32:2,3
**agent (12)**
48:3,15,22
49:7,9,12,14
49:20,23
64:19 74:11
95:6
**agents (2)**
48:12 74:4
**aggressive (3)**
44:2 62:22
63:2
**ago (1)**
30:22
**agree (7)**
7:2 32:3 35:25
38:7,8,9
39:10
**AGREED (4)**

3:3,6,8 4:4
**air (9)**
11:8,9,16,18
11:20 12:4
78:20 79:25
80:6
**Alden (1)**
30:14
**alerted (1)**
23:24
**alike (1)**
63:14
**alternative (1)**
94:3
**alternatives (...**
88:10 91:21
92:3,4,7 94:2
95:3
**ambulance (1)**
106:10
**Amendment ...**
33:8
**America (3)**
1:10,19 12:16
**American (1)**
102:8
**analogies (1)**
60:24
**analyzing (1)**
17:21
**and/or (1)**
58:17
**announceme...**
69:3
**annual (3)**
21:16 23:6
25:19
**answer (18)**
6:3,20 24:3
28:14 31:9,16
31:18 35:20
38:14 39:8
44:21 50:9
51:3 53:5

94:12,21 99:4
109:16
**answered (2)**
76:21 77:22
**answers (1)**
62:8
**anticipated (2)**
33:18 45:20
**antics (1)**
32:24
**anybody (4)**
85:25 107:4
112:3,13
**anymore (1)**
39:9
**apologize (2)**
11:11 56:7
**appear (1)**
52:14
**appeared (1)**
81:7
**appears (2)**
100:5 126:11
**applied (1)**
12:3
**apply (4)**
16:21 17:21
34:25 83:8
**appreciate (1)**
123:8
**apprehend (...**
39:14,18 40:2
40:3,13 41:7
42:11 46:19
47:7,9,24
65:21 68:10
89:12,22 90:2
90:7,25 91:7
91:22 92:6
**apprehended...**
48:2
**apprehendin...**
32:5 64:22
65:2,9 88:10

92:4 94:6,19
**apprehensio...**
49:16 60:14
70:14 94:3
**approach (2)**
73:15 93:15
**appropriate ...**
42:15
**approximate...**
13:18
**approximate...**
13:17,23 18:13
19:12
**area (4)**
72:24 73:2
85:12,13
**arm (6)**
31:4 101:14,16
101:18 102:7
102:18
**armed (1)**
71:6
**arms (3)**
83:20,21,22
**Army (3)**
11:5 12:7
102:11
**arrest (9)**
33:7,12 39:20
46:8 65:18
69:6 95:7
118:21 119:5
**arrested (1)**
45:18
**arresting (2)**
42:22 49:11
**arrive (1)**
107:16
**arrived (1)**
75:10
**ARROWOO...**
1:10
**asking (9)**
5:18 66:9

77:14 78:10
85:23 86:11
88:15 112:9
121:10
**asks (2)**
77:18 78:3
**aspire (1)**
31:14
**aspires (2)**
31:6,22
**assault (5)**
70:22,25 71:2
71:9 72:3
**assaults (1)**
70:24
**asshole (1)**
116:25
**assign (1)**
119:14
**assigned (3)**
49:12 50:5
74:14
**assignments ...**
73:23
**assistant (2)**
2:12 50:12
**assume (6)**
6:5,21 45:25
46:4 61:10,12
**assuming (12)**
17:15 24:12
46:8 65:12,14
86:3 99:16
114:13,24
115:20 117:7
121:22
**assumption (3)**
6:8 71:13,15
**Atlantic (3)**
22:23 23:7
24:6
**attempt (3)**
39:25 40:13
88:19

**attend (6)**
21:22 22:3
26:2 27:5,23
29:10
**Attendance (1)**
52:6
**attended (4)**
26:12 29:3
58:18 120:5
**attending (1)**
56:4
**attention (1)**
66:6
**attorney (9)**
2:9,12,19 3:11
4:17 51:21
111:14 113:4
122:11
**attorneys (4)**
2:3,10,17 3:4
**authorized (2)**
3:9 97:10
**automaticall...**
47:14
**availability (1)**
116:3
**available (5)**
22:9 69:18,24
70:3,4
**Avenue (2)**
2:4,10
**avoid (1)**
37:5
**aware (6)**
35:3 66:3
80:24 81:2
84:21 108:13

― B ―

**B-lining (1)**
75:7
**back (28)**
10:13 12:6
14:17,22

15:18 16:4,8
19:19 22:20
25:17 29:21
32:9 35:11
46:24,25 47:3
57:23 76:25
78:16 79:10
83:14 90:5
93:15 103:2
103:11 110:6
113:18
121:23
**background ...**
9:24,25 45:2
48:4
**backing (3)**
78:15,19 81:20
**backwards (3)**
78:22,25 79:7
**bad (1)**
110:5
**badge (1)**
100:4
**Baker (11)**
75:19,23 79:11
82:23 83:3
84:2,9,21
86:22 98:13
99:5
**based (5)**
60:15 66:10
94:7 95:16
117:17
**basic (4)**
13:14,20 14:15
33:6
**basically (15)**
29:22 52:5
61:19 66:9
68:16 75:10
76:18 77:9
85:4 90:23
92:15 96:19
103:2 106:5

120:6
**basis (5)**
15:7 21:16
25:19 33:11
55:15
**BATES (20)**
51:23 52:18
56:15 59:6,9
61:17 62:21
63:9,18 96:3
96:5 98:7,17
103:6,7,18
104:8 113:6
114:20
116:19
**bathroom (14)**
79:10,11,20
80:3,9,17
81:19,21,25
82:3,5 83:19
104:22 107:2
**bathtub (11)**
82:7,9,11,20
82:25 83:2,17
83:23 84:16
86:5 105:20
**batons (1)**
87:16
**beanbag (3)**
87:22,24 88:3
**bear (1)**
4:20
**becoming (1)**
12:4
**began (1)**
16:19
**beginning (2)**
16:9 65:11
**believe (20)**
7:22 9:17 65:5
66:5,16 68:18
68:23 71:7
76:4,11,11
78:10 94:7

100:15,18
102:2 103:9
107:10
113:17
122:20
**bell (1)**
53:22
**best (7)**
27:5 31:22,25
36:4 40:16
51:3 82:25
**better (4)**
10:15 28:15
31:21 82:18
**Bill (2)**
98:13 99:5
**Bills (1)**
57:6
**bit (2)**
115:24 116:7
**black (1)**
100:15
**blank (1)**
56:10
**block (2)**
30:7,8
**blood (1)**
126:15
**blue (1)**
102:19
**BMW (1)**
42:2
**Board (2)**
111:22 112:7
**bodies (1)**
74:9
**body (8)**
82:15 83:20
116:22
117:13,14,22
118:2,6
**borrow (1)**
99:7
**Bosnia (3)**

May 7, 2024

[Page 130]

12:13,21,24
**bottom (1)**
59:21
**Boulevard (1)**
122:17
**boxing (1)**
57:19
**Branch (1)**
63:16
**brand (1)**
99:11
**BRAXTER (1)**
1:12
**breach (1)**
74:14
**breacher (1)**
74:23
**break (1)**
51:10
**brief (1)**
119:11
**briefing (2)**
72:20 120:6
**briefings (1)**
72:14
**bring (2)**
47:17 48:21
**bringing (1)**
49:7
**brings (3)**
9:12 48:19
50:4
**broken (1)**
50:13
**brought (5)**
19:7 66:5,7,12
105:19
**budget (2)**
21:8,23
**Buffalo (3)**
2:11 50:20
57:6
**building (20)**
21:13 37:14,16

37:18,19,23
38:5,10,16
39:14,18
52:19 53:21
54:5,7 104:17
110:17,19
122:18,20
**built (1)**
29:24
**bull (1)**
102:21
**bullet-proof ...**
99:19
**bunch (1)**
120:17
**business (1)**
5:10
**button (1)**
59:20
**BWC (2)**
117:25 118:2

---

**C**

**C (6)**
2:2 4:2,2 5:2
126:2,2
**C'mon (1)**
93:14
**call (7)**
18:22 34:16
62:6 65:11
69:23 70:5
92:12
**called (5)**
12:17 23:11
64:17 92:11
121:8
**calling (1)**
20:7
**calls (1)**
92:17
**camera (1)**
118:2
**cameras (5)**

116:22 117:13
117:15,22
118:6
**CAMPOLIE...**
2:19 123:11
**cancel (1)**
21:24
**capacity (3)**
64:4 112:9,11
**car (18)**
39:6 40:25,25
46:23 67:24
67:25,25 68:5
68:8,17,19,21
69:3,4 75:7
93:21 94:11
114:22
**care (1)**
33:22
**career (6)**
7:21 8:6 55:8
90:9,19,24
**cargo (1)**
103:15
**Carlton (125)**
1:20 5:9 6:1
7:1 8:1 9:1
10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1

44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
123:15 124:5
126:5 127:1,1
**Carol (2)**
103:21 104:2

**carrier (1)**
99:22
**carries (1)**
87:16
**carry (8)**
87:12,15,15
101:9 103:14
104:14 105:5
121:23
**case (27)**
7:16 47:12,16
47:20 48:3,5
48:12,12,15
48:19,20,21
49:5,9,10,12
49:14,18,20
49:23 64:16
64:19 65:25
73:18 74:4
95:6 113:5
**cases (1)**
115:21
**catch (1)**
88:25
**cause (3)**
33:5 118:21
119:4
**cell (8)**
121:15,15,19
121:20,24,24
122:7,8
**center (4)**
30:21 32:16
96:8,11
**Central (3)**
10:7,8,10
**centralized (1)**
60:20
**Cerrone (26)**
2:12 7:8 8:21
26:16 28:22
31:8 34:17
35:8,14 36:15
36:25 38:13

39:7 51:11
53:4,13 54:15
58:19 59:16
62:16 67:13
102:13,24
103:5 120:19
123:10
**certain (5)**
37:23 55:13
117:9,21
119:14
**certificated (2)**
87:19,23
**certification ...**
3:5
**certify (1)**
126:4
**chance (1)**
87:9
**change (3)**
22:19 85:7
127:5
**changed (2)**
15:22 85:4
**changes (1)**
127:3
**charge (2)**
3:11 71:9
**charges (1)**
19:7
**Charles (4)**
24:25 25:5
112:18,19
**Charlotte (1)**
37:17
**child (2)**
70:25 71:9
**choice (4)**
36:21,22,23,23
**choices (1)**
36:20
**choose (1)**
11:25
**Chris (1)**

104:21
**Christian (9)**
1:12 26:25
27:7 28:2,20
50:24 51:2
104:10 125:5
**chronologica...**
113:22
**Chuck (2)**
103:21,25
**Church (1)**
2:17
**circumstanc...**
77:18
**city (8)**
1:10 2:16 22:8
22:23 23:7
24:6 50:17,18
**civil (2)**
7:15 33:2
**clarification ...**
7:11
**class (2)**
14:24 118:25
**classes (5)**
10:13 33:3,6
56:5 62:2
**clear (1)**
106:22
**click (3)**
60:5 61:8 62:7
**closest (1)**
19:22
**clothes (1)**
105:2
**Co-Defenda...**
1:21
**college (2)**
10:4,5
**color (10)**
51:16 58:25
95:22 98:3
113:10
124:10,12,14

124:16,18
**colorful (1)**
102:6
**Columbia (2)**
13:21 16:12
**combat (1)**
12:22
**come (21)**
24:8 40:22
43:16,17 48:5
76:18 77:15
77:19 78:4,4
78:4,10 88:15
88:17 92:18
92:20,21
93:20 104:22
118:25
122:14
**comes (2)**
93:12,13
**coming (2)**
29:9 78:6
**command (2)**
50:12 51:5
**commander ...**
50:11,16,17
**commencem...**
126:8
**COMMISSI...**
127:25
**committed (1)**
45:13
**committing (1)**
33:12
**common-sen...**
35:18
**communicat...**
24:7
**communicati...**
26:14 58:17
**community (1)**
15:16
**compiled (1)**
34:11

**complete (3)**
55:20 61:24
96:23
**completed (3)**
55:14 61:15
96:24
**completing (1)**
56:5
**compliance (2)**
85:17,18
**compliant (1)**
81:7
**complies (4)**
52:5,16 97:5
100:12
**comply (4)**
83:12,13 85:5
85:16
**computer (3)**
45:2 62:5,6
**concrete (1)**
71:16
**concur (1)**
9:21
**conduct (1)**
4:21
**conducted (2)**
4:5 65:2
**conducts (1)**
48:3
**configuratio...**
82:22 83:3
**confirming (1)**
4:11
**confusing (1)**
5:24
**connected (1)**
126:15
**consent (1)**
4:14
**consider (5)**
87:7 91:21
92:7,8 93:25
**consideratio...**

42:17
**considered (2)**
4:14 70:14
**consists (1)**
23:16
**Cont'd (1)**
124:25
**contact (6)**
49:6 74:15,20
80:15,22 83:5
**contacted (1)**
49:4
**Containment...**
92:11
**context (1)**
117:20
**continue (1)**
18:20
**control (5)**
4:9 32:24
82:14 84:13
93:21
**controlled (1)**
39:6
**conversation...**
97:13 107:11
**CONWAY (2)**
126:4,24
**coordinate (1)**
69:15
**cops (1)**
104:22
**copy (2)**
3:10 4:17
**correct (27)**
11:17,24 13:10
15:9 26:6
30:2 35:7
37:7,8,10,11
37:14 57:13
69:20,21
73:24 77:11
79:15 100:2
103:7 108:14

May 7, 2024

[Page 132]

109:16
111:16
112:10 113:3
115:25 127:3
**correctly (1)**
66:11
**costs (1)**
4:20
**counsel (13)**
4:4,7,18 8:21
34:13 54:10
62:10 102:13
117:4 118:15
118:22
126:11,19
**Counsel's (1)**
118:17
**country (2)**
22:15 31:7
**county (16)**
1:11,14 2:23
22:8 25:25
27:8,11,18
30:14 47:16
48:20,21 49:6
66:7 116:15
117:18
**couple (2)**
25:6 47:11
**course (4)**
52:17 54:20
56:15 112:7
**court (20)**
1:2,21 3:10 4:7
4:9,11 7:18
7:21,25 8:4,5
8:16 13:21,22
15:10,11
16:11 17:18
18:3 47:13
**courthouse (2)**
15:15 18:21
**courtroom (1)**
16:3

**cover (1)**
51:25
**Coverage (1)**
118:4
**covered (3)**
28:18 58:15
119:24
**covering (1)**
98:15
**covers (1)**
25:3
**COVID (2)**
98:19,20
**coworkers (2)**
117:6 121:12
**crafts (1)**
11:20
**created (1)**
109:8
**credentials (1)**
103:17
**crime (2)**
33:12 96:7
**crimes (2)**
19:2 45:13
**criminal (10)**
13:19 14:10,16
14:18 15:5
19:7 41:17
45:10,17
96:10
**Current (1)**
24:23
**Currently (1)**
24:22
**custody (5)**
19:8 39:3 82:8
82:11 89:3

---

**D**

**D (2)**
4:2 124:2
**D.C (2)**
16:20 18:11

**dagger (1)**
101:8
**Dan (2)**
24:24 25:5
**danger (2)**
37:7,10
**dangerous (18)**
37:14,15,23,24
38:7,10,15,18
38:22 39:9,22
39:25 46:5
71:10 94:18
94:19,22 95:2
**darted (3)**
79:10,11 81:21
**date (14)**
9:15,22 51:19
59:4 64:2
68:23 72:15
72:18 95:25
98:6,14 113:5
113:13 122:3
**dated (2)**
54:19 56:17
**day (27)**
9:8 23:19,22
23:22 29:19
29:24,25
53:25 54:20
64:5,13 67:10
68:20 87:6,13
87:24 99:5
109:25 110:2
110:6 111:17
113:16 119:2
123:18 126:6
126:21
127:24
**day-to-day (1)**
15:7
**days (2)**
29:23 65:17
**dead-end (1)**
73:11

**Deadly (1)**
32:23
**Death (1)**
102:2
**debriefing (4)**
108:15,20
109:7,12
**deceased (1)**
1:4
**decide (2)**
93:18 95:7
**decided (1)**
73:25
**decision (2)**
35:19,19
**decisions (4)**
35:7,15,16
43:14
**Dedrick (40)**
1:4 49:19
64:23 65:3,9
65:21 66:3,17
67:7,18 68:2
70:13 71:5
76:14,15,17
76:18 77:15
77:24 78:3,4
78:6,15,19
79:7,16 81:7
81:20 82:6,15
83:5,16 84:2
86:3 88:10,14
96:11 105:17
105:23
107:20
**Dedrick's (3)**
83:20 107:13
108:2
**deem (1)**
94:15
**Defendant (3)**
1:19 2:10,17
**Defendants (1)**
1:16

**definitely (1)**
118:8
**Delaware (1)**
2:10
**demand (5)**
26:13 28:19
54:12 58:16
62:11
**demands (2)**
28:19 58:16
**department (...**
1:14 2:16
47:16
**departments...**
33:25
**depend (2)**
21:23 40:18
**depending (7)**
21:8 40:16
42:24 60:9,10
94:10,22
**depends (1)**
41:16
**deployed (3)**
12:10,16 13:8
**deployments...**
12:12,17,20
**deposed (1)**
7:13
**deposes (1)**
127:1
**deposition (8)**
3:8 4:5,10,21
5:19 7:8 8:19
8:23
**deputies (2)**
1:12 22:11
**deputy (26)**
5:14 13:16
14:5,15,18
15:2,5 22:4,7
24:9,11,13
26:11 47:19
48:21 50:17

52:16 55:20
58:18 59:10
62:12 64:4
117:10 123:8
124:5 125:9
**describe (4)**
43:4 44:18
57:14 100:8
**described (1)**
52:8
**DESCRIPTI...**
124:9 125:3
**detectives (1)**
48:9
**determinatio...**
45:22,24
**determine (3)**
45:12 46:18
95:6
**determined (1)**
94:7
**determining ...**
47:25
**develop (2)**
42:12,20
**developed (1)**
64:22
**DeVinney (16)**
1:12 27:2,7
28:2,6,9,21
29:3 30:3
50:25 104:10
104:21
105:12,21
117:24 125:5
**Die (1)**
101:23
**different (26)**
8:10 20:8
22:18 24:13
30:5 35:22
40:11,11,23
41:4,8 42:9
47:11 49:25

57:21 60:3
68:25 69:15
69:16,19
70:23 74:17
92:23 94:23
114:15
115:20
**differently (1)**
108:25
**direct (1)**
25:8
**directly (2)**
22:4 126:17
**disagree (1)**
39:11
**disconnect (1)**
47:6
**Discovery (1)**
98:10
**discretion (1)**
95:16
**discuss (3)**
88:9,13 109:4
**discussed (4)**
72:8 92:2
108:5,20
**discussing (1)**
108:23
**discussion (1)**
67:15
**discussions (3)**
65:7 72:12
108:7
**DISMISSED...**
2:22
**dispatch (1)**
104:20
**District (8)**
1:2,2 2:13
13:16,21
16:12 52:19
53:21
**document (12)**
51:17,20 59:2

59:20 96:3
98:8 113:11
113:18
124:10,12,14
124:18
**documents (3)**
9:4,6,11
**DOE (1)**
1:11
**dog (4)**
62:22 63:2
102:9,10
**dogs (1)**
44:2
**doing (21)**
15:15 16:5,6,9
16:14,19 17:5
19:11 20:3,15
28:7 41:22
43:13 45:2
62:25 68:25
69:19 78:23
80:13 85:11
114:25
**DOLBY (1)**
2:5
**door (24)**
73:16 74:3,5,8
74:21,24 75:7
75:20 76:12
76:13,22
77:22 81:8,12
88:17 89:2,5
89:6,10 92:20
92:21 93:6,14
95:8
**doors (1)**
88:25
**doorway (1)**
77:6
**dot (1)**
86:18
**draped (2)**
101:15 102:20

**draw (1)**
38:23
**dress (1)**
105:2
**drive (1)**
68:19
**driven (1)**
68:24
**drove (3)**
68:5,21 69:2
**drug (1)**
114:21
**ducks (1)**
120:8
**duly (3)**
5:3 126:7
127:1
**duties (2)**
15:7,19
**duty (4)**
11:5,6 12:7
13:5

**E**

**E (9)**
2:2,2 4:2,2,2,2
124:2 126:2,2
**e-mail (2)**
17:2 28:23
**e-mailed (1)**
4:18
**E82 (1)**
14:15
**earlier (7)**
14:9 45:9 52:8
55:6 64:10
115:14
122:22
**Early (1)**
19:13
**easier (1)**
10:16
**east (1)**
30:17

**eastern (1)**
22:17
**echelon (2)**
24:2 60:23
**education (1)**
10:3
**educational (1)**
9:25
**effect (2)**
3:10 101:24
**eight (1)**
55:9
**eight-hour (2)**
30:7 53:8
**either (7)**
51:2 64:11
67:23 78:3
83:25 84:9
94:18
**Elliot (2)**
2:5 5:16
**employ (1)**
126:19
**employed (2)**
11:7 22:4
**encompasses...**
18:22
**encountered ...**
38:11
**enforcement ...**
31:4,6,12
32:15 35:6,23
36:12 57:22
60:13 63:16
69:16 84:25
91:13
**ensure (2)**
69:8,18
**entailed (2)**
33:8 53:3
**enter (8)**
41:13 46:2
61:8 79:14
81:25 89:21

104:17
106:22
**entered (11)**
78:13 79:20
80:9,12,16
81:16,18 90:7
90:13,20,25
**entering (3)**
91:21 92:5
94:17
**entire (2)**
7:21 37:15
**entitled (3)**
52:6 60:13
63:15
**entrance (1)**
40:14
**entry (19)**
21:13 37:13,22
38:5,9,22
39:5,13,18
40:8 46:14
52:20 53:21
54:4 78:9
88:2,8,11
94:25
**equivalent (1)**
61:5
**Erie (1)**
30:14
**ERRATA (1)**
127:1
**ESQ (3)**
2:5,12,19
**essentially (1)**
94:4
**estate (1)**
1:3
**estimate (1)**
29:2
**event (1)**
97:22
**eventually (1)**
106:3

**everybody (18)**
15:4 16:17
17:7 18:6,23
21:21 22:6
25:3 35:15,16
37:3 41:18
46:4 69:10,12
86:16 87:16
112:21
**exact (6)**
9:22 29:14
38:2 78:5
82:21 116:8
**exactly (9)**
17:16 46:10
55:10 56:25
76:3 77:23
99:15 108:21
119:5
**exam (3)**
61:22 62:13
125:9
**examination ...**
1:18 3:10 5:6
124:4 126:5
126:13
**examined (1)**
5:4
**example (35)**
17:19 23:13
25:13 26:3,25
27:6 31:25
33:4,24 37:17
40:12 41:22
42:3,21 43:14
43:20 47:3
48:20 50:10
55:12 62:21
65:20 73:15
80:22 88:13
90:17 92:24
93:25 104:16
104:21
108:23 109:4

114:18
115:18
119:17
**Exchange (2)**
122:17,19
**exchanged (3)**
51:21 77:3
98:9
**execute (3)**
43:22 46:7
69:5
**executed (4)**
72:16 74:12
75:11 116:9
**executing (2)**
72:9,14
**execution (9)**
68:12 70:8,12
72:12,20 73:6
73:9 88:18
108:5
**exhibit (11)**
4:17,17,19
51:18,20 59:3
92:3 95:24
98:5 113:7,12
**exhibits (2)**
4:16 124:8
**exit (1)**
93:2
**exited (1)**
106:21
**experience (3)**
10:25 94:17
95:17
**EXPIRES (1)**
127:25
**explain (2)**
28:14 77:8
**explains (1)**
49:9
**expose (4)**
35:24 36:7,13
37:9

**exposed (1)**
36:18
**exposer (1)**
83:9
**exposes (1)**
36:24
**exposure (2)**
36:3,6
**express (1)**
4:14
**extent (6)**
26:8,10 28:17
34:14 54:11
58:14
**extra (1)**
74:6
**eyes (1)**
86:6

**F**

**F (2)**
4:2 126:2
**face (1)**
98:15
**Facebook (1)**
123:3
**facility (1)**
30:16
**fact (4)**
6:6 40:21
67:21 84:5
**factors (2)**
42:18 43:21
**failed (1)**
39:20
**fair (20)**
7:4 19:9,17
20:22 29:13
30:9 32:4,20
33:20 38:8
42:19 43:24
44:3,5 49:17
50:3 57:20,24
77:20 97:23

**falls (1)**
23:4
**familiar (3)**
17:19 33:18
59:10
**family (4)**
45:3,4,6
107:20
**far (3)**
6:24 63:7
120:8
**fast (5)**
62:18 81:17
87:10 97:3
118:7
**father's (1)**
102:10
**feathers (1)**
102:20
**federal (9)**
11:8,9,15,18
22:5 31:5,13
32:15 47:12
**feel (2)**
73:2 81:20
**feeling (1)**
31:21
**fight (1)**
82:17
**fighting (2)**
83:23 84:14
**figure (4)**
85:24 86:13,14
97:2
**figuring (1)**
49:15
**filing (1)**
3:4
**fill (1)**
111:24
**fills (1)**
74:9
**finally (1)**
13:23

**find (2)**
5:23 104:17
**find/arrest (1)**
66:10
**firearm (2)**
46:3 100:19
**fired (2)**
84:17,21
**Firewood (2)**
66:25 67:9
**first (35)**
5:3,18 7:6,13
7:14 16:9
19:11 23:19
40:2,4 47:9
51:20 52:7,11
59:8,19 61:13
61:17 62:20
63:11,21
69:24 72:25
73:19 75:16
78:18 81:7
82:4 98:11
108:12 111:3
111:5 113:21
113:23 117:2
**five (4)**
11:6 24:18
29:12 119:7
**flag (2)**
102:8,8
**flashlight (1)**
101:4
**focused (1)**
86:6
**folks (2)**
8:8 116:13
**follow (3)**
26:17 28:23
62:14
**followed (1)**
82:3
**following (2)**
40:24 127:2

**follows (1)**
5:5
**foot (1)**
21:13
**force (76)**
3:9 9:2 18:9
20:9,13 21:7
21:12,17,18
21:19,21 22:2
22:7,12,22,24
22:25 23:5,12
25:18 26:5,21
27:5,16,20,23
28:3,4,10,25
29:8 30:23,24
32:6,21,23,24
32:25 33:10
34:20 35:2
40:7 41:24
42:11 47:8,23
48:7,10,16,20
48:22,24 49:2
49:4,7,8,10
49:13 50:2,6
50:15,16 64:8
65:8 66:13
87:12 91:20
95:16 99:7,8
114:12,15
115:4,16
118:23
119:13
**forgot (2)**
23:11 56:10
**form (15)**
3:6 31:9 35:9
36:16 37:2
38:14 39:8
56:2,3 119:7
119:8,9,10,11
119:14
**formal (3)**
30:16 72:14
73:22

**forward (2)**
62:18 118:7
**four (4)**
13:23 29:5
41:25 55:21
**four-hour (1)**
30:7
**freaks (1)**
121:5
**frequency (1)**
21:3
**frequently (3)**
60:7 89:19
91:10
**Friday (1)**
29:20
**friends (1)**
107:19
**front (15)**
37:16 38:17,21
39:2 57:23
75:12,13,17
75:20 92:20
92:21 93:14
100:15
106:14,17
**fugitive (52)**
15:25 16:2,5
16:14,19 17:6
17:24 18:12
18:20 19:3,5
19:11,25 20:3
20:7,8,11,13
20:15,17
21:18 34:20
34:25 39:14
39:19 40:2,17
41:25 42:11
46:19 47:9,13
49:3 57:10,17
60:14 64:8
89:12,22 90:8
91:2,7,12,15
91:16,22 92:6

94:20 119:18
119:19,20,22
**fugitive's (2)**
119:12,16
**fugitives (6)**
17:3 18:8 32:6
36:2 88:25
92:4
**furnished (1)**
3:11
**FURTHER (3)**
3:6,8 4:16
**fuzzy (1)**
118:9

**G**

**gaining (1)**
40:14
**gang (1)**
71:22
**gather (3)**
43:10 44:13,15
**gathered (4)**
67:21 70:12
72:19,25
**gathering (1)**
44:24
**gears (2)**
9:23 63:25
**general (19)**
42:16 44:17
53:24 54:2
59:12 71:12
71:15 74:4,10
74:16 87:13
87:14 91:20
92:5 94:15
117:4 118:15
118:17,22
**General's (2)**
111:15 122:11
**generally (10)**
15:6 18:25
21:16 26:24

41:13 48:18
59:8 63:10
89:5 121:13
**generated (3)**
96:17,20 97:5
**Georgia (1)**
32:16
**getting (6)**
13:14,24 34:4
75:6 93:24
109:14
**gist (2)**
15:13 45:7
**give (11)**
19:13 24:19
29:14 40:12
51:3 90:17
115:8,9 118:9
118:25
122:24
**given (2)**
7:24 98:25
**gives (1)**
9:16
**giving (1)**
116:2
**gladly (1)**
6:17
**glee (1)**
104:14
**glow (4)**
104:11,24
105:5,7
**go (41)**
9:7 10:10,12
10:20 14:17
14:22 16:8
18:3,9 22:7,9
23:12 24:6
25:10 29:22
30:21 32:9
36:23 40:20
41:3,10,18
45:4 46:23,25

May 7, 2024

[Page 136]

52:7 57:4,5
57:22 59:7
63:19 65:8
67:13 74:5,8
74:21 93:2
94:6 110:15
113:22
122:14
**goes (6)**
21:9 47:14
55:25 61:8
93:15 118:4
**going (40)**
5:17 9:23
23:21 25:17
36:9 38:16
40:20 41:10
41:19 42:2,25
43:6,7 46:14
46:15 47:23
52:4,15 55:4
58:6 59:7
61:20 63:4,25
65:18 66:19
67:6 78:22
79:7 86:23
92:6 93:6,19
104:3,5
114:21
116:23,25
118:16,23
**good (4)**
5:14,15 26:3
33:18
**gotten (3)**
14:11 66:11
97:16
**government ...**
22:5 31:5,13
**graduate (1)**
10:17
**graduated (2)**
10:16,25
**graduating (2)**

11:4 13:15
**grandma (11)**
76:21,25 77:9
77:14,21,22
80:13,15,19
80:24 81:3
**grandmothe...**
76:12 80:22
107:22
**grandmothe...**
66:18 67:2,8
67:12,19
**Great (1)**
22:24
**greets (1)**
23:20
**ground (3)**
5:19 80:25
81:4
**group (1)**
114:11
**guess (22)**
17:10,19 37:20
44:6 47:5
50:4 52:11
53:18 55:4
61:24 62:12
63:20 65:19
69:14 82:17
87:14 89:4,25
93:13 96:22
112:16
121:22
**guessing (5)**
16:6 54:3,3
56:23 120:15
**guides (1)**
34:2
**gun (38)**
38:18,21,23
39:2 41:18,20
45:16,23 46:9
46:15 71:3
80:10 84:9,10

84:14,18,22
84:24,24,25
85:2,4 86:2
87:2,22,24
89:23 90:3,8
90:10,14,14
91:17 105:13
105:14,15
120:19,22
**guns (9)**
40:21 41:6,9
41:15,17 44:6
44:7 71:13
120:17
**gunshot (1)**
85:22
**guy (3)**
93:7,11 105:2
**guys (27)**
26:2 27:16
46:12 72:8
73:14 74:6,17
75:8,12 79:3
81:18,24 82:7
83:23 85:23
87:15,15 88:6
88:9,13 92:13
92:16 93:14
104:14
112:15
119:14
120:16

————————
### H
————————
**H (1)**
5:2
**half (2)**
89:14 106:19
**hand (2)**
78:22 126:21
**handcuff (3)**
83:14 100:13
101:2
**handcuffs (2)**

38:25 82:13
**handful (1)**
24:17
**handle (1)**
69:22
**handouts (2)**
23:14,16
**hands (8)**
78:15,20,24,24
79:19,22
83:14 92:21
**handwritten ...**
55:25
**happen (1)**
42:6
**happened (22)**
9:2 25:11
37:17 42:4
68:22 76:2,6
76:7 77:25
81:14,17
87:10 88:21
90:4,16,18
97:14 106:6,8
107:10
110:18
122:12
**happening (2)**
24:5 85:21
**happens (6)**
47:10 89:18
91:10 93:22
93:23 105:16
**happy (1)**
26:18
**hard (10)**
21:6 24:17
28:11 29:4,6
29:14 44:13
58:10 89:15
94:21
**harm (5)**
35:25 36:6,8
36:14,24

**head (7)**
9:10 17:21
83:10 85:15
86:8,9 93:9
**hear (2)**
80:5 121:5
**heard (2)**
77:4 80:7
**hearing (2)**
83:25 85:22
**height (1)**
98:19
**held (4)**
1:21 61:3
67:16 126:6
**help (5)**
27:15 105:24
105:25
106:22
120:22
**helps (1)**
104:5
**hereunto (1)**
126:20
**hey (6)**
41:24 55:20
61:19 69:4,10
92:17
**hidden (1)**
38:23
**hierarchy (1)**
50:14
**high (10)**
10:16,17,20,21
10:25 11:4
56:16 60:14
63:22 70:14
**highest (1)**
10:2
**highlight (1)**
96:15
**highlighted (3)**
116:5,12,24
**hired (1)**

13:14
**history (4)**
13:12 41:17
    45:10,17
**hold (1)**
25:20
**holding (1)**
80:10
**holy (1)**
107:9
**home (13)**
39:5 42:23
    44:2,12 68:17
    68:18 74:3
    89:24 90:13
    90:21 91:21
    92:5 119:16
**hometown (2)**
19:21,23
**honestly (1)**
114:2
**horns (1)**
102:20
**hosted (1)**
29:10
**hour (2)**
55:9 106:19
**hours (4)**
52:23 55:14,21
    55:22
**house (45)**
38:19,22 40:19
    40:20 41:4,6
    41:10,11,13
    41:15,23
    66:18 67:2,8
    67:12,19
    69:12 71:14
    73:6,8 74:18
    77:24 78:14
    79:3,14 80:12
    80:16 81:15
    81:17,18
    92:25 93:8,16

93:19,20
94:12 106:4,9
106:14,18,21
106:23 107:5
108:2,11
**household (1)**
78:14
**hundred (1)**
8:9
**Hungary (1)**
12:21

─────────
**I**
─────────
**idea (10)**
55:3 56:23
    57:2,3 61:9
    70:2,3 80:14
    86:3 116:17
**identificatio...**
51:19 59:4
    95:25 98:5
    113:13
**identifiers (1)**
105:11
**identifies (1)**
105:10
**identify (3)**
104:5 105:6,7
**identifying (1)**
119:19
**identity (1)**
4:12
**idiot (1)**
56:10
**immediate (1)**
46:22
**immediately ...**
79:7,9 84:11
    85:8 105:22
    108:17
**important (1)**
89:7
**in-service (1)**
20:24

**incident (40)**
9:12,16 25:10
    25:11,14
    50:21 64:2,3
    68:20,23
    72:18 87:8
    90:6 96:3,21
    96:23 97:20
    108:10,16
    109:11,13,15
    109:20,24
    110:13,21
    112:4,20,22
    112:23 113:6
    116:7 120:11
    120:15 121:8
    121:18 122:4
    122:8,9,25
**incidents (2)**
71:18 91:5
**include (1)**
33:10
**includes (1)**
22:6
**incorrect (1)**
6:6
**Index (1)**
1:7
**indicate (1)**
59:21
**indicating (8)**
52:2,19 56:3
    78:17,23
    96:16 100:4,6
**indication (6)**
41:14 44:7
    70:13 71:5,12
    71:17
**indirectly (1)**
126:17
**individualize...**
50:12
**individually ...**
1:4

**individuals (1)**
56:4
**information ...**
43:10 52:12
    68:4 70:9,17
    96:8,10,11
    97:9,17
    119:19
**inherently (4)**
37:14 38:6
    39:21 95:2
**inhouse (1)**
16:17
**initially (2)**
18:21 75:22
**initiated (1)**
96:14
**injured (1)**
85:25
**inside (9)**
57:10,18 65:21
    68:9 82:8,11
    91:6 99:23
    108:11
**instance (3)**
65:20 90:20
    122:6
**institutions (1)**
12:16
**Instructions ...**
56:3
**intel (12)**
66:10,14,17,20
    66:24 67:6,7
    67:17,20 68:3
    71:21,25
**intelligence (4)**
44:15 48:5,8
    70:11
**intelligence-...**
44:19
**interested (1)**
126:17
**interior (1)**

17:16
**internal (5)**
8:15 16:23,24
    21:4 30:12
**internally (2)**
8:12,14
**interview (1)**
97:21
**investigating...**
18:25 108:10
    110:12
**investigation...**
8:15 16:20
    20:7,16 40:11
    48:4 68:25
    69:5 109:24
    112:5,6
**investigation...**
15:25 16:2,5
    16:15 17:6,24
    18:12,20,23
    18:24 19:13,5
    19:11,25 20:3
    20:12,17
**Investigative...**
112:11
**investigator ...**
1:10,13 13:19
    14:10,16,18
    14:22 15:2,5
    75:19 108:9
    109:21
    110:25
    111:10,14
    121:11
**investigators...**
48:9 66:16
    106:11,16
    110:20
    111:12
**invite (3)**
27:4,11,18
**involve (1)**
42:25

May 7, 2024

[Page 138]

**involved (5)**
71:18,21 90:12
91:5 112:24
**involves (1)**
21:13
**involving (1)**
71:2
**Iraq (1)**
12:25
**IRR (1)**
13:6
**issues (1)**
33:9

**J**

**James (10)**
1:3,4,4 49:19
64:23 65:3,9
65:21 66:4
107:12
**jaw (1)**
85:13
**Jeff (26)**
66:7,12 67:23
68:15,24 69:2
70:4,7 75:14
76:17,21,25
77:14,22,24
78:9,13 79:3
79:11 82:22
82:24 83:16
83:25 84:21
88:15 92:15
**Jeffrey (2)**
1:13 49:21
**Jersey (1)**
23:5
**job (7)**
10:25 13:12
15:6,19 37:15
38:12 89:19
**jogs (1)**
61:14
**JOHN (2)**

1:11 2:19
**join (2)**
11:12,25
**joined (4)**
11:2,4,22
13:13
**Josh (1)**
111:7
**Jr (3)**
10:21 103:21
104:2
**judge (1)**
7:20
**judicial (1)**
15:10
**June (2)**
54:19 126:21

**K**

**keep (2)**
56:3 60:24
**kept (2)**
60:21 61:11
**Kevin (1)**
111:6
**key (1)**
13:17
**keyed (1)**
78:12
**kid (2)**
72:3,4
**kids (2)**
43:15,20
**killed (2)**
5:17 112:25
**kind (22)**
8:15 17:20
34:24 44:20
51:4 57:19,22
61:10 65:14
69:12 72:14
73:5,18 75:20
78:15,22
100:8 105:5

105:14 106:2
109:10 116:2
**kinds (1)**
70:23
**knew (2)**
83:22 99:11
**knife (4)**
91:19 101:8,9
113:2
**knock (8)**
73:16 88:17,24
89:2,5,6,10
95:8
**knocked (6)**
75:14 76:4,5,8
76:10,21
**know (91)**
6:2 17:14
19:13 23:20
25:9 26:8,22
27:2 28:5,12
28:13 30:18
30:20 31:12
31:17,17
33:24 37:25
38:25 40:19
40:21 41:17
46:7 49:19
50:22 53:8
55:5,10,11,17
59:25 60:3,25
60:25 61:3,6
61:7,12 64:12
70:6,9,10
72:7,24 76:9
76:13,20
83:21,22
84:14 85:22
86:2,4 87:24
87:25 89:16
90:8 96:25
98:11,18,19
99:11 100:4
103:17,20

104:9 106:15
108:21
109:10,12
110:22 114:2
114:9,23
116:13,15,22
117:5,7 118:5
118:8,13,19
120:2,3,12,16
120:23 121:4
121:6,10
**knowing (1)**
41:19
**knowledge (1)**
60:19
**known (1)**
117:24

**L**

**L (3)**
3:2 4:2 5:2
**lack (1)**
82:17
**Lakes (1)**
22:24
**lame (1)**
102:21
**Larish (2)**
24:25 25:5
**laser (2)**
86:18,20
**late (2)**
19:13,14
**law (15)**
2:16 4:15 31:4
31:6,12 32:15
35:6,23 36:12
57:21 60:13
63:15 69:16
84:25 91:13
**laws (1)**
33:7
**lawsuit (2)**
9:13,16

**laying (1)**
84:15
**layout (2)**
44:11 63:10
**lead (1)**
26:23
**leader (9)**
31:6,25 49:22
49:24 50:8,19
50:23 64:11
64:13
**learned (5)**
33:4,7 35:4
37:12 67:11
**learning (1)**
61:20
**leaves (1)**
41:23
**leaving (1)**
65:22
**left (4)**
100:20 101:16
103:3 110:15
**legal (4)**
33:3,6,11
118:23
**LegalView/Z...**
4:8
**LEO (1)**
36:2
**lesson (2)**
23:14,16
**let's (8)**
9:24 16:8 18:7
36:20 40:8
49:3 51:9
93:15
**Letchenger (1)**
111:4
**lethal (6)**
32:24,25 87:4
87:11,18
111:22
**level (1)**

10:2
**Lexington (1)**
2:4
**Lexitas (1)**
4:9
**Liberty (2)**
101:23 102:2
**lie (1)**
116:25
**liked (1)**
118:23
**limit (1)**
36:3
**LINE (1)**
127:5
**list (1)**
52:17
**litigation (1)**
4:15
**little (9)**
55:2 59:20
61:25 73:11
85:9 98:24
100:11 101:8
116:6
**live (1)**
44:2
**LLP (1)**
2:3
**local (6)**
22:10,11 30:4
30:10 33:25
47:16
**located (1)**
10:22
**location (10)**
41:8 43:23
44:23 45:23
60:20 66:25
67:22 68:14
70:7 115:15
**locations (2)**
4:7 22:15
**logistics (1)**

49:15
**long (13)**
8:6 12:5 18:12
20:16 29:7,17
32:12 76:20
99:12,15
105:13,15
106:17
**longer (3)**
15:25 102:14
102:16
**look (11)**
26:18 45:14,17
55:25 59:9
61:19 63:6,14
63:20 77:13
92:18
**looking (9)**
43:21,25 45:3
45:9 54:21
61:13 62:20
99:22 103:23
**looks (11)**
53:7,15 54:24
56:11 58:2,6
101:5 103:15
114:19
118:10 120:2
**lot (14)**
41:16 42:24
43:2,3,16
46:22 57:7
70:23 73:17
73:21 74:5
89:13,16
106:13

—————————

**M**

**M (1)**
5:2
**M11 (1)**
96:16
**M428 (2)**
56:2,11

**magazine (1)**
100:14
**making (6)**
39:6 40:8
60:24 75:13
78:9 88:8
**man (3)**
116:15 117:2
117:18
**manager (1)**
18:4
**mandibular ...**
85:14
**manner (3)**
4:13 57:16
82:24
**manual (4)**
34:10,15,22
125:6
**marked (12)**
4:17 51:15,17
58:24 59:2
95:21,23 98:2
98:4 104:23
113:9,11
**marriage (1)**
126:16
**Marshal (45)**
8:16 11:3,8,9
11:10,13,16
11:18 12:2,3
12:4 13:12
14:5,15,18
15:3,5 20:24
21:4 24:9,11
25:2 29:11,15
31:4,5,14
34:2 64:4
95:23 96:2,21
97:10,13
99:17 105:9
111:21 112:3
121:16,17,20
121:25 122:7

122:24
124:14
**Marshal's (2)**
5:13 47:18
**Marshall (5)**
24:21,23 25:4
30:13 98:25
**marshals (7)**
8:10 22:4,8
31:24 38:6
55:15 60:2
**Maryland (1)**
13:16
**mask (1)**
98:22
**materials (10)**
26:10,13 54:12
58:16 59:2,6
92:2 95:15
124:12 125:7
**Materials/co...**
125:4
**mates (1)**
46:21
**matter (2)**
37:18 126:18
**mean (36)**
6:7 8:15 12:15
16:7 18:7,25
20:12 21:18
22:20 25:23
25:24 31:11
38:4 40:3
41:12,13 42:8
43:5 46:10
53:21 55:2
59:14 61:24
63:13 65:6
82:12 83:13
90:4 93:9
95:5 96:6,9
96:16 99:24
103:16
111:14

**meaning (3)**
47:12 66:24
102:22
**means (8)**
49:11 57:14
79:13 96:12
96:13,14,17
96:18
**measures (1)**
39:19
**medical (4)**
101:14 103:3,9
105:22
**meeting (1)**
4:8
**member (11)**
20:13 26:5
27:14 48:16
48:24,25 49:4
64:7 88:2
99:9 115:4
**members (10)**
1:14 9:2 21:11
25:20 26:22
27:23 28:3
45:6 69:15
87:12
**memory (2)**
9:7 61:14
**men (1)**
74:8
**mentioned (5)**
43:20 44:6,16
45:9 67:6
**message (1)**
121:6
**messages (3)**
113:5,11
124:17
**method (1)**
94:5
**methods (2)**
40:8 94:19
**MICHAEL (1)**

2:12
**middle (2)**
100:17 101:3
**military (1)**
10:6
**million (1)**
121:3
**mind (1)**
115:11
**minutes (1)**
8:20
**missed (1)**
57:8
**missing (1)**
119:25
**model (1)**
31:14
**moment (1)**
86:7
**Monday (1)**
29:18
**money (3)**
79:25 80:4,6
**Monroe (3)**
1:11,14 2:23
**months (2)**
24:5 60:10
**Morerro (3)**
117:10 118:11
120:3
**morning (2)**
5:14,15
**mother (1)**
107:13
**move (1)**
57:17
**movement (1)**
21:13
**moving (2)**
82:15,15
**MSCO (1)**
1:12
**multiple (2)**
104:19 114:9

**Municipal (1)**
2:19

---
**N**
---

**N (7)**
2:2 3:2 4:2,2,2
5:2 124:2
**name (11)**
5:8,16 56:14
61:4 76:13
111:3,5 115:9
115:10,10
119:12
**names (3)**
1:11,13 24:19
**National (2)**
96:7,10
**naturally (1)**
93:2
**NCIC (1)**
96:6
**necessarily (5)**
48:23 67:10
75:9 99:11
114:14
**necessary (2)**
36:5 127:3
**neck (2)**
83:10 85:12
**need (8)**
4:10 6:11,13
47:6 55:14
96:25 120:16
120:22
**needed (3)**
74:9 75:2
105:8
**neighbors (1)**
45:6
**never (12)**
13:8 35:23
39:17,24 40:4
55:19 80:10
80:19 84:17

107:14
111:23,25
**new (25)**
1:2,15,24 2:4,4
2:11,13,18
5:4,12 10:23
13:24 14:22
14:24 23:4,10
27:7,11 30:14
50:17,18
56:16 99:8
111:11,13
**newer (2)**
99:10,10
**nickname (2)**
115:5,7
**nine (1)**
98:10
**Notary (4)**
1:23 5:3
123:21
127:25
**Noted (1)**
123:12
**notice (1)**
41:9
**November (2)**
9:17,18
**number (24)**
21:6 24:17
28:11 29:4,6
29:13 47:12
47:15 51:23
55:13 56:15
62:21 63:10
63:18 89:13
89:15,17 96:3
104:8 114:7
114:20 117:8
118:10
120:24
**numbers (9)**
1:11,13 29:14
55:22 59:14

59:17 69:9
113:6 114:10
**NYSP (1)**
1:13

---
**O**
---

**O (5)**
3:2 4:2,2,2 5:2
**oath (3)**
3:9 4:10 7:24
**Objection (9)**
31:8 35:8,14
36:15,25
38:13 39:7
53:4 102:24
**objections (1)**
3:6
**Objective (1)**
61:18
**Objectives (1)**
63:19
**observation (...**
73:5
**observe (1)**
79:24
**observed (1)**
73:8
**obvious (9)**
39:21 76:17
78:2,8 79:9
82:6,16 84:8
84:23
**obviously (4)**
43:13 68:8
78:6 98:18
**occasion (3)**
71:8 91:14
112:25
**occupants (1)**
44:4
**occur (1)**
25:19
**October (1)**
9:18

**odds (1)**
41:10
**offhand (2)**
28:12 117:8
**office (21)**
1:15 2:9,23
5:13 13:25
25:25 27:8,11
30:16 34:7,9
47:18 50:20
50:20 66:8
111:15
112:15
118:17,25
119:3 122:11
**officer (11)**
3:9 4:10 27:3
35:23 36:12
39:10 64:17
91:13 104:21
115:6 117:4
**officers (10)**
1:11 22:8,8,11
24:13 33:22
35:6 74:2,15
80:5
**official (2)**
112:8 123:2
**officials (1)**
112:16
**OGC (4)**
116:25 117:3
120:5,6
**oh (3)**
85:8 97:4
120:21
**okay (235)**
6:5,11,15,18
6:22 7:14,23
8:8,18,22,25
9:4,6,11,15
9:19,23 10:5
10:8,8,14,17
11:12,22,25

May 7, 2024

[Page 141]

12:6,10,12,19
12:22 13:8,11
14:3,6 15:6
15:14,22 16:4
16:19,24 17:4
18:2,11,16,24
19:4,10,15,24
20:6,11 21:15
22:10,19 23:3
23:18 24:4,12
24:19 25:4,8
26:19 27:13
27:17 28:2,16
28:22 29:22
30:24 31:3,24
32:5,9,17
33:2,14,24
34:17 35:4
36:11 37:5
38:20 39:5,12
39:17 42:5,7
43:9 46:14
47:6,23 49:3
49:14,18,22
50:21 51:4,8
53:7,14,20
54:2,6,9,15
54:18 55:6,12
55:24 56:14
56:21 57:3,11
57:25 58:6,13
58:22 59:13
59:18 60:12
61:13,22 62:9
62:16 63:4,15
63:25 64:16
64:20,25
65:19,24 66:2
66:12,19 68:4
68:12,20 69:7
70:6 71:2
73:4,22,25
74:17 75:3,10
75:16 76:7,24

77:5,21 79:2
79:19,24 80:9
80:21 81:3,23
82:4,19,23
83:4,7 86:10
86:12,16,22
87:19 90:19
91:4,9,12,20
93:5 95:11,19
96:9,15,19
97:7,19,24
98:24 99:8,16
100:3,13
101:10,13,18
102:11
103:23 104:3
104:11,14
105:12,16
106:17,21,25
107:16
108:12,15,19
109:19
110:18
111:20 112:2
113:4,21
114:6,14,25
115:12,14,22
115:23 116:5
116:11,23
117:7,16,23
119:17,23
120:13,16,25
121:4,8,13,18
122:10,21
**once (8)**
7:21 8:12,14
18:10 23:3
36:21 60:10
61:8
**one-day (4)**
30:4,6 53:16
55:9
**one-week (1)**
25:18

**ones (1)**
30:12
**online (2)**
59:22 60:4
**open (1)**
74:24
**opens (2)**
76:12,13
**operating (3)**
34:15,21 125:6
**operation (2)**
34:6,10
**operational (...**
42:12,14,20
46:7,13,20
47:4 51:5
64:21 65:5
119:10
**operationall...**
65:16
**operations (5)**
18:22 56:16
57:4 63:17,23
**ops (1)**
115:24
**option (1)**
87:18
**options (2)**
87:4,11
**order (3)**
1:21 87:20
113:22
**organize (2)**
27:19 28:9
**organized (4)**
26:4 28:20
29:3 125:5
**organizes (1)**
23:25
**organizing (1)**
28:4
**outcome (1)**
126:18
**outside (11)**

38:17 40:22
77:15,19
78:10 81:12
88:14,15
92:19 107:2,5
**outstanding ...**
19:6
**oversea (1)**
12:19
**Overseas (1)**
12:21
**overview (1)**
10:24
**owned (1)**
68:5

_____
**P**
_____
**P (4)**
2:2,2 3:2 4:2
**P-I-N (1)**
57:12
**p.m (2)**
55:2 123:12
**packet (1)**
62:17
**page (19)**
51:25 52:18
54:18,21
55:25 56:15
59:7,7,8 63:9
63:11,18 96:5
114:20 124:4
124:9,25
125:3 127:5
**pain (2)**
85:17,18
**pants (1)**
103:15
**parked (1)**
114:22
**parking (1)**
57:7
**part (9)**
27:14,24 43:13

43:18 49:17
109:24 112:4
112:6 113:4
**participating...**
4:8
**particular (5)**
16:14 44:11
45:5 99:5
120:20
**particularly ...**
71:10
**parties (5)**
3:4 4:4,14,20
126:16
**partners (1)**
115:3
**party (2)**
2:22 126:10
**pass (1)**
48:9
**patch (2)**
99:17 105:9
**Patriotism (1)**
102:25
**patrol (1)**
33:25
**peace-keepin...**
12:23
**people (15)**
19:5 22:3 25:6
41:2 43:16
50:5 68:13
69:23 74:21
75:5 80:7
97:21 110:12
115:22 116:2
**percent (1)**
61:23
**Performance...**
61:18 63:19
**perimeter (3)**
72:23 74:7
92:16
**period (1)**

11:16
**periodically ...**
55:8
**permitted (2)**
35:24 36:7
**permitter (4)**
74:2,15,18
75:21
**perpendicula...**
73:3
**person (23)**
41:23 43:7,19
44:7 45:4,18
45:22 46:2,8
47:7,24 48:2
48:23 49:11
79:14 89:23
90:3,13 92:17
92:25 94:6
98:12 104:4
**person's (1)**
51:4
**personal (4)**
121:14,19,24
122:7
**personally (4)**
45:15,15 70:16
91:11
**personnel (1)**
60:21
**phone (12)**
103:12,13
104:20 117:8
121:15,15,19
121:20,24,24
122:7,8
**phonetic (7)**
24:23,24,25
25:2 111:4
115:13
117:10
**photocopied ...**
51:16 58:25
95:22 98:3

113:10
**photocopies ...**
124:16
**photocopy (4)**
124:11,13,15
124:18
**photographs...**
98:4,9,10
124:16
**physical (3)**
32:23 80:22
83:5
**picture (9)**
98:17 100:21
103:4,19
104:4,8
119:18,20,21
**pictures (2)**
63:3 108:11
**pin (5)**
57:6,9,11,15
95:9
**Pinning (1)**
58:7
**place (10)**
4:10 30:11
34:11 44:25
47:25 66:25
67:9 97:2
110:22 114:3
**placing (1)**
37:6
**plain (1)**
105:2
**Plaintiff (3)**
1:5,20 2:3
**Plaintiff's (6)**
51:18 59:3
95:24 98:4
113:12 124:9
**plan (12)**
41:12 42:12,14
42:21 46:7,13
47:4 64:22

65:16,20
73:14 119:11
**planning (5)**
42:10,22 49:16
64:25 65:5
**plans (3)**
23:14,17 46:20
**plate (1)**
99:21
**plates (3)**
99:21,22,24
**play (1)**
43:17
**plays (1)**
43:13
**please (13)**
5:8,11 34:19
35:10 51:14
54:15 58:23
67:13 95:20
97:25 104:23
110:4 113:8
**plus (1)**
16:17
**pocket (1)**
103:11
**pockets (3)**
100:23,25
103:14
**point (22)**
69:2 76:9,10
76:16 77:11
78:3,7 79:4,9
79:20 80:6
81:10 83:4
84:20 85:3
90:14 99:12
105:19,20
108:18
112:20 121:9
**point-person...**
49:15
**pointed (1)**
90:10

**pointer (1)**
86:18
**points (4)**
83:8,11 85:12
85:14
**police (13)**
1:14,15 32:18
33:18,22,25
66:6,16,21
67:18,20
69:17 105:10
**policy (3)**
40:5 94:13
95:5
**porch (7)**
73:15 75:13,13
75:18,23,24
81:12
**portion (1)**
53:9
**position (1)**
12:23
**positions (1)**
119:15
**positive (2)**
90:17 117:15
**possession (1)**
4:18
**possible (6)**
37:4 41:21
47:2 66:15
92:14 94:9
**possibly (1)**
84:12
**posts (1)**
123:3
**potential (1)**
88:10
**pouch (13)**
100:13,14,14
100:16,24
101:2,2,4,7,7
101:14 103:3
103:9

**practice (2)**
40:6,7
**practices (3)**
31:25 32:18
33:19
**preparation ...**
8:23
**prepare (1)**
8:19
**present (5)**
1:11,13 4:4
43:15 119:13
**presented (4)**
4:18 90:8
91:17,19
**presenting (1)**
4:17
**presents (1)**
90:3
**presiding (1)**
67:7
**pressure (5)**
83:8,11 85:9
85:11,14
**pretty (5)**
72:7 87:5
102:21
103:21 117:9
**previous (4)**
28:18 58:15
63:11,12
**previously (5)**
45:13 61:16
70:2 71:18
73:4
**print (1)**
56:11
**prior (16)**
4:18 17:17
40:14 64:20
65:3,9 66:2
68:12 70:7,12
72:8,15,20,22
73:6,8

May 7, 2024

[Page 143]

prisoners (3)
15:10,12 33:15
Prisons (1)
11:7
probable (2)
118:21 119:4
probably (19)
13:22 16:11,12
18:14 19:12
20:18 24:21
29:12 31:20
33:5 45:7
60:22 69:4
84:14 103:13
105:21
106:20
108:21 109:2
problem (2)
28:22 97:4
procedures (7)
32:18 33:19
34:6,10,15,21
125:6
proceed (1)
46:15
proceeding (1)
127:2
process (7)
12:5 44:19
47:8 69:6,7
69:10,13
Produce (1)
15:10
produced (3)
54:11 84:10
113:4
production (2)
34:16 125:2
professional ...
33:21
Program (1)
60:14
promoted (1)
14:21

promotion (3)
13:20 14:11,19
promotions (1)
14:12
proper (1)
32:18
protection (1)
99:25
provide (2)
11:20 23:13
provided (3)
121:16,17,25
public (16)
1:23 5:3 35:24
36:4,8,13,18
36:24 37:10
41:2 94:16
110:17,19
122:19
123:21
127:25
pucker (1)
117:2
pulled (3)
90:9 106:3,8
purpose (1)
4:15
pursuant (1)
1:21
push (1)
81:3
pushed (1)
80:25
put (34)
16:22,24 21:6
21:12,20
22:21 24:17
26:21 27:3,15
28:11 29:4,6
30:13 34:18
47:19 54:15
55:5 58:20
59:17 66:8
69:22 70:4

83:11,14 85:9
89:13,15,17
92:3 119:12
119:15,20,21
putting (1)
26:23

## Q

question (48)
3:7 4:19 5:21
5:24 6:3,6,17
6:20 7:6
17:10 28:15
31:9 35:9,11
35:20 36:6,11
36:16 37:2,20
38:2,14 39:8
47:21 52:7
53:15 56:7,9
59:19,24
64:12 66:20
67:5,6 69:14
89:4,9 90:22
90:23 91:23
94:5,13
105:12 110:3
110:5 113:21
120:25
121:13
questioning (1)
4:19
questions (13)
5:18 9:24
45:20 53:17
53:19 59:7
96:4,5 113:14
121:3,10,11
123:7
quick (3)
51:9 79:6
119:10
quickly (3)
78:11 79:6
84:8

quote (1)
103:25

## R

R (4)
2:2 4:2 5:2
126:2
radio (6)
46:22 69:4
72:22 93:16
101:11,15
random (2)
28:13,15
range (1)
30:15
read (5)
35:11,12 38:5
95:14 97:3
reading (2)
99:16 120:7
real (1)
97:3
realized (1)
116:6
really (3)
52:12 70:18
103:19
reason (2)
98:23 127:5
reasons (3)
105:4 106:14
118:24
recall (14)
7:19,22 18:14
25:3 27:25
55:7 60:15
62:25 67:20
68:3 70:18
86:19,21
94:24
receive (1)
17:5
received (2)
17:13 32:17

recess (1)
51:12
recognize (1)
120:24
recollection (...
52:21 53:3,18
54:22 56:21
62:23 73:13
record (9)
5:8,11 35:12
51:23 56:4
67:14,16
103:6 126:13
recorded (1)
4:13
recording (1)
4:13
records (9)
51:17,24 52:6
60:21 61:3,11
62:12 124:10
125:9
red (5)
86:18,19
102:19
104:24
122:18
reference (2)
110:21 119:4
referencing (4)
118:5,13 120:4
120:5
referring (3)
116:16,20
120:10
refresh (1)
62:22
regarding (1)
4:19
Regional (1)
23:4
regular (2)
55:14 105:13
regularly (1)

59:25
**regulations (1)**
34:24
**related (2)**
9:11 67:23
**relay (1)**
47:18
**relaying (1)**
120:6
**remember (95)**
8:2,7 9:9,9,15
9:21 17:16
24:20 28:3,6
53:25 56:25
57:25 58:11
58:11 60:17
62:24 63:2,3
63:20,21,24
64:15,20
66:11,15,20
67:25 68:15
70:20 71:11
71:20,23
72:11,13 75:6
75:15,17,21
76:3,5,23,24
77:2,14,16,23
78:5,14,18
79:16,18,23
80:4 81:22
82:21 83:2,25
84:3,5,6
85:21 86:22
86:24,25
98:15,16 99:5
99:15 105:24
105:25
106:19
107:15,16,19
107:21,22,25
108:7,19,23
111:3,4,10
113:15,25
115:10 116:7

116:8 117:20
119:5 122:3,5
122:12,13
**remind (2)**
6:11,13
**remote (1)**
4:7
**remotely (1)**
4:11
**repeat (3)**
67:3 73:7
91:23
**rephrase (4)**
6:17 31:10
36:9 38:3
**replying (1)**
17:2
**report (14)**
81:6 95:23
96:2,17,20,21
96:24 109:8
109:11,13,15
111:24 122:8
124:14
**reporter (3)**
4:7,11 35:13
**Reporting (1)**
4:9
**reports (1)**
25:15
**represent (1)**
5:16
**represented ...**
126:11
**representing...**
3:11
**request (4)**
16:23,25 19:18
47:8
**REQUESTS ...**
125:2
**require (1)**
88:2
**required (2)**

35:6 36:22
**requirement ...**
36:19
**requirement...**
55:13,15
**reserved (1)**
3:7
**reserves (1)**
13:4
**resided (1)**
68:5
**residence (16)**
40:9,15 42:22
44:4,8 46:2
65:21 88:9,11
89:11,22 90:7
90:25 91:6
94:18,25
**residing (3)**
67:8,12,19
**resisting (2)**
82:17 83:15
**resort (1)**
39:15
**respect (2)**
54:13 125:7
**respective (1)**
3:4
**responding (1)**
104:19
**restate (1)**
90:22
**retired (1)**
24:25
**reverse (1)**
113:22
**review (6)**
9:4,6 25:9,14
111:22 112:7
**reviewed (1)**
127:2
**reword (1)**
46:11
**RICHARD (2)**

1:10,12
**Rick (3)**
115:8,8,11
**Rico (3)**
115:3,4,5
**right (30)**
9:20 12:8 15:8
21:19 26:20
27:8 34:5
38:24 52:13
56:2,18 61:20
63:12 72:21
81:24 88:8
93:9 97:10
100:17,20
101:22 102:7
103:11
106:25
109:21
113:25 114:2
114:4 115:11
123:6
**rights (1)**
33:2
**ring (1)**
53:22
**rise (1)**
9:16
**risk (4)**
56:16 60:14
63:22 70:14
**Road (1)**
30:21
**Rochester (22)**
1:10,14 2:16
2:18 5:12
13:24 14:2,4
14:13 16:7,7
18:17,19
19:10,19 20:2
23:4 29:9
30:18 34:9
50:18 66:18
**ROE (1)**

1:12
**role (7)**
15:19 31:14
49:25 50:8
51:4 75:4,9
**roles (2)**
50:5 74:11
**room (2)**
2:17 15:11
**rooms (1)**
106:22
**ROTH (2)**
2:3,3
**rounds (1)**
100:24
**row (1)**
120:8
**RPD (14)**
1:10,11 17:20
30:15 50:10
60:24,25
69:16 100:3
108:9 109:21
110:20
111:10
122:23
**rules (4)**
5:19 6:12,14
34:24
**run (2)**
79:3,6
**run-of-the-m...**
88:16,18,21
**running (5)**
78:12,12,13
79:4,5

_____
**S**

**S (7)**
2:2,12 3:2,2
4:2,2 5:2
**safe (9)**
35:7,15,16,18
35:19 37:3

May 7, 2024

[Page 145]

39:4 41:21
46:25
**safely (4)**
43:22 46:8,18
109:5
**safer (3)**
36:21 94:2,4
**safest (3)**
94:8,9,15
**safety (5)**
60:13 63:16
110:17,19
122:20
**Salina (4)**
25:2,5 112:18
112:19
**sat (2)**
7:15 46:12
**Saturday (1)**
29:20
**saw (12)**
67:24 69:2
76:17 77:24
78:19 79:2
80:10,18
81:20 82:4
84:9,18
**saying (9)**
72:6 73:23
76:15 86:20
86:22 88:21
115:23
116:14
117:12
**says (34)**
39:23 40:5
47:23 48:12
52:16,19,23
54:25 58:7
61:17,19,22
63:17,18
76:14 80:24
94:14,25 97:9
99:17 102:2

105:9 114:20
115:18
117:17,23,25
118:4,8 119:6
119:23
120:15 121:2
127:2
**scenario (4)**
46:24 92:23
94:22,23
**scene (8)**
51:3,5 75:6
107:17 110:7
110:9,13,16
**school (8)**
10:12,16,18,20
10:21 11:2,4
14:17
**score (1)**
61:23
**scores (2)**
62:13 125:9
**Scottsville (1)**
30:21
**scouting (6)**
42:21 44:23
68:13,16 70:7
115:2
**screen (1)**
51:25
**scroll (5)**
52:4,15 62:19
96:25 100:11
**seaboard (1)**
22:17
**sealing (1)**
3:4
**second (6)**
62:19 63:18
81:21 114:18
115:8,9
**section (2)**
61:2,4
**securing (1)**

15:11
**security (7)**
11:20 15:11
16:3 18:3,21
107:25
108:13
**see (35)**
12:22 43:7,12
43:19,21 44:9
52:2 59:8
61:14 62:19
68:16,18,19
69:23 76:11
77:10,12
78:15,16 79:8
79:19 80:2,8
81:3,8,9,25
83:16 86:17
92:21 100:10
100:13
102:18 103:3
103:19
**seeing (5)**
75:19 78:19
105:24
107:16,22
**seen (7)**
59:11 73:19
84:22,23 95:4
113:18 114:3
**sees (2)**
78:3 87:2
**send (1)**
111:24
**Senior (1)**
10:21
**sense (3)**
56:6 99:2,3
**sent (4)**
114:19,23
117:5 121:6
**separate (2)**
4:7 101:6
**September (...**

9:19 15:22,24
50:22 54:14
64:3,21 65:3
65:9 66:2
125:8
**Sergeant (2)**
1:12 105:21
**Seriously (1)**
121:4
**Service (26)**
4:9 8:16 11:3,9
11:10,13,16
11:19 12:2,4
13:12 20:25
21:5 29:11,15
30:13 31:14
34:2 96:21
99:2 112:4
121:16,17,20
121:25
122:24
**Service's (1)**
111:21
**serving (1)**
15:12
**set (4)**
59:5 74:7
92:16 126:20
**setting (1)**
72:22
**setup (3)**
63:8 74:2
92:25
**seven (1)**
29:12
**Shane (6)**
24:21,23 25:4
97:10,12,13
**sheet (5)**
52:9 56:10,12
71:25 127:1
**sheets (1)**
26:9
**Shenea (3)**

1:3,4 107:12
**SHERIFF (1)**
1:12
**Sheriff's (6)**
1:12,14 2:23
25:25 27:8,11
**shield (1)**
74:14
**Shields (26)**
2:5 5:7,16 7:10
26:7,19 28:17
28:24 34:13
35:10 51:9,14
51:22 54:10
58:14,23
62:10 95:20
97:25 98:7
102:15 103:7
113:8 120:21
123:6 124:5
**shit (3)**
101:20 102:5
107:9
**shit-mode (1)**
85:8
**shocked (1)**
106:2
**shoot (2)**
86:23 104:23
**shooter (3)**
104:16,18,18
**shooting (8)**
21:14 30:15
54:20 71:18
88:22 105:17
106:6 107:23
**short (3)**
11:16 13:6
72:20
**shortly (3)**
11:22 20:18
120:14
**shot (20)**
84:17,20 85:24

85:25 86:2,7
86:10,13,14
86:17 90:21
91:2,6,13,15
91:16,18
99:25 105:18
112:25
**show (4)**
92:20 106:10
106:12,13
**showed (2)**
75:5 108:10
**shown (1)**
9:8
**side (9)**
30:17 77:6,7
81:12 100:20
100:20 101:5
101:10 103:4
**sides (1)**
57:23
**sidewalk (2)**
92:22 94:11
**sign-in (4)**
26:9 52:9 56:9
56:12
**signal (1)**
41:24
**signature (2)**
56:19 127:23
**signed (2)**
3:8,10
**signs (1)**
47:13
**similar (3)**
14:11 17:23
63:7
**simple (1)**
88:16
**simultaneous...**
105:20
**sit (3)**
53:2 55:11
96:22

**sitting (1)**
46:21
**situation (10)**
40:10,23 41:4
41:5,19 42:15
75:3 90:2,6
104:17
**situations (2)**
38:11 90:11
**six (3)**
24:18 29:12
60:10
**skies (1)**
11:21
**skull (2)**
102:19,21
**slide (1)**
61:17
**slides (4)**
61:14 62:21,21
63:21
**slipping (1)**
115:11
**small (2)**
62:3 101:3
**smallest (1)**
119:24
**smart (2)**
88:6 95:12
**Smith (128)**
1:20 5:9 6:1
7:1 8:1 9:1
10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1,12 27:1
28:1 29:1
30:1 31:1
32:1 33:1

34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1,18 59:1
60:1 61:1
62:1,12 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1

122:1 123:1
123:15 124:5
126:5 127:1,1
**Smith's (1)**
125:9
**snake (1)**
101:18
**sniper (1)**
50:13
**somebody (7)**
23:19 26:22
33:12 65:18
95:7 96:24
105:21
**son (1)**
5:17
**SOPs (2)**
34:4,12
**sorry (8)**
36:10 46:11
57:8 73:7
76:12 91:24
92:10 120:21
**sort (3)**
88:22 98:18
115:16
**sound (2)**
9:20 95:12
**sounds (2)**
17:10 72:6
**speak (14)**
8:22 97:7
98:21 107:4
107:12
109:23
110:11,20,25
111:20,23,25
112:3,13
**speaking (1)**
107:15
**specialized (2)**
17:22,23
**specific (17)**
7:12 20:3

27:19 28:19
34:21 49:25
50:5,7,8
54:13 60:12
61:2 62:25
65:5 121:21
125:5,8
**specifically (4)**
28:6 34:25
37:21 61:4
**specification ...**
48:17
**speculate (1)**
117:14
**speculating (5)**
53:11 54:4
116:17,18
118:20
**speculation (1)**
116:20
**spent (3)**
8:20 15:14
106:13
**spoke (11)**
35:5 67:3
77:22 80:19
107:14
109:20 110:6
110:9 111:10
112:19,21
**spoken (4)**
30:25 84:4
85:23 86:25
**spot (1)**
114:22
**squad (1)**
17:3
**squeeze (1)**
85:16
**stadium (1)**
57:7
**staging (2)**
72:24 73:2
**standard (5)**

34:5,10,14,21
125:6
**standards (1)**
33:21
**standing (5)**
38:17,20 75:12
77:5 105:23
**start (7)**
9:25 12:5
17:25 18:8
19:11 78:12
113:17
**started (6)**
16:6,9 18:13
19:24 20:15
78:9
**starting (2)**
17:17 54:25
**starts (1)**
113:23
**state (16)**
1:15,23 5:4,8
5:10,12 22:10
66:6,16,20
67:18,20
69:16 111:11
111:13
119:11
**statement (5)**
32:4 122:10,15
122:21 123:2
**statements (2)**
122:22,25
**States (7)**
1:2,10,19 2:9
2:12 5:13
11:10
**staying (1)**
66:17
**stenographic...**
126:9
**step (2)**
16:25 47:24
48:11 93:17

**stick (1)**
104:24
**sticks (4)**
104:11,15
105:5,7
**STIPULAT...**
3:3,6,8 4:4,16
**stop (6)**
39:6 40:25
42:2 57:16
83:15 95:9
**stopped (1)**
93:21
**Stopping (1)**
57:9
**straightforw...**
72:7
**strategies (1)**
88:14
**Strathmore (1)**
115:19
**street (5)**
2:17 5:12
68:25 73:3,12
**stuff (6)**
32:18 33:14
44:12 45:8
71:24 116:12
**subject (1)**
117:22
**submit (1)**
61:8
**subpoenas (1)**
15:12
**Subscribed (2)**
123:17 127:23
**suggestion (1)**
116:22
**Suite (1)**
2:4
**summoned (1)**
114:21
**summons (1)**
15:12

**Sunday (1)**
29:18
**Superior (4)**
13:21,22 16:11
17:18
**supervisor (1...**
24:8,10 25:9
97:6,8,12,20
106:12
109:20 110:7
112:2 122:23
**supervisors (4)**
55:19 106:11
106:16
110:12
**supervisory (...**
24:11,13
**supply (1)**
99:4
**supposed (1)**
36:12
**sure (58)**
6:7,8 11:11
16:8 28:14,24
29:8 31:11,12
31:16,19
35:20,22
36:11,20 38:2
38:4 42:8,10
44:21 46:10
46:16 47:22
50:9,10 51:11
55:21,24 58:5
60:17 63:9
65:6,7,13
74:6,13 77:8
86:15 87:5
90:5,16,23
91:25 93:7,11
94:12 97:4,15
98:16 99:14
103:21 104:2
108:17 109:3
110:3 112:8

117:11 120:7
**surrounding ...**
74:17
**surrounds (1)**
69:12
**surveillance ...**
41:23 42:24
43:2,4,6,11
43:13,18
44:10,13,14
48:6,8,13
65:4
**suspect (1)**
44:24
**swat (11)**
17:20,22,23
27:3,10,14,14
27:18 50:10
87:25 88:5
**switch (2)**
9:23 63:25
**sworn (8)**
3:9,10 4:11 5:3
123:17 126:7
127:1,23
**symbolize (1)**
102:22
**system (4)**
47:15,20
107:25
108:13

_____

**T**

_____

**T (8)**
3:2,2 4:2,2 5:2
5:2 126:2,2
**T.F (1)**
115:6
**T.K (1)**
101:6
**tackle (1)**
83:16
**tags (2)**
102:9,10

**tailing (1)**
41:25
**take (20)**
13:11 19:13
26:18,23
30:11 42:17
46:6,17 51:5
51:9 54:16
58:20 61:25
62:5 73:5
82:8,11 93:17
104:18 114:4
**taken (6)**
1:20 34:17
51:12 110:22
126:9 127:2
**takes (2)**
44:25 47:25
**talk (7)**
8:25 25:15
49:19 64:2
78:4 93:16
112:16
**talked (2)**
72:2 122:22
**talking (9)**
45:5 46:21
55:6 58:8
67:17 111:12
115:14,17
116:13
**target (3)**
40:17,24
119:12
**taser (8)**
87:5,7,16,17
87:19,20
100:16,24
**tasers (1)**
87:15
**task (68)**
9:2 18:9 20:8
20:13 21:7,12
21:17,18,18

21:21 22:2,6
22:12,22,25
23:5,12 25:18
25:20 26:4,21
27:4,16,20,22
28:3,4,10,25
29:8 30:23,24
32:6 40:7
41:24 42:11
47:8,23 48:7
48:10,16,19
48:21,24 49:2
49:4,7,7,9,12
50:2,6,14,16
64:8 65:8
66:13 87:12
91:20 95:16
99:6,8 114:12
114:15 115:4
115:16
118:23
119:13
**tasks (5)**
15:15 22:24
34:20 35:2
37:24
**tattoo (4)**
101:18,20
102:6,17
**taught (5)**
31:3 38:6
39:12,17 40:5
**Tax (1)**
54:20
**team (16)**
17:20,22 37:6
46:21 49:22
49:24 50:8,11
50:13,19,22
64:11,13 88:2
88:5 108:15
**teammates (1)**
107:6
**teams (2)**

50:13 87:25
**Tech (3)**
10:7,8,11
**technically (2)**
12:17 14:16
**technique (2)**
85:4,7
**techniques (2)**
85:17,19
**telephone (2)**
114:6,10
**tell (17)**
5:20,23 6:2,5,9
8:18 10:2
23:15,18 24:4
25:23 45:17
54:7 66:22
104:23 107:7
114:10
**telling (2)**
18:4 107:8
**temple (1)**
85:14
**ten (2)**
24:16 32:13
**TERAZA (2)**
126:4,24
**term (3)**
49:25 57:15
65:6
**Terminal (2)**
61:18 63:19
**terms (2)**
7:2 72:8
**test (5)**
61:25 62:3,4,7
114:22
**testified (5)**
5:5 7:7,18,20
8:5
**testifying (1)**
3:11
**testimony (5)**
7:15,24 126:8

126:9 127:3
**Texas (2)**
10:7,8
**text (15)**
113:5,11
114:11,16,18
114:23
115:18 117:5
117:17
119:25
120:13,23
121:2,6
124:17
**texts (5)**
113:15,21
115:17
117:19
121:14
**thank (6)**
62:16 85:18
115:13 123:9
123:10,11
**thanks (1)**
28:24
**thing (16)**
35:4,18 37:12
47:5,9 62:11
75:16 77:18
78:18 81:14
82:4 85:20
113:24
117:12 118:3
119:24
**things (13)**
38:4 41:16
43:16,25
65:12,15 84:6
91:25 92:12
98:24 108:24
109:5 119:16
**think (71)**
6:13 8:2,3,3
17:15 19:9,12
30:14,19,19

31:2,20 32:8
34:4,7,12
35:17,17
38:15 39:10
40:10 41:5
44:15,20 45:8
45:15,22
47:20 50:25
55:18 57:5
58:4 60:9
65:12,14
66:17 67:3,10
68:9 70:16
71:20 72:2,4
73:3 77:3,21
79:22 80:2
82:22,25 88:6
102:15
103:13,22,25
111:8 112:7,9
112:11
113:22
116:11,21
117:6,9,10,21
118:15,24
119:4 120:14
123:6
**thinking (3)**
12:19 47:4,5
**thinks (1)**
31:21
**third (1)**
79:14
**Thornborou...**
11:7
**thought (2)**
64:10 118:10
**thousands (1)**
88:25
**thread (1)**
114:16
**threat (1)**
36:13
**three (5)**

13:17,22 18:15
29:4 74:7
**three-day (1)**
58:3
**throwing (1)**
79:24
**Thursday (1)**
29:20
**tied (1)**
115:23
**time (56)**
3:7 7:13,14,25
8:4,4 11:16
13:6,19 14:14
15:14,17
16:13,22 17:9
20:4,23 22:18
24:14 25:7
28:25 29:8
40:6,19 41:6
45:25 50:21
51:13 55:17
64:7 66:21
68:6,10 69:17
70:19 73:17
73:21 76:15
81:16,18 87:3
90:24 91:8,11
99:9 106:13
108:12
111:18,19
112:17
113:23 116:8
118:17,20
123:8,12
**times (12)**
7:7,23 8:9,12
29:5,13 46:20
46:22 76:4,10
91:4 119:21
**title (9)**
14:4,25 15:4
24:9,10 53:6
54:20 56:16

60:15
**today (10)**
5:18 9:12 14:7
15:19 18:4,8
20:19 48:13
53:2 123:8
**today's (2)**
8:19,23
**TODD (1)**
1:12
**tomorrow (1)**
23:22
**tool (3)**
39:15 74:24
101:6
**tools (1)**
100:9
**top (6)**
9:10 63:16
82:19,24
83:10 93:9
**Tourniquet (3)**
100:14 101:2,7
**track (1)**
42:2
**trained (1)**
39:24
**training (99)**
16:14,18 17:5
17:7,12,12,13
17:16,22,24
18:6,7,9 20:2
21:8,10,12,17
21:20 22:2,21
22:22 23:15
23:24,25 24:5
25:17,25 26:9
27:15,16,18
27:19 28:4,10
29:19,23,24
30:6,16,20,23
32:12,14,15
32:17 33:17
35:5 37:13,21

39:13 46:24
46:25 51:17
51:24 52:6,13
52:20,21,24
53:3,8,16,22
54:4,12,13,22
55:7,13 56:5
56:12,15,22
57:6,9 58:2,3
58:4 59:2,5
59:22 60:4,12
60:13,20 61:3
61:11,24
62:24 63:11
63:12,16 92:2
94:25 124:10
124:12 125:7
125:8
**trainings (40)**
20:24 21:4,14
23:6,13 25:19
25:21 26:11
26:14,15,21
26:24 27:4,10
27:22 28:7,20
29:2,9,16,16
30:3,5,10,25
37:22 52:7
53:10 55:9
58:12,18 60:4
60:7 61:7
62:13,18 63:6
125:4,5,9
**transcribed (1)**
126:10
**transcript (2)**
126:12 127:2
**transferred (7)**
13:24 14:3,12
18:16,19
19:16,18
**transporting...**
15:11
**travel (4)**

29:18,21,23
52:17
**treatment (1)**
33:14
**trial (5)**
1:18 3:7 7:9
126:5,13
**tried (5)**
74:6 84:12
85:8 92:16
105:22
**tries (3)**
35:16 37:3
42:13
**true (3)**
6:9 95:4
126:12
**try (26)**
31:25 36:3
40:3,7,20,25
41:7,10,20
42:2 43:7
46:4,23,25
48:4 50:7,18
68:10 74:13
83:11 84:13
85:5,16 89:2
94:9 119:13
**trying (29)**
8:2 9:7,8 43:10
45:12 46:18
57:16 69:15
76:3 82:8,10
82:13,17 83:8
83:11 85:15
85:24 86:13
86:14,15 88:6
88:14,25
89:25 91:6
95:12 99:3
105:24
117:20
**Tuesday (1)**
29:19

**tunnel (6)**
78:21 79:21
80:8 84:11
86:8,9
**turned (1)**
79:10
**turns (1)**
79:8
**two (19)**
8:9 11:7 13:17
16:16 18:14
24:2,5 36:20
36:22,23
47:15 54:20
54:20 62:17
74:7 75:8
77:3 82:7
111:8
**type (5)**
64:25 65:7
70:25 71:24
107:10
**types (3)**
44:24 60:3
119:16
**typical (6)**
77:17 88:23
89:5,10 97:19
105:2
**typically (1)**
43:4
**typo (1)**
55:4

_____
**U**
_____
**U (2)**
3:2 4:2
**U.S (52)**
8:16 11:2,5,12
11:20 12:2,3
13:12 14:5
15:2,5 20:24
21:4 22:4,7
22:11 24:9,11

25:2 29:10,15
31:4,5,14,15
31:24 34:2
40:6 47:13,18
49:2 55:25
56:11 60:2
63:15 64:4
95:23 96:2,14
96:15,20
99:17 105:9
111:21 112:3
112:16
121:16,17,25
122:7,23
124:14
**Ulatowski (12)**
1:13 49:21
52:18 64:18
66:5 75:19,23
76:4 81:6
82:19 84:9
114:24
**unauthorize...**
4:14
**underneath (1)**
83:20
**understand (3)**
5:20 6:16 19:4
**understood (2)**
6:21,23
**unfamiliar (1)**
57:15
**unidentified ...**
1:14
**United (7)**
1:2,10,19 2:9
2:12 5:13
11:10
**unknown (2)**
1:11,13
**unnecessaril...**
36:7,13,18,23
**unnecessary ...**
35:24 37:6,10

May 7, 2024

[Page 150]

**unoccupied (6)**
37:13,22 38:10
38:16 39:13
39:18
**Unofficially (...**
112:13
**upper (2)**
100:23 102:18
**use (6)**
32:21 33:10
56:3 105:8
121:19 122:6
**use-of-force ...**
25:14
**USMS (1)**
63:17
**usually (17)**
22:22 23:7,8
23:20 29:18
30:6 43:6
44:9 48:3,25
51:7 62:2
74:4 87:17
93:8 103:16
111:23
**Utica (1)**
23:10

————————

**V**

**V (1)**
4:2
**vaguely (1)**
99:5
**Vandermar (...**
115:13
**vantage (1)**
81:9
**various (6)**
21:14 22:15
42:18 74:10
92:3 115:22
**vehicle (11)**
56:16 57:4,6,9
57:10,11,16

57:17 58:7
63:17,22
**vehicles (1)**
57:22
**venue (1)**
23:11
**verbal (1)**
23:23
**versus (3)**
15:15 39:6
65:22
**vest (6)**
98:24 99:6,19
99:20,21
100:9
**vests (1)**
99:4
**videoconfere...**
1:22 2:6,14,20
4:6,8,13,21
**Vinewood (5)**
73:3,5,11
114:23
115:19
**violation (1)**
4:14
**violent (1)**
45:13
**vision (6)**
78:21 79:21
80:8 84:11
86:8,9
**voice (1)**
121:5
**voluntarily (1)**
110:23

————————

**W**

**Waco (1)**
32:16
**wait (5)**
40:22 41:3
92:25 93:12
93:19

**waited (1)**
106:10
**waiting (4)**
106:11,12,15
107:5
**waived (1)**
3:5
**walk (1)**
79:6
**walked (1)**
75:24
**walking (7)**
75:17 78:11,16
78:24 80:19
81:8 92:22
**wall (1)**
77:7
**want (20)**
17:14 32:9,13
35:19 36:3,17
37:5,9 47:17
48:12 69:5,8
89:7 93:17
95:8,9 98:21
99:14 117:11
121:2
**wanted (5)**
19:6 53:16
72:3 110:20
112:16
**wants (2)**
7:10 35:15
**war (2)**
12:24 13:2
**Ward (2)**
24:24 25:5
**warm (1)**
118:9
**warrant (31)**
17:3 19:6
43:22 47:13
47:15,19,20
49:5 66:3,6,8
66:8,12 68:13

69:6 70:12,15
70:20 72:9,13
72:15 73:6,9
74:11 75:11
76:19 88:19
92:18 96:14
108:5 116:8
**warranted (1)**
70:18
**warrants (3)**
17:17 18:4
47:14
**wasn't (13)**
14:19 28:18
58:15 71:2
73:17,21 75:8
84:15 86:4,20
107:8 119:2
120:10
**watch (1)**
115:19
**watching (3)**
43:8 44:21
86:8
**Waverly (2)**
10:21,23
**way (16)**
32:25 35:22
40:14 60:2
63:7 65:15
71:10,22
75:13 83:5
88:6 93:22
94:8,14 95:13
117:25
**Wayne (2)**
49:6 66:7
**ways (4)**
40:2,4 42:9
47:11
**we've (1)**
92:18
**weapons (1)**
87:4

**wear (2)**
98:20,22
**wearing (1)**
79:17
**web-base (2)**
63:5,6
**web-based (1)**
61:6
**Wednesday (1)**
29:19
**week (8)**
18:8,9 21:7,10
21:17 22:22
29:17,22
**week-long (3)**
29:16 53:9
55:7
**weeks (2)**
32:13 65:17
**went (15)**
13:14,15 44:20
74:3 78:11
80:16 81:15
84:11 85:8
86:7,10,17
106:25
119:25
122:16
**weren't (2)**
14:15 73:22
**West (1)**
30:15
**Western (3)**
1:2 2:13 56:16
**WHEREOF ...**
126:20
**white (1)**
102:19
**wife (1)**
121:7
**window (1)**
77:13
**wish (1)**
79:21

**withdraw (2)**
64:12 97:8
**withdrawn (2)**
47:7 72:13
**witness (16)**
3:11 4:7,10,11
4:17,18,19
5:2 53:14
59:18 123:9
124:4 126:7
126:14,20
127:23
**witness's (1)**
4:11
**woman (1)**
5:17
**word (2)**
13:18 114:4
**words (7)**
76:19 77:2
78:5 82:18
84:3 85:23
86:25
**work (9)**
17:3 26:24
45:2,2 47:17
48:12 65:22
69:19 93:2
**working (6)**
15:24 16:2,2
18:23 36:2
64:3
**wouldn't (7)**
27:17 39:9
45:24 61:12
77:9,12 85:7
**writing (6)**
26:17 34:18
54:16 58:20
62:14 109:16
**written (8)**
4:14 36:19
58:16 62:3,4
62:7 73:20

109:11
**wrong (4)**
116:14 117:18
118:4 119:25

___

**X**

**x (3)**
1:3,16 124:2
**XXX-XXX-...**
114:8

___

**Y**

**yard (4)**
37:16 38:17,21
39:2
**yeah (13)**
48:18 60:24
65:19 72:2
77:20 86:13
89:25 90:5
92:11 97:4
101:8 109:14
121:22
**year (9)**
10:17 11:12
18:10 19:15
21:7,9 55:22
60:10 99:13
**years (9)**
10:10 11:6,8
11:11 13:17
13:23 18:15
21:24 30:22
**yell (1)**
85:2
**yelled (3)**
84:10,24 85:3
**York (21)**
1:2,15,24 2:4,4
2:11,13,18
5:4,12 10:23
13:24 23:10
27:8,11 30:14
50:17,18
56:17 111:11

111:13

___

**Z**

___

**0**

**05/07/2024 (1)**
127:2

___

**1**

**1 (2)**
51:18 124:10
**1-10 (2)**
1:11,12
**1:15 (1)**
123:12
**10:05 (1)**
1:22
**10:08 (1)**
116:6
**10:09 (1)**
117:24
**10:11 (1)**
120:2
**10:30 (1)**
116:12
**100 (2)**
5:12 96:5
**10016 (1)**
2:4
**102 (1)**
96:4
**103 (1)**
98:8
**104 (1)**
98:17
**108 (3)**
103:6,8,19
**109 (2)**
103:18 104:3
**11:04 (1)**
120:14
**11:13 (1)**
121:2
**111 (1)**
104:8

**112 (1)**
98:8
**113 (1)**
124:17
**11th (1)**
56:17
**13 (1)**
56:17
**138 (1)**
2:10
**14202 (1)**
2:11
**14614 (2)**
2:18 5:13
**15 (6)**
9:19 64:3,21
65:3,10 66:2
**17:00 (1)**
52:23
**17:308 (1)**
54:25
**1811 (2)**
13:19 14:10
**192 (1)**
2:4
**1995 (3)**
10:19 11:2
12:7

___

**2**

**2 (3)**
59:3 92:3
124:12
**20 (1)**
127:24
**2000 (1)**
12:7
**2002 (2)**
11:14 13:13
**2004 (1)**
41:25
**2005 (2)**
16:20 18:13
**2005ish (2)**

16:12,15
**2007 (3)**
13:25 18:17
19:14
**2008 (5)**
19:12,14,25
20:16,20
**2010 (1)**
22:20
**2011 (1)**
22:20
**2016 (2)**
54:14 125:8
**2021 (13)**
9:17,20 15:20
15:23,24
50:22 54:19
56:18 64:3,21
65:3,10 66:2
**2022 (1)**
20:21
**2024 (4)**
1:22 123:18
126:6,21
**22 (1)**
54:19
**23-CV-6057(...**
1:7
**26,58 (1)**
125:4
**28 (1)**
125:5

___

**3**

**3 (2)**
95:24 124:14
**30 (1)**
2:17
**34 (1)**
125:6

___

**4**

**4 (2)**
98:5 124:16
**412A (1)**

May 7, 2024

[Page 152]

2:17
**45 (2)**
8:20 120:9
**4th (1)**
33:8

---
**5**

**5 (4)**
113:7,12 124:5
124:17
**5/22 (1)**
58:7
**5/25 (1)**
58:7
**5:00 (2)**
52:24 55:2
**51 (1)**
124:10
**525 (1)**
51:23
**531 (1)**
52:18
**535 (1)**
54:18
**538 (1)**
56:15
**54 (1)**
125:7
**543 (1)**
51:23
**561 (1)**
113:6
**567 (1)**
116:19
**568 (1)**
114:20
**569 (1)**
113:6
**581 (1)**
59:6
**582 (2)**
59:9,14
**583 (1)**
61:17

**59 (1)**
124:12
**591 (1)**
62:22

---
**6**

**6 (2)**
66:25 67:9
**62 (1)**
125:9
**649 (1)**
63:10
**650 (1)**
63:18

---
**7**

**7 (1)**
1:22
**7:30 (1)**
113:23
**716 (1)**
59:6
**7th (2)**
126:6,21

---
**8**

**8:16 (2)**
113:24 114:19
**8:20 (1)**
115:18
**80 (1)**
61:23
**802 (1)**
2:4

---
**9**

**9 (2)**
54:14 125:8
**9/11 (1)**
11:23
**9/9/2016 (1)**
52:20
**9:00 (3)**
52:23,24 54:25
**90s (1)**

10:13
**95 (1)**
96:4
**96 (1)**
124:14
**98 (1)**
124:16
**99.99 (1)**
119:21