1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
---------------------------------------------------x

SHENEA JAMES as administrator of the estate of
DEDRICK JAMES, deceased, and SHENEA JAMES
individually,

                              Plaintiff,

                                    Case No.:
                                    23-cv-6057(DLG)
                    -against-

THE UNITED STATES OF AMERICA, DEPUTY UNITED STATES
MARSHAL CARLTON SMITH, CITY OF ROCHESTER, RPD
OFFICER WILLIAM BAKER, RPD INVESTIGATOR RICHARD
ARROWOOD, "JOHN DOE RPD OFFICERS 1-10" (names and
number of whom are unknown at present), MONROE
COUNTY SHERIFF TODD BAXTER, MSCO SERGEANT CHRISTIAN
DEVINNEY, "RICHARD ROE SHERIFF'S DEPUTIES 1-10"
(names and number of whom are unknown at present),
NYSP INVESTIGATOR JEFFREY ULATOWSKI, and other
unidentified members of the Rochester Police
Department, Monroe County Sheriff's Office, and New
York State Police,

                              Defendants.
---------------------------------------------------x
                                    September 17, 2024
                                    12:23 P.M.


          DEPOSITION of SERGEANT CHRISTIAN

DEVINNEY, a Defendant herein, taken by the

attorneys for their respective parties, pursuant to

Court Order, and held before Barbara E. Bierman, a

Notary Public and Shorthand Reporter for and within

the State of New York at the above stated time and

place.

2

1

2    A P P E A R A N C E S :

3

4    ROTH & ROTH, LLP
            Attorneys for Plaintiff
5            192 Lexington Avenue, Suite 802
            New York, New York 10016
6
      BY:    ELLIOT SHIELDS, ESQ.
7            Eshields@rothandrothlaw.com

8

9

      UNITED STATES DEPARTMENT OF JUSTICE
10            Attorneys for Defendant
            THE UNITED STATES OF AMERICA,
11            MSCO SERGEANT CHRISTIAN DEVINNEY
            138 Delaware Avenue
12            Buffalo, New York 11402

13    BY:    MICHAEL S. CERRONE, ESQ.
            Michael.cerrone@usdoj.gov
14

15

16

17    ROCHESTER OF CITY HALL
            Attorneys for Defendant
18            CITY OF ROCHESTER
            30 Church Street, 400A
19            Rochester, New York 14614

20    BY:    JOHN M. CAMPOLIETO, ESQ.
            John.campolieto@cityofrochester.gov
21

22

23

24

25

3

1

    F E D E R A L   S T I P U L A T I O N S

2

3        IT IS HEREBY STIPULATED AND AGREED, by and

4    among the attorneys for the respective parties

5    herein, that the sealing, filing and certification

6    of the within deposition be waived; that such

7    deposition may be signed and sworn to before any

8    officer authorized to administer an oath, with the

9    same force and effect as if signed and sworn to

10   before whom said deposition is taken.

11       IT IS FURTHER STIPULATED AND AGREED that all

12   objections, except as to form, are reserved to the

13   time of trial.

14

15

16

17

18

19

20

21

22

23

24

25

4

1                THE REPORTER:  Counselors, are you

2          ordering a copy of the transcript for this

3          witness?

4                MR. CERRONE:  Yes.

5                MR. CAMPOLIETO:  Yes.

6                THE REPORTER:  It is hereby

7          stipulated and agreed by and between counsel

8          for all parties present that pursuant to

9          Federal Rule of Civil Procedure 28 (a)(2),

10         this deposition is being conducted remotely

11         and that the court reporter shall be

12         permitted to administer the oath to the

13         witness via videoconference.

14               The witness and all counsel are in

15         separate remote locations and participating

16         via Zoom, telephone or any web conference

17         meeting platform under the control of the

18         court reporting agency.

19               It is further stipulated that this

20         videoconference will not be recorded in any

21         manner and that any recording without the

22         express written consent of all parties shall

23         be considered unauthorized, in violation of

24         law and shall not be used for any purpose in

25         this litigation or otherwise.

5

```
 1              Before I swear in the witness, I will

 2         ask each counsel to stipulate on the record

 3         that I, the court reporter, may swear in the

 4         witness even though I am not physically in

 5         the presence of the witness and that there is

 6         no objection to that at this time, nor will

 7         there be an objection at a future date.

 8              MR. SHIELDS:  Plaintiff stipulates.

 9              MR. CERRONE:  Government stipulates.

10              MR. CAMPOLIETO:  City defendant

11         stipulates.

12              (Whereupon, the Witness presented a

13         government ID, issued in New York as

14         identification.)

15   C H R I S T I A N   D E V I N N E Y,

16              The witness herein, having been first

17         duly sworn by a Notary Public of the State of

18         New York, was examined and testified as follows:

19   DIRECT EXAMINATION BY

20   ELLIOT SHIELDS, ESQ.:

21         Q.    Please state your name for the record.

22         A.    Sergeant Christian DeVinney.

23         Q.    Please state your work address.

24         A.    Monroe County Sheriff, 130 S.

25   Plymouth Avenue, Rochester, New York 14614.
```

6

1                        C. DeVinney

2        Q.        Good morning, Sergeant.

3        A.        Good morning, sir.

4        Q.        My name is Elliot Shields.  I

5    represent a woman whose son was killed.  And I am

6    going to ask you some questions today.

7                  My first question is, have you ever

8    given testimony in a deposition in a civil case

9    like this before?

10       A.        I haven't.

11       Q.        How many times?

12                 MR. CERRONE:  He said he has not.

13       A.        I haven't.

14       Q.        Have not, okay.  So just some ground

15   rules for the deposition.

16                 Like the court reporter gave a little

17   introduction.  She is writing down everything that

18   I say, everything that you say, any objections your

19   attorney might have.

20                 So if you could just wait to answer

21   my question until after I am done talking, that is

22   really helpful for the court reporter.

23                 Okay?

24       A.        I gotcha, yeah.

25       Q.        And then if you don't understand any

7

                         C. DeVinney

1

2    of my questions, please tell me.  And I'll gladly

3    rephrase the question for you.

4              Okay?

5        A.    Yes, sir.

6        Q.    And then throughout the deposition

7    your attorney might have some objections.

8    Generally, those are just for the record.

9              After he objects, you can go ahead

10   and answer the question, unless he directs you

11   specifically not to answer the question.

12             Okay?

13       A.    Okay.

14       Q.    And now you testified that you've

15   never done a civil deposition before.

16             But I am assuming you have testified

17   in criminal court previously?

18       A.    Yes.

19       Q.    About how many times would you

20   estimate?

21       A.    I am not -- I am not sure.  Several

22   times.  I don't even -- I haven't even thought

23   about the number so I am not sure.

24             It's been twenty-five years, so.  I

25   am not sure.  I don't want to --

8

1                    C. DeVinney

2        Q.      Sure.  Over the course of your

3    twenty-five-year career, you've testified a good

4    amount in criminal court?

5        A.      Yes.

6        Q.      Okay.  So it is generally similar but

7    we are just not in a courtroom.

8                Okay?

9        A.      Yeah, yes, I apologize.

10       Q.      No worries.

11       A.      I am familiar.

12       Q.      Can you tell me everything that you

13   did to prepare for today's deposition?

14       A.      I reviewed my statement.  I spoke

15   with Mr. Cerrone yesterday briefly.  And, yeah,

16   that is really about it.

17       Q.      When you say you reviewed your

18   statement, is that the supporting deposition that

19   you completed after the incident?

20       A.      Yes, sir.

21       Q.      Did you review any other documents?

22       A.      No, sir.

23       Q.      Did you speak with anyone other than

24   Mr. Cerrone?

25       A.      No, sir.

9

                        C. DeVinney

1

2      Q.      Is that one conversation

3   yesterday, and don't tell me anything about the

4   substance of that conversation, but is that the

5   only conversation that you had with your attorney

6   to prepare for the deposition?

7      A.      Yes.

8      Q.      About how long did that last, that

9   conversation?

10     A.      Maybe, I think about fifteen minutes.

11     Q.      So you didn't speak with anyone else

12  that was on the task force or involved in the

13  incident in any way?

14     A.      No, sir.

15     Q.      I just want to ask you some questions

16  about your background, and we will start with your

17  educational background.

18             Can you just tell me what is your

19  highest level of education?

20     A.      I went to community college I think

21  for about two years after high school.  And that is

22  about it.

23             I didn't complete an Associate's.  I

24  didn't complete a Bachelor's.  Some college.

25     Q.      So some college.  And then did you

10

                    C. DeVinney

1    between I guess graduating high school and starting

2    with the Monroe County Sheriff's office, did you

3    have any other work experience in law enforcement?

4         A.      No.

5         Q.      How about like any military

6    background, did you ever serve in the military at

7    all?

8         A.      I joined the Navy very briefly.

9    Sorry.  Did you have a question?

10        Q.      Oh, no.  Can you just tell me about

11   that?

12        A.      Yeah, I went in the Navy.  A week

13   from boot camp, I went to sick call in the morning

14   because I had a chest cold.

15               And because I had asthma when I was

16   like twelve, they gave me a medical discharge.

17   Because at the time, someone, I think he died, had

18   asthma in their background.

19               So they were making a big deal.  They

20   weren't -- yeah, I guess having asthma in your

21   childhood was a problem.

22               So I had a medical discharge so it

23   was very brief.

24        Q.      So the asthma was basically a

1                       C. DeVinney

2    disqualifier for you?

3         A.      Yeah.

4         Q.      When was that, about?

5         A.      '96.

6         Q.      '96, okay.

7         A.      Yes, sir.

8         Q.      What year did you join the

9    sheriff office?

10        A.      Monroe County Sheriff's office,

11   specifically I joined in 2002, April of 2002.

12        Q.      Prior to joining the sheriff's

13   office, did you work for any other law enforcement

14   agencies?

15        A.      Yes, sir.  I started, I think it was

16   '99, I started with Andover Police Department

17   part-time.

18                And then I joined Alfred P.D.

19   part-time.  And then I got picked up by Steuben

20   County Sheriff's office full-time.  I think Steuben

21   was around 2000.

22                And then I transferred to Monroe

23   County in 2002.

24        Q.      First it was Andover and then Alfred

25   and then it was Steuben?

12

1                    C. DeVinney

2        A.      Yes.

3        Q.      And then Monroe County?

4        A.      Yes, sir.

5        Q.      When you started with Andover, did

6    you have to go to the police academy?

7        A.      Yeah, I went to Corning Police

8    Academy.  I want to say it was '98.  I know it was

9    once in a while so I think it was '98 when I went

10   to the police academy, Corning Police Academy.

11              And then at that time, you had to pay

12   your own way.  So I paid my way in there, got

13   sponsored from another police department.

14              And then eventually got picked up by

15   Andover.

16       Q.      So you basically paid for to the

17   academy and then you had to like apply to the

18   various police departments?

19       A.      Yes, you had to take your resume in

20   and, yeah, you got it.

21       Q.      And so you were with Andover for a

22   year?

23       A.      It was part-time for a couple of

24   years, Alfred and Andover, even when I got picked

25   up full-time by Stueben.

13

1                    C. DeVinney

2        Q.      And when was full-time with Steuben,

3    2000?

4        A.      I think it was 2000, I believe.

5        Q.      When you went to Steuben, did you

6    have to redo the police academy at all?

7        A.      No, nope.

8        Q.      And then you were there for about two

9    years before you went to the Monroe County

10   Sheriff's office?

11       A.      Yes.

12       Q.      When you went to Monroe County

13   Sheriff's office, did you have to redo the police

14   academy?

15       A.      No.  They did, I think at the time,

16   about a week of training, just kind of get familiar

17   with their policies and procedures, qualifying with

18   their firearm, doing their defensive tactics

19   program.

20               Yeah, I believe that was about it.

21   And then you do field training for a couple of

22   weeks and I don't recall how many weeks.

23       Q.      You said field training for a couple

24   of weeks?

25       A.      Yes, sir.

14

1                    C. DeVinney

2        Q.     Do you remember who your field

3   training officers were?

4        A.     Yeah, I remember a couple of them.

5   You want to know the names?

6        Q.     Sure, if you remember them.

7        A.     Yeah.  Mike Sofia, Roger Hake.

8               THE REPORTER:  Mike Sofia?

9               THE WITNESS:  S-O-F-I-A, Roger Hake,

10        H-A-K-E.

11        A.     Mike Morrensey. (phonetic)  Mike

12   Sofia was my primary, though.  Once you start you

13   have a primary, somebody you start with and

14   somebody you end with.

15               So Mike Sofia was my primary.  He has

16   since retired.  I don't know where he is now.  But

17   I am trying to think who else.  Yes, I think that

18   is it.

19        Q.     Now, I know with like the RPD, I

20   think field training is about four months.  You

21   said a couple of weeks.

22               Do you recall exactly how long it

23   was?

24        A.     I don't.  Yeah, I don't.  I could say

25   a couple of weeks and I can say ten and twelve.

15

                    C. DeVinney

1    But I don't recall exactly.

2        Q.      Now, can you take me through

3    basically your career with the Monroe County

4    Sheriff's office from when you started and your

5    different positions that you have held within the

6    sheriff's office?

7        A.      Yes, sir.  2002, April of 2002, I

8    joined Monroe County Sheriff's office.  And I ended

9    up going to just basic patrol afternoons in B zone

10   which is Henrietta.

11                2005 I tried out for the SWAT team,

12   successfully passed that.

13                And then somewhere around, I want to

14   say 2008, I don't remember the dates, but I got

15   different instructor certifications for defensive

16   tactics and firearms, somewhere around that time

17   frame.

18                Around 2009, I got on our warrant

19   unit and served on the Marshals task force as a

20   deputy.

21                And then around I think -- and then

22   for us they are all like short stints.  They are

23   usually assignments for two-year to five-year

24   stints.

16

                         C. DeVinney

1

2                  So that was a temporary assignment.

3    And when you are done with that, you go back to

4    patrol.

5                  So around 2012, I go back to patrol.

6    And then after that, we were setting up tactical

7    unit, so I joined that.

8                  I don't remember how long I was

9    there.  I think it could have been a year, two

10   years, I don't remember.

11                 I haven't looked at the dates.

12   Again, a temporary assignment.  And again, leave

13   that, go back to patrol.

14                 Then I put in for our narcotics unit,

15   specifically GRANET, Greater Rochester Area

16   Narcotics Team.

17                 They are an enforcement team.

18   G-R-A-N-E-T, GRANET.  And there you are just teamed

19   with up smart PD guys.

20                 I think like I had a guy from border

21   patrol like ICE on the team, another deputy from

22   the sheriff's office, my supervisor was a sheriff's

23   sergeant.  I was there for about a year.

24                 And then in July of 2017, I got

25   promoted to sergeant.  And like anything else, when

17

                    C. DeVinney

1    you get promoted, you go back to uniform patrol.

2               So after that, I am trying to think

3    how long it was.  I think it was five years ago,

4    the position at the warrant unit or the sergeant of

5    the warrant unit came open.

6               And I put in for that and that was

7    March, five years ago.  So what would that be, 2019

8    I think.  And forgive me on the specific year.

9               Yeah, and I have had been in the

10   warrant unit and Marshals task force for the last

11   five years, five and a half.

12   Q.    Let me ask you a question about that

13   last thing you just said.  So you said you have

14   been in the warrant unit.

15              And what I am trying to figure out

16   is, is the warrant unit with sheriff's office or is

17   that with the Marshals task force?

18   A.    So we have a warrant unit that

19   existed for as long as I can remember.  And again,

20   forgive me on the dates.

21              I don't know exactly when the

22   sheriff's office teamed up with the Marshals office

23   but I want to say it was probably around 2008.

24              We started working with the marshals.

18

                        C. DeVinney

1                        C. DeVinney

2    Because when I came on the warrant -- sorry, if I

3    am maybe not answering the question.

4                    MR. CERRONE:  You are doing great.

5        A.        Okay.  So around -- so when I came on

6    as a deputy to the marshal -- to the warrant unit,

7    we got teamed up.

8                    There were four guys assigned to our

9    warrant unit.  And two would go work with the

10   Marshals office specifically, get sworn in by the

11   Marshals.

12                   And then we are constantly working

13   with each other, just manpower wise, so we are

14   constantly intermixing.

15                   But it was just the way our

16   department wanted to do it.  And when I came on as

17   a sergeant, I just had the four deputies that were

18   assigned to me, plus myself all become part of it.

19                   Because we just needed each other to

20   all work together.  So we are employed by the

21   sheriff's office.  We do have a warrant unit under

22   our office.

23                   The Special Operations Warrant Unit

24   is under that umbrella.  But we are all sworn in

25   and deputized with the Marshals office and all work

1                    C. DeVinney

2    together.

3                    If there's -- they only work certain

4    level cases like violent felonies.  So if anything

5    less than that, it might not fit their criteria.

6                    Sometimes we will have to like say we

7    get like a misdemeanor or a violation warrant with

8    the sheriff's office, you know, hey, guys, sorry,

9    we have to break up and do that.

10                   They can't do that, right, based on

11   their policies and procedures.

12                   So we will go do that.  But again, I

13   mean most of it, but we have so many violent

14   crimes, that 99 percent of the time we work

15   together.

16        Q.     I think I understand your answer.

17   But just to clarify, and make sure I understand,

18   because I don't want to --

19        A.     Sure.

20        Q.     It sounds like with the warrant unit

21   for the sheriff's office basically you and the

22   other individuals in the warrant unit for the

23   sheriff's office are all deputized as deputy U.S.

24   Marshals; is that right?

25        A.     That's correct.

20

1                    C. DeVinney

2       Q.      And then whether or not when you are

3   serving a warrant or executing a warrant, whether

4   or not you are acting within your capacity as a

5   deputized marshal or if you are acting within your

6   capacity as a sheriff employee, that depends on the

7   level of the crime, and whether it falls within the

8   purview of the U.S. Marshals office, which would be

9   violent felonies, stuff like that, higher level

10  crimes versus maybe misdemeanor, which wouldn't

11  fall under the U.S. Marshals purview; and in those

12  circumstances you would be working as a sergeant

13  for the sheriff's office; is that right?

14              MR. CERRONE:  Objection to the form

15      of question.

16              You can answer.

17      A.      Yes, sir.

18      Q.      So I understood that correctly?

19      A.      Yeah, they are only allowed to serve

20  certain warrants locally.

21      Q.      So, for example, like when you go

22  into work on a daily basis, where do you report

23  to?

24      A.      A lot of times we will brief Mondays

25  at the fed building.  But we do have some of our

```
1                    C. DeVinney
2    own offices and office space at our office.
3              Because we do have -- or my guys have
4    a warrant assigned to them from the sheriff's
5    office.
6              So the majority of the warrants are
7    sheriff's warrants that we serve along with city --
8              So we have to constantly go back to
9    our office to, you know, grab files.
10              THE REPORTER:  Excuse me.
11              (Whereupon, a discussion was held off
12         the record.)
13              (Whereupon, the requested portion of
14         the record was read back.)
15              THE WITNESS:  We wanted packages
16         from the city.
17         Q.    Just to be clear for the record, when
18    you say go back to our office, you just mean over
19    at the sheriff's department?
20         A.    Yes, sir.
21         Q.    So from March 2019, you said you were
22    assigned back as a sergeant with the warrant unit
23    with the Marshals office; is that right?
24         A.    Yes, sir.
25         Q.    And have you had that role
```

22

1                    C. DeVinney

2    continuously through today?

3         A.      Yes.

4         Q.      So like no changes or promotions or

5    anything?

6         A.      No promotions.

7         Q.      Can you describe your role on the

8    Fugitive Task Force at the time of the incident

9    with Dedrick James which was in, I believe September

10   2021, the incident was September 15, 2021?

11        A.      Yes, sir.  In as supervisor, I do

12   help with some of the training and just making sure

13   that everyone has the resources that they need, I

14   guess.

15               So somewhat as a leadership position

16   amongst all the guys.

17        Q.      Now, did you have any title?

18        A.      No, no, there is no title for the

19   task force.  They just know that I am sergeant with

20   the sheriff's office.

21        Q.      And I asked that question because I

22   believe somewhere I read that you were

23   quote/unquote tactical leader for the task force

24   department?

25        A.      Yeah.

23

                    C. DeVinney

1

2      Q.       That would be accurate?

3      A.       Yeah, I think that is the way guys

4   look at me like that because I put on a lot of

5   their trainings.

6              That is not like, I guess, a title I

7   am aware of that tasks forces have, per se.  They

8   just may just look at guys as a leader on a team.

9              And I obviously put out a lot of

10   training that we do.  So, yes, being a tactical

11   leader in the task force would be not be

12   inaccurate.

13             But I think it is just, you know,

14   something that the guys gave me.

15     Q.       Okay.  So it is not like --

16     A.       I guess, yeah, but I don't know.  I

17   never known or I mean ever asked, like, I don't

18   think that is an official title on a task force,

19   but.

20     Q.       Gotcha.  For example, I have some

21   experience with like the RPDs SWAT team.  And there

22   is a commander of the SWAT team and an assistant

23   SWAT team hierarchy.

24             So I guess my question is, is there

25   any official hierarchy on the Fugitive Task Force?

24

1                    C. DeVinney

2       A.      Yes.  I guess obviously meaning a

3   supervisor and because of that I lead training

4   and help with that position, try to help, make

5   sure they have the resources they need.

6               Yeah, they kind of look to me for

7   those things.

8       Q.      Now, you described that one of your

9   roles is leading trainings.

10              Other than leading trainings, what

11  other responsibilities did you have on the task

12  force?

13      A.      On the task force, I was in charge of

14  the four deputies that are under me.  Again,

15  keeping up communication amongst the different

16  departments.

17              I have continued to be on the SWAT

18  team this entire time.  Support wise, yeah.

19      Q.      I guess my question is so separately

20  if the SWAT team for the sheriff's office had an

21  operation, you might get called in to participate

22  in that; is that what you are saying?

23      A.      Yes, sir.

24      Q.      Do you have any leadership role on

25  the sheriff's SWAT team?

25

C. DeVinney

1      A.      I am.  I am a team leader.

2      Q.      And I am guessing there's multiple

3  different teams?

4      A.      Yes, sir.

5      Q.      What is the team that you are the

6  team leader for?

7      A.      Blue team.

8      Q.      So like I said, I am familiar with

9  RPD's SWAT team where they have an entry team.

10             So I know the Rochester Police

11  Department's SWAT team has, for example, an entry

12  team, and a sniper team.

13             So I was just going to ask what if

14  there is similar teams on the sheriff's office and

15  if the colors like coordinate with the various

16  enter team or sniper team and whatnot?

17     A.      Yes.  I can give you the breakdown.

18  So we have from the top down, we have a commander,

19  an assistant commander, a troop leader.

20             And then three entry teams, red,

21  white and blue.  And then we have sniper team.

22             That's the general breakdown.  And I

23  am, like I said, the team leader for the blue team.

24     Q.      So that would be you're the team

26

C. DeVinney

1    leader for one of the three entry teams; is that

2    it?

3    A.    Yes.

4    Q.    Okay, gotcha.  So let's go back to

5    the Fugitive Task Force for the U.S. Marshals.

6

7         During warrant executions, what are

8    your primary responsibilities, like are you in

9    charge of the planning and directing the

10   operations?

11   A.    No, not specifically.  I try to make

12   sure that they do have some minimal things figured

13   out.

14        I try to leave that up to the case

15   agent, you know, how they -- because they are the

16   ones that know all the intel, whatever warrant

17   suspect we are going after.

18        So I try to let them so much decide

19   and we try to talk as a group, and if there's

20   anything that anybody objects to or disagrees with.

21        And then again, I am trying to make

22   sure that we have enough people.  We have other --

23   you know, we have the resources that we need.  That

24   kind of thing.

25   Q.    So let's talk about, you mentioned

```
 1                    C. DeVinney
 2    that you lead some trainings.  So let's talk about
 3    trainings for the sheriff's office.
 4              I am sorry, not the sheriff's office,
 5    the U.S. Marshals Task Force.
 6              Can you just describe the training
 7    generally the task force member receive on how to
 8    safely execute a warrant?
 9        A.     Yeah, so from myself or just overall,
10    myself and the task force?  Is that it, which would
11    you like?
12              There is kind of two things going on.
13    So I'll just kind of --
14              So I offer training.  The Marshals
15    office offers training once or twice a year.
16              I forget what it stands for.  It is
17    like high-risk fugitive apprehensive training, or
18    something like that.  It is usually out towards
19    Atlantic City.
20              And then they have another trainer in
21    Buffalo named Jim Bona (phonetic) that I have been
22    in regular contact with about me training they're
23    putting out through their office.
24              And any training that I am putting
25    on.  Most of the time I am specifically putting on,
```

28

                              C. DeVinney

1

2    it is usually firearms, medical, CQB, vehicle

3    interdiction and open air.  I think that is the

4    gist of that.

5         Q.      One thing you said was CQB?

6         A.      Yes, it stands for close quarter

7    battles.  Essentially, it is teaching people how to

8    enter buildings, clear rooms.

9         Q.      I was going to ask if any of the

10   topics that you teach involved an entry into a

11   building.

12                And it sounds like that would be the

13   topic that would be like a warrant entry?

14        A.      Yes.

15        Q.      And so I am not sure if you said --

16   like how many times per year will you put on that

17   training?

18        A.      Specifically CQB or training in

19   general?

20        Q.      Yes.  I guess let me withdraw that.

21   When you do your trainings, would it cover all of

22   those topics or would it be on a specific topic for

23   each separate training?

24        A.      No, so yes and no.  There are some

25   days where we will cover multiple topics.  Most of

```
 1                    C. DeVinney
 2    the time, once a month or every other month, we
 3    train as a team.  And CQB could just be one of
 4    those topics.
 5          Q.      So the task force trains you said
 6    once every month or every other month together?
 7          A.      Yes, plus like I said, once a year
 8    for three, four days out at Atlantic City.
 9          Q.      And when you guys train on that once
10    a month -- other than the Atlantic City when you
11    train together, that is in the Rochester area
12    somewhere?
13          A.      Yes.
14          Q.      And when those trainings are put on,
15    are you the one that is always leading them or is
16    somebody else who would lead those trainings
17    sometimes?
18          A.      Most of the time it is me.
19          Q.      And do you have, for example, like
20    lesson plans or power-points that you use in those
21    trainings?
22          A.      Yes.
23          Q.      And does that include for the CQB
24    trainings?
25          A.      Yes.
```

30

1                    C. DeVinney

2              MR. SHIELDS:  Mike, we just call for

3        production for any CQB lesson plans,

4        power-points, anything in writing about the

5        trainings.

6              MR. CERRONE:  No problem.  Just like

7        last time, just put it in writing, follow-up

8        with a formal demand.

9                    And we will respond appropriately.

10             MR. SHIELDS:  Sure.  I am going to

11       make sure I write that down.

12       Q.     And, sergeant, in putting together

13  those lesson plans, did you ever, I don't know,

14  take a class about being an instructor, like an

15  instructor's class?

16       A.     Yes.

17       Q.     Was it --

18       A.     I am sorry.  I interrupted you.  Go

19  ahead.

20       Q.     I was going to say can you tell me

21  about that.

22       A.     Yeah, I don't recall the year.

23  Because it was -- I did our defensive tactics

24  program that was first as an instructor for our

25  defensive tactics.

31

                        C. DeVinney

1

2              Somewhere in there, you have to take

3    IDS, which is an instructor development program.

4              And then I also took firearms

5    instructor.  So I just don't recall the dates

6    specifically of when the IDS was, DT, sorry, DT

7    being defensive tactics and firearms.

8              I just don't recall the years.  But

9    it was right around that time.  It's between 2007

10   and 2010 I want to say, yeah.

11       Q.    And how did you go about developing

12   your lesson plans for this CQB training?

13       A.    Through other instructors, and then

14   we updated our CQB.

15              I think it was around 2014 we started

16   training with another company called Northern Red

17   to just kind of update our tactics, specifically

18   just for room clearing, super CQB.

19              And then that, yeah, is where that

20   came from.

21       Q.    You said that you started training or

22   working with a company called Northern Red; is that

23   what you said?

24       A.    Yes, sir.

25       Q.    Can you tell me about that, that is a

32

1                          C. DeVinney

2    private company?

3         A.       That's a private company made up of

4    mostly retired special forces in Delta Force.

5         Q.       And so how does that work, do they

6    put out like trainings and lesson plans that you

7    can purchase?

8         A.       No.  They put on classes regularly.

9    At the time, I was just going to them to see if

10   this would be a good fit.

11                 And that is kind of where -- the Army

12   side of the house is kind of where we started our

13   tactics when I first came on the team.

14                 So I tried to stick with Army,

15   ex-Army guys, stuff like that, for any change in

16   tactics, hopefully they were minor.

17        Q.       So basically, you guys went to some

18   of those classes, is that what happened or --

19        A.       Yes.

20        Q.       -- did you just go and do it?

21        A.       Yeah, so I went to some classes with

22   some team leaders and assistant team leaders.

23                 We decided that we are going to move

24   forward with training with them.  And since that

25   time frame, from wherever that was, again, I think

33

1                    C. DeVinney

2    it was 2014 or '16.  Sorry.  I am bad with the

3    years here.

4                    We continued to train and work with

5    them, had them train our entire team up and had

6    consistent training with them since.

7                    MR. SHIELDS:  Mike, again, we call

8           for any of the Northern Red training

9           materials that are in the possession of

10          either the Marshals office or the sheriff's

11          office that were used in development of the

12          CQB trainings.

13          Q.      It sounds like the Northern Red

14   trainings overlapped in your roles with the

15   sheriff's office in the Fugitive Task Force; is

16   that fair to say?

17          A.      Yeah, yeah.

18          Q.      And obviously, on the time period

19   that you said you were the task force versus just

20   with the sheriff's office in different roles since

21   you said you kind of went back and forth, right.

22          A.      Yeah, yeah, I just wanted to make

23   sure I understood what you were saying.

24          Q.      Getting back to the CQB trainings, is

25   there a regular schedule for those specifics

34

1                    C. DeVinney

2    trainings?

3         A.       For the task force?

4         Q.       Correct.

5         A.       Yeah, not -- again, like I said, we

6    try to schedule something once a month.  Nothing is

7    set up ahead of time.

8                  We will just usually try to throw a

9    date out, make sure most guys can meet that date

10   and put it on.

11                 Because it just requires making sure

12   I have myself or other instructors able to make it,

13   most of the task force guys can make it, making

14   sure I have the facilities to train at, whether it

15   is firearms, medical, so on and so forth.

16        Q.       So these are like training that were

17   being held regularly before the incident with

18   Dedrick James in September of 2021?

19        A.       Yeah, yes, as much as I can remember,

20   yes.

21        Q.       Do you remember, for example, like

22   the last training that you had before the incident

23   with Dedrick James in September of 2021?

24        A.       I do not.  Sorry.

25        Q.       Hard question.  It is not a memory

35

1                    C. DeVinney

2    test, so.

3          A.      Yeah, I would fail it, yeah.

4          Q.      Now I am going to switch it up a

5    little bit.

6                  Now, the trainings, do they include,

7    for example, talking about the process for

8    gathering intelligence before you execute a

9    warrant?

10         A.      What was the question again?  I am

11   sorry.  I caught the last part.  Can you ask that

12   again?  I am sorry.

13         Q.      Sure.  Before you execute the

14   warrant, go in, when you are preparing --

15         A.      Yes.

16         Q.      -- do your trainings that you give

17   cover that preparation process, including any

18   intelligence gathering?

19         A.      Yes.

20         Q.      Can you describe that for me?

21         A.      Yes.  So usually, we try to look at

22   what, you know, who is the suspect, what crime, why

23   they are wanted, what is their history.

24                 And then try to develop some kind of

25   pattern like.  Like do they stay at home, do they

1                    C. DeVinney

2    drive, do they walk, you know, stuff like that.

3                    And then try to decide whether or not

4    we are going to try to knock and talk, try to

5    surround and call them out, try to stop them in a

6    vehicle or stop them on the street walking.

7                    Is that helpful?

8        Q.       Very helpful.  So can you describe

9    that process here in the case of Dedrick James why

10   the decision was made to knock on his door and

11   enter the home versus stopping him in a car, on the

12   street or something else?

13       A.       Yeah, I'll do my best, just because I

14   don't recall all the information that day.  I

15   don't, yeah.

16                   Like I said, it is usually one of

17   those tactics, right, like I just mentioned.  And I

18   leave a lot of that up to the case agent.

19                   Because everyone generally knows that

20   that is how we are going to do it.  And I give them

21   a little bit of leeway on how they will want to be

22   with their case.

23                   I don't remember everything prior to

24   that at all.  I just don't remember everything for

25   that day because we just do it all the time.

37

                    C. DeVinney

1

2              But obviously Trooper Ulatowski

3    wanted to knock on the door.  And if I remember

4    correctly, it sounded like it -- like, again, if I

5    remember correctly, he had some sign that the

6    target may be at the residence.

7              And like I remember why he was wanted

8    but I just don't remember everything that went into

9    it.

10       Q.    Just more in general, how would that

11   decision be made, if you don't remember this

12   specific instance?

13       A.    Sure.  Like why, like sometimes do we

14   knock, why do they we do that sometimes; is that

15   what you are asking?

16       Q.    Yes, the decision to knock and try to

17   make contact that way versus stopping them walking

18   on the street versus stopping them in their

19   vehicle.

20       A.    Sure, yeah.  So sometimes that will

21   just be like is this a place that they are at a

22   lot, how long has he been looking for him.

23              You know, what is the level of

24   violence that they are showing, do they have a

25   prior history of guns, you know, have they been

38

1                       C. DeVinney

2    involved in shootings or a homicide.

3             Sometimes that will deter us from

4    maybe knocking on a door, not always, not always,

5    but sometimes that will deter it.

6        Q.      So you are saying that knocking and

7    entering a home would be more dangerous, correct?

8        A.      Yes, it is all dangerous, but, yeah.

9        Q.      Because you are kind of like in an

10   enclosed space that is unfamiliar, that would be

11   one reason it would be more dangerous?

12       A.      I would say because we are knocking

13   and we don't know what the person is doing on the

14   other side of the door, yeah.

15            And they have the ability to shoot

16   back, shoot through walls, doors, stuff like that,

17   yeah.

18       Q.      I had a question about a document so

19   I am going to put it up.  It is the enforcement

20   action briefing.

21            And I was hoping you could explain

22   the document to me?

23            MR. SHIELDS:  So we will make this

24       Exhibit 1 for the deposition.

25            (Whereupon, enforcement action

39

C. DeVinney

1          briefing was deemed marked as Plaintiff's

2          Exhibit 1 for Identification, as of this

3          date.)

4          Q.     My question is, sergeant, can you see

5   this document with the heading on your screen?

6          A.     Yes, I can see it.

7          Q.     So I am going to go down to the

8   second page.

9                 MR. CERRONE:  We are getting up to

10         get closer to the screen.

11         Q.     So can you just generally explain to

12  me what this document is, what it is used for on

13  the task force?

14         A.     Yes.  The Marshals, any time they did

15  like a local state warrant wanted package, they

16  have got to enter and put out one of these forms.

17                It is called Form 45 and enter it

18  into their JDIS system.  And forgive me, I don't

19  know what JDIS stands for off the top of my head.

20                But just general information about

21  the target.

22         Q.     So you list things like objective.

23  Is that something that is like generic on every

24  form or is this something that someone would type

40

1                       C. DeVinney

2    in, if you know?

3         A.       It is something somebody would type

4    in.  I believe most of the time Marshals guys are

5    filling these out, filling this out is deputy

6    marshals.

7         Q.       And then I had a question down here,

8    known safety consideration, the one thing that's

9    got an X is "Assault LEO".

10                 So I am assuming that means there was

11   a known history of an assault on an officer, do you

12   know?

13        A.       Yeah, I don't recall.

14        Q.       You don't recall you mean in this

15   specific instance?

16        A.       Yeah, I don't recall the history

17   there.

18        Q.       But in general, would that be what

19   that would mean?

20        A.       That is what I would assume.

21        Q.       I guess my only other question is

22   rally point and it says Bulls Head Plaza.

23                 Is that where you guys would meet up

24   before going to execute the warrant?

25        A.       Yeah, it looks like there.  We've

```
 1                    C. DeVinney
 2   used that area before for briefing.  I was not at
 3   that specific briefing, at that location that day.
 4                    I joined them on the street.  They
 5   were already set up on the location in the
 6   neighborhood there.
 7        Q.      So you were not involved in any of
 8   the preplanning or briefing for this warrant
 9   execution then?
10        A.      Not at that very beginning, no.
11        Q.      How about on any prior occasions?
12        A.      Not that I recall.
13        Q.      So I will ask just because I'll keep
14   you standing up here about your support deposition?
15                    MR. SHIELDS:  Off the record.
16                    (Whereupon, a discussion was held off
17        the record.)
18                    MR. SHIELDS:  We will put up your
19        deposition as Exhibit 2.
20                    (Whereupon, supporting deposition was
21        deemed marked as Plaintiff's Exhibit 2 for
22        Identification, as of this date.)
23        Q.      I guess I highlighted the portion.
24   It says that you are aware of Dedrick and the
25   background of his warrant as you had discussed his
```

42

1                    C. DeVinney

2    warrant on a prior occasion.

3                  So I guess my question is just what

4    do you remember about that prior discussion of his

5    warrant, or can you like --

6                  I'll leave that there and then I'll

7    ask a follow-up questions?

8        A.      Okay, no problem.  I just remember

9    that he was wanted for, from what I recall, pulling

10   a toothbrush out of a two-year-old's mouth.

11                 And I was told like teeth came out of

12   the child's mouth.  So that seems very violent to me

13   again.

14                 That is just what I remember.  That

15   is probably what I assume I am eluding to.

16                 Again, I don't recall any prior gun

17   history, assault on a LE person or anything.

18                 But I do remember when I am speaking

19   of that, that's.

20                 MR. CERRONE:  Sorry, that popped up

21        on the screen.

22        A.      So, yes, that is what I remember.

23                 MR. SHIELDS:  And I don't think I

24        have any other specific questions about this

25        for now so I am going to take it down.

43

```
 1                    C. DeVinney
 2             MR. CERRONE:  Just for the record,
 3        could we just identify the Bates numbers on
 4        those exhibits.
 5             I think the first was 932.
 6             MR. SHIELDS:  No problem.  The first
 7        one was a three-page document, 931 to 933.
 8        And the questions were specifically asked
 9        about -- it just looks like the number was
10        cut off, but it was one in the middle, which
11        should have been 932.
12             And then Exhibit 2, the supporting
13        deposition, was another three-page document,
14        178 to 180.
15             And the questions were asked about
16        page 179.
17             MR. Cerrone:  Thank you.
18        Q.     All right, sergeant, I guess my
19   follow-up questions was going to be, when the task
20   force gets a warrant and you have like a discussion
21   like you mentioned in the supporting deposition, I
22   guess my question is, can you just kind of take me
23   through the process when you guys get a warrant;
24   like what is the next thing that happens, how do
25   you plan going about executing the warrant?
```

44

1                    C. DeVinney

2       A.        So we usually try to brief, you know,

3   with as many tasks force members as possible about

4   the target and history, just anything known,

5   location of what the relationship is between the

6   location and the target, what we know about any

7   patterns they may have.

8                Like I said previously, is this

9   someplace they stay a lot.  Is this someplace they

10  are in and out of quickly.  Do they drive, do they

11  get picked up, do they walk.

12               That is the gist.  And then again

13  like I said, normal course of action is usually

14  knock and talk, surround a call out, stop them in a

15  vehicle or stop them walking.

16               And like I said, that day

17  specifically obviously whatever decision was made

18  would be knock and talk.

19               And I was not, as you obviously point

20  out and in the document there, there was a prior

21  brief location.

22               But I don't remember what I was doing

23  that day prior to.  But usually we will put out

24  some of that information on the target in a thread,

25  in a text thread.

45

                        C. DeVinney

1

2              And then usually I'll make some phone

3    calls to different members.  Usually not always the

4    case agent, because they are tied up trying to

5    gather other resources and other things.

6              So I'll try to get as much

7    information as I can, make sure that search things

8    are set up.

9              You know, we are doing a knock and

10   talk, whose going to the door, whose going to be on

11   containment.

12             Do we have anything -- if anything

13   happens, do we have medical, is somebody set up to

14   provide medical and transport, if anything happens.

15             I think that's the general idea.

16        Q.    So you described some things about,

17   for example, patterns that they might have, whether

18   they stay at that location a lot, whether they

19   drive a vehicle, how do you gather that

20   information, where does that come from?

21        A.    It is usually -- well, I guess it is

22   just based on what they get.  They get a prior

23   history or unit officers, sometimes the

24   investigators, you know have dealt with a lot.

25             Like, you know, when we assign some

46

1                    C. DeVinney

2    of these packages, usually there is some

3    information.

4                    Again, this is not something that I

5    specifically do as a sergeant.  Like I am not

6    assigned warrants.

7                    And I don't run the investigations as

8    far as like who they are, all the subtleties and

9    the locations.  So I am just speaking on behalf of

10   what was some of the officers do.

11                   But sometimes the investigator that

12   is handling the case will give them what they know.

13   They will get some information.

14                   They may do drive-by locations or sit

15   surveillance a little bit ahead of time, stuff like

16   that.

17                   Does that kind of answer the question

18   or do you need more?

19        Q.     I guess my questions is about the

20   intelligence gathering.

21                   So would you agree that gathering

22   intelligence is essential to ensure the safety

23   during a warrant execution?

24        A.     Yes.

25        Q.     Now, it is sounds like you are not

47

1                          C. DeVinney

2      sure what specific intelligence was gathered about

3      Dedrick James before the warrant execution?

4          A.      I do not recall today, no.  Yeah, I

5      just don't remember.

6          Q.      Is that something that would be put

7      in any specific document?

8          A.      I don't think so.  I think the only

9      document was the one that you showed, maybe if they

10     a have a warrant tracker.

11             If Trooper Ulatowski had some kind of

12     warrant tracker, maybe they had notes on there.  I

13     don't know.

14             I don't know if he did or not.  That

15     would be a question for him.

16         Q.      Before either a warrant is executed

17     like here at a residence or the decision is made to

18     stop someone on the street or do a vehicle stop,

19     generally, is it the process to conduct

20     surveillance of the individual to make that

21     decision?

22         A.      Yes, sometimes.  Can you repeat that

23     question one more time?  I want to make sure I am

24     answering that for you correctly.

25         Q.      So to make the decision of how you

48

1                    C. DeVinney

2   are going to apprehend the person, whether that be

3   knocking on their door, stopping their vehicle,

4   stopping them on the street.

5        A.      Yes, essentially, there's

6   surveillance, do the pattern lineup, you know,

7   whatever they are seeing and whatever they know.

8        Q.      Okay?

9        A.      But that's a case agent for that,

10  that kind of stuff.

11       Q.      And how long would that surveillance

12  last, would it be something that would be a couple

13  of hours or would it happen over a course of a

14  week?

15       A.      I think it is all relative to the

16  case and the agent and the movement of the target.

17               It could literally we show up and

18  they've got movement or they've got whatever intel

19  they had.

20               Like that day, obviously, it showed

21  something that got -- showed that the target would

22  be at that location for the trooper to make that

23  decision.

24               But, yeah, I mean sometimes it could

25  be hours, days.

49

1                    C. DeVinney

2       Q.      So it varies case to case, basically?

3       A.      It varies case to case, yeah.

4       Q.      And now, when you do know that you

5  are going to execute a warrant and enter a

6  property, do you do ever anything like go to the

7  Department of Buildings and get a layout for the

8  house?

9       A.      That does happen sometimes.  I don't

10 think it happens very often.  It is usually easier

11 to -- yeah, that's not a very common thing.

12      Q.      As far as you know, that's not

13 something that happened in this case?

14      A.      No, I don't recall that happening.

15      Q.      And in this case, do you have any

16 idea if the task force adjusted any of its plans

17 based on any surveillance or intelligence that was

18 gathered before the operation?

19      A.      I don't remember.  All I can do is

20 assume here today.

21      Q.      Can you tell me what you are

22 thinking?

23      A.      Specifically to why we chose to knock

24 and talk; is that the question?

25      Q.      Yes.

50

C. DeVinney

2    A.        Sorry.  All right.  Based on my

3    statement, what I can recall, obviously, the

4    trooper, I believe, just they had been looking

5    prior to.

6            And obviously, had assigned the

7    target would be there at this residence on that

8    day.

9            You know, there is different reasons

10   on surveillance.  Like sometimes it is a very hard

11   location to set because based on the neighborhood,

12   based on how the neighborhood was laid out, based

13   on if there's lookouts.

14           And it just can be hard to gain that

15   intel sometimes based on that.

16           And then again, depends on the

17   target, the severity of his crime, prior history.

18   You know, shootings and gun is obviously something

19   we concern more about.

20           But just remembering specifically

21   that there was some kind of assault on a

22   two-year-old with a toothbrush thing, obviously

23   that is serious.

24           But I don't recall any weapons.  I

25   don't remember that being part of any brief or

51

1                    C. DeVinney

2    intel, just from what I can remember.  So I am

3    trying to answer the question the best I can.

4                    MR. CERRONE:  You are doing well.

5         Q.       So just let me ask some follow-up

6    questions to make sure I understand your answer.

7                    So it sounds to me like you are

8    saying there were no --

9                    You guys are going after the worst of

10   the worst, right, super dangerous people with guns

11   that are involved in murders and stuff, and this is

12   not one of those cases, right; that is basically

13   what you are saying?

14                   MR. CERRONE:  Objection to form.

15                   MR. CAMPOLIETO:  Objection.

16                   MR. CERRONE:  Go ahead.

17        A.       This, I mean, he assaulted a

18   two-year-old, so to me that was fairly serious.

19        Q.       So I guess let me ask a better

20   question.

21                   In terms of the level of danger that

22   it looks like based on your review of the document

23   and what you remembered, like you guys did not

24   consider this to be a very high-risk dangerous

25   suspect that you were going to apprehend; is that

52

C. DeVinney

1    fair?

2        A.    I don't -- I don't like saying that.

3    I would not say that.  Just because I know that

4    even charges like that are less than have and can

5    turn out bad.

6            So we do have different ways of, you

7    know, approaching targets, whether it is a

8    structure or outside.

9            And they are all bad.  So we do our

10   best to make sure that we are safe as possible.

11   And none of it is safe.  All of it is dangerous.

12           People have killed officers for a lot

13   less.  To me a kid getting assaulted was very

14   serious.

15           So, you know, but again, measuring

16   like what you may be getting to, is kind of like

17   the safety of the officers, more like are they

18   armed and could they have an upper hand on us, yeah

19   that is always a possibility.

20           Like that is always a possibility.

21   And we have to measure each one of those.  And

22   sometimes, you know, it's just not perfect.

23       Q.    Do you remember if in this case there

24   was a written operational plan developed for the

53

1                    C. DeVinney

2    apprehension of Dedrick James?

3         A.       No, I don't, other than the document

4    that you showed me.

5         Q.       And the document that I showed, that

6    is not -- I mean an operational plan, that is like

7    a specific document that would be prepared,

8    correct?

9         A.       Yes.

10        Q.       And was the document that I showed

11   you earlier, that is not the quote/unquote the

12   operational plan, correct?

13        A.       I don't think so.  I don't look at

14   that form very often.  That is something like I

15   said is filled out by the Marshals.

16              All the guys on the task force fill

17   out one of those before we can all participate.

18        Q.       When you say --

19        A.       There is no operational plan, other

20   than that filled out.  If you are looking for other

21   documents for an operational plans, there is

22   nothing else filled out.

23        Q.       So you are saying that -- so I guess

24   my question is like the SOP that is produced in

25   discovery in this case refers to a written

54

1                          C. DeVinney

2    operation plan that is supposed to be filled out

3    when there is time to do so.

4                  Are you saying that there is no

5    specific form, other than the form that we looked

6    at earlier, that constitutes a quote/unquote

7    operation plan?

8          A.     Yeah, that would be what I look at as

9    operational, you know, operational plan.  Because

10   it has target information on there.

11                I believe it has some location

12   information on there.  I just don't recall.

13         Q.     Now, when you guys plan an operation

14   like this, what contingency measures do you try to

15   plan for?

16         A.     Communication, making sure everybody

17   is on the right channel, making sure we have enough

18   manpower, making sure medical is set up, any

19   additional resources.

20                Sometimes we get canine.  In this

21   case we did.  And I think that's it.

22         Q.     Now, do you remember if in planning

23   this operation, if there was any consideration

24   given to potential risks such as the presence of

25   armed individuals inside the home or the

55

1                    C. DeVinney

2    possibility of other civilians inside of the home?

3         A.     Yeah, ask that question again about

4    armed individuals in the home?  What was the

5    question?

6         Q.     Yes.  Do you recall or do you know if

7    in planning this operation if there was any

8    consideration given to the potential risks of such

9    as armed individuals inside of the home or

10   civilians inside of the home?

11        A.     Yes.  That is always a consideration.

12   That is something that we always try to worry

13   about.

14        Q.     And how do you take that into

15   consideration during the planning process?

16        A.     Just the planning and training.  We

17   try to make sure that we are making the best

18   approach.

19               This approach being how we are going

20   to go in, knock, surround and call out and then

21   training.  Making sure that everyone is trained and

22   has experience in doing these things.

23        Q.     Okay.  So can you give me any

24   examples of what precautions were taken to ensure

25   the safety of both the team and any potential

56

                    C. DeVinney

1

2    occupants of the house in this incident?

3        A.      Yes, we try to contain.  We try to

4    set up containment outside.  Make sure anybody

5    coming and going so we can limit that.

6               We try to make sure we have medical,

7    guys to perform medical and/or do any kind of

8    emergency transport.

9               I believe one of the guys had a

10   shield.  We have tried make sure if we do have a

11   clear structure, if we knock and talk, we have guys

12   able to go inside and clear properly as well and

13   deal with anybody in the house.

14              I think that is a couple of things.

15       Q.     So one thing that I think you

16   mentioned another option that we had not talked

17   about before is containing, call out.

18              Under what circumstance would you do

19   a contain and call out?

20       A.     Usually, where we think that the

21   target has been identified, held up there for a

22   long, long period of time, may be relative to the

23   case.

24              We get set hours, days.  And

25   depending on the severity of the warrant or the

57

1                    C. DeVinney

2    history of the target, we may do a surround and

3    call out then.

4        Q.    So can you give me factors that might

5    lead to a contain and call out versus an entry like

6    you did here?

7        A.    Yes.  Something involving weapons or

8    homicide, we have been trying to confirm that the

9    target is at the location, whether that is via

10   surveillance or other technology.

11            And we are just not getting any

12   movement from the target leaving or anything like

13   that.

14            But even that requires at some point

15   potentially knocking on doors and call them out and

16   so on.

17            MR. SHIELDS:  I want to put up

18        another exhibit, the standard operating

19        procedures.

20            And I just had some questions for you

21        on that.

22            (Whereupon, USMS SOP was marked as

23        Plaintiff's Exhibit 3 for Identification, as

24        of this date.)

25            MR. CERRONE:  Before we get to that,

58

1                          C. DeVinney

2          could we just take a five-minute break.  I

3          just need to use the bathroom.

4                  MR. SHIELDS:  Okay.

5                  (At this time, there was a pause in

6          the proceeding.)

7                  MR. SHIELDS:  On your screen, for the

8          record, this is the first page of the SOP.

9          It's Bates 935.

10         Q.      Do you see that on your screen,

11 sergeant?

12         A.      Yes, sir.

13         Q.      Now, I guess my first question is, so

14 the SOP, it says for enforcement operations and

15 United States Marshals Service.

16                  And this would be something that all

17 members of the Marshals would be required to comply

18 with?

19         A.      Yes.

20         Q.      So it is like equivalent to the

21 general orders for the sheriff's office?

22         A.      Yes.

23         Q.      Like rules I guess, basically?

24         A.      Right, yes.

25         Q.      In the table contents, I want to go

1                       C. DeVinney

2    what I highlighted, "Enforcement Operations

3    Operational Procedures, executing search warrants

4    and arrest warrants."

5                       So that will be, I will go down to

6    page eight of this pdf which is Bates number 941?

7                       MR. SHIELDS:  And for the record,

8         this will be Exhibit 3 for the deposition.

9         Q.       I guess my first question is just, in

10   the process of executing a warrant, what kind of

11   procedures do you have in place to ensure that the

12   SOP is complied with?

13        A.       Can you ask that question again?

14        Q.       Sure.  In general, when the task

15   force is executing a warrant, what procedures are

16   in place to ensure that that the SOP is being

17   complied with?

18        A.       Well, I know for my guys, they have a

19   warrant tracker.  And there is general information

20   that they have to fill out for the warrants that

21   they are assigned.

22                       So again, just in briefing alone with

23   the guys, they are all required to answer, you

24   know, just the standard that we have is know the

25   background of the current charges, and any

60

1                        C. DeVinney

2     backgrounds that they know of, whether violence or

3     guns or whatever that history is.

4                        I know that is something that we have

5     at the sheriff's office.  Again, I don't

6     specifically know about Ulatowski as a trooper.

7                        And obviously this is the Marshals

8     SOP for general order or whatever, that is given.

9                        But, yeah, I know for at least for

10    us, for the sheriff's office, that is one of our

11    standards.

12         Q.     So is there like a checklist or

13    something that you guys would fill out to ensure

14    that the SOPs each required thing is complied with?

15         A.     No.

16         Q.     Do you know if there was anything

17    done in this case to ensure that the SOP was

18    followed during the planning and execution for the

19    warrant for Dedrick James?

20         A.     I don't know, other than the form

21    that you showed earlier.

22         Q.     And then when it says here in little

23    A, A1 little A, that --

24                        MR. CERRONE:  Just for the record, I

25         have a copy of the document and I am going to

                         C. DeVinney

1

2          show is to the sergeant so he can look at it

3          and work from here in this position rather

4          than standing in front of the screen.

5                    MR. SHIELDS:  Sure.

6                    MR. CERRONE:  So you are on page 942?

7                    MR. SHIELDS:  Correct.

8          Q.      When it is says "Time permitting and

9    prior to initiating any enforcement operations in

10   the field, a complete background investigation will

11   be conducted by the USMS Enforcement Operations

12   member assigned to the case."

13                   So I guess my question is when it

14   says the member assigned to the case, could that be

15   like the person who is deputized, like who is that

16   referring to, does that specifically mean the US

17   Marshals officer or it could be anyone on the team?

18         A.      Yeah, that would be members assigned

19   to the case could essentially either they could

20   fill it out or they would give the information to

21   one of the deputy marshals to fill out one for

22   them.

23                   I don't know just what happened in

24   this specific case.

25         Q.      So I guess my question is, when it

62

                        C. DeVinney

1

2    says member, that basically in the way you guys

3    operate could be any member of the team?

4         A.      Yes.

5         Q.      And so you just don't know exactly

6    what background investigation was conducted in this

7    case?

8         A.      I don't.  I don't.

9         Q.      And under A, it lists -- it has a

10   list of 1 through 17.

11               As far as you know, is there any kind

12   of like checklist to make sure that all of those

13   things are conducted during the background

14   investigation?

15        A.      I believe it is on that form, the

16   enforcement action briefing.

17        Q.      So I put back up the enforcement

18   action briefing.  So I am just looking at it.

19               MR. CERRONE:  What's the Bates number

20        on that again?

21               MR. SHIELDS:  931 to 933.

22               MR. CERRONE:  What question is before

23        the witness right now?

24        Q.      I was just looking at the SOP and

25   then the enforcement action briefing.  And I think

63

                              C. DeVinney
1        his answer was that the checklist, you know, all of
2        these items 1 through 17 would be contained in the
3        enforcement action briefing.
4
5                      So I just want to take a look at that
6        together to see if all of those things were, in
7        fact, listed there.
8                      So I guess what you're saying all the
9        known safety considerations and then the location
10       concerns, those would cover all of the items in 1
11       through 17.
12            A.       It appears that way.
13            Q.       Now I am just going through the SOP.
14       When you guys are planning an operation, how do you
15       decide what types of safety equipment are necessary
16       for the team to ensure that the operation can be
17       conducted safely?
18            A.       Well, equipment is usually, minimum
19       is usually vest.
20                     MR. CERRONE:  What do you mean by
21            vest?
22                     THE WITNESS:  Any ballistic vest.
23            A.       Make sure everyone has a ballistic
24       vest.  Obviously, they want their firearm, whether
25       it is just a pistol or they are qualified to carry

64

1                          C. DeVinney

2    a rifle, any shield tray or if they are issued a

3    shield, like a ballistic shield.

4         Q.        But would different equipment,

5    different safety equipment be brought to different

6    types of warrant executions based on safety

7    concerns?

8         A.        Most of the time it is the same thing.

9    Helmets, I am sorry I forgot to mention helmets.

10   That is some guys have helmets, some guys don't.

11                 But the basic stuff that everyone

12   carries is a ballistic vest, a pistol and a rifle.

13        Q.        And then the next item here is F

14   where it say, "Prior to the execution of an arrest

15   warrant or enforcement activity, photos of the

16   fugitives will be shown to each member of the

17   arrest team and a written pre-operational plan will

18   be formulated and communicated."

19                 I guess that was my question earlier.

20   You were saying the enforcement action briefing is

21   the only written operational plan; is that right?

22        A.        Yeah, I think we call it 45, if I

23   remember that right one.  I apologize.

24        Q.        Form USM 45, it's very faint.

25        A.        Yeah, sorry about that.  Yes, so that

65

C. DeVinney

1    is something that is filled out so that the

2    Marshals and everyone can act on one of these

3    warrants.

4    

5        Q.    Now, I had asked some of these

6    questions before about -- I am going to take this

7    down for now.

8              As far as you remember, you don't

9    remember any of the considerations between knock

10   and enter versus, for example, waiting for Dedrick

11   to leave the house and apprehend him in his

12   vehicle, you don't remember those considerations in

13   this case?

14       A.    I don't remember why, no.  I don't

15   recall why.

16       Q.    How about you said you were present

17   at the scene, correct?  You showed up to the scene

18   prior to the entry; is that right?

19       A.    Yes.

20       Q.    Do you remember was there any

21   discussion of the fact that there was a camera

22   system or surveillance system that was present on

23   the outside of the house?

24       A.    I don't remember.

25       Q.    I am sorry.  I missed your answer.

66

1                    C. DeVinney

2         A.        Sorry.  I don't remember.

3         Q.        Okay.  In general, if you guys are

4    doing I guess pre-execution surveillance and you

5    noticed that there's a camera system on the house,

6    how would that play into, if at all, your decision

7    to knock or enter the house?

8         A.        Yeah, that plays a factor sometimes,

9    sure.  But it doesn't always obviously stop us.

10                   But that is obviously a consideration

11   for safety and approach.  But that is not always a

12   factor to stop us or not.

13        Q.        Can you explain that a little more?

14        A.        Yeah.  I guess, again, I don't recall

15   specifically this case.  But, again, like cameras,

16   them knowing where you are positioned on the

17   outside is a safety factor for us, right.

18                   So for this specific case, I don't

19   recall hearing about it.  Maybe they did, maybe

20   they didn't.  I just don't remember.

21        Q.        It could be a safety factor because,

22   for example, I mean people might react differently

23   if they see a large number of heavily armed police

24   officers outside, correct?

25        A.        Sure.

67

1                    C. DeVinney

2        Q.        Now, in this case, I think are you

3   saying that the person to ask questions about

4   specific planning of the operation would be Jeff

5   Ulatowski?

6        A.        That is fair, yes.

7        Q.        Because he was the person who had

8   been assigned the warrant; is that it?

9        A.        Yes.

10        Q.        Is that generally how you would work,

11   the person who's assigned the warrant on the task

12   force would be in charge of basically planning the

13   execution of the warrant?

14        A.        Yes.

15        Q.        Do they ever do that in consultation

16   with you since you are sort of like one of the more

17   senior people on the team?

18        A.        Yes.

19        Q.        But that didn't happen in this case?

20        A.        I just don't remember.  I just don't

21   remember who I talked to, how many people I talked

22   to that day.

23                  I just don't recall the details of

24   that, yeah.

25        Q.        Is there any kind of like, I don't

68
                    C. DeVinney
1
2  know, standard planning process for the person who
3  is assigned the warrant to get together with more
4  senior members of the team to make the plan for its
5  execution?
6       A.    Yeah, usually they try, like they
7  start like they will talk to the Marshals office.
8  They will get the 45 filled out.
9            They will brief and discuss the case.
10 I am not always present.
11           But, yeah, they will usually brief
12 the case.  And everyone has a general idea of what
13 the plan and how we are going to execute a warrant,
14 so.
15      Q.    Is there any specific member of the
16 team who needs to approve the plan to execute the
17 warrant?
18      A.    No.
19      Q.    Because there is no like set
20 hierarchy within the team?
21      A.    I mean it's the Marshals task force.
22 They will usually brief.  You know, they have to be
23 a part of at it.  They have to fill out this form
24 so they tend to be a part of it.
25           So they have to make sure that is

1                    C. DeVinney

2    filled out so we can act on their behalf as well

3    for those type of warrants.

4              So they may have gone to some of the

5    other guys prior to getting there.  And obviously

6    according to the document, it said they briefed at

7    the Bulls Head Plaza.

8              But I just don't recall that day.

9         Q.    So I guess my question is like if

10   this was not a task force, if you were on the

11   sheriff's office SWAT team or something, there

12   would be the commander who would have to sign off

13   on any pre-operational plan, correct?

14        A.    Yes.

15        Q.    But there is no equivalent to like

16   the commander for the task force?

17        A.    No.  I mean there is -- there's -- I

18   just don't remember.  I don't remember what -- I am

19   trying to remember marshal.

20             Carl Smith was that there that day.

21   I am just trying to think who else for deputies

22   from the Marshals office were there.

23             But again, they brief.  They all kind

24   of operate the same.  We try to make sure we have

25   enough of the information that is required.  Any

70

1                      C. DeVinney

2    major safety issues, the guys will discuss amongst

3    themselves.

4                 Like that day I showed up.  And I

5    just don't remember any -- I don't remember every

6    details of that prior to.

7         Q.    So on this day you don't recall

8    exactly.  But I guess my question is just more

9    generally.

10                It sounds like there is no specific

11   person that needs to sign off on or approve of

12   plans for execution of a warrant within the

13   Fugitive Task Force team prior to the execution,

14   correct?

15        A.    Marshals have to have that 45 signed

16   on -- filed out, excuse me.

17        Q.    So, basically, the U.S. Marshals opt

18   team would have to do some sort of sign off?

19        A.    Yeah, they have to fill that out and

20   enter it into their system.

21        Q.    And in terms of the number of members

22   of the team, there's fewer marshals on the team

23   than there are members from other law enforcement

24   agencies; is that correct?

25        A.    Yeah, it depends on the day.

71

C. DeVinney

1    Q.    In total, there's about fifteen
members of the team; is that right?

4    A.    Yeah.

5    Q.    And there's only about three Marshals
in total?

7    A.    Yes, so it fluctuates over the years.
I have four guys assigned.  But then they have
other members that can help out sometimes that are
deputized.

11          The Marshals office has -- it sort of
the changed since this time.  So sometimes the guys
will be assigned to operations which is their court
side of the house.

15          So sometimes you will get one guy.
Sometimes you will get three guys.  Sometimes you
will get four guys.  Sometimes you will get one
guy.

19    Q.    And then maybe there is not a
specific hierarchy on the team, but is there like a
de facto hierarchy where, for example, earlier you
said the people kind of look to you as a tactical
leader since you lead trainings and stuff?

24    A.    Yes.

25    Q.    So in general, before a warrant is

72

```
 1                    C. DeVinney
 2    executed, would they normally come to you and
 3    discussion the plan?
 4         A.       Sometimes, like if I was present in a
 5    briefing.
 6         Q.       Kind of like saying, hey, sarge, what
 7    do you think?
 8         A.       Yes, they may speak up.
 9         Q.       But again, there is no written rule
10    for, hey, we need to get Sergeant DeVinney's input
11    here but we execute this?
12         A.       No.
13         Q.       Just going back to something we
14    talked about a little bit earlier.
15                  When you guys are developing a plan,
16    how do you guys I guess think about backup plans or
17    alternatives plans in case the initial plan fails?
18         A.       Do we talk about contingencies; is
19    that the question?
20         Q.       Correct.
21         A.       Yeah, we do.  Knock and talk, it
22    would essentially be turns into a surround and call
23    out.
24         Q.       But that didn't happen in this case,
25    right?
```

73

C. DeVinney

1    A.    No.

2    Q.    Okay.  So how come that didn't happen

3

4    in this case?

5    A.    Well, because from what I understand,

6    they knocked, were interviewing from what I

7    remember the grandmother, and they ID their

8    suspect.

9    Q.    And in hindsight, would you say it

10   would have been safer when the suspect ran into

11   another room for the officers who entered to have

12   gone back outside and called them to come out?

13   A.    No, I wouldn't say so.

14   Q.    Why not?

15   A.    I mean it just depends.  It all

16   depends.  Again, it all up to the individual what

17   they are seeing.

18         And can you potentially close on them

19   and take them into custody safely or can you not.

20   It is really subjective to the officer.

21   Q.    How do you train for that?

22   A.    What is that?

23   Q.    How do you train for that, a

24   situation like that?  Because it is subjective to

25   the officer based on their trainings and

74

1                           C. DeVinney

2     experience, correct?

3          A.        Yes.

4          Q.        So I guess, for example, does the

5     task force do any specific training on situations

6     where you think that maybe when you do a knock and

7     talk the suspect is going to be compliant but then

8     they run; do you do any training on how to safely

9     handle that situation?

10         A.        Yeah, we have done some different

11    scenarios where maybe we take shout outs by the

12    door and then we will back off.

13                   So depending on how far they made it

14    into the structure, they may continue to clear.  I

15    mean it can go both ways.

16         Q.        When you say they may continue to

17    clear, I am not familiar with all of the

18    terminology.

19                   Does that mean they might try to

20    continue to --

21         A.        Yeah, they may continue to move

22    through the structure.

23                   MR. CERRONE:  The officers?

24                   THE WITNESS:  The officers, yes.

25         Q.        So if the suspect runs, when you say

75

                         C. DeVinney
1
2    they may continue to clear, that means that the
3    officers may continue to chase them through the
4    structure?
5          A.    Yes.
6          Q.    And so can you describe when they
7    are continuing to clear what kind of training do
8    you do about how to do that safely?
9          A.    You can move directly to them.  You
10   can move directly towards them.  You can enter and
11   clear the room to them while the officers clear the
12   immediate area as well as other rooms.
13         Q.    Is one of the concerns something
14   like what happened in this case that if the suspect
15   runs that they might be looking to grab a weapon or
16   a firearm?
17         A.    Yes.
18         Q.    So how do you prepare for something
19   like that prior to the execution of a warrant
20   knowing that if they run into the structure that
21   they might arm themselves with a firearm?
22         A.    Just continue training, firearm
23   trainings, scenario base training.  When it comes
24   to a structure, again CQB training.  Talking and
25   trying to find contingencies.

76

                        C. DeVinney

1

2       Q.      So do you have like -- does the task

3   force engage in specific training about, for

4   example, talking down suspects in situations like

5   this, or de-escalation training?

6       A.      Yes, I believe.  I am not sure about

7   HRFA.  I think they do some of that.  They do do

8   CQB.

9               They do talk and teach some of that

10  in the medical and in their CQB training.

11      Q.      There was something you might have

12  said that I missed, VERPA or something, at the

13  beginning.

14      A.      No, I am sorry.  Yeah, we call it

15  HRFA.  I forget what it stands for.

16              It's essential their yearly training

17  that they put on.  Sorry about that.  HRFA, I think

18  it is like high-risk fugitive training.  I forget

19  what the acronym stands for.

20      Q.      So I guess basically what I meant was

21  like communication skills training for how to get a

22  suspect to voluntarily come into custody.

23              Is that what you are saying would be

24  included in the HRFA and the CQB training?

25      A.      Sometimes, yes.

77

1          C. DeVinney

2               MR. SHIELDS:  Mike, so I guess we

3          just call for any of HRFA or CQB training

4          that involves communication skills for

5          getting suspects to comply with coming into

6          custody.

7               MR. CERRONE:  We will take it under

8          advisement upon receipt.

9     Q.     How about does the task force have

10   certain specialized tools that you ever use prior

11   to entering a home or knocking, such as cameras or

12   tactical mirrors, things you might look into I

13   guess windows and try to get an idea of what is

14   going on inside the house, do you guys use stuff

15   like that?

16   A.     I am trying to think of that time

17   frame.  We do -- we have used some stuff, maybe

18   like a mirror, maybe a camera pole at the time.

19               I don't remember then if we had that.

20   Q.     So basically it sounds like that at

21   least after this incident those were the types

22   of tools that the task force has but you are not

23   sure if the task force had them at time of this

24   incident?

25   A.     I believe we had a camera pole I

78

1                        C. DeVinney

2    believe at the time.

3         Q.        Do you have any idea if a camera pole

4    was used in this case?

5         A.        No, it was not.

6         Q.        Do you know why it wasn't?

7         A.        Because they entered the house and

8    grabbed the suspect.

9         Q.        So are you saying that would be

10   something that may be if the decision had been made

11   to do the contain and call out or something, that

12   might be a situation where you use it but not when

13   you knock?

14        A.        No, I am not saying that.  I would

15   say sometimes we will use that for clearing crawl

16   spaces like attics, stuff like that.

17        Q.        I listen to the podcast you did

18   about guy that hid in the, what was it, attic crawl

19   space under the insulation.

20                  So stuff like that?

21        A.        Yes.

22        Q.        Gotcha.  Let's see do you guys ever

23   use anything like diversionary devices or flash

24   bangs?

25        A.        No, we are not allowed to use those.

1                    C. DeVinney

2    No, on that, no.

3        Q.      Okay.

4        A.      SWAT operations, yes.  Not on the

5    task force.

6        Q.      Okay, got it.

7        A.      Yes, sir.

8        Q.      And does the task force ever use

9    things like any less lethal equipment like tasers

10   or bean bag guns?

11       A.      Just I am trying, at that time, I

12   believe it was just tasers.

13       Q.      And that's changed since then, now

14   more equipment is allowed?

15       A.      We at the sheriff's office now, we

16   have like tasers, sometimes can on certain

17   operations we can use less lethal shot guns or bean

18   bag rounds for the 40 baton round.

19              And that is not my specialty so I

20   don't want to misspeak.

21       Q.      So that is for the sheriff's office.

22   Are you saying that if it is allowed for the

23   sheriff's office that it's allowed for the task

24   force or are there different rules for the

25   equipment for the task force?

                    C. DeVinney

1

2     A.      Yeah, there's different rules.  I am
3  not saying it was in 2021.

4     Q.      I am sorry.  I missed that last
5  answer.

6             MR. CAMPOLIETO:  Can you give me two
7        minutes to pause for a second.  I have to go
8        offline for a minute.

9             (At this time, there was a pause in
10        the proceeding.)

11             (Whereupon, the requested portion of
12        the record was read back.)

13             MR. CERRONE:  I think he answered the
14        question.  I am not sure.  I don't know if
15        you might want to follow-up, Elliot.

16             MR. SHIELDS:  Sure.

17     Q.      So are the rules for the equipment
18  for task force, would that be in the SOP or
19  somewhere else, if you know?

20     A.      No.  The specific equipment again
21  remind me of what you are asking for.

22     Q.      I think we were talking about less
23  lethal like bean bag guns and tasers.

24     A.      Yeah, tasers at the time were allowed
25  by all members.

1                    C. DeVinney

2       Q.       And so they were allowed.  Was there

3   any kind of rule that a certain number of members

4   of the task force had to be equipped with tasers,

5   anything like that?

6       A.       No, not that I recall.

7       Q.       I guess what I am getting at is like

8   if there's a planning process and part of the

9   planning for contingencies and maybe the

10  contingencies as well we want to ensure that

11  there's less lethal options; that is not something

12  that would be, I guess, required in that

13  contingency plan to ensures that there's less

14  lethal options available?

15      A.       Yes, we try to make sure members have

16  at least a taser.  So not all members have a taser.

17  Like I said, our numbers fluctuate some days.

18      Q.       So there would not be like a rule or

19  a practice on the team to ensure that; for

20  example, if three members are doing the entry, that

21  at least one of those members is equipped with a

22  taser?

23      A.       We try but we don't have a set

24  number, no.

25      Q.       When you do your trainings on CQB, do

82

                              C. DeVinney

1

2    you do like failure drills to prepare officers for

3    situations like when the original plan fails?

4         A.      Well, you mean a failure plan is when

5    the original plan fails?

6         Q.      Yes.  So I guess that is similar to a

7    contingency plan.  So you have your plan and you

8    have your backup plan.

9                 I have heard them referred to as

10   failure drills for the situation where the primary

11   plan and the backup plan failed.

12        A.      Yeah, like I said, we will do like

13   essentially if you get shots fired at the main

14   entry before you have entered, we have done some of

15   those.

16        Q.      Then just going back to the less

17   lethal stuff, does your training involve any use of

18   less lethal options during entries?

19        A.      I don't.  But every member at least

20   on the sheriff's office has training for less

21   lethal.  If they are carrying a taser, that is

22   included in their training.

23        Q.      So like the CQB training that you put

24   on, that would not include use of less lethal

25   options like tasers during the entry?

83

                    C. DeVinney

1

2       A.      Not specifically, no, of a tasers.

3   But maybe like announcing backing off, like that.

4       Q.      On the date of this incident, do you

5   know if the team was aware prior to knocking and

6   entering how many people were inside of the

7   residence before they entered the residence?

8       A.      I don't remember right now.  Yeah, I

9   don't remember.

10      Q.      Would you agree that it is dangerous

11  to execute a warrant without knowing how many

12  people are inside the house?

13      A.      Yes.

14      Q.      Was the task force aware of the

15  possibility that there could have been civilians or

16  family members inside of the house?

17      A.      I believe so.

18      Q.      Do you know what precautions were

19  taken, if any, to ensure the safety of any of those

20  potential civilians or family members?

21      A.      Any precautions?

22      Q.      Correct.

23      A.      Yeah, I guess just like I said, have

24  several people prepared if they had to make entry

25  to go into the house to be able to potentially

84

1                              C. DeVinney

2     contain a suspect and deal with another occupant.

3          Q.       Now, after the operation, was there a

4     debrief or evaluation conducted by the task force?

5          A.       Yes.  We did have a debrief some time

6     after.  I don't recall when that was.  Because

7     immediately we were all separated and had to go

8     back to our departments.

9          Q.       So ordinarily, if there's like a

10    shooting like there was here, where everyone was

11    not separated and had to go back to their

12    departments, would a debrief be held immediately?

13         A.       Yes.  Usually, yes.

14         Q.       And do you remember when the debrief

15    was eventually conducted here?

16         A.       For this incident, I don't remember

17    when.

18         Q.       Does the task force complete an

19    after-action report or some other like debrief

20    report?

21         A.       For like normal everyday?

22         Q.       I guess specific to this incident, do

23    you know if there was an after-action report or

24    some other debrief report that was completed?

25         A.       I am not sure.  I'm not sure.

85

1                      C. DeVinney

2        Q.      Normally would there be an

3    after-action report or a debrief report completed?

4        A.      On what kind of case?

5        Q.      For like a warrant execution like

6    this case if there is no incident.

7                So I guess like if in this case

8    Dedrick had been apprehended without incident,

9    would there have been a report generated?

10       A.      Not a report.  But we would have

11   debriefed, talked about any issues.

12       Q.      Are reports generated in some

13   instances?

14               MR. CERRONE:  In which type of cases?

15       Q.      After a warrant execution for the

16   apprehension of a fugitive, are there normally some

17   kind of after-action report or debrief report

18   compete?

19               MR. CERRONE:  Objection to the form

20        of the question.

21               You can answer.

22       A.      No, not normally, not the task force.

23       Q.      How about in your role on the SWAT

24   team, on the SWAT team, do you guys execute like

25   high-risk search warrants?

86

1                    C. DeVinney

2          A.      Yes.

3          Q.      After the execution of a high-risk

4    search warrant, do you complete an after-action

5    report or a similar report?

6          A.      Yes, sir.

7          Q.      So that is basically a different

8    process for your role on the SWAT team for the

9    Monroe County Sheriff's office versus the Fugitive

10   Task Force?

11         A.      Yes, sir.

12         Q.      Do you know why there is no kind of

13   after-action report drafted on the task force?

14         A.      I mean I believe that there's an

15   after-action report after all the incident is done.

16   But there's -- yeah, I don't know.  I don't know.

17         Q.      Because what's the purpose of an

18   after-action report?

19         A.      To improve and notice any major

20   issues operationally, training, environmental

21   situationals.

22         Q.      So it would be better to help the

23   task force improve, right, if you guys did some

24   sort of after-action reports after incidents like

25   this?

87

```
 1                   C. DeVinney
 2              MR. CAMPOLIETO:  Objection.
 3              You can answer.
 4       A.      We do do debriefs after, after
 5  apprehension.  Written, no.
 6       Q.      Just so we are clear for the record,
 7  when you say you do debriefs, that is like a
 8  meeting where everybody gets together and talks
 9  about what happened?
10       A.      Yes, sir.
11       Q.      And so basically the difference
12  between the sheriff's office and the task force
13  would be that with the sheriff's offices that
14  debrief would be then followed up with a writing
15  like an after-action report but not on the Fugitive
16  Task Force?
17       A.      Correct.
18       Q.      Based upon what happened during the
19  Dedrick James' warrant execution, were there any
20  changes made to future operational planning?
21       A.      I mean, yeah.  I don't think it was
22  specifically this case.  But again, just the
23  severity of all our warrants.
24              And the opportunity or the chance for
25  anything of that happening is just, again, we are
```

88

```
 1                      C. DeVinney
 2   always trying to at least -- I am trying to improve
 3   any training more how we handle some of these
 4   cases.
 5                  But this specific just based on what
 6   I recall, I don't, I don't know if I would have
 7   changed anything as far as knocking and talking.
 8                  I just don't recall enough
 9   information to answer that part to that specific
10   incident.
11       Q.    Okay.  So are you saying that after
12   this incident there were changes made in general
13   but you are not sure if they were specifically
14   because of this incident?
15       A.    I think you just always are trying to
16   improve overall education and training of the guys.
17       Q.    And it sounds like you are not sure
18   if you implemented any changes to the training or
19   operations based specifically on what happened in
20   this incident?
21       A.    I just don't recall right now about
22   this specific incident.
23       Q.    How about after this warrant
24   execution, did anybody -- was there any evaluation
25   done on like your role on the team as the de facto
```

89

```
 1                    C. DeVinney

 2   tactical leader?

 3        A.        Not that I know of.

 4        Q.        And how about any other general

 5   reviews or evaluations of what happened in this

 6   incident and how the warrant was executed, are you

 7   aware of any --

 8                  Other than the Attorney General's

 9   office report, are you aware of any reviews of the

10   incident and critiques of the tactics that were

11   used?

12        A.        I don't recall.  I don't remember.  I

13   don't recall anything.

14        Q.        Now, did you personally review the

15   Attorney General's report?

16        A.        No.

17        Q.        I am sorry that was no?

18        A.        I don't remember.  I may have read

19   it.  I just don't.  Yeah, I just don't remember it.

20   Yeah, I just don't fully recall.

21        Q.        Is it frequent that the Attorney

22   General writes a report about a warrant that the

23   task force executes?

24        A.        Of this type of outcome?

25        Q.        I mean do you remember any other
```

90

1                        C. DeVinney

2    cases where the Attorney General has written a

3    report about a case were you guys, you personally

4    have been involved in executing a warrant?

5          A.      Yes.

6          Q.      How many other times?

7          A.      I would give this one, maybe one

8    other, one or two others.

9          Q.      And was that because the others also

10   involved someone that was killed during the

11   incident?

12         A.      Yes.

13         Q.      That doesn't happen very often, that

14   would be something that would like stand out,

15   right?

16         A.      Yes.

17         Q.      Now, do you know if there are any

18   specific changes to the task force's training or

19   operations based on the Attorney General's report

20   in this case?

21         A.      I don't recall this, if it was for

22   this specific incident.

23                 But I know for us, any newer members

24   started riding around with other task force members

25   and trying to get them trained sooner than later.

91
C. DeVinney

1      Those are some of the teams we were
2
3  trying to make, personally.  But I just don't
4  recall what changes were made specifically for this
5  incident.
6      Q.    It sounds like there is kind of a
7  more in-depth field training, is that what you are
8  saying, when you say riding around with other task
9  force members?
10     A.    For lack of a better term, yes.
11 There is no evaluation.  There is nothing written
12 or documented for that.
13          But it is just kind of getting them
14 to get to know the members, to see how we conduct
15 daily operations.
16     Q.    It's not something formal but just
17 trying to get them up to speed more quickly?
18     A.    Yes, I think that is just something
19 we just do locally.
20     Q.    One of the specific recommendations
21 in the Attorney General's report was that the task
22 force should equip all of its members with
23 body-worn cameras.
24          After the task force report, did -- I
25 am sorry.

C. DeVinney

1

2                After the Attorney General's report,

3    did the task force implement that recommendation

4    and start to equip its members with body-worn

5    cameras?

6         A.     Yes, we did, the sheriff's office

7    did.

8         Q.     So now today if a task force

9    operation happens and a warrant is executed, do the

10   members of the sheriff's office wear their

11   body-worn cameras and activate them?

12        A.     Yes.

13        Q.     Do you know if the rest of the task's

14   members are also equipped with body-worn cameras?

15        A.     At the time, I think we were

16   transitioning.  But we hadn't gotten there yet.  I

17   don't recall fully recall.

18                Now today, all of the sheriff's

19   members do.  And I believe the Marshals just went

20   to body-worn cameras.

21        Q.     And then the other members of your

22   task force would be RPD and state troopers; is that

23   right?

24        A.     Yes.

25        Q.     And they also have body-worn cameras?

93

C. DeVinney

1    A.    I don't -- I know they didn't at the
2    time.  Because we only had one guy assigned
3    currently.
4
5         So I am trying to remember between
6    now and then.  So I just don't remember if the
7    state police currently assigned has one.
8         But at the time, I don't think
9    anybody did.  Does that help?
10   Q.    Yes.  Do you remember any other
11   recommendations either from the Attorney General's
12   office or any other independent law enforcement
13   agency that is involved in the task force, the
14   sheriff's department, the police department, state
15   police, do you remember any other recommendations
16   that were made to changes in trainings or operation
17   as a result of this incidents?
18   A.    As a result of this incident, I am
19   not recall anything right now.  Unless you have
20   something.
21   Q.    No, I don't have anything.  I was
22   just wondering if there's anything I had missed.
23        So, okay, well, sergeant, those were
24   all of my questions for today.  I appreciate your
25   time.

94

1                    C. DeVinney

2      A.      Yes, sir.  Thank you.

3              MR. CERRONE:  John, do you have

4      anything?

5              MR. CAMPOLIETO:  I don't.  Thank you

6      very much.

7              MR. CERRONE:  Thank you.

8              (Whereupon, the within examination

9      was concluded.  Time noted, 12:23 P.M.)

10             (Whereupon, enforcement action

11     briefing was marked as Plaintiff's Exhibit 1

12     for Identification, as of this date.)

13             (Whereupon, supporting deposition was

14     marked as Plaintiff's Exhibit 2 for

15     Identification, as of this date.)

16             (Whereupon, SOP was marked as

17     Plaintiff's Exhibit 3 for Identification, as

18     of this date.)

19                *            *            *

20

21

22

23

24

25

95

1

2              A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK    )

5                          SS:

6    COUNTY OF            )

7

8            I, CHRISTIAN DeVINNEY, hereby certify

9    that I have read the transcript of my testimony

10   taken under oath in my deposition of September 17,

11   2024; that the transcript is a true, complete and

12   correct record of what was asked, answered and said

13   during this deposition, and that the answers on the

14   record as given by me are true and correct.

15

16                        _____

                          CHRISTIAN DeVINNEY

17

18

19   Subscribed and sworn to

20   before me this _____ day

21   of _____, 2024.

22

23   _____
     NOTARY PUBLIC

24

25

96

1

2                        I N D E X

3    WITNESS

4    Sergeant Christian DeVinney

5    BY                                    PAGE

6    Elliot D. Shields, Esq.              5-94

7

8                      E X H I B I T S

9    PLAINTIFF'S        DESCRIPTION        PAGE

10   1                  Enforcement action  38/94
                        briefing
11
     2                  Supporting deposition 41/94
12
     3                  USMA SOP            57/94
13

14              INFORMATION TO BE SUPPLIED      PAGE

15   Production for any CQB lesson plans,        30
     power-points, anything in writing about
16   the trainings.

17   Northern Red training materials that are in   33
     the possession of either the Marshals office
18   or the sheriff's office that were used in
     development of the CQB trainings
19
     HRFA or CQB training that involves          77
20   communication skills for getting suspects
     to comply with coming into custody
21

22

23

24

25

97

1

2                  C E R T I F I C A T E

3

4    STATE OF NEW YORK )

5                    ) SS.:

6    COUNTY OF NASSAU   )

7              I, BARBARA E. BIERMAN, a shorthand

8    reporter and Notary Public within and for the State

9    of New York, do hereby certify:

10              That CHRISTIAN DeVINNEY, the witness

11   whose Examination Before Trial is hereinbefore set

12   forth, was duly sworn by me and that such

13   Examination Before Trial is a true record of the

14   testimony given by such witness.

15              I further certify that I am not

16   related to any of the parties to this action by

17   blood or marriage; and that I am in no way

18   interested in the outcome of this matter.

19              IN WITNESS WHEREOF, I have hereunto

20   set my hand this 14th day of October, 2024.

21

22

23   _____

                 BARBARA E. BIERMAN

24

25

## A

**A1** 60:23
**ability** 38:15
**able** 34:12 56:12 83:25
**academy** 12:6,8,10,10,17
  13:6,14
**accurate** 23:2
**acronym** 76:19
**act** 65:3 69:2
**acting** 20:4,5
**action** 38:20,25 44:13
  62:16,18,25 63:4 64:20
  94:10 96:10 97:16
**activate** 92:11
**activity** 64:15
**additional** 54:19
**address** 5:23
**adjusted** 49:16
**administer** 3:8 4:12
**administrator** 1:3
**advisement** 77:8
**after-action** 84:19,23
  85:3,17 86:4,13,15,18
  86:24 87:15
**afternoons** 15:10
**against-** 1:7
**agencies** 11:14 70:24
**agency** 4:18 93:13
**agent** 26:15 36:18 45:4
  48:9,16
**ago** 17:4,8
**agree** 46:21 83:10
**agreed** 3:3,11 4:7
**ahead** 7:9 30:19 34:7
  46:15 51:16
**air** 28:3
**Alfred** 11:18,24 12:24
**allowed** 20:19 78:25
  79:14,22,23 80:24 81:2
**alternatives** 72:17
**AMERICA** 1:8 2:10
**amount** 8:4
**and/or** 56:7
**Andover** 11:16,24 12:5
  12:15,21,24
**announcing** 83:3
**answer** 6:20 7:10,11
  19:16 20:16 46:17 51:3
  51:6 59:23 63:2 65:25
  80:5 85:21 87:3 88:9
**answered** 80:13 95:12
**answering** 18:3 47:24
**answers** 95:13
**anybody** 26:20 56:4,13
  88:24 93:9
**apologize** 8:9 64:23
**appears** 63:12
**apply** 12:17

**appreciate** 93:24
**apprehend** 48:2 51:25
  65:11
**apprehended** 85:8
**apprehension** 53:2 85:16
  87:5
**apprehensive** 27:17
**approach** 55:18,19 66:11
**approaching** 52:8
**appropriately** 30:9
**approve** 68:16 70:11
**April** 11:11 15:8
**area** 11:6 15 29:11 41:2
  75:12
**arm** 75:21
**armed** 52:19 54:25 55:4,9
  66:23
**Army** 32:11,14
**arrest** 59:4 64:14,17
**ARROWOOD** 1:9
**asked** 22:21 23:17 43:8
  43:15 65:5 95:12
**asking** 37:15 80:21
**assault** 40:9,11 42:17
  50:21
**assaulted** 51:17 52:14
**assign** 45:25
**assigned** 18:8,18 21:4,22
  46:6 50:6 59:21 61:12
  61:14,18 67:8,11 68:3
  71:8,13 93:3,7
**assignment** 16:2,12
**assignments** 15:24
**assistant** 23:22 25:20
  32:22
**Associate's** 9:23
**assume** 40:20 42:15 49:20
**assuming** 7:16 40:10
**asthma** 10:16,19,21,25
**Atlantic** 27:19 29:8,10
**attic** 78:18
**attics** 78:16
**attorney** 6:19 7:7 9:5
  89:8,15,21 90:2,19
  91:21 92:2 93:11
**attorneys** 1:20 2:4,10,17
  3:4
**authorized** 3:8
**available** 81:14
**Avenue** 2:5,11 5:25
**aware** 23:7 41:24 83:5,14
  89:7,9

## B

**B** 15:10 96:8
**Bachelor's** 9:24
**back** 16:3,5,13 17:2 21:8
  21:14,18,22 26:5 33:21

  33:24 38:16 62:17
  72:13 73:12 74:12
  80:12 82:16 84:8,11
**background** 9:16,17 10:7
  10:19 41:25 59:25
  61:10 62:6,13
**backgrounds** 60:2
**backing** 83:3
**backup** 72:16 82:8,11
**bad** 33:2 52:6,10
**bag** 79:10,18 80:23
**BAKER** 1:9
**ballistic** 63:22,23 64:3,12
**bangs** 78:24
**Barbara** 1:21 97:7,23
**base** 75:23
**based** 19:10 45:22 49:17
  50:2,11,12,12,15 51:22
  64:6 73:25 87:18 88:5
  88:19 90:19
**basic** 15:10 64:11
**basically** 10:25 12:16
  15:4 19:21 32:17 49:2
  51:12 58:23 62:2 67:12
  70:17 76:20 77:20 86:7
  87:11
**basis** 20:22
**Bates** 43:3 58:9 59:6
  62:19
**bathroom** 58:3
**baton** 79:18
**battles** 28:7
**BAXTER** 1:10
**bean** 79:10,17 80:23
**beginning** 41:10 76:13
**behalf** 46:9 69:2
**believe** 13:4,20 22:9,22
  40:4 50:4 54:11 56:9
  62:15 76:6 77:25 78:2
  79:12 83:17 86:14
  92:19
**best** 36:13 51:3 52:11
  55:17
**better** 51:19 86:22 91:10
**Bierman** 1:21 97:7,23
**big** 10:20
**bit** 35:5 36:21 46:15
  72:14
**blood** 97:17
**blue** 25:8,22,24
**body-worn** 91:23 92:4,11
  92:14,20,25
**Bona** 27:21
**boot** 10:14
**border** 16:20
**break** 19:9 58:2
**breakdown** 25:18,23
**brief** 10:24 20:24 44:2,21

  50:25 68:9,11,22 69:23
**briefed** 69:6
**briefing** 38:20 39:2 41:2
  41:3,8 59:22 62:16,18
  62:25 63:4 64:20 72:5
  94:11 96:10
**briefly** 8:15 10:9
**brought** 64:5
**Buffalo** 2:12 27:21
**building** 20:25 28:11
**buildings** 28:8 49:7
**Bulls** 40:22 69:7

## C

**C** 2:2 5:15 6:1 7:1 8:1 9:1
  10:1 11:1 12:1 13:1
  14:1 15:1 16:1 17:1
  18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1
  26:1 27:1 28:1 29:1
  30:1 31:1 32:1 33:1
  34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1
  42:1 43:1 44:1 45:1
  46:1 47:1 48:1 49:1
  50:1 51:1 52:1 53:1
  54:1 55:1 56:1 57:1
  58:1 59:1 60:1 61:1
  62:1 63:1 64:1 65:1
  66:1 67:1 68:1 69:1
  70:1 71:1 72:1 73:1
  74:1 75:1 76:1 77:1
  78:1 79:1 80:1 81:1
  82:1 83:1 84:1 85:1
  86:1 87:1 88:1 89:1
  90:1 91:1 92:1 93:1
  94:1 95:2 97:2,2
**call** 10:14 30:2 33:7 36:5
  44:14 55:20 56:17,19
  57:3,5,15 64:22 72:22
  76:14 77:3 78:11
**called** 24:21 31:16,22
  39:18 73:12
**calls** 45:3
**camera** 65:21 66:5 77:18
  77:25 78:3
**cameras** 66:15 77:11
  91:23 92:5,11,14,20,25
**camp** 10:14
**CAMPOLIETO** 2:20 4:5
  5:10 51:15 80:6 87:2
  94:5
**canine** 54:20
**capacity** 20:4,6
**car** 36:11
**career** 8:3 15:4
**Carl** 69:20
**CARLTON** 1:8

carries 64:12
carry 63:25
carrying 82:21
case 1:6 6:8 26:14 36:9,18
    36:22 45:4 46:12 48:9
    48:16 49:2,2,3,3,13,15
    52:24 53:25 54:21
    56:23 60:17 61:12,14
    61:19,24 62:7 65:13
    66:15,18 67:2,19 68:9
    68:12 72:17,24 73:4
    75:14 78:4 85:4,6,7
    87:22 90:3,20
cases 19:4 51:12 85:14
    88:4 90:2
caught 35:11
Cerrone 2:13 4:4 5:9 6:12
    8:15,24 18:4 20:14 30:6
    39:10 42:20 43:2,17
    51:4,14,16 57:25 60:24
    61:6 62:19,22 63:20
    74:23 77:7 80:13 85:14
    85:19 94:3,7
certain 19:3 20:20 77:10
    79:16 81:3
certification 3:5
certifications 15:16
certify 95:8 97:9,15
chance 87:24
change 32:15
changed 71:12 79:13 88:7
changes 22:4 87:20 88:12
    88:18 90:18 91:4 93:16
channel 54:17
charge 24:13 26:9 67:12
charges 52:5 59:25
chase 75:3
checklist 60:12 62:12
    63:2
chest 10:15
child's 42:12
childhood 10:22
chose 49:23
Christian 1:10,18 2:11
    5:22 95:8,16 96:4 97:10
Church 2:18
circumstance 56:18
circumstances 20:12
city 1:8 2:17,18 5:10 21:7
    21:16 27:19 29:8,10
civil 4:9 6:8 7:15
civilians 55:2,10 83:15,20
clarify 19:17
class 30:14,15
classes 32:8,18,21
clear 21:17 28:8 56:11,12
    74:14,17 75:2,7,11,11
    87:6

clearing 31:18 78:15
close 28:6 73:18
closer 39:11
cold 10:15
college 9:20,24,25
colors 25:16
come 45:20 72:2 73:3,12
    76:22
comes 75:23
coming 56:5 77:5 96:20
commander 23:22 25:19
    25:20 69:12,16
common 49:11
communicated 64:18
communication 24:15
    54:16 76:21 77:4 96:20
community 9:20
company 31:16,22 32:2,3
compete 85:18
complete 9:23,24 61:10
    84:18 86:4 95:11
completed 8:19 84:24
    85:3
compliant 74:7
complied 59:12,17 60:14
comply 58:17 77:5 96:20
concern 50:19
concerns 63:10 64:7
    75:13
concluded 94:9
conduct 47:19 91:14
conducted 4:10 61:11
    62:6,13 63:17 84:4,15
conference 4:16
confirm 57:8
consent 4:22
consider 51:24
consideration 40:8 54:23
    55:8,11,15 66:10
considerations 63:9 65:9
    65:12
considered 4:23
consistent 33:6
constantly 18:12,14 21:8
constitutes 54:6
consultation 67:15
contact 27:22 37:17
contain 56:3,19 57:5
    78:11 84:2
contained 63:3
containing 56:17
containment 45:11 56:4
contents 58:25
contingencies 72:18
    75:25 81:9,10
contingency 54:14 81:13
    82:7
continue 74:14,16,20,21

    75:2,3,22
continued 24:17 33:4
continuing 75:7
continuously 22:2
control 4:17
conversation 9:2,4,5,9
coordinate 25:16
copy 4:2 60:25
Corning 12:7,10
correct 19:25 34:4 38:7
    53:8,12 61:7 65:17
    66:24 69:13 70:14,24
    72:20 74:2 83:22 87:17
    95:12,14
correctly 20:18 37:4,5
    47:24
counsel 4:7,14 5:2
Counselors 4:1
County 1:10,13 5:24 10:3
    11:10,20,23 12:3 13:9
    13:12 15:4,9 86:9 95:6
    97:6
couple 12:23 13:21,23
    14:4,21,25 48:12 56:14
course 8:2 44:13 48:13
court 1:1,21 4:11,18 5:3
    6:16,22 7:17 8:4 71:13
courtroom 8:7
cover 28:21,25 35:17
    63:10
CQB 28:2,5,18 29:3,23
    30:3 31:12,14,18 33:12
    33:24 75:24 76:8,10,24
    77:3 81:25 82:23 96:15
    96:18,19
crawl 78:15,18
crime 20:7 35:22 50:17
crimes 19:14 20:10
criminal 7:17 8:4
criteria 19:5
critiques 89:10
current 59:25
currently 93:4,7
custody 73:19 76:22 77:6
    96:20
cut 43:10

_____

### D

D 3:1 5:15 95:2 96:2,6
daily 20:22 91:15
danger 51:21
dangerous 38:7,8,11
    51:10,24 52:12 83:10
date 5:7 34:9,9 39:4
    41:22 57:24 83:4 94:12
    94:15,18
dates 15:15 16:11 17:21
    31:5

day 36:14,25 41:3 44:16
    44:23 48:20 50:8 67:22
    69:8,20 70:4,7,25 95:20
    97:20
days 28:25 29:8 48:25
    56:24 81:17
de 71:21 88:25
de-escalation 76:5
deal 10:20 56:13 84:2
dealt 45:24
debrief 84:4,5,12,14,19
    84:24 85:3,17 87:14
debriefed 85:11
debriefs 87:4,7
deceased 1:3
decide 26:18 36:3 63:15
decided 32:23
decision 36:10 37:11,16
    44:17 47:17,21,25
    48:23 66:6 78:10
Dedrick 1:3 22:9 34:18
    34:23 36:9 41:24 47:3
    53:2 60:19 65:10 85:8
    87:19
deemed 39:2 41:21
defendant 1:19 2:10,17
    5:10
Defendants 1:14
defensive 13:18 15:16
    30:23,25 31:7
Delaware 2:11
Delta 32:4
demand 30:8
department 1:13 2:9
    11:16 12:13 18:16
    21:19 22:24 49:7 93:14
    93:14
Department's 25:12
departments 12:18 24:16
    84:8,12
depending 56:25 74:13
depends 20:6 50:16 70:25
    73:15,16
deposition 1:18 3:6,7,10
    4:10 6:8,15 7:6,15 8:13
    8:18 9:6 38:24 41:14,19
    41:20 43:13,21 59:8
    94:13 95:10,13 96:11
deputies 1:11 18:17 24:14
    69:21
deputized 18:25 19:23
    20:5 61:15 71:10
deputy 1:8 15:21 16:21
    18:6 19:23 40:5 61:21
describe 22:7 27:6 35:20
    36:8 75:6
described 24:8 45:16
DESCRIPTION 96:9

Page 3

**details** 67:23 70:6
**deter** 38:3,5
**develop** 35:24
**developed** 52:25
**developing** 31:11 72:15
**development** 31:3 33:11
  96:18
**devices** 78:23
**DeVinney** 1:11,19 2:11
  5:22 6:1 7:1 8:1 9:1
  10:1 11:1 12:1 13:1
  14:1 15:1 16:1 17:1
  18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1
  26:1 27:1 28:1 29:1
  30:1 31:1 32:1 33:1
  34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1
  42:1 43:1 44:1 45:1
  46:1 47:1 48:1 49:1
  50:1 51:1 52:1 53:1
  54:1 55:1 56:1 57:1
  58:1 59:1 60:1 61:1
  62:1 63:1 64:1 65:1
  66:1 67:1 68:1 69:1
  70:1 71:1 72:1 73:1
  74:1 75:1 76:1 77:1
  78:1 79:1 80:1 81:1
  82:1 83:1 84:1 85:1
  86:1 87:1 88:1 89:1
  90:1 91:1 92:1 93:1
  94:1 95:8,16 96:4 97:10
**DeVinney's** 72:10
**died** 10:18
**difference** 87:11
**different** 15:6,16 24:15
  25:4 33:20 45:3 50:9
  52:7 64:4,5,5 74:10
  79:24 80:2 86:7
**differently** 66:22
**DIRECT** 5:19
**directing** 26:9
**directly** 75:9,10
**directs** 7:10
**disagrees** 26:20
**discharge** 10:17,23
**discovery** 53:25
**discuss** 68:9 70:2
**discussed** 41:25
**discussion** 21:11 41:16
  42:4 43:20 65:21 72:3
**disqualifier** 11:2
**DISTRICT** 1:1,1
**diversionary** 78:23
**document** 38:18,22 39:6
  39:13 43:7,13 44:20
  47:7,9 51:22 53:3,5,7
  53:10 60:25 69:6

**documented** 91:12
**documents** 8:21 53:21
**DOE** 1:9
**doing** 13:18 18:4 38:13
  44:22 45:9 51:4 55:22
  66:4 81:20
**door** 36:10 37:3 38:4,14
  45:10 48:3 74:12
**doors** 38:16 57:15
**drafted** 86:13
**drills** 82:2,10
**drive** 36:2 44:10 45:19
**drive-by** 46:14
**DT** 31:6,6
**duly** 5:17 97:12

---

**E**

**E** 1:21 2:2,2 3:1,1 5:15,15
  95:2,2 96:2,8 97:2,2,7
  97:23
**earlier** 53:11 54:6 60:21
  64:19 71:21 72:14
**easier** 49:10
**education** 9:19 88:16
**educational** 9:17
**effect** 3:9
**eight** 59:6
**either** 33:10 47:16 61:19
  93:11 96:17
**Elliot** 2:6 5:20 6:4 80:15
  96:6
**eluding** 42:15
**emergency** 56:8
**employed** 18:20
**employee** 20:6
**enclosed** 38:10
**ended** 15:9
**enforcement** 10:4 11:13
  16:17 38:19,25 58:14
  59:2 61:9,11 62:16,17
  62:25 63:4 64:15,20
  70:23 93:12 94:10
  96:10
**engage** 76:3
**ensure** 46:22 55:24 59:11
  59:16 60:13,17 63:16
  81:10,19 83:19
**ensures** 81:13
**enter** 25:17 28:8 36:11
  39:17,18 49:5 65:10
  66:7 70:20 75:10
**entered** 73:11 78:7 82:14
  83:7
**entering** 38:7 77:11 83:6
**entire** 24:18 33:5
**entries** 82:18
**entry** 25:10,12,21 26:2
  28:10,13 57:5 65:18

81:20 82:14,25 83:24
**environmental** 86:20
**equip** 91:22 92:4
**equipment** 63:15,18 64:4
  64:5 79:9,14,25 80:17
  80:20
**equipped** 81:4,21 92:14
**equivalent** 58:20 69:15
**Eshields@rothandroth...**
  2:7
**Esq** 2:6,13,20 5:20 96:6
**essential** 46:22 76:16
**essentially** 28:7 48:5
  61:19 72:22 82:13
**estate** 1:3
**estimate** 7:20
**evaluation** 84:4 88:24
  91:11
**evaluations** 89:5
**eventually** 12:14 84:15
**everybody** 54:16 87:8
**everyday** 84:21
**ex-Army** 32:15
**exactly** 14:22 15:2 17:22
  62:5 70:8
**examination** 5:19 94:8
  97:11,13
**examined** 5:18
**example** 20:21 23:20
  25:12 29:19 34:21 35:7
  45:17 65:10 66:22
  71:21 74:4 76:4 81:20
**examples** 55:24
**excuse** 21:10 70:16
**execute** 27:8 35:8,13
  40:24 49:5 68:13,16
  72:11 83:11 85:24
**executed** 47:16 72:2 89:6
  92:9
**executes** 89:23
**executing** 20:3 43:25 59:3
  59:10,15 90:4
**execution** 41:9 46:23 47:3
  60:18 64:14 67:13 68:5
  70:12,13 75:19 85:5,15
  86:3 87:19 88:24
**executions** 26:7 64:6
**exhibit** 38:24 39:3 41:19
  41:21 43:12 57:18,23
  59:8 94:11,14,17
**exhibits** 43:4
**existed** 17:20
**experience** 10:4 23:21
  55:22 74:2
**explain** 38:21 39:12
  66:13
**express** 4:22

---

**F**

**F** 3:1 64:13 97:2
**facilities** 34:14
**fact** 63:7 65:21
**facto** 71:21 88:25
**factor** 66:8,12,17,21
**factors** 57:4
**fail** 35:3
**failed** 82:11
**fails** 72:17 82:3,5
**failure** 82:2,4,10
**faint** 64:24
**fair** 33:16 52:2 67:6
**fairly** 51:18
**fall** 20:11
**falls** 20:7
**familiar** 8:11 13:16 25:9
  74:17
**family** 83:16,20
**far** 46:8 49:12 62:11 65:8
  74:13 88:7
**fed** 20:25
**Federal** 4:9
**felonies** 19:4 20:9
**fewer** 70:22
**field** 13:21,23 14:2,20
  61:10 91:7
**fifteen** 9:10 71:2
**figure** 17:16
**figured** 26:12
**filed** 70:16
**files** 21:9
**filing** 3:5
**fill** 53:16 59:20 60:13
  61:20,21 68:23 70:19
**filled** 53:15,20,22 54:2
  65:2 68:8 69:2
**filling** 40:5,5
**find** 75:25
**firearm** 13:18 63:24
  75:16,21,22
**firearms** 15:17 28:2 31:4
  31:7 34:15
**fired** 82:13
**first** 5:16 6:7 11:24 30:24
  32:13 43:5,6 58:8,13
  59:9
**fit** 19:5 32:10
**five** 17:4,8,12,12
**five-minute** 58:2
**five-year** 15:24
**flash** 78:23
**fluctuate** 81:17
**fluctuates** 71:7
**follow-up** 30:7 42:7 43:19
  51:5 80:15
**followed** 60:18 87:14
**follows** 5:18

**force** 3:9 9:12 15:20
17:11,18 22:8,19,23
23:11,18,25 24:12,13
26:6 27:5,7,10 29:5
32:4 33:15,19 34:3,13
39:14 43:20 44:3 49:16
53:16 59:15 67:12
68:21 69:10,16 70:13
74:5 76:3 77:9,22,23
79:5,8,24,25 80:18 81:4
83:14 84:4,18 85:22
86:10,13,23 87:12,16
89:23 90:24 91:9,22,24
92:3,8,22 93:13
**force's** 90:18
**forces** 23:7 32:4
**forget** 27:16 76:15,18
**forgive** 17:9,21 39:19
**forgot** 64:9
**form** 3:12 20:14 39:18,25
51:14 53:14 54:5,5
60:20 62:15 64:24
68:23 85:19
**formal** 30:8 91:16
**forms** 39:17
**formulated** 64:18
**forth** 33:21 34:15 97:12
**forward** 32:24
**four** 14:20 18:8,17 24:14
29:8 71:8,17
**frame** 15:18 32:25 77:17
**frequent** 89:21
**front** 61:4
**fugitive** 22:8 23:25 26:6
27:17 33:15 70:13
76:18 85:16 86:9 87:15
**fugitives** 64:12
**full-time** 11:20 12:25
13:2
**fully** 89:20 92:17
**further** 3:11 4:19 97:15
**future** 5:7 87:20

**G**

**G** 95:2
**G-R-A-N-E-T** 16:18
**gain** 50:14
**gather** 45:5,19
**gathered** 47:2 49:18
**gathering** 35:8,18 46:20
46:21
**general** 25:23 28:19
37:10 39:21 40:18
45:15 58:21 59:14,19
60:8 66:3 68:12 71:25
88:12 89:4,22 90:2
**General's** 89:8,15 90:19
91:21 92:2 93:11

**generally** 7:8 8:6 27:7
36:19 39:12 47:19
67:10 70:9
**generated** 85:9,12
**generic** 39:24
**getting** 33:24 39:10 52:14
52:17 57:11 69:5 77:5
81:7 91:13 96:20
**gist** 28:4 44:12
**give** 25:18 35:16 36:20
46:12 55:23 57:4 61:20
80:6 90:7
**given** 6:8 54:24 55:8 60:8
95:14 97:14
**gladly** 7:2
**go** 7:9 12:6 16:3,5,13 17:2
18:9 19:12 20:21 21:8
21:18 26:5 30:18 31:11
32:20 35:14 39:8 49:6
51:16 55:20 56:12
58:25 59:5 74:15 80:7
83:25 84:7,11
**going** 6:6 15:10 25:14
26:17 27:12 28:9 30:10
30:20 32:9,23 35:4 36:4
36:20 38:19 39:8 40:24
42:25 43:19,25 45:10
45:10 48:2 49:5 51:9,25
55:19 56:5 60:25 63:13
65:6 68:13 72:13 74:7
77:14 82:16
**good** 6:2,3 8:3 32:10
**gotcha** 6:24 23:20 26:5
78:22
**gotten** 92:16
**government** 5:9,13
**grab** 21:9 75:15
**grabbed** 78:8
**graduating** 10:2
**grandmother** 73:7
**GRANET** 16:15,18
**great** 18:4
**Greater** 16:15
**ground** 6:14
**group** 26:19
**guess** 10:2,21 22:14 23:6
23:16,24 24:2,19 28:20
40:21 41:23 42:3 43:18
43:22 45:21 46:19
51:19 53:23 58:13,23
59:9 61:13,25 63:8
64:19 66:4,14 69:9 70:8
72:16 74:4 76:22 77:2
77:13 81:7,12 82:6
83:23 84:22 85:7
**guessing** 25:3
**gun** 42:16 50:18
**guns** 37:25 51:10 60:3

79:10,17 80:23
**guy** 16:20 71:15,18 78:18
93:3
**guys** 16:19 18:8 19:8 21:3
22:16 23:3,8,14 29:9
32:15,17 34:9,13 40:4
40:23 43:23 51:9,23
53:16 54:13 56:7,9,11
59:18,23 60:13 62:2
63:14 64:10,10 66:3
69:5 70:2 71:8,12,16,17
72:15,16 77:14 78:22
85:24 86:23 88:16 90:3

**H**

**H** 5:15 96:8
**H-A-K-E** 14:10
**Hake** 14:7,9
**half** 17:12
**HALL** 2:17
**hand** 52:19 97:20
**handle** 74:9 88:3
**handling** 46:12
**happen** 48:13 49:9 67:19
72:24 73:3 90:13
**happened** 32:18 49:13
61:23 75:14 87:9,18
88:19 89:5
**happening** 49:14 87:25
**happens** 43:24 45:13,14
49:10 92:9
**hard** 34:25 50:10,14
**head** 39:20 40:22 69:7
**heading** 39:6
**heard** 82:9
**hearing** 66:19
**heavily** 66:23
**held** 1:21 15:6 21:11
34:17 41:16 56:21
84:12
**helmets** 64:9,9,10
**help** 22:12 24:4,4 71:9
86:22 93:9
**helpful** 6:22 36:7,8
**Henrietta** 15:11
**hereinbefore** 97:11
**hereunto** 97:19
**hey** 19:8 72:6,10
**hid** 78:18
**hierarchy** 23:23,25 68:20
71:20,21
**high** 9:21 10:2
**high-risk** 27:17 51:24
76:18 85:25 86:3
**higher** 20:9
**highest** 9:19
**highlighted** 41:23 59:2
**hindsight** 73:9

**history** 35:23 37:25 40:11
40:16 42:17 44:4 45:23
50:17 57:2 60:3
**home** 35:25 36:11 38:7
54:25 55:2,4,9,10 77:11
**homicide** 38:2 57:8
**hopefully** 32:16
**hoping** 38:21
**hours** 48:13,25 56:24
**house** 32:12 49:8 56:2,13
65:11,23 66:5,7 71:14
77:14 78:7 83:12,16,25
**HRFA** 76:7,15,17,24 77:3
96:19

**I**

**ICE** 16:21
**ID** 5:13 73:7
**idea** 45:15 49:16 68:12
77:13 78:3
**identification** 5:14 39:3
41:22 57:23 94:12,15
94:17
**identified** 56:21
**identify** 43:3
**IDS** 31:3,6
**immediate** 75:12
**immediately** 84:7,12
**implement** 92:3
**implemented** 88:18
**improve** 86:19,23 88:2,16
**in-depth** 91:7
**inaccurate** 23:12
**incident** 8:19 9:13 22:8
22:10 34:17,22 56:2
77:21,24 83:4 84:16,22
85:6,8 86:15 88:10,12
88:14,20,22 89:6,10
90:11,22 91:5 93:18
**incidents** 86:24 93:17
**include** 29:23 35:6 82:24
**included** 76:24 82:22
**including** 35:17
**independent** 93:12
**individual** 47:20 73:16
**individually** 1:4
**individuals** 19:22 54:25
55:4,9
**information** 36:14 39:21
44:24 45:7,20 46:3,13
54:10,12 59:19 61:20
69:25 88:9 96:14
**initial** 72:17
**initiating** 61:9
**input** 72:10
**inside** 54:25 55:2,9,10
56:12 77:14 83:6,12,16
**instance** 37:12 40:15

instances 85:13
instructor 15:16 30:14,24
    31:3,5
instructor's 30:15
instructors 31:13 34:12
insulation 78:19
intel 26:16 48:18 50:15
    51:2
intelligence 35:8,18 46:20
    46:22 47:2 49:17
interdiction 28:3
interested 97:18
intermixing 18:14
interrupted 30:18
interviewing 73:6
introduction 6:17
investigation 61:10 62:6
    62:14
investigations 46:7
investigator 1:9,12 46:11
investigators 45:24
involve 82:17
involved 9:12 28:10 38:2
    41:7 51:11 90:4,10
    93:13
involves 77:4 96:19
involving 57:7
issued 5:13 64:2
issues 70:2 85:11 86:20
item 64:13
items 63:3,10

**J**

James 1:3,3,3 22:9 34:18
    34:23 36:9 47:3 53:2
    60:19
James' 87:19
JDIS 39:19,20
Jeff 67:4
JEFFREY 1:12
Jim 27:21
John 1:9 2:20 94:3
John.campolieto@city...
    2:20
join 11:8
joined 10:9 11:11,18 15:9
    16:7 41:4
joining 11:12
July 16:24
JUSTICE 2:9

**K**

K 95:2
keep 41:13
keeping 24:15
kid 52:14
killed 6:5 52:13 90:10
kind 13:16 24:6 26:24

27:12,13 31:17 32:11
    32:12 33:21 35:24 38:9
    43:22 46:17 47:11
    48:10 50:21 52:17 56:7
    59:10 62:11 67:25
    69:23 71:22 72:6 75:7
    81:3 85:4,17 86:12 91:6
    91:13
knock 36:4,10 37:3,14,16
    44:14,18 45:9 49:23
    55:20 56:11 65:9 66:7
    72:21 74:6 78:13
knocked 73:6
knocking 38:4,6,12 48:3
    57:15 77:11 83:5 88:7
know 12:8 14:5,16,19
    17:22 19:8 21:9 22:19
    23:13,16 25:11 26:15
    26:16,23 30:13 35:22
    36:2 37:23,25 38:13
    39:20 40:2,12 44:2,6
    45:9,24,25 46:12 47:13
    47:14 48:6,7 49:4,12
    50:9,18 52:4,8,16,23
    54:9 55:6 59:18,24,24
    60:2,4,6,9,16,20 61:23
    62:5,11 63:2 68:2,22
    78:6 80:14,19 83:5,18
    84:23 86:12,16,16 88:6
    89:3 90:17,23 91:14
    92:13 93:2
knowing 66:16 75:20
    83:11
known 23:17 40:8,11
    44:4 63:9
knows 36:19

**L**

L 3:1,1 95:2
lack 91:10
laid 50:12
large 66:23
law 4:24 10:4 11:13 70:23
    93:12
layout 49:7
LE 42:17
lead 24:3 27:2 29:16 57:5
    71:23
leader 22:23 23:8,11 25:2
    25:7,20,24 26:2 71:23
    89:12
leaders 32:22,22
leadership 22:15 24:24
leading 24:9,10 29:15
leave 16:12 26:14 36:18
    42:6 65:11
leaving 57:12
leeway 36:21

LEO 40:9
lesson 29:20 30:3,13
    31:12 32:6 96:15
let's 26:5,25 27:2 78:22
lethal 79:9,17 80:23
    81:11,14 82:17,18,21
    82:24
level 9:19 19:4 20:7,9
    37:23 51:21
Lexington 2:5
limit 56:5
lineup 48:6
list 39:23 62:10
listed 63:7
listen 78:17
lists 62:9
literally 48:17
litigation 4:25
little 6:16 35:5 36:21
    46:15 60:22,23 66:13
    72:14
LLP 2:4
local 39:16
locally 20:20 91:19
location 41:3,5 44:5,6,21
    45:18 48:22 50:11
    54:11 57:9 63:9
locations 4:15 46:9,14
long 9:8 14:22 16:8 17:4
    17:20 37:22 48:11
    56:22,22
look 23:4,8 24:6 35:21
    53:13 54:8 61:2 63:5
    71:22 77:12
looked 16:11 54:5
looking 37:22 50:4 53:20
    62:18,24 75:15
lookouts 50:13
looks 40:25 43:9 51:22
lot 20:24 23:4,9 36:18
    37:22 44:9 45:18,24
    52:13

**M**

M 2:20 95:2
main 82:13
major 70:2 86:19
majority 21:6
making 10:20 22:12
    34:11,13 54:16,17,18
    55:17,21
manner 4:21
manpower 18:13 54:18
March 17:8 21:21
marked 39:2 41:21 57:22
    94:11,14,16
marriage 97:17
marshal 1:8 18:6 20:5

69:19
marshals 15:20 17:11,18
    17:23,25 18:10,11,25
    19:24 20:8,11 21:23
    26:6 27:5,14 33:10
    39:15 40:4,6 53:15
    58:15,17 60:7 61:17,21
    65:3 68:7,21 69:22
    70:15,17,22 71:5,11
    92:19 96:17
materials 33:9 96:17
matter 97:18
mean 19:13 21:18 23:17
    40:14,19 48:24 51:17
    53:6 61:16 63:20 66:22
    68:21 69:17 73:15
    74:15,19 82:4 86:14
    87:21 89:25
meaning 24:2
means 40:10 75:2
meant 76:20
measure 52:22
measures 54:14
measuring 52:16
medical 10:17,23 28:2
    34:15 45:13,14 54:18
    56:6,7 76:10
meet 34:9 40:23
meeting 4:17 87:8
member 27:7 61:12,14
    62:2,3 64:16 68:15
    82:19
members 1:12 44:3 45:3
    58:17 61:18 68:4 70:21
    70:23 71:3,9 80:25 81:3
    81:15,16,20,21 83:16
    83:20 90:23,24 91:9,14
    91:22 92:4,10,14,19,21
memory 34:25
mention 64:9
mentioned 26:25 36:17
    43:21 56:16
MICHAEL 2:13
Michael.cerrone@usdo...
    2:13
middle 43:10
Mike 14:7,8,11,11,15
    30:2 33:7 77:2
military 10:6,7
minimal 26:12
minimum 63:18
minor 32:16
minute 80:8
minutes 9:10 80:7
mirror 77:18
mirrors 77:12
misdemeanor 19:7 20:10
missed 65:25 76:12 80:4

93:22
**misspeak** 79:20
**Mondays** 20:24
**Monroe** 1:10,13 5:24 10:3 11:10,22 12:3 13:9 13:12 15:4,9 86:9
**month** 29:2,2,6,6,10 34:6
**months** 14:20
**morning** 6:2,3 10:14
**Morrensey** 14:11
**mouth** 42:10,12
**move** 32:23 74:21 75:9,10
**movement** 48:16,18 57:12
**MSCO** 1:10 2:11
**multiple** 25:3 28:25
**murders** 51:11

**N**

**N** 2:2 3:1 5:15,15,15 95:2 95:2 96:2
**name** 5:21 6:4
**named** 27:21
**names** 1:9,11 14:5
**narcotics** 16:14,16
**NASSAU** 97:6
**Navy** 10:9,13
**necessary** 63:15
**need** 22:13 24:5 26:23 46:18 58:3 72:10
**needed** 18:19
**needs** 68:16 70:11
**neighborhood** 41:6 50:11 50:12
**never** 7:15 23:17
**New** 1:1,13,23 2:5,5,12 2:19 5:13,18,25 95:4 97:4,9
**newer** 90:23
**nope** 13:7
**normal** 44:13 84:21
**normally** 72:2 85:2,16,22
**Northern** 31:16,22 33:8 33:13 96:17
**Notary** 1:22 5:17 95:23 97:8
**noted** 94:9
**notes** 47:12
**notice** 86:19
**noticed** 66:5
**number** 1:10,11 7:23 43:9 59:6 62:19 66:23 70:21 81:3,24
**numbers** 43:3 81:17
**NYSP** 1:12

**O**

**O** 3:1 95:2
**oath** 3:8 4:12 95:10
**objection** 5:6,7 20:14 51:14,15 85:19 87:2
**objections** 3:12 6:18 7:7
**objective** 39:23
**objects** 7:9 26:20
**obviously** 23:9 24:2 33:18 37:2 44:17,19 48:20 50:3,6,18,22 60:7 63:24 66:9,10 69:5
**occasion** 42:2
**occasions** 41:11
**occupant** 84:2
**occupants** 56:2
**October** 97:20
**offer** 27:14
**offers** 27:15
**office** 1:13 10:3 11:9,10 11:13,20 13:10,13 15:5 15:7,9 16:22 17:17,23 17:23 18:10,21,22,25 19:8,21,23 20:8,13 21:2 21:2,5,9,18,23 22:20 24:20 25:15 27:3,4,15 27:23 33:10,11,15,20 58:21 60:5,10 68:7 69:11,22 71:11 79:15 79:21,23 82:20 86:9 87:12 89:9 92:6,10 93:12 96:17,18
**officer** 1:9 3:8 40:11 61:17 73:20,25
**officers** 1:9 14:3 45:23 46:10 52:13,18 66:24 73:11 74:23,24 75:3,11 82:2
**offices** 21:2 87:13
**official** 23:18,25
**offline** 80:8
**Oh** 10:11
**okay** 6:14,23 7:4,12,13 8:6,8 11:6 18:5 23:15 26:5 42:8 48:8 55:23 58:4 66:3 73:3 79:3,6 88:11 93:23
**once** 12:9 14:12 27:15 29:2,6,7,9 34:6
**ones** 26:16
**open** 17:6 28:3
**operate** 62:3 69:24
**operating** 57:18
**operation** 24:21 49:18 54:2,7,13,23 55:7 63:14 63:16 67:4 84:3 92:9 93:16
**operational** 52:25 53:6 53:12,19,21 54:9,9 59:3 64:21 87:20
**operationally** 86:20
**operations** 18:23 26:10 58:14 59:2 61:9,11 71:13 79:4,17 88:19 90:19 91:15
**opportunity** 87:24
**opt** 70:17
**option** 56:16
**options** 81:11,14 82:18 82:25
**order** 1:21 60:8
**ordering** 4:2
**orders** 58:21
**ordinarily** 84:9
**original** 82:3,5
**outcome** 89:24 97:18
**outs** 74:11
**outside** 52:9 56:4 65:23 66:17,24 73:12
**overall** 27:9 88:16
**overlapped** 33:14

**P**

**P** 2:2,2 3:1
**P.D** 11:18
**P.M** 1:16 94:9
**package** 39:16
**packages** 21:15 46:2
**page** 39:9 43:16 58:8 59:6 61:6 96:5,9,14
**paid** 12:12,16
**part** 18:18 35:11 50:25 68:23,24 81:8 88:9
**part-time** 11:17,19 12:23
**participate** 24:21 53:17
**participating** 4:15
**parties** 1:20 3:4 4:8,22 97:16
**passed** 15:13
**patrol** 15:10 16:4,5,13,21 17:2
**pattern** 35:25 48:6
**patterns** 44:7 45:17
**pause** 58:5 80:7,9
**pay** 12:11
**PD** 16:19
**pdf** 59:6
**people** 26:22 28:7 51:10 52:13 66:22 67:17,21 71:22 83:6,12,24
**percent** 19:14
**perfect** 52:23
**perform** 56:7
**period** 33:18 56:22
**permitted** 4:12
**permitting** 61:8
**person** 38:13 42:17 48:2 61:15 67:3,7,11 68:2 70:11
**personally** 89:14 90:3 91:3
**phone** 45:2
**phonetic** 14:11 27:21
**photos** 64:15
**physically** 5:4
**picked** 11:19 12:14,24 44:11
**pistol** 63:25 64:12
**place** 1:24 37:21 59:11,16
**Plaintiff** 1:5 2:4 5:8
**Plaintiff's** 39:2 41:21 57:23 94:11,14,17 96:9
**plan** 43:25 52:25 53:6,12 53:19 54:2,7,9,13,15 64:17,21 68:4,13,16 69:13 72:3,15,17 81:13 82:3,4,5,7,7,8,11,11
**planning** 26:9 54:22 55:7 55:15,16 60:18 63:14 67:4,12 68:2 81:8,9 87:20
**plans** 29:20 30:3,13 31:12 32:6 49:16 53:21 70:12 72:16,17 96:15
**platform** 4:17
**play** 66:6
**plays** 66:8
**Plaza** 40:22 69:7
**please** 5:21,23 7:2
**plus** 18:18 29:7
**Plymouth** 5:25
**podcast** 78:17
**point** 40:22 44:19 57:14
**pole** 77:18,25 78:3
**police** 1:12,13 11:16 12:6 12:7,10,10,13,18 13:6 13:13 25:11 66:23 93:7 93:14,15
**policies** 13:17 19:11
**popped** 42:20
**portion** 21:13 41:23 80:11
**position** 17:5 22:15 24:4 61:3
**positioned** 66:16
**positions** 15:6
**possession** 33:9 96:17
**possibility** 52:20,21 55:2 83:15
**possible** 44:3 52:11
**potential** 54:24 55:8,25 83:20
**potentially** 57:15 73:18 83:25
**power-points** 29:20 30:4 96:15

practice 81:19
pre-execution 66:4
pre-operational 64:17
69:13
precautions 55:24 83:18
83:21
preparation 35:17
prepare 8:13 9:6 75:18
82:2
prepared 53:7 83:24
preparing 35:14
preplanning 41:8
presence 5:5 54:24
present 1:10,11 4:8 65:16
65:22 68:10 72:4
presented 5:12
previously 7:17 44:8
primary 14:12,13,15 26:8
82:10
prior 11:12 36:23 37:25
41:11 42:2,4,16 44:20
44:23 45:22 50:5,17
61:9 64:14 65:18 69:5
70:6,13 75:19 77:10
83:5
private 32:2,3
probably 17:24 42:15
problem 10:22 30:6 42:8
43:6
Procedure 4:9
procedures 13:17 19:11
57:19 59:3,11,15
proceeding 58:6 80:10
process 35:7,17 36:9
43:23 47:19 55:15
59:10 68:2 81:8 86:8
produced 53:24
production 30:3 96:15
program 13:19 30:24
31:3
promoted 16:25 17:2
promotions 22:4,6
properly 56:12
property 49:6
provide 45:14
Public 1:22 5:17 95:23
97:8
pulling 42:9
purchase 32:7
purpose 4:24 86:17
pursuant 1:20 4:8
purview 20:8,11
put 16:14 17:7 23:4,9
28:16 29:14 30:7 32:6,8
34:10 38:19 39:17
41:18 44:23 47:6 57:17
62:17 76:17 82:23
putting 27:23,24,25

30:12
___
**Q**
qualified 63:25
qualifying 13:17
quarter 28:6
question 6:7,21 7:3,10,11
10:10 17:13 18:3 20:15
22:21 23:24 24:19
34:25 35:10 38:18 39:5
40:7,21 42:3 43:22
46:17 47:15,23 49:24
51:3,20 53:24 55:3,5
58:13 59:9,13 61:13,25
62:22 64:19 69:9 70:8
72:19 80:14 85:20
questions 6:6 7:2 9:15
42:7,24 43:8,15,19
46:19 51:6 57:20 65:6
67:3 93:24
quickly 44:10 91:17
quote/unquote 22:23
53:11 54:6

___
**R**
R 2:2 3:1 5:15 97:2
rally 40:22
ran 73:10
react 66:22
read 21:14 22:22 80:12
89:18 95:9
really 6:22 8:16 73:20
reason 38:11
reasons 50:9
recall 13:22 14:22 15:2
30:22 31:5,8 36:14
40:13,14,16 41:12 42:9
42:16 47:4 49:14 50:3
50:24 54:12 55:6 65:15
66:14,19 67:23 69:8
70:7 81:6 84:6 88:6,8
88:21 89:12,13,20
90:21 91:4 92:17,17
93:19
receipt 77:8
receive 27:7
recommendation 92:3
recommendations 91:20
93:11,15
record 5:2,21 7:8 21:12
21:14,17 41:15,17 43:22
58:8 59:7 60:24 80:12
87:6 95:12,14 97:13
recorded 4:20
recording 4:21
red 25:21 31:16,22 33:8
33:13 96:17
redo 13:6,13

referred 82:9
referring 61:16
refers 53:25
regular 27:22 33:25
regularly 32:8 34:17
related 97:16
relationship 44:5
relative 48:15 56:22
remember 14:2,4,6 15:15
16:8,10 17:20 34:19,21
36:23,24 37:3,5,7,8,11
42:4,8,14,18,22 44:22
47:5 49:19 50:25 51:2
52:24 54:22 64:23 65:8
65:9,12,14,20,24 66:2
66:20 67:20,21 69:18
69:18,19 70:5,5 73:7
77:19 83:8,9 84:14,16
89:12,18,19,25 93:5,6
93:10,15
remembered 51:23
remembering 50:20
remind 80:21
remote 4:15
remotely 4:10
repeat 47:22
rephrase 7:3
report 20:22 84:19,20,23
84:24 85:3,3,9,10,17,17
86:5,5,13,15,18 87:15
89:9,15,22 90:3,19
91:21,24 92:2
reporter 1:22 4:1,6,11
5:3 6:16,22 14:8 21:10
97:8
reporting 4:18
reports 85:12 86:24
represent 6:5
requested 21:13 80:11
required 58:17 59:23
60:14 69:25 81:12
requires 34:11 57:14
reserved 3:12
residence 37:6 47:17 50:7
83:7,7
resources 22:13 24:5
26:23 45:5 54:19
respective 1:20 3:4
respond 30:9
responsibilities 24:11
26:8
rest 92:13
result 93:17,18
resume 12:19
retired 14:16 32:4
review 8:21 51:22 89:14
reviewed 8:14,17
reviews 89:5,9

RICHARD 1:9,11
riding 90:24 91:8
rifle 64:2,12
right 19:10,24 20:13
21:23 31:9 33:21 36:17
43:18 50:2 51:10,12
54:17 58:24 62:23
64:21,23 65:18 66:17
71:3 72:25 83:8 86:23
88:21 90:15 92:23
93:19
risks 54:24 55:8
Rochester 1:8,12 2:17,18
2:19 5:25 16:15 25:11
29:11
ROE 1:11
Roger 14:7,9
role 21:25 22:7 24:24
85:23 86:8 88:25
roles 24:9 33:14,20
room 31:18 73:11 75:11
rooms 28:8 75:12
ROTH 2:4,4
round 79:18
rounds 79:18
RPD 1:8,9,9 14:19 92:22
RPD's 25:10
RPDs 23:21
rule 4:9 72:9 81:3,18
rules 6:15 58:23 79:24
80:2,17
run 46:7 74:8 75:20
runs 74:25 75:15

___
**S**
S 2:2,13 3:1,1 5:15,24
96:8
S-O-F-I-A 14:9
safe 52:11,12
safely 27:8 63:17 73:19
74:8 75:8
safer 73:10
safety 40:8 46:22 52:18
55:25 63:9,15 64:5,6
66:11,17,21 70:2 83:19
sarge 72:6
saying 24:22 33:23 38:6
51:8,13 52:3 53:23 54:4
63:8 64:20 67:3 72:6
76:23 78:9,14 79:22
80:3 88:11 91:8
says 40:22 41:24 58:14
60:22 61:8,14 62:2
scenario 75:23
scenarios 74:11
scene 65:17,17
schedule 33:25 34:6
school 9:21 10:2

**screen** 39:6,11 42:21 58:7 58:10 61:4
**se** 23:7
**sealing** 3:5
**search** 45:7 59:3 85:25 86:4
**second** 39:9 80:7
**see** 32:9 39:5,7 58:10 63:6 66:23 78:22 91:14
**seeing** 48:7 73:17
**senior** 67:17 68:4
**separate** 4:15 28:23
**separated** 84:7,11
**separately** 24:19
**September** 1:15 22:9,10 34:18,23 95:10
**sergeant** 1:10,18 2:11 5:22 6:2 16:23,25 17:5 18:17 20:12 21:22 22:19 30:12 39:5 43:18 46:5 58:11 61:2 72:10 93:23 96:4
**serious** 50:23 51:18 52:15
**serve** 10:7 20:19 21:7
**served** 15:20
**Service** 58:15
**serving** 20:3
**set** 34:7 41:5 45:8,13 50:11 54:18 56:4,24 68:19 81:23 97:11,20
**setting** 16:6
**severity** 50:17 56:25 87:23
**SHENEA** 1:3,3
**sheriff** 1:10 5:24 11:9 20:6
**sheriff's** 1:11,13 10:3 11:10,12,20 13:10,13 15:5,7,9 16:22,22 17:17 17:23 18:21 19:8,21,23 20:13 21:4,7,19 22:20 24:20,25 25:15 27:3,4 33:10,15,20 58:21 60:5 60:10 69:11 79:15,21 79:23 82:20 86:9 87:12 87:13 92:6,10,18 93:14 96:18
**shield** 56:10 64:2,3,3
**Shields** 2:6 5:8,20 6:4 30:2,10 33:7 38:23 41:15,18 42:23 43:6 57:17 58:4,7 59:7 61:5 61:7 62:21 77:2 80:16 96:6
**shoot** 38:15,16
**shooting** 84:10
**shootings** 38:2 50:18
**short** 15:23

**shorthand** 1:22 97:7
**shot** 79:17
**shots** 82:13
**shout** 74:11
**show** 48:17 61:2
**showed** 47:9 48:20,21 53:4,5,10 60:21 65:17 70:4
**showing** 37:24
**shown** 64:16
**sick** 10:14
**side** 32:12 38:14 71:14
**sign** 37:5 69:12 70:11,18
**signed** 3:7,9 70:15
**similar** 8:6 25:15 82:6 86:5
**sir** 6:3 7:5 8:20,22,25 9:14 11:7,15 12:4 13:25 15:8 20:17 21:20,24 22:11 24:23 25:5 31:24 58:12 79:7 86:6,11 87:10 94:2
**sit** 46:14
**situation** 73:24 74:9 78:12 82:10
**situationals** 86:21
**situations** 74:5 76:4 82:3
**skills** 76:21 77:4 96:20
**smart** 16:19
**Smith** 1:8 69:20
**sniper** 25:13,17,22
**Sofia** 14:7,8,12,15
**somebody** 14:13,14 29:16 40:3 45:13
**someplace** 44:9,9
**somewhat** 22:15
**son** 6:5
**sooner** 90:25
**SOP** 53:24 57:22 58:8,14 59:12,16 60:8,17 62:24 63:13 80:18 94:16 96:12
**SOPs** 60:14
**sorry** 10:10 18:2 19:8 27:4 30:18 31:6 33:2 34:24 35:11,12 42:20 50:2 64:9,25 65:25 66:2 76:14,17 80:4 89:17 91:25
**sort** 67:16 70:18 71:11 86:24
**sounded** 37:4
**sounds** 19:20 28:12 33:13 46:25 51:7 70:10 77:20 88:17 91:6
**space** 21:2 38:10 78:19
**spaces** 78:16
**speak** 8:23 9:11 72:8

**speaking** 42:18 46:9
**special** 18:23 32:4
**specialized** 77:10
**specialty** 79:19
**specific** 17:9 28:22 37:12 40:15 41:3 42:24 47:2,7 53:7 54:5 61:24 66:18 67:4 68:15 70:10 71:20 74:5 76:3 80:20 84:22 88:5,9,22 90:18,22 91:20
**specifically** 7:11 11:11 16:15 18:10 26:11 27:25 28:18 31:6,17 43:8 44:17 46:5 49:23 50:20 60:6 61:16 66:15 83:2 87:22 88:13,19 91:4
**specifics** 33:25
**speed** 91:17
**spoke** 8:14
**sponsored** 12:13
**SS** 95:5 97:5
**stand** 90:14
**standard** 57:18 59:24 68:2
**standards** 60:11
**standing** 41:14 61:4
**stands** 27:16 28:6 39:20 76:15,19
**start** 9:16 14:12,13 68:7 92:4
**started** 11:15,16 12:5 15:5 17:25 31:15,21 32:12 90:24
**starting** 10:2
**state** 1:13,23 5:17,21,23 39:16 92:22 93:7,14 95:4 97:4,8
**stated** 1:23
**statement** 8:14,18 50:3
**States** 1:1,8,8 2:9,10 58:15
**stay** 35:25 44:9 45:18
**Steuben** 11:19,20,25 13:2 13:5
**stick** 32:14
**stints** 15:23,25
**stipulate** 5:2
**stipulated** 3:3,11 4:7,19
**stipulates** 5:8,9,11
**stop** 36:5,6 44:14,15 47:18,18 66:9,12
**stopping** 36:11 37:17,18 48:3,4
**street** 2:18 36:6,12 37:18 41:4 47:18 48:4
**structure** 52:9 56:11

**74:14,22 75:4,20,24**
**Stueben** 12:25
**stuff** 20:9 32:15 36:2 38:16 46:15 48:10 51:11 64:11 71:23 77:14,17 78:16,20 82:17
**subjective** 73:20,24
**Subscribed** 95:19
**substance** 9:4
**subtleties** 46:8
**successfully** 15:13
**Suite** 2:5
**super** 31:18 51:10
**supervisor** 16:22 22:11 24:3
**SUPPLIED** 96:14
**support** 24:18 41:14
**supporting** 8:18 41:20 43:12,21 94:13 96:11
**supposed** 54:2
**sure** 7:21,23,25 8:2 14:6 19:17,19 22:12 24:5 26:12,22 28:15 30:10 30:11 33:23 34:9,11,14 35:13 37:13,20 45:7 47:2,23 51:6 52:11 54:16,17,18 55:17,21 56:4,6,10 59:14 61:5 62:12 63:23 66:9,25 68:25 69:24 76:6 77:23 80:14,16 81:15 84:25 84:25 88:13,17
**surround** 36:5 44:14 55:20 57:2 72:22
**surveillance** 46:15 47:20 48:6,11 49:17 50:10 57:10 65:22 66:4
**suspect** 26:17 35:22 51:25 73:8,10 74:7,25 75:14 76:22 78:8 84:2
**suspects** 76:4 77:5 96:20
**SWAT** 15:12 23:21,22,23 24:17,20,25 25:10,12 69:11 79:4 85:23,24 86:8
**swear** 5:1,3
**switch** 35:4
**sworn** 3:7,9 5:17 18:10 18:24 95:19 97:12
**system** 39:19 65:22,22 66:5 70:20

---
**T**

**T** 3:1,1 5:15 95:2 96:8 97:2,2
**table** 58:25
**tactical** 16:6 22:23 23:10

71:22 77:12 89:2
**tactics** 13:18 15:17 30:23
    30:25 31:7,17 32:13,16
    36:17 89:10
**take** 12:19 15:3 30:14
    31:2 42:25 43:22 55:14
    58:2 63:5 65:6 73:19
    74:11 77:7
**taken** 1:19 3:10 55:24
    83:19 95:10
**talk** 26:19,25 27:2 36:4
    44:14,18 45:10 49:24
    56:11 68:7 72:18,21
    74:7 76:9
**talked** 56:16 67:21,21
    72:14 85:11
**talking** 6:21 35:7 75:24
    76:4 80:22 88:7
**talks** 87:8
**target** 37:6 39:22 44:4,6
    44:24 48:16,21 50:7,17
    54:10 56:21 57:2,9,12
**targets** 52:8
**taser** 81:16,16,22 82:21
**tasers** 79:9,12,16 80:23
    80:24 81:4 82:25 83:2
**task** 9:12 15:20 17:11,18
    22:8,19,23 23:11,18,25
    24:11,13 26:6 27:5,7,10
    29:5 33:15,19 34:3,13
    39:14 43:19 49:16
    53:16 59:14 67:11
    68:21 69:10,16 70:13
    74:5 76:2 77:9,22,23
    79:5,8,23,25 80:18 81:4
    83:14 84:4,18 85:22
    86:10,13,23 87:12,16
    89:23 90:18,24 91:8,21
    91:24 92:3,8,22 93:13
**task's** 92:13
**tasks** 23:7 44:3
**teach** 28:10 76:9
**teaching** 28:7
**team** 15:12 16:16,17,21
    23:8,21,22,23 24:18,20
    24:25 25:2,6,7,8,10,10
    25:12,13,13,17,17,22
    25:24,24,25 29:3 32:13
    32:22,22 33:5 55:25
    61:17 62:3 63:16 64:17
    67:17 68:4,16,20 69:11
    70:13,18,22,22 71:3,20
    81:19 83:5 85:24,24
    86:8 88:25
**teamed** 16:18 17:23 18:7
**teams** 25:4,15,21 26:2
    91:2
**technology** 57:10

**teeth** 42:11
**telephone** 4:16
**tell** 7:2 8:12 9:3,18 10:11
    30:20 31:25 49:21
**temporary** 16:2,12
**ten** 14:25
**tend** 68:24
**term** 91:10
**terminology** 74:18
**terms** 51:21 70:21
**test** 35:2
**testified** 5:18 7:14,16 8:3
**testimony** 6:8 95:9 97:14
**text** 44:25
**Thank** 43:17 94:2,5,7
**thing** 17:14 26:24 28:5
    40:8 43:24 49:11 50:22
    56:15 60:14 64:8
**things** 24:7 26:12 27:12
    39:23 45:5,7,16 55:22
    56:14 62:13 63:6 77:12
    79:9
**think** 9:10,20 10:18 11:15
    11:20 12:9 13:4,15
    14:17,17,20 15:22 16:9
    16:20 17:3,4,9 19:16
    23:3,13,18 28:3 31:15
    32:25 42:23 43:5 45:15
    47:8,8 48:15 49:10
    53:13 54:21 56:14,15
    56:20 62:25 64:22 67:2
    69:21 72:7,16 74:6 76:7
    76:17 77:16 80:13,22
    87:21 88:15 91:18
    92:15 93:8
**thinking** 49:22
**thought** 7:22
**thread** 44:24,25
**three** 25:21 26:2 29:8
    71:5,16 81:20
**three-page** 43:7,13
**throw** 34:8
**tied** 45:4
**time** 1:23 3:13 5:6 10:18
    12:11 13:15 15:17
    19:14 22:8 24:18 27:25
    29:2,18 30:7 31:9 32:9
    32:25 33:18 34:7 36:25
    39:15 40:4 46:15 47:23
    54:3 56:22 58:5 61:8
    64:8 71:12 77:16,18,23
    78:2 79:11 80:9,24 84:5
    92:15 93:3,8,25 94:9
**times** 6:11 7:19,22 20:24
    28:16 90:6
**title** 22:17,18 23:6,18
**today** 6:6 22:2 47:4 49:20
    92:8,18 93:24

**today's** 8:13
**TODD** 1:10
**told** 42:11
**tools** 77:10,22
**toothbrush** 42:10 50:22
**top** 25:19 39:20
**topic** 28:13,22
**topics** 28:10,22,25 29:4
**total** 71:2,6
**tracker** 47:10,12 59:19
**train** 29:3,9,11 33:4,5
    34:14 73:21,23
**trained** 55:21 90:25
**trainer** 27:20
**training** 13:16,21,23 14:3
    14:20 22:12 23:10 24:3
    27:6,14,15,17,22,24
    28:17,18,23 31:12,16
    31:21 32:24 33:6,8
    34:16,22 55:16,21 74:5
    74:8 75:7,22,23,24 76:3
    76:5,10,16,18,21,24
    77:3 82:17,20,22,23
    86:20 88:3,16,18 90:18
    91:7 96:17,19
**trainings** 23:5 24:9,10
    27:2,3 28:21 29:14,16
    29:21,24 30:5 32:6
    33:12,14,24 34:2 35:6
    35:16 71:23 73:25
    75:23 81:25 93:16
    96:16,18
**trains** 29:5
**transcript** 4:2 95:9,11
**transferred** 11:22
**transitioning** 92:16
**transport** 45:14 56:8
**tray** 64:2
**trial** 3:13 97:11,13
**tried** 15:12 32:14 56:10
**troop** 25:20
**trooper** 37:2 47:11 48:22
    50:4 60:6
**troopers** 92:22
**true** 95:11,14 97:13
**try** 24:4 26:11,14,18,19
    34:6,8 35:21,24 36:3,4
    36:4,5 37:16 44:2 45:6
    54:14 55:12,17 56:3,3,6
    68:6 69:24 74:19 77:13
    81:15,23
**trying** 14:17 17:3,16
    26:21 45:4 51:3 57:8
    69:19,21 75:25 77:16
    79:11 88:2,2,15 90:25
    91:3,17 93:5
**turn** 52:6
**turns** 72:22

**twelve** 10:17 14:25
**twenty-five** 7:24
**twenty-five-year** 8:3
**twice** 27:15
**two** 9:21 13:8 16:9 18:9
    27:12 80:6 90:8
**two-year** 15:24
**two-year-old** 50:22 51:18
**two-year-old's** 42:10
**type** 39:25 40:3 69:3
    85:14 89:24
**types** 63:15 64:6 77:21

------

**U**

**U** 3:1
**U.S** 19:23 20:8,11 26:6
    27:5 70:17
**Ulatowski** 1:12 37:2
    47:11 60:6 67:5
**umbrella** 18:24
**unauthorized** 4:23
**understand** 6:25 19:16
    19:17 51:6 73:5
**understood** 20:18 33:23
**unfamiliar** 38:10
**unidentified** 1:12
**uniform** 17:2
**unit** 15:20 16:7,14 17:5,6
    17:11,15,17,19 18:6,9
    18:21,23 19:20,22
    21:22 45:23
**United** 1:1,8,8 2:9,10
    58:15
**unknown** 1:10,11
**update** 31:17
**updated** 31:14
**upper** 52:19
**use** 29:20 58:3 77:10,14
    78:12,15,23,25 79:8,17
    82:17,24
**USM** 64:24
**USMA** 96:12
**USMS** 57:22 61:11
**usually** 15:24 27:18 28:2
    34:8 35:21 36:16 44:2
    44:13,23 45:2,3,21 46:2
    49:10 56:20 63:18,19
    68:6,11,22 84:13

------

**V**

**V** 5:15
**varies** 49:2,3
**various** 12:18 25:16
**vehicle** 28:2 36:6 37:19
    44:15 45:19 47:18 48:3
    65:12
**VERPA** 76:12
**versus** 20:10 33:19 36:11

37:17,18 57:5 65:10
86:9
**vest** 63:19,21,22,24 64:12
**videoconference** 4:13,20
**violation** 4:23 19:7
**violence** 37:24 60:2
**violent** 19:4,13 20:9
42:12
**voluntarily** 76:22

---

**W**

**W** 95:2
**wait** 6:20
**waiting** 65:10
**waived** 3:6
**walk** 36:2 44:11
**walking** 36:6 37:17 44:15
**walls** 38:16
**want** 7:25 9:15 12:8 14:5
15:14 17:24 19:18
31:10 36:21 47:23
57:17 58:25 63:5,24
79:20 80:15 81:10
**wanted** 18:16 21:15
33:22 35:23 37:3,7
39:16 42:9
**warrant** 15:19 17:5,6,11
17:15,17,19 18:2,6,9,21
18:23 19:7,20,22 20:3,3
21:4,22 26:7,16 27:8
28:13 35:9,14 39:16
40:24 41:8,25 42:2,5
43:20,23,25 46:23 47:3
47:10,12,16 49:5 56:25
59:10,15,19 60:19 64:6
64:15 67:8,11,13 68:3
68:13,17 70:12 71:25
75:19 83:11 85:5,15
86:4 87:19 88:23 89:6
89:22 90:4 92:9
**warrants** 20:20 21:6,7
46:6 59:3,4,20 65:4
69:3 85:25 87:23
**wasn't** 78:6
**way** 9:13 12:12,12 18:15
23:3 37:17 62:2 63:12
97:17
**ways** 52:7 74:15
**We've** 40:25
**weapon** 75:15
**weapons** 50:24 57:7
**wear** 92:10
**web** 4:16
**week** 10:13 13:16 48:14
**weeks** 13:22,22,24 14:21
14:25
**went** 9:20 10:13,14 12:7,9
13:5,9,12 32:17,21

33:21 37:8 92:19
**weren't** 10:21
**WESTERN** 1:1
**whatnot** 25:17
**WHEREOF** 97:19
**white** 25:22
**WILLIAM** 1:9
**windows** 77:13
**wise** 18:13 24:18
**withdraw** 28:20
**witness** 4:3,13,14 5:1,4,5
5:12,16 14:9 21:15
62:23 63:22 74:24 96:3
97:10,14,19
**woman** 6:5
**wondering** 93:22
**work** 5:23 10:4 11:13
18:9,20,25 19:3,14
20:22 32:5 33:4 61:3
67:10
**working** 17:25 18:12
20:12 31:22
**worries** 8:10
**worry** 55:12
**worst** 51:9,10
**wouldn't** 20:10 73:13
**write** 30:11
**writes** 89:22
**writing** 6:17 30:4,7 87:14
96:15
**written** 4:22 52:25 53:25
64:17,21 72:9 87:5 90:2
91:11

---

**X**

**x** 1:2,15 40:9 96:2,8

---

**Y**

**Y** 5:15
**yeah** 6:24 8:9,15 10:13,21
11:3 12:7,20 13:20 14:4
14:7,24 17:10 20:19
22:25 23:3,16 24:6,18
27:9 30:22 31:10,19
32:21 33:17,17,22,22
34:5,19 35:3,3 36:13,15
37:20 38:8,14,17 40:13
40:16,25 47:4 48:24
49:3,11 52:19 54:8 55:3
60:9 61:18 64:22,25
66:8,14 67:24 68:6,11
70:19,25 71:4 72:21
74:10,21 76:14 80:2,24
82:12 83:8,23 86:16
87:21 89:19,20
**year** 11:8 12:22 16:9,23
17:9 27:15 28:16 29:7
30:22

**yearly** 76:16
**years** 7:24 9:21 12:24
13:9 16:10 17:4,8,12
31:8 33:3 71:7
**yesterday** 8:15 9:3
**York** 1:1,13,23 2:5,5,12
2:19 5:13,18,25 95:4
97:4,9

---

**Z**

**zone** 15:10
**Zoom** 4:16

---

**0**

---

**1**

**1** 38:24 39:3 62:10 63:3
63:10 94:11 96:10
**1-10** 1:9,11
**10016** 2:5
**11402** 2:12
**12:23** 1:16 94:9
**130** 5:24
**138** 2:11
**14614** 2:19 5:25
**14th** 97:20
**15** 22:10
**16** 33:2
**17** 1:15 62:10 63:3,11
95:10
**178** 43:14
**179** 43:16
**180** 43:14
**192** 2:5

---

**2**

**2** 4:9 41:19,21 43:12
94:14 96:11
**2000** 11:21 13:3,4
**2002** 11:11,11,23 15:8,8
**2005** 15:12
**2007** 31:9
**2008** 15:15 17:24
**2009** 15:19
**2010** 31:10
**2012** 16:5
**2014** 31:15 33:2
**2017** 16:24
**2019** 17:8 21:21
**2021** 22:10,10 34:18,23
80:3
**2024** 1:15 95:11,21 97:20
**23-cv-6057(DLG)** 1:6
**28** 4:9

---

**3**

**3** 57:23 59:8 94:17 96:12
**30** 2:18 96:15

**33** 96:17
**38/94** 96:10

---

**4**

**40** 79:18
**400A** 2:18
**41/94** 96:11
**45** 39:18 64:22,24 68:8
70:15

---

**5**

**5-94** 96:6
**57/94** 96:12

---

**6**

---

**7**

**77** 96:19

---

**8**

**802** 2:5

---

**9**

**931** 43:7 62:21
**932** 43:5,11
**933** 43:7 62:21
**935** 58:9
**941** 59:6
**942** 61:6
**96** 11:5,6
**98** 12:8,9
**99** 11:16 19:14