UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

SHENEA JAMES as administrator of the estate Of
DEDRICK JAMES, deceased, and SHENEA JAMES,
individually,

                                        Plaintiff,

                                                            **23-cv-6057 (MAV)(MJP)**

                        -against-

THE UNITED STATES OF AMERICA, CITY OF
ROCHESTER, RPD INVESTIGATOR RICHARD
ARROWOOD, et al.

                                        Defendants.


**MEMORANDUM OF LAW IN OPPOSITION TO THE CITY OF ROCHESTER'S
MOTION FOR SUMMARY JUDGMENT**

Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016

# **TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 4

RELEVANT LAW ............................................................................................................ 8

ARGUMENT ..................................................................................................................... 9

    I.    DEFENDANT CITY IS LIABLE FOR THE ACTIONS OF RICHARD ARROWOOD UNDER THE DOCTRINE OF *RESPONDEAT SUPERIOR* ...................................................... 9

        A.    Arrowood was acting within the scope of his employment with Defendant City .......... 9

        B.    Lapsed Deputization does not absolve municipal liability ........................................... 10

        C.    State-Law Claims Against the City Under Respondeat Superior ................................ 11

    II.    PLAINTIFF'S NEGLIGENCE CLAIMS AGAINST ARROWOOD AND THE CITY MUST PROCEED TO TRIAL (Ninth and Eleventh causes of action).................................... 12

    III.    DEFENDANT CITY IS LIABLE FOR ARROWOOD'S FAILURE TO INTERVENE (Thirteenth cause of action) ..................................................................................................... 14

        A.    Contrary to Defendant's assertion, New York recognizes a common-law failure to intervene claim..................................................................................................................... 14

        B.    Arrowood had a realistic opportunity to intervene and was obligated to do so............ 17

    IV.    ARROWOOD'S VIOLATIONS OF THE STANDARD OPERATING PROCEDURES CONSTITUTE EVIDENCE OF NEGLIGENCE AND COMPEL DENIAL OF SUMMARY JUDGMENT ................................................................................. 19

    V.    PLAINTIFF'S CLAIM FOR WRONGFUL DEATH MUST PROCEED TO TRIAL (Tenth Causes of Action)......................................................................................................... 22

CONCLUSION.................................................................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bowden v. State of New York*, 2024 WL 1733927, at *5 (Ct. Cl. 2024). ......................................... 9

*Bowden v. State*, No. 138757, 2024 WL 1733927, at *5 (N.Y. Ct. Cl. Jan. 15, 2024). ............... 16

*Brown v. City of New York*, 798 F.3d 94, 101 (2d Cir. 2015) ...................................................... 21

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ..................................................................... 8

*Cortlandt Street Recovery Corp. v Bonderman*, 31 N.Y.3d 30, 38 (2018). ................................... 9

*Ferreira v. City of Binghamton*, 38 N.Y.3d 298 (2022), ............................................................ 12

*Galapo v. City of New York*, 219 A.D.2d 581 (2d Dep't 1995). ........................................... 2, 21

*Guzman v. United States*, No. 11-CV-5834, 2013 WL 543343, at *9–10 (S.D.N.Y. Feb. 14, 2013). ....................................................................................................................................... 11

*Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ..................................... 9

*James v. United States*, 2023 WL 3485695, at *8–9 (W.D.N.Y. May 11, 2023), ....................... 12

*Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999). ........................... 9, 12, 14, 23

*Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241–42 (2021) .............................. 21

*Lubecki v. City of New York*, 304 A.D.2d 224 (1st Dep't 2003) ............................................ 2, 20

*Lumsden v. State*, No. 141497, 2025 WL 1618752, at *2–4 (N.Y. Ct. Cl. Apr. 8, 2025). ........... 17

*Meeks v. City of Rochester*, No. 6:22-cv-6163, 2022 WL 13789086, at *3 (W.D.N.Y. Oct. 24, 2022). ....................................................................................................................................... 15

*Newsome v. County of Suffolk*, 109 A.D.3d 802 (2d Dep't 2013) .......................................... 2, 20

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 115 (2d Cir. 2017) .................. 9

*O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) ..................................... 9

*O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003). .................................... 9

*Rose v. City of Utica*, No. 6:14-CV-01256 (BKS/TWD), 2015 WL 13852450 (N.D.N.Y. Dec. 2, 2015) ..................................................................................................................................... 3, 21

*SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) ................................ 8

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004) ..... 9

*Stuart v. State*, No. 142611, 2024 WL 5359943, at *8 (N.Y. Ct. Cl. Dec. 12, 2024). ................. 15

*Virgile v. City of New York*, No. 23-CV-9482, 2025 WL 1248653, at *5–6 (E.D.N.Y. Apr. 30, 2025). ....................................................................................................................................... 11

**Statutes**

28 U.S.C. § 2679 ......................................................................................................................... 10

28 U.S.C. §§ 1346(b)(1), 2671–2680 .......................................................................................... 10

Fed. R. Civ. P. 56(a) ...................................................................................................................... 8

## PRELIMINARY STATEMENT

Defendant, City of Rochester ("City") and Richard Arrowood's motion for summary judgment should be denied.[1] Investigator Richard Arrowood, a Rochester Police Department officer, participated directly and materially in the negligent planning and execution of the arrest warrant operation that resulted in the wrongful death of Dedrick James. ("Mr. James"). Arrowood was, at all relevant times, a City employee acting within the scope of his municipal employment, as he was not a deputized United States Marshall on the date of the incident. The City is therefore vicariously liable under the doctrine of respondeat superior. Arrowood's own admissions, combined with the undisputed record and governing law, raise triable questions of fact on Plaintiff's common-law negligence and failure-to-intervene claims against Arrowood.

Mr. James was killed on the morning of September 15, 2021, when members of the United States Marshals Service Fugitive Task Force ("USMSFTF") and Arrowood attempted to arrest him at his grandmother's home at 6 Vinewood Place, a short, dead-end street in Rochester. The USMSFTF and Arrowood had surveilled the location the day before and that morning. Although Arrowood acknowledged that safer alternatives existed—including surveilling James's movements and conducting a controlled vehicle stop—USMSFTF members rushed into James' residence, threw his elderly grandmother to the ground, chased him into a bathroom, tackled him into a bathtub, and engaged in a physical struggle. During the alleged struggle over a gun, one shot was fired, striking Mr. James in the chest, killing him. The officers wore no body cameras. No one knows who fired the fatal shot or what precisely occurred inside the bathroom.

---

[1] As explained below, Plaintiff does not contest dismissal of the 12th Cause of Action for Assault and Battery, as the evidence demonstrates Arrowood had no physical contact with Mr. James. However, Plaintiff contends the City's motion should be denied in all other respects, and that every other cause of action against Arrowood and the City should proceed to trial.

Prior to the warrant execution, the Task Force disregarded and violated multiple mandatory provisions of the USMS Enforcement Operations Standard Operating Procedures. Specifically, they failed to prepare or communicate a written pre-operational plan, in violation of SOP § IV.A.1.f (requiring that "a written pre-operational plan will be formulated and communicated"); did not conduct or share a complete background investigation, contrary to SOP § IV.A.1.a (mandating a detailed background check "[t]ime permitting and prior to initiating any enforcement operations"); and failed to formulate contingency plans addressing resistance, flight, or other foreseeable risks, as required by SOP § IV.A.1.j (requiring officers to "evaluate the circumstances and weigh the benefits and consequences of attempting an arrest against other alternatives"). Arrowood himself did not participate in any background investigation or contingency planning discussion and did not attend the pre-operational briefing—further violating SOP §§ IV.A.1.f and IV.A.1.g, which require either a written or structured verbal plan "using the Situational Operational Planning Checklist," and a team briefing before the arrest.

Arrowood and other Task Force members received no specialized training in fugitive apprehension planning, and they had no checklist or other system for ensuring that mandatory SOP procedures were complied with. As established in *Lubecki v. City of New York*, 304 A.D.2d 224 (1st Dep't 2003), *Newsome v. County of Suffolk*, 109 A.D.3d 802 (2d Dep't 2013), and *Galapo v. City of New York*, 219 A.D.2d 581 (2d Dep't 1995), violations of internal police policies like the USMS SOPs are admissible evidence of negligence, as they reflect accepted standards of reasonable care and preclude summary judgment when they raise triable issues of fact. Arrowood's deposition also demonstrates that he understood the risks of entering a suspect's home without proper planning. He testified that officers should consider the risk of being shot when entering a residence, and he agreed that waiting for a suspect to leave can be safer. Despite this knowledge,

he failed to caution the team against rushing into the house and failed to develop or insist on an alternative plan. The absence of a formal operational plan and briefing, the failure to discuss alternatives, and Arrowood's inaction when he had the opportunity to suggest a safer course demonstrate negligence in planning and execution, and contain all the hallmarks of a common-law failure to intervene claim. These SOP violations, as in *Rose v. City of Utica*, 2015 WL 13852450 (N.D.N.Y. Dec. 2, 2015), create genuine issues of material fact, mandating denial of summary judgment.

On the morning of the operation, Arrowood was assigned to conduct surveillance and was positioned at the end of 6 Vinewood Place—a short, dead-end residential street with only one way in or out. From this vantage point, Arrowood was uniquely situated to observe whether Mr. James exited the house and got into his car. He was also uniquely positioned to consider the advantages of conducting a controlled vehicle stop in this case, because of the surveillance he conducted and his familiarity with the short dead-end street on which Mr. James' home was located.

Arrowood admitted that apprehending a suspect during a car stop is often safer than entering a residence, and other Task Force members concurred. Yet despite his position, experience, and knowledge of this safer alternative, Arrowood did not advocate for or suggest it. He failed to urge caution, propose a delay, or insist on any contingency-based approach—even though he acknowledged that officer safety depends on weighing risks like suspect flight or resistance. Instead, the team rushed into the house. The absence of a formal operational plan or meaningful pre-execution discussion, combined with Arrowood's failure to speak up while engaged in active surveillance, constitutes actionable negligence and supports a claim for failure to intervene. This was not a case of split-second judgment—it was a negligent failure of basic

planning and failure to intervene to prevent the task force from breaching a duty owed to decedent, Mr. James, causing his death.

For these reasons and the reasons detailed below, the City's motion should be denied.

## STATEMENT OF FACTS

On September 15, 2021, Dedrick James was killed during a warrant execution by the USMS Fugitive Task Force[2] at the home where he lived with his elderly grandmother at 6 Vinewood Place, Rochester, NY. The Task Force stormed into his home, threw his elderly grandmother to the ground, chased him into a bathroom, tackled him into a tub—and during the ensuing struggle, a gun discharged and Mr. James was struck in the chest, killing him. The only eyewitnesses to the shooting are Task Force members, who were not wearing body worn cameras.

Mr. James had no criminal convictions. On the date of the incident, the Task Force was executing a warrant arising from charges against Mr. James for allegedly assaulting his two-year-old son, "KC." Despite the accidental nature of the incident involving KC, law enforcement investigated, interviewing involved parties shortly after the incident. Mr. James submitted to a voluntary interview on December 29, 2020, after which no criminal charges were pursued. ¶1 Mr. James voluntarily submitted to a second interview on April 20, 2021. ¶2 New York State Police Investigator Scott Carr conferred with the District Attorney's office following the second interview and was told not to file charges. ¶3. The DA's office changed their mind on July 26, 2021, notifying Investigator Carr that Mr. James was being charged with assaulting KC. ¶4

In August of 2021—almost eight months after the incident involving KC—Investigator Carr began trying to locate Mr. James. He attempted to call Mr. James on August 11 and 23, 2021;

---

[2] The Task Force was comprised of officers from several different law enforcement agencies, including the Rochester Police Department, Monroe County Sheriff's Office, and New York State Police. All personnel were deputized as Marshalls during their involvement in the joint operation, except for RPD Officer Richard Arrowood.

but no one answered the phone on either occasion. ¶5-7.[3] On August 24, 2021, Investigator Carr went to Mr. James' residence and knocked on the door. No one answered. ¶8. The next day, August 25, Carr obtained an arrest warrant, and on August 26, Carr requested the assistance of USMSFTF to apprehend Mr. James. ¶¶ 9-10.

The USMS Task Force is a multi-agency unit led by the U.S. Marshals Service, and by policy may only pursue felony cases involving violent offenses. See SOP § III.C.2.c (listing qualifying offenses); § III.C.2.e (mandating review to ensure compliance with criteria). ¶¶11-12. Its operations are governed by detailed Standard Operating Procedures that include both discretionary guidance and mandatory requirements, particularly concerning tactical planning and investigative preparation. See SOP § IV.A. These include a requirement that a written pre-operational plan must be formulated and communicated to all team members before executing an arrest warrant. SOP § IV.A.1.f.; ¶17. Where time does not permit a written plan, the team must instead use a verbal plan structured by the Situational Operational Planning Checklist. SOP § IV.A.1.g.; ¶18. Time permitting, a complete background investigation of the subject must be conducted in advance. SOP § IV.A.1.a.; ¶14. All officers must be visibly identified as law enforcement—e.g., by raid jackets, vests, or badges—and may not operate in plain clothes. SOP § IV.A.1.b–c.; ¶16. The SOPs also prescribe various tactical protocols and contingency planning measures that must be considered and implemented, including planning for officer safety, subject resistance, medical emergencies, and potential barricade situations. SOP § IV.A.1.e–k.; ¶¶15, 19.

Trooper Jeff Ulatowski assembled the U.S. Marshals Task Force to arrest Dedrick James— but none of the mandatory procedures governing task force operations were followed. This is even

---

[3] It is unknown what number or numbers Investigator Carr used to try to reach Mr. James. Law enforcement had multiple numbers for him, and none had been tried since December of 2020. When Investigator Carr spoke to Mr. James in April of 2021, he reached him by going to his residence in person.

though the enforcement action took place on September 15, 2021, several weeks after the planning process began. No written pre-operational plan was prepared or distributed, in violation of mandatory USMS policy. SOP § IV.A.1.f ("A written pre-operational plan will be formulated and communicated."); ¶¶32-33. One verbal pre-operational briefing was held two weeks prior to the operation. ¶24 RPD Investigator Richard Arrowood did not attend. ¶25 Arrowood also never saw the mandatory written Enforcement Action Briefing that was prepared in this case. ¶¶13, 34.

Investigator Arrowood has significant knowledge about U.S. Marshal enforcement actions from his approximately three years working on the Task Force as a Deputy United States Marshall. ¶20 He understood the critical importance of engaging in background investigation of a suspect, communicating the results to the team, and planning for enforcement operations, as well as any contingencies that can arise. ¶21-22. Despite this, Arrowood knew virtually nothing about Mr. James prior to the operation that resulted in his death beyond a basic understanding of the incident that made Mr. James wanted. ¶23 He was generally unfamiliar with mandatory SOPs that governed enforcement actions taken by the Task Force. ¶35 There was no discussion of Mr. James's background, the potential for weapons, the layout of the residence, or any contingency or alternate arrest strategies. ¶¶26-27, 29. No pre-operational checklist was conducted. ¶32 Ulatowski unilaterally decided that the team would surround the house while he attempted a knock-and-talk approach. ¶¶26-28. All of this is even though Arrowood knew that discussion of these matters needed to occur prior to the execution of the warrant. ¶36

No member of the Task Force attempted to contact Mr. James before executing the warrant. Instead, the Task Force only engaged in visible "drive-by" surveillance at 6 Vinewood Place on September 14 and 15, to look for a white Dodge car that they believed belonged to Mr. James and appeared to indicate that he was home. ¶39, 44. The surveillance was initiated by Trooper

Ulatowski, but on September 15, he left for several hours to take a drug test. ¶40 Arrowood took over surveillance of the house while Ulatowski was gone. ¶40-41. He surveilled the location and took no other actions. ¶42 He never observed Mr. James. ¶43 When Trooper Ulatowski returned, Arrowood simply confirmed that he had not seen Mr. James leave, and they initiated the warrant execution by notifying other Task Force members to come to the scene to execute the warrant. ¶45

Task Force members did not meet on September 15 to go over a pre-operational briefing or discuss the plan before attempting to arrest Mr. James, which was "unusual." ¶45, 48 Ulatowski claimed that he believed all Task Force members were familiar with the facts based on the briefing that was conducted approximately two weeks earlier, which Arrowood did not attend. ¶46 No specific roles or assignments were given to task force members prior to executing the arrest. ¶47 Without any discussion or plan, Ulatowski and other officers approached the house and knocked on the door. ¶¶55-56 When they approached, the Task Force did not know who was inside the residence and had not conducted visual surveillance of the home itself ¶¶50, 53. Task Force members were all wearing plain clothes, in contravention of mandatory policy. ¶51 Arrowood went to the back yard to take a perimeter point and keep containment of the house. ¶52

Ulatowski, Baker, and Smith immediately entered the house after Mr. James's grandmother answered the door—rushing into the home, throwing his grandmother on the floor, and chasing him into a bathroom. ¶¶57-59 This is despite the fact that Mr. James was believed at that time to have a gun. ¶60 Arrowood and other Task Force members testified that it was unsafe to pursue a suspect with a gun inside of their residence, and that a better practice would have been to wait for him to come out and apprehend him. ¶37-28, 49. Arrowood never conveyed this opinion to anyone else on the task force, despite having had the time and opportunity to do so.

After Ulatowski, Baker, and Smith chased Mr. James into the bathroom, Ulatowski tackled him into the bathtub. ¶62 There was allegedly a physical struggle over a gun. ¶¶64-68 Eventually, the gun was discharged—but no one knows who pulled the trigger or the exact circumstances under which it fired. ¶¶71-73 Mr. James was shot and killed. ¶¶74-75 Arrowood does not recall any discussion by the Task Force members afterwards about what happened. ¶50 No changes were made to the protocols of the task force following James' death. ¶51

Investigator Arrowood was not deputized as a Special Deputy U.S. Marshal on the date of the operation. ¶ 13 (response to City). His deputization had lapsed prior to September 15, 2021, and he was therefore acting solely in his capacity as a Rochester Police Department officer. The City of Rochester has assumed responsibility for his legal defense and indemnification in this matter, and the United States has not certified him for substitution under the Westfall Act. Arrowood's participation in the warrant execution—including his surveillance role, inaction during planning, and failure to advocate for safer alternatives—was conducted entirely under color of his City employment.

## RELEVANT LAW

Summary judgment is appropriate under Rule 56 only where the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is genuine "if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).

The burden rests on the party seeking summary judgment to establish the absence of any triable issue, and in evaluating the evidence, the court must resolve all ambiguities and draw all

permissible inferences in favor of the nonmoving party. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004); *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 115 (2d Cir. 2017). Courts may not weigh evidence or assess witness credibility, as those determinations fall exclusively within the factfinder's province. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Whether Plaintiff can ultimately prevail on these allegations is not relevant. *Cortlandt Street Recovery Corp. v Bonderman*, 31 N.Y.3d 30, 38 (2018).

These principles carry particular force in cases involving the use of deadly force. Where, as here, the person shot is unable to testify and the only account comes from the officers involved, courts must be especially cautious. The Second Circuit has made clear that courts must critically evaluate the officer's version and consider whether circumstantial evidence could allow a factfinder to reject it and find the use of force unreasonable. *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003).

## ARGUMENT

## I. DEFENDANT CITY IS LIABLE FOR THE ACTIONS OF RICHARD ARROWOOD UNDER THE DOCTRINE OF *RESPONDEAT SUPERIOR*

### A. Arrowood was acting within the scope of his employment with Defendant City

The doctrine of respondeat superior renders an employer vicariously liable for torts committed by an employee acting within the scope of their employment. See *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999). Courts regularly apply this rule to police officers' actions—including negligent planning and failure to intervene. See *Bowden v. State of New York*, 2024 WL 1733927, at *5 (Ct. Cl. 2024).

It is undisputed that Richard Arrowood's deputization as a Special Deputy U.S. Marshal had lapsed by September 15, 2021. The City affirmatively states in its summary judgment brief

that Arrowood "was participating in this United States Marshal Task Force operation, under the assumption that he was deputized ... [but] his deputization was not in effect at the time of the September 15, 2021 incident." See Defendant's MOL at p. 4. Therefore, Arrowood was not acting as a federal officer; he was acting as an RPD officer and City employee when he surveilled the home, coordinated with other law enforcement, and participated in the task force operation.

This alone establishes municipal liability. Arrowood was an active-duty Rochester Police Department investigator performing a law enforcement function on behalf of the City of Rochester. The federal government has declined to defend or indemnify Arrowood in this action—unlike his co-defendants Baker, Ulatowski, and DeVinney—and the City of Rochester has undertaken both his defense and indemnification. That allocation of responsibility makes clear who employed and controlled Arrowood on the day in question: Defendant City.

The decision of Judge Larimer supports this conclusion. In ruling on the Government's motion to substitute and dismiss under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671–2680, and the Westfall Act, 28 U.S.C. § 2679, the Court explicitly granted substitution and immunity only for federal officers whose deputizations were active and who were certified by the U.S. Attorney as acting in a federal capacity. See Dkt. 21 at 23–24. Arrowood was not among them. That is because no certification was ever issued for Arrowood. He was not deputized, not a federal employee, and not eligible for substitution. *See id*. at 8–10. Accordingly, he remains in this case as an employee of the Rochester Police Department, for whom the City of Rochester is vicariously liable under settled New York law.

### B. Lapsed Deputization does not absolve municipal liability

Incredibly, the City now argues that it cannot be held liable because Arrowood was "participating" in a federal task force. The City cites no legal authority—because there is none—

for the proposition that a local officer whose deputization has lapsed should nonetheless be treated as a federal agent. Courts addressing task force liability uniformly reject that logic. In *Virgile v. City of New York*, the Eastern District held that municipal liability depends on whether the municipality retained control over its officer. Without a valid Westfall certification and absent clear proof that the officer had been detailed to exclusive federal service, the court refused to dismiss the City as a party. See *Virgile v. City of New York*, No. 23-CV-9482, 2025 WL 1248653, at *5–6 (E.D.N.Y. Apr. 30, 2025).

The same principle applied in *Guzman v. United States*, where the Southern District allowed state-law claims against the City to proceed despite the presence of a federal task force, holding that it would be premature to dismiss the City without discovery into whether it maintained control over its officers. *Guzman v. United States*, No. 11-CV-5834, 2013 WL 543343, at *9–10 (S.D.N.Y. Feb. 14, 2013).

Here, that question has already been answered. The City does not dispute that Arrowood's deputization was inactive and it has assumed full responsibility for defending and indemnifying him. That is the very definition of respondeat superior.

### C. State-Law Claims Against the City Under Respondeat Superior

The City does not dispute that it would be liable under respondeat superior for any tortious conduct by Investigator Arrowood committed within the scope of his City employment. Rather, the City argues that no such tort occurred, asserting that Arrowood played no meaningful role in planning or executing the warrant and had no physical contact with Mr. James.

As further detailed in Points II-IV, infra, that argument mischaracterizes both Arrowood's deposition testimony and the applicable standard. Arrowood was a sworn Rochester Police Department officer acting as part of a multi-agency task force. His active role in surveillance, his admitted failure to review or follow governing SOPs, and his inaction in the face of known risks

provide ample support for Plaintiff's negligence and failure-to-intervene claims. Because Arrowood was acting within the scope of his City employment, the City is vicariously liable for his conduct under settled New York law. See *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999). Whether his omissions breached the standard of care is a question for the jury—not a basis for dismissal at summary judgment.

## II. PLAINTIFF'S NEGLIGENCE CLAIMS AGAINST ARROWOOD AND THE CITY MUST PROCEED TO TRIAL (Ninth and Eleventh causes of action)

Plaintiff's Ninth and Eleventh Causes of Action assert common-law negligence against RPD Investigator Richard Arrowood, who personally participated in the Task Force planning and execution of the arrest warrant that resulted in Mr. James' death. Arrowood is directly liable for his individual negligent conduct, and the City of Rochester is vicariously liable for that conduct under the doctrine of respondeat superior.

To the extent the Amended Complaint asserts a negligent planning claim directly against the City of Rochester as a municipality, Plaintiff concedes the evidence does not support that theory of liability and agrees to dismiss that "*Ferreira*" claim—or the claim that alleges the City itself was negligent in the planning of the warrant. As this Court recognized in *James v. United States*, 2023 WL 3485695, at *8–9 (W.D.N.Y. May 11, 2023), and as Plaintiff explained in her opposition to the Government's motion for summary judgment, municipal liability under *Ferreira v. City of Binghamton*, 38 N.Y.3d 298 (2022), requires that the City itself assumed responsibility for designing and controlling the warrant operation. That is not the case here. Instead, it was the "Task Force", and all its individual members, that assumed responsibility for designing and controlling the warrant operation.

However, Arrowood—an active-duty RPD officer participating with members of the Task Force—engaged in individually negligent acts that contributed to Mr. James's death. Arrowood's

own testimony establishes that he failed to take even the most basic precautions required of an officer participating in a high-risk warrant operation. He admitted that effective warrant planning must include contingencies for resistance, escape, or surprise occupants. See Ex. C, Arrowood Dep. at 24:4–13, 27:13–25. He specifically acknowledged that it is often safer to apprehend a suspect outside their home, where they are less comfortable and less likely to react violently. *Id*. at 29:15–31:3. Yet Arrowood made no effort to advocate for those safer alternatives—despite being uniquely positioned to do so.

At the time of the operation, Arrowood was assigned to surveillance at the end of a one-way, dead-end street—an ideal position to consider, plan, and advocate for recommending a controlled vehicle stop of Mr. James. *Id*. at 44:19–20. He admitted that such a stop would have been ideal and that he "would have called it out" if James drove away. *Id*. at 56:12–57:6. But there is no evidence that he—or anyone else—discussed or considered that approach during the planning process. *Id*. at 56:12–20. In short, although Arrowood understood the tactical advantages of a safer alternative, he failed to propose it, failed to communicate it, and failed to act on it.

Arrowood also failed to follow or familiarize himself with the applicable Standard Operating Procedures (SOPs) governing fugitive apprehension. He did not know whether a written Operational Plan existed and had never seen the Enforcement Action Briefing—and he did not consider the Enforcement Action Briefing to be the formal Pre-Operational Plan. *Id*. at 25:13–26:17, 48:18–24; Ex. H, Enforcement Action Briefing. While he acknowledged that contingency planning is important for officer safety—including preparation for resistance, flight, or unexpected occupants—he failed to raise or advocate for any such planning. *Id*. at 24:4–13; 27:13–25. These failures breached the applicable standard of care for a sworn officer participating in a high-risk warrant operation.

He further violated the SOPs by failing to wear visible police identification, contrary to the clear directive that "[a]ll members of the arrest team will be appropriately identified as police officers: raid jackets, vests, neck badge, etc." See Ex. C at 62:7–12; Ex. D, USMS SOP, Sec IV A.1.b–c (Bates No. 00000942). He conducted no background investigation into Mr. James and knew almost nothing about him, despite testifying that such investigation is a critical element of warrant planning. See Ex. C at 22:12–23:17, 47:11–24; see also Ex. D, USMS SOP, Sec IV A.1.a.

Most tellingly, Arrowood confirmed that there was no comprehensive briefing, no assignment of tactical roles, and no formal leadership identified for the operation. Ex. C at 43:4–19. The approach to the residence was uncoordinated. Arrowood knew entry into a home carried heightened risk—yet he did nothing to raise objections, caution the team, or advocate for delay. *Id.* at 29:15–31:3.

These failures were not mere oversights. They were actionable breaches of duty by a sworn law enforcement officer who, by his own admission, understood the risks and knew the required safeguards—but ignored them. The absence of a formal operational plan, the failure to consider safer alternatives, and Arrowood's inaction in the face of those failures demonstrate negligence in both planning and execution. Because he acted within the scope of his City employment, the City is liable for his conduct under respondeat superior. See *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999). These claims are fully supported by the record and should proceed to trial.

### III. DEFENDANT CITY IS LIABLE FOR ARROWOOD'S FAILURE TO INTERVENE (Thirteenth cause of action)

#### A. Contrary to Defendant's assertion, New York recognizes a common-law failure to intervene claim

The City argues that the Thirteenth Cause of Action for failure to intervene must be dismissed because, in its view, "there is no such claim in New York for a 'failure to intervene.'"

ECF No. 60-9, page 7. This argument misstates settled New York law. Numerous courts—including the New York Court of Claims and the U.S. District Court for the Western District of New York—have held that a failure-to-intervene claim is actionable under New York common-law negligence principles.

In *Meeks v. City of Rochester*, Chief Judge Elizabeth A. Wolford rejected this same argument. The plaintiff in *Meeks* brought a state-law failure-to-intervene claim against several officers and the City of Rochester under a theory of respondeat superior. The City removed the case to federal court, contending that the claim was "really" a disguised § 1983 federal claim. Judge Wolford rejected that characterization and remanded the case, holding that "Plaintiff has chosen to pursue his failure to intervene claim under New York state law and the viability of that claim is a matter for the state court to determine." The court further explained that the complaint stated a cognizable negligence theory and that the City's attempt to transform it into a federal question was both jurisdictionally unsupported and legally incorrect. See *Meeks v. City of Rochester*, No. 6:22-cv-6163, 2022 WL 13789086, at *3 (W.D.N.Y. Oct. 24, 2022).

New York's Court of Claims has reached the same conclusion in multiple decisions. In *Stuart v. State of New York*, the court rejected the State's attempt to dismiss a failure-to-intervene claim on jurisdictional grounds. It held that, "[b]ased upon a liberal reading of the claim, the claim is not alleging a federal constitutional tort. Rather, the Court finds that the claim alleges that the State was negligent in its failure to intervene to prevent or to mitigate the attacks upon claimant." *Stuart v. State*, No. 142611, 2024 WL 5359943, 85 Misc.3d 1201(A), at *8 (N.Y. Ct. Cl. Dec. 12, 2024).

Similarly, in *Bowden v. State of New York*, the Court of Claims expressly rejected the State's argument that a failure to intervene claim could only be brought under 42 U.S.C. § 1983

and was therefore not cognizable in the Court of Claims. The State moved to dismiss the claim, asserting that it sounded in federal constitutional law, and not in New York tort law. But the court disagreed, holding that the negligent failure to intervene theory asserted by the claimants was properly grounded in New York common law. The court emphasized that "[t]he causes of action for negligent failure to intervene, and negligent hiring, training and supervision will not be dismissed at this juncture," and explicitly noted that the claim arose from allegations that correction officers failed to act despite having the opportunity and proximity to prevent ongoing assaults. *Bowden v. State*, No. 138757, 2024 WL 1733927, 82 Misc.3d 1232(A), at *5 (N.Y. Ct. Cl. Jan. 15, 2024).  In reaching this conclusion, the court sided with claimants' argument that the claim sounded in negligence, not constitutional law, and was therefore within the court's jurisdiction. It emphasized that at the pleading stage, the court must determine whether the facts "fit within any cognizable legal theory," and that failure to intervene is actionable under New York's settled law of torts where employees—such as corrections officers—have a duty to act to prevent foreseeable harm. The case is a direct repudiation of the argument advanced by the City here, that failure-to-intervene claims are not recognized under New York law.

In *Lumsden v. State of New York*, the Court of Claims again upheld a negligent failure-to-intervene claim over the State's objection that it failed to state a cause of action. The State had moved to dismiss on multiple grounds, including lack of jurisdiction and failure to plead sufficient facts. In particular, it challenged the viability of the failure-to-intervene claim, implicitly suggesting it was a constitutional tort that could not be heard in the Court of Claims. The court rejected that contention outright. Citing *Bowden* with approval, the court held that "the claim, which sets forth the date, time, location and the details of the attack upon claimant ... is sufficiently specific to state a cause of action alleging ... the failure to intervene." See *Lumsden v. State*, No.

141497, 2025 WL 1618752, at *4 (N.Y. Ct. Cl. Apr. 8, 2025). The court specifically credited allegations that correction officers were present, witnessed the assault, and failed to intervene despite hearing the claimant's screams and having the opportunity to prevent or mitigate the attack. It reaffirmed that such claims—although sometimes mislabeled as constitutional—are properly pled as common-law negligence under New York law and fall squarely within the jurisdiction of the Court of Claims. In doing so, *Lumsden* not only reinforces the holding in *Bowden* but also confirms that failure-to-intervene claims are actionable under state negligence principles where state employees fail to act despite proximity, knowledge, and a duty to intervene.

Together, these cases confirm that a failure-to-intervene claim is not some undefined or novel tort, but rather a well-established theory of liability grounded in New York's common-law duty of care. Courts evaluate such claims under ordinary negligence principles—namely, whether a government actor had a duty to act, the opportunity to intervene, and failed to take reasonable steps to prevent foreseeable harm.

Plaintiff's allegations satisfy that standard. Arrowood was present at the scene, understood the risks of rushing into a home to apprehend a potentially armed suspect, and knew that no operational plan or briefing had occurred. He did nothing to intervene or to propose safer alternatives. Whether that inaction constituted a breach of his duty is a question for the jury. But it is emphatically not a question of legal nonexistence.

The City's blanket assertion that such claims are "noncognizable" is flatly contradicted by the case law. The Thirteenth Cause of Action properly alleges that Arrowood negligently failed to intervene to prevent a foreseeable and preventable death. That claim is viable under New York law, and the City's motion to dismiss should be denied.

**B. Arrowood had a realistic opportunity to intervene and was obligated to do so**

17

Even applying federal elements of a failure-to-intervene claim, as suggested by Defendant, Arrowood's deposition shows he had a realistic opportunity to intervene:

1. **Knowledge of risk:** Arrowood recognized that forcing entry into a suspect's home posed lethal risks and that waiting outside could reduce those risks. See Ex. C at 29:15-23; 30:15-31:3. He admitted there was no operational plan and no discussion of alternatives, even though that was both a requirement and the norm as he understood it. *See id*. at 24:4-13; 27:13-25; 49:2-7; 50:4-6; 54:3-4. Arrowood believed it would have been better to arrest James after he left his residence, rather than after going inside. *See id*. at 56:17-20. Tragically, there is no evidence that he shared this belief.

2. **Ability to act:** As the surveillance officer positioned at the end of Vinewood Place—a short, one-way dead-end street—Arrowood had a clear line of sight on Mr. James's vehicle and radio communication with the Task Force. See Ex. B at 68:2–5; Ex. C at 52:17–53:7. He had "relieved" Ulatowski earlier that morning and assumed control of operational surveillance. Id. at 53:16–18. This position afforded him a uniquely advantageous perspective to observe if Mr. James exited the residence and to recommend a controlled traffic stop—an option Arrowood himself acknowledged would have been safer. Id. at 56:17–20. Given the layout of the street and the fact that there was only one direction in which James could drive, a vehicle stop would have been straightforward and low-risk. Arrowood was not only in the best position to recommend this alternative—he was the only Task Force member with sustained visual contact on the residence. His failure to propose this approach or caution the team against entry—despite knowing it was the safer course—constitutes a breach of his duty to act.

3. **Non-trivial lapse of time:** Surveillance occurred on the evening of September 14, 2021 and resumed on the morning of September 15, 2021. Arrowood thus had hours to evaluate the situation and propose a safer plan – particularly during the extended period where Ulatowski had left him in charge. His inaction meets the "realistic opportunity to intervene" requirement.

4. **Proximate cause:** Had Arrowood suggested a traffic stop, or waiting for Mr. James to exit the residence, the task force likely could have arrested Mr. James without forcing entry, eliminating the circumstances that led to the fatal shooting. The City's argument that Arrowood's actions had "nothing to do with Mr. James" ignores his role in shaping the tactical approach.

Accordingly, a jury could find that Arrowood had a realistic opportunity to prevent the harm and that he breached his duty by failing to do so.

## IV. ARROWOOD'S VIOLATIONS OF THE STANDARD OPERATING PROCEDURES CONSTITUTE EVIDENCE OF NEGLIGENCE AND COMPEL DENIAL OF SUMMARY JUDGMENT

Arrowood's violations of the USMS Standard Operating Procedures constitute compelling evidence of negligence and mandate denial of the City and Arrowood's motion for summary judgment. As Arrowood himself admitted, these SOPs are not mere suggestions but mandatory safeguards designed to prevent exactly the kind of avoidable tragedy that unfolded here. New York courts routinely deny summary judgment where, as here, officers violate their own departmental policies, guidelines, or SOPs—recognizing that such breaches provide direct proof that the conduct fell below accepted standards of reasonable police care. These internal rules are not abstract ideals; they codify proven, "good and accepted" protocols for minimizing risk and ensuring safety.

Deviations from them, like Arrowood's failure to plan, brief, or advocate for alternatives, create triable issues of fact as to whether he exercised due care—issues that a jury must resolve.

In *Lubecki v. City of New York*, 304 A.D.2d 224 (1st Dep't 2003), the Appellate Division affirmed a jury verdict against NYPD officers who violated internal guidelines during a hostage situation, resulting in the hostage's death. The Patrol Guide and related orders were admitted as evidence of the "established protocols and procedures" that defined what reasonable care required under the circumstances. *Id*. at 233–34. The court rejected the argument that the Patrol Guide imposed a higher duty, holding instead that such procedures define the contours of acceptable police conduct and that violations support liability under "ordinary standards of reasonable care." *Id*. at 235. The court emphasized that the officers' failure to follow hostage protocols—such as calling a negotiator, establishing firearms control, and refraining from firing when an innocent bystander was in jeopardy—precluded qualified immunity and created liability for negligence. *Id*. at 233–35. Lubecki underscores that when officers ignore mandatory safety protocols, courts must deny summary judgment to allow a jury to assess whether the deviation breached the duty of reasonable care.

This principle is echoed in other decisions denying summary judgment based on policy violations. In *Newsome v. County of Suffolk*, 109 A.D.3d 802 (2d Dep't 2013), the Second Department reversed summary judgment for police defendants where a K-9 unit dog bit the plaintiff during a search. The court held that questions of fact existed regarding whether the dog's handler acted consistently with acceptable police practice, particularly given evidence of potential violations of departmental procedures on canine use. *Id*. at 803. The court denied qualified immunity and summary judgment, reasoning that deviations from internal protocols raise triable issues of negligence, even where officers claim discretionary judgment. Similarly, in *Galapo v.*

*City of New York*, 219 A.D.2d 581 (2d Dep't 1995), the Second Department reversed summary judgment in a wrongful death case where a police officer accidentally shot his partner during an operation. The court held that alleged violations of the NYPD Patrol Guide on firearm use created triable issues, denying qualified immunity because such breaches demonstrate a failure to exercise reasonable discretion. *Id*. at 582–83. These cases illustrate that courts routinely deny summary judgment and qualified immunity when officers violate internal rules, as those violations provide evidence that the conduct fell below accepted police standards.

Federal courts applying New York law follow suit, denying summary judgment where policy violations suggest negligence. In *Rose v. City of Utica*, No. 6:14-CV-01256 (BKS/TWD), 2015 WL 13852450 (N.D.N.Y. Dec. 2, 2015), the district court denied summary judgment in an excessive force case involving a fatal police shooting of a suicidal teenager. The court held that allegations of the officer's failure to follow crisis intervention and active shooter protocols created triable issues of negligence, rejecting qualified immunity because the deviations indicated a lack of reasonable judgment. *Id*. at *10–11. The court emphasized that government immunity does not apply "where a police officer's actions are so unprofessional that they demonstrate a total failure to exercise reasonable discretion." *Id*. at *11 (internal quotation omitted).

The U.S. Supreme Court has also affirmed the relevance of internal policies in excessive force analyses. In *Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241–42 (2021), the Court vacated summary judgment for officers who applied prolonged pressure on a detainee's back, leading to asphyxiation, holding that "a police department's training, policies and 'well-known police guidance' are relevant to the consideration of whether police officers acted reasonably under the circumstances." Similarly, in *Brown v. City of New York*, 798 F.3d 94, 101 (2d Cir. 2015), the Second Circuit held that the NYPD's internal policies regarding officers' use

of pepper spray are directly relevant to the excessive force claim. *Brown*, 798 F.3d at 102 n.11 ("The dissent suggests that the Patrol Guide standard is not relevant because the excessive force standard derives from the Constitution. But the Supreme Court in *Tennessee v. Garner*, . . . considered police regulations of several jurisdictions in making a constitutional ruling on excessive force, and regulations of a single department have also been considered." (citations omitted)).

These decisions compel denial of summary judgment here. Arrowood admitted failing to comply with multiple mandatory SOP provisions, including requirements to: (1) conduct a background investigation, (2) formulate a written or checklist-structured operational plan, (3) review the Enforcement Action Briefing, (4) participate in a pre-operational briefing, (5) consider safer alternatives, and (6) wear visible police identification. See Ex. C at 19:18–20:20, 22:12–23:17, 25:9–26:25, 48:18–24, 62:7–12; Ex. D at IV.A.1.a-j. As in *Lubecki* and *Rose*, these violations—going to core safety protocols—create triable issues of negligence and preclude summary judgment, as they suggest a failure to exercise reasonable judgment. Arrowood confirmed the SOPs' purpose: to mitigate in-home arrest risks and protect civilians. *Id*. at 29:15–31:3. His testimony, like in *Brown* and *Lombardo*, acknowledges the standards but admits noncompliance, raising fact questions for a jury. Summary judgment must be denied.

## V.    PLAINTIFF'S CLAIM FOR WRONGFUL DEATH MUST PROCEED TO TRIAL (Tenth Causes of Action)

Plaintiff concedes that Investigator Arrowood had no physical contact with Mr. James and therefore does not oppose dismissal of the Twelfth Cause of Action for assault and battery against Arrowood or the City of Rochester.

However, the Tenth Cause of Action for wrongful death remains viable. Under New York law, a wrongful death claim may lie against a defendant whose negligent conduct was a proximate cause of the decedent's death—even if the defendant did not personally inflict the fatal blow. That

is precisely the theory asserted here: that Arrowood's negligence and failure to intervene foreseeably contributed to the circumstances that led to Mr. James's death.

Arrowood testified that it would have been "ideal" to apprehend Mr. James outside the home and that it is safer to do so because suspects are more dangerous when "comfortable" inside. See Arrowood Dep. at 29:15–31:3, 56:19–57:6. He further admitted that he was stationed on the street with the specific assignment to surveil the house—positioning that would have allowed him to alert the team and suggest a safer arrest method. *Id*. at 44:19–20. Yet he did not do so. He failed to communicate any safety concerns, failed to raise contingency alternatives, and failed to object to the rapid entry plan that ultimately resulted in a fatal confrontation.

Arrowood's inaction forms the basis of a valid negligence theory. As the Court of Claims explained in *Stuart v. State*, negligent failure to intervene may constitute actionable tortious conduct under New York law—even in the absence of direct physical force. See *Stuart v. State*, *supra.*

Because Arrowood was acting within the scope of his employment with the Rochester Police Department at all relevant times, the City of Rochester is vicariously liable for his tortious conduct under the doctrine of respondeat superior. See *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999).

Accordingly, the wrongful death claim against Arrowood and the City should proceed to trial.

## **CONCLUSION**

For the foregoing reasons, the City of Rochester's motion for summary judgment should be denied in part and granted in part. Plaintiff does not oppose dismissal of the Twelfth Cause of

Action (assault and battery) as to Investigator Richard Arrowood and the City, based on the undisputed fact that Arrowood had no physical contact with Mr. James.

However, genuine issues of material fact preclude summary judgment on all remaining claims. The Ninth, Tenth, Eleventh, and Thirteenth Causes of Action—for negligent planning, wrongful death, negligence, and failure to intervene—are properly asserted against Arrowood in his individual capacity and against the City of Rochester under respondeat superior. Arrowood was a Rochester Police Department officer, not a deputized federal agent. He was acting within the scope of his duties. The City's own brief concedes that his deputization had lapsed. The United States declined to certify or defend him. The City is thus vicariously liable for his tortious acts.

Arrowood admitted that proper warrant planning requires briefing, role assignments, background investigation, and contingency options—none of which occurred. He acknowledged that waiting to arrest a suspect outside may reduce risks and that no written or verbal plan was ever shared with him. Despite his assigned surveillance role and his knowledge of the risks, Arrowood failed to suggest or advocate for any alternative to forced entry. That inaction—contrary to his training, the SOPs, and his own testimony—breached his duty of care and contributed to the fatal outcome. As affirmed in *Lubecki, Newsome, Galapo,* and *Rose*, violations of internal SOPs like these constitute evidence of negligence, creating triable issues of fact and precluding summary judgment on negligence claims.

The City's categorical assertion that New York does not recognize a negligent failure-to-intervene claim is incorrect. As numerous decisions have held, including Meeks v. City of Rochester, Stuart v. State, Bowden v. State, and Lumsden v. State, such claims are firmly grounded in New York common law and require factual development—not dismissal.

Because material factual disputes remain concerning Arrowood's conduct, omissions, and knowledge, including his violations of SOPs that reflect accepted police standards under Lubecki and progeny, and because he was a City employee acting within the scope of his duties, Plaintiff's claims for negligence, wrongful death, and failure to intervene must proceed to trial. Denial of summary judgment is required to allow a jury to evaluate these breaches as evidence of negligence.

Dated: July 28, 2025          Roth & Roth, LLP
       New York, New York

                                    ~//s//~
                              Elliot Dolby Shields